# Exhibit – C / Transcripts

Case 2:28-cv-04498-PA   Document 13-5   Filed 06/05/23   Page 2 of 786   Page ID #:490
Case 2:16-cr-00215-PA   Document 83-5   Filed 07/20/17   Page 2 of 786   Page ID #:444

1

```
 1                UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3            HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

 4

 5    UNITED STATES OF AMERICA,

 6                 Plaintiff,

 7         vs.                           Case No. CR-16-215-PA

 8    MICHAEL MIRANDO,

 9                 Defendant.
                                     /
10

11

12            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                              VOIR DIRE
13                    TUESDAY, APRIL 25, 2017
                            8:30 A.M.
14                    LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22    _____

23           TERRI A. HOURIGAN, CSR NO. 3838, CCRR
                FEDERAL OFFICIAL COURT REPORTER
24             350 WEST FIRST STREET, ROOM 4311
              LOS ANGELES, CALIFORNIA  90012
25                     (213) 894-2849
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 3 of 786   Page ID #:445
Case 2:18-cr-00123-PA   Document 83-5   Filed 07/20/19   Page 2 of 7   Page ID #:491

2

1              **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         EILEEN DECKER
          United States Attorney
5         BY:  MICHAEL FREEDMAN
              KATHERINE RYKKEN
6               Assistant United States Attorney
          United States Courthouse
7         312 North Spring Street
          Los Angeles, California  90012
8

9

     **FOR THE DEFENDANT MICHAEL MIRANDO:**
10

          LAW OFFICES OF KEVIN BARRY MCDERMOTT
11        BY:  KEVIN B. MCDERMOTT
              Attorney at Law
12        300 Spectrum Center Drive, Suite 1420
          Irvine, California 92618
13

14

     ALSO PRESENT:  Special Agent Kathleen Kennedy
15

16

17

18

19

20

21

22

23

24

25

1           **LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 25, 2017**

2                          **8:30 A.M.**

3                          --oOo--

4                  (Court called to order)

5           THE COURTROOM DEPUTY:  Please be seated and come to

6  order.

7      Item 1, *CR-16-215, United States of America versus Michael*

8  *Mirando.*

9      Counsel, please state your appearances.

10          MR. FREEDMAN:  Good morning, Your Honor.  Michael

11  Freedman and Katherine Rykken on behalf of the United States,

12  and with us at counsel table is Kathleen Kennedy with the

13  Federal Bureau of Investigation.

14          MR. MCDERMOTT:  Good morning.  Kevin McDermott on

15  behalf Mr. Mirando, who is present.  And also I have my

16  paralegal from my office, Ms. Elise MacNamara, who will be with

17  me today on the jury selection.

18          THE COURT:  Good morning.

19          MR. MCDERMOTT:  Thank you, sir.

20          THE COURT:  Has each side provided the clerk with a

21  list of potential witnesses?

22          MR. FREEDMAN:  Yes, Your Honor, we have.

23          MR. MCDERMOTT:  Yes, sir.

24          THE COURT:  What's the government's current estimate

25  as to how long it's going to take to put on its case?

Case 2:23-cv-04498-PA   Document 3-5   Filed 06/05/23   Page 5 of 786   Page ID #:493
Case 2:18-cr-00123-PA   Document 83-5   Filed 07/20/07   Page 4 of 790   Page ID #:447

4

1         MR. FREEDMAN:  We currently estimate three to five

2    days.

3         THE COURT:  Okay.  We're going to impanel two

4    alternates, and is everybody in agreement that we could tell

5    the jury that we anticipate that this case will be concluded by

6    Tuesday or Wednesday of next week?

7         MR. FREEDMAN:  Yes, Your Honor.

8         THE COURT:  I ask that the government, prior to

9    taking any evidence of the case, provide the clerk with an

10   electronic version of its exhibit list.

11        MR. FREEDMAN:  We will do that, Your Honor.

12        THE COURT:  If you intend to impeach a witness with

13   grand jury testimony, or some other sworn testimony, just give

14   us the page, the line number, so that the other side has an

15   opportunity to review it.

16        I will ask if they have any objections, and then simply

17   read -- assuming there is no objection -- then simply read that

18   portion of the testimony.  There is no follow-up and that's it.

19        When we seat the jury, Juror No. 1 is going to be on the

20   first row in the seat closest to me.

21        Then Juror Number 7 will take the first seat on the second

22   row closest to me.

23        If you have a preemptory challenge as to any of the

24   jurors, before you announce your preemptory challenge, meet and

25   confer with the other side so if there is going to be a motion

Case 2:23-cv-04498-PA   Document 3-5   Filed 06/05/23   Page 6 of 786   Page ID #:494
Case 2:18-cr-00123-PA   Document 83-1   Filed 07/20/07   Page 3 of 79   Page ID #:448

5

 1    with regard to that preemptory, we will take that up at

 2    sidebar.

 3         Okay.  There is no food or coffee allowed in the

 4    courtroom.

 5         Please don't address the jurors or the witnesses.  You

 6    don't need to say good morning to the witness.  I will take

 7    care of that.

 8         Don't thank the witness following an answer.  Thank the

 9    Court.

10         There are no speaking objections.  Just tell me what the

11    evidentiary basis is, and I will rule it.

12         If I want to hear from somebody I will ask -- I will take

13    you to sidebar.

14         If you want -- if you want a sidebar, you can ask, you may

15    not get it.  We will take it up at the next recess.

16         Okay.  Has -- have you received the background

17    questionnaires?

18              MR. FREEDMAN:  Yes, Your Honor.

19              MR. MCDERMOTT:  Yes, Your Honor.

20              THE COURT:  Any objections to the background

21    questionnaire?

22              MR. MCDERMOTT:  Not by defense, sir.

23              MR. FREEDMAN:  No, Your Honor.

24              THE COURT:  Have you received the criminal case

25    questionnaire?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 3-5   Filed 06/05/23   Page 7 of 786   Page ID #:449
Case 2:18-cv-00213-PA   Document 83-1   Filed 07/20/17   Page 6 of 79   Page ID #:498

6

1          MR. FREEDMAN:  Yes, Your Honor.

2          MR. MCDERMOTT:  Yes, sir.

3          THE COURT:  Do you have any objections or

4    suggestions to any of those questions?

5          MR. FREEDMAN:  One suggestion, Your Honor, 26

6    pertains to recordings of conversations.

7       The government doesn't have any recordings of

8    conversations so we may not need that one.

9          THE COURT:  All right.  Anything else we need to

10   take up before we bring the panel in?

11         MR. FREEDMAN:  Your Honor, one item with respect to

12   exhibits.  The parties filed a stipulation regarding the

13   majority of exhibits as to examination, authenticity, and

14   admissibility, and particularly, there is a handful of summary

15   charts and other records that the case agent will testify to.

16      The case agent will be testifying last, so we would like

17   to show some of those exhibits to other witnesses before the

18   case agent has testified.

19      I have a list here if the Court would be willing to

20   entertain a motion to pre-admit those exhibits.  I could give

21   the Court the numbers.

22         THE COURT:  Okay.  Do you have any objection?

23         MR. MCDERMOTT:  Sir, the only reason that they are

24   allowed to come in is under 1001.

25      I would object, without the agent first identifying what

App. 0418            **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 3-5   Filed 06/05/23   Page 8 of 786   Page ID #:450
Case 2:18-cr-00123-PA   Document 83   Filed 07/20/19   Page 7 of 90   Page ID #:490

7

1    the documents are.

2        I don't want witnesses addressing documents that really

3    need to be described and understood by the jury through the FBI

4    agent.

5              THE COURT:  What are the exhibit numbers?

6              MR. FREEDMAN:  Exhibit 8 is a summary chart of

7    Holter Lab orders that were placed with Datrix.  They would

8    intend to show that to the the witness from Datrix, Jon Barron.

9        Then there is a summary chart for each of the four patient

10   beneficiaries showing the claims that were made in the

11   beneficiaries' name.

12             THE COURT:  What are the numbers?

13             MR. FREEDMAN:  36, 50, 62.

14             THE COURT:  One second.  36, 50?

15             MR. FREEDMAN:  62, and 77.

16             MR. MCDERMOTT:  If I may interrupt, as to those he

17   has identified, I don't have any objection as to those specific

18   witnesses going through them, as long as those are the

19   witnesses that go through those documents.

20             THE COURT:  Okay.  All right.  So what we will do is

21   we will provisionally admit those.

22             MR. MCDERMOTT:  Thank you.

23             MR. FREEDMAN:  Thank you, Your Honor.

24             THE COURT:  Anything else?

25             MR. FREEDMAN:  No, Your Honor.

App. 0419

**UNITED STATES DISTRICT COURT**

```
 1              MR. MCDERMOTT:  No, sir.

 2              THE COURT:  Has the government provided the defense

 3    with a list of names of witnesses it intends to call today?

 4              MR. FREEDMAN:  Yes, Your Honor.

 5              MR. MCDERMOTT:  They did, Your Honor.

 6              THE COURT:  Who are those witnesses?

 7              MR. FREEDMAN:  Potentially up to four depending on

 8    timing.  The first witness will be Jon Barron  of Datrix.

 9         Most likely the second witness will be the first patient

10    beneficiary, John Hattrup.

11         It's slightly possible there may be a scheduling issue

12    with Mr. Hattrup's work schedule, in which case, we would go to

13    witnesses 3 and 4, Dr. Joy, and Dr. Richmond.

14              THE COURT:  Okay.  And both sides have -- well, let

15    me just say, I want to make sure that both sides are -- have

16    carefully thought out their options and concluded that this is

17    what they want to do, because once this train gets moving, it's

18    kind of hard to stop it, and the decisions that are made today

19    are going to probably have life-altering consequences.

20         So, I want to make sure everybody has clearly thought this

21    out, that this is what they want to do, and if it is, that is

22    fine.  That is why we are here.

23              MR. MCDERMOTT:  I would just like to say, Your

24    Honor, as we indicated to you at the very start of the case,

25    there was about 60,000 pages of discovery.
```

**UNITED STATES DISTRICT COURT**

1      Sometimes the drawback on having a relatively quick trial

2   date is to really have to crunch hard and go through the

3   numbers and go through all of the documents, which we have

4   done.

5      This would have been something that had we all sat down

6   previously, there might have been some negotiation process that

7   would take place.

8      The circumstances -- the events that have gone on in this

9   case, have not prevented it -- it just wasn't an offer that

10  made a lot of difference, to be honest with you, Your Honor.

11     So the decision is being made because, you know, it's

12  between a rock and a hard place.  We are here.

13           THE COURT:  Okay.  That's fair.  I want to make sure

14  everybody knows what they have signed up for.

15     All right.  We're going to bring down a panel.  We're

16  probably going to put the panel over here on my right side in

17  the back of the courtroom.

18           MR. FREEDMAN:  Your Honor, our trial cart is over

19  there, would you prefer us over there?

20           THE COURT:  No, that is fine.

21     All right.  If either side is going to have spectators

22  here that are affiliated with one side or the other, I want to

23  make sure that both sides remind them about the decorum here in

24  the courtroom.

25     They sit there with a poker face, don't -- no outbursts --

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 11 of 786   Page ID #:459
Case 2:16-cr-00225-PA   Document 83   Filed 07/20/15   Page 108 of 179   Page ID #:453

10

```
 1   don't make faces about testimony.
 2        Okay.  Anything else?
 3        I'm going to ask the clerk to go ahead and call the panel
 4   down, and we will come back out and we will get started as soon
 5   as they are here.
 6        It's probably going to take 15 or 20 minutes for the panel
 7   to be brought up.
 8        I'm going to ask anybody that is seated on the right side
 9   of the courtroom if you could go over to the left side, and we
10   will probably need the first two rows over on the left side.
11        We will ask all of the spectators who are not potential
12   jurors, once the panel comes down, if you could move to the
13   rear of the courtroom on the left side.
14        All right.  Thank you very much.
15            THE COURTROOM DEPUTY:  All rise.
16        This Court now stands in recess.
17                         (Recess.)
18            THE COURTROOM DEPUTY:  All rise for the jury.
19        You may be seated.
20        Ladies and gentlemen, would you please rise and raise your
21   right hand.
22        Do you solemnly swear that you will make true answers to
23   such questions as may be put to you, touching upon your
24   qualifications to serve as jurors upon the trial of the cause
25   now before this Court, so help you God?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 12 of 786   Page ID #500
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/17   Page 11 of 79   Page ID #:454

11

```
 1              PROSPECTIVE JURORS:  I do.

 2              THE COURT:  You may be seated.

 3         Please be seated and come to order.

 4         Item No. 1, CR-16-215, United States of America versus

 5    Michael Mirando.

 6         Counsel, please state your appearances.

 7              MR. FREEDMAN:  Good morning, Your Honor.  Michael

 8    Freedman and Katherine Rykken on behalf of the United States.

 9              THE COURT:  Good morning.

10              MR. MCDERMOTT:  Good morning, sir.  Kevin McDermott

11    on behalf of Mr. Mirando, who is present, along with my

12    paralegal assistant, Elise MacNamara.

13              THE COURT:  Good morning.

14         Members of the panel, good morning.

15         I'm Judge Percy Anderson, and I would like to welcome you

16    to this courtroom.

17         We're here this morning for the important task of

18    selecting a jury to try a criminal case.

19         We rely on juries in this country to decide cases tried in

20    our courts, so jury service is an important duty of

21    citizenship.

22         Jurors must conduct themselves with honesty, integrity,

23    and fairness.

24         Under our system of justice, the role of the jury is to

25    find the facts of the case based on the evidence presented in
```

```
 1    the trial.  That is, from the evidence seen, and heard in

 2    Court, the jury decides what the facts are, and then applies to

 3    those facts the law that I will give in my instructions to the

 4    jury.

 5         My role, as the trial judge, is to make whatever legal

 6    decisions must be made during the trial and to explain to the

 7    jury the legal principles that then guide its decisions.

 8         As you probably know, at the beginning of any Court case,

 9    the first step involves a selection of jurors who are going to

10    hear the case.

11         During this process, I will be asking you questions.  It

12    provides the Court and the lawyers with an opportunity to

13    inquire into your background, experience, and state of mind, to

14    determine whether you are qualified to be a juror in this case.

15         Now, "qualified" simply means you can be fair and

16    impartial; that you can decide this case based on the evidence

17    presented in this courtroom and on nothing else.

18         Please keep in mind, that during this process, there is no

19    such thing as a right or wrong answer, only answers that are

20    complete or incomplete.  Err on the side of giving too much

21    information.

22         In this case, you will be sitting as judges of the facts.

23         All parties have a right to expect that you will perform

24    your role fairly and impartially, and not because of any bias

25    or prejudice you bring into this courtroom.
```

App. 0424

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 14 of 786   Page ID #:502
Case 2:18-cr-00423-PA   Document 83-5   Filed 07/20/15   Page 130 of 75   Page ID #:456

13

 1        If there is any reason why any of you might be biased or

 2   prejudiced in any way, you must disclose such reasons when you

 3   are asked to do so.

 4        It's your duty to make this disclosure.

 5        In giving you these admonitions, I want to make it clear

 6   that I have no intention of trying to embarrass anyone or to

 7   invade your privacy or the privacy of any of your family

 8   members or close personal friends.

 9        If you have something that you think that the lawyers and

10   I should know, but you do not wish to discuss it in the

11   presence of the entire panel in open Court, please let me know,

12   and we can discuss that matter at sidebar outside the presence

13   of the other jurors.

14        This is a criminal case entitled, the *United States of*

15   *America versus Michael Mirando*.

16        To begin this process, I would like to introduce you to

17   the parties, and counsel in this matter.

18        I'm going to ask government counsel to stand and introduce

19   themselves and anyone seated at counsel table to the

20   prospective jurors.

21        MR. FREEDMAN:  Good morning.  My name is Michael

22   Freedman.  I'm the Assistant United States Attorney.

23        MS. RYKKEN:  Good morning.  My name is Katherine

24   Rykken.  I'm also an Assistant United States Attorney, and

25   sitting with us at counsel table is Kathleen Kennedy, who works

App. 0425              **UNITED STATES DISTRICT COURT**

Case 2:23-cr-04498-PA   Document 1-5   Filed 06/05/23   Page 15 of 786   Page ID #503
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/15   Page 14 of 79   Page ID #:457

14

 1    with the FBI.

 2              THE COURT:  All right.  Thank you.

 3         Is there any member of the jury panel who is acquainted

 4    with or have seen counsel or the agent or who may have heard

 5    their names prior to today?

 6         If your answer is yes, please raise your hand.

 7         All right.  Let the record reflect that no hands were

 8    raised.

 9         Would counsel stipulate that I do not have to note for the

10    record there were no hands raised in response to my future

11    questions?

12              MR. MCDERMOTT:  Yes, Your Honor.

13              MR. FREEDMAN:  Yes, Your Honor.

14              THE COURT:  I'm going to ask defense counsel to

15    stand and introduce themselves, and the defendant as well as

16    anyone else seated at counsel table to the prospective jurors.

17              MR. MCDERMOTT:  Thank you, sir.  Kevin McDermott on

18    behalf of Mr. Michael Mirando.  With me today, I also have my

19    assistant, Elise MacNamara.

20              THE COURT:  Thank you.

21         Is there any member of the jury panel, who is acquainted

22    with or has seen counsel or acquainted with the defendant or

23    who may have heard their names prior to today?

24         If your answer is yes, please raise your hand.

25         (No response.)

App. 0426                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 16 of 786   Page ID #:504
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/15   Page 1901 of 9   Page ID #:458

15

```
 1        Do any of you or any members of your family know or have

 2   any kind of relations with me?

 3        During the trial of this case, the following persons may

 4   be called as witnesses.  I'm going to have the clerk read the

 5   names of the prospective witnesses.

 6           THE COURTROOM DEPUTY:  Jon Barron , John Hattrup,

 7   Ronald D. Richmond, Gregory Joy, Martha Bennett, Suzanne

 8   Darsow, Lisa Solmor, Ruby Simpkins, Robyn Consiglio, Stacey

 9   Foster-Sixtos, Jeffrey Globus, Emily Russell, Stanton Crowley,

10   Kathleen Kennedy.

11           THE COURT:  Have any of you heard of or otherwise

12   been acquainted with any of the witnesses just named that you

13   believe would affect your ability to be a fair and impartial

14   juror in this case, or make it difficult for you to be a fair

15   and impartial juror?

16        Just raise your hands.

17        You should note that the parties are not required and

18   might not wish to call all of these witnesses and they may find

19   it necessary later to call other witnesses.

20        This is a case in which a defendant is charged with 15

21   counts of healthcare fraud.

22        The government alleges that from January of 2005, to April

23   of 2016, the defendant engaged in a scheme to defraud health

24   insurance companies.

25        The defendant was a member and the owner of Holter Labs,
```

App. 0427                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 17 of 786   Page ID #:509
Case 2:18-cv-00215-PA   Document 83   Filed 07/20/15   Page 18 of 79   Page ID #:509
#:459

16

1    LLC which was formed in 2005.

2         Holter Labs provided cardiovascular monitoring services to

3    doctors.

4         Holter provided a digital recorder to doctors for use on

5    their patients.

6         The recorder, is a portable device that monitors

7    cardiovascular activity for 24 or 48 hours.

8         The device records electrical signals from the heart via a

9    series of electrodes attached to the chest.

10        The most common use of the Holter recorder is to monitor

11   heart activity for electrocardiography, or an ECG.

12        Defendant alleges defendant fraudulently billed insurance

13   companies using medical codes.  These codes are used by

14   healthcare service providers in medical billing.

15        The defendant is charged with using these codes to

16   fraudulently bill insurance companies.

17        The defendant denies these allegations.

18        The charges against the defendant are contained in an

19   indictment.

20        The indictment is simply the description of the charges

21   made by the government against the defendant.  It is not

22   evidence of anything.

23        To these charges, the defendant has pled not guilty, and

24   it will be the question of his guilt or innocence to the

25   charges that you will be asked to decide if you are selected a

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 18 of 786   Page ID #:500
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/17   Page 1001 of 9   Page ID #:500
#:460

17

1    trial juror in this case.

2        I'm going to ask the clerk to call the names of 12

3    prospective jurors.

4        As your name is called, please come forward and take your

5    seat in the jury box as the clerk directs.

6        Prospective Juror No. 1, should take the seat closest to

7    me on the first row.

8        And the next prospective juror takes the next seat, until

9    the first six seats on the first row are filled.

10        Prospective Juror Number 7, takes the first seat on the

11   second row, closest to me, and the next prospective juror takes

12   the next seat until six seats are filled on the second row.

13        All right.  I'm going to ask the clerk to call the names

14   of the 12 prospective jurors.

15            THE COURTROOM DEPUTY:  Juror No. 1, John Adler.

16       Juror No. 2, Steve Diaz.

17       Juror No. 3, Hazel Prado.

18       Juror No. 4, Christina Arellano.

19       Juror No. 5, Charles Green.

20       Juror No. 6, Jordan Gottfried.

21       Juror No. 7, Adam Lawrence.

22       Juror No. 8, Matthew Khokhar.

23       Juror No. 9, James Bull.

24       Juror No. 10, Susan McDonald.

25       Juror No. 11, Brenda Sniderhan.

**UNITED STATES DISTRICT COURT**

```
 1         Juror Number 12, Cuong Tran.

 2         THE COURT:  All right.  Ladies and gentlemen, I'm going to

 3    continue asking questions of other prospective jurors seated in

 4    the jury box, but these questions are directed to all of the

 5    jurors in the courtroom, because if any of the prospective

 6    jurors seated in the jury box are excused, a replacement will

 7    be called, and I will ask that person without repeating all of

 8    the prior questions, whether any of those questions pertain to

 9    him or her.

10         Therefore, it is important that each of you listen

11    carefully to the questions I will be asking, and keep in mind

12    any of which call for an affirmative answer or other

13    explanation on your part.

14         In that way, if you are called to the jury box, I won't

15    have to repeat each of the questions to you.

16         Now, it's important that all of you remain in the

17    courtroom during the questioning of jurors in the jury box.

18         So if you are called to replace a juror, you will have

19    heard all of the Court's questions.

20         Now, we will take a break this morning, but until we take

21    our break, you are all to remain in the courtroom.

22         When we do take our break this morning, you are not to

23    discuss this case with anyone, including your fellow jurors,

24    members of your family, people involved in the trial, or anyone

25    else.  And you are not allowed to permit others to discuss the
```

1    case with you.

2         This admonition is communicating -- includes communicating

3    by e-mail, using social networking sites such as blogs,

4    MySpace, Facebook, or Twitter.

5         If anyone approaches you and tries to talk with you about

6    this case, please let me know about it immediately.

7         Do not read any news stories or listen to any radio or

8    television reports about the case or about anyone who has

9    anything to do with it.

10        Do not do any research such as consulting dictionaries,

11   searching the Internet or using other reference materials, and

12   do not make any investigation about the case on your own.

13        If you need to communicate with me, simply give a signed

14   note to the clerk to give to me.

15        And most importantly, do not make up your mind about what

16   your verdict should be until after you have gone to the jury

17   room to decide the case, and you and your fellow jurors have

18   discussed the evidence.

19        Keep an open mind until then.

20        Now, the people seated in the jury box, having heard the

21   charges which have been filed against the defendant, is there

22   any member of the jury seated in the jury box who feels that he

23   or she cannot give the government or the defendant a fair trial

24   because of the nature of these charges?

25        Just raise your hand.

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 21 of 786   Page ID #:509
Case 2:16-cr-00415-PA    Document 83    Filed 07/20/15    Page 200 of 795   Page ID #:463

20

1    The fact that the defendant is in Court for this trial for

2    the charges that have been brought against him is no evidence

3    whatsoever the defendant's guilt.

4        Jurors are to consider only evidence properly received in

5    the courtroom in determining the guilt or innocence of the

6    defendant.

7        Unless and until this is done, the presumption of

8    innocence prevails.

9        Have any of you seated in the jury box either seen, read,

10   or heard anything about this case or have any of you heard

11   anyone express an opinion about the case or anyone who has

12   anything to do with it?

13       Is there anything about the nature of these charges that

14   would prevent you from being a fair and impartial juror?

15       Do any of you have any personal philosophical or

16   ideological views about the healthcare laws of the United

17   States that would make it difficult for you to act fairly and

18   impartially in this case?

19       Do any of you have any beliefs or feelings about the

20   parties, the lawyers, or witnesses that would make it

21   impossible or difficult for you to act fairly and impartially,

22   both as to defendant and the government?

23       Have any of you ever been involved in, seen, heard, or

24   read anything about criminal prosecutions that would cause you

25   to question your ability to be a fair and impartial juror?

App. 0432    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 22 of 786   Page ID #:510
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/17   Page 20 of 75   Page ID #:464

21

1    Do any of you have any beliefs or feelings toward the law

2    in general or healthcare, specifically, that would make it

3    impossible or difficult for you to act fairly and impartially

4    as to both parties in this case?

5    Let me also ask if any of you have any special

6    disabilities, medical problems, difficulties with language,

7    that you believe would impair your ability to devote your full

8    attention to the evidence in this case?

9    All right.  Sir, I'm going to ask on the first row, if you

10   would step down, and walk all the way around, and join us over

11   here at sidebar.

12                    (Side begins.)

13           THE COURT:  If would you stand right here, please.

14           PROSPECTIVE JUROR:  All right.

15           THE COURT:  And I'm sorry, if you would just wait

16   for us.

17   Okay.  If would you keep your voice down, and do you have

18   any health problem?

19           PROSPECTIVE JUROR:  Well, my lower back has been

20   wrecked for a long time.  I have a difficult time sitting for

21   extended periods of time.

22   But, you know, I'm just saying that, you know, I've also

23   had some health issues with my heart and stuff.  I had an

24   ablation on my heart about a month ago.

25   You know, I don't know how long it's going to last, but if

1    I'm able to stand up or move around.

2            THE COURT:  You can stand up any time you want.

3    Okay.

4            PROSPECTIVE JUROR:  That would be my major concern.

5    I'm 66 years old.  Healthcare is a big subject in my life, and

6    you know, there is a lot of things -- your questions are so

7    general, I mean, do I know policemen or do I know -- you know.

8            THE COURT:  Uh-huh.  Well, we will get into all of

9    that.

10        If at any time you feel that you need to tell us

11   something, just let us know.

12           PROSPECTIVE JUROR:  Okay.

13           THE COURT:  Thank you.  If you could resume your

14   seat.

15           PROSPECTIVE JUROR:  Thank you.

16           THE COURT:  Prospective Juror Number 12, if you

17   could join us, please.

18        Okay.  If you could stand right here, and if you could

19   just keep your voice down.

20        And what did you want to tell us?

21           PROSPECTIVE JUROR:  I want to tell you my English is

22   not my language, so I'm not sure I want to proceed as a juror

23   in this case.

24           THE COURT:  Okay.  What do you do for a living?

25           PROSPECTIVE JUROR:  Unfortunately -- I am not

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 24 of 786   Page ID #:512
Case 2:10-cv-00225-PA   Document 83   Filed 07/20/15   Page 23 of 75   Page ID #:466

23

```
 1    working.
 2              THE COURT:  Are you working right now?
 3              PROSPECTIVE JUROR:  Not yet.  I'm a student.
 4              THE COURT:  What school do you go to?
 5              PROSPECTIVE JUROR:  Evans Community Adult School.
 6              THE COURT:  Okay.  Were you able to read the
 7    questionnaires?
 8              PROSPECTIVE JUROR:  Yes, I did.
 9              THE COURT:  Were you able to understand those
10    questions?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  Is there anything I have talked about
13    thus far you have difficulty understanding?
14              PROSPECTIVE JUROR:  Yes, I have.
15              THE COURT:  Okay.  If you would have a seat on that
16    second row for just a moment.
17              PROSPECTIVE JUROR:  Okay.
18              THE COURT:  Okay.  Sir, just right there for a
19    second.
20         I guess I had a little difficulty understanding him.
21         Do you have any -- if you want to keep him for a while,
22    that is fine.  If you don't have any objection, I will excuse
23    him.
24              MR. MCDERMOTT:  No objection.
25              MR. FREEDMAN:  No objection.
```

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 25 of 786   Page ID #513
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/17   Page 24 of 79   Page ID #:467

24

1          THE COURT:  Okay.  I'm going to ask you return up to

2     the jury assembly room on the first floor.

3          PROSPECTIVE JUROR:  Okay.

4          THE COURT:  Just tell them you have been excused.

5          PROSPECTIVE JUROR:  Thank you, sir.

6          THE COURT:  All right.

7                    (Sidebar ends.)

8          THE COURT:  All right.  I'm going to ask the clerk

9     to call the name of another prospective juror.

10         THE COURTROOM DEPUTY:  Bryan Young.

11         THE COURT:  Sir, did you hear the questions that I

12    asked earlier this morning?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Is there anything that I have inquired

15    about that in good conscience you should disclose to us?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Anything about the nature of these

18    charges that cause you to have any concerns about your ability

19    to be a fair and impartial juror?

20         PROSPECTIVE JUROR:  I have been in healthcare for

21    16 years.

22         THE COURT:  Okay.  Well, we will get into that a

23    little -- more a little later when we talk to you individually.

24      Is there anything that would cause you to have concerns

25    considering your involvement in healthcare, that caused you to

**UNITED STATES DISTRICT COURT**

```
 1    have any doubts about your ability to be fair and impartial to

 2    both sides?

 3                PROSPECTIVE JUROR:  I don't believe so.

 4                THE COURT:  Okay.  We will have some further

 5    conversations and explore that.  Thank you.

 6        Okay.  Are any of the jurors seated in the jury box taking

 7    any medication that would make it difficult for you to give

 8    your full attention to the evidence in this case?

 9        As a juror you are obligated to follow the law given to

10    you by the Court.

11        Is there anyone who would be unwilling or unable to follow

12    the law given in the Court's instructions disregarding your own

13    notions or ideas of what the law is or ought to be?

14        One important task of the jury is to listen to the

15    testimony of various witnesses, and to decide how much or how

16    little weight the testimony should be given.

17        Would any of you be unable or unwilling to perform this

18    task?

19        Does anybody seated in the jury box know anyone else

20    seated in the jury box?

21        Take a look at each other.

22        I take it you are a complete set of strangers.

23        Now ladies and gentlemen, I recognize that jury service is

24    probably an inconvenience for you, taking you away from your

25    jobs and family and disrupting your daily routine.
```

App. 0437                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 27 of 786   Page ID #:515
Case 2:18-cr-00215-PA   Document 63   Filed 07/20/15   Page 26 of 79   Page ID #:469

26

 1      It is, however, one of the most important duties that

 2  citizens of this country are called upon to perform.

 3      And for this reason, I know you will not take this duty

 4  lightly.

 5      Now, we expect the presentation of all phases of this

 6  case, including the opening statements, the presentation of the

 7  evidence, the arguments of counsel, and the Court's

 8  instructions, will last somewhere in the neighborhood of five

 9  days, plus your deliberations.

10      Now our daily schedule will normally be from 8:00 a.m. to

11  1:30 with two short breaks.

12      So we're going to be done, except for today -- we're going

13  to be done every day at 1:30.

14      Now today we're going to meet until noon.

15      We will take a lunch break, we will resume at 1:30 and we

16  will continue until 5:00.

17      So that we expect that all aspects of the case would

18  conclude by Tuesday -- Wednesday at the latest of next week,

19  with the case then being submitted to the jury for its

20  deliberations.

21      During deliberations, your hours will change.  You will

22  deliberate from 8:00 a.m. to 3:30, and lunch will be brought

23  in.

24      And we may or may not meet on this intervening Monday, but

25  that is something that we will decide in connection and in

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 28 of 786   Page ID #:510
Case 2:18-cv-04215-PA   Document 83   Filed 07/20/15   Page 29 of 79   Page ID #:470

27

 1   consultation with the jury that ultimately is picked in this

 2   case.

 3        Now, I want to advise you that a juror may be excused from

 4   jury service only upon a showing of specific facts which

 5   constitute an undue hardship for the juror and not for the

 6   juror's employer.

 7        An undue hardship includes the following:

 8        The prospective juror has a personal obligation to care

 9   for the sick, aged, or infirmed dependents or to care for

10   children or no comparable substitute care is either available

11   or practical without imposing an undue financial hardship on

12   the prospective juror or the person cared for.

13        The prospective juror has a physical or mental disability

14   or impairment, not affecting the person's ability to serve on a

15   jury, but that would expose the juror to an undue risk of

16   mental or physical harm.

17        Preparation in the trial would expose the prospective

18   juror to an extreme financial hardship, taking into account the

19   following factors.

20        The length of the trial, whether the prospective juror is

21   sole support for his or her family, and the availability of

22   employer reimbursement.

23        Please keep in mind that jury service is not only a duty

24   and a responsibility, but it's also a right that our

25   forefathers fought to secure because of its importance in the

App. 0439

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 29 of 786   Page ID #:517
Case 2:18-cr-00425-PA   Document 83   Filed 07/20/18   Page 28 of 29   Page ID #:471

28

 1    governing of a democratic society.

 2         As a society, we have given to the people the power to

 3    decide disputes in civil cases, and to make the ultimate

 4    determination of whether or not to deprive a fellow citizen of

 5    life, liberty, or property in criminal cases.

 6         Jury service is a duty that is not to be shirked and a

 7    right that should not be lightly relinquished.

 8         Now bearing in mind the importance of trial by jury, do

 9    any of you seated in the jury box have any reasons why you feel

10    that jury service for this period of time and during the hours

11    I have indicated, would pose an undue hardship for you and

12    require that you be excused from consideration as a juror in

13    this case.

14         Please raise your hands.

15         All right.  We're going to take you up one at a time.

16         I'm going to ask the lady on the first row if you would

17    step down, and walk all the way around, and we will talk to you

18    over here at sidebar.

19                       (Sidebar begins.)

20         THE COURT:  Hello.  Okay, if you could keep your

21    voice down and tell us why you think you can't serve.

22         PROSPECTIVE JUROR:  I live about 62 miles away in

23    Oxnard.  I have two children that I take to school in the

24    morning.

25         This morning it was very hectic trying to get somebody to

App. 0440                    **UNITED STATES DISTRICT COURT**

```
 1    get them to school.  I had to leave 5:30 a.m., so it's hard

 2    find any care for them.

 3         I can't see myself being able to do that for five days,

 4    and I also work, but that is different.  It's mainly the kids.

 5              THE COURT:  Are you married?

 6              PROSPECTIVE JUROR:  I am.

 7              THE COURT:  Okay.  What does your husband do for a

 8    living?

 9              PROSPECTIVE JUROR:  He works at a catalytic

10    converter company.  He leaves at 5:00, and he's gone by 4:30.

11              THE COURT:  Do you work?

12              PROSPECTIVE JUROR:  I do.

13              THE COURT:  Where do you work?

14              PROSPECTIVE JUROR:  I'm a teacher at the Hueneme

15    School District.

16              THE COURT:  What are your hours?

17              PROSPECTIVE JUROR:  My hours, I start by 7:30 a.m.

18    to 3:15, contracted.

19              THE COURT:  Who takes care of your children while

20    you are working?

21              PROSPECTIVE JUROR:  So I drop them off in the

22    morning.  They go to school.  My husband can pick them up by

23    3:00.

24              THE COURT:  Okay.  How old are your children?

25              PROSPECTIVE JUROR:  I have an 11 and 13 year old.
```

App. 0441                    **UNITED STATES DISTRICT COURT**

Case 2:28-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 31 of 786   Page ID #:519
Case 2:10-cr-00225-PA   Document 83   Filed 07/20/15   Page 30 of 79   Page ID #:473

30

```
 1              THE COURT:  Okay.  They both go to the same school?
 2              PROSPECTIVE JUROR:  No.  My son goes to school
 3  15 minutes away.  And my daughter goes about ten minutes away
 4  from our home, driving.
 5              THE COURT:  So the 11 year old is?
 6              PROSPECTIVE JUROR:  Elementary.
 7              THE COURT:  Fifth grade?
 8              PROSPECTIVE JUROR:  Uh-huh.
 9              THE COURT:  And the 13 year old is?
10              PROSPECTIVE JUROR:  She is in high school.
11              THE COURT:  Okay.  Middle school stops at what?
12              PROSPECTIVE JUROR:  Sorry, I said 13.  She's 14.
13  I'm in denial, I don't want her to grow up.
14              THE COURT:  Okay.
15              PROSPECTIVE JUROR:  Because I have to leave so early
16  to get here on time, that's the thing.  I have to leave my home
17  by 5:30 a.m., to be here because of the traffic.
18              THE COURT:  Uh-huh.  And you live in Oxnard?
19              PROSPECTIVE JUROR:  Yes.  According to my MapQuest,
20  it's 62 miles away.
21              THE COURT:  Uh-huh.  Well, one of the things I think
22  we could -- I'm not sure if it solves your problem, but one of
23  the things I think you might qualify for, is that we could --
24  if jurors live a certain distance away, we can put you up in a
25  local hotel.
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 32 of 786   Page ID
Case 2:18-cr-00425-PA   Document 83   Filed 07/20/19   Page 31 of 79   Page ID #:520
#:474

31

1          PROSPECTIVE JUROR:  But what do I do for my kids?

2          THE COURT:  Your 14 your old?  Stay out of the way.

3          PROSPECTIVE JUROR:  I don't want her to stay by

4     herself.  I'm very protective.

5          THE COURT:  Well, yeah.  They grow up too quick.

6     Your husband normally picks them up?

7          PROSPECTIVE JUROR:  He normally picks them up after,

8     yeah.

9          THE COURT:  What time does he leave in the morning?

10          PROSPECTIVE JUROR:  He leaves at 4:30 a.m.

11       He starts his day at 5:00 a.m.

12          THE COURT:  What does he do?

13          PROSPECTIVE JUROR:  He's a catalytic converter

14     supervisor there.

15          THE COURT:  Okay.  What time do you normally leave

16     in the morning?

17          PROSPECTIVE JUROR:  I normally leave about 7:20, and

18     I drop one off then I drop the other, and then I get to work.

19          THE COURT:  Okay.  And you start your day at work at

20     what time?

21          PROSPECTIVE JUROR:  7:45, 8 o'clock.

22          THE COURT:  Okay.  Have a seat right there just on

23     that second row for a moment.

24          PROSPECTIVE JUROR:  Okay.

25          THE COURT:  Okay.  I guess I would be inclined to

App. 0443              **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 33 of 786   Page ID #:521
Case 2:18-cv-00415-PA   Document 83   Filed 07/20/15   Page 32 of 79   Page ID #:475

32

1    excuse her, but if somebody wants to keep her.

2              MR. MCDERMOTT:  No.

3              MR. FREEDMAN:  We have got several people on the

4    list that are coming from Atascadero and Paso Robles.  I wonder

5    about that, too.

6              THE COURT:  Okay.  Sir, I believe you also had your

7    hand up.  If you could join us over here please.

8              THE COURT:  If you could step near the microphone

9    and if you could keep your voice down.

10             PROSPECTIVE JUROR:  So my mother just had surgery on

11   Friday.  She's the only source of income right now.

12        My dad is at home.  So he's taking care of her, and so

13   right now I need to pay bills and keep the lights on, as far as

14   financially, that is it.

15        My dad is taking care of my mom at home, and doesn't have

16   a way of making money.

17             THE COURT:  What type of surgery did she have?

18             PROSPECTIVE JUROR:  It was on her -- the female --

19   it's for her bladder, basically.

20             THE COURT:  How long was she hospitalized?

21             PROSPECTIVE JUROR:  She was hospitalized for two

22   days.

23             THE COURT:  Okay.  And what does she do for a

24   living?

25             PROSPECTIVE JUROR:  She works -- she helps special

```
 1   needs kids for the district, the school district.

 2             THE COURT:  How old is your mother?

 3             PROSPECTIVE JUROR:  58.

 4             THE COURT:  Okay.  Does your father work?

 5             PROSPECTIVE JUROR:  No.

 6             THE COURT:  How old is he?

 7             PROSPECTIVE JUROR:  65.

 8             THE COURT:  Is he retired?

 9             PROSPECTIVE JUROR:  I'm not sure.

10             THE COURT:  What did he do for a living?

11             PROSPECTIVE JUROR:  A welder.

12             THE COURT:  Okay.  And what do you do?  Do you work?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  What do you do?

15             PROSPECTIVE JUROR:  I'm a mechanical engineer for

16   Haas Automation.

17             THE COURT:  I'm sorry, for who?

18             PROSPECTIVE JUROR:  Haas Automation.

19             THE COURT:  Okay.  Where do you work?

20             PROSPECTIVE JUROR:  Oxnard.

21             THE COURT:  And where do your parents live?

22             PROSPECTIVE JUROR:  San Luis Obispo or Atascadero,

23   California.

24             THE COURT:  Does your employer reimburse you for

25   jury service?
```

App. 0445                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 35 of 786   Page ID #:523
Case 2:18-cr-00425-PA   Document 83   Filed 07/20/19   Page 34 of 79   Page ID #:477

34

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  How many employees do you have?

 3              PROSPECTIVE JUROR:  Total?

 4              THE COURT:  Total.

 5              PROSPECTIVE JUROR:  I think it's 1,300.

 6              THE COURT:  Go ahead.

 7              PROSPECTIVE JUROR:  There is not as many engineers.

 8  It's probably about 40.

 9              THE COURT:  Okay.  And how many -- are all of those

10  employees located in the facility where you work?

11              PROSPECTIVE JUROR:  Yeah.

12              THE COURT:  Do you have their phone number?

13              PROSPECTIVE JUROR:  Yes.  I don't have it memorized.

14              THE COURT:  Okay.  Well, you will need to give us

15  the phone number.  We will have the clerk -- we will confirm

16  that they don't pay for jury service.

17              PROSPECTIVE JUROR:  Okay.

18              THE COURT:  So, we will just keep you for now, if

19  you have that number on you.

20              PROSPECTIVE JUROR:  I can look it up on my phone.  I

21  don't have it on me.

22              THE COURT:  Is your phone here?

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  If you could look that up, and let me

25  know when you have got it, I will have the clerk come by and
```

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 36 of 786   Page ID #:24
Case 2:18-cr-00425-PA   Document 83   Filed 07/20/15   Page 39 of 79   Page ID #:478

35

1    get it.  We will have somebody call.

2              PROSPECTIVE JUROR:  So sit down over there?

3              THE COURT:  Go back and resume your seat for now.

4              THE COURT:  Okay.  I think there was a hand raised

5    on the second row.  If you could come over and join us please?

6         You will need to walk all the way around.

7         If could step a little closer to the microphone.

8              PROSPECTIVE JUROR:  Yes, sir.

9              THE COURT:  What hardship do you think you have that

10   would prevent you from being with us for the next week or so?

11             PROSPECTIVE JUROR:  Mine is just purely financial.

12   I'm an independent contractor.

13        I work in the television industry since 2008, roughly, and

14   my live-in girlfriend of 15 years also works with me.  And so

15   basically when I'm not working either of us are not working.

16        And the last job I just ended was two weeks ago this

17   Thursday, so it's already been couple of weeks.

18        I have been looking for jobs in the interim, and basically

19   everything is kind of waiting on today's turnout to see how

20   that goes.

21             THE COURT:  Okay.

22             PROSPECTIVE JUROR:  As soon as I know that, I can

23   call the production companies and let him know I could work.

24             THE COURT:  What specifically do you do?

25             PROSPECTIVE JUROR:  I'm a production designer, an

```
 1    art director and set designer for television commercials.  I

 2    work out of my home and the shop that I rent.

 3              THE COURT:  How do you go about getting work?

 4              PROSPECTIVE JUROR:  Well, a lot of it is people call

 5    me through word of mouth, or previous jobs that I have had with

 6    production companies, like producers that I have worked with in

 7    the past will call me.

 8        I build miniature sets for stop motion, and it's kind of a

 9    small part of the industry, so you know.

10              THE COURT:  Okay.  Do you have any jobs that are

11    currently lined up?

12              PROSPECTIVE JUROR:  Well, they are waiting on the

13    outcome of, like -- I have a potential job that could happen at

14    any point depending on the production company and the client.

15              THE COURT:  So, they don't have a start date?

16              PROSPECTIVE JUROR:  No, sir.

17              THE COURT:  Okay.  So is there any job that you have

18    that currently has a start date?

19              PROSPECTIVE JUROR:  Not a definite start date.

20        I have just basically looked for work, when I'm not

21    working.  I make phone calls to previous clients.  And I have

22    been doing that for the past couple of weeks.

23              THE COURT:  I take it for the last couple of weeks

24    you have been looking, but you just haven't found anything?

25              PROSPECTIVE JUROR:  I found two, but they are
```

App. 0448

Case 2:23-cv-04493-PA    Document 1-5    Filed 06/05/23    Page 38 of 786    Page ID #520
Case 2:18-cv-04215-PA    Document 83    Filed 07/20/19    Page 39 of 79    Page ID #480

37

 1    waiting on the outcome of whether I'm going to be in jury

 2    service or not.

 3              THE COURT:  Okay.  Do you have an idea as to when

 4    they are going to start -- are they waiting for you to get --

 5    to figure out a date or do they have a date when they are going

 6    to start?

 7              PROSPECTIVE JUROR:  They are waiting on me.

 8              THE COURT:  Okay.  So if this was a two-day trial or

 9    a three-day -- if it was going to end Friday --

10              PROSPECTIVE JUROR:  That should be fine.

11              THE COURT:  That would be fine?

12              PROSPECTIVE JUROR:  Yeah, sure.

13              THE COURT:  Okay.

14              PROSPECTIVE JUROR:  That's the only thing, the

15    length of it.  If it brings me into next week and deliberation

16    I just --

17              THE COURT:  Okay.  And I'm sorry, where do you live?

18              PROSPECTIVE JUROR:  Eagle Rock.

19              THE COURT:  I know where it is.

20         During the week, except for today, we're going to stop

21    every day at 1:30.

22              PROSPECTIVE JUROR:  Yes, sir.

23              THE COURT:  You would have a chance to make calls or

24    do whatever.

25         I assume that when you are making these miniature sets,

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 39 of 786   Page ID #:527
Case 2:16-cr-00225-PA   Document 83   Filed 07/20/17   Page 38 of 79   Page ID #:481

38

```
 1    you do that at home?

 2              PROSPECTIVE JUROR:  I rent space depending on the

 3    job I'm on.

 4              THE COURT:  Okay.  So I take it, it would help you

 5    in your case if we say -- if we ended this thing by Tuesday,

 6    and we met on Monday, and we could end this thing by Tuesday,

 7    would that work for you?

 8              PROSPECTIVE JUROR:  I mean, I'm definitely willing

 9    to do whatever -- I'm very interested in this whole process.  I

10    want to do it, but it's just like, you know, the sooner would

11    be better for us.

12              THE COURT:  Why don't we do this:  Why don't we talk

13    to you a little bit more, see what it is about, you see what

14    the case is about, and then we'll -- the more you hear, if you

15    are uncomfortable with it, raise your hand, and we will let you

16    know see if we can work this out.

17              PROSPECTIVE JUROR:  Say that again.

18              THE COURT:  Just let me know later on as we progress

19    further, if you are uncomfortable with it.  I really think

20    we're probably going to be able to finish this thing up Monday

21    or by probably Tuesday at the latest.

22              PROSPECTIVE JUROR:  Okay.

23              THE COURT:  All right.  Thank you.

24              PROSPECTIVE JUROR:  I appreciate it.

25              THE COURT:  All right.  Sir?
```

App. 0450

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 40 of 786   Page ID #:528
Case 2:10-cv-04215-PA   Document 83-5   Filed 07/20/12   Page 39 of 49   Page ID #:482

39

```
1                PROSPECTIVE JUROR:  Hello.
2                THE COURT:  If could you keep your voice down and
3    tell us why you don't think you could be with us for the next
4    week or so?
5                PROSPECTIVE JUROR:  I'm working at 7-Eleven, and
6    7-Eleven is not reimbursing me for anything.
7                THE COURT:  Okay.  What are your hours?
8                PROSPECTIVE JUROR:  Hours are 7 to 8 hours.
9                THE COURT:  What time do you start?
10               PROSPECTIVE JUROR:  7 o'clock to 6 o'clock.
11               THE COURT:  What time do you get off?
12               PROSPECTIVE JUROR:  4 o'clock to 2 o'clock.
13               THE COURT:  What days of the week do you work?
14               PROSPECTIVE JUROR:  Four days, five days sometimes.
15               THE COURT:  Okay.  And do you -- are you just an
16   employee or do you own?
17               PROSPECTIVE JUROR:  No.  I'm working franchise
18   system.  I'm working at a franchise.
19               THE COURT:  Is it your store?
20               PROSPECTIVE JUROR:  No.
21               THE COURT:  Are you married?
22               PROSPECTIVE JUROR:  Yeah.
23               THE COURT:  Does your wife work?
24               PROSPECTIVE JUROR:  Yeah.
25               THE COURT:  Where does she work?
```

App. 0451          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04198-PA    Document 1-5    Filed 06/05/23    Page 41 of 786    Page ID #:529
Case 2:16-cr-00215-PA    Document 83    Filed 07/20/17    Page 40 of 45   Page ID #:483

40

```
 1              PROSPECTIVE JUROR:  Beauty salon.

 2              THE COURT:  Does she work full-time?

 3              PROSPECTIVE JUROR:  Yeah, full-time.

 4              THE COURT:  Are there any other members of your

 5    household that work?

 6              PROSPECTIVE JUROR:  My daughter is at UCLA.

 7              THE COURT:  Does she live with you at home?

 8              PROSPECTIVE JUROR:  No.  She doesn't.  She lives in

 9    the dorms.

10              THE COURT:  So is it just you and your wife living

11    at home?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  7-Eleven doesn't reimburse you at all?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  Okay.  Just have a seat right over there

16    next to that lady right there.  Thank you.

17         Okay.  Who is next -- second row.

18         All right.  Sir.

19              PROSPECTIVE JUROR:  I have -- my work is supposed to

20    be sending me to Austin Sunday night for all next week.

21         We have a new E.H.R. implementation at my hospital.

22         They are sending two people from each hospital.

23         We have three campuses in the community, Foothill and

24    Queen of the Valley.  And I work at ICC in Foothill.

25         I'm in the pharmacy, so they are sending me for Foothill
```

App. 0452

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 42 of 786    Page ID #:530
Case 2:18-cr-00215-PA    Document 83-5    Filed 07/20/19    Page 41 of 79    Page ID #:484

41

 1   and ICC.

 2       They don't have another person in the pharmacy that can

 3   go.  They are sending me Sunday night until Friday morning and

 4   then I'm flying back.

 5               THE COURT:  Okay.  Where are they sending you to?

 6               PROSPECTIVE JUROR:  Austin.

 7               THE COURT:  Okay.  What is the name of the company

 8   you work for?

 9               PROSPECTIVE JUROR:  I work for Intercommunity

10   Hospital on Foothill.  It is for Citrus Valley Health Partners

11   in Covina, West Covina, and Glendora.

12               THE COURT:  They are sending you back to Boston to

13   do what exactly?

14               PROSPECTIVE JUROR:  We're getting a new EHR, which

15   is an electronic health record.  So we use Medi-Tech right now.

16   We use Medi-Tech 5.0 and we are implementing Medi-Tech 6.15.

17   So they are sending people down there so we know how to build

18   the database and fill all of the medications, put all of the

19   new sets in, and learn all the background information so we can

20   run it at our hospitals.

21               THE COURT:  What do you do in the pharmacy?

22               PROSPECTIVE JUROR:  I'm a pharmacy supervisor for

23   ICC and Foothill.

24               THE COURT:  How many employees do they have?

25               PROSPECTIVE JUROR:  ICC, we have about 40, and

App. 0453            **UNITED STATES DISTRICT COURT**

```
 1   Foothill, we only have about 16.
 2             THE COURT:  Okay.  I'm sorry, which facility do you
 3   work at?
 4             PROSPECTIVE JUROR:  I work at ICC and Foothill.  I
 5   am over both of them.
 6             THE COURT:  Physically, where are you?
 7             PROSPECTIVE JUROR:  Three days at ICC and two days
 8   at Foothill.
 9             THE COURT:  How many supervisors?
10             PROSPECTIVE JUROR:  Just me.  I'm the only pharmacy
11   tech for both campuses.
12             THE COURT:  Who do you report to?
13             PROSPECTIVE JUROR:  I report to my director.  I have
14   different directors.  One for ICC and one for Foothill.
15             THE COURT:  Okay.  So you are the highest-ranking
16   person in the pharmacy?
17             PROSPECTIVE JUROR:  Under my director.
18             THE COURT:  Under your director, so it's a director
19   pharmacy?
20             PROSPECTIVE JUROR:  Correct.
21             THE COURT:  Are you married?
22             PROSPECTIVE JUROR:  Yes.
23             THE COURT:  What does your wife do?
24             PROSPECTIVE JUROR:  My wife is a teaching assistant
25   for special needs.
```

App. 0454                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 44 of 786   Page ID #:532
Case 2:18-cr-00225-PA   Document 83   Filed 07/20/15   Page 48 of 75   Page ID #:486

43

1    THE COURT:  Okay.  Just have a seat right there at

2  that second row for just a second.

3       Okay.  Have we talked to everybody?

4       Thank you.  All right.

5       I'm inclined to put all of these people back in the

6  audience and replace them unless -- well, let's talk about the

7  woman first, who has the two children.

8            MR. MCDERMOTT:  We would not object to that at all

9  -- too far away.

10            THE COURT:  What about the gentleman that works in

11  the 7-Eleven?

12            MR. MCDERMOTT:  No objection.

13            MR. FREEDMAN:  No objection.

14            THE COURT:  The last gentlemen.

15            MR. MCDERMOTT:  Certainly, by the defense.

16            MR. FREEDMAN:  No objection.

17            THE COURT:  Okay.  All right.  Let me take them one

18  at a time.

19       All right, Miss, and you are seated where?

20            PROSPECTIVE JUROR:  Next to the gentleman standing

21  up.

22            THE COURT:  So you are No. 4?

23            PROSPECTIVE JUROR:  Yes.

24            THE COURT:  Your name?

25            PROSPECTIVE JUROR:  Christina Arellano.

**UNITED STATES DISTRICT COURT**

```
 1   A-r-e-l-l-a-n-o.
 2             THE COURT:  Okay.  All right.  What I'm going to do
 3   is I'm going to ask you to return to the audience.
 4             PROSPECTIVE JUROR:  Okay.
 5             THE COURT:  We will let you know by the end of the
 6   day.
 7             PROSPECTIVE JUROR:  Okay.  Thank you.
 8             THE COURT:  Sir -- okay.  Where are you seated at in
 9   the jury box?
10             PROSPECTIVE JUROR:  Second row, second left.
11             THE COURT:  Okay.  So you are Number 8, and your
12   last name?
13             PROSPECTIVE JUROR:  Khokhar, K-h-o-k-h-a-r.
14             THE COURT:  Okay.  I'm going to ask if would you
15   just have a seat back in the audience, and then we will let you
16   know by the end of the day.
17        Why don't you get your belongings and take a seat in the
18   audience.
19             PROSPECTIVE JUROR:  Okay.
20             THE COURT:  Sir, you are Juror Number 12?
21             PROSPECTIVE JUROR:  Yes.
22             THE COURT:  Your last name?
23             PROSPECTIVE JUROR:  Young.  Y-o-u-n-g.
24             THE COURT:  Do you have any belongings?
25             PROSPECTIVE JUROR:  No.
```

App. 0456                  **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 46 of 786   Page ID #:534
Case 2:10-cr-00215-PA   Document 83   Filed 07/20/12   Page 49 of 79   Page ID #:488

45

```
 1              THE COURT:  Take a seat in the audience, and we will

 2    let you know.

 3              PROSPECTIVE JUROR:  Thank you, sir.

 4              THE COURT:  I'm sorry?

 5              PROSPECTIVE JUROR:  My company's number --  the

 6    phone number.

 7              THE COURT:  Oh, you have that number.  That's fine,

 8    if you could give that to the clerk, please.

 9              THE COURT:  While we're doing that, Juror No. 1,

10    what is your last name?

11              PROSPECTIVE JUROR:  Adler.

12              THE COURT:  Juror No. 2?

13              PROSPECTIVE JUROR:  Diaz.

14              THE COURT:  Juror No. 3?

15              PROSPECTIVE JUROR:  Prado.

16              THE COURT:  And Juror No. 5?

17              PROSPECTIVE JUROR:  6 is Green, and you are

18    Mr. Gottfried?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  All right.  We're going to call the

21    names of three prospective jurors.

22         As your name is called, if you would come to the lectern,

23    please.

24              THE COURTROOM DEPUTY:  Joseph Kopecky.

25              THE COURT:  Just right there, sir.
```

Case 2:28-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 47 of 786   Page ID #:489
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/17   Page 46 of 79   Page ID #:489

46

1    All right.  Sir, did you hear the questions I asked of the

2    other prospective jurors?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Is there anything that I have inquired

5    about that in good conscience you should disclose to us?

6            PROSPECTIVE JUROR:  No.

7            THE COURT:  Anything about the nature of these

8    charges that causes you to have any concerns about your ability

9    to be fair and impartial to both sides?

10           PROSPECTIVE JUROR:  No.  Only, I'm also in the

11   healthcare field, but someone else mentioned that.

12           THE COURT:  We will get to that.

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Anything about the length of the trial

15   that would prevent you from serving?

16           PROSPECTIVE JUROR:  Not prevent me.  It may be a

17   financial issue, but if that was the question.

18           THE COURT:  Okay.  Why don't you step over here for

19   a moment, please.

20                   (Sidebar begins.)

21           THE COURT:  Okay.  What is the financial issue?

22           PROSPECTIVE JUROR:  I work as a per diem, so I'm

23   paid hourly.  I work Monday, Tuesday, Wednesday.  I'm the sole

24   support of my family.  I do have a kid in college, a mortgage

25   payment.  I'm not going to go broke, but if I lost basically

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 48 of 786   Page ID #:536
Case 2:16-cv-04225-PA   Document 83   Filed 07/20/17   Page 47 of 79   Page ID #:490

47

 1   this week and next week of work, that would set me back

 2   considerably.

 3              THE COURT:  Okay.  Who do you work for?

 4              PROSPECTIVE JUROR:  Southern California Kaiser

 5   Permanente.

 6              THE COURT:  What do you do for them?

 7              PROSPECTIVE JUROR:  I'm a per-diem physician.

 8       After we retire -- I'm retired -- I work an hourly,

 9   per-diem physician.

10              THE COURT:  Okay.  And does your wife work?

11              PROSPECTIVE JUROR:  No.

12              THE COURT:  Okay.  And do you have any other members

13   of the household?

14              PROSPECTIVE JUROR:  No.  Kids have left the house,

15   except for the last one is in college.

16              THE COURT:  Okay.  And are you contributing to that

17   individual's support.

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Okay.  Prior to assuming this position

20   with Kaiser, by whom were you employed?

21              PROSPECTIVE JUROR:  I was a partner until age 65.

22   At age 65, we have to relinquish our partnership.

23       And if we wish to continue, we have to do so as per diem,

24   which I am doing.

25              THE COURT:  Is that with Kaiser?

Case 2:23-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 49 of 786  Page ID #:537
Case 2:16-cv-04125-PA  Document 83  Filed 07/20/17  Page 49 of 49  Page ID #:491

48

```
 1                    PROSPECTIVE JUROR:  Yes.

 2                    THE COURT:  Okay.  Are you receiving a retirement

 3    from Kaiser as well as the per diem?

 4                    PROSPECTIVE JUROR:  Yes.

 5                    THE COURT:  And I'm sorry, what city do you live in?

 6                    PROSPECTIVE JUROR:  I live in Ventura County.  Oak

 7    Park, which is right near Thousand Oaks.

 8                    THE COURT:  Okay.  What are your hours when you are

 9    working per diem?

10                    PROSPECTIVE JUROR:  Usually 8:30 until about 6:00.

11                    THE COURT:  And you are working three days a week?

12                    PROSPECTIVE JUROR:  Yes.

13                    THE COURT:  I'm sorry, Monday --

14                    PROSPECTIVE JUROR:  Tuesday and Wednesday.

15                    THE COURT:  Do you have -- are you an independent

16    contractor now?

17                    PROSPECTIVE JUROR:  I'm not salaried.  I'm not sure.

18    I don't have a contract with them, but I'm an employee.

19                    THE COURT:  You are an employee?

20                    PROSPECTIVE JUROR:  Yeah.

21                    THE COURT:  Do they pay for jury service?

22                    PROSPECTIVE JUROR:  No, not for me.  As a partner, I

23    would have had that benefit, but once I'm retired, I don't have

24    any of those benefits any more.

25                    THE COURT:  Do you have any benefits?
```

App. 0460                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA   Document 1-5   Filed 06/05/23   Page 50 of 786   Page ID #:538
Case 2:16-cr-00425-PA   Document 63   Filed 07/20/17   Page 49 of 79   Page ID #:492

49

```
 1              PROSPECTIVE JUROR:  No.  Just hourly.

 2              THE COURT:  I'm sorry, your wife does not work?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  Has she ever worked?

 5              PROSPECTIVE JUROR:  Just about the time we got

 6    married.  That was a long time ago.

 7              THE COURT:  Okay.  So you have missed two days this

 8    week, and if we were off Monday, you would be able to work on

 9    Monday, right?

10              PROSPECTIVE JUROR:  Right, sir.

11              THE COURT:  Which Kaiser do you work at?

12              PROSPECTIVE JUROR:  Thousand Oaks office.

13              THE COURT:  I'm sorry, where do you live?

14              PROSPECTIVE JUROR:  Oak Park, which is near Thousand

15    Oaks.

16              THE COURT:  Okay.  You will work after -- do you

17    ever adjust your hours?

18              PROSPECTIVE JUROR:  Well, I have fixed hours.  Like

19    my patients this morning had to be canceled.  If I'm not there

20    tomorrow, they will have to be canceled.  That is my schedule.

21              THE COURT:  Okay.  Just have a seat right there for

22    a second.

23              MR. FREEDMAN:  I think a lot of the professionals on

24    the panel are going to have the same scheduling issues.

25         My concern is that they often overlap the people I think
```

App. 0461

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 51 of 786    Page ID #:539
Case 2:16-cr-00425-PA    Document 83    Filed 07/20/17    Page 50 of 79    Page ID #:493

50

 1    the defense might want to strike anyway, so they may not end up
 2    on the panel, but the defense is asserting the challenges.
 3              THE COURT:  Well, if it simply was that he was a
 4    doctor, I wouldn't let him off.  And I'm not so sure now.
 5              MR. FREEDMAN:  He's retired.
 6              THE COURT:  What's your position?
 7              MR. MCDERMOTT:  I think he's given us enough basis
 8    to let him go.
 9              THE COURT:  Okay.  So at this point you are
10    receiving whatever retirement income, plus whatever?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  If you are ultimately selected on the
13    panel, and you need -- you need to be at work on Monday, we
14    will allow you to do that, if you are ultimately selected.
15         But based on -- based on what you have told me thus far, I
16    think we are probably going to deny your request for financial
17    hardship.
18         So if you could take that empty seat on the first row.
19              PROSPECTIVE JUROR:  Thank you.
20              THE COURT:  Thank you.
21                   (Sidebar ends.)
22              THE COURT:  All right.  Let's call the name of
23    another prospective juror, please.
24              THE COURTROOM DEPUTY:  Dawn Huizar, spelled
25    H-u-i-z-a-r.  Please come forward.

App. 0462

Case 2:28-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 52 of 786   Page ID
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/17   Page 51 of 79   Page ID #540
#:494

51

```
 1                THE COURT:  Good morning.

 2                PROSPECTIVE JUROR:  Good morning.

 3                THE COURT:  Did you hear the questions I asked of

 4     the other prospective jurors?

 5                PROSPECTIVE JUROR:  I did hear them.

 6                THE COURT:  Is there anything that I have inquired

 7     about that in good conscience, you should disclose to us?

 8                PROSPECTIVE JUROR:  No.

 9                THE COURT:  Anything about the charges that would

10     prevent you from serving?

11                PROSPECTIVE JUROR:  No.

12                THE COURT:  Anything about the length of the trial

13     that would prevent you from serving?

14                PROSPECTIVE JUROR:  No.  If you could take that

15     empty chair on the second row, Prospective Juror No. 8.

16            Let's call the name of another prospective juror.

17                THE COURTROOM DEPUTY:  Frank Ogata.

18                THE COURT:  Good morning.

19                PROSPECTIVE JUROR:  Good morning.

20                THE COURT:  Did you hear the questions I asked of

21     the other prospective jurors?

22                PROSPECTIVE JUROR:  Yes.

23                THE COURT:  Is there anything I have inquired about

24     that in good conscience you should disclose to us?

25                PROSPECTIVE JUROR:  I do have a -- I have a
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 53 of 786   Page ID #:541
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/17   Page 52 of 79   Page ID #:495

52

1  problem -- could I approach the bench?

2          THE COURT:  Sure.  Why don't you come on over.

3                  (Sidebar begins.)

4          THE COURT:  Just one second.

5      Okay.

6          PROSPECTIVE JUROR:  Okay.  I'm in the health field.

7  I'm a dentist, okay.

8      And at the current time, I'm under investigation under a

9  similar situation from the LA County District Attorney's Office

10  for what -- I haven't been charged with -- I am under an

11  investigation.

12      They had a search warrant and came to my house and dental

13  office, and took a substantial amount of charts.

14          THE COURT:  Uh-huh.

15          PROSPECTIVE JUROR:  It's a similar situation, where

16  they are saying that I submitted coding for procedures that was

17  not exactly what I got paid for.

18      And in the process, you know, they put me through a lot of

19  abuse.  They broke down the door.

20      They put my face on the ground.  The DA Drug Enforcement

21  Agents, this is not a court-related case -- all they wanted to

22  do is look at my charts.

23      But they had weapons, 11, 12, deputies.  And they treated

24  me just like a drug person.

25      They broke down the door.  If I were behind the door, I

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 54 of 786   Page ID #542
Case 2:18-cv-04215-PA   Document 83-5   Filed 07/20/15   Page 39 of 79   Page ID #:496

53

 1    could have been killed.  They put my face on the ground, you

 2    know, early in the morning.

 3         I don't think I could be very objective.  It's just too

 4    close to my case.  This is just last December.

 5         So, you know, I haven't been charged, but I mean, my

 6    lawyer can't even tell me if I'm going to be charged through

 7    the District Attorney's Office who is doing this.

 8         So I don't think I could hear this.

 9              THE COURT:  Okay.  Were these -- do you know what

10    agency executed the search warrant?

11              PROSPECTIVE JUROR:  This is LA County District

12    Attorney, Los Angeles.

13              THE COURT:  Okay.

14              PROSPECTIVE JUROR:  I have it -- you know, I had a

15    security camera.  I have these agents coming with weapons.

16              THE COURT:  Uh-huh.  Was this at your home?

17              PROSPECTIVE JUROR:  At home and my office,

18    simultaneously.

19              THE COURT:  Okay.

20              PROSPECTIVE JUROR:  I had dirt all over my face.

21    This is not a drug case.  It's a chart coding issue, you know.

22    I submitted coding that was not exactly what the insurance

23    company wanted.

24              THE COURT:  The thing I just want to know is the

25    officers who executed the warrant.

54

```
 1              PROSPECTIVE JUROR:  Local deputies.

 2              THE COURT:  So these were deputy sheriffs?

 3              PROSPECTIVE JUROR:  They were DEA agents because

 4    when they went to my office, my neighbors asked them, "Who are

 5    you guys?"

 6         They said, "We do a lot of DEA raids to get search

 7    warrants."  And you know, this is --

 8              THE COURT:  Were they in uniform or in plain

 9    clothes?

10              PROSPECTIVE JUROR:  They were in uniform, but it was

11    kind of unusual.  I thought -- I couldn't see because I didn't

12    have my glasses.

13              THE COURT:  Okay.  So the people --

14              PROSPECTIVE JUROR:  I thought they were ICE.

15              THE COURT:  Excuse me.  The people that knocked on

16    your door, okay --

17              PROSPECTIVE JUROR:  Okay.

18              THE COURT:  -- they were deputy sheriffs?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  Okay.  And they were wearing uniforms?

21              PROSPECTIVE JUROR:  Same outfit, but I couldn't

22    recognize it.  I couldn't see it, but they were wearing the

23    same.

24              THE COURT:  Did they give you a copy of the search

25    warrant?
```

App. 0466                    UNITED STATES DISTRICT COURT

Case 2:28-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 56 of 786   Page ID
Case 2:18-cr-00215-PA   Document 83   Filed 07/20/15   Page 59 of 79   Page ID #:544
#:498

55

1          PROSPECTIVE JUROR:  One of them.  They told me they

2    had a search warrant.  Later on they showed it to me.

3          THE COURT:  Okay.  Have a seat right there.

4      Okay.

5          MR. MCDERMOTT:  Could we get to him?

6          THE COURT:  Good luck.

7      Just have a seat in the audience.  You shouldn't talk to

8    any of the other prospective jurors about what we have talked

9    about.

10     Okay.  Thank you.

11                    (Sidebar ends.)

12         THE COURT:  All right.  If we could have the clerk

13   call the name of the another prospective juror.

14         THE COURTROOM DEPUTY:  Alice Montalvo.

15         THE COURT:  Good morning.

16    PROSPECTIVE JUROR:  Good morning.

17         THE COURT:  Did you hear the questions I asked of

18   the other prospective jurors?

19    PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Is there anything that I have inquired

21   about that in good conscience you should disclose to us?

22    PROSPECTIVE JUROR:  No.

23         THE COURT:  Anything about the nature of these

24   charges that causes you to have any concerns about your ability

25   to be fair and impartial to both sides?

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 57 of 786   Page ID #:499
Case 2:18-cr-00223-PA   Document 83   Filed 07/20/15   Page 56 of 79   Page ID #:548

56

```
 1                PROSPECTIVE JUROR:  No.

 2                THE COURT:  Anything about the length of the trial

 3     that would prevent you from serving?

 4                PROSPECTIVE JUROR:  No.

 5                THE COURT:  All right.  If could you take that last

 6     seat on the second row, please.

 7            Just one second.  Madam Clerk.

 8                THE COURTROOM DEPUTY:  Yes.

 9                THE COURT:  All right.  So all of you seated in the

10     jury box, at least at this point, think that you can be with us

11     for the remainder of this week?

12            All right.  Now as jurors, you are going to be the finders

13     of fact in this case.

14            You are required to base your decisions solely on the

15     evidence that is presented here in Court.

16            You may not consider any facts or any information that you

17     learn outside of Court, and you may not rely on your own

18     prejudices or biases in judging this case.

19            Do any of you believe that you should not be able to do

20     this?

21            As a judge, it's my job to instruct you on the law that is

22     applicable to this case.

23            You are required to find the facts and then apply the law

24     as I give it to you, to those facts.

25            Do any of you feel that you would have any difficulty
```

App. 0468                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 58 of 786   Page ID #:500
Case 2:18-cr-00215-PA   Document 83   Filed 07/20/15   Page 57 of 79   Page ID #:540

57

 1    accepting and following my instructions concerning the law that

 2    governs this case?

 3         As you may know a defendant is presumed innocent until

 4    proven guilty.

 5         This presumption of innocence continues until the jury

 6    concludes, if it does, that the defendant is guilty beyond a

 7    reasonable doubt.

 8         If the jury finds that the government has not proved the

 9    defendant's guilt beyond a reasonable doubt, it must return a

10    not-guilty verdict.

11         And you cannot return a guilty verdict unless you find

12    that the government has established the defendant's guilt

13    beyond a reasonable doubt.

14         This is a different standard than is used in civil cases.

15         There, the jury merely has to find that a party has

16    established that its version of the facts is more probably true

17    than not.

18         Is there anything in the criminal standard of proof,

19    beyond a reasonable doubt, that you believe would make it

20    difficult for you to be a fair and impartial juror in this

21    case?

22         The potential punishment for the crimes that have been

23    charged is a matter for the Court to decide.

24         Are there any of you who have concerns about the level of

25    punishment that might be imposed if the defendant is found

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 59 of 786   Page ID #:547
Case 2:18-cr-00213-PA   Document 83   Filed 07/20/15   Page 58 of 75   Page ID #:501

58

```
 1    guilty and feel that those concerns would make it difficult for

 2    you to fairly judge this case?

 3          Unlike the government, the defendant has no burden, and

 4    does not have to present any evidence if he chooses not to do

 5    so.

 6          You must wait until all of the evidence has been presented

 7    before making up your mind.

 8          Are there any of you who do not believe you could withhold

 9    judgment until all of the evidence has been presented?

10          Is there anything that you have heard about the case you

11    believe would make it difficult for to you consider the

12    evidence fairly and impartially?

13          Is there anyone seated in the jury box for any reason who

14    feels that he or she should not be selected as a juror in this

15    case?

16          All right.  We're going to take our first break of the

17    morning.

18          When we return, we're going to start asking the potential

19    jurors questions about themselves.

20          Now, again, until we come back and while you are on your

21    break, you are not to discuss this case with anyone including

22    your fellow jurors.

23          Please do not read or listen to any news reports or other

24    accounts about the trial.

25          If anyone approaches you and tries to talk with you about
```

App. 0470

 1   this case, please let me know about it immediately.

 2        If you happen to see one of the lawyers out in the hallway

 3   and say, hi, and they don't speak to you, they can't.

 4        So don't hold it against them if you happen to see them,

 5   and they just walk right by you.

 6        They are instructed to do that, so, don't hold that

 7   against them.

 8        So we're going to take a break for about ten minutes, and

 9   then we are going to come back in and resume jury selection.

10   So let's try and be back in our seats at 25 until the hour.

11             THE COURTROOM DEPUTY:  All rise.

12             (JURY EXITS THE COURTROOM AT 11:29 A.M.)

13             THE COURT:  All right.  Anything we need to take up?

14   We will see you in about ten minutes.

15                  (Morning recess.)

16             THE COURTROOM DEPUTY:  All rise.

17             (JURY ENTERS THE COURTROOM AT 11:41 A.M.)

18             THE COURTROOM DEPUTY:  You may be seated.

19             THE COURT:  Miss, if you could join us over here

20   please.

21                  (Sidebar begins.)

22             PROSPECTIVE JUROR:  My sister-in-law is planning to

23   come to our house.  She lives in Westminister, and she needs to

24   be taken care of.

25             THE COURT:  Just keep your voice down.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 61 of 786   Page ID #:503
Case 2:16-cr-00215-PA   Document 83   Filed 07/20/17   Page 60 of 79   Page ID #:549

60

1      PROSPECTIVE JUROR:  I didn't know that she was going

2   to come with IVs and medication.

3      I'm an LVN.  They want to have antibiotics installed in

4   the IV, and I could do it.

5      But they made sure a relative is able to do it, and, I go,

6   oh, yes, I know who my sister-in-law is.

7      But I didn't know this until today.  I just called my

8   husband, and I told him I was picked for jury duty.

9      He starts telling me this.  He just found out that Letia

10  is going to come with IV, and I may need someone to administer

11  antibiotics in her IV.

12          THE COURT:  Okay.  When is she due to arrive?

13          PROSPECTIVE JUROR:  Tomorrow.

14          THE COURT:  Okay.  And how often do these IVs have

15  to be changed?

16          PROSPECTIVE JUROR:  You know, I did not know this

17  until today, just a few minutes ago.

18          THE COURT:  I understand.  So she's coming tomorrow.

19  And do you know what time she's coming tomorrow?

20          PROSPECTIVE JUROR:  It will be in the afternoon

21  around 12 or 1, and then there is going to be a person that

22  will come and make sure that I do it right.

23      But if she was at home, a nurse will be there for a few

24  hours to do it.

25          THE COURT:  Okay.  How often do these IVs have to

App. 0472

Case 2:28-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 62 of 786  Page ID #:550
Case 2:16-cv-00215-PA  Document 83  Filed 07/20/17  Page 61 of 79  Page ID #:504

61

```
 1   be --
 2             PROSPECTIVE JUROR:  I don't know.  I don't know
 3   anything about the IV.  She's going to come home with my
 4   husband.  They are going to pick her up.  It's an outpatient
 5   thing, and surgery.  And he's going to bring her home.  The
 6   surgery is going to be at 10:00, and he will probably be home
 7   maybe by 2, 3 or something like that, maybe.  It depends on the
 8   traffic.
 9             THE COURT:  Where do you live?
10             PROSPECTIVE JUROR:  I live in Covina.
11             THE COURT:  Okay.  Is it just tomorrow you have to
12   put these IVs in?
13             PROSPECTIVE JUROR:  I don't know, maybe it might be
14   a few days, uh-huh.
15        I don't have to put the IV in.  I have to administer the
16   medication in the IV, the antibiotics.
17             THE COURT:  Okay.  How often do you have to do that?
18             PROSPECTIVE JUROR:  I don't know.
19             THE COURT:  You don't know.
20             PROSPECTIVE JUROR:  I just found out.
21        My husband said his sister called her and this is what
22   they are going to be doing.
23             THE COURT:  Okay.  Is there a reason why they
24   wouldn't have a nurse -- if she was going to have a nurse at
25   home, why they wouldn't have the nurse at your house?
```

App. 0473

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 63 of 786    Page ID #:552
Case 2:10-cv-04215-PA    Document 83    Filed 07/20/12    Page 62 of 79    Page ID #:505

62

```
1              PROSPECTIVE JUROR:  Right.  It would be at her house

2    in Westminister, but she needs to be taken care of.

3              THE COURT:  Okay.  But if she were in her own house

4    she would have a nurse?

5              PROSPECTIVE JUROR:  Just for a short time.

6              THE COURT:  So you are requesting to be excused?

7              PROSPECTIVE JUROR:  Uh-huh.

8              THE COURT:  Okay.  Have a seat right there for a

9    second.

10             THE COURT:  Okay.  I'm inclined to excuse her unless

11   somebody has an objection.

12        I'm going to let the dentist go.  And I believe I might as

13   well do this now.  Juror number -- I think it's 6, the

14   mechanical engineer.

15             THE COURT:  They don't pay.

16             MS. RYKKEN:  Okay.

17             THE COURT:  All right.  You can return to the jury

18   assembly room on the first floor and tell them you have been

19   excused.

20             PROSPECTIVE JUROR:  Just go right here and wait --

21   go downstairs?

22             THE COURT:  Go downstairs to the first floor.  Tell

23   them you have been excused.

24             PROSPECTIVE JUROR:  Okay then.

25             THE COURT:  All right.  Juror Number 6, if you could
```

App. 0474                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 64 of 786   Page ID #552
Case 2:18-cv-04223-PA   Document 83   Filed 07/20/15   Page 63 of 79   Page ID #:506

63

```
 1    join us over here please.

 2        Are you an hourly employee or salaried employee?

 3            PROSPECTIVE JUROR:  Hourly.

 4            THE COURT:  Okay.  We have confirmed that your

 5    employer doesn't pay, so we're going to excuse you.  So you can

 6    return to the jury assembly room on the first floor.

 7            PROSPECTIVE JUROR:  What is that?

 8            THE COURT:  You can return to the jury assembly room

 9    on the first floor, and tell them you have been excused.

10            PROSPECTIVE JUROR:  Okay.

11            THE COURT:  If I could see the gentleman on the

12    first row on the end?

13        All right.  Sir we're going to excuse you, you can go back

14    to the jury assembly room on the first floor and tell them you

15    have been excused.

16            PROSPECTIVE JUROR:  Okay.  Thank you.

17            THE COURT:  Thank you.  Okay.

18                       (Sidebar ends.)

19            THE COURT:  All right.  I'm going to ask the clerk

20    to call the names of another prospective juror.

21            THE COURTROOM DEPUTY:  Matthew Field.  Please come

22    forward.

23            THE COURT:  Good morning.  Did you have any

24    questions I asked of the other prospective jurors?

25            PROSPECTIVE JUROR:  Yes.
```

App. 0475                UNITED STATES DISTRICT COURT

```
 1            THE COURT:  Is there anything I have inquired about
 2   that in good conscience you should disclose to us?
 3            PROSPECTIVE JUROR:  No.
 4            THE COURT:  Is there anything about the length of
 5   the trial that would prevent you from serving?
 6            PROSPECTIVE JUROR:  No.
 7            THE COURT:  Anything about the nature of these
 8   charges that may cause you to have concerns to be fair and
 9   impartial to both sides?
10            PROSPECTIVE JUROR:  No.
11            THE COURT:  If you could take the last chair on the
12   first row, please.
13        Call the name of another prospective juror.
14            THE COURTROOM DEPUTY:  Matthew Moore.
15            THE COURT:  Good morning.
16            PROSPECTIVE JUROR:  Good morning.
17            THE COURT:  Did you hear the questions I asked of
18   the other prospective jurors?
19            PROSPECTIVE JURORS:  Yes.
20            THE COURT:  Is there anything I have inquired about
21   that in good conscience you should disclose to us?
22            PROSPECTIVE JUROR:  No.
23            THE COURT:  Anything about the nature of these
24   charges that cause you to have any concerns about your ability
25   to be fair and impartial to both sides?
```

App. 0476

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 66 of 786   Page ID
#:508
Case 2:18-cr-00215-PA   Document 83   Filed 07/20/15   Page 69 of 79   Page ID #:554
65

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Anything about the length of the trial

 3    that would prevent you from serving?

 4              PROSPECTIVE JUROR:  I might have financial

 5    obligations.

 6              THE COURT:  Okay.  If could you join us over here

 7    please.

 8                        (Sidebar begins.)

 9              THE COURT:  Okay.  If could you just keep your voice

10    down and talk into the microphone.

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  What's the financial hardship that you

13    have?

14              PROSPECTIVE JUROR:  So I live 180 miles away in San

15    Luis Obispo.  I am kind of living paycheck to paycheck, a

16    college student working a retail job making about 16 or $20 a

17    week.  It's just the hotel part because last time I had to

18    sleep in my car.

19              THE COURT:  Okay.  If you are ultimately selected as

20    a juror, we will get you a hotel and pay for it.

21              PROSPECTIVE JUROR:  After or because I don't have

22    the money right now.

23              THE COURT:  Right now.

24              PROSPECTIVE JUROR:  Okay.

25              THE COURT:  I'm pretty sure.  I will make sure, but
```

App. 0477

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 67 of 786    Page ID #:553
Case 2:18-cr-00215-PA    Document 83    Filed 07/20/18    Page 68 of 79    Page ID #:509

66

```
 1    I think we will pay -- I think they will front that cost.  I
 2    will make sure.
 3              PROSPECTIVE JUROR:  Okay.  If that can get confirmed
 4    then I have no problem staying for a week.
 5              THE COURT:  Okay.  Let me make sure.
 6              PROSPECTIVE JUROR:  Okay.
 7              THE COURT:  So by the time we get back from lunch,
 8    we will know for sure.  We will keep you in, and if it turns
 9    out that they don't, then we will let you go.
10              PROSPECTIVE JUROR:  Thank you.
11              THE COURT:  So if you would take that last seat on
12    the second row.
13              PROSPECTIVE JUROR:  Okay.
14                        (Sidebar ends.)
15              THE COURT:  All right.  Ladies and gentlemen, we're
16    now going to ask you some questions about yourselves, again,
17    they are not designed to pry into your personal lives or
18    affairs, they are asked to discover if you have any knowledge
19    about the case, if you have any preconceived opinions that you
20    might find difficult to move aside.
21         If you have any personal or family experiences, which
22    might cause you to identify yourselves within the parties, and
23    you cannot assure each of the parties that the jury will be
24    fair and impartial.
25         Please do not withhold information when you are seated on
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 68 of 786   Page ID #:510
Case 2:18-cv-04215-PA   Document 83   Filed 07/20/15   Page 67 of 79   Page ID #:556

67

```
 1   the jury.  Be straightforward in your answers, rather than
 2   answering in a way that you feel the lawyers or I expect you to
 3   answer.
 4        If your answer to a question is yes, please raise your
 5   hands so additional questions may be asked.
 6        If your answer to a question is no, you need to do
 7   nothing.
 8        Again, any time you prefer to approach the bench to answer
 9   a question, rather than answering in front of the entire panel,
10   please feel free to so indicate.
11        All right.  We're going to begin with Juror No. 1.  Let's
12   see if we can find a microphone.
13        And do you have a copy of the background questionnare?
14            PROSPECTIVE JUROR:  Yes.
15            THE COURT:  All right.  If you could just answer the
16   background questionnaire, and answer each of those questions.
17            PROSPECTIVE JUROR:  My name is John Adler.  I live
18   in Beverly Hills.  I have lived there for over 20 years.
19        Prior to that, I lived in Atlanta, Georgia.
20        I'm married.
21        I have three children, one 25, male in college, and an 18
22   year old about to graduate from high school, and I have an
23   11 year old in middle school, a girl.
24            THE COURT:  Your educational background?
25            PROSPECTIVE JUROR:  I have a bachelor's degree.
```

App. 0479                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 69 of 786   Page ID #:557
Case 2:18-cv-04215-PA   Document 83   Filed 07/20/19   Page 68 of 79   Page ID #:511

68

 1          No military service.

 2          I'm the owner and chief operating officer of a company

 3     called Phyllis Morris Originals.

 4               THE COURT:  What do they do?

 5               PROSPECTIVE JUROR:  We're a high-end furniture

 6     manufacturer.

 7               THE COURT:  And does your wife work?

 8               PROSPECTIVE JUROR:  My wife works with me.  She is

 9     an interior designer, and deals in sales and marketing of our

10     company.

11               THE COURT:  Have you ever served on a jury before?

12               PROSPECTIVE JUROR:  I have been -- no, I have always

13     been dismissed from a jury.

14               THE COURT:  Have you ever been a party or witness of

15     a criminal case?

16               PROSPECTIVE JUROR:  Unfortunately, yes.

17               THE COURT:  Was that a civil or criminal case?

18               PROSPECTIVE JUROR:  Civil case for me personally --

19     well, with my business.

20               THE COURT:  Anything about that experience that

21     caused you to have concerns about your ability to be fair and

22     impartial to both sides in this case?

23               PROSPECTIVE JUROR:  I'm going to say I assume, yes,

24     I don't know.

25          I mean, I don't know what the case is really about, so.

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 70 of 786   Page ID #:558
Case 2:18-cr-00215-PA   Document 83   Filed 07/20/18   Page 69 of 79   Page ID #:512

69

```
 1            THE COURT:  Okay.  Well this is a criminal case

 2    involving healthcare fraud.

 3            PROSPECTIVE JUROR:  Right.

 4            THE COURT:  And the nature of the civil case -- what

 5    was the issue?

 6            PROSPECTIVE JUROR:  It was between an interior

 7    designer who said we defrauded her of commissions.

 8            THE COURT:  Okay.  And was there anything about that

 9    experience, in being a civil case, that you believe would have

10    an adverse effect or cause you to have doubts about your

11    ability to be fair and impartial to both sides of this case?

12            PROSPECTIVE JUROR:  I'm going to answer, I believe,

13    I can be fair and impartial.  I believe.

14            THE COURT:  Okay.  Is there any doubt in your mind?

15            PROSPECTIVE JUROR:  I guess.  I mean, I'm not

16    100 percent confident that I can say I have zero impartiality

17    or fairness.

18            THE COURT:  Okay.  Would you join us over here

19    please?

20                    (Sidebar begins.)

21            THE COURT:  Okay.  Did you have a lawyer in the

22    civil case?

23            PROSPECTIVE JUROR:  I did.

24            THE COURT:  When was the civil case?

25            PROSPECTIVE JUROR:  Eight years ago.
```

App. 0481                    **UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Okay.  And was it actually tried?

 2              PROSPECTIVE JUROR:  No.  It went to mediation.

 3              THE COURT:  Okay.  So then it was settled?

 4              PROSPECTIVE JUROR:  Yes.  We settled, much to my

 5   chagrin, but yes.

 6              THE COURT:  Both sides are usually not entirely

 7   pleased with settlement.

 8              PROSPECTIVE JUROR:  That's what my lawyer told me.

 9              THE COURT:  Okay.  Was that in state Court or

10   federal Court.

11              PROSPECTIVE JUROR:  State.

12              THE COURT:  In Los Angeles Superior Court?

13              PROSPECTIVE JUROR:  Uh-huh.

14              THE COURT:  Now you know that what happened in that

15   case has nothing to do with --

16              PROSPECTIVE JUROR:  Yes, of course.

17              THE COURT:  Okay.  What happened in that case that

18   caused you to have concerns about your ability to be fair and

19   impartial in this case?

20              PROSPECTIVE JUROR:  I'm just saying I felt -- it was

21   just a very -- I know it was a very emotional scenario for me,

22   it cost a lot of money, and I was just not happy.

23              THE COURT:  You got sued?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  And it wasn't the most pleasant
```

**UNITED STATES DISTRICT COURT**

Case 2:28-cv-04498-PA    Document 4-5    Filed 06/05/23    Page 72 of 786    Page ID #:560
Case 2:18-cr-00225-PA    Document 83    Filed 07/20/15    Page 71 of 79    Page ID #:514

71

```
 1   experience?

 2              PROSPECTIVE JUROR:  Right.

 3              THE COURT:  You took it personally?

 4              PROSPECTIVE JUROR:  I did.

 5              THE COURT:  And you knew this person and she ended

 6   up turning --

 7              PROSPECTIVE JUROR:  I barely even knew her.  It was

 8   a horror -- was a hustle.  I felt I was being set up.

 9              THE COURT:  Okay.

10              PROSPECTIVE JUROR:  It's a no good deed goes

11   unpunished.

12              THE COURT:  I have been there.

13         Well, look, what is really important here is that both

14   sides deserve a jury that can leave whatever baggage they may

15   bring to this at the door.

16              PROSPECTIVE JUROR:  That's what I'm saying.  I'm not

17   saying that I'm adamantly against one or the other of the

18   parties.  I'm just telling you when you asked me the question,

19   can I be 100 percent --

20              THE COURT:  Okay.  Well, what I need, and if you

21   can't, you can't.  But what I need is commitment from each of

22   those jurors, that they can be fair and impartial, that they

23   can look both sides in the eye and tell them, look, whatever

24   happened in that case, I'm going to just put that aside, and

25   I'm going to judge this case based on the evidence in this
```

App. 0483

**UNITED STATES DISTRICT COURT**

```
 1   case.  I'm going to base it on the testimony of the witnesses,

 2   and the exhibits that are actually received into evidence.

 3        And whatever happened in the criminal case is not going to

 4   have anything to do with the decision that I reach in this

 5   case.

 6        If can you do that, fine.  If you can't, just let us know.

 7             PROSPECTIVE JUROR:  Okay.

 8             THE COURT:  Okay.  So, can you be fair and impartial

 9   to both sides in this case?

10             PROSPECTIVE JUROR:  I believe so.

11             THE COURT:  Okay.  Can you assure both sides that

12   whatever happened in that nightmare of a civil case, you are

13   going to put that aside, and judge this case based solely on

14   the evidence you hear, here in this courtroom?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Okay.  So you can make that commitment

17   to both sides?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Okay.  All right.  Just have a seat

20   right there for a second.

21        All right.  Does either side wish to have the Court make

22   any further inquiry?

23             MR. MCDERMOTT:  Not by the defendant.

24             MR. FREEDMAN:  No, Your Honor.

25             THE COURT:  If you could resume your seat, please.
```

App. 0484

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 74 of 786   Page ID #:562
Case 2:16-cr-00425-PA   Document 83   Filed 07/20/17   Page 73 of 79   Page ID #:516

73

```
 1                      (Sidebar ends.)
 2              THE COURT:  Okay.  Do you have a criminal case
 3    questionnaire?
 4              PROSPECTIVE JUROR:  Yes.
 5              THE COURT:  Did have you a chance to look through
 6    that?
 7              PROSPECTIVE JUROR:  So I do have an immediate family
 8    member who has been arrested and charged with a crime regarding
 9    a criminal offense.
10              THE COURT:  When was that?
11              PROSPECTIVE JUROR:  It's my 18 year-old.  It's still
12    ongoing.
13              THE COURT:  Okay.  Do you recall what police agency
14    was involved?
15              PROSPECTIVE JUROR:  Los Angeles Police Department.
16              THE COURT:  Okay.  And is that case still active?
17              PROSPECTIVE JUROR:  It is active.
18              THE COURT:  When was that?
19              PROSPECTIVE JUROR:  The offense was in July.
20              THE COURT:  Of 2016?
21              PROSPECTIVE JUROR:  Yes, 16.
22              THE COURT:  And can you tell us generally what it
23    involved?
24              PROSPECTIVE JUROR:  The assault of a peace officer.
25              THE COURT:  Do you have any concerns about the way
```

Case 2:28-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 75 of 786    Page ID #:503
Case 2:16-cr-00215-PA    Document 83    Filed 07/20/17    Page 74 of 79    Page ID #:517

74

1    his case is being handled?  Do you have any concerns about the

2    way that the police handled that?

3            PROSPECTIVE JUROR:  I'm not -- I don't have a

4    problem with the way the judge is handling it.

5        I have a problem with the way law enforcement handled it.

6            THE COURT:  Okay.  There may be law enforcement

7    officers.  I don't think anything from LAPD will be testifying

8    in this case, but there may be law enforcement officers who may

9    be witnesses in this case.

10        Are you going to be able to put aside what has happened

11    with your son and your feelings concerning law enforcement

12    about the way his case was handled, and judge the credibility

13    of the law enforcement agency who testify in this case fairly

14    and impartially?

15            PROSPECTIVE JUROR:  Yes.

16            THE COURT:  So you are going to be able to judge the

17    credibility of any law enforcement witnesses the same way you

18    would that of any other witness who testifies in this case?

19            PROSPECTIVE JUROR:  I believe so.

20            THE COURT:  Any doubt in your mind?

21            PROSPECTIVE JUROR:  A little doubt.

22            THE COURT:  Okay.  Any other yes responses to any of

23    the other questions?

24            PROSPECTIVE JUROR:  No. 2.  I actually just spent --

25    a very close friend of mine was murdered.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA  Document 1-5  Filed 06/05/23  Page 76 of 786  Page ID #:564
Case 2:18-cr-00215-PA  Document 83  Filed 07/20/15  Page 79 of 79  Page ID #:518

75

```
 1        His case was -- it's been three years, it just ended
 2   actually in March.
 3              THE COURT:  Do you know what police agency was
 4   handling that case?
 5              PROSPECTIVE JUROR:  That was with Los Angeles
 6   city -- Los Angeles County, I guess.
 7              THE COURT:  Okay.  Do you have any concerns about
 8   the way that that case was handled?
 9              PROSPECTIVE JUROR:  No.
10              THE COURT:  And when you say the case was recently
11   resolved, how was it resolved?
12              PROSPECTIVE JUROR:  It was over three years.  The
13   defendant was -- they wanted life without parole.  I think he
14   got murder in the second degree.
15              THE COURT:  Okay.
16              PROSPECTIVE JUROR:  I wasn't happy about that, but.
17              THE COURT:  Do you have any other yes or affirmative
18   responses to any of the other questions?
19              PROSPECTIVE JUROR:  My father is a surgeon.  He's
20   been in the medical field for my entire life.
21              THE COURT:  Okay.  Any other yes or affirmative
22   responses to any of the other questions?
23              PROSPECTIVE JUROR:  My grandfather has a pacemaker.
24   And philosophically, I do feel -- I do have feelings or views
25   around healthcare.
```

App. 0487

**UNITED STATES DISTRICT COURT**

Case 2:28-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 77 of 786   Page ID #:568
Case 2:10-cr-00215-PA   Document 83   Filed 07/20/12   Page 78 of 79   Page ID #:519

76

```
 1            THE COURT:  Okay.  May I see counsel at sidebar?

 2                      (Sidebar begins.)

 3            THE COURT:  Okay.  I think I'm going to break for

 4   lunch, and given his answers, I'm inclined to excuse this

 5   juror.

 6        Does either side wish to have any further inquiries,

 7   specifically his question that he has doubts about his ability

 8   to be fair and impartial, I think, with respect to his son's

 9   case and just -- and I think unless jurors can commit that they

10   are going to be fair and impartial, probably there is a doubt

11   in their minds, I think they probably ought to be excused.

12        Do you want me to make some further inquiries?  I will be

13   happy to do that.

14            MR. MCDERMOTT:  No, Your Honor.

15            MS. RYKKEN:  No, Your Honor.

16                      (Sidebar ends.)

17            THE COURT:  All right.  Ladies and gentlemen, we're

18   going to break for lunch.

19        Again, I want to remind you that you are not to discuss

20   this case with anyone, including your fellow jurors, members of

21   your family, people involved in the trial, or anyone else, nor

22   are you allowed to permit others to discuss the case with you.

23        If anyone approaches you and tries to talk with you about

24   this case, please let me know about it immediately.

25        Don't communicate by e-mail, use any social networking
```

App. 0488

Case 2:23-cv-04448-PA  Document 1-5  Filed 06/05/23  Page 78 of 786  Page ID #:566
Case 2:18-cr-00425-PA  Document 83  Filed 07/20/19  Page 78 of 79  Page ID #:520

77

```
 1    sites.  Don't text message anything about the case.

 2         Do not read any news stories or listen to any articles or

 3    radio or television reports about the case or about anyone who

 4    has anything to do with it.

 5         Do not do any research, such as consulting dictionaries,

 6    searching the Internet, using other reference materials, and do

 7    not make any investigation about the case on your own.

 8         If you need to communicate with me, simply give a note to

 9    the clerk.

10         We're going to come back at -- let's come back at -- we're

11    going to start at 1:30, so everybody ought to be back in the

12    courtroom at 1:25.

13         So except for Prospective Juror No. 1, the rest of you are

14    excused.

15         There is a cafeteria downstairs on the first floor.  Eat

16    there at your own risk -- I shouldn't say that.

17         And there is a few places within a few blocks at either

18    direction.

19         All right.  Thank you very much.

20             THE COURTROOM DEPUTY:  All rise.

21         (JURY EXITS THE COURTROOM AT 12:08 P.M.)

22             THE COURTROOM DEPUTY:  You may be seated.

23             THE COURT:  Sir, we're going to excuse you.  You can

24    return to the jury assembly room on the first floor and tell

25    them you have been excused.  Thank you.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 79 of 786   Page ID #:567
Case 2:16-cv-04215-PA   Document 83   Filed 07/20/17   Page 78 of 79   Page ID #:521

78

1                    PROSPECTIVE JUROR:  Do I leave this here or take it

2      to the clerk?

3                    THE COURTROOM DEPUTY:  Leave it there.  Thank you.

4                    THE COURT:  All right.  Anything else that we need

5      to take up?

6                    MR. FREEDMAN:  No, Your Honor.

7                    MR. MCDERMOTT:  No, sir.

8                    THE COURT:  We will resume at 1:30.  Thank you.

9                    THE COURTROOM DEPUTY:  All rise.  This Court now

10     stands in recess.

11                             (Lunch recess.)

12              (The morning session concluded at 12:10 a.m.)

13                              * * *

14

15

16

17

18

19

20

21

22

23

24

25

App. 0490                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 80 of 786   Page ID #:568
Case 2:16-cv-04215-PA   Document 83   Filed 07/20/17   Page 79 of 79   Page ID #:522

79

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6            I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  July 2, 2017

17

18

19                         /s/ TERRI A. HOURIGAN

20         _____
                 TERRI A. HOURIGAN, CSR NO. 3838, CCRR
21                 Federal Official Court Reporter

22

23

24

25

Case 2:23-cv-04498-PA   Document 1-5   Filed 07/26/23   Page 81 of 786   Page ID
Case 2:16-cv-00215-PA   Document 65   Filed 07/26/23   Page 196 of 78   Page ID #9869
#:523

1

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,

6              Plaintiff,

7       vs.                          Case No. CR-16-215-PA

8   MICHAEL MIRANDO,

9              Defendant.
                                        /
10

11

12        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                       TRIAL DAY 1
13           WEDNESDAY, APRIL 26, 2017
                       8:30 A.M.
14           LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23        TERRI A. HOURIGAN, CSR NO. 3838, CCRR
             FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
             LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-2849

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 82 of 786   Page ID #:524
Case 2:16-cr-00218-PA   Document 85   Filed 07/26/17   Page 2 of 76   Page ID #:570

2

```
1                    APPEARANCES OF COUNSEL:

2


3    FOR THE PLAINTIFF:

4         EILEEN DECKER
          United States Attorney
5         BY:  MICHAEL FREEDMAN
               KATHERINE RYKKEN
6              Assistant United States Attorney
          United States Courthouse
7         312 North Spring Street
          Los Angeles, California  90012
8


9
     FOR THE DEFENDANT MICHAEL MIRANDO:
10
          LAW OFFICES OF KEVIN BARRY MCDERMOTT
11        BY:  KEVIN B. MCDERMOTT
               Attorney at Law
12        300 Spectrum Center Drive, Suite 1420
          Irvine, California 92618
13


14
     ALSO PRESENT:  Special Agent Kathleen Kennedy
15

16

17

18

19

20

21

22

23

24

25
```

App. 0493

Case 2:23-cv-04498-PA    Document 5-5    Filed 06/05/23    Page 83 of 786   Page ID #:571
Case 2:16-cr-00215-PA    Document 85    Filed 07/26/17    Page 39 of 78   Page ID #:525

3

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 26, 2017

 2                             8:30 A.M.

 3                             --oOo--

 4                   (Court called to order)

 5

 6              THE COURTROOM DEPUTY:  All rise.  Calling Item 1,

 7    CR-16-215, United States of America versus Michael Mirando.

 8         Counsel, please state your appearances.

 9              MR. FREEDMAN:  Good morning, Your Honor.  Michael

10    Freedman and Katherine Rykken appearing on behalf of the United

11    States.  Kathleen Kennedy is with us at counsel table.

12              THE COURT:  Good morning.

13              MR. MCDERMOTT:  Good morning, Your Honor.  Kevin

14    McDermott appearing on behalf of Mr. Mirando, who is present.

15              THE COURT:  Good morning.

16         All right.  The first thing is do we have any prospective

17    jurors in the courtroom?

18              MR. MCDERMOTT:  No, sir.

19              THE COURT:  First thing is I have had two jurors

20    report to me that the defendant approached them in the

21    restroom, and he had contact with two prospective jurors.

22         Sir, let me make it clear to you, which I thought I had

23    already done yesterday -- look here, sir, that is unacceptable.

24         Do not contact -- have any contact.  I don't mean -- even

25    to say hi, with any of these jurors; is that clear?
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 84 of 786   Page ID #:526
Case 2:16-cr-00218-PA   Document 85   Filed 07/26/17   Page 4 of 78   Page ID #:4572

4

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Now from what I understand, one of the

 3    jurors was greeted with a, "hello, how are you."

 4        And another juror was made a greeting, because he's in the

 5    habit of saying hello to people, how are you doing, and the

 6    defendant remarked, "Not very well."

 7        So, if the parties wish, I will talk to those two jurors,

 8    I will have them brought in and make some further inquiry or we

 9    can leave it the way that it is, at least, at this point, based

10    on what has been reported to me.

11        And I will admonish the jury again that they are not to

12    have any contacts with anyone having anything to do with this

13    case.

14              MR. FREEDMAN:  Your Honor, I think the second juror

15    that the defendant said, "not very well" to is somewhat more

16    concerning.

17        The government would be interested in the Court inquiring

18    further as to that juror.

19              MR. MCDERMOTT:  Sir, I wasn't present when this

20    happened.

21        Can I have 60 seconds in the outer room just to discuss

22    with my client what the circumstances were?

23        I'm not objecting to what the government has in mind.

24        I would just like to know the circumstances a little

25    better myself.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 85 of 786   Page ID #:579
Case 2:16-cr-00216-PA   Document 65-5   Filed 07/20/17   Page 5 of 78   Page ID #:527

5

```
 1              THE COURT:  That's fine.  I will give you an
 2    opportunity to do that.
 3              MR. MCDERMOTT:  Thank you.
 4              MR. FREEDMAN:  Could I ask one more question?
 5              THE COURT:  Yes.
 6              MR. FREEDMAN:  Was it a juror who is already seated?
 7              THE COURT:  Yes.
 8        Now, we have approximately eight jurors, including the
 9    last one that we talked to last night, who, I believe, said
10    words to the effect that she was a school psychologist who
11    wanted to be excused because she was the only psychologist
12    assigned to her school, and in the event that there was an
13    emergency, she needed to be there.
14        And I think I had indicated to her, that that was not a
15    hardship.
16        Then I think she said something to the effect of, well, I
17    have an in-law who is being investigated, and it looks just
18    like the defendant, at which point, I think, we adjourned for
19    the day.
20        My -- given the number of preemptory challenges we have,
21    and given the numbers of jurors that we have left, which is,
22    approximately eight, my proposal would be to skip over her and
23    put her at the end of the current list of eligible jurors, and
24    see if we can get a jury seated, assuming we don't have some
25    other problem, and at least one or two alternates.
```

App. 0496

**UNITED STATES DISTRICT COURT**

```
 1        And alternatively, if we have to call her up, either as a
 2   potential juror or as an alternate, fine, then I will rule on
 3   her request.
 4        But both parties -- I need both parties to agree to that,
 5   but you certainly don't have to.
 6        If not, I will call on her and rule on her request.
 7             MR. FREEDMAN:  That is fine with us, Your Honor.
 8             MR. MCDERMOTT:  No objection from the defense.
 9             THE COURT:  Okay.  Now, we don't have any additional
10   jurors available to us today.
11        There is a trial that is starting today over at Roybal,
12   and there may be some jurors who are leftovers or who aren't
13   used in that proceeding, who could be made available.  I
14   suspect they wouldn't be made available until this afternoon.
15        I can get more jurors tomorrow.  If we can't -- these
16   eight people that we have, if we can't seat a jury today, then
17   I believe what we probably will have to do is just come back
18   tomorrow, and then I can get some additional jurors and we
19   would finish selecting the jury.
20        But hopefully, we will be able to utilize these eight and
21   be able to get our jury picked.
22        Now, I think, according to my notes, I believe the defense
23   has two preemptory challenges left, and the government has one,
24   so that's sort of our situation.
25        So I would hope that we will be able to -- now I think
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 65-5    Filed 07/20/23    Page 7 of 98    Page ID #:575
Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 87 of 786    Page ID #:529

7

 1    we're missing -- I think, the last time the Court checked -- I

 2    think we are missing one of the jurors who we seated yesterday.

 3    I think there is one that is missing from the available pool.

 4        So why don't I allow defense counsel to confer with his

 5    client, and we will get an update on the number of jurors who

 6    are present while you are doing that.

 7            MR. MCDERMOTT:  Thank you.

 8            THE COURT:  Okay.  Anything else?

 9            MR. FREEDMAN:  Not at this time, Your Honor.

10            MR. MCDERMOTT:  No, sir.

11            THE COURT:  We will bring -- well, I'm going to let

12    you confer with your client, then we will take up this matter.

13            MR. MCDERMOTT:  Yes, sir.

14            THE COURT:  Okay.

15                        (Recess.)

16            THE COURT:  All right.  At least the last time that

17    I checked, Prospective Juror Number 11 is not here.

18            THE COURTROOM DEPUTY:  Everyone is present.

19            THE COURT:  All right.  So we now have everybody

20    present.

21        Now, you have had an opportunity to confer with your

22    client.

23            MR. MCDERMOTT:  Let me start by apologizing to the

24    Court.

25        Maybe I should have done a better job of reinforcing the

1    Court's order.  I can confirm there was contact apparently in

2    the urinal, and I don't object to the government's request to

3    have at least one of them.

4         Could we identify which two in the box might have been

5    contacted?

6              THE COURT:  Uh-huh.  Maybe.

7              THE COURTROOM DEPUTY:  Juror No. 2.

8              THE COURT:  I thought there were two contacts -- I

9    thought there were two potential contacts.

10        So apparently there were two contacts.  One with Juror

11   No. 2, and one with prospective Juror No. 3.

12             MR. MCDERMOTT:  Okay.

13             THE COURT:  Now, I guess one of the questions that I

14   guess I want to have answered, is whether or not there were any

15   other potential jurors who may have overheard whatever this

16   conversation consisted of, and so I propose that out of an

17   over-abundance of caution, we bring them both in.

18             MR. MCDERMOTT:  Yes, sir.

19             THE COURT:  And see if we can figure out what

20   transpired, and what steps we need to take, if any, to

21   alleviate any concerns from either side.

22        Okay.  I'm going to ask the clerk to bring in Prospective

23   Juror No. 2, and if you both can have a seat please.

24             THE COURTROOM DEPUTY:  All rise.

25             (PROSPECTIVE JUROR 2 ENTERS THE COURTROOM.)

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 89 of 786   Page ID #:531
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 90 of 98   Page ID #:517

9

```
 1                THE COURTROOM DEPUTY:  You may be seated.

 2                THE COURT:  Mr. Diaz, you are Prospective Juror

 3    No. 2.

 4                PROSPECTIVE JUROR:  Yes, sir.

 5                THE COURT:  I was advised this morning you may have

 6    had some contact with the defendant this morning?

 7                PROSPECTIVE JUROR:  Yes, I did, sir.

 8                THE COURT:  Okay.  Can you tell me what transpired?

 9                PROSPECTIVE JUROR:  So we were in the restroom, I

10    believe, we said "good morning" to each other.  And then I

11    happened to say, "how are you doing," and then he responded,

12    "not too good."

13                THE COURT:  Were there any other jurors in the

14    restroom when you had this exchange?

15                PROSPECTIVE JUROR:  No, not that I know of.

16                THE COURT:  Okay.  And when the defendant said he

17    was not doing too good, did you respond to him?

18                PROSPECTIVE JUROR:  I don't believe so.

19                THE COURT:  Okay.  And who initiated the contact?

20                PROSPECTIVE JUROR:  I'm not too sure, because I was

21    already using the restroom when the two gentlemen showed up.

22                THE COURT:  There was somebody else besides the

23    defendant?

24                PROSPECTIVE JUROR:  Yes.

25                THE COURT:  Okay.  Who else was there?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 90 of 786  Page ID #:518
Case 2:18-cr-00215-PA  Document 85  Filed 07/20/18  Page 100 of 78  Page ID #:532

10

```
 1              PROSPECTIVE JUROR:  I believe it's the guy sitting

 2   on the bench.

 3              THE COURT:  Okay.

 4              PROSPECTIVE JUROR:  He was to my right, and the

 5   defendant was to my left.

 6              THE COURT:  Okay.  Well, one of the things that the

 7   Court instructed the jurors yesterday is not to have any

 8   contact with anybody --

 9              PROSPECTIVE JUROR:  Correct.

10              THE COURT:  -- having to have anything to do with

11   this case.

12              PROSPECTIVE JUROR:  Correct.

13              THE COURT:  Let me ask you, can you set aside that

14   brief interaction you had with the defendant, and judge this

15   case based solely on the evidence you hear, here in the

16   courtroom?

17              PROSPECTIVE JUROR:  I believe I can.

18              THE COURT:  Okay.  Can you put that aside and be a

19   fair and impartial juror, both as to the defendant and the

20   government?

21              PROSPECTIVE JUROR:  I believe I can.

22              THE COURT:  Is there any doubt in your mind?

23              PROSPECTIVE JUROR:  I mean, a little doubt.

24              THE COURT:  And why do you have doubt in your mind?

25              PROSPECTIVE JUROR:  Maybe because I could possibly
```

App. 0501

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 91 of 786   Page ID #:519
Case 2:10-cr-00215-PA   Document 85   Filed 07/20/11   Page 11 of 78   Page ID #:533

11

```
 1   feel bad for the guy, not too sure.  So, I just want to be

 2   completely honest.

 3              THE COURT:  Yes, that's fine.  Let me see both

 4   counsel at sidebar for a moment.

 5                        (Sidebar begins.)

 6              THE COURT:  Does either counsel wish to have further

 7   inquiry be made?

 8              MR. MCDERMOTT:  No, sir.

 9              THE COURT:  Okay.  And the gentleman that raised his

10   hand, I assume is related to the defendant.

11              MR. MCDERMOTT:  That's the father.

12              THE COURT:  Okay.  What would you --

13              MR. FREEDMAN:  Give me a brief moment to confer.

14              THE COURT:  That's fine.

15              MR. FREEDMAN:  Your Honor, I think given what the

16   juror has stated about potential doubt, unfortunately, he's not

17   going to be a suitable juror in the government's point of view.

18              MR. MCDERMOTT:  Your Honor, I don't have anything

19   else to add to it, Judge.

20              THE COURT:  Do you want to remove him for cause?

21              MR. FREEDMAN:  Yes.

22              THE COURT:  Any objection?

23              MR. MCDERMOTT:  I really can't say that I can.

24              THE COURT:  Okay.  All right.  I'm just going to ask

25   him whether he has had any other contact with any of the other
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 92 of 786   Page ID #:580
Case 2:18-cr-00215-PA   Document 85   Filed 07/20/15   Page 12 of 78   Page ID #:534

12

 1   jurors about this conversation.

 2              MR. MCDERMOTT:  Certainly, right.

 3              THE COURT:  And then we will bring in the other

 4   juror and see where we are.

 5       I think we would excuse him probably then we will see how

 6   far we can get with what we have got remaining.  If we can get

 7   a jury, fine, if we can't, we will get some more jurors and

 8   resume tomorrow.

 9              MR. MCDERMOTT:  I apologize to the Court.

10              MR. FREEDMAN:  Thank you, Your Honor.

11                         (Sidebar ends.)

12              THE COURT:  Mr. Diaz.

13              PROSPECTIVE JUROR:  Yes, sir.

14              THE COURT:  Have you had any conversations with any

15   of the other jurors about your contact with the defendant?

16              PROSPECTIVE JUROR:  Yes.

17              THE COURT:  Okay.  And which jurors did you have

18   contact with?

19              PROSPECTIVE JUROR:  No. 3, I don't know what his

20   name is.  The reason is, he actually mentioned it to me first.

21              THE COURT:  Okay.  What did he mention to you?

22              PROSPECTIVE JUROR:  He said that the defendant said

23   good morning to him.

24              THE COURT:  Uh-huh.

25              PROSPECTIVE JUROR:  So then that's when I told him

App. 0503

**UNITED STATES DISTRICT COURT**

```
 1    what happened in the restroom.

 2            THE COURT:  Okay.  And did -- when you had this

 3    conversation with Prospective Juror No. 3, where did you have

 4    that conversation at?

 5            PROSPECTIVE JUROR:  In the hallway.

 6            THE COURT:  Okay.  Were other jurors present when

 7    you had this conversation?

 8            PROSPECTIVE JUROR:  No.  It was just me and him.

 9            THE COURT:  Okay.  All right.  We're going to --

10    given your statements about having some doubt about being fair

11    and impartial in this case, we're going to excuse you as a

12    juror.

13        I'm going to ask if -- well, first I'm going to ask you

14    not to share the conversations that we have had in here with

15    any of the other jurors.

16            PROSPECTIVE JUROR:  Okay.

17            THE COURT:  I'm going to -- I'm going to ask the

18    clerk to have you escorted into the jury room, and if you could

19    just wait there, and then we will have some further

20    instructions for you.

21            PROSPECTIVE JUROR:  Okay, sir.

22            THE COURT:  All right.  So if you can wait one

23    minute, and Madam Clerk, if you could escort Mr. Diaz into the

24    jury room, and then have Prospective Juror No. 3 come out.

25            THE COURTROOM DEPUTY:  Mr. Diaz, if you could please
```

App. 0504

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 94 of 786    Page ID #:536
Case 2:16-cr-00215-PA    Document 85    Filed 07/20/17    Page 14 of 76    Page ID #:582

14

1    follow me.

2              THE COURT:  All right.  Let's bring in Prospective

3    Juror No. 3.

4              MR. FREEDMAN:  Your Honor, can I make one request?

5              THE COURT:  Yes.

6              MR. FREEDMAN:  I know the Court has now warned the

7    defendant, but given that other members of defendant's family

8    have been involved, perhaps a warning would be appropriate.

9              THE COURT:  Trust me, we will be talking.

10             THE COURTROOM DEPUTY:  All rise.

11             (PROSPECTIVE JUROR 3 ENTERS THE COURTROOM)

12             THE COURT:  Good morning.  Is it Mr. Barragan?

13             PROSPECTIVE JUROR:  Barragan is fine.

14             THE COURT:  Sorry.

15             PROSPECTIVE JUROR:  No worries.

16             THE COURT:  I understand that you may have had some

17   contact with the defendant this morning?

18             PROSPECTIVE JUROR:  That is correct, Your Honor.

19             THE COURT:  Can you tell me what happened?

20             PROSPECTIVE JUROR:  As I got out of the elevator, I

21   was approaching the restroom to use the restroom before I came

22   in here; the defendant was exiting the restroom and proceeded

23   to greet me.

24             THE COURT:  Okay.  What did he say?

25             PROSPECTIVE JUROR:  It was something in the nature

**UNITED STATES DISTRICT COURT**

Case 2:23-cr-04498-PA   Document 1-5   Filed 06/05/23   Page 95 of 786   Page ID #:583
Case 2:18-cr-00223-PA   Document 85   Filed 07/20/15   Page 190 of 78 of Page ID #:537

15

 1   of how are you doing?

 2             THE COURT:  Okay.  What did you say?

 3             PROSPECTIVE JUROR:  I ignored it.  I kept on

 4   walking.

 5             THE COURT:  Did you subsequently -- well, were there

 6   any other jurors who were around when the defendant greeted

 7   you?

 8             PROSPECTIVE JUROR:  The only other person that was

 9   around was, I believe, the last name was Mr. Diaz, but he was

10   sitting towards the middle here on one of the benches.

11       I don't know if he saw or heard it, but he was in that

12   area.

13             THE COURT:  Okay.  Did you subsequently have any

14   contact with any of the other jurors about the defendant

15   greeting you?

16             PROSPECTIVE JUROR:  With Mr. Diaz.  That was it.

17             THE COURT:  Okay.  What did you and Mr. Diaz say to

18   each other?

19             PROSPECTIVE JUROR:  Just in regards that I asked,

20   hey, this guy attempted to greet me, what is going on.  I

21   believe we were informed to report that to the clerk or the

22   judge.

23       So, when I told him that, oh yeah, he said -- he had said

24   "what is up" to me in the bathroom.  He said, "Good morning,

25   how is it going."  He responded, "not too good today."

App. 0506           **UNITED STATES DISTRICT COURT**

```
 1                THE COURT:  Okay.  Let me ask you, was that the sum
 2    total of the contact that you had with the defendant?
 3                PROSPECTIVE JUROR:  That was it.
 4                THE COURT:  The sum total of the conversations you
 5    had with other jurors?
 6                PROSPECTIVE JUROR:  The other jurors were just stuff
 7    about the morning, the drive in, and whatnot.
 8                THE COURT:  But you didn't have any contact with any
 9    other jurors about this.
10                PROSPECTIVE JUROR:  In regards to this, no.
11                THE COURT:  I may have asked you this before, but
12    did -- other than Mr. Diaz, were there any other jurors around
13    when this happened?
14                PROSPECTIVE JUROR:  Not to my knowledge.
15                THE COURT:  Okay.  Do you -- taking into account
16    this contact you had with the defendant, do you still feel you
17    can be fair and impartial as to both sides in this case?
18                PROSPECTIVE JUROR:  I believe the defendant has
19    tried to gain sympathy.
20         I mean, I took college classes -- I did political science,
21    teaching psychology, you know, courses and whatnot, you know,
22    these are behaviors that a person is trying to gain, you know,
23    sympathy from.  An individual that is essentially going to
24    decide they are guilty or innocent.
25                THE COURT:  Uh-huh.
```

App. 0507              **UNITED STATES DISTRICT COURT**

Case 2:28-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 97 of 786   Page ID #:539
Case 2:18-cr-00215-PA   Document 85   Filed 07/20/19   Page 100 of 78   Page ID #:538

17

```
 1              PROSPECTIVE JUROR:  It would be difficult at this
 2    point, because, you know, I work with students and a lot of
 3    them have gotten in trouble with the law, and are products of
 4    second opportunities, or if they weren't, things have been
 5    very, very difficult for them.
 6         The likes of this put all of this into context, what is
 7    really going on here.  If this individual was trying to make
 8    contact with me, did he really do something wrong?
 9         So it kind of leaves me, okay, why would he even try to
10    make any contact or communication with me?
11              THE COURT:  Uh-huh.  Okay.  Let me see counsel at
12    sidebar.
13                   (Sidebar begins.)
14              THE COURT:  Okay.  Does either counsel wish to have
15    the Court make any further inquiries?
16              MR. FREEDMAN:  No, sir.
17              THE COURT:  Okay.  What is the government's
18    position?
19              MR. FREEDMAN:  He has expressed, I think, that his
20    opinions have been swayed.
21         I think one difference is that he avoided contacting and
22    seems to be, of the two jurors, the one who recognized the need
23    to report it to the Court.
24         So it's somewhat less concerning than the other juror.
25              THE COURT:  What is the defense position?
```

Case 2:23-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 98 of 786  Page ID
#:540
Case 2:18-cr-00415-PA  Document 85  Filed 07/20/21  Page 18 of 78  Page ID #:586

18

1          MR. MCDERMOTT:  It would appear, based upon the

2     contact -- I don't -- this is a juror I wanted to keep

3     honestly.  Now it sounds like I have got a juror that has been

4     swayed unfortunately in the other direction.

5          So I would ask the Court's indulgence on letting this guy

6     go at this point in time.

7          MR. FREEDMAN:  We won't object.

8          THE COURT:  I think you are right.

9          So, I will excuse this juror.

10         Now, having heard from these two jurors, I am seriously

11    contemplating revoking his bond.

12         I think this was a deliberate attempt to gain sympathy

13    from these jurors, from him.  I don't know about his father,

14    but certainly from the defendant.

15         Given what the Court repeatedly admonished the jurors, the

16    parties, you know, think about it.

17         MR. MCDERMOTT:  I understand, Judge.  I just, again,

18    I apologize to the Court.  I should have done a better job

19    myself in reinforcing it.  I know, I know.  It's just, you

20    know, we have had six months of without bond or with basically

21    the signature bond.  He's made all of the appearances.

22         Up to this point, I haven't had an issue with him as far

23    as responding to my requests to get stuff done, be there when

24    stuff needs to be done.

25         I don't know that -- you know, it seems to be awfully

App. 0509                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 99 of 786   Page ID #:587
Case 2:18-cr-00215-PA   Document 85   Filed 07/20/19   Page 19 of 78   Page ID #:541

19

1  severe.

2    I think the good prior acts showing is probably

3  appropriate, and I would certainly ask the Court to consider

4  that.

5        MR. FREEDMAN:  We would request that the Court would

6  discipline here.  I don't know what else is going to get

7  through to him.

8        THE COURT:  I will certainly consider it.  It's

9  certainly a consideration at this point.

10    I have been doing this for quite a while, both as a trial

11  lawyer, prosecutor, defense lawyer, as a judge; I have never

12  had a defendant so blatantly do something like this.

13    Not once.  Once, you can understand, but just beyond the

14  pale.

15        MR. FREEDMAN:  I would like to note for the record,

16  I was also greeted by the defendant this morning coming out of

17  the courtroom door, and I said nothing in response, but now

18  that this has come up, I failed to mention it.

19        MR. MCDERMOTT:  So we have a concurrent pattern.

20    Okay.  Well, I mean, you know, a habit I should have

21  broken him of.  Were you swayed?

22        THE COURT:  I would laugh, but you can't -- you

23  can't make this stuff up.

24        MR. MCDERMOTT:  I know, Judge.

25        THE COURT:  In any event, let's excuse this juror.

App. 0510                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5 Filed 06/05/23   Page 100 of 786   Page ID #:542
Case 2:16-cr-00213-PA   Document 65   Filed 07/20/17   Page 20 of 98   Page ID #:542

20

 1          MR. MCDERMOTT:  Yes, sir.

 2          THE COURT:  Then we will resume jury selection.

 3          MR. FREEDMAN:  Now, we have three empty seats, does

 4   the government still have more preemptory challenges?  We would

 5   like some more, given -- given how this has transpired and what

 6   has been going on here.

 7          MR. MCDERMOTT:  I don't object.  If the Court wants

 8   to consider it, I recognize that that was our mistake.

 9      Although, I have previously passed on these two, so I will

10   tell you my feeling -- what I felt about these two.

11          THE COURT:  We will address that.

12      Let's get -- see how much we can get done today.

13      The next time we're over here -- the next time we're over

14   here, we will address whether we are going to give the

15   government another preemptory challenge.

16          MR. MCDERMOTT:  Yes, sir.

17                   (Sidebar ends.)

18          THE COURT:  All right.  Sir, first of all, I want to

19   stress, you certainly didn't do anything wrong.

20      However, I am going to have to excuse you as a juror.  I

21   want to thank you for your candor, and thank you for your

22   service.

23      And you can return to the jury assembly room on the first

24   floor.

25          PROSPECTIVE JUROR:  Will I stay there for the

App. 0511                 **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 5    Filed 06/05/23    Page 101 of 786    Page ID
#:543
Case 2:16-cr-00213-PA    Document 65    Filed 07/20/17    Page 21 of 78    Page ID #:589

21

 1   remainder?

 2              THE COURT:  No, you can tell them that you have been

 3   excused.

 4              PROSPECTIVE JUROR:  I have been excused.  Thank you

 5   very much.  Have a good day.

 6              THE COURTROOM DEPUTY:  All rise.

 7              (PROSPECTIVE JUROR 3 EXITS THE COURTROOM.)

 8              THE COURTROOM DEPUTY:  You may be seated.

 9              THE COURT:  I'm going to ask the clerk to also -- if

10   you could have Juror No. 2 brought in, and I will formally

11   excuse him as well.

12              THE COURTROOM DEPUTY:  All rise.

13              (PROSPECTIVE JUROR 2 ENTERS THE COURTROOM.)

14              THE COURT:  All right.  Sir, we're going to excuse

15   you, and ask you not have any conversations with any

16   prospective jurors about what we have talked about.

17         You can return to the jury assembly room on the first

18   floor and tell them you have been excused.

19              PROSPECTIVE JUROR:  Okay, sir.

20              THE COURT:  Thank you.

21              PROSPECTIVE JUROR:  Shall I exit this way?

22              THE COURT:  That's fine.

23         All right.  The government has made a request to have

24   additional preemptory challenges awarded to them as a result of

25   these two jurors having to be excused.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 102 of 786   Page ID
#:544
Case 2:16-cv-00218-PA   Document 65   Filed 07/20/17   Page 22 of 78   Page ID #:590

22

```
 1        As I understand it, the government has one preemptory

 2   challenge left.

 3        Why don't we go with where we are at this point, and then

 4   assuming you exercise that, and if you feel the need to have

 5   another one, you can raise that at that time.

 6             MR. FREEDMAN:  Thank you, Your Honor.

 7             THE COURT:  All right.  Let's bring the jury in and

 8   resume with jury selection.

 9        And again, I want to stress to the parties and anyone

10   affiliated with these parties, you are not to have any contact

11   with these jurors.

12        And if anybody has any further contact with these jurors,

13   I'm going to consider that jury tampering, which is a

14   punishable offense.

15             THE COURTROOM DEPUTY:  All rise.

16             (JURY ENTERS THE COURTROOM AT 9:24 A.M.)

17             THE COURTROOM DEPUTY:  You may be seated.

18             THE COURT:  All right.  We're going to resume with

19   jury selection this morning.

20        I believe yesterday Ms. Alford was called.

21        We're going to put you at the end of our list here today,

22   and then we will hear from you.

23        I'm going to ask the clerk to call the next prospective

24   juror.

25             THE COURTROOM DEPUTY:  Daniel Rodriguez.
```

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 103 of 786   Page ID
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 23 of 78   Page ID #:591
#:545

23

 1                    PROSPECTIVE JUROR:  Good morning.

 2                    THE COURT:  Mr. Rodriguez, did you hear the

 3       questions I asked of the other prospective jurors yesterday?

 4                    PROSPECTIVE JUROR:  Yes, I did.

 5                    THE COURT:  Is there anything I inquired about that

 6       in good conscience you should disclose?

 7                    PROSPECTIVE JUROR:  No.

 8                    THE COURT:  Anything about the length of the trial

 9       that would prevent you from serving?

10                    PROSPECTIVE JUROR:  Yes.

11                    THE COURT:  Sir, if you could come over here,

12       please?

13                            (Sidebar begins.)

14                    PROSPECTIVE JUROR:  Good morning.  My job does not

15       pay for jury duty.  I cannot be out for five days, if that, or

16       more than that.

17                    THE COURT:  Okay.  Are you married?

18                    PROSPECTIVE JUROR:  No I'm not married.

19                    THE COURT:  Is there anybody else living in your

20       household?

21                    PROSPECTIVE JUROR:  Yes.

22                    THE COURT:  Brother and mom and dad.

23             Okay.  Do your parents work?

24                    PROSPECTIVE JUROR:  Yes.

25                    THE COURT:  What does your father do?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 104 of 786   Page ID
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 24 of 78   Page ID #:592
#:546

24

```
 1              PROSPECTIVE JUROR:  My father works in the kitchen

 2    at a restaurant in Santa Barbara.

 3              THE COURT:  What does your mom do?

 4              PROSPECTIVE JUROR:  She works at elderly living.

 5              THE COURT:  Okay.  Is both your mother and father

 6    working full-time?

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  How old is your brother?

 9              PROSPECTIVE JUROR:  My brother is 28.

10              THE COURT:  Okay, is he working?

11              PROSPECTIVE JUROR:  Yes, he is working.

12              THE COURT:  What does he do?

13              PROSPECTIVE JUROR:  He works for the county or city.

14              THE COURT:  Okay.  And what do you do?

15              PROSPECTIVE JUROR:  I work for BMW.

16              THE COURT:  BMW?

17              PROSPECTIVE JUROR:  BMW, yeah.

18              THE COURT:  A dealer?

19              PROSPECTIVE JUROR:  You call it a dealer.  It's a

20    collision center made by the dealer.

21              THE COURT:  What do you do for them?

22              PROSPECTIVE JUROR:  A repair specialist.

23              THE COURT:  How many employees do they have at that

24    facility?

25              PROSPECTIVE JUROR:  Eight.
```

App. 0515

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 105 of 786   Page ID
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 25 of 78   Page ID #:593
#:547

25

```
 1              THE COURT:  Okay.  And what are your normal hours?
 2              PROSPECTIVE JUROR:  8 to 5 or 6 to 9:30 p.m. I'm on
 3    commission, so I don't get paid by the hour, I get paid on
 4    whatever I do.
 5              THE COURT:  Okay.  And how many days a week do you
 6    work?
 7              PROSPECTIVE JUROR:  Five.
 8              THE COURT:  Okay.  And normally what days do you
 9    work?
10              PROSPECTIVE JUROR:  Monday through Friday.
11         I do commute an hour and a half every single day.
12              THE COURT:  Where is it?
13              PROSPECTIVE JUROR:  Right here in Huntington Park,
14    Ventura County.  Circumstances don't allow me to live around
15    here.
16              THE COURT:  Okay.  Do you contribute financially to
17    your household?
18              PROSPECTIVE JUROR:  I do.  As far as mortgage, food,
19    things from the laundry, that's what I do, those types of
20    things.
21              THE COURT:  Get mom's home cooking.
22              PROSPECTIVE JUROR:  Well, my parents are never home.
23    It's difficult.
24              THE COURT:  Have a seat there.  Thank you.
25              PROSPECTIVE JUROR:  Thank you.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 106 of 786   PageID
#:548
Case 2:16-cv-00218-PA   Document 65   Filed 07/20/17   Page 26 of 76   Page ID #:594

26

 1          THE COURT:  Okay.  What is the parties' position?

 2          MR. MCDERMOTT:  Judge, I'm not going to offer one.

 3  I'm going to curry my favor as much as I can with the Court.  I

 4  think we have forfeited our ability to --

 5          MR. FREEDMAN:  I don't have a strong view one way or

 6  other.

 7          THE COURT:  I'm probably going to excuse him.

 8          MR. MCDERMOTT:  All right.

 9          THE COURT:  Sir.

10      Okay.  Why don't you resume your seat in the audience and

11  we will let you know.

12          PROSPECTIVE JUROR:  Thank you.

13                          (Sidebar ends.)

14          THE COURT:  All right.  Let's call the name of

15  another prospective juror.

16          THE COURTROOM DEPUTY:  Gretchen Lindgreen.

17          THE COURT:  Good morning.

18          PROSPECTIVE JUROR:  Good morning.

19          THE COURT:  Did you hear the questions I had of the

20  other prospective jurors yesterday?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Is there anything that in good

23  conscience you should disclose to us?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Anything about the length of the trial

App. 0517

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 107 of 786   Page ID
Case 2:16-cv-00213-PA   Document 65   Filed 07/20/17   Page 27 of 78   Page ID #:549
#:549

27

 1    that would prevent you from serving?

 2              PROSPECTIVE JUROR:  No.

 3              THE COURT:  Anything about the nature of these

 4    charges that would cause you concerns about your ability to be

 5    fair and impartial to both sides?

 6              PROSPECTIVE JUROR:  No.

 7              THE COURT:  If you could take seat two on the first

 8    row, please.

 9         Let me just ask everybody in here, have any of you either

10    read or heard anything about this case during the last

11    48 hours?

12              PROSPECTIVE JUROR:  No.

13              THE COURT:  Any of you had any contact with anybody

14    about this case including any of the participants during the

15    last 48 hours?

16              PROSPECTIVE JURORS:  No.

17              THE COURT:  Okay.  Even just to say hello?  Anybody?

18              PROSPECTIVE JURORS:  No.

19              THE COURT:  Let's see if we can get you a

20    microphone.

21         And do you have a copy of the background questionnaire?

22              PROSPECTIVE JUROR:  Yes.

23              THE COURT:  If you could tell us a little bit about

24    yourself?

25              PROSPECTIVE JUROR:  My name is Gretchen Lindgreen.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 65-5    Filed 06/05/23    Page 108 of 786   Page ID
Case 2:16-cr-00215-PA    Document 65    Filed 07/20/17    Page 28 of 78   Page ID #596
#:550

28

1    I live in Santa Clarita, California.  I have lived there on and

2    off for 30 years.  I spent some time in the bay area and some

3    time in Orange County.

4         I am married.

5         I have one daughter, who will be two in July.

6         I have a bachelor's degree and master's degree.

7         No military service.

8         My occupation is I am a high school guidance counselor.  I

9    have been doing that for about three years.

10              THE COURT:  Which high school?

11              PROSPECTIVE JUROR:  It's Opportunities for Learning.

12   It is an independent study charter high school.

13              THE COURT:  Okay.

14              PROSPECTIVE JUROR:  My husband is an English teacher

15   and baseball coach at West Ranch High School in Santa Clarita.

16              THE COURT:  Have you ever served on a jury before?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Ever been a party or witness in a civil

19   or criminal case?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  And have you had a chance to look at the

22   criminal case questionnaire?

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  Do you have any yes or affirmative

25   answers to any of those questions?

App. 0519                 **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 109 of 786   Page ID #:551
Case 2:16-cv-00215-PA   Document 65-5   Filed 07/20/17   Page 29 of 78   Page ID #:551

29

 1              PROSPECTIVE JUROR:  I do -- I believe Number 29.

 2              THE COURT:  Okay.

 3              PROSPECTIVE JUROR:  I have three uncles who are in

 4     the Sheriff's Department.

 5          One was a chief.  He is now retired.  He is working for

 6     the relief association.  He is the executive director of that.

 7          Another is a lieutenant and one is a captain.

 8          I also have an aunt, who is a defense attorney for the

 9     County of Los Angeles.

10          I have a cousin who was an attorney for the federal

11     government in Washington D.C. for the commerce department.

12              THE COURT:  Okay.

13              PROSPECTIVE JUROR:  He's now an attorney in Los

14     Angeles doing employment and labor law.

15              THE COURT:  Okay.  When you said you had relatives

16     that are employed with the Sheriff's Department, which

17     Sheriff's Department is that?

18              PROSPECTIVE JUROR:  Los Angeles.

19              THE COURT:  Los Angeles County?

20              PROSPECTIVE JUROR:  Yes.

21              THE COURT:  And do you know what they do for the

22     Sheriff's Department?  Do they work patrol?

23              PROSPECTIVE JUROR:  I believe one uncle is still on

24     patrol.

25              THE COURT:  One is a lieutenant and one is a

Case 2:23-cv-04498-PA    Document 5-5    Filed 06/05/23    Page 110 of 786    Page ID #:552
Case 2:16-cr-00218-PA    Document 65    Filed 07/20/17    Page 30 of 78   Page ID #:598

30

 1   captain?

 2          PROSPECTIVE JUROR:  The captain, he is detective in

 3   the cyber-something.

 4          THE COURT:  Okay.  Ever had discussion with them

 5   about the work that they do or their cases?

 6          PROSPECTIVE JUROR:  Yes.

 7          THE COURT:  Do you think you can put aside any of

 8   those discussions and judge this case, based solely on the

 9   evidence you hear here in Court?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  And you had an aunt that is a defense

12   attorney?

13          PROSPECTIVE JUROR:  Yes.  So she was a defense

14   attorney for the Sheriff's Department.  She is now for the

15   County of Los Angeles.

16          THE COURT:  Okay.  And you had a cousin who used to

17   work for the commerce department?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Any other yes or affirmative responses

20   to any of the other questions?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Pass for cause as to the newly-seated

23   juror?

24          MR. FREEDMAN:  Yes, Your Honor.  Could we have a

25   brief sidebar?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 111 of 786   Page ID #:553
Case 2:16-cv-00218-PA   Document 65   Filed 07/20/17   Page 31 of 78   Page ID #:599

31

```
 1              THE COURT:  Yes.

 2              MR. FREEDMAN:  Thank you.

 3                      (Sidebar begins.)

 4              MS. RYKKEN:  I may have accidently spoken with

 5    Juror 2 yesterday.  I don't know if it's her.  I know that it

 6    was someone that was at the door yesterday who was having

 7    trouble, so I said, "you have to stand back and try it again."

 8    I don't know if it's her or not, but she looked kind of like

 9    her.

10              THE COURT:  Okay.

11              MS. RYKKEN:  She wasn't wearing a badge, so I don't

12    remember anything else.

13              THE COURT:  Okay.  So the person you had that

14    interlude with wasn't wearing a badge?

15              MS. RYKKEN:  No.

16              THE COURT:  Okay.

17              MS. RYKKEN:  It was at 5:30, when we left yesterday,

18    maybe 5:45.

19              MR. MCDERMOTT:  I think she already said she had no

20    contact.

21              MS. RYKKEN:  Thank you.

22              THE COURT:  Excuse me, counsel.  Unless somebody has

23    an objection, what I intend to do is go ahead and see if we can

24    fill those empty seats before we go back to exercise

25    challenges.
```

App. 0522

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 112 of 786   Page ID #:554
Case 2:16-cv-00211-PA   Document 65   Filed 07/20/17   Page 32 of 76   Page ID #:600

32

```
 1              MS. RYKKEN:  Thank you.

 2              THE COURT:  Any additional questions by counsel for

 3     the newly-seated juror?

 4              MR. FREEDMAN:  No, Your Honor.

 5              MR. MCDERMOTT:  Not by defense, sir.

 6              THE COURT:  Thank you.  Let's call the name of

 7     another prospective juror, please.

 8              THE COURTROOM DEPUTY:  Belkis Miller.

 9              THE COURT:  Did you hear the questions I asked of

10     the other prospective jurors yesterday?

11              PROSPECTIVE JUROR:  Yes, I did.

12              THE COURT:  Is there anything that I inquired about

13     that in good conscience you should disclose to us?

14              PROSPECTIVE JUROR:  No.  I have a few yes answers to

15     the questionnaires.

16              THE COURT:  Okay.  We will get to that.

17         Is there anything about the nature of these charges that

18     cause you to have concerns about your ability to be fair and

19     impartial to both sides?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Anything about the length of the trial

22     that would prevent you from serving?

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  If could you come over here, please.

25                        (Sidebar begins.)
```

App. 0523

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 113 of 786   Page ID
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 33 of 78   Page ID #:555
#:555

33

```
1              THE COURT:  Okay.  Good morning.  What is it about

2   the length of the trial that causes you to have concerns?

3              PROSPECTIVE JUROR:  Because I have two kids, 13 and

4   11, and they go to school.  And I have to drop them off to

5   school and have to pick them up and take them to all of the

6   activities they have.  That is the only reason.

7         And also because I'm self-employed.  If I don't work, I

8   don't have an income.

9              THE COURT:  Are you married?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Okay.  What does your husband do?

12             PROSPECTIVE JUROR:  He's a police officer, LAPD.

13             THE COURT:  LAPD?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  And what -- where does he work at?

16             PROSPECTIVE JUROR:  Van Nuys Station at 4:00 in the

17  morning.

18             THE COURT:  What city do you reside in?

19             PROSPECTIVE JUROR:  I'm sorry?

20             THE COURT:  What city do you reside in?

21             PROSPECTIVE JUROR:  Sherman Oaks.

22             THE COURT:  Your children are 11 and 13?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Okay.  And what time do they normally go

25  to school?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 114 of 786   Page ID #:556
Case 2:16-cv-00218-PA   Document 85-5   Filed 07/20/17   Page 34 of 46   Page ID #:602

34

```
 1              PROSPECTIVE JUROR:  They go to school, usually at
 2    7:50.
 3              THE COURT:  Okay.  And do they both attend the same
 4    school?
 5              PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  Where is the school located?
 7              PROSPECTIVE JUROR:  It's a couple of miles from my
 8    house.
 9              THE COURT:  Back in the day, I used to walk.
10              PROSPECTIVE JUROR:  I know, but it is different now.
11    Crazy people out there.
12              THE COURT:  Believe me, I know.
13              PROSPECTIVE JUROR:  He's going to go to Notre Dame.
14    It's only three blocks.  He's going to have to walk with a
15    group of kids.
16              THE COURT:  Okay.  What are your husband's hours?
17              PROSPECTIVE JUROR:  I believe he works from
18    4:00 a.m. to 2:00 p.m., but then he does the Dodger's Stadium
19    and he works at Staples for overtime and stuff that he does.
20              THE COURT:  Okay.  And what do you do?
21              PROSPECTIVE JUROR:  I'm a medical esthetician.
22              THE COURT:  How often do you work?
23              PROSPECTIVE JUROR:  I work four days a week,
24    sometimes five.  It depends how busy.
25              THE COURT:  Where do you work?
```

App. 0525                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 15-5   Filed 06/05/23   Page 115 of 786   Page ID #:557
Case 2:16-cv-00219-PA   Document 65   Filed 07/20/17   Page 89 of 75   Page ID #:6602

35

```
 1                PROSPECTIVE JUROR:  At Westlake.

 2                THE COURT:  Westlake?

 3                PROSPECTIVE JUROR:  Westlake Village.

 4                THE COURT:  What are your hours?

 5                PROSPECTIVE JUROR:  My hours could be like from

 6    9:00 a.m. to 9:00 p.m.  I usually work 12-hour days.

 7                THE COURT:  Are you working full-time?

 8                PROSPECTIVE JUROR:  I believe full-time.  I work

 9    three or four days, but it's a bunch of hours in one day.

10                THE COURT:  Okay.  And the name of your employer is?

11                PROSPECTIVE JUROR:  Medical Esthetics.

12                THE COURT:  You are literally self-employed?

13                PROSPECTIVE JUROR:  Yes, I am.

14                THE COURT:  Okay.  I'm sorry, what do you do?

15                PROSPECTIVE JUROR:  Medical esthetics, skin care.

16                THE COURT:  Got you.  Do you have relatives in the

17    area?

18                PROSPECTIVE JUROR:  My mom.

19                THE COURT:  Where does she live?

20                PROSPECTIVE JUROR:  She lives about a mile away, but

21    she doesn't drive.  She takes a bus.

22                THE COURT:  Okay.

23                PROSPECTIVE JUROR:  And my husband's mother, they

24    live together.  She had her driver's license taken away.  She

25    hit somebody on a bicycle.
```

App. 0526

Case 2:23-cv-04498-PA   Document 35-5   Filed 06/05/23   Page 116 of 786   Page ID
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 80 of 76   Page ID #9604
#:558

36

```
 1                THE COURT:  Okay.

 2                PROSPECTIVE JUROR:  She doesn't drive any more.

 3                THE COURT:  She's not giving lessons to the

 4  13 year-old?

 5                PROSPECTIVE JUROR:  No.  She was with my son when

 6  this happened.

 7                THE COURT:  Tell you what, assuming the lawyers

 8  agree, I'm going to put you at the end of the list.

 9                PROSPECTIVE JUROR:  Okay.

10                THE COURT:  Then we will decide.

11                PROSPECTIVE JUROR:  Sounds good.

12                THE COURT:  We will let you know.  Just sit in the

13  audience for now.

14                          (Sidebar ends.)

15                THE COURT:  Okay.  Let's call the name of another

16  prospective juror.

17                THE COURTROOM DEPUTY:  Mylinne Apiado.

18                PROSPECTIVE JUROR:  Good morning.

19                THE COURT:  Good morning.  Did you hear the

20  questions I asked the other prospective jurors yesterday?

21                PROSPECTIVE JUROR:  Yes, I did.

22                THE COURT:  Is there anything that I have inquired

23  that in good conscience you should disclose to us?

24                PROSPECTIVE JUROR:  I work in the healthcare

25  industry.
```

App. 0527

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 117 of 786   Page ID #:559
Case 2:18-cr-00218-PA   Document 65   Filed 07/20/17   Page 87 of 78   Page ID #:605

37

```
 1                THE COURT:  Okay.  Is there anything about the
 2     length of this trial that would prevent you from serving?
 3                PROSPECTIVE JUROR:  I'm afraid, yes.
 4                THE COURT:  I'm sorry?
 5                PROSPECTIVE JUROR:  Yes.
 6                THE COURT:  Okay.
 7                        (Sidebar begins.)
 8                THE COURT:  Go ahead.
 9                PROSPECTIVE JUROR:  I'm a nurse.  I have a
10     five-year-old and one-year-old daughter, and my husband takes
11     care of them.  My husband already missed a job last night.
12                THE COURT:  Sorry?
13                PROSPECTIVE JUROR:  He missed a job.  So if I did
14     this for the period of five days or so --
15                THE COURT:  Uh-huh.
16                PROSPECTIVE JUROR:  -- we are going to suffer.  Me
17     and my husband.
18          So I'm afraid I can't -- we -- so, I live in Ventura
19     County.  I have a five-year-old and a one-year-old daughter, me
20     and my husband take care of them.
21          I'm a nurse.  And I'm familiar with a heart monitor, and I
22     have seen it in some of my patients.
23                THE COURT:  Okay.  For now, let's talk about what
24     days of week do you work?
25                PROSPECTIVE JUROR:  No particular days, Your Honor.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 118 of 786   Page ID
#:560
Case 2:16-cv-00215-PA   Document 65   Filed 07/20/17   Page 38 of 78   Page ID #:606

38

1          THE COURT:  Okay.  And what does your husband do for

2     a living?

3          PROSPECTIVE JUROR:  He's a factory worker.

4          THE COURT:  Does he work full-time?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  When you are working?

7          PROSPECTIVE JUROR:  He's taking care of the kids.

8          THE COURT:  He takes care of the kids.

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  And what is your normal schedule?

11          PROSPECTIVE JUROR:  Morning -- 7:00 in the morning.

12          THE COURT:  I take it he must work then?

13          PROSPECTIVE JUROR:  At night.

14          THE COURT:  He works at night, so he's taking care

15     of the kids during the day?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Now who is your employer?

18          PROSPECTIVE JUROR:  Ensign, Incorporated.  But I

19     work at Glenwood Center.

20          THE COURT:  How many employees does your employer

21     have?

22          PROSPECTIVE JUROR:  In our facility, probably like

23     200 or so.

24          THE COURT:  Okay.  Are you reimbursed for jury

25     service?

App. 0529          UNITED STATES DISTRICT COURT

Case 2:16-cv-00218-PA  Document 65  Filed 07/20/17  Page 39 of 78  Page ID #:9607

```
 1              PROSPECTIVE JUROR:  I don't know.
 2              THE COURT:  Okay.  All right.  What we're going to
 3    need to do is I need to get a phone number for your employer,
 4    okay, And I need to find out whether they pay you for jury
 5    service.
 6              PROSPECTIVE JUROR:  Uh-huh.
 7              THE COURT:  And for what period of time.  So can you
 8    give us a phone number so we can call them?
 9              PROSPECTIVE JUROR:  Uh-huh.
10              THE COURT:  If you can provide that phone number --
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  -- to the clerk, then we will call them.
13              PROSPECTIVE JUROR:  Okay.
14              THE COURT:  You didn't ask them whether they paid
15    you for jury service?
16              PROSPECTIVE JUROR:  Probably they would and wouldn't
17    have a problem with that.  I have been there for five years.
18    My manager knows I'm in jury duty right now.
19              THE COURT:  Okay.  So I think what we're going to
20    do, if there is an issue about them paying you for jury
21    service, you can let me know that.
22              PROSPECTIVE JUROR:  Uh-huh.
23              THE COURT:  But I don't think we can excuse you.
24              PROSPECTIVE JUROR:  Uh-huh.
25              THE COURT:  If they are going to reimburse you for
```

App. 0530

Case 2:16-cv-00218-PA    Document 65    Filed 07/20/17    Page 40 of 70    Page ID #:608

40

```
 1    your jury service.

 2              PROSPECTIVE JUROR:  Okay.  Even if I know the Holter

 3    Labs?

 4              THE COURT:  There are a lot of people who know about

 5    Holter monitors, people who wear those monitors.

 6              PROSPECTIVE JUROR:  Okay.  I guess I have to travel

 7    from Ventura to here?

 8              THE COURT:  Pretty much.  Depending on where you

 9    live in Ventura, we may be able to -- the Court may be able to

10    put you up in a hotel if you would like that to save you the

11    drive.

12              PROSPECTIVE JUROR:  I have to talk to my husband

13    about that.

14              THE COURT:  Okay.  It might be a nice vacation from

15    the kids -- I'm just kidding.

16         So, I'm going to -- is there anything about the nature of

17    these charges that causes you to have questions about your

18    ability to be fair and impartial to both sides?

19              PROSPECTIVE JUROR:  I believe I know about the

20    device.

21              THE COURT:  Well, that's okay.

22         Yeah, we will talk about that.

23         Do you know how the device works?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Are you ever involved in purchasing
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 121 of 786   Page ID #:609
Case 2:16-cv-00216-PA   Document 55   Filed 07/20/17   Page 41 of 78   Page ID #:563

41

```
 1    those devices?

 2              PROSPECTIVE JUROR:  No.  With the patients, we take

 3    care of the patients, and the monitor and the pacemaker and all

 4    of that.

 5              THE COURT:  Okay.  Okay.  So if you could take that

 6    empty chair there on the first row.

 7              PROSPECTIVE JUROR:  Thank you.

 8              THE COURT:  Okay.

 9                        (Sidebar ends.)

10              THE COURT:  I'm sorry, what is your last name?

11              PROSPECTIVE JUROR:  Apiado.

12              THE COURT:  If you could take the microphone and

13    take the background questionnaire and tell us a little bit

14    about yourself.

15              PROSPECTIVE JUROR:  My name is Mylinne Apiado.

16        I live in Ventura County.  I have been there for almost

17    ten years now.

18          Before that, I lived in the Philippines.  I'm married.  I

19    have two daughters, 5 and 1 years old.

20              THE COURT:  Your educational background?

21              PROSPECTIVE JUROR:  I have a bachelor's degree and

22    an associate degree.

23          I have no military service.  I'm a nurse.

24              THE COURT:  Okay.  Who are you employed by?

25              PROSPECTIVE JUROR:  I work at Glenwood Care Center
```

App. 0532

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 122 of 786   Page ID #:564
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 42 of 78   Page ID #:610

42

1    in Ventura County.

2              THE COURT:  Okay.  Your what does your husband do

3    for a living?

4              PROSPECTIVE JUROR:  My husband is factory worker.

5    The name of his company, I believe is Catalytic Solution.

6              THE COURT:  Ever served on a jury before?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Ever been a party or witness in a civil

9    or criminal case?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Okay.  Have you had a chance to look at

12   the criminal case questionnaire?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Do you have a yes or affirmative answers

15   to any of those questions.

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR:  Number 12, I work in the

19   healthcare industry.

20        And Number 14, I'm familiar with the heart rate monitoring

21   devices.  Some of my patients may wear them.

22             THE COURT:  Okay.

23             PROSPECTIVE JUROR:  I have a specialized training in

24   healthcare, and we have training and in-services in our

25   facility about fraud, Medicare, and insurance services.

App. 0533                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 123 of 786   Page ID #:565
Case 2:16-cv-00218-PA   Document 65   Filed 07/20/17   Page 43 of 78   Page ID #:611

43

```
 1        And 21, I believe healthcare laws should be revised.

 2   That's all.

 3              THE COURT:  Can you just repeat that last sentence

 4   you said?

 5              PROSPECTIVE JUROR:  Number 21?

 6              THE COURT:  Number 21.

 7              PROSPECTIVE JUROR:  I think laws related to

 8   healthcare should be revised.

 9              THE COURT:  Okay.  With respect to losses?

10              PROSPECTIVE JUROR:  I do.

11              THE COURT:  Okay.  Can you tell me what you mean by

12   that?

13              PROSPECTIVE JUROR:  Before the healthcare change,

14   our facility is always booked, like, it's always, always full.

15              THE COURT:  Uh-huh.

16              PROSPECTIVE JUROR:  Then after the healthcare has

17   been changed --

18              THE COURT:  Uh-huh.

19              PROSPECTIVE JUROR:  -- we rarely are full.  Our

20   facility is -- patients have been low, and some of the coverage

21   has been changed, so patients before used to stay for a longer

22   period of time, and then now that patients -- it's like a

23   certain period that they have to stay.  And even if the patient

24   feels that they need to stay more, a bit longer, the coverage

25   is not -- the insurance is not going to cover all of the stay,
```

App. 0534

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 124 of 786   Page ID
#:566
Case 2:16-cv-00219-PA   Document 65   Filed 07/20/17   Page 44 of 73   Page ID #:612

44

```
 1    and then they have to pay out of pocket for that.

 2                THE COURT:  Okay.

 3                PROSPECTIVE JUROR:  Sometimes, it's frustrating for

 4    them.

 5                THE COURT:  Okay.  Any other yes or affirmative

 6    responses to any of the other questions?

 7                PROSPECTIVE JUROR:  No more.

 8                THE COURT:  Okay.  Pass for cause as to the newly

 9    seated juror?

10                MR. FREEDMAN:  Yes, Your Honor.

11                MR. MCDERMOTT:  Yes, sir.

12                THE COURT:  Any additional questions for the newly

13    seated juror?

14                MR. FREEDMAN:  No, Your Honor.

15                MR. MCDERMOTT:  Not by defense.

16                THE COURT:  All right.  Thank you.

17          Let's call the name of another prospective juror, please.

18                THE COURTROOM DEPUTY:  James Hall.

19                THE COURT:  Good morning.

20                PROSPECTIVE JUROR:  Good morning, Your Honor.

21                THE COURT:  Did you hear the questions I asked of

22    the other prospective jurors?

23                PROSPECTIVE JUROR:  I did.

24                THE COURT:  Is there anything I have inquired about

25    that in good conscience you should disclose to us?
```

App. 0535

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 125 of 786   Page ID
Case 2:18-cr-00218-PA   Document 65   Filed 07/20/17   Page 49 of 75   Page ID #:619
#:567

45

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Anything about the length of the trial

 3    that would prevent you from serving?

 4              PROSPECTIVE JUROR:  No.

 5              THE COURT:  Anything about the nature of these

 6    charges that cause you to have any concerns about your ability

 7    to fair and impartial to both sides?

 8              PROSPECTIVE JUROR:  No.

 9              THE COURT:  All right.  Sir, if you could take the

10    empty chair on the second row, please.

11         And if you could take the microphone and take the

12    background questionnaire and tell us a little bit about

13    yourself.

14              PROSPECTIVE JUROR:  My name is James Hall.  I live

15    in Azusa.  I have just lived a few months.

16         My wife lived in New Hampshire where I was the last

17    16 years.

18         I'm remarried.  I have two children, plus two

19    step-children.  So they range from a boy, 26, a girl, 24, and

20    another boy, 23, and another one, 20.

21         The 26 year old is a professional machinist in New

22    Hampshire.

23         The 24-year-old female is an artist and copywriter in the

24    advertising industry in Dearborn, Michigan.

25         My 23 year old is still in college in New Hampshire, in
```

Case 2:23-cv-04498-PA    Document 5-5   Filed 06/05/23    Page 126 of 786   Page ID
Case 2:16-cv-00213-PA    Document 65   Filed 07/20/17    Page 46 of 76   Page ID #:614
#:568

46

```
 1    computer science.

 2         My 20 year old is in college up in Eureka.

 3         I have got a bachelor's of science.

 4         I served in the U.S. Army, as well as the Tennessee

 5    National Guard and the Texas National Guard.

 6              THE COURT:  What was your job in the army?

 7              PROSPECTIVE JUROR:  I started enlisted as a

 8    mechanic, and then I was an infantry officer, and then an

 9    attack helicopter pilot.

10              THE COURT:  Does your wife work?

11              PROSPECTIVE JUROR:  She's a retired school teacher

12    from Massachusetts, and just got her California credential, so

13    she's looking for work.

14              THE COURT:  Ever served on a jury before?

15              PROSPECTIVE JUROR:  I have not.

16              THE COURT:  Ever been a party or witness in a civil

17    or criminal case?

18              PROSPECTIVE JUROR:  Yes, civil case.

19              THE COURT:  When was that?

20              PROSPECTIVE JUROR:  25 years ago.

21              THE COURT:  Do you recall generally what it was

22    about?

23              PROSPECTIVE JUROR:  Well, I brought a case against a

24    cab company.  I had a car totaled, and my passenger and I were

25    both injured from a cab that was being driven by someone who
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 127 of 786   Page ID
Case 2:16-cv-00218-PA   Document 65   Filed 07/20/17   Page 47 of 78   Page ID #:615
#:569

47

 1    didn't have a license.

 2            THE COURT:  Anything about that experience that

 3    causes you to have concerns about your ability to be fair and

 4    impartial in this case?

 5            PROSPECTIVE JUROR:  No.

 6            THE COURT:  Have you had a chance to look at the

 7    criminal case questionnaire?

 8            PROSPECTIVE JUROR:  I have.

 9            THE COURT:  Do you have any yes or affirmative

10    responses to any of those questions?

11            PROSPECTIVE JUROR:  Yes, I do, for 2, 12 and 21.

12            THE COURT:  Why don't we start with 2.

13            PROSPECTIVE JUROR:  Just a property crime.  I had a

14    new car stolen from an airport parking once.

15            THE COURT:  Okay.

16            PROSPECTIVE JUROR:  My parents also had their house

17    completely cleaned out once, on vacation.  So that kind of

18    impacted us for a while.

19            THE COURT:  Was that here locally?

20            PROSPECTIVE JUROR:  No.  Their case was in

21    Louisville, Kentucky, and my car was in Nashville, Tennessee.

22            THE COURT:  Anything about those experiences that

23    caused you to have any concerns about your ability to be a fair

24    and impartial juror?

25            PROSPECTIVE JUROR:  No.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 128 of 786   Page ID
Case 2:16-cv-00215-PA   Document 65   Filed 07/20/17   Page 48 of 78   Page ID #:616
#:570

48

```
 1                    THE COURT:  What about Number 12?

 2                    PROSPECTIVE JUROR:  One of my brothers spent most of

 3      his career in medical services sales, not devices, though.

 4                    THE COURT:  Okay.  Do you know what product he was

 5      selling?

 6                    PROSPECTIVE JUROR:  Excuse me?

 7                    THE COURT:  Do you know what product he was selling?

 8                    PROSPECTIVE JUROR:  It was mainly in-home care of

 9      different sorts, both services, and lower level-trained.

10                    THE COURT:  And 21?

11                    PROSPECTIVE JUROR:  Just generically, I think there

12      is plenty of room for improvement in our healthcare and our

13      illegal drug laws and firearm laws, but nothing that is

14      specific to this case.

15                    THE COURT:  Okay.  Any other yes or affirmative

16      answers to any of the other questions?

17                    PROSPECTIVE JUROR:  No, sir.

18                    THE COURT:  Any of your views in response to 21, do

19      you have any concerns about those views making it difficult for

20      you to be fair and impartial?

21                    PROSPECTIVE JUROR:  No, I don't.

22                    THE COURT:  Okay.  Pass for cause as to the newly

23      seated juror?

24                    MR. FREEDMAN:  Yes, Your Honor.

25                    MR. MCDERMOTT:  Yes, sir.
```

App. 0539

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 129 of 786   Page ID
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 49 of 78   Page ID #:571
#:571

49

```
1              THE COURT:  Any additional questions to the newly

2    seated juror?

3              MR. FREEDMAN:  No, Your Honor.

4              MR. MCDERMOTT:  I have none.

5              THE COURT:  All right.  I believe the next

6    preemptory challenge rests with the defense.

7              MR. MCDERMOTT:  Sir, with the Court's permission, I

8    would ask the Court to thank and excuse Juror No. 3.

9              THE COURT:  All right.  Miss, you are excused.

10        Thank you very much for your service.  You can return to

11   the jury assembly room on the first floor.

12        All right.  I want to ask the clerk to call the name of

13   another prospective juror.

14              THE COURTROOM DEPUTY:  Armond Abrami.

15              THE COURT:  Good morning.  Did you hear the

16   questions I have asked of the other prospective jurors?

17              PROSPECTIVE JUROR:  Yes. I did.

18              THE COURT:  Is there anything I inquired about that

19   in good conscience, you should disclose to us?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Anything about the length of the trial

22   that would prevent you from serving?

23              PROSPECTIVE JUROR:  Yes, sir.

24              THE COURT:  If you could join us over here, please?

25                        (Sidebar begins.)
```

App. 0540

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  What is it about.

 2              PROSPECTIVE JUROR:  Just financial.  I got a job six

 3   months ago.  I'm a new employee, already, just my wife is not

 4   working.  I'm the only person working, that's why I don't want

 5   to lose my job, other than that I don't have any excuse.

 6              THE COURT:  Okay.  Where do you work?

 7              PROSPECTIVE JUROR:  Just -- it's a cabinet company

 8   that is in Riverside.

 9              THE COURT:  What do you do for them?

10              PROSPECTIVE JUROR:  I'm a field operation manager.

11              THE COURT:  Okay.  How many employees do they have?

12              PROSPECTIVE JUROR:  Just 40 under me.

13              THE COURT:  40 under you?

14              PROSPECTIVE JUROR:  Yes.

15              THE COURT:  And do they reimburse you for jury

16   service?

17              PROSPECTIVE JUROR:  I don't think so, I'm new.

18              THE COURT:  Did you ask?

19              PROSPECTIVE JUROR:  I asked them; they said no.

20              THE COURT:  Okay.  Can you give us the name of your

21   employer?

22              PROSPECTIVE JUROR:  Yes.

23              THE COURT:  And phone number.

24              PROSPECTIVE JUROR:  Sure.

25              THE COURT:  Okay.
```

App. 0541                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 131 of 786   Page ID
#:573
Case 2:16-cv-00215-PA   Document 65   Filed 07/20/17   Page 51 of 78   Page ID #:619

51

```
 1            PROSPECTIVE JUROR:  I got it in my phone.  My phone
 2    is off.  Can I go get it over there?
 3            THE COURT:  Sure.
 4            PROSPECTIVE JUROR:  The cabinet company is Hardmark
 5    Cabinet.
 6            THE COURT:  Why don't you take this, get the phone
 7    number and the name, and write it down.
 8            PROSPECTIVE JUROR:  Sure.
 9            THE COURT:  We will make a call.
10            PROSPECTIVE JUROR:  That's fine.  Okay.  Thank you.
11            THE COURT:  I take it, though, that are you married?
12            PROSPECTIVE JUROR:  Yes.
13            THE COURT:  Is your wife working?
14            PROSPECTIVE JUROR:  She was doing just home care.
15            THE COURT:  Uh-huh.
16            PROSPECTIVE JUROR:  But the person, they passed
17    away.  She's not working now.
18            THE COURT:  Anybody else residing in your household?
19            PROSPECTIVE JUROR:  Sorry?
20            THE COURT:  Anybody else living in your household?
21            PROSPECTIVE JUROR:  I have 14-year-old son and 10.
22            THE COURT:  Okay.  So it's just the four of you.
23            PROSPECTIVE JUROR:  Yes.
24            THE COURT:  Yeah, write down that name.  We will
25    make a call and we will let you know.
```

App. 0542

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 132 of 786   Page ID #:574
Case 2:16-cr-00213-PA   Document 85   Filed 07/20/17   Page 52 of 78   Page ID #:620

52

```
1              PROSPECTIVE JUROR:  Sure.  I'm going to go outside
2    and write it down?
3              THE COURT:  You can do it right there.
4                        (Sidebar ends.)
5              THE COURT:  Let's call the name of another
6    prospective juror.
7              THE COURTROOM DEPUTY:  Jessy Varghese.
8              THE COURT:  Good morning.
9              PROSPECTIVE JUROR:  Good morning.
10             THE COURT:  Did you hear the questions I asked of
11   the other prospective jurors?
12             PROSPECTIVE JUROR:  Yes.
13             THE COURT:  Is there anything I have inquired about
14   that in good conscience you should disclose to us?
15             PROSPECTIVE JUROR:  No.
16             THE COURT:  Anything about the nature of these
17   charges that cause you to have any concerns about your ability
18   to be fair and impartial to both sides?
19             PROSPECTIVE JUROR:  No.
20             THE COURT:  Anything about the length of the trial
21   that would prevent you from serving?
22             PROSPECTIVE JUROR:  No.
23             THE COURT:  Okay.  If could you take the empty chair
24   there on the first row for us.
25         And if we could get you the microphone, and do you have a
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 133 of 786   Page ID
Case 2:16-cv-00215-PA   Document 65   Filed 07/20/17   Page 53 of 78   Page ID #:621
#:575

53

```
 1   copy of the background questionnaire?
 2        If you could tell us a little bit about yourself?
 3             PROSPECTIVE JUROR:  My name is Jessy Varghese.
 4        I live in Cerritos.
 5        I have been living there for the past 18 years.  Before
 6   that I lived in Glendale.
 7        I'm married.  I have two children, ages 21 and 18.  I have
 8   a master's degree.  I have not served in the military.  I am a
 9   registered nurse.
10             THE COURT:  Where do you work?
11             PROSPECTIVE JUROR:  I work for Kaiser Permanente.
12             THE COURT:  Okay.  And does your husband work?
13             PROSPECTIVE JUROR:  Yes.  He's a transportation
14   engineer for the City of LA.
15             THE COURT:  Okay.  And your child is 21?
16             PROSPECTIVE JUROR:  Will be graduating from
17   undergraduate studies.
18             THE COURT:  Okay.  Ever served on a jury before?
19             PROSPECTIVE JUROR:  Yes.
20             THE COURT:  How many times?
21             PROSPECTIVE JUROR:  Four times.
22             THE COURT:  Okay.  Do you remember the most recent
23   one?
24             PROSPECTIVE JUROR:  It was about five years ago.
25             THE COURT:  Okay.  Do you recall generally what the
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 85-5   Filed 06/05/23   Page 134 of 786   Page ID
#:576
Case 2:16-cv-00219-PA    Document 85   Filed 07/20/17   Page 54 of 78   Page ID #:622

54

```
 1   case was about?

 2            PROSPECTIVE JUROR:  I think it was a criminal case.

 3            THE COURT:  Okay.  And was the jury able to reach a

 4   verdict?

 5            PROSPECTIVE JUROR:  Yes.

 6            THE COURT:  Do you recall anything of the other

 7   times you served on a jury?

 8            PROSPECTIVE JUROR:  Yes.  That was a while ago.  I

 9   served three times in a civil case.

10            THE COURT:  Uh-huh.

11        Were you able to reach a verdict all of the time?

12            PROSPECTIVE JUROR:  Uh-huh.

13            THE COURT:  Okay.  Ever been a party or witness on a

14   civil or criminal case?

15            PROSPECTIVE JUROR:  No.

16            THE COURT:  Have you had a chance to look at the

17   criminal case questionnaire?

18            PROSPECTIVE JUROR:  Yes.

19            THE COURT:  Do you have a yes or affirmative answer

20   to any of those questions?

21            PROSPECTIVE JUROR:  Yes.

22            THE COURT:  Which ones?

23            PROSPECTIVE JUROR:  Number 12.  I work in the

24   healthcare industry.  I'm a registered nurse.  I have a sister

25   who is a physician.
```

App. 0545

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 135 of 786   Page ID
#:577
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 55 of 75   Page ID #:629

55

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR:  Number 14, as part of my job, my

3   patients use heart rate monitoring devices.

4          THE COURT:  Okay.  Any other yes or affirmative

5   answers to any of the other questions?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  What sort of medicine does your sister

8   practice?

9          PROSPECTIVE JUROR:  Pediatrics.

10          THE COURT:  Are you ever involved in the billing for

11   any of the patients who have these heart monitors?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Okay.  Ever been involved in

14   interpreting data from the heart monitors?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  All right.  Thank you very much.

17      Pass for cause as to the newly-seated juror?

18          MR. FREEDMAN:  Yes, sir.

19          THE COURT:  Any additional questions for the

20   newly-seated juror?

21          MR. FREEDMAN:  No.

22          MR. MCDERMOTT:  No, sir.

23          THE COURT:  All right.  I believe the next

24   preemptory rests with the government.

25          MR. FREEDMAN:  Your Honor, the government accepts

```
1    the panel as currently constituted.

2              THE COURT:  Just one second.  And the next

3    preemptory rests with the defense.

4              MR. MCDERMOTT:  Sir, could we have a quick sidebar?

5              THE COURT:  Yes.

6                   (Sidebar begins.)

7              MR. MCDERMOTT:  In light of everything that has

8    transpired this morning, I thought I would ask you directly.  I

9    have been trying to limit the amount of medical care services

10   people involved with the jury, and if I would invoke, it would

11   be Juror No. 3, the registered nurse.  That would be my last --

12   it looks like -- on the panel.  So.

13             MR. FREEDMAN:  Your Honor, our concern is that we

14   have witnesses who have now been here for the second day.  We

15   have three witnesses who have come -- two witnesses who have

16   come from out of state, several out of town.

17       I recognize what the defense views in terms of who they

18   are trying to strike.  I think if this witness is stricken,

19   we're going to go into tomorrow and what I would -- we asked

20   earlier if the government could have an additional strike.  I

21   think an additional appropriate remedy for the defendant's

22   conduct is more putting everyone in the situation to forfeit

23   one of his strikes and for the defense to accept the panel.

24             THE COURT:  I'm not inclined to do that.

25             MR. MCDERMOTT:  Thank you.
```

App. 0547

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 137 of 786   Page ID #:625
Case 2:16-cv-00215-PA   Document 65   Filed 07/20/17   Page 57 of 78   Page ID #:579

57

1          THE COURT:  They have a preemptory, and I recognize

2    the difficulty with this, but it is what it is.  I'm not -- I

3    think you are just buying yourself an issue on appeal.

4          MR. MCDERMOTT:  I know.

5          THE COURT:  The right of the defendant to strike at

6    this point.

7          MR. MCDERMOTT:  That's why I wanted to bring it up

8    to the Court directly.  I knew the government might have some

9    issue about it, but I have got a job to do, irrespective of

10   everything else going on.

11         THE COURT:  Is that who you are going to?

12         MR. MCDERMOTT:  Do you want me to announce it out

13   loud?

14         THE COURT:  Yes.

15         MR. FREEDMAN:  Can I now, at this point, we're out

16   of strikes.  Can we renew or request for additional strike?

17         THE COURT:  Well, I think the issue is you may want

18   to, assuming you get another one, you may want to think about

19   there are several issues that are involved with giving you

20   another strike.

21      For example, he has passed, I think.

22         MR. MCDERMOTT:  Yes.

23         THE COURT:  And if you -- let's say you struck

24   somebody else who was on the panel, that would give him the

25   opportunity to have a strike restored that he passed on.

App. 0548                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 138 of 786   Page ID
#:580
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 58 of 78   Page ID #:620

58

1      Okay.  And I'm not sure any of that -- whether we're going

2  to -- I think all of the remaining jurors here have issues of

3  one sort or another.

4      I will talk to the lady who came up here yesterday, but

5  based on what you said yesterday, that doesn't sound very

6  promising.  I have had some contact with the jury commissioner.

7  We may be able to get some discards from Judge Klausner.  I was

8  told we may know something in the next 20 minutes.  I kind of

9  really doubt that.  But certainly we wouldn't have anybody here

10  until this afternoon.

11      And I -- the earliest I think to get additional jurors

12  would be tomorrow.  So it sounds like we're going to be --

13      Now, if you are having witness problems or whatever, I

14  think you want to -- whatever issue that is -- I think you want

15  to resolve it before the jury is sworn, because you may be

16  faced with jeopardy having attached.

17      So if there is going to be an issue with regard to

18  witnesses' unavailability, given what is going on, I think we

19  ought to try to resolve those issues before the jury is sworn

20  and jeopardy attaches.

21      So you may want to think about that.  I think this is --

22  you may want to think about whether or not you want additional

23  preemptories, given everything that has gone on.

24      I probably would be inclined to grant that, but by the

25  same token, that is probably going to give him an opportunity

App. 0549

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 139 of 786   Page ID
#:581
Case 2:16-cr-00218-PA   Document 65-5   Filed 07/20/17   Page 59 of 78   Page ID #:621

59

```
 1    to say, I want to at least be able to ask -- I want to have
 2    that preemptory that I passed on restored.
 3         We still need two alternates, in any event.
 4              MR. MCDERMOTT:  Right.  Just so it's clear for the
 5    record, the two that were bounced this morning were absolutely
 6    two I wanted to keep.  So it wasn't an advantage I sought.
 7              THE COURT:  I have no doubt that -- well, in any
 8    event.  Enough said.
 9         So let's do that, then we will end.
10                        (Sidebar ends.)
11              MR. MCDERMOTT:  Sir, after conferring with the
12    government and with the Court's permission we would thank and
13    excuse Juror No. 3.
14              THE COURT:  All right.  You are excused.  Thank you
15    very much for your service.  You can report back to the jury
16    assembly room on the first floor.
17         Ms. Alford, if you could come forward please.
18         Sir, if you could resume your seat in the audience please.
19                        (Sidebar begins.)
20              THE COURT:  Okay.  All right.  Were you able to
21    listen to the Court's questions yesterday?
22              PROSPECTIVE JUROR:  Yes.
23              THE COURT:  Okay.  Is there anything that in good
24    conscience you should disclose to us?
25              PROSPECTIVE JUROR:  Just what I discussed yesterday.
```

App. 0550               **UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Okay.  And I want to make sure I
 2    understand what you disclosed yesterday.
 3              PROSPECTIVE JUROR:  Okay.
 4              THE COURT:  I believe the first thing you disclosed
 5    yesterday was that there was -- you are a psychologist, I
 6    believe.
 7              PROSPECTIVE JUROR:  School psychologist.
 8              THE COURT:  And there are no other available
 9    psychologists at the school you work at?
10              PROSPECTIVE JUROR:  My boss asked me to communicate
11    that to you.
12              THE COURT:  I'm happy to --
13              PROSPECTIVE JUROR:  My director asked me to
14    communicate that to you.
15              THE COURT:  That's fine.  Unfortunately, the law
16    provides that it's a hardship for the juror -- not the juror's
17    employer.  So that's not going to work.
18              PROSPECTIVE JUROR:  That's fine.
19              THE COURT:  Now, the other thing that I believe I
20    heard you say yesterday, was that you had an in-law --
21              PROSPECTIVE JUROR:  Not an inlaw, my husband, one of
22    his many childhood best friends.
23              THE COURT:  Okay.
24              PROSPECTIVE JUROR:  Runs a pharmaceutical company at
25    Puerto Rico, and he has been under investigation for the past
```

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 141 of 786   Page ID
#:583
Case 2:16-cr-00215-PA   Document 65   Filed 07/20/17   Page 61 of 78   Page ID #:629

61

```
 1    two years for some sort of pharmaceutical fraud.

 2             THE COURT:  Okay.  And this is a childhood friend of

 3    your husband's.

 4             PROSPECTIVE JUROR:  He's grown up with, yeah.

 5             THE COURT:  You need to stand a little closer to the

 6    microphone.

 7             PROSPECTIVE JUROR:  He's in regular contact with him

 8    and he has explained the situation to us because he has

 9    residence in Puerto Rico.  I thought I had to explain that.

10             THE COURT:  That's fine.

11             PROSPECTIVE JUROR:  I'm in the loop of the knowledge

12    of that.  You said err on the side being more forthcoming, and

13    I'm being as forthcoming as I can.

14             THE COURT:  That's fine.  The real issue is whether

15    you can be fair and impartial with respect to this case,

16    whether you can decide this case based on the evidence.

17             PROSPECTIVE JUROR:  I think I can -- I just wanted

18    to give you that information.

19             THE COURT:  That is absolutely fine.  We appreciate

20    you doing that.

21        So you can commit to both sides that if you were selected

22    as a juror, that you could be fair and impartial to both sides?

23             PROSPECTIVE JUROR:  I believe so.

24             THE COURT:  Okay.  Is there any doubt in your mind?

25             PROSPECTIVE JUROR:  No.
```

App. 0552                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 35-5   Filed 06/05/23   Page 142 of 786   Page ID
Case 2:16-cr-00215-PA   Document 65   Filed 07/20/17   Page 62 of 78   Page ID #:630
#:584

62

```
 1              THE COURT:  Okay.

 2              PROSPECTIVE JUROR:  I just thought I was supposed to

 3   tell you I thought it was on the line that something should be

 4   shared.

 5              THE COURT:  That is fine.  I'm glad that you did

 6   that.

 7              PROSPECTIVE JUROR:  Okay.

 8              THE COURT:  So you can decide this case based solely

 9   on the evidence you hear, here in this courtroom?

10              PROSPECTIVE JUROR:  Absolutely.  I have done that

11   before.

12              THE COURT:  You have served as a juror before?

13              PROSPECTIVE JUROR:  Twice -- well actually once.

14   Twice in this Court.

15              THE COURT:  I'm going to ask you if could you take

16   that empty chair on the first row.

17              PROSPECTIVE JUROR:  Sure.

18              THE COURT:  Okay.

19                        (Sidebar ends.)

20              THE COURT:  Okay.  If you could take the background

21   questionnaire and tell us a little bit about yourself.

22              PROSPECTIVE JUROR:  My name is Kristin Alford.  I

23   live in Newbury Park.  I have so for about 12 years.  I lived

24   in Oak Park prior to that.

25       I'm married.  I have two children, ages 11 and 13.
```

App. 0553                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 143 of 786   Page ID
#:585
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 63 of 78   Page ID #:631
63

1      I have a master's degree in psychology and a credential in

2  school psychology.

3      I have never served in the military.  I'm a school

4  psychologist.  I work for Oak Park Unified School District.

5          THE COURT:  What does your husband do for a living?

6          PROSPECTIVE JUROR:  He's a certified public

7  accountant, self-employed.

8          THE COURT:  Ever served on a jury before?

9          PROSPECTIVE JUROR:  I have been called to jury

10  service three times.  I have served once, and we were able to

11  come to a resolution on the case.

12          THE COURT:  Was that a civil or criminal case?

13          PROSPECTIVE JUROR:  Criminal.

14          THE COURT:  Okay.  Ever been a party or witness in a

15  civil or criminal proceeding?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Can you tell me a little bit about that?

18          PROSPECTIVE JUROR:  I gave to one of my husband's

19  friends, I gave him $25,000 for him to get a car for me.

20      He was a car broker, and I never received the car.

21      So because my husband is an accountant, he had done

22  accounting work for him, I was able to assemble the six other

23  -- get the names and assemble the six other people who had been

24  robbed by him under the same circumstances, and helped the

25  police put the case together.  And we put him in jail.

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 144 of 786   Page ID
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 64 of 78   Page ID #632
#:586

64

1          THE COURT:  Okay.  Anything about that experience

2   that causes you to have concerns about your ability to be fair

3   and impartial to both sides in this case?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Have you had a chance to look at the

6   criminal case questionnaire?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Do you have any yes responses to any of

9   those questions?

10         PROSPECTIVE JUROR:  To No. 2, as I just stated.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR:  Of course, I have been robbed.

13   I think everybody has been robbed several times.  I have had my

14   car broken into several times.

15         THE COURT:  Okay.  Were the police called?

16         PROSPECTIVE JUROR:  When my car was robbed?

17         THE COURT:  Yes.

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Do you have any concerns about the way

20   the case was handled?

21         PROSPECTIVE JUROR:  No, they were wonderful.

22         THE COURT:  Any other yes or affirmative responses

23   to any of the other questions?

24         PROSPECTIVE JUROR:  I have worn the heart monitor

25   device and so has my father for arrythmia.

Case 2:23-cv-04498-PA   Document 5-5  Filed 06/05/23   Page 145 of 786   Page ID
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 69 of 75   Page ID #:639
#:587

65

```
 1              THE COURT:  Okay.  Prescribed by a physician?
 2              PROSPECTIVE JUROR:  Yes.
 3              THE COURT:  And how long did you wear the monitor
 4    for?
 5              PROSPECTIVE JUROR:  I think it was 24 hours.  It was
 6    five years ago, I don't remember.
 7              THE COURT:  Okay.  Any other yes or affirmative
 8    responses to any of the other questions?
 9              PROSPECTIVE JUROR:  I don't think it's that
10    relevant.  My mom was a school nurse and a registered nurse.
11              THE COURT:  Okay.  Anything else?
12              PROSPECTIVE JUROR:  No.
13              THE COURT:  Okay.  Thank you.
14         Pass for cause as to the newly-seated juror?
15              MR. FREEDMAN:  Yes, Your Honor.
16              MR. MCDERMOTT:  Yes, sir.
17              THE COURT:  Any additional questions for the
18    newly-seated juror?
19              MR. MCDERMOTT:  No, sir.
20              MR. FREEDMAN:  No, Your Honor.
21              THE COURT:  Let me see counsel at sidebar.
22                        (Sidebar begins.)
23              THE COURT:  Okay.  I believe you have exercised your
24    last preemptory.
25              MR. MCDERMOTT:  That's true.
```

App. 0556

```
 1              THE COURT:  You don't have any further preemptories.

 2              MR. FREEDMAN:  No.

 3              THE COURT:  Now, assuming we want to have alternates

 4   in this case, each side would get an additional preemptory for

 5   any alternates, okay.

 6        Now, are you -- do you want to request an additional

 7   preemptory as to the jurors in the box?

 8              MR. FREEDMAN:  No.

 9              THE COURT:  Okay.  Now, I have a -- I'm going to

10   excuse the jury for them to take a break.

11        We have one individual that we're trying to confirm what

12   his issues are.

13        Other than the people that are seated out here now, we're

14   out of jurors.

15        Don't quote me, but I think that if the parties want to

16   stipulate if we lost a juror, I think you can stipulate to

17   having a lesser number of jurors.

18        I'm not requiring anybody to do that, but if you want to

19   discuss that issue, you might want to explore that.

20              MR. MCDERMOTT:  Uh-huh.

21              THE COURT:  We're still waiting to hear back if

22   there are going to be additional jurors that are going to be

23   available today.

24        If not -- and I will hopefully know that in the next half

25   an hour -- if not, I will review these people's requests -- I
```

App. 0557

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 147 of 786   Page ID
#:589
Case 2:16-cr-00218-PA   Document 65   Filed 07/20/17   Page 67 of 78   Page ID #:635

67

```
 1   don't remember the lady --

 2             MR. FREEDMAN:  She's a medical esthetician.

 3             THE COURT:  Oh yeah.  She's got children 11 and 13

 4   that she takes to school.

 5             MR. MCDERMOTT:  Her mother was in an accident.

 6             MR. FREEDMAN:  She takes them to school, so it's

 7   possible she can take them a little bit early.  She lives in

 8   the valley.

 9             THE COURT:  If she takes them a little earlier or we

10   start a little later.

11       Do you have her name?

12             MR. FREEDMAN:  It is Belkis something.  I can't

13   remember her last name.

14             THE COURT:  Miss.

15             PROSPECTIVE JUROR:  Me?

16             THE COURT:  Yes.  Okay.  What time do you take your

17   children and drop them off?

18             PROSPECTIVE JUROR:  I drop them off about 7:45,

19   7:50.  School starts at 8:00.

20             THE COURT:  Okay.  How long does it take you to get

21   here from home?

22             PROSPECTIVE JUROR:  I have been taking the train

23   because the traffic is really bad.  Today, it took me like

24   maybe about an hour to get here.

25             THE COURT:  Uh-huh.
```

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 148 of 786   Page ID
#:590
Case 2:16-cr-00215-PA   Document 85   Filed 07/20/17   Page 68 of 78   Page ID #:636
68

 1          PROSPECTIVE JUROR:  Maybe more.  I had to drive to

 2   the station.  I didn't want to deal with traffic so I took the

 3   train.

 4          THE COURT:  Any possibility that you could drop your

 5   kids off earlier?

 6          PROSPECTIVE JUROR.  No.  They don't do anything

 7   before 7:30.

 8          THE COURT:  So if you dropped your kids off at 7:40,

 9   you might be able to be here by 9:00?

10          PROSPECTIVE JUROR:  I don't know.  It depends on

11   traffic, I guess, if I drive.

12      I don't think I want to take the train all of the time,

13   but if I drive, then I will probably be more than that, because

14   I am driving from Sherman Oaks.

15          THE COURT:  Okay.  Just resume your seat.

16                      (Sidebar ends.)

17          THE COURT:  All right.  Ladies and gentlemen, we're

18   going to take our first break.  I will remind you until this

19   trial is over, you are not to discuss this case with anyone,

20   including your fellow jurors, among yourselves, and people

21   involved in the trial, or anyone else.

22      Do not allow anyone to approach you and talk with you

23   about this case.

24      If anybody approaches you or wants to talk with you about

25   this case, please let me know about it immediately.

App. 0559          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 149 of 786   Page ID
Case 2:16-cr-00213-PA   Document 65   Filed 07/20/17   Page 69 of 78   Page ID #:637
#:591

69

1      Do not read or listen to any news reports or other

2  accounts about the trial.

3      Do not do any research, consult the dictionaries, search

4  the Internet, and use other reference materials.

5      If you need to communicate with me, send a note to the

6  clerk.

7      We're going to resume now.  It's 10:24.  We're going to

8  take -- I want to take about -- we're going to come back at 20

9  until the hour.

10      Okay.  Thank you very much.

11          THE COURTROOM DEPUTY:  All rise.

12          (JURY EXITS THE COURTROOM AT 10:27 A.M.)

13          THE COURT:  All right.  We will reconvene in ten

14  minutes.

15      We will see what the latest update is to figure out if

16  there are available jurors.  We will see you in about ten

17  minutes.

18          THE COURTROOM DEPUTY:  The Court now stands in

19  recess.

20      All rise.

21          THE COURT:  We don't have any prospective jurors in

22  the courtroom.

23      I believe we now have 12 jurors with no alternates.

24      I have got a couple of options here.  The parties can

25  stipulate, I believe, under the rules to have less than 12

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 150 of 786   Page ID #:638
Case 2:16-cr-00219-PA   Document 65   Filed 07/20/17   Page 70 of 78   Page ID #:592

70

```
 1    return a verdict in the event that we lost one or more of these

 2    12.

 3          That is something the parties are going to have to

 4    discuss.  If you can agree to it, fine, if you can't, that is

 5    fine.

 6          Assuming you can't do that, there is a judge that is

 7    picking a jury today.  And as jurors are not used or no longer

 8    going to be considered for jury duty in that case, they can be

 9    funneled over here.

10          My guess is that we probably wouldn't get anybody until

11    probably after the lunch hour.

12          The other option would be to call jurors tonight.

13          Excuse these 12, and have them come back tomorrow -- have

14    them come back tomorrow.

15          We will go ahead and see if we can get some alternates,

16    have this jury show up at 9:00, start with the alternates

17    selection, and see if we can, by the time the jury gets here at

18    9:00, have the alternates selected.

19                MR. MCDERMOTT:  Sir, for the Court's information,

20    the government counsel and I have talked about the matter of

21    allowing the panel to drop below 12.

22          I believe I can represent for both sides that we prefer

23    not to go in that direction.

24                THE COURT:  Okay.

25                MR. MCDERMOTT:  It's a mutual decision on that part.
```

App. 0561                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 151 of 786   Page ID #:593
Case 2:16-cr-00213-PA   Document 65   Filed 07/20/17   Page 71 of 78   Page ID #:639

71

1          MR. FREEDMAN:  That's correct, Your Honor.

2          THE COURT:  Okay.  Now, I don't want to keep the

3   other alternates.  I really don't want to keep these people

4   here all day while we decide what is going to happen with the

5   jury that is being selected.  I can excuse them -- just one

6   moment.

7          Madam Clerk, would you go out and make sure those outer

8   doors are closed and there is no one standing in the area?

9          I think probably the thing we should do is have these 12

10   take an early lunch, come back here, have them come back at

11   12:30 or one o'clock and make a decision at that time as to --

12   it looks like we're going to get something from Klausner.

13          Just Judge Klausner is selecting a jury today.  We're

14   going to get some people who are no longer eligible to serve

15   with them.

16          We can have them get here, seat the alternates today, and

17   get started.

18          If not, I think tomorrow is the option, and we will know

19   that probably by one o'clock.  So I think that is what I'm

20   going to do.

21          As to the people that are waiting here, I think we are

22   still waiting to hear back from the gentleman who doesn't think

23   that the supervisor will pay.

24          The lady whose husband works for LAPD, I'm not sure that

25   is a real good alternative at this point.

App. 0562                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 65-5    Filed 06/05/23    Page 152 of 786    Page ID
Case 2:16-cr-00218-PA    Document 65    Filed 07/20/17    Page 72 of 78    Page ID #:640
#:594

72

1    We could start -- ask the one juror to drop off her kids

2    off at 7:40, and start our trial at 9 o'clock.  I suspect she

3    might make it in by then.

4    And, of course, that doesn't ensure that the parties might

5    exercise their preemptory, and so I think probably the better

6    course is to have the jury come back, take an early lunch, have

7    everybody come back at 12:30 or one o'clock and then analyze it

8    later.  Unless somebody else has a different idea?

9        MR. FREEDMAN:  That sounds fine, Your Honor.  What

10   time would you like us back here?

11       THE COURT:  I will have the jury back here -- I

12   think, we're going to send them off to lunch, and we will

13   decide whether it's going to be 12:30 or one o'clock.

14   Does anybody have anything they want to add?

15       MR. MCDERMOTT:  Just also for the Court's

16   edification, discussing with government counsel, they are not

17   going to lose any witnesses.  It's all going to be the

18   inconvenience factor of it.  I just wanted to make sure we

19   didn't have an issue with that.

20       MR. FREEDMAN:  I think what we will do, assuming the

21   Court thinks this is the case, probably tell our first witness

22   he should stick around in case we get started today.

23   Is there a possibility we may push past 1:30?

24       THE COURT:  I'm not sure what you mean by push on

25   past 1:30.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 5-5   Filed 06/05/23   Page 153 of 786   Page ID #:595
Case 2:16-cr-00215-PA   Document 85   Filed 07/20/17   Page 73 of 78   Page ID #:641

73

 1          MR. FREEDMAN:  Well, I know that the Court's

 2   schedule is normally 8:00 to 1:30.

 3          THE COURT:  Today we're going to go past if we can

 4   get the alternates picked today.  Then we will push forward and

 5   we will go until 5:00.

 6          MR. FREEDMAN:  So we will keep our witnesses here

 7   for now, and they will have to reschedule it if they need to

 8   come back.

 9          THE COURT:  As I mentioned to counsel, the Court is

10   considering, based on the conduct of our defendant and his

11   family, principally the defendant, the Court has considered

12   whether or not his bond should be revoked; I will decide that

13   this afternoon.

14      Okay.  Anything else before the jury is brought back in?

15          MR. FREEDMAN:  No, Your Honor.

16          MR. MCDERMOTT:  No, sir.

17          THE COURT:  Okay.

18          THE COURTROOM DEPUTY:  All rise.

19          (JURY ENTERS THE COURTROOM AT 11:02 A.M.)

20          THE COURT:  You may be seated.  This may take a

21   while.

22          THE COURTROOM DEPUTY:  All rise.  You may be seated.

23          THE COURT:  Ladies and gentlemen, we still need to

24   select two alternate jurors.

25      Unfortunately, we're not going to be able to commence that

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA  Document 5-5  Filed 06/05/23  Page 154 of 786  Page ID
#:596
Case 2:16-cv-00215-PA  Document 65  Filed 07/20/17  Page 74 of 78  Page ID #:9642
74

1    process immediately.

2         So what I'm going to do, I'm going to excuse you for an

3    early lunch.  It's 11 o'clock now, and I really want to

4    apologize for this.

5         I have never had this come up before.  We're going to have

6    you back in -- why don't you take a two-hour lunch and come

7    back at one o'clock, and then we will hopefully be able to get

8    our alternates selected -- two alternates selected, and then we

9    would be able to commence with the actual trial and counsel's

10   opening statements and presentation of witnesses.

11        At one o'clock, if we can't get the alternates selected, I

12   will excuse you for the day.  You can come back tomorrow.

13        We will get the alternates picked.  It will be very quick

14   and very brief, and then we will start the actual trial.

15        So I will see everybody back here at one o'clock.

16

17        PROSPECTIVE JUROR:  Yes, we thought we were starting

18   today.  A lot of us thought we were only going to be going

19   until 1:30 today.  Roughly, what time are we going to go to

20   today, just because I have made arrangements for my children.

21        THE COURT:  If you have made arrangements based on

22   the understanding -- excuse me -- that we were going to stop at

23   1:30, and you can't undo that, let us know, and we will make an

24   adjustment, and we will just get this thing started tomorrow

25   and we will start at 8:00 and go until 1:30.

App. 0565                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 65-5   Filed 06/05/23   Page 155 of 786   Page ID #:597
Case 2:16-cr-00213-PA   Document 85   Filed 07/20/17   Page 75 of 75   Page ID #:6649

75

 1        If you can make an adjustment, then what we will do today

 2   when we come back, is that we would just go until 4:30 or 5:00

 3   or whatever -- however long we can.

 4        And I'm sorry about the confusion.  Really it isn't

 5   anybody's fault.  It's just one of those unfortunate

 6   circumstances.

 7        Do you think you are going to be able to make any other

 8   arrangements?

 9             PROSPECTIVE JUROR:  I was wondering whether it was

10   going to be 3 o'clock or 5 o'clock.  If we had a rough idea

11   that changes things dramatically if you have to drive home in

12   rush hour.

13             THE COURT:  Well, we can do pretty much whatever is

14   convenient for you at this point.

15        So everybody -- if we come to a collective decision -- we

16   could stop at 3:30 today.  We will do that, and if you can be

17   here until 5:00, we will do that.

18        I think the more trial we can put in, the sooner we're

19   going to get finished.

20        So, when you come back at one o'clock, I want you to think

21   about it, whatever calls you have to make, go ahead and make

22   them.  Let -- just let me know, and we will adjust to your

23   schedules.

24        Okay.  So you are excused.  You can go to lunch.

25        Grand Central Market -- you are early -- so maybe the

App. 0566

Case 2:23-cv-04498-PA   Document 5   Filed 06/05/23   Page 156 of 786   Page ID
Case 2:16-cv-00215-PA   Document 65   Filed 07/20/17   Page 76 of 76   Page ID #9644
#:598

76

 1    lines won't be too long.

 2         We will see everybody back here at one o'clock.

 3              THE COURTROOM DEPUTY:  All rise.

 4              THE COURT:  As to the people that are waiting, sir,

 5    we will let you know.  We're still making some calls, and we

 6    will let you know when you get back here at one o'clock.

 7              PROSPECTIVE JUROR:  Sure.

 8              THE COURT:  Sir, I believe you had your hand up.

 9              PROSPECTIVE JUROR:  If we don't come into an

10    agreement about selecting the two guys you need, I can't miss

11    another day of work.  I can't be here tomorrow.

12              THE COURT:  Okay.  I will let you know your status

13    at one o'clock.

14              PROSPECTIVE JUROR:  Okay.  Thank you.

15              THE COURT:  Miss, I will let you know at one o'clock

16    as well.

17              PROSPECTIVE JUROR:  Thank you.

18         (JURY EXITS THE COURTROOM AT 11:11 A.M.)

19              THE COURT:  Okay.  Let me caution everyone, you

20    should avoid these jurors.

21         Talking to these jurors can be considered a violation of

22    law, either obstruction of justice or jury tampering.

23         So please, and I'm ordering people to stay away from these

24    jurors, and have no contact with them.

25         If I learn of any contact with any of these prospective

App. 0567                 **UNITED STATES DISTRICT COURT**

```
1    jurors by anyone, I will hold a contempt hearing, recommend to

2    the United States Attorney's Office that the person be

3    prosecuted.

4         I will have a contempt hearing, and if I find that there

5    has been contact with these jurors in violation of my order, I

6    will have you jailed in contempt of Court.

7         So we will see everybody at one o'clock.

8              THE COURTROOM DEPUTY:  This Court is now in recess.

9                         (Recess taken.)

10        (Morning proceedings were concluded at 11:12 a.m.)

11                         *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

App. 0568

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 158 of 786   Page ID #:600
Case 2:16-cv-00218-PA    Document 65    Filed 07/20/17    Page 78 of 78   Page ID #:9646

78

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                             )
4    STATE OF CALIFORNIA      )

5

6              I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  June 30, 2017

17

18

19                         /s/ TERRI A. HOURIGAN

20                    _____
                      TERRI A. HOURIGAN, CSR NO. 3838, CCRR
                                        Federal Official Court
21   Reporter

22

23

24

25

App. 0569



1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        ~~HONORABLE~~ PERCY ANDERSON, U.S. DISTRICT JUDGE

4                         - - -

5

6

7                                    )
        UNITED STATES OF AMERICA,    )
8                                    )
                         PLAINTIFF,  )
9                                    )
                vs.                  ) No. CR16-215-PA
10                                   )
        MICHAEL MIRANDO,             )
11                                   )
                         DEFENDANT.  )
12      _____)

13

14           REPORTER'S TRANSCRIPT OF JURY TRIAL

15                   DAY 2, VOLUME II

16                    PAGES 79-182

17                LOS ANGELES, CALIFORNIA

18              WEDNESDAY, APRIL 26, 2017

19                    12:34 P.M.

20

21

22      _____

23         CINDY L. NIRENBERG, CSR 5059, FCRR
              U.S. Official Court Reporter
24            350 W. 1st Street, #4455
                Los Angeles, CA 90012
25              www.msfedreporter.com

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:
                         OFFICE OF THE UNITED STATES ATTORNEY
 4                       BY: MICHAEL FREEDMAN,
                             ASSISTANT U.S. ATTORNEY
 5                           KATHERINE A. RYKKEN,
                             ASSISTANT U.S. ATTORNEY
 6                       312 NORTH SPRING STREET
                         13TH FLOOR
 7                       LOS ANGELES, CA 90012
                         213-894-2434
 8

 9

10

11

12

13   FOR THE DEFENDANT:
                         LAW OFFICES OF KEVIN BARRY MCDERMOTT
14                       BY: KEVIN B. MCDERMOTT, ATTORNEY AT LAW
                         300 SPECTRUM CENTER DRIVE
15                       SUITE 1420
                         IRVINE, CA 92618
16

17

18

19   ALSO PRESENT:
                         KATHLEEN KENNEDY, SPECIAL AGENT
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

App. 0571

I N D E X

GOVERNMENT'S WITNESSES:                    PAGE

JOHN HATTRUP, JR.

  DIRECT BY MS. RYKKEN                    133

  CROSS BY MR. MCDERMOTT                  142


JON BARRON

  DIRECT BY MS. RYKKEN                    145

  CROSS BY MR. MCDERMOTT                  161

  REDIRECT BY MS. RYKKEN                  174

  RECROSS BY MR. MCDERMOTT                176



FURTHER PROCEEDINGS

VOIR DIRE (CONTINUED)                       88

DISCUSSION HELD AT SIDEBAR                 102

DISCUSSION HELD AT SIDEBAR                 104

JURORS SWORN                               107

DISCUSSION HELD OUTSIDE PRESENCE OF JURY   109

DISCUSSION HELD OUTSIDE PRESENCE OF JURY   111

PRELIMINARY JURY INSTRUCTIONS GIVEN        111

OPENING STATEMENT BY MS. RYKKEN           121

OPENING STATEMENT BY MR. MCDERMOTT        125

DISCUSSION HELD OUTSIDE PRESENCE OF JURY   178



| | | | |
|---|---|---|---|
| 1 | E X H I B I T S | | |
| 2 | TRIAL EXHIBITS | MARKED | ADMITTED |
| 3 | 1 | | 134 |
| 4 | 2 | | 156 |
| 5 | 3 | | 151 |
| 6 | 4 | | 153 |
| 7 | 5 | | 158 |
| 8 | 6 | | 157 |
| 9 | 7 | | 176 |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

App. 0573

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 26, 2017

 2                            12:34 P.M.

 3                            - - - - -

 4         THE CLERK:   Item 1, CR16-215, United States of

 5    America versus Michael Mirando.

 6              Counsel, please state your appearances.

 7         MR. FREEDMAN:   Good afternoon, Your Honor.   Michael

 8    Freedman and Katherine Rykken on behalf of the United States.

 9         THE COURT:   Good afternoon.

10         MR. MCDERMOTT:   Good afternoon, sir.   Kevin McDermott

11    appearing on behalf of Mr. Mirando, who is present.

12         THE COURT:   Good afternoon.   Members of the panel,

13    good morning.   I'm Judge Percy Anderson, and I would like to

14    welcome you to this courtroom.

15              We're here this afternoon for the important task of

16    selecting two alternates to try a criminal case.

17              We rely on the juries in this country to decide cases

18    tried in our courts so the jury service is an important duty.

19    Jurors must conduct themselves with honesty, integrity and

20    fairness.

21              Under our system of justice, the jury is to find the

22    facts of the case based on the evidence presented at the trial,

23    that is, from the evidence seen and heard in court.   The jury

24    decides what the facts are, and then applies to those facts the

25    law that I will give in my instructions to the jury.
```

App. 0574

1          My role as the trial judge is to make whatever legal

2    decisions must be made during trial and to explain to the jury

3    the legal principles that will guide its decisions.

4          As you probably know, at the beginning of any court

5    case, the first step involves the selection of jurors who are

6    going to hear the case.

7          During this process, I will be asking you questions.

8    It provides the Court and the lawyers with an opportunity to

9    inquire into your background, experience and state of mind to

10   determine whether you're qualified to be a juror in this case.

11         Now, "qualified" simply means that you can be fair

12   and impartial, that you can decide this case based on the

13   evidence presented in this courtroom and on nothing else.

14         Please keep in mind that during this process, there's

15   no such thing as a right or wrong answer, only answers that are

16   complete or incomplete.  Err on the side of giving too much

17   information.

18         In this case you will be sitting as judges of the

19   facts.  All parties have a right to expect that you'll perform

20   your role fairly and impartially and not because of any bias or

21   prejudice you bring into this courtroom.  If there's any reason

22   why any of you might be biased or prejudiced in any way, you

23   must disclose such reasons when you're asked to do so.  It's

24   your duty to make these disclosures.

25         In giving you these admonitions, I want to make it

1    clear that I have no intention of trying to embarrass anyone,

2    to invade your privacy or the privacy of any of your family

3    members or close personal friends.  If you have something that

4    you think the lawyers or I should know, but you do not wish to

5    discuss it in the presence of the entire panel in open court,

6    please let me know and we can discuss that matter at sidebar

7    outside the presence of the other jurors.

8              This is a criminal case.  It's entitled the United

9    States of America versus Michael Mirando.

10             To begin this process, I'd like to introduce you to

11   the parties and counsel in this matter.

12             I'm going to ask government counsel to stand and

13   introduce himself and who is seated at counsel table to the

14   prospective jurors.

15             MR. FREEDMAN:  Hello.  My name's Michael Freedman.

16   I'm the assistant United States attorney.

17             MS. RYKKEN:  And I am Katherine Rykken, also a United

18   States Attorney.

19             THE COURT:  Any member of the jury panel who's

20   acquainted with or who has seen counsel or may have heard their

21   names prior to today?  If your answer is yes, please raise your

22   hand.

23             All right.  Will counsel stipulate that I do not have

24   to note for the record that there were no hands raised in

25   response to my future questions?

```
 1              MR. FREEDMAN:  Yes.

 2              MR. MCDERMOTT:  Yes, that's correct.

 3              THE COURT:  I'm going to ask defense counsel to stand

 4     and introduce himself and the defendant to the prospective

 5     jurors.

 6              MR. MCDERMOTT:  Thank you, Your Honor.

 7              My name is Kevin McDermott.  I'm a defense counsel

 8     and I represent the defendant in this case, Michael Mirando.

 9              THE COURT:  Is there any member of the jury panel who

10     is acquainted with or seen counsel or the defendant or who may

11     have heard their names prior to today?  If your answer to the

12     question is yes, please raise your hand.

13              Do any of you or any members of your families know or

14     have any kind of relations with me?

15              During the trial of this case, the following persons

16     may be called as witnesses.  I'm going to ask the clerk to read

17     the names of the proposed witnesses.

18              THE CLERK:  Jon Barron, John Hattrup, Ronald D.

19     Richmond, Gregory Joy, Martha Bennett, Susan Darsow, Lisa

20     Solmar, Ruby Simpkins, Robyn Consiglio, Stacey Foster-Sixtos,

21     Jeffrey Globus, Emily Russell, Stanton Crowley, Kathleen

22     Kennedy.

23              THE COURT:  Have any of you heard of or are otherwise

24     acquainted with any of the witnesses just named that you

25     believe would affect your ability to be a fair and impartial
```

App. 0577

 1   juror in this case or make it difficult for you to be a fair
 2   and impartial juror in this case?
 3            Please raise your hand.
 4            You should note that the parties are not required and
 5   might not wish to call all of these witnesses, and they may
 6   find it necessary to later call other witnesses.
 7            This is a case in which the defendant is charged with
 8   15 counts of health care fraud.  The government alleges that
 9   from January of 2005 to April of 2016, the defendant engaged in
10   a scheme to defraud health insurance companies.
11            The defendant was the owner of Holter Labs LLC, which
12   he formed in 2005.
13            Holter Labs provided cardiovascular monitoring
14   services to doctors.  Holter provided a digital recorder to
15   doctors for their use on their patients.  The recorder is a
16   portable device that monitors cardiovascular activity for 24 or
17   48 hours.  The device records electrical signals from the heart
18   via a series of electrodes attached to the chest.
19            The most common use of a Holter recorder is to
20   monitor heart activity for an ECG or an electrocardiograph.
21   The government alleges that the defendant fraudulently billed
22   insurance companies using medical codes.  These codes are used
23   by health care service providers in medical billings.  The
24   defendant is charged with using these codes to fraudulently
25   bill insurance companies.

1        The defendant denies these allegations.  The charges
2   against the defendant are contained in an Indictment.  The
3   Indictment is simply the description of the charges made by the
4   government against the defendant.  It is not evidence of
5   anything.

6        To these charges the defendant has pled not guilty,
7   and it will be the question of his guilt or innocence to the
8   charges that you'll be asked to decide if you're selected as an
9   alternate juror in this case.

10       Now, we're going to pick two alternates, and I'm
11  going to ask the clerk to call the names of the two prospective
12  alternates.

13       As your name is called, please come forward, and I'm
14  going to ask Alternate Number 1 to take the next-to-the-last
15  seat on the first row, and for Alternate Number 2 to take the
16  next-to-the-last seat on the second row.

17       So, again, as your name is called, please come
18  forward.

19       THE CLERK:  Thomas Lin.

20       Wayne Tennis.

21       THE COURT:  I'm going to continue asking questions of
22  the jurors seated in the jury box, but these questions are
23  directed to all of you seated in the courtroom because if any
24  of these prospective jurors are excused, a replacement will be
25  called and I will ask that person, without repeating all of the

1   prior questions, whether any of those questions pertain to him
2   or her.

3        Therefore, it's important that each of you listen
4   carefully to the questions that I will be asking and keep in
5   mind any of which call for an affirmative answer or other
6   explanation on your part, and that way if you're called into
7   the jury box, I won't have to repeat each of the questions for
8   you.

9        Now, it's important that all of you remain in the
10  courtroom during the questioning of jurors in the jury box so
11  that if you're called to replace a juror, you will have heard
12  all of the Court's questions.

13       Now, we will take a break at some point this
14  afternoon, and when we do take our break, you're not to discuss
15  this case with anyone, including your fellow jurors, members of
16  your family, anybody involved in this trial or anyone else, nor
17  are you allowed to permit others to discuss the case with you.

18       This includes communicating by e-mail or text
19  messages.  Don't use any social networking sites such as blogs,
20  MySpace, Facebook, Twitter.  If anybody approaches you and
21  tries to talk with you about this case, please let me know
22  about it immediately.

23       Do not read any news stories or articles or listen to
24  any radio or television reports about the case or about anyone
25  who has anything to do with it.  Don't do any research, such as

```
 1   consulting dictionaries, searching the internet or using other
 2   reference materials.  Do not make any investigation about the
 3   case on your own.
 4          If you need to communicate with me, simply give a
 5   note to the clerk.
 6          And most importantly, do not make up your mind about
 7   what your verdict should be until after you've gone to the jury
 8   room to decide the case and you and your fellow jurors have
 9   discussed the evidence.  Keep an open mind until then.
10          Now, having heard the charges which have been filed
11   against the defendant, is there any -- well, let me direct this
12   to the two prospective jurors.
13          Do either of you feel that you cannot give the
14   parties, both the government and the defendant, a fair trial
15   because of the nature of these charges?
16          PROSPECTIVE JUROR:  No.
17          PROSPECTIVE JUROR:  No, sir.
18          THE COURT:  All you have -- if your answer is yes to
19   any of these questions, just raise your hand.  Okay?
20          The fact that the defendant is in court for this
21   trial where the charges have been brought against him is no
22   evidence whatsoever of the defendant's guilt.
23          Jurors are only to consider evidence properly
24   received in the courtroom in determining the guilt or innocence
25   of the defendant.  Until and unless this is done, the
```

1  presumption of innocence prevails.

2          Have either of you seen or read or heard anything

3  about this case or have either of you heard anyone express an

4  opinion about the case or about anyone who has anything to do

5  with it?

6          Do any of you have any personal philosophical or

7  ideological views about the health care laws that would make it

8  difficult for you to act fairly and impartially in this case?

9          Do any of you have any beliefs or feelings toward any

10  of the parties, attorneys, witnesses, that would make it

11  impossible or difficult for you to act fairly and impartially

12  both as to the defendant and the government?

13          Have either of you been involved in, seen, heard or

14  read anything about criminal prosecutions in general that would

15  cause you to question your ability to be a fair and impartial

16  juror in this case?

17          Any of you have any feelings or beliefs toward the

18  law in general, or the health care law specifically, that would

19  make it impossible or difficult for you to act fairly and

20  impartially as to both parties in this case?

21          Let me also ask if either of you have any special

22  disabilities, medical problems, difficulties with language that

23  you believe would impair your ability to devote your full

24  attention to this case?

25          Are either of you taking any medication that would

```
 1   make it difficult for you to give your full attention?
 2              As a juror, you're obligated to follow the law given
 3   to you by the Court.  Is there anyone who would be unwilling or
 4   unable to follow the law as given to you in the Court's
 5   instructions, disregarding your own notions or ideas of what
 6   the law is or ought to be?
 7              One important task of the jury is to listen to the
 8   testimony of the various witnesses and decide how much or how
 9   little weight the testimony should be given.
10              Would either of you be unable or unwilling to perform
11   this task?
12              Do either of you know each other?
13              PROSPECTIVE JUROR:  No.
14              THE COURT:  Okay.  Now, I want everybody to listen to
15   this.
16              I recognize that jury service is probably an
17   inconvenience for you, taking you away from your jobs and
18   families and disrupting your daily routine.  It is, however,
19   one of the most important duties that citizens of this country
20   are called upon to perform.
21              It provides the public with a way of giving back for
22   the men and women who are fighting every day and putting their
23   lives on the line to preserve our way of life, because trial by
24   jury is an important factor in a democracy, and for that reason
25   I know you will not take this duty lightly.
```

App. 0583

1          Now, we expect the presentation of all phases of this
2     case, including the opening statements, the evidence, the
3     arguments of counsel, the instructions of the Court, will last
4     approximately I want to say between three and five days, plus
5     your deliberations.

6          Now, our daily schedule will normally be from
7     8:00 a.m. to 1:30, and we're are going to take two short
8     breaks. Now, so except for today, we're going to stop at 1:30,
9     and then we'll resume that following day at 8:00 a.m.

10         Today we're going to resume probably at -- hopefully
11    by 1 o'clock, and we'll meet during the afternoon and we'll
12    probably go until 4:00, 5 o'clock.

13         So we would expect that all phases of this case are
14    going to conclude by Tuesday or Wednesday at the latest, with
15    the case then being submitted to the jury for its
16    deliberations.

17         During deliberations your hours will change. The
18    jury will deliberate from 8:00 a.m. to 3:30 and lunch will be
19    brought in.

20         Now, I want to advise you that a juror may be excused
21    from jury service only upon a showing of specific facts which
22    constitute an undue hardship for the juror and not for the
23    juror's employer.

24         An undue hardship includes the following: The
25    prospective juror has a personal obligation to care for the

App. 0584

```
 1   sick, aged or infirmed dependent or to care for children where
 2   no comparable substitute care is either available or practical
 3   without imposing an undue financial hardship on the prospective
 4   juror or the person cared for; the prospective juror has a
 5   physical or mental disability or impairment not affecting the
 6   person's ability to serve on a jury but that would expose the
 7   prospective juror to an undue risk of mental or physical harm;
 8   participation in the trial would expose a prospective juror to
 9   an extreme financial burden, taking into account the following
10   factors:   The length of the trial, whether the prospective
11   juror is a sole support for his or her family, and the
12   availability of employer reimbursement.
13              Please keep in mind that jury service is not only a
14   duty and a responsibility, but it's a right that our
15   forefathers fought to secure, and men and women are fighting
16   today and putting their lives on the line because of its
17   importance in the governing of a democratic society.
18              As a society, we've given to the people power to
19   decide disputes between their fellow citizens in civil cases
20   and the power to make the ultimate determination of whether or
21   not to deprive a fellow citizen of life, liberty or property in
22   criminal cases.
23              Jury service is a duty that is not to be shirked and
24   a right that should not be likely relinquished.
25              Now, bearing in mind the importance of trial by jury,
```

App. 0585

1    do either of you seated in the jury box have any reasons why

2    you feel that jury service or the time enduring the hours I've

3    indicated would pose an undue hardship for you and require that

4    you be excused for consideration as a juror?

5          Okay.  So both of you think you can be with us?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.  Now, for those of you who are

8    seated in the audience, prospective jurors, are there any of

9    you who feel as though you can't be with us for the period of

10   time and the hours that I've indicated?

11         Just raise your hands.

12         Okay.  So I see two hands.

13         Okay.  Thank you.

14         Now, as jurors you're going to be the finders of fact

15   in this case.  You're required to base your decision solely on

16   the evidence presented in court.  You may not consider any

17   facts or information you learn outside of court, and you may

18   not rely on your own prejudices or biases in judging this case.

19         Do either of you believe that you would not be able

20   to do this?

21         As a judge, it's my job to instruct you on the law

22   that's applicable to this case.  You're required to find the

23   facts and then apply the law as I give it to you to those

24   facts.

25         Do either of you feel that you'd have any difficulty

```
 1   accepting and following the Court's instructions?
 2           As you may know, a defendant is presumed innocent
 3   until proven guilty.  This presumption of innocence continues
 4   until the jury concludes, if it does, that the defendant is
 5   guilty beyond a reasonable doubt.
 6           If the jury finds that the government has not proved
 7   the defendant's guilt beyond a reasonable doubt, it must return
 8   a not guilty verdict.  And you cannot return a guilty verdict
 9   unless you find that the government has established the
10   defendant's guilt beyond a reasonable doubt.
11           This is a different standard that's used in civil
12   cases.  There the jury merely has to find that a party has
13   established that its version of the facts is more probably true
14   than not.
15           Is there anything in the criminal standard of proof
16   beyond a reasonable doubt that you believe would make it
17   difficult for you to be a fair and impartial juror in this
18   case?
19           Unlike the government, the defendant has no burden
20   and does not have to present any evidence if he chooses not to
21   do so.  You must wait until all of the evidence has been
22   presented before making up your mind.
23           Are there any of you who do not believe that you
24   could withhold judgment until all of the evidence has been
25   presented?
```

App. 0587

```
1              The potential punishment for the crimes that have

2    been charged is a matter for the Court to decide.

3              Are there any of you who have concerns about the

4    level of punishment that might be imposed if the defendant is

5    found guilty and feel that those concerns would make it

6    difficult for you to fairly judge this case?

7              All right.  Ladies -- well, gentlemen, we're now

8    going to ask you some questions about yourselves.

9              Again, they're not designed to pry unnecessarily into

10   your personal lives or affairs.  They're asked to discover if

11   you have any knowledge about the case, if you have any

12   preconceived opinions that you might find difficult to lay

13   aside, if you have any personal or family experiences which

14   might cause you to identify yourselves with any of the parties,

15   and to assure each party that the jury will be fair and

16   impartial.

17             Please do not withhold information.  Be

18   straightforward in your answers, rather than answering in a way

19   that you feel the lawyers or I expect you to answer.  If your

20   answer to a question is yes, please raise your hand so that

21   additional questions may be asked.

22             If your answer to a question is no, you need do

23   nothing.

24             Again, at any time if you prefer to approach the

25   bench to answer a question rather than answering in front of
```

App. 0588

```
 1   the entire panel here in open court, please feel free to so
 2   indicate.
 3              All right.  We're going to begin with Alternate
 4   Number 1.
 5              I believe you have the microphone.  And if you could
 6   take the background questionnaire and just answer each of those
 7   questions and tell us a little bit about yourself.
 8              PROSPECTIVE JUROR:  My name is Thomas Lin.  I live in
 9   Santa Clarita, California.  I've lived in Santa Clarita for
10   about 25 years.
11              My marital status is divorced.  I live with my
12   fiancée in Santa Clarita.
13              I have three children.  They're all girls ranging in
14   ages from 16 to 21.  Two of them are in college.
15              My education is I graduated from Cal State
16   Northridge.  I have a bachelor's in science.
17              I do not have any military experience.
18              I'm currently a senior vice president in business
19   development for a mortgage outsourcing company.  That company's
20   name is ISGN Solutions and they're based out of Palm Bay,
21   Florida.
22              THE COURT:  And the partner that you're living with,
23   what does he or she do for a living?
24              PROSPECTIVE JUROR:  She's a mortgage loan officer.
25              THE COURT:  Okay.  And who does she work for?
```

App. 0589

1            PROSPECTIVE JUROR:  Peak, P-e-a-k.

2            THE COURT:  Okay.  Ever served on a jury before?

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  Ever been a party or a witness in a civil

5    or criminal case?

6            PROSPECTIVE JUROR:  A party in a civil if you

7    consider divorce.

8            THE COURT:  Okay.  Anything about that experience

9    that would cause you to have concerns about your ability to be

10   fair and impartial to both sides in this case?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Have you had a chance to look at the

13   Criminal Case Questionnaire?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Do you have any yes responses to any of

16   those questions?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  Okay.  Which ones?

19           PROSPECTIVE JUROR:  Twelve and 14.

20           THE COURT:  Why don't we turn to Number 12 first and

21   if you could tell us why you answered yes to that question.

22           PROSPECTIVE JUROR:  Yeah.  My brother used to work

23   for Medtronics, which is a medical device company.

24           THE COURT:  Right.  What did he do for them?

25           PROSPECTIVE JUROR:  He was a project manager.

```
1              THE COURT:  And what about 14?
2              PROSPECTIVE JUROR:  My mother has heart problems and
3    has a heart monitoring device.
4              THE COURT:  Okay.  Do you know how often she wears
5    that?
6              PROSPECTIVE JUROR:  I think it's constant.
7              THE COURT:  Okay.  Any other yes or affirmative
8    answers to any of the other questions?
9              PROSPECTIVE JUROR:  No, Your Honor.
10             THE COURT:  Thank you very much.  If you could pass
11   the microphone back.
12             And, sir, if you could tell us a little bit about
13   yourself.
14             PROSPECTIVE JUROR:  My name is Wayne Tennis.  I live
15   in Long Beach, born and raised in Long Beach.
16             THE COURT:  What high school did you go to?
17             PROSPECTIVE JUROR:  I went to Lakewood High School.
18             THE COURT:  The Lakewood Lancers.
19             PROSPECTIVE JUROR:  Yes, sir.
20             THE COURT:  Okay.  All right.
21             PROSPECTIVE JUROR:  Married.  I have three children:
22   a 13-year-old girl, a ten year-old boy and a five-year old
23   girl.
24             THE COURT:  Your educational background?
25             PROSPECTIVE JUROR:  I graduated from Long Beach
```

```
 1   State.  Never served in the military.
 2            I own an elevator service company named Total Access
 3   Elevator.  It's been around for about ten years.  My wife,
 4   well, she works part time for me.
 5            THE COURT:  Ever served on a jury before?
 6            PROSPECTIVE JUROR:  No, sir.
 7            THE COURT:  Ever been a party or a witness in a civil
 8   or criminal case?
 9            PROSPECTIVE JUROR:  Yes, sir.
10            THE COURT:  Okay.  Is that -- if you can just tap it
11   once.
12            PROSPECTIVE JUROR:  Hello.  There it is.
13            Yes, I was a party in a civil case.
14            THE COURT:  Okay.  Anything about that experience
15   that would cause you to have any concerns about your ability to
16   be fair and impartial?
17            PROSPECTIVE JUROR:  No, sir.
18            THE COURT:  Can you tell us just generally what that
19   civil case was about or what it involved?
20            PROSPECTIVE JUROR:  It was a liability case with an
21   elevator accident.
22            THE COURT:  Okay.  Have you had a chance to look at
23   the Criminal Case Questionnaire?
24            PROSPECTIVE JUROR:  Yes, sir.
25            THE COURT:  Do you have any yes responses to any of
```

```
1   those questions?
2            PROSPECTIVE JUROR:  No, Your Honor.
3            THE COURT:  Thank you very much.
4            May I see counsel at sidebar?
5       (The following proceedings were held at sidebar.)
6            THE COURT:  Okay.  I think we ought to -- well, I'm
7   wondering if we ought to seat maybe one more -- one or two more
8   alternates or are the parties generally satisfied with these
9   two if we're having two alternates?
10           MR. MCDERMOTT:  You know, just the mention of
11  Medtronics -- is that a name that's involved with this at all?
12           MS. RYKKEN:  It's a diabetic device company.
13           MR. MCDERMOTT:  Is that what that is?
14           THE COURT:  I think they may also make pacemakers.
15           MS. RYKKEN:  I don't know that.
16           MR. MCDERMOTT:  Okay.  Then I don't have any issues
17  with anyone.
18           MS. RYKKEN:  Yeah, I don't either.
19           THE COURT:  Okay.  And both of you are comfortable
20  with just having two alternates?
21           MS. RYKKEN:  I think so.
22           MR. MCDERMOTT:  I think so.
23           MR. FREEDMAN:  I think so.
24           MS. RYKKEN:  Yes.
25           THE COURT:  Okay.  Oh, I'm sorry.  So each of you
```

App. 0593

```
 1   will have one peremptory strike.  Okay.
 2        (The following proceedings were held in open court.)
 3             THE COURT:  All right.  Ladies and gentlemen, let me
 4   ask counsel, any challenges for cause as to the newly seated
 5   alternates?
 6             MR. FREEDMAN:  No, sir.
 7             MR. MCDERMOTT:  No, sir.
 8             THE COURT:  Any additional questions for the newly
 9   seated alternates?
10             MR. FREEDMAN:  No, Your Honor.
11             MR. MCDERMOTT:  Not by defense.
12             THE COURT:  All right.  Ladies and gentlemen, the
13   parties are now going to exercise peremptory challenges.  Each
14   side is entitled to a certain number of peremptory challenges
15   to prospective jurors seated in the jury box.
16             A peremptory challenge allows counsel to remove a
17   prospective juror that he or she believes may be unsympathetic
18   to his or her case.
19             A peremptory challenge is one for which no cause or
20   reason need been given.  Don't hold it against either side.
21   It's something that lawyers do.
22             All right.  The first peremptory I believe rests with
23   the government.
24             MR. FREEDMAN:  Your Honor, the government accepts the
25   alternate panel as currently constituted.
```

App. 0594

```
 1              THE COURT:  Okay.  Next peremptory challenge lies
 2   with the defense.
 3              MR. MCDERMOTT:  The same is true with the defense,
 4   sir.
 5              THE COURT:  All right.  Okay.  Ladies and gentlemen
 6   we've selected our alternates.
 7              Thank you very much for your service.  You may return
 8   to the jury assembly room on the first floor.
 9              All right.  Please be seated.
10         (The Court and clerk confer off the record.)
11              THE COURT:  Okay.  You're going to be joined by 12
12   other people that have been selected as a jury, and we will see
13   if we can -- see if they've all returned.
14              Yes, sir.
15              PROSPECTIVE JUROR:  May I use the restroom?
16              THE COURT:  Sure.
17              MS. RYKKEN:  Your Honor, may we use the restroom as
18   well really quickly?
19              THE COURT:  That's fine.
20              MS. RYKKEN:  Thank you.
21         (Jury in at 1:13 P.M.)
22              THE COURT:  All right.  I understand that Juror
23   Number 5 would like to speak to the Court.
24              Okay.  If you could join us over here, please.
25         (The following proceedings were held at sidebar.)
```

```
 1              PROSPECTIVE JUROR:  I just want to share my feeling
 2    the way I feel.
 3              THE COURT:  Uh-hmm.
 4              PROSPECTIVE JUROR:  I been having this strong feeling
 5    of getting this way of kinda come up with something fair to the
 6    case.  I've been working to myself.  I keep coming to the same
 7    place as I'm confused.  I want to be come around doing a great
 8    job as juror, but I don't mind -- I'm just feeling not fair to
 9    do what is right to do in this case.
10              THE COURT:  Well, you know, part of the process
11    involves hearing the evidence.
12              PROSPECTIVE JUROR:  Right.
13              THE COURT:  And we haven't done that yet.  So you're
14    going to -- the jury should be able to hear the witnesses, see
15    the exhibits, listen to the arguments of counsel, and then
16    reach a decision and listen to the views of your fellow jurors.
17              PROSPECTIVE JUROR:  Excuse my interruption.
18              The way I have seen things is -- from yesterday by
19    the way of the process, going through it all day it, it just
20    blocked me.  Today I'm in process to catching up.  It gets to
21    the point that I goes [sic] to the same -- same hole, and I --
22    if I were to open up and see other -- you know, but it's your
23    decision.  Whatever you guys decide.  I just want to share my
24    feeling about what I feel, and what I -- I'm able to give to
25    you guys.
```

```
 1            THE COURT:  Okay.  Well, what are you confused about
 2  at this point?
 3            PROSPECTIVE JUROR:  The way the process been going
 4  through the whole day yesterday, and we got to stay longer and
 5  basically be able to, you know, get upset with the jury and now
 6  it's same kind of process we going through it, so I'm very
 7  confused.
 8            THE COURT:  Okay.  Well, to answer your -- to address
 9  your confusion, yesterday we were just trying to select a jury.
10  We've got a jury selected now, and so now we're ready to start
11  the trial.
12            PROSPECTIVE JUROR:  Well, I will do my best, but in
13  the meantime, I just want to explain myself.
14            THE COURT:  I appreciate that.
15            PROSPECTIVE JUROR:  My feelings are knowledge is
16  being fair to the case, so I don't want to sound like I never
17  expressed myself --
18            THE COURT:  That's fine.
19            PROSPECTIVE JUROR:  -- as a citizen, so I just want
20  to share with you guys.
21            THE COURT:  Okay.  That's fine.  You can always do
22  that.
23            PROSPECTIVE JUROR:  Uh-huh.
24            THE COURT:  But we're ready to get started.
25            PROSPECTIVE JUROR:  Okay.  Thank you.
```

```
 1              THE COURT:  Okay.

 2         (Prospective juror takes a seat.)

 3              THE COURT:  Either of you have anything you want

 4    to --

 5              MR. FREEDMAN:  No.

 6              MR. MCDERMOTT:  No.

 7              THE COURT:  Okay.

 8         (The following proceedings were held in open court.)

 9              THE COURT:  Ladies and gentlemen, you might notice

10    those two handsome strangers sitting at the end of each row.

11    They have now joined you as jurors in this case, and I think

12    we're prepared to get started this afternoon.

13              Any reason why the 12 jurors shouldn't be sworn at

14    this time?

15              MR. MCDERMOTT:  Not by the defense, sir.

16              MR. FREEDMAN:  No, Your Honor.

17              THE COURT:  All right.  I'm going to ask that the 12

18    jurors stand and be sworn by the clerk.

19              THE CLERK:  Please raise your right hand.

20              Do you solemnly swear that you will well and truly

21    try the cause now before this Court and a true verdict therein

22    render, according to the evidence and instructions of the

23    Court, so help you God?

24              THE JURY:  I do.

25              THE COURT:  You may be seated.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              All right.  Thank you.

2              Any reason why the alternates shouldn't be sworn at

3    this time?

4              MR. MCDERMOTT:  No, sir.

5              MR. FREEDMAN:  No, Your Honor.

6              THE COURT:  All right.  I'm going to ask the

7    alternates to be stand and be sworn.

8              THE CLERK:  Do you solemnly swear that you will well

9    and truly try the cause now before this Court and a true

10   verdict therein render according to the evidence and

11   instructions of the Court, so help you God.

12             THE ALTERNATES:  I do.

13             THE COURT:  For those of you that weren't selected,

14   you're excused -- that are remaining in the audience, and you

15   may return to the jury assembly room on the first floor and

16   tell them that you have been excused.  Thank you.

17             All right.  Ladies and gentlemen, we're going to have

18   the clerk escort you back to the jury room so she can show you

19   where it is.  She is going to go over some logistical matters

20   with you, tell you how to get in in the mornings, give you some

21   telephone numbers to call if you're running late -- and

22   hopefully you won't because we can't start unless all of you

23   are here and present.

24             And then once she gives you this orientation, we're

25   going to come back.  I'm going to have some preliminary
```

```
 1   instructions for you.  Then we'll have the opening statements
 2   of counsel and then we'll start taking evidence from some of
 3   the witnesses.
 4          Now, I know we had some earlier discussions before we
 5   left about meeting this afternoon.  Is everybody going to be
 6   able to be here this afternoon?
 7          A JUROR:  I would have to leave by 3:00 to get my
 8   children.
 9          THE COURT:  Okay.  Can everybody be here until 3
10   o'clock?  Okay.  We'll go until 3 o'clock.
11          A JUROR:  Thank you.
12          THE COURT:  And then tomorrow morning we're going to
13   start at 8 o'clock and we'll go until 1:30.  We're going to
14   take two short breaks -- two short 15-minute breaks and then
15   we'll stop at 1:30 and come back the next day.
16          All right.  Thank you very much.
17          If you would stand and the clerk will escort you out
18   and show you where the jury room is.
19          THE CLERK:  All rise.
20      (Jury out at 1:20 P.M.)
21      (The following was heard outside the presence of the
22      jury.)
23          THE COURT:  Okay.  Let me go over some instructions
24   that I'm going to give the jury when they come back in.
25          These are all of the preliminary instructions.  I'm
```

| | |
|---|---|
| 1 | going to give 1.1, 1.2 -- I'm going to include in 1.2 the |
| 2 | essential elements of the crime that's charged in the |
| 3 | Indictment -- 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 1.10, 1.11, |
| 4 | 1.12, 1.13.  And then we'll give -- I believe it's 2.2, which |
| 5 | is bench conferences and recesses. |
| 6 | And at some point, I believe there's a stipulation -- |
| 7 | and you'll let me know if -- are you going to read the |
| 8 | stipulation or is it just -- |
| 9 | MR. FREEDMAN:  I think the only stipulation is as to |
| 10 | the exhibits.  There's no fact stipulation. |
| 11 | THE COURT:  Okay.  Any objections to any of those -- |
| 12 | giving any of those instructions? |
| 13 | MR. MCDERMOTT:  No, sir. |
| 14 | MR. FREEDMAN:  No. |
| 15 | THE COURT:  And your opening statement is going to be |
| 16 | how long? |
| 17 | MS. RYKKEN:  Six to eight minutes. |
| 18 | MR. MCDERMOTT:  No more than 20, sir. |
| 19 | THE COURT:  Okay. |
| 20 | MS. RYKKEN:  Your Honor, though, I was planning on |
| 21 | using this (indicating) just briefly to show them what the |
| 22 | Holter device is, if that's okay with you.  It will be Exhibit |
| 23 | 1 through Jon Barron. |
| 24 | THE COURT:  Okay.  Any objection? |
| 25 | MR. MCDERMOTT:  No, sir. |

App. 0601

```
 1              MS. RYKKEN:  And he's also seen the PowerPoint that I
 2   will be using, which is just a couple of slides.
 3              THE COURT:  Okay.  Defense going to be using any
 4   demonstrative exhibits during its opening?
 5              MR. MCDERMOTT:  No, sir.
 6              THE COURT:  All right.  As soon as the jury gets
 7   back, we'll get started and see how far we can get until -- I
 8   guess that gives us about an hour and a half.
 9              And who is your first witness.
10              MS. RYKKEN:  It depends on the timing.  We would --
11   there is one witness, John Hattrup, who will probably go today
12   if we can only get one person in, so that's probably --
13              MR. FREEDMAN:  We'll switch one and two.
14              MS. RYKKEN:  Yeah, we'll switch one and two.
15              THE COURT:  All right.  I think we'll be hopefully
16   about five or ten minutes and then we'll be able to get
17   started.
18         (Recess taken 1:25 to 1:30 P.M.)
19         (The following was heard outside the presence of the
20         jury.)
21              THE COURT:  All right.  Let's bring the jury in.
22         (Jury in at 1:32 P.M.)
23              THE COURT:  Ladies and gentlemen, you now are the
24   jury in this case, and I want to take a few minutes to tell you
25   something about your duties as jurors and to give you some
```

App. 0602

1  instructions.

2          These are preliminary instructions.  At the end of

3  the trial, I will give you more detailed instructions.  Those

4  instructions will control your deliberations.  You should not

5  take anything I may say or do during the trial as indicating

6  what I think of the evidence or what your verdict should be.

7          This is a criminal case brought by the United States

8  government.  The government charges the defendant with health

9  care fraud and causing an act to be done.

10          The charges against the defendant are contained in

11  the Indictment.  The Indictment is simply the description of

12  the charges made by the government against the defendant.  It

13  is not evidence of anything.

14          The defendant has pleaded not guilty to the charges

15  and is presumed innocent unless and until the government proves

16  the defendant guilty beyond a reasonable doubt.

17          In addition, the defendant has the right to remain

18  silent and never has to prove innocence or present any

19  evidence.

20          In order to help you follow the evidence, I will now

21  give you a brief summary of the elements of the crimes which

22  the government must prove beyond a reasonable doubt to make its

23  case.

24          In order for the defendant to be found guilty of

25  health care fraud, in violation of Section 1347 of Title 18 of

```
 1  the United States Code, the government must prove each of the
 2  following elements beyond a reasonable doubt:
 3          First, the defendant knowingly and willfully
 4  participated in a scheme or plan to defraud a health care
 5  benefit program or a scheme or plan for obtaining money or
 6  property from a health care benefit program by means of false
 7  or fraudulent pretenses, representations or promises;
 8          Second, the statements made or facts omitted as part
 9  of the scheme was material, that is, they had a natural
10  tendency to influence or were capable of influencing a person
11  to part with money or property of a health care benefit
12  program;
13          Third, the defendant acted with the intent to
14  defraud, that is, the intent to deceive or cheat; and,
15          Fourth, the scheme was in connection with the
16  delivery of or payment for health care benefits, items or
17  services.
18          In determining whether a scheme to defraud exists,
19  you may consider not only the defendant's words and statements
20  but also the circumstances in which they are used as a whole.
21          The term "health care benefit program" means any
22  public or private plan or contract affecting commerce under
23  which any medical benefit, item or service is provided to any
24  individual and includes any individual or entity who's
25  providing a medical benefit, item or service for which payment
```

1   may be made under the plan or contract.

2          A scheme to defraud and a scheme for obtaining money

3   or property means any deliberate plan of action or course of

4   conduct by which someone intends to deceive or to cheat another

5   or by which someone intends to deprive another of something of

6   value.

7          Defendant may be found guilty of health care fraud

8   even if he personally did not commit the act or acts

9   constituting the crime but instead willfully caused an act to

10  be done, which if directly performed by him or another would

11  constitute health care fraud.

12         To prove the defendant guilty under this theory, the

13  government must prove beyond a reasonable doubt:

14         First, health care fraud was committed by someone;

15         Second, defendant willfully ordered, directed or

16  otherwise brought about the commission of health care fraud.

17         These instructions are preliminary, and the

18  instruction I will give you at the end of the case will

19  control.

20         The punishment provided by law for these crimes is

21  for the Court to decide.  You may not consider punishment in

22  deciding whether the government has proved its case against the

23  defendant beyond a reasonable doubt.

24         The evidence you are to consider in deciding what the

25  facts are consists of the sworn testimony of any witness, the

1   exhibits which are received into evidence, and any factors to

2   which all lawyers stipulate.

3          The following things are not evidence and you must

4   not consider them as evidence in deciding the facts of this

5   case:  Statements and arguments of the attorneys, questions and

6   objections of the attorneys, testimony that I instruct you to

7   disregard, and anything you may see or hear when court is not

8   in session, even if what you see or hear is from the witnesses.

9          Some evidence is admitted for a limited purpose only.

10   When I instruct you that an item of evidence has been admitted

11   for a limited purpose, you must consider it only for that

12   limited purpose and for no other.

13          Evidence may be direct or circumstantial.  Direct

14   evidence is direct proof of a fact, such as testimony by a

15   witness about what that witness personally saw or heard or did.

16   Circumstantial evidence is indirect evidence, that is, it is

17   proof of one or more facts from which one can find another

18   fact.

19          For example, if you wake up in the morning and see

20   that the sidewalk is wet, you may find from that fact that it

21   rained during the night, however, other evidence, such as a

22   turned on garden hose, may explain the water on the sidewalk,

23   therefore, before you decide that a fact has been proved by

24   circumstantial evidence, you must consider all of the evidence

25   in light of reason, experience and common sense.

App. 0606

```
1          You are to consider both direct and circumstantial
2    evidence.  The law permits you to give equal weight to both,
3    but it is for you to decide how much weight to give any
4    evidence.
5          There are Rules of Evidence which control what can be
6    received into evidence.  When a lawyer asks a question or
7    offers an exhibit into evidence and the lawyer on the other
8    side thinks that it is not permitted by the Rules of Evidence,
9    that lawyer may object.
10          If I overrule the objection, the question may be
11   answered or the exhibit received.  If I sustain the objection,
12   the question cannot be answered and the exhibit cannot be
13   received.  Whenever I sustain an objection to a question, you
14   must ignore the question and must not guess at what the answer
15   would have been.
16          Sometimes I may order that evidence be stricken from
17   the record and that you disregard or ignore the evidence.  That
18   means that when you are deciding the case, you must not
19   consider the evidence which I told you to disregard.
20          In deciding the facts in this case, you may have to
21   decide which testimony to believe and which testimony not to
22   believe.  You may believe everything a witness says or part of
23   it or none of it.
24          In considering the testimony of any witness, you may
25   take into account the opportunity and ability of the witness to
```

```
 1    see or hear or know the things testified to, the witness's
 2    memory, the witness's manner while testifying, the witness's
 3    interest in the outcome of the case and any bias or prejudice,
 4    whether other evidence contradicted the witness's testimony,
 5    the reasonableness of the witness's testimony in light of all
 6    the evidence, and any other factors that bear on believability.
 7              The weight of the evidence as to a fact does not
 8    necessarily depend on the number of witnesses who testify.
 9              I will now say a few words about your conduct as
10    jurors.
11              First, keep an open mind throughout the trial and do
12    not decide what the verdict should be until you and your fellow
13    jurors have completed your deliberations at the end of the
14    case.
15              Second, because you must decide this case based only
16    on the evidence received in the case and on my instructions as
17    to the law that applies, you must not be exposed to any other
18    information about the case or to the issues it involves during
19    the course of your jury duty.
20              Thus, until the end of the case or unless I tell you
21    otherwise, do not communicate with anyone in any way and do not
22    let anyone else communicate with you in any way about the
23    merits of the case or anything to do with it.
24              This includes discussing the case in person, in
25    writing, by phone, or electronic means via e-mail, text
```

1   messaging or any internet chat room, blog, website or any other

2   feature.

3          This applies to communicating with your fellow jurors

4   until I give you the case for your deliberations, and it

5   applies to communicating with everyone else, including your

6   family members, your employer, the media or press, and the

7   people involved in the trial, although you may notify your

8   family and your employer that you have been seated as a juror

9   in the case.  But if you're asked or approached in any way

10  about your jury service or anything about the case, you must

11  respond that you've been ordered not to discuss the matter and

12  to report that contact to the Court.

13         Because you will receive all of the evidence and

14  legal instructions you properly may consider to return a

15  verdict, do not read, watch or listen to any news or media

16  accounts or commentary about the case or anything to do with

17  it.

18         Do not do any research, such as consulting

19  dictionaries, searching the internet or using other reference

20  materials, and do not make any investigation or in any other

21  way try to learn about the case on your own.

22         The law requires these restrictions to ensure the

23  parties have a fair trial based on the same evidence that each

24  party has had an opportunity to address.  A juror who violates

25  these restrictions jeopardizes the fairness of these

1    proceedings and a mistrial could result that would require the
2    entire trial process to start over.

3           If any juror is exposed to any outside information,
4    please notify the Court immediately.

5           At the end of the trial, you will have to make your
6    decision based on what you recall of the evidence. You will
7    not have a written transcript of the trial. I urge you to pay
8    close attention to the testimony as it is given.

9           If you wish, you may take notes to help you remember
10   what witnesses said. If you do take notes, please keep them to
11   yourself until you and your fellow jurors go to the jury room
12   to decide the case. Do not let note taking distract you so
13   that you do the not hear other answers by witnesses.

14          When you leave for the day, your notes should be left
15   in the courtroom on your chairs.

16          Whether or not you take notes, you should rely on
17   your own memory of what was said. Notes are only to assist
18   your memory. You should not be overly influenced by the notes.

19          And we will -- once the testimony starts, we will
20   provide you with notebooks.

21          The next phase of the trial is now going to begin.

22          First, each side may make an opening statement. An
23   opening statement is not evidence. It is simply an outline to
24   help you understand what that party expects the evidence will
25   show. A party is not required to make an opening statement.

1    The government will then present evidence and counsel

2    for the defendant may cross-examine.  Then the defendant may

3    present evidence and counsel for the government may

4    cross-examine.  After the evidence has been presented, the

5    attorneys will make closing arguments and I will instruct you

6    on the law that applies to the case.  After that, you will go

7    into the jury room to deliberate on your verdict.

8    From time to time during the trial, it may become

9    necessary for me to talk with the attorneys outside of the

10   hearing of the jury either by having a conference at the bench

11   when the jury is present in the courtroom or by calling a

12   recess.

13   Most of the time, these conferences will involve a

14   determination as to whether evidence is admissible under the

15   Rules of Evidence.  It is appropriate to take these matters up

16   outside the presence of the jury.  Should I conclude a more

17   prolonged discussion than necessary, I may excuse you from the

18   courtroom.

19   We will, of course, do what we can to keep the number

20   and length of these conferences to an absolute minimum.

21   I may not always grant an attorneys request for a

22   conference.  Do not consider my granting or denying a request

23   for a conference as any indication of my opinion of the case or

24   of what your verdict should be.

25   Thank you.

App. 0611

```
 1              Does the government wish to give an opening statement
 2    at this time?
 3              MS. RYKKEN:  Yes, Your Honor.
 4              May I begin, Your Honor?
 5              THE COURT:  Yes, please.
 6              MS. RYKKEN:  Thank you.
 7              This is a Holter device (indicating).
 8              It measures your heart rate and it does so for a
 9    short period of time, 24 or 48 hours.  But there are a lot of
10    things that it cannot do.  It cannot measure your heart rate,
11    for example, for 30 days, it can't measure your breathing, and
12    it can't see what's going on inside your head.
13              But the defendant, Michael Mirando, made at least
14    two-and-a-half-million dollars by charging insurance companies
15    for things like that that this device cannot and did not do.
16              He padded the bills.  He is now charged with 15
17    counts of health care fraud.
18              So I want to talk about how this works.  The Holter
19    device is a screening tool so that the doctor can see what's
20    going on in a patient's heart and then they can see if more
21    testing is necessary or maybe a cardiologist.
22              The defendant owns a company called Holter Labs
23    which, in turn, owned many of these devices.
24              All right.  So here's our first step.  A patient, for
25    example, will go to her regular family practice doctor
```

App. 0612

1    complaining of a heart palpitation or a funny heartbeat or
2    something like that.  Typically, the doctor will maybe hook her
3    up to the ECG machine and see if there's anything the doctor
4    can see at the time.  And if not, the doctor will sometimes
5    order the Holter device for 24 to 48 hours to see if something
6    else is happening over the course of a full day or two days.
7            So then the next step is the patient will be hooked
8    up to this device at the doctor's office, will wear the device
9    for 24 to 48 hours, sometimes keeping a journal or pressing a
10   button when there's a funny heartbeat.  And then when the 24
11   hours are over, the patient will then bring the device back to
12   the doctor's office to have it taken off and have the data
13   read.
14           So that is step three.  The data is taken from the
15   device and it is sent to a third party.  In this case, the
16   third party was defendant's company, Holter Labs.
17           So the data is taken off of here on a little tiny
18   card.  It looks like maybe a little bit bigger than the SIM
19   card on your phone.  It's sent to Holter Labs, and then they
20   plug it in, the software reads it, and it will spit out a
21   report for the doctor to review.  So once the report is
22   created, the doctor will then review the report.
23           All right.  In this chain of events, there are two
24   things that happen that should be billed to an insurance
25   company.  The first of those is when the report is created by

App. 0613

```
 1    Holter Labs, and the second one is when the doctor actually
 2    reviews that report and gives the patient advice about what to
 3    do next.  But the defendant charged for far more than actually
 4    occurred.
 5              This first one (indicating) for 24 hours, that's
 6    fine.
 7              But instead of just billing for the single service
 8    that was provided, he also billed for things like brain scans,
 9    sleep apnea, 30-day heart monitoring, wireless monitoring,
10    which this is not capable of, and something called a microvolt
11    T-wave assessment.
12              The defendant wasn't allowed to bill for any of
13    those.  These are all tests that a doctor would have had to
14    order, and the doctors in this case ordered none of those
15    tests.
16              In addition to all of those different items, the
17    defendant also billed for multiple dates of service.  So a
18    patient would wear it once and then the defendant would bill it
19    two, three or four times.
20              So the defendant was and still is responsible for all
21    of the billing that his company does.  You will see those
22    documents that he submitted to the insurance companies.
23              So the scheme was very simple.  There was one
24    legitimate charge and then there were multiple fraudulent
25    charges that were added onto that.
```

```
1            The charge for brain scans and respiratory tests.
2    This cannot do that.  It just can't.  But he billed insurance
3    companies about two-and-a-half-million dollars for things that
4    this device just cannot do, and that two-and-a-half-million
5    dollars is about 80 percent of defendant's profits.
6            And then he took those profits and put them in
7    various different bank accounts, and he hid them from his
8    business partner and kept the majority for himself.
9            Defendant knew this was a fraud.  It was not a
10   mistake.  He did not do this once or twice.  He did not do it
11   50 or a hundred times.  He did this tens of thousands of times
12   for over ten years.  He is the one who submitted the claims and
13   he put his name on the dotted line.
14           During the trial, you will hear from the doctors, you
15   will hear from the patients, and you will hear from the
16   insurance companies that paid the claims, and you'll be able to
17   look at all of the documents for yourself and see exactly what
18   was submitted and what was paid.
19           The patients will tell you that they wore the Holter
20   device one time for one day and that it tested their heart rate
21   and nothing more.  And the doctors will tell you that they
22   ordered one Holter device for one day and that it was to
23   monitor the patient's heart rate and nothing more.
24           At the close of the trial, the government will come
25   back to you and ask you to return the only verdict consistent
```

1    with the evidence in this case and a verdict of guilty.

2              THE COURT:  All right.  Thank you.

3              Does the defense wish to give an opening statement at

4    this time?

5              MR. MCDERMOTT:  May I, sir?

6              THE COURT:  Yes.

7              MR. MCDERMOTT:  Thank you.

8              Ladies and gentlemen, good afternoon and welcome to

9    being the judges of the facts, the judges of the determination

10   of what the evidence really means in this case and what it does

11   not.

12             You'll notice that when we come in and out of court,

13   the parties stand up and wait until you're seated, and the

14   reason that we do that is because of the importance that you

15   have in this case.

16             And for those of you that are concerned and nervous

17   about whether or not you can be an adequate juror and a fair

18   juror, remember that you are on equal par with each one of you.

19   Your determination of the evidence, your understanding of the

20   facts in this case will dictate and determine whether or not

21   Michael Mirando is guilty or not guilty of the offenses.

22             And as the judge instructed you just a couple of

23   minutes ago, my client has absolutely no burden whatsoever.  So

24   if the judge instructed you to go into the jury deliberation

25   room right now and decide and deliberate on a verdict, you'd

```
 1    have to come back with a not guilty because there's been no
 2    evidence presented.
 3              That highlights the fact that the government carries
 4    the burden from the very start of this case until the finish,
 5    and my client has no obligation whatsoever to put any evidence
 6    on in this case and the burden will never shift from the
 7    government.
 8              So those of you who are doing this for the very first
 9    time, all we ask from the defense side is keep an open mind
10    throughout the entire course of the case.  Wait until all the
11    evidence is in and you have an opportunity to sit down with
12    your other judges of the law -- of the facts and make a final
13    determination as to the guilt or innocence.
14              Now, obviously, with everything going on in our world
15    these days, there's a lot of discussion about health care, and
16    I want you to understand what that impact is involved in this
17    particular situation.
18              In this case, my client is not a health care expert,
19    never trained, has no health care background, and all the
20    people involved with this case, at least with Holter Labs, no
21    experience, no training, no education.  It's all
22    seat-of-the-pants understanding of how a Holter device works
23    and how you bill.
24              So what you're going to learn in this case is in
25    about 2002, a government witness by the name of Stan Crowley
```

1    was a neighbor of my client.  My client was working at Intel at
2    the time and the two men were roughly about ten, fifteen years
3    apart in age, Crowley being the older man.  But my client was
4    working for Intel as a systems manager.  Absolutely no
5    experience whatsoever in the health care field.

6           Crowley, just so happened to have worked his way up
7    in a company that worked with Holter devices.  Now, don't be
8    confused.  Holter Labs is the name of the company, but the
9    Holter device is something that's entirely different and not
10   necessarily anything that my client created.

11          Holter device was created by another bunch of people,
12   and it just so happened that Stan Crowley had worked for those
13   people.  And Stan Crowley and another associate of his by the
14   name of James Cast worked with this other company for a number
15   of years, and what they learned at that company was how to bill
16   and what to bill for the use of the device.

17          Now, bear in mind, you will see Mr. Crowley testify
18   here, at least he's on the government's witness list, and I
19   anticipate some of the testimony that he will have to offer in
20   this case and some of that testimony will be this.  Mr. Crowley
21   and Mr. Cast had to leave the previous company.  They had the
22   good fortune of meeting a young man that had a few extra
23   dollars and they were able to convince him to start a company,
24   Holter Labs.

25          And when they started that company, Mr. Crowley is

1  the expert on how to interpret and what to use the devices for
2  because he's been involved in the field a number of years
3  before he meets Michael Mirando.

4          And while they get the company set up, Mr. Crowley
5  brings in James Cast. And what is Mr. Cast good at? Billing.
6  Billing.

7          Now, one of the things that isn't explained here --
8  and, again, it goes back to this health care thing -- we're
9  getting into coding. No more do you fill out a piece of paper
10 or even a fax or an e-mail with -- give you a description of
11 what we are using the device for -- code. 922622. 977221.

12         What you need to know and understand is that the
13 coding needs to be correct for the insurance company to accept
14 it and pay.

15         And so when the process was undergoing and the
16 company was being developed and formed, Cast and Crowley were
17 teaching Michael Mirando how to bill, what to bill, when to
18 bill.

19         And another twist in this entire circumstance is
20 this. The makers of the Holter devices, Datrix -- Mr. Barron
21 will come in and testify -- nobody sits down and teaches you
22 coding.

23         Even the doctors will tell you, that will come in and
24 testify, coding is perhaps some of the most complicated of the
25 part of medicine anymore. "It's difficult because I don't get

1    to just tell the insurance company I applied a Holter device,

2    but I have to put a specific code down.  I now have to have

3    people that I hire that understand coding so I can get paid."

4           Now, why would the doctors want to become involved

5    with an item such as this, not the least of which because of

6    patient care and needs and that sort of thing?  But you have to

7    understand when Holter Labs got started, the concept is to

8    reach out to doctors, encourage one of them to take one of

9    their devices for free, utilize the device on the patient and

10   most of the information is sent electronically.  You can't wait

11   for days after a heart's been monitored to determine what's the

12   appropriate care that should be done.  By that time the patient

13   may be dead.  So they e-mail the stuff back and forth.

14          And, again, the people responsible for teaching my

15   client, Cast and Crowley, taught the mechanisms as to how to

16   interpret, how to read and how to bill.

17          Not once did any insurance company during the entire

18   time go to Holter Labs and say, "You know what?  We've been

19   looking at your bills.  Why are you billing with this code

20   number?  This code number this machine does not do."  But they

21   didn't.

22          In this case you will hear no evidence from an

23   insurance company that says, "We think you got a problem with

24   your coding and we're not going to pay you."  No, we go on for

25   nine years almost.

```
1          How does this matter come to light?  My client works
2   his tail off, gets the business booming, makes most of the
3   money, and the other two, they're not happy.  They're not
4   happy.  And what do they do?  They start a lawsuit.  They sue
5   my client civilly, state court, demanding their share,
6   demanding that they get their percentage of the profits and
7   their interest in the company.
8          He fought him.  Fought them hard.  And they got angry
9   because he was prevailing in the civil suit.  He was winning.
10          So what did they threaten to do?  "We're going to go
11   and tell the authorities," and that's what they did.
12          Mr. Crowley took evidence from a server at Holter
13   Labs, had it for a year, because he brought his buddy Cast back
14   into the picture -- because, see, Cast was supposed to become a
15   partner but he didn't deliver the money he was supposed to
16   deliver as being a partner or the material that he was supposed
17   to add to the business quality.
18          But he comes storming back in the picture once he
19   realizes how much money this is making because of the efforts
20   to market this product, and he starts the ball rolling with the
21   lawsuit and Crowley joins.
22          And two days before Crowley walks into the offices of
23   the FBI, he gets a lawyer who comes with him and, "Oh, by the
24   way, I have this stick of information and evidence that came
25   from one of the servers, and we got it -- involving a
```

1    particular insurance company, and lo and behold, we've got

2    evidence that he's been billing -- he's been billing the

3    insurance companies under the wrong codes and he's billing

4    multiple times wrong codes."

5            I submit to you when the evidence is fully fleshed

6    out, Crowley went to the FBI because he did it before.  You

7    will learn in this case that Cast and Crowley had a prior

8    employer, Holter Devices, Holter Devices, and they didn't like

9    what was going on their either.  They didn't get the kind of

10   money they thought either.  They went to the FBI.

11           And lo and behold, by the time it was all said and

12   done, they made a lot of money because in that circumstance,

13   that company was billing Medicare, Medi-Cal, a government

14   agency, and they were allowed to reap the profits of some of

15   the clawback on that.

16           So this is not a situation in which the insurance

17   companies came and decided that there was something wrong with

18   the billing.  This is circumstance of two individuals who

19   taught my client everything.  And the insurance companies will

20   tell you the same thing.

21           Think about it.  You learn how to drive a car.  You

22   got to go to a class.  And it's a pretty important thing

23   because of the harm and damage you can do if there's an

24   accident.  Well, consider the harm and damage you can do with a

25   medical device --

```
1              THE COURT:  Sir, this is an opening statement, not a
2   closing argument.
3              MR. MCDERMOTT:  -- if, in fact, there's no training.
4   And the evidence will show that my client, nor anyone else in
5   this picture, ever received any training on coding.
6              On that basis and on that understanding and the
7   knowledge of what you will hear from Mr. Crowley about the
8   circumstances of this company, I assert to you that my client
9   did not knowingly understand that this was, in fact, a
10  fraudulent billing operation.  Everything he taught, everything
11  he was instructed, everything that was passed along to him.
12             And I submit to you by the time we're finished with
13  this case, one of the things that you may fully understand here
14  is that maybe Cast and Crowley knew exactly what they were
15  doing when they came to my client.
16             When it's all said and done, I think there will be
17  more than enough reasonable doubt to convince you that my
18  client should not be found guilty of these charges.
19             Thank you for the opportunity.
20             THE COURT:  All right.  Thank you.  All right.  If
21  you would call your first witness please.
22             MS. RYKKEN:  Thank you, Your Honor.  The government
23  calls John Hattrup.
24             THE CLERK:  Please raise your right hand.
25             Do you solemnly swear that the testimony you shall
```

```
 1    give in the cause now before this Court shall be the truth, the
 2    whole truth, and nothing but the truth, so help you God?
 3                    THE WITNESS:  I do.
 4                    THE CLERK:  Please be seated.
 5                    Please state your full name and spell your last name
 6    for the record.
 7                    THE WITNESS:  John Robert Hattrup, Jr.  Last name is
 8    H-a-t-t-r-u-p.
 9                    THE COURT:  All right.  Counsel.
10                    MS. RYKKEN:  Thank you, Your Honor.
11                            JOHN HATTRUP, JR.,
12                        having been first duly sworn,
13                            testified as follows:
14                            DIRECT EXAMINATION
15    BY MS. RYKKEN:
16    Q.   What do you do for a living?
17    A.   I'm a delivery driver for a printing company.
18    Q.   Where do you live?
19    A.   Mission Viejo.
20    Q.   Have you worn a heart rate monitoring device before?
21    A.   Yes.
22    Q.   Do you remember when that was?
23    A.   Back in 2011.
24                    MS. RYKKEN:  Your Honor, I'd like him to take a look
25    at Exhibit 1, which is the heart-rate device.
```

```
 1              THE COURT:  All right.
 2    BY MS. RYKKEN:
 3    Q.    What is that?
 4    A.    A Holter device.
 5    Q.    Is that similar to the one that you wore?
 6    A.    Yeah, and it was attached to my chest.
 7              MS. RYKKEN:  The government would move to admit
 8    Exhibit 1.
 9              THE COURT:  Any objection?
10              MR. MCDERMOTT:  None, sir.
11              THE COURT:  All right.  It will be received.
12         (Trial Exhibit 1 admitted into evidence.)
13    BY MS. RYKKEN:
14    Q.    So you said that you wore the device in April of 2011?
15    A.    Correct.
16    Q.    For how long did you wear the device?
17    A.    One night.
18    Q.    So how did that get attached?  What happened?
19    A.    I went to the doctor's office and after an EKG, they
20    hooked me up to this and sent me home.
21    Q.    What happened once you went home?
22    A.    They just said to go about your normal activity and
23    everything was being recorded on there and so return the next
24    day and turn it back in.
25    Q.    So I notice that you're putting your hand sort of all over
```

```
 1   the chest area; is that right?
 2   A.   Yeah, it was attached like up here (indicating) on my
 3   chest.
 4   Q.   "Up here," like near your shoulders?  Is that what
 5   you're --
 6   A.   Like right in here (indicating).
 7   Q.   Were the electrodes ever near your head?
 8   A.   No.
 9   Q.   Nowhere around your face?
10   A.   No.
11   Q.   So you wore it once for one night?
12   A.   Correct.
13   Q.   Did you ever wear it for 30 days?
14   A.   No.
15   Q.   Did you ever wear it again?
16   A.   Not from that particular doctor, no.
17   Q.   When was the next time that you wore it?
18   A.   I believe it was in 2013 with a cardiologist.
19   Q.   So is that about two years later?
20   A.   Correct.
21   Q.   So when you had the device, did you have to do anything
22   else like change the batteries or plug it in?
23   A.   No.
24   Q.   What's your understanding of why the doctor had you wear
25   this device?
```

```
1  A.    Just to check how my heart was beating and, you know, if
2  it was going too fast or too slow or if there was any
3  irregularities in my heartbeat.
4  Q.    Did you have any other kind of cardiac procedure while you
5  were wearing the device?
6  A.    No.
7  Q.    What about trouble sleeping?  Did you have trouble
8  sleeping when you were wearing the device?
9  A.    No.
10 Q.    Did you go to see the doctor about sleeping problems?
11 A.    No.
12 Q.    Are you familiar with sleep apnea?
13 A.    Yes.
14 Q.    What is it?
15 A.    When basically you stop breathing at night.
16 Q.    What's your doctor's name?
17 A.    At that time in 2011, Dr. Greg Joy.
18 Q.    Did you ever see Dr. Joy about sleep apnea?
19 A.    No.
20 Q.    Did you ever -- did he ever order a sleep study for you?
21 A.    No.
22 Q.    Did you take any tests at all to monitor your respiratory
23 effort?
24 A.    No.
25        MS. RYKKEN:  Your Honor, I'd like to have the witness
```

App. 0627

```
 1   look at Exhibit 50.
 2   BY MS. RYKKEN:
 3   Q.   There's a binder right there to your right, the bigger
 4   binder, and if you could turn to Exhibit 50, please.
 5        MS. RYKKEN:   This is the exhibit -- one of the
 6   exhibits we had agreed is provisionally admitted until the
 7   later testimony of Agent Kennedy.
 8        Permission to publish?
 9        THE COURT:   That's fine.
10        MS. RYKKEN:   Thank you.
11   BY MS. RYKKEN:
12   Q.   Do you see the document on the page?
13   A.   Yes.
14   Q.   This is a summary of all of the procedures that were
15   billed to insurance.   Okay.   Who was your insurer at the time
16   in 2011?
17   A.   United Health Care.
18   Q.   And at the time did you live in Mission Viejo?
19   A.   Yes.
20   Q.   So let's go through this one by one.   The first date, do
21   you see up there on the top left, it's 4/11/2011?
22   A.   Um-hmm.
23   Q.   Is that the date that you wore the heart rate monitor?
24   A.   Yes.
25   Q.   So do you see the first line?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

| 1 | A. | Um-hmm. |
| 2 | Q. | What does that say? |
| 3 | A. | "ECG monitor report, 24 hours." |
| 4 | Q. | And is that what happened?  Did you have an ECG for 24 |
| 5 | hours? | |
| 6 | A. | I wore the Holter for one evening, yes. |
| 7 | Q. | And the second line, what does that say? |
| 8 | A. | "Cardiovascular procedure." |
| 9 | Q. | Did you have a cardiovascular procedure on April 11? |
| 10 | A. | No, I didn't. |
| 11 | Q. | And the next line down, what does it say? |
| 12 | A. | "EEG all night recording." |
| 13 | Q. | Do you know what an EEG is? |
| 14 | A. | No, I don't. |
| 15 | Q. | To your knowledge did you have an EEG that day? |
| 16 | A. | They did something in the office while they hooked me up |
| 17 | to something in the office, and then I wore the Holter home. |
| 18 | That's the only two things I remember. |
| 19 | Q. | And then the last item, can you read that? |
| 20 | A. | "PRS, CRX, oral non-chemo therapeutic NOS." |
| 21 | Q. | Do you know what that is? |
| 22 | A. | Not a clue. |
| 23 | Q. | Do you know whether that happened? |
| 24 | A. | No, it didn't. |
| 25 | Q. | I'd like to look at the next date, please. |

App. 0629

```
 1              MS. RYKKEN:  Before you highlight that --
 2    BY MS. RYKKEN:
 3    Q.   Do you see additional dates on this document?  Can you
 4    read those?
 5    A.   "4/12, 4/15, 4/18, 4/21."
 6    Q.   Did you have additional -- an additional Holter test on
 7    April 12th of 2011?
 8    A.   No, I didn't.
 9    Q.   Did you have an oral non-chemo therapeutic NOS on April
10    12th, 2011?
11    A.   No, I didn't.
12    Q.   Take the next day.  What about April 15th of 2011?
13    A.   Yeah, I see it.  I didn't have any of those.
14    Q.   By "any of those," you mean another ECG monitor for 24
15    hours?
16    A.   Correct.
17    Q.   Or an EEG?
18    A.   Correct.
19    Q.   Or an autonomic nerve function test?
20    A.   No.
21    Q.   Or an oral non-chemo therapeutic NOS?
22    A.   No.
23    Q.   And then on April 18th, 2011, did you have any additional
24    medical testing done on April 18th, 2011?
25    A.   No, I didn't.
```

App. 0630

| | | |
|---|---|---|
| 1 | Q. | Did you have a microvolt T-wave assessment? |
| 2 | A. | No. |
| 3 | Q. | Did you have an ECG monitor report? |
| 4 | A. | No. |
| 5 | Q. | Did you have an EEG all night recording? |
| 6 | A. | No. |

7 Q. And, again, the oral non-chemo -- I think that's supposed
8 to be therapeutic, but therapeutic NOS, did you have that?
9 A. No, I didn't.
10 Q. And then the last date on here is April 21. Can you take
11 a look at that list and see if you had any of those procedures
12 done on April 21?
13 A. No, I didn't.
14 Q. So you did not have a microvolt T-wave assessment?
15 A. No.
16 Q. And you didn't have another ECG monitor report?
17 A. No.
18 Q. And you didn't have an EEG?
19 A. No.
20 Q. Or the oral non-chemo therapeutic NOS?
21 A. No, I didn't.
22 Q. To your knowledge did Mr. Richmond order any of these
23 additional tests besides the first?
24 A. I never saw Dr. Richmond, I saw Dr. Joy.
25 Q. I'm sorry. Dr. Joy.

```
 1              Did Dr. Joy ever order any other additional tests for
 2   you after the first?
 3   A.    No.  No, he didn't.
 4   Q.    Did you have any other medical tests done the week after
 5   you wore the Holter device?
 6   A.    Yes.  Actually, I went to a cardiologist.
 7   Q.    A cardiologist that was not Dr. Joy?
 8   A.    Correct.  Dr. Joy is a primary care doctor.  He's an MD.
 9   Q.    Do you recall if you ever received a bill from Holter
10   Labs?
11   A.    No.
12   Q.    You don't recall or you did not?
13   A.    I don't remember getting one, no.
14   Q.    Do you remember ever paying Holter Labs for wearing the
15   device?
16   A.    No, I don't.
17              MS. RYKKEN:  Can I have just one minute with counsel,
18   Your Honor?
19              THE COURT:  Yes.
20         (Counsel confer off the record.)
21              MS. RYKKEN:  Nothing further, Your Honor.
22              THE COURT:  All right.  Cross-examination.
23              MR. MCDERMOTT:  May I, sir?
24              THE COURT:  Yes.
25              MR. MCDERMOTT:  Thank you.
```

App. 0632

CROSS-EXAMINATION

BY MR. MCDERMOTT:

Q.   Sir, when I ask you something -- EOB.  Do you know what that means?

A.   No, I do not.

Q.   Explanation of Benefits.  Do you recall ever getting that from your insurance company by chance?

A.   I may have, but I can't say for sure.

Q.   Okay.  Just a thumbnail for the jury.  In preparation of your testimony here today, were you given an opportunity to take a look at your medical records?

A.   They briefly showed me what I just looked at right there.

Q.   All right.  That paid sheet, but you actually haven't taken a look at your medical records that are contained with Dr. Joy or the cardiologist; is that correct?

A.   No, I haven't.

Q.   So as far as what might have been told to you about what was done with that Holter device, you're relying upon Exhibit Number 50 that was just up on the board, correct?

A.   No, I'm going by what I remember.

Q.   Okay.  You remember how many times you may have worn something, correct?

A.   Correct.

Q.   Did the doctor actually explain to you what the device would do?

1    A.    It was basically measuring my heart rhythm.

2    Q.    All right.  And when you were done wearing it, did you, in

3    fact, sit down with the doctor and go through the results of

4    the examination?

5    A.    I don't remember if I did, no.

6    Q.    And in the last questions that the government asked you,

7    that had to do with whether or not you were billed by Holter

8    Labs at all.  Do you remember that question?

9    A.    Yes, I remember the question.

10   Q.    Any recollection as you sit here today back in April of

11   2011 whether or not you were sent a bill from your insurance

12   company or any other person or entity asking for payment for

13   the device you wore that day?

14   A.    No, I never received anything.

15   Q.    And as you sit here today, do you have any recollection

16   whatsoever of reviewing an Explanation of Benefits of what

17   occurred in April of 2011?

18   A.    No, I don't.

19   Q.    So, in essence, what you're looking at today -- and I

20   recognize you remember the one occasion which you wore it.  And

21   there might have been a second time with your cardiologist?

22   A.    Correct.

23   Q.    And that might have been in the same month?

24   A.    No.  I believe that it was later on.

25   Q.    Okay.  And as you sit here today, do you have a

```
1    recollection of your insurance company in any way contacting
2    you or informing you that there's multiple bills occurring in
3    April of 2011?
4    A.   No, I never received any kind of, you know, phone call or
5    anything written.
6    Q.   All right.  Thank you, sir.
7              THE COURT:  Any redirect?
8              MS. RYKKEN:  No.  Thank you, Your Honor.
9              THE COURT:  All right.  Sir, you may step down.
10             THE WITNESS:  Okay.  Thank you.
11             THE COURT:  Call your next witness.
12             MS. RYKKEN:  The government calls Jon Barron.
13             THE CLERK:  Please raise your right hand.
14             Do you solemnly swear that the testimony you shall
15   give in the cause now before this Court shall be the truth, the
16   whole truth, and nothing but the truth, so help you God?
17             THE WITNESS:  I do.
18             THE CLERK:  Please be seated.
19             Please state your full name, spell your last name for
20   the record.
21             THE WITNESS:  My name is Jon, J-o-n, Barron,
22   B-a-r-r-o-n.
23             THE COURT:  All right.  Counsel.
24             MS. RYKKEN:  Thank you.
25   ///
```

App. 0635

| 1 | JON BARRON, |
| 2 | having been first duly sworn, |
| 3 | testified as follows: |
| 4 | DIRECT EXAMINATION |
| 5 | BY MS. RYKKEN: |
| 6 | Q. What do you do for a living? |
| 7 | A. I own Datrix LLC -- |
| 8 | Q. For how long -- |
| 9 | A. -- which is a manufacturer of ambulatory cardiac monitors. |
| 10 | Q. How long have you owned the company? |
| 11 | A. I owned it from 1988 to 2009 and then I bought it back in |
| 12 | February of this year. |
| 13 | Q. And you said that you are the owner. Do you have a |
| 14 | day-to-day role? |
| 15 | A. Yes. |
| 16 | Q. What do you do? |
| 17 | A. I manage the day-to-day activities, sales, engineering. |
| 18 | Q. So you're familiar with the Holter device? |
| 19 | A. Yes. |
| 20 | Q. Can you take a look at Exhibit 1, which is right in front |
| 21 | of you. What is that? |
| 22 | A. It's a Holter ECG recorder. |
| 23 | Q. Did you design this? |
| 24 | A. Yes. |
| 25 | Q. So is it your company that manufactures the Holter device? |

App. 0636

```
1    A.    Yes.   This one's not -- this version is not manufactured
2    anymore.
3    Q.    What version is that?
4    A.    This is a VX3 and this particular version is an E series.
5    Q.    So how many different kinds of Holter devices does your
6    company manufacturer?
7    A.    Currently two.
8    Q.    And in the past how many other different versions have
9    there been?
10   A.    Just Holter?   Three or four.
11   Q.    So this model is no longer in production.   When did you
12   begin producing this model?
13   A.    The first variation of this came out in -- I'm not exactly
14   sure.   It was in early 2000s.
15   Q.    And when did you stop producing that model?
16   A.    I'm not -- I'm not sure but probably in the last three or
17   four years.
18   Q.    Do you know how the device works?
19   A.    Yes.
20   Q.    Can you explain how it works?
21   A.    This device is -- is applied to a patient with these --
22   like you've probably seen these on TV before, but these are
23   snap leads that are connected to wires, and the patient would
24   have electrodes, kind of like bandaids, with -- to help conduct
25   the little tiny electrical signals that come off of a patient's
```

```
1    chest or the area -- chest area.

2           And then the -- once the patient is hooked up, the

3    batteries are inserted and a compact flash card.  You don't see

4    those very often anymore, but they were pretty common in

5    cameras, and the compact flash card is where the data is

6    digitized.  The little tiny signals are amplified and digitized

7    and they're stored on the compact flash card in a format that's

8    readable by any PC computer.

9    Q.   What happens after a patient wears the device?

10   A.   This particular device it's common for a patient to wear

11   for 24 to 48 hours, and then the patient would come back and

12   the compact flash card would be inserted into a compact flash

13   card reader on a computer and downloaded into the computer, and

14   then the -- typically software would analyze that data or an

15   operator would edit the data if the analyzer made mistakes.

16   Q.   Does your company have any role in the production of the

17   reports?

18   A.   No.

19   Q.   So is it a different software provider that takes care of

20   that?

21   A.   Yes.  There's multiple software providers for various

22   recorders.  This one I think is only one manufacturer which is

23   Caird Technology.

24   Q.   So if I understand you correctly, Caird Technology is the

25   software provider for this particular device?
```

| | |
|---|---|
| 1 | A. It's the only one I'm aware of. |
| 2 | Q. So are you involved at all with patients once the device |
| 3 | is sold to a third party? |
| 4 | A. No. |
| 5 | Q. What about doctors? Are you involved with the doctors at |
| 6 | all? |
| 7 | A. Occasionally. |
| 8 | Q. How so? |
| 9 | A. If a doctor is not -- and probably not in the IDTF world, |
| 10 | which is when this is used by a service, but when it's used by |
| 11 | a doctor, if the patient is not happy or they freak out and |
| 12 | they don't get service or they don't get their questions |
| 13 | answered, on occasion they might call. |
| 14 | Q. What about insurance companies? Are you involved with |
| 15 | them? |
| 16 | A. No. |
| 17 | Q. So you mentioned it's a heart rate monitoring device. Can |
| 18 | it do anything else? |
| 19 | A. No. |
| 20 | Q. You mentioned IDTF earlier. What does that mean? |
| 21 | A. Independent diagnostic -- I don't remember what the F |
| 22 | stands for, but they're services that are contracted to -- by |
| 23 | doctors and hospitals to do the scanning or do various tests |
| 24 | that they may or may not want to do. |
| 25 | Q. Are you familiar with Holter Labs? |

```
 1   A.   Yes.

 2   Q.   Is that an IDTF?

 3   A.   I would consider it to be an IDTF.

 4   Q.   So you said it can't do anything else.  Do you know what

 5   an EEG is?

 6   A.   Yes.

 7   Q.   What is it?

 8   A.   It's a -- where you -- it's about the brainwaves instead

 9   of the heart.

10   Q.   Can this device measure brainwaves?

11   A.   No.

12   Q.   Do you know what sleep apnea is?

13   A.   Yes.

14   Q.   What is it?

15   A.   Well, it's -- it's when you're trying to diagnose if a

16   patient has a sleeping disorder where -- with breathing and

17   sometimes they'll stop breathing when they're sleeping and

18   their pulse ox goes down and it's not a good thing.

19   Q.   Is this device, the Holter device, is that made for sleep

20   apnea tests?

21   A.   I've heard of it being in used in conjunction with sleep

22   apnea tests.

23   Q.   What about with respiratory tests?

24   A.   No.

25   Q.   Can it measure breathing?
```

```
 1    A.    No.

 2    Q.    What about oxygenation rates?

 3    A.    No.

 4    Q.    Do you know what a microvolt T-wave assessment is?

 5    A.    No.

 6    Q.    To your knowledge can this device perform a microvolt

 7    T-wave assessment?

 8    A.    I don't know.  It's not in the intended use of the device.

 9    Q.    Did you design it to measure microvolt T-wave assessment?

10          THE COURT:  Sir, can you push that microphone a

11    little bit further away from you.  Thank you.

12    BY MS. RYKKEN:

13    Q.    Can you look at Exhibit 3 in the binder to your right.

14          It's the bigger binder.

15    A.    Okay.

16    Q.    Do you know what this document is?

17    A.    Yes.

18    Q.    What is it?

19    A.    It's the brochure for the VX3 Holter recorder.

20    Q.    Is this a brochure that your company developed?

21    A.    Yes.

22          MS. RYKKEN:  I would like to move to admit Exhibit 3

23    into evidence.

24          THE COURT:  Any objection?

25          MR. MCDERMOTT:  No objection, sir.
```

```
 1                    THE COURT:  It will be received.
 2          (Trial Exhibit 3 admitted into evidence.)
 3               MS. RYKKEN:  Permission to publish to the jury?
 4               THE COURT:  Yes.  Once it's received, you don't have
 5   to ask for permission.
 6               MS. RYKKEN:  Thank you.
 7   BY MS. RYKKEN:
 8   Q.   So this is how you advertised the Holter device?
 9   A.   Yes.
10   Q.   Can you read down there on the bottom, it says "Available
11   OEM options."  What does that mean?
12   A.   Which page are you --
13   Q.   On page 1 just above the bullet points.
14               If you look on the screen in front of you, it's
15   highlighted.
16               THE COURT:  Sir, if you could look on that screen in
17   front of you.
18               THE WITNESS:  Oh, that's even better.
19   BY MS. RYKKEN:
20   Q.   What does "Available OEM options" mean?
21   A.   That was put in there to have a conversation with
22   particular OEMs about what they might want to do with the
23   device, like have an additional -- or a different sample rate
24   or -- it was just a conversation because this doesn't go --
25   this goes to OEMs, not to doctors or hospitals.  It doesn't
```

```
 1   typically go to the end user.
 2   Q.   What is OEM?
 3   A.   Good question.  Original equipment manufacturer.  So it's
 4   for, like, people that -- other companies buy our product and
 5   put their name on it a lot of times, and so it might be a
 6   bigger company that purchased the product from us would be --
 7   is who we are targeting this to.
 8   Q.   And the bullet points, are those features of the device?
 9   A.   Except for the -- well, I was going to say when it says
10   optional, but I wouldn't necessarily consider that a feature.
11   Q.   And the second one "Selectable 24 or 48-hour recording,"
12   what does that mean?
13   A.   You can select whether you want to run it for 24 or 48
14   hours.
15   Q.   Is the device capable of running for longer than that?
16   A.   Not this one.
17   Q.   You have other ones that can do that?
18   A.   Yes.
19   Q.   For how long?
20   A.   We've tested it to ten days.
21   Q.   Does this particular model of the Holter device have any
22   wireless capability?
23   A.   No.
24   Q.   You said a little bit about the intended use of the
25   device.  What does that mean?
```

```
 1    A.    When we file with the FDA for a product like this, we have
 2    to say what the -- in the paperwork it has to say what the
 3    intended use is.
 4    Q.    Can you look at Exhibit 4.
 5    A.    Yes.
 6    Q.    What is this document?
 7    A.    It is a summary that's put on the FDA website of the
 8    510(K) that was filed for the device.
 9    Q.    Is this a document that your company filed?
10    A.    Yes.
11               MS. RYKKEN:   I move to admit Exhibit 4 into evidence.
12               MR. MCDERMOTT:   No objection.
13               THE COURT:   It will be received.
14          (Trial Exhibit 4 admitted into evidence.)
15    BY MS. RYKKEN:
16    Q.    So "Intended use," can you look at the bottom of page 1,
17    and can you please read that --
18               THE COURT:   Again, sir, it might be easier if you
19    looked at the screen.
20    BY MS. RYKKEN:
21    Q.    Can you please read the "Intended use"?
22    A.    Just the whole thing or --
23    Q.    Can you read it aloud, please?
24    A.    "The VX3 digital Holter recorder is intended for recording
25    of ECG data collected from ambulatory patients.  Recorder can
```

App. 0644

1   collect data in the presence of implanted pacemaker pulses and
2   can detect and record the occurrence of signals characteristic
3   of pacemaker pulses."
4           THE COURT:  Just a little slower, sir, because she
5   has to record exactly what you're saying.
6           Go ahead.
7           THE WITNESS:   "The recorder is used under the order
8   of a physician, who reviews the data after downloading and
9   processing by a Holter playback system.  The physician
10  determines the presence of normal and abnormal ECG data, as
11  well as pacemaker pulses during the events of the patient's
12  daily activity."
13  BY MS. RYKKEN:
14  Q.   Thank you.  If there had been other intended uses for the
15  Holter device, would you have had to include it here?
16  A.   Yes.
17  Q.   So if the device was going to be used as -- to measure
18  microvolt T-wave assessments, you would have had to include it
19  in this form?
20  A.   It's clearly stated in the FDA guidance documents that if
21  the intended use changes or if it's modified, you have to file
22  a new 510(K).
23  Q.   Okay.  Let's turn to Holter Labs next.  Are you familiar
24  with Holter Labs?
25  A.   A little bit.

| | |
|---|---|
| 1 | Q.   How? |
| 2 | A.   My understanding is they buy this recorder that we |
| 3 | manufacture but I think they normally or typically buy them -- |
| 4 | and I may be wrong -- but maybe from distributors. |
| 5 | Q.   So a distributor, is that someone like the OEM you |
| 6 | mentioned earlier? |
| 7 | A.   No, that's a little bit different. |
| 8 | Q.   How is that different? |
| 9 | A.   Well, normally, they would -- they might be -- there could |
| 10 | be multiple -- they could have multiple devices that they would |
| 11 | sell.  In other words, they may have -- be a little bit |
| 12 | different characteristics, a different label to more than one |
| 13 | person, but that doesn't typically happen. |
| 14 | Q.   Do you know the defendant Michael Mirando? |
| 15 | A.   Not that I know of. |
| 16 | Q.   Do you know Stanton Crowley? |
| 17 | A.   No. |
| 18 | Q.   Do you know Jim Cast? |
| 19 | A.   No. |
| 20 | Q.   So you mentioned that Holter Labs purchased these devices |
| 21 | from you.  Can you please look at Exhibit 2.  It has a few |
| 22 | different pages, so can you make sure you look at all of the |
| 23 | pages. |
| 24 | A.   Okay. |
| 25 | Q.   What is this document? |

```
1    A.    Maybe I'm on the wrong -- is it Exhibit 3?  I'm sorry.

2    Q.    Exhibit 2.

3          MR. MCDERMOTT:  Exhibit 2 we're talking about?

4          MS. RYKKEN:  Pictures.

5          THE WITNESS:  I see photos of the device.

6    BY MS. RYKKEN:

7    Q.    Is this a device that your company manufactured?

8    A.    Yes.

9    Q.    How can you tell?

10   A.    By the physical characteristics, the label that's on the

11   back of it, the pouch, the strap and the label, the front

12   label.

13         MS. RYKKEN:  The government would move to admit

14   Exhibit 2 into evidence.

15         MR. MCDERMOTT:  No objection.

16         THE COURT:  It will be received.

17         (Trial Exhibit 2 admitted into evidence.)

18         MS. RYKKEN:  Can we look at page 3.

19   BY MS. RYKKEN:

20   Q.    So page 3, do you see this picture of the device?

21   A.    Yes.

22   Q.    So you mentioned the label just a moment ago.  What does

23   that say?

24   A.    "Holter Labs, cardiac monitoring."

25   Q.    So is that something that you put on the device, the label
```

```
 1   on the front?
 2   A.    Yes.
 3   Q.    So you did that for Holter Labs?
 4   A.    Yes.
 5   Q.    Do you do that for other people that you provide the
 6   device to?
 7   A.    Yes.
 8   Q.    Okay.  So you mentioned some third parties that may have
 9   been the people that sold the devices to Holter Labs.  So can
10   you look at Exhibit 6, please.
11             What is that document?
12   A.    There are quite a few invoices.
13   Q.    And what do the invoices describe?
14   A.    They describe the device sold -- or the -- and/or
15   accessory and the bill to.
16   Q.    Is this Datrix's bill?
17   A.    Yes.
18             MS. RYKKEN:  Move to admit into evidence.
19             MR. MCDERMOTT:  No objection.
20             THE COURT:  It will be received.
21        (Trial Exhibit 6 admitted into evidence.)
22             MS. RYKKEN:  Can you go to the last page, please.
23   It's Bates 670.
24   BY MS. RYKKEN:
25   Q.    If you can look at the last page of the invoice.  So in
```

```
1    the top "Bill to" and "Ship to," who was this billed to?
2    A.    Lynn, L-y-n-n, Medical.
3    Q.    And who was it shipped to?
4    A.    Holter Labs.
5    Q.    And who is Lynn Medical?
6    A.    They are a distributor of a lot of different medical --
7    like the electrodes that we talked about earlier, batteries and
8    equipment.
9    Q.    And then in the description of the item, it says "7-lead,
10   3-channel VX3 cable" and "Shipping charge."
11             Is that something that goes with the device that
12   we've been talking about?
13   A.    Yes.  That's this piece right here, the wire (indicating).
14   Q.    Okay.  And then Exhibit 5, please.  Can you turn to that.
15             What is Exhibit 5?
16   A.    It's an invoice for the same device.
17   Q.    Is it a Datrix invoice?
18   A.    Yes.
19             MS. RYKKEN:  Move to admit Exhibit 5 into evidence.
20             MR. MCDERMOTT:  No objection, sir.
21             THE COURT:  It will be received.
22        (Trial Exhibit 5 admitted into evidence.)
23             THE WITNESS:  It's not to Lynn Medical, though.  It's
24   to a different -- it's to the manufacturer of the Holter
25   software.
```

App. 0649

```
 1  BY MS. RYKKEN:
 2  Q.   So in the "Bill to," it says Caird Technology?
 3  A.   Yes.
 4  Q.   In the description, what does that say?
 5  A.   VX3-7-lead, 3-channel Datrix digital recorder Series E
 6  with Holter Lab label.  Includes pouch, belt, 7-lead patient
 7  cable, lot number," blah, blah, blah, "serial number."  The
 8  serial number is VXE4114 through VXE4143.
 9  Q.   So is this an invoice for a device that went to Holter
10  Labs?
11  A.   Yes, I would assume so.  The shipping was the South
12  Carolina address, but it had the Holter Lab label on it, so I
13  would assume that's where it went.
14  Q.   So is it fair to say that your company sold a number of
15  different Holter devices to Holter Labs?
16  A.   Yes.
17           MS. RYKKEN:  I would like to show the witness Exhibit
18  8, which we had agreed earlier was provisionally admitted.
19           THE COURT:  All right.
20           MS. RYKKEN:  I think defense has no objection if we
21  could publish to the jury ahead of admitting it through Agent
22  Kennedy.
23           THE COURT:  That's fine.
24  BY MS. RYKKEN:
25  Q.   Do you see this list?  This is a summary of invoices for
```

```
 1    the Holter recorder.  So on the description, that all looks the
 2    same, "VX3-7-lead, 3-channel."
 3              Is that similar to the device that you have up there?
 4    A.    Yes.
 5    Q.    And these were all purchased by Lynn Medical; is that
 6    right?
 7    A.    Yes.
 8    Q.    And can you look at the dates purchased and tell me the
 9    range of dates.
10    A.    Which exhibit is this?
11    Q.    Exhibit 8.
12    A.    It doesn't show the full page.  Oh, there it is.
13              3944 through 4125 VXE.
14    Q.    Oh, I see.  Those are the serial numbers?
15    A.    I believe one of the dates.
16    Q.    What about the dates?  Can you look at the dates purchased
17    just so we have a range of dates?
18    A.    This particular page has May 18th, 2011, on the whole
19    page.
20    Q.    Okay.  And then on the front page, is the date on there
21    6/6/2005 the first date?
22    A.    I'm sorry.  Which exhibit?
23              Oh, here it is.  Yes.  6/6/2005.
24    Q.    Okay.  So is it fair to say that you sold this particular
25    model to Holter Labs from the period of 6/6/2005 to
```

```
1    approximately May 18th, 2011?

2    A.   Yes.

3              MS. RYKKEN:  Nothing further, Your Honor.

4              THE COURT:  All right.  Cross-examination.

5              MR. MCDERMOTT:  Yes, sir.  Thank you.

6                        CROSS-EXAMINATION

7    BY MR. MCDERMOTT:

8    Q.   Mr. Barron, you've explained for us that you're the owner

9    of the company and you've been the owner on and off since 1988?

10   A.   That's correct.

11   Q.   And was this a device that you actually invented?

12   A.   No.

13   Q.   Do you know who the inventor was?

14   A.   Well, are you referring to the inventor of Holter?

15   Q.   Yes.

16   A.   It was Dr. Holter, and Del Mar Avionics commercialized it.

17   Q.   Someplace in Southern California, wasn't it invented?

18   A.   Yes.

19   Q.   So in '88 you began the process of manufacturing these

20   devices?

21   A.   No.

22   Q.   What did you do?

23   A.   Primarily consulting.

24   Q.   Consulting.  And who were you consulting?

25   A.   To which company?
```

App. 0652

```
1    Q.   Yes.
2    A.   A little bit -- there was Del Mar Avionics.  And I don't
3    remember the name of the company because it was changed a
4    couple of times, but it was DMS.  Diagnostic Monitoring Systems
5    I believe was the name.
6    Q.   Now, when you say that you consulted, was that in helping
7    them manufacture?  What exactly did you consult in?
8    A.   Well, initially, I wrote some of the software for a Holter
9    software program, and sometime in the '90s that particular
10   company asked for a design for a tape Holter recorder, which
11   was the predecessor to the digital recorder.
12            And when we finished it, they told us that they could
13   not buy that from us because they thought that it was going to
14   disrupt a relationship they had with a customer.  And so by
15   accident we started manufacturing -- I mean, we weren't
16   planning on getting into the Holter recorder business but they
17   said that it was okay and we started manufacturing them and we
18   sold them to, you know, other companies.
19   Q.   So sometime in the '90s you began manufacturing these
20   devices?
21   A.   Yes.
22   Q.   Or at least its predecessor?
23   A.   Yes.
24   Q.   And when you looked at the chart there from between 2005
25   and 2011, was your company the one manufacturing the devices?
```

App. 0653

| 1 | A. | In 2005, yes. In 2011 it was the company that purchased |
| 2 | the company from me. I was the -- at that point I was the |
| 3 | general manager. I wasn't -- |
| 4 | Q. | Did it still carry the moniker or the name Datrix? |
| 5 | A. | Well, I believe it said Intercon Datrix. Intercon was the |
| 6 | company that purchased it. |
| 7 | Q. | And that was the company responsible for manufacturing, |
| 8 | correct? |
| 9 | A. | Yes. |
| 10 | Q. | And where did the manufacturing take place? |
| 11 | A. | For this particular recorder, the manufacturing was still |
| 12 | in -- the boards were manufactured in San Diego and the devices |
| 13 | were assembled and tested in Escondido, California. |
| 14 | Q. | Now, you were still involved with the company while the |
| 15 | manufacturing took place between 2005 and 2011? |
| 16 | A. | Yes. |
| 17 | Q. | And how many employees were there? |
| 18 | A. | For which -- for just that division? |
| 19 | Q. | Yes. |
| 20 | A. | I don't know. Five or six. |
| 21 | Q. | People actually manufacturing the device? |
| 22 | A. | In the Escondido office, yes. |
| 23 | Q. | Okay. Now, let me ask you this. Do you have a medical |
| 24 | background? |
| 25 | A. | No. |

App. 0654

| | |
|---|---|
| 1 | Q. Do you have a medical coding background? |
| 2 | A. No. |
| 3 | Q. Now, I believe your testimony was that you're not the only |
| 4 | entity that manufactures Holter devices; is that true? |
| 5 | A. That's true. |
| 6 | Q. Off the top of your head, with your experience in the |
| 7 | industry, how many manufacturers are out there? |
| 8 | A. Wow. There's -- quite a few have entered the field |
| 9 | recently, a lot of foreign companies. |
| 10 | Q. Let me backtrack a little bit just so I stay on track with |
| 11 | the time frame here. |
| 12 | The chart you saw, 2005 through 2011, best estimate |
| 13 | as to the number of manufacturers during that time frame? |
| 14 | THE COURT: If you know. |
| 15 | THE WITNESS: I don't know. |
| 16 | THE COURT: Okay. Next question. |
| 17 | BY MR. MCDERMOTT: |
| 18 | Q. Next question would be then how many -- are you familiar |
| 19 | with companies that manufacture the software for that device? |
| 20 | A. I'm not familiar with all of them, but many. |
| 21 | Q. All right. Now, do they consult with you -- now, just so |
| 22 | we have a picture. You manufacture the hardware and somebody |
| 23 | else actually manufactures the software? |
| 24 | A. Yes. |
| 25 | Q. And that was true during 2005 through 2011? |

```
 1   A.   Yes.
 2   Q.   And one of those individuals would have been a gentleman
 3   by the name of James Brown?
 4   A.   Yes.
 5   Q.   And he's somebody you're personally familiar with,
 6   correct?
 7   A.   Yes.
 8   Q.   And he --
 9          MS. RYKKEN:  Objection.  Relevance.
10          THE COURT:  Well, let's hear the next question.
11   BY MR. MCDERMOTT:
12   Q.   And he's also responsible for manufacturing the software?
13   A.   Yes.
14   Q.   Now, are you familiar with all of the different types --
15   now, you testified about what they call a 510(K)?
16   A.   Yes.
17   Q.   And just for my edification, that's the application number
18   when you submit a device to the FDA for approval?
19   A.   Yes.
20   Q.   And --
21   A.   Excuse me.  It includes the actual submission and it's
22   assigned a 510(K) number.
23   Q.   I understand.  So the 5-(K) is a number given to it by the
24   FDA?
25   A.   Yes.
```

| | |
|---|---|
| 1 | Q. And according to the paperwork that we saw here today, you |
| 2 | got your approval in 2003 for that device? |
| 3 | A. For one variation of the device, yes. There was a |
| 4 | previous variation to the device. |
| 5 | Q. Since 2003 have there been other 510(K) applications? |
| 6 | A. Yes. |
| 7 | Q. Okay. And are you familiar with -- again, are you |
| 8 | familiar with what other applications this device is being used |
| 9 | for? |
| 10 | A. Which device are you referring to? |
| 11 | Q. The one that we saw on the screen that you've been |
| 12 | testifying about, the V -- what is that, VK -- |
| 13 | A. VX3. |
| 14 | Q. VX3. Are there other 510(K) applications for that device? |
| 15 | A. I know of one. |
| 16 | Q. And what was that for? |
| 17 | A. You mean from a different manufacturer? |
| 18 | Q. Yes, sir. |
| 19 | A. Yes, I know of one. |
| 20 | Q. And what was that for? |
| 21 | A. I don't remember what the -- it had something to do with |
| 22 | the ANS, I believe. |
| 23 | Q. What is it? |
| 24 | A. Something nervous system. |
| 25 | Q. Okay. So at least from 2005, 2011, were you aware of |

```
 1   other manufacturers installing software device -- or software
 2   programs that would make your device do other things besides
 3   ECG work?
 4   A.   Only that one.
 5            THE COURT:  Excuse me.  When she stands up, just wait
 6   because she --
 7            MS. RYKKEN:  Objection.  Relevance and lacks personal
 8   knowledge.
 9            THE COURT:  Objection as to foundation is sustained.
10   BY MR. MCDERMOTT:
11   Q.   Have you, in fact, had -- did you have communications or
12   conversations with software individuals, people that were
13   manufacturing software for your device between 2005 and 2011?
14   A.   Yes.
15   Q.   And did you discuss with these individuals what the device
16   could or could not do?
17   A.   Only maybe with the one that you're referring to, Jim
18   Brown.
19   Q.   Okay.  And Mr. Brown during that time was involved with
20   the software development of your Datrix device?
21   A.   No, just the playback software.
22   Q.   The playback software.  When we're talking about that,
23   that's when the doctor takes the flash, puts it in the computer
24   and sends it to an IDTF to interpret?
25   A.   That may be one way that it's handled, yes.
```

```
1    Q.   All right.  Is there -- in your knowledge between 2005 and

2    2011, did Mr. Brown come up with any software that expanded

3    what that device could do beyond what the 510(K) said?

4              THE COURT:  The Court objects.  No foundation.

5    BY MR. MCDERMOTT:

6    Q.   All right.  When you had discussions with Mr. Brown, were

7    you aware of any application of software that he created that

8    expanded the ability of that device?

9    A.   Yes.

10   Q.   Thank you.  What did he -- excuse me.  Based on your

11   conversations with him, can you tell the jury what capabilities

12   Mr. Brown came up with or expanded with the software?

13             MS. RYKKEN:  Objection.  Hearsay.

14             THE COURT:  Sustained.

15   BY MR. MCDERMOTT:

16   Q.   To your knowledge does this device with an appropriate

17   software or some type of software tweak do something other than

18   what the 5(K)10 [sic] authorizes?

19             MS. RYKKEN:  Objection.  Lacks foundation and

20   personal knowledge.

21             THE COURT:  Sustained.

22   BY MR. MCDERMOTT:

23   Q.   Are you aware of any tweak in the software that goes

24   beyond the 510(K) that your application applied for?

25             MS. RYKKEN:  Objection.  Lacks foundation and
```

App. 0659

1   personal knowledge.

2           THE COURT: Sustained.

3   BY MR. MCDERMOTT:

4   Q.   Mr. Barron, the question here would be are you familiar

5   with CPT codes?

6   A.   I know what they are.

7   Q.   Do you know what CPT codes apply to your device?

8   A.   No.

9   Q.   Have you ever had an opportunity to in the course of your

10   construction of these devices actually train individuals as to

11   what appropriate CPT codes would be for the use of that device?

12   A.   No.

13   Q.   Are you familiar with the term "frequency sample rates,"

14   sir?

15   A.   The term together or individually?

16   Q.   The term together?

17   A.   The two words individually?

18   Q.   The term together?

19   A.   No.

20   Q.   The Datrix 512 and the VX3, do they have a frequency rate?

21   A.   Yes.

22   Q.   And as you sit here today, do you understand what that

23   frequency rate is? And can I put it in terms -- I'm sorry,

24   sir. Between 2005 to 2011, do you understand what the rates

25   were?

```
 1   A.   I'm sorry.  The frequency and the rates can be two
 2   different things.  If you're talking about the sample rate,
 3   yes, I can tell you.  If you talk about the frequency, I can
 4   tell you the --
 5   Q.   How about the sample rate, sir?
 6   A.   The sample rate for most of them was 128.  I believe this
 7   one was a little bit higher than that.
 8   Q.   256?
 9   A.   I don't think so.
10   Q.   Okay.  Let me ask you this.  Can you just explain to the
11   jury what frequency rate means?
12             MS. RYKKEN:  Objection.  Relevance.
13             THE COURT:  Sustained.
14   BY MR. MCDERMOTT:
15   Q.   Are you aware of any other manufacturer out there that
16   uses the same -- roughly the same frequency rate as your device
17   for EEG work?
18             MS. RYKKEN:  Objection.  Relevance and lack of
19   personal knowledge.
20             THE COURT:  Sustained as to foundation.
21   BY MR. MCDERMOTT:
22   Q.   Are you familiar with other manufacturers involving
23   frequency rates around 128 that utilize the device for EEG
24   reading?
25             MS. RYKKEN:  Objection.  Lacks personal knowledge and
```

```
 1   foundation.
 2            MR. MCDERMOTT:  I'm asking if he knows, sir.
 3            THE COURT:  You can answer that yes or no.
 4            THE WITNESS:  Am I aware -- I'm sorry.  Would you ask
 5   the question again, please?
 6   BY MR. MCDERMOTT:
 7   Q.   Sure.  Let me be a little more pointed.  Are you familiar
 8   with a device called EEGer4?
 9   A.   No.
10   Q.   I take it, then -- all right.  So have you had any --
11   anybody from an insurance company or any representative from an
12   insurance company come to you between 2005 and 2011 asking you
13   to explain why your device is being used for billing in a
14   certain way?
15   A.   No.
16   Q.   And I noted on one of the exhibits that the government
17   provided to you that the device actually could work for at
18   least eight days?
19   A.   Yes.  I'm trying to remember which variation works for
20   eight days, but the software for this particular device I think
21   was I think 48 hours.  It was just made so that it wouldn't run
22   further than 48 hours.  The idea behind that was to possibly be
23   able to use the batteries more than once.
24   Q.   Understood.  And that's based on the software that's in
25   that device, correct?
```

App. 0662

```
1    A.    Yes.
2    Q.    And someone like Mr. Brown, is he responsible for the
3    software that could go into that device?
4           MS. RYKKEN:  Objection.  Lacks foundation and
5    personal knowledge.
6           THE COURT:  Sustained.
7    BY MR. MCDERMOTT:
8    Q.    Are you aware of whether or not other manufacturers of
9    software can actually be inputted into that device?
10          THE COURT:  Same objection.  Same ruling.
11          MR. MCDERMOTT:  Just a second.
12   BY MR. MCDERMOTT:
13   Q.    Just a couple of follow-ups.
14          When you were asked to testify, were you asked to go
15   through your personal records to determine how many devices may
16   have been sold to Holter Labs?
17   A.    Yes.
18   Q.    And the documents that you saw here today, do they reflect
19   the devices that you believe you sold to Holter Labs?
20   A.    Yes.
21   Q.    As you sit here today, there was other distributors that
22   may have sold to Holter Labs?
23   A.    Yes.
24   Q.    Were you a direct sales to Holter Labs?
25   A.    I don't know.  There may have been instances of it.  I'd
```

```
1   have to go back and refer to the invoices.
2   Q.   All right.  But as you sit here today and based on your
3   testimony, did you see any document that reflected a direct
4   sale?
5   A.   No.
6   Q.   It looked like Lynn Medical -- is that a company you're
7   familiar with?
8   A.   Yes.
9   Q.   And I believe it's based out of Minnesota?
10  A.   I think it was -- it might be Michigan.
11  Q.   Michigan.  Excuse me.  Michigan.
12            All right.  Are they a manufacturer or just a
13  distributor?
14  A.   I don't know that they manufacture anything.
15  Q.   So would Lynn Medical be the only distributor that you
16  sent product to during that time frame?
17  A.   When you say "product," you mean this variation of the
18  product?
19  Q.   Yes, sir.  Yes, sir.  2005 to 2011?
20  A.   According to the invoices, it looks like we sent some to
21  Care -- Jim Brown's business also.
22  Q.   All right.  Now, to my understanding, is he someone that
23  actually then vends or distributes to doctors?
24            MS. RYKKEN:  Objection.  Lacks foundation and
25  personal knowledge.
```

```
1                   THE COURT:  Sustained.
2    BY MR. MCDERMOTT:
3    Q.  Do you know what Mr. Brown does with those devices when he
4    gets them?
5                   MS. RYKKEN:  Objection.  Lacks personal knowledge.
6                   THE COURT:  You can answer that yes or no.
7                   THE WITNESS:  I can't be certain.
8                   THE COURT:  That's fine.
9                   MR. MCDERMOTT:  I'll withdraw.  I have nothing
10   further.
11                  THE COURT:  Any redirect?
12                  MS. RYKKEN:  Just very, very briefly.
13                  THE COURT:  Okay.  We are after 3:00, and I know one
14   of the jurors --
15                  If we go another five minutes, is that going --
16                  A JUROR:  That's fine.
17                  THE COURT:  Okay.
18                        REDIRECT EXAMINATION
19   BY MS. RYKKEN:
20   Q.  Can you get Exhibit 7 please in the binder.
21               Do you see that?
22   A.  Yes.
23   Q.  What is it?
24   A.  It looks like an invoice from our company or the
25   predecessor company to Holter Labs directly.
```

```
 1   Q.    So a minute ago you were asked about whether or not you

 2   had directly billed to Holter Labs, correct?

 3              MS. RYKKEN:  I'm sorry.  The government would move to

 4   admit Exhibit 7 into evidence, Your Honor.

 5              THE COURT:  Any objection?

 6              MR. MCDERMOTT:  Sir, I just have one foundational

 7   question.  I don't have any objection as to the validity of the

 8   documents.  It just has to do with the question of --

 9              THE COURT:  Just give me the evidentiary basis for

10   your objection if you have one.

11              MR. MCDERMOTT:  Lack of foundation.  Just one or two

12   more questions more.  That's all she needs.

13        (Counsel confer off the record.)

14   BY MS. RYKKEN:

15   Q.    All right.  What is this document?

16   A.    It's an invoice to Cardio Labs.

17   Q.    To Holter Labs?

18   A.    I'm sorry.  Holter Labs.  Cardio Labs is a different

19   company.

20   Q.    And what products are in the invoice?

21   A.    It looks like mostly -- it looks like they're all

22   accessories and repairs.

23              MS. RYKKEN:  Move to admit Exhibit 7 into evidence.

24              MR. MCDERMOTT:  No objection now.

25              THE COURT:  All right.  It'll be received.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          (Trial Exhibit 7 admitted into evidence.)

 2   BY MS. RYKKEN:

 3   Q.   So on cross you were asked about whether or not you had

 4   had direct sales to Holter Labs, and I want to show you this to

 5   clean up the record.

 6          Did you have any direct sales to Holter Labs?

 7   A.   Yes.

 8          MS. RYKKEN:   Thank you.   Nothing further.

 9          THE COURT:   Anything else?

10                     RECROSS-EXAMINATION

11   BY MR. MCDERMOTT:

12   Q.   Just the invoices you're looking at don't reflect

13   hardware, just accessories, correct?

14   A.   Accessory -- hardware accessories, yes.

15   Q.   Right.   There's no actual Holter device in there?

16   A.   The recorder's -- the recording device is not in the

17   invoice.

18          MR. MCDERMOTT:   Thank you.

19          MS. RYKKEN:   Nothing further.

20          THE COURT:   All right.   Sir, you may step down.

21          All right.   Ladies and gentlemen, we're going to

22   adjourn for the day.

23          Again, I want to remind you until this trial's over,

24   you're not to discuss this case with anyone, including your

25   fellow jurors, members of your family, people involved in the
```

App. 0667

```
 1   trial or anyone else, and do not allow others to discuss the
 2   case with you.
 3            This includes discussing the case in internet chat
 4   rooms, through blogs, by e-mails or text messages.  If anyone
 5   tries to communicate with you about this case, please let me
 6   know about it immediately.
 7            Do not read, watch or listen to any news reports or
 8   other accounts about the trial or anyone associated with it.
 9   Do not do any research, such as consulting dictionaries,
10   searching the internet or using other reference materials and
11   do not make any investigation on your own.
12            Finally, you're reminded to keep an open mind until
13   all of the evidence has been received, you've heard the
14   arguments of counsel, the instructions of the Court and the
15   views of your fellow jurors.
16            If you need to speak with me, simply give a note to
17   the clerk.
18            We're going to resume tomorrow morning at 8:00 a.m.
19   sharp.  We can't start unless all of you are present, so please
20   try and be on time.  If you aren't used to coming downtown,
21   please leave yourself plenty of time to get down here.
22            All right.  Thank you very much.  We'll see everybody
23   tomorrow morning at 8 o'clock.
24            Please leave your notebooks on your chairs.
25            THE CLERK:  All rise.
```

App. 0668

```
1         (Jury out at 3:08 P.M.)
2         (The following was heard outside the presence of the
3     jury.)
4             THE COURT:  Let me ask a question.  The False Claims
5     Act case that you made reference to in your opening
6     statement --
7             MR. MCDERMOTT:  Yes, sir.
8             THE COURT:  -- most False Claims Act cases are
9     authorized by congress.
10            MR. MCDERMOTT:  Yes, sir.
11            THE COURT:  Correct?  And whistle blowers are
12    entitled by law to receive proceeds.
13            MR. MCDERMOTT:  Yes, sir.
14            THE COURT:  Correct?
15            MR. MCDERMOTT:  Yes, sir.
16            THE COURT:  And in the particular case that you were
17    referring to, did the government intervene in that case?
18            MR. MCDERMOTT:  Yes, they did.
19            THE COURT:  And the government -- and, you know, I
20    guess I'm a little confused because it sounds like what you're
21    trying to convey to the jury is that there was something wrong
22    with Mr. -- I don't know -- Crowley --
23            MR. MCDERMOTT:  Crowley.
24            THE COURT:  -- participating in that qui tam case,
25    and -- first of all, I think I mentioned before, I'm not going
```

App. 0669

| | |
|---|---|
| 1 | to retry that case. |
| 2 | MR. MCDERMOTT:  Right. |
| 3 | THE COURT:  And before that's mentioned in front of |
| 4 | this jury, we need to go to sidebar, because I'm not -- even |
| 5 | assuming that has some relevance here, trying to explain to |
| 6 | this jury what's behind a qui tam case, how people go about |
| 7 | filing it and why they're authorized to do that, I don't know |
| 8 | that we want to take that kind of time to try to explain this. |
| 9 | And I think the government has taken the position |
| 10 | before they may have an objection to it, so maybe we need to |
| 11 | talk about that before it's mentioned again because -- and, |
| 12 | quite frankly, I'm not sure that I'd have to instruct the jury |
| 13 | that there was absolutely nothing wrong with Crowley serving as |
| 14 | a relater to uncover government fraud. |
| 15 | MR. MCDERMOTT:  I certainly wouldn't have an |
| 16 | objection to that.  I'm not implying that he did anything -- |
| 17 | THE COURT:  Oh, I think you are. |
| 18 | MR. MCDERMOTT:  Well, from the standpoint of -- |
| 19 | again, it may be a motivation. |
| 20 | THE COURT:  And as a matter of fact, if Crowley was |
| 21 | aware that there was fraud being perpetrated by your client, |
| 22 | there was certainly nothing wrong with him turning your |
| 23 | client -- blowing the whistle on your client for that matter. |
| 24 | MR. MCDERMOTT:  Sure. |
| 25 | THE COURT:  So -- but, you know, we can talk about |

```
 1  it, and see where you're trying to go, although I think I have
 2  an idea.
 3           Now, the other issue is the defendant's bond.  And
 4  I've thought about this.  I've listened to the testimony of the
 5  two jurors that had to be excused.  And I think the second
 6  juror that we talked to, I think he got it absolutely correct
 7  that the defendant made contact with those jurors despite the
 8  fact that the Court had repeatedly admonished the jury that
 9  they were to have no contact with anybody that had anything to
10  do with this case.
11           And it's obvious to me that what the defendant was
12  doing was trying to curry favor with the those jurors.  He knew
13  exactly who they were.  They were wearing a badge.  He not only
14  did it once, but he did it twice and caused these jurors to
15  have to be recused.
16           To me that violated the conditions of his bond
17  because one of the conditions of his bond was not -- to obey
18  all laws and by tampering with these witnesses, he violated the
19  law by jury tampering and obstruction of the orderly
20  administration of justice, and the Court finds that he violated
21  his conditions of bond, and I'm going to order him remanded
22  into custody forthwith.
23           VOICE:  Oh, Jesus Christ.
24           THE COURT:  And, sir, there will be no outbursts from
25  you because you're about one step from getting locked up
```

App. 0671

```
 1    yourself.  So if you want to remain in this trial, I suggest
 2    that you keep quiet.
 3              So, sir, have a seat.
 4              The marshals will be here to take you into custody.
 5              Now, we'll be here tomorrow starting at 8 o'clock.
 6              Is there anything else?
 7              MR. FREEDMAN:  No, Your Honor.
 8              MS. RYKKEN:  Nothing.  Thank you.
 9              THE COURT:  Okay.  Thank you.
10              If the Court Security Officers could stay here until
11    the marshals come.
12              THE OFFICER:  Yes, sir.
13              THE CLERK:  This Court now stands adjourned.
14         (Evening recess taken 3:14 p.m.)
15                          --oOo--
16
17
18
19
20
21
22
23
24
25
```

App. 0672

1

2

3                              CERTIFICATE

4

5         I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date: JANUARY 15, 2018

13

14

15

16

17                   /s/   Cindy L. Nirenberg, CSR No. 5059

18                              Official Court Reporter

19

20

21

22

23

24

25

App. 0673

Case 2:23-cv-04498-PA   Document 7-5   Filed 06/05/23   Page 263 of 786   Page ID #:705
Case 2:16-cv-00215-PA   Document 67   Filed 07/20/17   Page 105 of 293   Page ID #:9642

1

1     UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

4

5 UNITED STATES OF AMERICA,

6      Plaintiff,

7  vs.        Case No. CR-16-215-PA

8 MICHAEL MIRANDO,

9      Defendant.

10 _____/

11

12   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
         TRIAL DAY 2
13      THURSDAY, APRIL 27, 2017
        8:00 A.M.
14      LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22  _____

23    TERRI A. HOURIGAN, CSR NO. 3838, CCRR
     FEDERAL OFFICIAL COURT REPORTER
24    350 WEST FIRST STREET, ROOM 4311
    LOS ANGELES, CALIFORNIA  90012
25      (213) 894-2849

```
1                    APPEARANCES OF COUNSEL:

2


3    FOR THE PLAINTIFF:

4        EILEEN DECKER
         United States Attorney
5        BY:  MICHAEL FREEDMAN
             KATHERINE RYKKEN
6             Assistant United States Attorney
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California  90012
8

9
     FOR THE DEFENDANT MICHAEL MIRANDO:
10
         LAW OFFICES OF KEVIN BARRY MCDERMOTT
11       BY:  KEVIN B. MCDERMOTT
             Attorney at Law
12       300 Spectrum Center Drive, Suite 1420
         Irvine, California 92618
13

14
     ALSO PRESENT:  Special Agent Kathleen Kennedy
15

16

17

18

19

20

21

22

23

24

25
```

App. 0675

1            **I N D E X**

2

3       -----------------------------------------------------------

4            CHRONOLOGICAL INDEX OF WITNESSES

5   WITNESSES:                                        PAGE

6   GREGORY JAMES JOY, M.D.

        Direct Examination by Ms. Rykken          9
7       Cross-Examination by Mr. McDermott        21

8
    MARTHA ANN BENNETT
9
        Direct Examination by Ms. Ryyken          29
10      Cross-Examination by Mr. McDermott        38

11
    RONALD DAVID RICHMOND, M.D.
12
        Direct Examination by Ms. Rykken          42
13      Cross-Examination by Mr. McDermott        52
        Redirect Examination by Ms. Rykken        61
14      Recross-Examination by Mr. McDermott      61

15
    SUSAN DARSOW
16
        Direct Examination by Ms. Rykken          63
17      Cross-Examination by Mr. McDermott        97
        Redirect Examination by Ms. Rykken        115
18      Recross-Examination by Mr. McDermott      116

19
    STACEY RUTH SIXTOS
20
        Direct Examination by Mr. Freedman        117
21      Cross-Examination by Mr. McDermott        125

22

23  JEFFREY JOHN GLOBUS, M.D.

24      Direct Examination by Mr. Freedman        127
        Cross-Examination by Mr. McDermott        139
25

App. 0676

4

**I N D E X**

------------------------------------------------------------

<u>CHRONOLOGICAL INDEX OF WITNESSES</u>

<u>WITNESSES:</u>                                              <u>Page</u>

LISA MARY SOLMOR

    Direct Examination by Mr. Freedman                150
    Cross-Examination by Mr. McDermott                157


RUBY SIMPKINS, M.D.

    Direct Examination by Mr. Freedman                160
    Cross-Examination by Mr. McDermott                169
    Redirect Examination by Mr. Freedman              173


EMILY DAWN RUSSELL

    Direct Examination by Mr. Freedman                176
    Cross-Examination by Mr. McDermott                192


ROBYN CONSIGLIO

    Direct Examination by Mr. Freedman                199
    Cross-Examination by Mr. McDermott                207


STANTON ROSS CROWLEY

    Direct Examination by Mr. Freedman                212

App. 0677

INDEX OF EXHIBITS

| EXHIBIT NO. | Page |
|---|---|
| 41 | 11 |
| 42 | 18 |
| 28 | 33 |
| 27 | 44 |
| 29 | 51 |
| 31 | 68 |
| 32 | 73 |
| 33 | 75 |
| 34 | 77 |
| 35 | 79 |
| 37 | 79 |
| 44 | 84 |
| 45 | 87 |
| 46 | 88 |
| 47 | 89 |
| 48 | 91 |
| 49 | 92 |
| 51 | 93 |
| 77 | 121 |
| 72 | 134 |
| 70 | 138 |
| 62 | 154 |
| 55 | 162 |

App. 0678

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA  Document 7-5  Filed 06/05/23  Page 268 of 786  Page ID #:710
Case 2:16-cv-00218-PA  Document 67  Filed 07/20/17  Page 68 of 298  Page ID #:6052

6

1              INDEX OF EXHIBITS

2    EXHIBIT NO.                                    Page

3    58                                             166

4    56                                             169

5    73                                             181

6    74                                             185

7    75                                             186

8    76                                             188

9    78                                             191

10   59                                             202

11   60                                             203

12   63                                             205

13   14                                             217

14   18                                             223

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 7-5  Filed 06/05/23   Page 269 of 786   Page ID
Case 2:16-cr-00215-PA   Document 67-5  Filed 07/20/17   Page 7 of 298   Page ID #659
#:711

7

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, APRIL 27, 2017

 2                                  * * *

 3

 4              THE COURTROOM DEPUTY:  All rise.

 5         Calling Item 1, CR-16-215-PA, United States of America

 6    versus Michael Mirando.

 7         Counsel, may I have your appearance please?

 8              MR. FREEDMAN:  Good morning, Your Honor.  Michael

 9    Freedman and Katherine Rykken on behalf of the United States.

10    Kathleen Kennedy is with us at counsel table.

11              MR. MCDERMOTT:  Good morning, sir.  Kevin McDermott

12    on behalf of Mr. Mirando, who is present.

13              THE COURT:  Good morning.

14         I believe all of the members of the jury are here.  Are we

15    ready to proceed?

16              MR. MCDERMOTT:  Yes, sir.

17              MR. FREEDMAN:  Your Honor, there is one quick item I

18    wanted to inform the Court with respect to the National Cardio

19    issue.

20         First of all, after yesterday, now that the issue is

21    continuing to be raised, the government's view is that it's

22    still irrelevant and shouldn't come in.

23         But recognizing the defense is trying to get it in, we

24    spent some time with Mr. Crowley talking about the issue.

25              One item that came up -- I just wanted to note for the
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 7-5   Filed 06/05/23   Page 270 of 786   Page ID #:712
Case 2:16-cv-00215-PA   Document 67   Filed 07/20/17   Page 8 of 236   Page ID #:654

8

```
 1    record, I have already told the defense.

 2         In January, when the issue first came up, we got discovery

 3    from the FBI from the National Cardio criminal case, and we

 4    produced it to the defense.

 5         We didn't spend a whole time reviewing it, because it

 6    wasn't an issue we thought was relevant.

 7         Yesterday, I spent more time digging into those documents,

 8    and the issue is -- I noticed in the settlement agreement that

 9    the settlement agreement -- for the first time I noticed that

10    National Cardio and the two Parsons were represented by the law

11    firm that I used to work at.

12         I checked with our office's professional responsibility

13    coordinator, and there is no conflict there.

14         But I just wanted to note that for the Court.

15         I have already told the defense, and the defense doesn't

16    have any issue with it.

17              THE COURT:  Okay.

18              MR. FREEDMAN:  Thank you, Your Honor.

19              MS. RYKKEN:  We have one other housekeeping issue.

20    Agent Kennedy is having a lot of coughing.

21         If she is having a coughing fit, which she suspects might

22    happen, would you like her to ask for permission to step out or

23    should she step out with asking?

24              THE COURT:  She doesn't need to ask for permission.

25              MS. RYKKEN:  Thank you, all right.
```

App. 0681

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 37-5   Filed 06/05/23   Page 271 of 786   Page ID
Case 2:16-cv-00218-PA   Document 67   Filed 07/20/17   Page 9 of 235   Page ID #655
#:713

9

```
 1              THE COURT:  All right.  Let's bring the jury in.

 2              THE COURTROOM DEPUTY:  All rise.

 3              (JURY ENTERS THE COURTROOM AT 8:11 A.M.)

 4              THE COURTROOM DEPUTY:  Please be seated, and come to

 5   order.

 6              THE COURT:  Good morning, ladies and gentlemen.  If

 7   you would call your next witness, please?

 8              MS. RYKKEN:  The government calls Dr. Gregory Joy.

 9              THE COURTROOM DEPUTY:  Please raise your right hand.

10                   (Oath was administered.)

11              THE WITNESS:  I do.

12              THE COURTROOM DEPUTY:  Please be seated.

13

14                   GREGORY JAMES JOY M.D.,

15        having been duly sworn, testified as follows:

16

17              THE COURTROOM DEPUTY:  Please state your full name,

18   spell your last name for the record.

19              THE WITNESS:  Gregory James Joy, J-o-y.

20              THE COURT:  All right.  Let's begin.

21              MS. RYKKEN:  Thank you, Your Honor.

22

23                        DIRECT EXAMINATION

24   BY MS. RYKKEN:

25   Q    Dr. Joy, what do you do for a living?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 272 of 786   Page ID #:714
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 100 of 235   Page ID #:650

10

```
 1    A    I'm a physician.

 2    Q    What kind of physician?

 3    A    I practice internal medicine, and also practice part-time

 4    emergency medicine.

 5    Q    Are you involved in family practice?

 6    A    I do that, too, yes.

 7    Q    So what does internal medicine entail?

 8    A    It involves medical care for primarily adult persons 16

 9    and over, mostly.

10    Q    Where is your practice located?

11    A    Mission Viejo.

12    Q    Is that in Orange County?

13    A    Orange County, California.

14    Q    And what is the name of your practice?

15    A    I'm currently employed with Optum Health and Medical

16    Group.

17    Q    And in 2012, were you also employed with Optum?

18    A    No.  I was in partnership practice.

19    Q    What was the name of that practice in 2012?

20    A    It was also a family medical group.

21    Q    Is John Hattrup your patient?

22    A    Yes, he was.

23    Q    For how long was he your patient?

24    A    A number of years.

25    Q    Do you recall when he stopped being your patient?
```

App. 0683

1   A     Not too long after -- maybe four or five years ago.  I

2   talked to him.

3         Apparently, he had to go to Kaiser because of his

4   employment.

5   Q     Okay.  So it was about 2011 or '12?

6   A     Something like that.

7   Q     Did he come to your office on April 11, of 2011?

8   A     As I recall from my records, yes.

9   Q     Can you look at Exhibit 41 in the binder to your right,

10  please?

11        You just open that up.  There are a number of tabs in

12  there.

13        Do you see that document?

14  A     Yes.

15  Q     What is it?

16  A     It's a copy of my clinical note dated 4/11/2011.

17  Q     For what patient?

18  A     John Hattrup.

19  Q     Is this a record you created?

20  A     Yes.

21        MS. RYKKEN:  The government moves to admit Exhibit

22  41 into evidence.

23        MR. MCDERMOTT:  No objection.

24        THE COURT:  It will be received.

25        (Exhibit 41 received into evidence.)

UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 274 of 786   Page ID #:658
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 12 of 235   Page ID #:716

12

```
 1              MS. RYKKEN:  Will you please put it up.

 2    BY MS. RYKKEN:

 3    Q     Okay.  Why did John Hattrup come to see you on April 11th,

 4    2011?

 5    A     His chief complaint was chest pain and flaring in his

 6    chest.

 7    Q     And what did you do?

 8    A     I examined him.  I took vital signs.  I discussed his

 9    concerns.

10    Q     Did you do any tests in the office?

11    A     Pardon?

12    Q     Did you do any tests in the office that day?

13    A     I did an electrocardiogram.

14    Q     And did you do anything else after that?

15          Did you order any tests to the follow up?

16    A     I ordered a Holter monitor.

17    Q     And what is a Holter monitor?

18    A     A Holter monitor is a device where a person wears

19    something like a little walkman on their person, and they have

20    leads attached to their chest.

21          It then records their electrical activity of their heart

22    for a specified period of time, usually 24 hours.

23              MS. RYKKEN:  Agent Kennedy, you do have Exhibit 1,

24    the Holter device?

25              MS. KENNEDY:  No, I don't.  The Court does.
```

App. 0685

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 275 of 786   Page ID #:717
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 13 of 235   Page ID #:659

13

```
 1            THE WITNESS:  Yes, it looks like a Holter monitor.

 2   BY MS. RYKKEN:

 3   Q    Okay.  And then -- okay, on the patient record we have

 4   highlighted for you in the screen in front of you; do you see

 5   your assessment and plan?

 6            THE COURT:  If you would, look on that monitor right

 7   there in front of you.

 8            THE WITNESS:  Oh, yes.

 9   BY MS. RYKKEN:

10   Q    So it says "check lab and Holter"?

11        What does Holter refer to?

12   A    That is a Holter monitor.

13   Q    The 24-hour test you referred to?

14   A    The 24-hour electrocardiogram, yes.

15   Q    Did you order this device for Mr. Hattrup again?

16   A    Not that I'm aware.

17   Q    So, it's your recollection you ordered it one time?

18   A    Yes.

19   Q    Did you order him to wear it for three more times over the

20   next two weeks?

21   A    I have no record of that.  I doubt I would have, no.

22   Q    And so you said it was a 24-hour test.

23        Did you ever order him to wear a Holter device for a

24   longer period of time, say, 30 days?

25   A    Not that I recall.  I don't see any order for that.  It
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 276 of 786   Page ID #:718
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 14 of 235   Page ID #:660

14

 1    would not be routine.

 2              MS. RYKKEN:  Can you look at Exhibit 50 in the

 3    binder in front of you?

 4              THE WITNESS:  Okay.

 5              MS. RYKKEN:  Okay.  This is one of the exhibits that

 6    was provisionally admitted, and we published yesterday.

 7        May we publish it again?

 8              THE COURT:  All right.

 9              MS. RYKKEN:  Thank you.

10    BY MS. RYKKEN:

11    Q    This is a chart of the charges that Holter Labs submitted

12    to insurance for John Hattrup's use of the Holter device.

13        So we're going to highlight the first day, April 11, 2011.

14        Do you see that?

15    A    Yes.

16    Q    Okay.  The first line item, what is that?

17    A    ECG monitor report 24 hours.

18    Q    Did you order that for Mr. Hattrup?

19    A    If that was what the term referred to Holter monitor, yes.

20    Q    Do you see the next item?

21    A    Cardiovascular procedure.

22    Q    Did you order a cardiovascular procedure for Mr. Hattrup?

23    A    I have no idea what that is.

24    Q    Do you see the next line?

25        The third line, do you see that?

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 277 of 786   Page ID
Case 2:16-cv-00215-PA   Document 87-5   Filed 07/20/17   Page 196 of 235   Page ID #:661
#:719

15

1    A    It's an EEG on that recording.

2    Q    Do you know what an EEG is?

3    A    Yes.

4    Q    What is it?

5    A    It's an electroencephalogram.  It's a reporting of brain

6    waves.

7    Q    Did you order an EEG for John Hattrup?

8    A    I did not, would not.

9    Q    The next line.  The very last line, do you see that?

10   A    RX oral non-chemotherapy.  I have no idea what that means.

11   Q    Did you order that -- oral non-chemotherapy for John

12   Hattrup?

13   A    No.

14   Q    Let's look at the next day, 4/12/2011.

15        Do you see that on your screen?

16   A    Yes.

17   Q    Did you order any additional tests for Mr. Hattrup on

18   April 12th, 2011?

19   A    No.

20   Q    Do you see the ECG monitoring and analysis?

21        Did you order a second ECG for Mr. Hattrup on April 12,

22   2011?

23   A    No.

24   Q    And the next one.

25        Did you order an oral non-chemotherapeutic NOS for

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 278 of 786   Page ID #:720
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 190 of 235   Page ID #:662

16

```
 1   Mr. Hattrup on April 12, 2011?

 2   A    I have no idea what that is.

 3   Q    Okay.  Let's look at the third day, of April 15th, 2011.

 4        Do you see that on your screen?

 5   A    Yes.

 6   Q    Did you order any additional tests for Mr. Hattrup on

 7   April 15th, 2011?

 8   A    No.

 9   Q    Did you order an ECG monitor report for 24 hours on

10   April 15, 2011?

11   A    No.

12   Q    Did you order an EEG on April 15th, 2011?

13   A    Definitely, no.

14   Q    Did you order an autonomic nerve function test for

15   Mr. Hattrup on April 15th, 2011?

16   A    I have no idea what that is.

17   Q    Did you order an oral non-chemotherapeutic NOS for

18   Mr. Hattrup on April 15, 2011?

19   A    No.

20   Q    So let's look at the next day, which is April 18th, 2011.

21        Do you see that?

22   A    Microvolt T-wave assessment.

23   Q    Did you order a Microvolt T-wave assessment for

24   Mr. Hattrup?

25   A    I don't know what that is.
```

App. 0689

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 279 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 260 of 235   Page ID #:663
#:721

17

1    Q    Did you order an additional ECG monitor report for

2    24 hours for Mr. Hattrup on April 18th, of 2011?

3    A    No.

4    Q    Did you order an EEG for Mr. Hattrup on April 18th, 2011?

5    A    No.

6    Q    And did you order this oral non-chemotherapeutic NOS for

7    Mr. Hattrup on April 18, 2011?

8    A    No.

9    Q    Now, I will take a look at the last date on this chart,

10   which is April 21st, 2011.

11        Do you see the date on there?

12   A    Yes.

13   Q    Did you order a Microvolt T-wave assessment for

14   Mr. Hattrup on April 21st, 2011?

15   A    Again, I don't know what that is.

16   Q    Did you order an additional ECG for Mr. Hattrup?

17   A    No.

18   Q    On that date, did you order an EEG for Mr. Hattrup on

19   April 21st 2011?

20   A    No.

21   Q    On the last one, did you order an oral

22   non-chemotherapeutic NOS for Mr. Hattrup?

23   A    No.

24   Q    So you testified a moment ago, that you ordered one Holter

25   device for him for a 24-hour period.

App. 0690                **UNITED STATES DISTRICT COURT**

```
 1          Can you look at Exhibit 42, please?

 2   A      42?

 3   Q      Yes.

 4          Do you see Exhibit 42?

 5   A      Yes.

 6   Q      What is this?

 7   A      It's a report of a Holter monitor.

 8   Q      For what patient?

 9   A      John Hattrup.

10   Q      What is the date?

11   A      April 11th, 2011.

12   Q      Did you review this report for Mr. Hattrup?

13   A      I believe I did.

14             MS. RYKKEN:  The government moves to admit

15   Exhibit 42 in evidence.

16             MR. MCDERMOTT:  No objection, sir.

17             THE COURT:  It will be received.

18          (Exhibit 42 received into evidence.)

19   BY MS. RYKKEN:

20   Q   So the date on the top of this form for the jury is

21   April 11th, 2011.

22          And the patient is John Hattrup.

23          And you were the physician listed there, Gregory Joy?

24   A    I'm sorry, yes.  I'm the ordering physician -- referring

25   physician, yes.
```

App. 0691

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 281 of 786   Page ID #:723
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 190 of 235   Page ID #:563

19

```
 1   Q    So this is the report you received back from Holter Labs?

 2   A    Yes.

 3   Q    What did your review of this report tell you?

 4   A    It is a report of how many beats there were on the average

 5   heart beat.

 6        His maximum heart rate was one 124.  His minimum was 55.

 7        He had no V-tachs at PV pairs.  That is where abnormal

 8   rhythms occur one right after the other.

 9        There is 31 abnormal PVCs.

10        No supraventricular tachycardias.

11        17, supraventricular ectopies and no pauses.

12        And the patient pressed the event button seven times.

13        Then the rest of the other report is clarifications and I

14   can pronounce those -- some of the parts that might be of

15   interest in the entire record.

16   Q    Does this report have an EEG in here, an

17   electroencephalogram report?

18   A    I don't believe so, no.

19   Q    Does it have a sleep study?

20   A    It has a page which is listed as sleep apnea, and except

21   for a heart rate graph, I don't see anything about any entries

22   under sleep apnea.

23   Q    Have you ordered sleep apnea tests in the past?

24   A    Yes.

25   Q    Is this something you would expect to see in a sleep apnea
```

App. 0692

Case 2:23-cv-04493-PA    Document 1-5    Filed 06/05/23    Page 283 of 786    Page ID #:724
Case 2:18-cv-00213-PA    Document 87    Filed 07/20/17    Page 206 of 235    Page ID #:666

20

```
 1   study?
 2   A    I don't generally review them, but, no.  It does not look
 3   like one.
 4   Q    Does this have any respiratory monitoring on it?
 5   A    Pardon?
 6   Q    Does this have any respiratory monitoring on it?
 7   A    Well, there is something on page 1 of 1, right after it
 8   says "sleep apnea."
 9        And I don't know -- it's not labeled, so I don't know if
10   this is respirations or not.
11   Q    Okay.  You did not review this report to see if John
12   Hattrup had sleep apnea?
13   A    I did not review this with an eye to determine whether
14   there was sleep apnea or not.
15   Q    Do you see a Microvolt T-wave assessment in this report?
16   A    I have no idea what that is, but I don't see anything that
17   looks unusual.
18   Q    Do you know if data about the heart rate can indicate
19   sleep apnea?
20   A    Pardon?
21   Q    Do you know if data from the Holter device can indicate
22   sleep apnea?
23   A    I doubt it.
24   Q    Do you deal with the billing in your office?
25   A    Pardon?
```

App. 0693                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 283 of 786   Page ID #:725
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 200 of 285   Page ID #:667

21

```
 1  Q    Do you deal with the billing in your office?

 2  A    No.

 3           MS. RYKKEN:  Nothing further.

 4           THE COURT:  Cross-examination?

 5           MR. MCDERMOTT:  Thank you, sir.

 6

 7                    CROSS-EXAMINATION

 8  BY MR. MCDERMOTT:

 9  Q    Doctor, can you tell the jury how often, during that time

10  frame in 2011, you might have ordered a patient to have a

11  Holter device applied to their body?

12  A    Per year?

13  Q    During that time frame -- once a week, once a month?  How

14  often was it?

15  A    Occasionally.  A few times a year, perhaps.

16  Q    Okay.  And when you have a patient put on a device like

17  that, do you bill the insurance company for the work and

18  service you do in relation to that test?

19  A    I bill for the reading I make of it, yes.

20  Q    Now, we just got done reviewing quite a bit of that

21  Exhibit No. 42, which is a report that was prepared by Holter

22  Labs, correct?

23       The items that you were just looking at?

24  A    Yes.

25  Q    Now, do you have an understanding as to how the
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 284 of 786   Page ID #:726
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 220 of 235   Page ID #:668

22

 1    information gets from your patient to Holter Labs to give you

 2    that report?

 3    A    No.

 4    Q    So, at some point in time, you received Exhibit No. 42, at

 5    your office, correct?

 6    A    Yes.

 7    Q    And this particular document, was this something you

 8    actually were able to pull from your records and give to the

 9    government or did the government get the records and give it to

10    you to look at?

11    A    They pulled these records -- they pulled these records

12    from my records.

13    Q    Okay.  So, were you asked to independently go through all

14    of your records for this particular patient to determine how

15    many times he may have had a Holter device?

16    A    I don't recall I was, no.

17    Q    So, you are relying upon the materials that are presented

18    to you today to remember how many times this particular patient

19    may have worn that device?

20    A    No, I did review my records.

21    Q    You did review it?

22    A    Yes.

23    Q    And did you review your records for the entire month of

24    April before you testified here today?

25    A    I didn't review all of my records regarding Mr. Hattrup.

App. 0695                    UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 285 of 786   Page ID #:727
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 286 of 285   Page ID #:669

23

```
 1  Q    Okay.  That particular report, No. 42, does that look like
 2  a report that you normally received from Holter Labs when you
 3  had a Holter device applied to a patient?
 4  A    Yes.
 5  Q    And the portion that it talks about, sleep apnea.
 6       Was that something that was regularly included in one of
 7  those reports?
 8  A    I don't recall.
 9  Q    But in this particular report, it does have a section or a
10  paragraph on sleep apnea, correct?
11  A    It does.
12  Q    Even though you didn't order it, it was something that
13  came in the report back to you?
14  A    Yes.
15  Q    And it's my understanding when you review a report, you
16  sit down and talk to the patient about what is in the report?
17  A    Sometimes.
18  Q    All right.  And because of the work you put into
19  interpreting the report, and looking at it, that is a billable
20  event for you in your office?
21  A    Yes.
22  Q    And when you make that --
23  A    Sorry, if the patient is in my office.
24  Q    So once you do the review of the report with the patient,
25  you then have the right to send a bill into the insurance
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 286 of 786   Page ID #:728
Case 2:18-cv-00213-PA   Document 87   Filed 07/20/19   Page 24 of 235   Page ID #:610

24

```
 1   company for your work and your effort, correct?

 2   A     Yes.

 3   Q     Now, at any point in time, were you ever contacted by the

 4   insurance company related to this particular patient regarding

 5   the multiple events that occurred during this -- these

 6   documents, the 15th and the 18th and the 21st?

 7         Did any insurance company contact you about that?

 8   A     No.

 9   Q     At any point in time, were you ever notified there was

10   billing occurring on a patient that you had that didn't match

11   your records?

12   A     No.

13              MR. MCDERMOTT:  Just a second.  Your Honor.

14   BY MR. MCDERMOTT:

15   Q     Can I please, sir, have you take a look at the first page

16   of No. 42 again?

17         And on that first page, sir, and just so we have a frame

18   of reference, there is a bottom right-hand corner that you will

19   see a little number "USA," 025212.

20         Do you see that?

21   A     Yes.

22   Q     Now in there, there is a comment section about three

23   quarters of the way down the page.

24         Do you see that?

25   A     Yes.
```

UNITED STATES DISTRICT COURT

Case 2:23-cv-04408-PA   Document 1-5   Filed 06/05/23   Page 287 of 786   Page ID #:729
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 290 of 285   Page ID #:671

25

 1   Q    And in there, the last line says, "the patient pressed the

 2   event button on a recorder seven times."

 3        Do you see that?

 4   A    Yes.

 5   Q    Do you understand what that particular line means?

 6   A    That means there is something happening that the patient

 7   wants to explain or is uncomfortable or whatever.

 8   Q    The Exhibit No. 1, the Holter device that the government

 9   had you take a look at, can you confirm for the jury that that

10   is a duplicate or exact replica that was used on your patient

11   back in 2011?

12   A    I have no way of confirming that.

13   Q    Okay.  But did you explain to the patient while they are

14   wearing it, that there is a button they should push when

15   something happens or something occurs?

16   A    Yes, I would say there is a button.  "If there is

17   something you want to clarify or if it's a button" -- I'm sorry

18   -- "if you have what you were doing this for occurs, like

19   fluttering of the chest, press the button."

20   Q    Okay.  So when you are sitting down with the patient and

21   before they apply the device, you actually explain to them how

22   they should use the device in order to properly record what is

23   going on in their chest, correct?

24   A    Yes.

25   Q    Okay.

App. 0698            **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 288 of 786   Page ID #:730
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 286 of 285   Page ID #:612

26

 1    A    Or it would be recorded anyway, maybe to bring it to our

 2    attention.

 3    Q    Right.  And Mr. Hattrup's particular situation, his was a

 4    heart flutter problem?

 5    A    Yes, and chest pain.

 6    Q    And chest pain.  So this would be an appropriate event if

 7    he felt chest pain or flutter to push a particular button on

 8    this device?

 9    A    Yes.

10    Q    And that particular event would then be recorded by the

11    Holter device?

12    A    Yes.

13    Q    Now when you look through No. 42, do you see any documents

14    in 42 -- any pages, that reflect those events being recorded?

15    A    I'm not finding any items here, which specifically are

16    labeled as "patient pushed the button."

17    Q    Is it possible then that the report is incomplete that you

18    are looking at?

19    A    It's possible.

20    Q    Because when you have reviewed reports that indicate that

21    events occurred, as it indicates on the first page, there will

22    be some documents attached to the report that identify what

23    those events were, true?

24    A    Usually.

25    Q    Okay.  And I would note that you were asked on direct,

                    UNITED STATES DISTRICT COURT

Case 2:23-cv-04198-PA   Document 1-5   Filed 06/05/23   Page 289 of 786   Page ID #:?13
Case 2:18-cv-00213-PA   Document 87-5   Filed 07/20/15   Page 290 of 285   Page ID #:913

27

```
 1   sir, this would be with the little number at the bottom,

 2   025216, it has a heading of sleep apnea on the very top.

 3        I will wait until you find that Document 025216.  It is at

 4   the very bottom right-hand corner.

 5        Do you see that?

 6   A    Yes.

 7   Q    Okay.  Now, you were asked to take a look at that on

 8   direct.

 9        This particular page, does it in fact reflect that some

10   kind of sleep apnea testing was done?

11   A    It's titled that.

12   Q    Okay.  Obviously, you testified that it wasn't something

13   you had requested, though, correct?

14   A    Right.

15   Q    And upon reviewing this report, did you happen to contact

16   either Holter Labs or your carrier as to work being performed

17   that wasn't asked for?

18   A    No.

19   Q    As a result of the work that was performed on behalf of

20   Mr. Hattrup, it's my understanding that you recommended he see

21   a cardiologist.

22   A    That was part of my initial plan to obtain a cardiologist

23   consultation and also a Holter.

24   Q    This particular device, did it confirm your original

25   diagnosis that he should see a cardiologist?
```

App. 0700            **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 290 of 786   Page ID #:732
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 290 of 295   Page ID #:614

28

```
 1   A     This has nothing do with my decision to see a

 2   cardiologist.

 3         He needed to see him for chest pain and flutters, no

 4   matter what this shows.

 5   Q     But again, did this particular report exist and confirm

 6   your feelings what should be done with Mr. Hattrup?

 7   A     I don't know.

 8              MR. MCDERMOTT:  All right.  Thank you.  I have

 9   nothing further.

10              THE COURT:  Redirect?

11              MS. RYKKEN:  No redirect.

12              THE COURT:  Sir, you may step down.

13         Thank you very much.

14              THE WITNESS:  Thank you.

15              THE COURT:  Call your next witness.

16              MS. RYKKEN:  Can the government have a brief sidebar

17   before this witness?

18              THE COURT:  Yes.

19                      (Sidebar begins.)

20              MS. RYKKEN:  I just wanted to remind the Court the

21   next witness has some issues, and she requires to take a

22   bathroom break.

23         We talked about that at the status break.  I wanted to let

24   you know.

25              THE COURT:  Okay.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 291 of 786   Page ID #:733
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 29 of 235   Page ID #:673

29

```
 1                      (Sidebar ends.)

 2            MS. RYKKEN:  The government called Martha Bennett.

 3       She will be here shortly.  She's in the restroom.

 4            THE COURT:  All right.

 5            THE COURTROOM DEPUTY:  Please stand here, and raise

 6  your right hand.

 7                      (Oath was administered.)

 8            THE WITNESS:  I do.

 9            THE COURTROOM DEPUTY:  Please be seated.  Please

10  state your full name and spell your last name for the record.

11            THE WITNESS:  Martha Ann Bennett, B-e-n-n-e-t-t.

12

13                 MARTHA ANN BENNETT,

14       having been duly sworn, testified as follows:

15

16            THE COURT:  Ms. Bennett, I understand from time to

17  time you need to take a break, so let us know and we will

18  certainly accommodate you.

19            THE WITNESS:  Thank you.

20            THE COURT:  All right.

21

22                      DIRECT EXAMINATION

23  BY MS. RYKKEN:

24  Q    What do you do for a living, Ms. Bennett?

25  A    I'm a homemaker.
```

App. 0702                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 292 of 786   Page ID #:710
Case 2:18-cv-00213-PA   Document 87   Filed 07/20/15   Page 30 of 235   Page ID #:734

30

```
 1    Q     Have you always been a homemaker?

 2    A     No.  I was in IT, information technology, for about

 3    20 years.

 4          And when I had my son, he had special needs, so I didn't

 5    go back to work after that.

 6    Q     Where do you live?

 7    A     Lake Forest, Orange County.

 8    Q     Did you live in Lake Forest in 2012?

 9    A     Yes.

10    Q     Have you worn a heart rate monitoring device before?

11    A     Yes.

12    Q     Can you look at Exhibit 1, which is the device on the

13    table in front of you.

14          It will be there in one moment.

15    A     Oh.  It does not look familiar.  It was a while ago, but

16    it was about that size, but I'm not sure if this is the exact

17    device.

18    Q     Is that similar to the device you wore?

19    A     It was similar.  It was a small pack with wires.

20    Q     Do you remember when you wore it?

21    A     Based on information I have looked at since we have

22    talked, it was -- I'm thinking fall of 2012, but not positive

23    on the date.

24    Q     Does November 30th, 2012, sound right?

25    A     Before the holidays, yes.
```

App. 0703                **UNITED STATES DISTRICT COURT**

1  Q     Why were you wearing the device?

2  A     For several weeks prior to that, I had intermittent

3  episodes of feeling like my heart was racing, especially when I

4  would go to bed at night.

5        I would lay down -- excuse me -- it would start racing and

6  just not stop -- pardon me.

7        So after having that for several weeks, I was getting

8  concerned there was something wrong with my heart.

9        So I made an appointment with my family doctor.

10 Q     Who is your family doctor?

11 A     Dr. Ronald Richmond.

12 Q     What did he do?

13 A     He gave me a basic exam.  I'm pretty sure we did an EKG in

14 the office during that exam, and nothing showed up.

15       So then he wanted me to do a 24-hour test with a monitor

16 similar to this.

17       Thank you.

18       Because he couldn't do any treatment until he could

19 identify a problem, so that is why I wore it for 24 hours to

20 see if anything would show up during that 24 hours.

21 Q     So when you had the device put on, was that at the

22 doctor's office?

23 A     Yes.

24 Q     And how was the device put on?

25 A     His nurse put it on.  You know, the electro pads, I will

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 294 of 786   Page ID #:736
Case 2:16-cv-00215-PA   Document 87-5   Filed 07/20/17   Page 32 of 235   Page ID #:678

32

 1   call them, you have them if you get an EKG test.  It was all

 2   worn under my clothing.

 3        And then the pack, and I wore it straight for 24 hours.  I

 4   did not take it off.

 5             MS. RYKKEN:  And I just want the record to reflect

 6   that the witness was pointing to the area right below her

 7   shoulder, sort of on her chest.

 8             THE WITNESS:  There were several spots on my chest.

 9   BY MS. RYKKEN:

10   Q    Okay.  Were any of the electrodes on your head?

11   A    No.

12   Q    Or anywhere on your face?

13   A    No.

14   Q    Did you have to do anything else once the device was on?

15   A    No.  My doctor told me to do regular activities.

16        I could exercise.  I slept with it on.

17        He told me to do errands, housework, any regular

18   activities.

19   Q    Did you wear the device ever again or was that just a

20   one-time thing?

21   A    Just one time.

22   Q    Did you ever wear it for a 30-day period?

23   A    No.

24   Q    And then once you had it, did you change any batteries?

25   A    Not that I recall, no.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 295 of 786   Page ID
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 33 of 255   Page ID #:619
#:737

33

1          MS. RYKKEN:  Okay.  Can you look in that binder in

2    front of you at Tab 28, which is Exhibit 28.

3          THE WITNESS:  Okay.

4    BY MS. RYKKEN:

5    Q    Do you see the document?

6    A    Yes.

7    Q    What is it?

8    A    This is the log that my doctor gave me to fill out during

9    that 24-hour period.

10         It just says what activity I was doing, and if I had any

11   symptoms, I was to make a comment lined up with that activity.

12         I have while taking my son to school, I had a mild

13   sensation at that time.

14         The majority of the time, I didn't feel anything.

15         MS. RYKKEN:  Your Honor, the government moves to

16   admit Exhibit 28.

17         MR. MCDERMOTT:  No objection, sir.

18         THE COURT:  It will be received.

19         (Exhibit 28 received into evidence.)

20   BY MS. RYKKEN:

21   Q    Do you see that on the screen in front of you?

22   A    Yes.

23   Q    Is that what you were just talking about?

24   A    Yes.

25   Q    This is your log.  Is that your handwriting on the right?

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 296 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 34 of 235   Page ID #:680
#:738

34

```
 1   A     Yes, it is.

 2   Q     And when you say "mild for ten minutes," what does that

 3   mean?

 4   A     It meant I had that racing sensation, but not to the

 5   extreme that I had been feeling when I made the doctor

 6   appointment.

 7   Q     Is the same thing true for the other times you wrote

 8   "mild" on here?

 9   A     Yes.

10   Q     It looks like that was four different times?

11   A     Yes.

12   Q     And then on the next page, page 3, do you see that?

13   A     Yes.

14   Q     Is that your handwriting?

15         It's on the top on the screen, you can twist that.

16   A     Yes.

17   Q     Do you see the date that you started?

18   A     11/30/2012.

19   Q     So when you went to see Dr. Richmond, did you have any

20   understanding of why he has you wear that device?

21   A     Yes.

22   Q     What was your understanding?

23   A     He did not detect any of my symptoms during the office

24   appointment.

25         So he couldn't prescribe any follow-up treatment if he
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 297 of 786   Page ID
#:739
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 35 of 235   Page ID #:682

35

1    couldn't identify the symptoms.

2        So by wearing the device for 24 hours, especially at

3    night, because I had said it was happening a lot at night, the

4    device would capture that information and then he could make a

5    diagnosis and treatment.

6    Q    Did you go to the doctor with any other complaints that

7    day?

8    A    No.

9    Q    Did you complain about sleep apnea?

10   A    No.

11   Q    Did you complain about any brain function?

12   A    No.

13   Q    Were you having any trouble breathing?

14   A    No.

15   Q    Did you ever see Dr. Richmond about sleep apnea?

16   A    No.

17   Q    Did he ever order a sleep study for you?

18   A    No.

19         MS. RYKKEN:  Can you turn to Exhibit 36.  This is

20   the summary chart of charges that Holter Labs submitted

21   insurance for your use of the Holter device.

22       We have previously agreed that as pre-admitted.

23       Permission to publish?

24         MR. MCDERMOTT:  No objection.

25         THE COURT:  That's fine.

App. 0708                    UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 298 of 786    Page ID #:740
Case 2:16-cv-00215-PA    Document 87-5    Filed 07/20/17    Page 30 of 235    Page ID #:682

36

```
 1          (Exhibit 36 received into evidence.)

 2     BY MS. RYKKEN:

 3     Q     Do you see that chart?

 4     A     Yes.

 5     Q     We have a number of different dates on here.

 6           Do you see December 3rd, of 2012?

 7     A     Yes.

 8     Q     What is the first line?

 9     A     ECG monitor/report 24 hours.

10     Q     So you wore the Holter device once, correct?

11     A     Correct.

12     Q     The next line says "cardiovascular procedure."

13           Did you have a cardiovascular procedure that day?

14     A     No.

15     Q     Do you know what an EEG is, an electroencephalogram?

16     A     I honestly get ECG and EEG mixed up.

17           I think EEG -- is that the brain, or am I incorrect?

18               MS. RYKKEN:  I'm just asking if you know what it is.

19               THE WITNESS:  I'm not positive.

20     BY MS. RYKKEN:

21     Q     To your knowledge, did you have an electroencephalogram

22     that night?

23     A     I didn't have any testing at night other than just wearing

24     the device on my chest that one night.

25     Q     Okay.  Do you see the fourth line this "PRSCRX oral
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 299 of 786   Page ID
#:741
Case 2:18-cv-00213-PA   Document 87-5   Filed 07/20/17   Page 300 of 335   Page ID #:683

37

1   non-chemotherapeutic NOS?

2   A    Yes.

3   Q    Do you know what that is?

4   A    I have no idea.

5   Q    To your knowledge, did you have testing done for oral

6   non-chemotherapeutic NOS?

7   A    No, I have not had any oral testing with my family doctor.

8   Q    Let's take a look at the second date.

9        December 4th of 2012, is the date.

10        Do you know what Microvolt T-wave assessment is?

11   A    No, I do not.

12   Q    To your knowledge did you have a Microvolt T-wave

13   assessment done?

14   A    Not to my knowledge, no.

15   Q    Did you have a second ECG done?

16   A    No.

17   Q    And December 6, 2012, a second Microvolt T-wave assessment

18   test.

19        Did you have a second Microvolt T-wave assessment

20   performed, to your knowledge?

21   A    No.

22   Q    What about a third ECG, did you have a third ECG?

23   A    No.

24   Q    Did you have a second EEG or electroencephalogram on

25   December 6, of 2012?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 300 of 786   Page ID #2
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 38 of 295   Page ID #:684
#:742

38

```
 1   A     No.

 2   Q     Let's look at the last day, December 10th, of 2012.

 3         Did you have a fourth ECG monitor report done?

 4   A     No.

 5   Q     Did you have a sleep study that day?

 6   A     No.

 7   Q     Did you have a fourth EEG?

 8   A     No.

 9   Q     Do you recall if you ever received a bill from Holter

10   Labs?

11   A     I don't believe so.

12   Q     Do you recall if you ever paid them for wearing the

13   device?

14   A     I honestly don't remember.  I don't think so.

15            MS. RYKKEN:  Nothing further.

16            THE COURT:  All right.  Cross-examination?

17            MR. MCDERMOTT:  Thank you, sir.

18

19                    CROSS-EXAMINATION

20   BY MR. MCDERMOTT:

21   Q     If you would turn back to that Exhibit No. 29, that the

22   government had you take a look at.

23            THE COURT:  29 or 28?

24            MR. MCDERMOTT:  Excuse me, sir, 28.  Are you there

25   on the front page, ma'am?
```

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 301 of 786   Page ID
#:743
Case 2:16-cv-00235-PA   Document 87   Filed 07/20/17   Page 39 of 235   Page ID #:683
39

```
 1              THE WITNESS:  28, yes.
 2   BY MR. MCDERMOTT:
 3   Q    And that claims to be a Holter order form?
 4        Have you ever seen that document before?
 5   A    It doesn't look familiar.
 6   Q    All right.  Do you see where it's circled, "was your
 7   doctor, at the time, Dr. Ronald Richmond"?
 8   A    Yes.
 9   Q    He had been your treating physician for a period of time,
10   your general practitioner physician?
11   A    Yes.
12   Q    When you were finished wearing the device, did you and
13   Dr. Richmond sit down and discuss the results of the test?
14   A    I had -- I took the device back to the office, and then
15   there was follow-up.
16        I don't remember if it was on the phone or I made an
17   appointment.
18   Q    Okay.
19   A    But I was informed that there were no results from the
20   test, so there was nothing he could do for the problem because
21   they didn't have enough information to treat it.
22   Q    All right.  So at least from your perspective when you
23   were talking with the doctor about the report, he apparently
24   had something that he was reviewing or looking at, and he was
25   telling you about the results, true?
```

App. 0712                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA    Document 1-5    Filed 06/05/23    Page 302 of 786    Page ID
Case 2:16-cv-00215-PA    Document 87    Filed 07/20/17    Page 40 of 235    Page ID #:680
#:744

40

```
 1   A     Yes.

 2   Q     And as a result of having the device, did the doctor refer

 3   you on to a cardiologist or what happened as a result of

 4   wearing that device?

 5   A     Nothing happened because the symptoms that I had

 6   complained about, he didn't have any indication that they had

 7   happened.  So he couldn't do anything because there wasn't any

 8   indication to him.

 9   Q     Okay.

10   A     He believed me, but there wasn't any factual information

11   that he could treat.

12   Q     All right.  So, obviously Dr. Richmond did this for you --

13   you have never seen this order form before -- did he explain to

14   you what the device was capable of doing, if you wore it?

15   A     He did.  I don't remember all of the details.  It was

16   quite a while ago.

17   Q     Right.

18   A     But my understanding was that it would have recorded -- if

19   I had experienced this intermittent racing -- the device would

20   have recorded that, and then he would have seen that.

21   Q     I realize it's been a while ago.  It looks like almost

22   five years ago.

23         Do you recall having a discussion with your doctor about

24   if you experienced an event that there might be a button to

25   push on the device?
```

                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 303 of 786   Page ID #:745
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 41 of 135   Page ID #:687

41

 1   A     Not that I recall.

 2   Q     All right.  Okay.

 3         Now, the government asked you about -- most of us that

 4   have insurance -- sometimes you will get a notice in the mail

 5   from your insurance company something called an explanation of

 6   benefits.

 7         Do you recall whether or not your insurance company at

 8   that time gave you those kind of mailings?

 9   A     Yes, they did.

10   Q     All right.  At any point in time, you have already told us

11   and told the jury that you never got a bill from Holter Labs,

12   correct?

13   A     Not that I remember.

14   Q     All right.  And do you have a recollection of receiving

15   explanation of benefits in which there were multiple charges or

16   payments by your insurance company to Holter Labs?

17   A     Yes.

18   Q     And did you ever contact your insurance company or did

19   they contact you about these multiple payments to the Holter

20   Labs?

21   A     No.  I did not contact them, and I do not remember them

22   contacting me.

23   Q     All right.  So at no point in time, did your insurance

24   company reach out to you and say, "Does this conform with

25   services you had with Dr. Richmond?"

App. 0714               **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 304 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 42 of 235   Page ID #:688
#:746

42

```
 1   A     Not that I remember.

 2   Q     Okay.

 3              MR. MCDERMOTT:  Thank you, ma'am.  I have nothing

 4   further.

 5              MS. RYKKEN:  No redirect.

 6              THE COURT:  You may step down.  Thank you very much.

 7   Call your next witness.

 8              MS. RYKKEN:  The government calls Dr. Ronald

 9   Richmond.

10              THE COURTROOM DEPUTY:  Sir, please raise your right

11   hand.

12                   (Oath was administered.)

13              THE WITNESS:  I do.

14              THE COURTROOM DEPUTY:  Please be seated.  Please

15   state your full name, and spell your last name for the record.

16              THE WITNESS:  Ronald David Richmond,

17   R-i-c-h-m-o-n-d.

18

19              DR. RONALD DAVID RICHMOND,

20         having been duly sworn, testified as follows:

21

22         MS. RYKKEN:  May I proceed, Your Honor?

23         THE COURT:  Yes.

24

25                   DIRECT EXAMINATION
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 305 of 786   Page ID #:747
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 438 of 255   Page ID #:689

43

```
 1   BY MS. RYKKEN:

 2   Q     What do you do for a living, Doctor?

 3   A     I'm a doctor in family practice.

 4   Q     What does "family practice" mean?

 5   A     Primary care medicine.

 6   Q     What is primary care medicine?

 7   A     It is taking care of the general needs of a patient,

 8   mostly adults in my practice.

 9   Q     Where is your practice located?

10   A     Mission Viejo, California.

11   Q     Is that in Orange County?

12   A     Yes.

13   Q     Did you work for the -- what is the name of your practice?

14   A     OSO Family Medical Group.

15   Q     Is that the name of your practice now?

16   A     No.  We were joined in with OptumCare Medical Group, in

17   September of 2014.

18   Q     So in 2012, you worked for OSO Medical Group?

19   A     Correct.

20   Q     Is Martha Bennett your patient?

21   A     Yes.

22   Q     How long has she been your patient?

23   A     Probably 18 years.

24   Q     So she was your patient in 2012?

25   A     Yes.
```

App. 0716                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 306 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 44 of 235   Page ID #:690
#:748

44

```
 1   Q    Did she come to your office on November 30th, of 2012?

 2   A    Yes.

 3   Q    Can you look at Exhibit 27 in the binder right next to you

 4   on your -- the larger binder.

 5   A    Which exhibit?

 6        MS. RYKKEN:  Just a moment, Exhibit 27.

 7   BY MS. RYKKEN:

 8   Q    Do you see that?

 9   A    Yes.

10   Q    What is this?

11   A    It's an office note from November 30th, 2012, when I saw

12   Ms. Bennett for a physical.

13   Q    Are these your notes?

14   A    Yes, they are.

15        MS. RYKKEN:  The government moves to admit

16   Exhibit 27 into evidence.

17        MR. MCDERMOTT:  No objection, Your Honor.

18        THE COURT:  It will be received.

19   (Exhibit 27 received into evidence.)

20   BY MS. RYKKEN:

21   Q    So on the screen in front of you, we're going to highlight

22   some different portions.

23   A    Okay.

24   Q    The patient name.  What is the patient's name?

25   A    Martha A. Bennett.
```

App. 0717          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA    Document 1-5    Filed 06/05/23    Page 307 of 786    Page ID
#:749
Case 2:18-cv-00213-PA    Document 87    Filed 07/20/17    Page 45 of 235   Page ID #:691

45

1   Q    And the provider, Ronald Richmond.  That is you?

2   A    Correct.

3   Q    Why did she come to see you?

4   A    Just for a general physical checkup.

5   Q    Did she complain about any heart palpitations that she was

6   having?

7   A    Yeah.  One of the things she brought up during that visit

8   was that she was having some palpitations or extra heart beats

9   she was concerned about.

10  Q    What did you do next?

11       Did you do any tests in the office?

12  A    I'm pretty sure we did an EKG that day just to see if

13  there was anything going on.

14  Q    Let's look at page 3.  Assessment and plan.

15       Do you see that?

16  A    Uh-huh.  Let me see.

17  Q    It's on the screen in front of you, too, if you would

18  like.

19  A    Okay, yeah.  Schedule for an EKG.

20  Q    Then the heart palpitations, it says, "today's

21  instructions counseling includes Holter?"

22  A    Correct.

23  Q    What is a Holter?

24  A    That's a 24-hour heart monitor to see how the heart rhythm

25  is doing over a 24-hour period.

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 308 of 786 Page ID #:750
Case 2:18-cv-00213-PA Document 87-5 Filed 07/20/15 Page 46 of 235 Page ID #:692

46

1  Q    Do you see the Holter monitor in front of you, which is

2  Exhibit 1?

3  A    Yes.

4  Q    Is that similar to the one you ordered for Martha Bennett?

5  A    Yes.

6  Q    Did you apply the Holter monitor to her yourself?

7  A    No, my medical assistant would have done that.

8  Q    Okay.  Did you ever order her to wear it again after this

9  first time?

10  A    No.

11  Q    How long did you ask her to wear the device?

12  A    24 hours.

13  Q    Did you order her to wear it three more times in the next

14  two weeks?

15  A    No.

16  Q    Did you ever order a 30-day test for a Holter monitor?

17  A    No.

18       MS. RYKKEN:  I would like to publish Exhibit 36,

19  which is our summary chart that has been previously stipulated

20  to as pre-admitted.

21       MR. MCDERMOTT:  No objection, Your Honor.

22       MS. RYKKEN:  Permission to publish?

23       THE COURT:  It's fine.

24       (Exhibit 36 was admitted in evidence.)

25  BY MS. RYKKEN:

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 309 of 786   Page ID #:693
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 40 of 235   Page ID #:751

47

```
 1   Q    This is a summary chart of all of the charges that Holter
 2   Labs submitted to insurance for Martha Bennett's use of the
 3   device.
 4        Do you see that?
 5   A    Yes.
 6   Q    The first date is December 3rd, of 2012.
 7        Do you see the first line that says "ECG monitor and
 8   report for 24 hours"?
 9   A    Yes.
10   Q    Is that consistent with the one Holter device that you
11   ordered?
12   A    Yes.
13   Q    On the second line, cardiovascular procedure.
14        Did you order a cardiovascular procedure for Martha
15   Bennett?
16   A    Nothing different than the Holter monitor.
17   Q    Do you know what an EEG is?
18   A    Yeah, that would be a measure of brain waves.
19   Q    What does EEG stands for?
20   A    Electroencephalogram.
21   Q    Did you order any EEG tests for Martha Bennett?
22   A    No.
23   Q    Did you ever order an EEG for her?
24   A    I have never order an EEG in my life.
25   Q    The last line, PRSCRX plural non-chemotherapeutic NOS.
```

App. 0720        **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA    Document 1-5    Filed 06/05/23    Page 310 of 786    Page ID #:694
Case 2:16-cv-00213-PA    Document 87-5    Filed 07/20/17    Page 48 of 235   Page ID #:752

48

1     Did you order that for Martha Bennett?

2   A    No, I don't know what that is.

3   Q    Take a look at the second date on this chart, which is

4   December 4th, of 2012.

5       Do you see Microvolt T-wave assessment?

6   A    I see it.

7   Q    Do you know what that is?

8   A    Nope.

9   Q    Did you order one for Martha Bennett?

10  A    No.

11  Q    Did you order a second EEG for Martha Bennett on

12  December 12th?

13  A    No.

14  Q    Third date, December 6, of 2012, again, the Microvolt

15  T-wave assessment, did you order that for Martha Bennett?

16  A    No.

17  Q    Did you order a third ECG monitor?

18  A    No.

19  Q    Did you order a second EEG for Martha Bennett?

20  A    No.

21  Q    And this is the last date on the chart, 12/10/2012.

22      This is a fourth ECG monitor.

23      Did you order that for Martha Bennett?

24  A    No.

25  Q    Did you order a sleep study for Martha Bennett?

Case 2:23-cv-04408-PA    Document 1-5    Filed 06/05/23    Page 311 of 786    Page ID
Case 2:16-cv-00213-PA    Document 87-5    Filed 07/20/17    Page 49 of 235   Page ID #:693
#:753
49

```
 1    A     No.

 2    Q     Did you order an EEG for Martha Bennett?

 3    A     No.

 4               MS. RYKKEN:  Can you take a look at Exhibit 28 next,

 5    which has been previously admitted.

 6          Can you put page 1 up, please.

 7    BY MS. RYKKEN:

 8    Q     Do you see that?

 9    A     Yes.

10    Q     What is that first page?

11    A     It's an order form for the Holter monitor.

12    Q     Is this something you or your office billed out?

13    A     Yes.

14    Q     Who was this order form for?

15    A     Martha Bennett.

16    Q     Who is the provider of the service?

17    A     Holter Labs.

18    Q     Can you move down to the other half of the page, please.

19               MR. FREEDMAN:  What number?

20               MS. RYKKEN:  28.

21    BY MS. RYKKEN:

22    Q     So is that your signature at the bottom?

23    A     Yes.

24    Q     Okay.  It says Holter monitoring.  It has different

25    options here.  It looks like you didn't check one of them.
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 312 of 786   Page ID #:754
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 50 of 235   Page ID #:696

50

```
 1   A      Correct.

 2   Q      Do you see any options for anything other than a 24-hour

 3   or 48-hour study?

 4   A      No.

 5   Q      And the options up above for diagnosis, you didn't check

 6   any of those?

 7   A      Palpitations, 785.1.

 8   Q      Did you create this form?

 9   A      Yes, or I directed my MA to do it.

10   Q      Is this a form -- the form itself -- is that one that your

11   office created or was that something that was given to you from

12   Holter Labs?

13   A      The form itself would have been given to us from Holter

14   Labs, then it was in our electronic medical record, a copy, and

15   then you copied it with this information.

16   Q      Okay.  So, can you take a look at Tab 29, which is Exhibit

17   29 in your binder?

18   A      Yes.

19   Q      Okay.  What is that?

20   A      This would be the report of the findings of the Holter

21   monitor.

22   Q      Who is that report for?

23   A      Martha Bennett.

24   Q      What is the date?

25   A      December 3rd, 2012.
```

App. 0723

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 313 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 309 of 235   Page ID #:697
#:755

51

```
 1              MS. RYKKEN:  The government moves to admit

 2    Exhibit 29 into evidence.

 3              THE COURT:  Any objection?

 4              MR. MCDERMOTT:  No objection.

 5              THE COURT:  It will be received.

 6         (Exhibit 29 received into evidence.)

 7    BY MS. RYKKEN:

 8    Q    All right.  As you just stated, the physician is you,

 9    Ronald Richmond, M.D., and the patient is Martha Bennett, and

10    the date of service was December 3rd, of 2012; is that right?

11    It's up on the top left?

12    A    Uh-huh.

13    Q    So you reviewed this report for Ms. Bennett?

14    A    Yes.

15    Q    What did you learn?

16    A    That she had a lot of PVCs or premature ventricular

17    contractions.

18         There was no serious heart concerns from this.

19    Q    Can you take a look at that and see whether there is a

20    result of an EEG in here?

21    A    Nothing that looks -- no EEG.

22    Q    Do you see anything for the Microvolt T-wave assessment?

23    A    I don't know what that is.  I wouldn't know what to look

24    for.

25    Q    What about any sleep study results?
```

```
 1        If you look at page 12, there is a mention of sleep apnea.
 2   A    Yeah.  It says sleep apnea on there, but there was no
 3   oxygen or breathing apparatus set up.
 4   Q    What would you expect to see for a sleep apnea study?
 5   A    Well, usually you have an oxygen monitor, some kind of
 6   breathing monitor.  They put an electrode on your head as well.
 7   Q    You don't see any of those results in this report?
 8   A    No.
 9   Q    And this report -- what period of time does it cover?
10        How many hours?
11   A    I assume 24 hours.
12   Q    Can you take a look and confirm, please?
13   A    Oh yeah, 24 hours.
14   Q    Thank you.
15        Okay.  Did you receive another such report for Martha
16   Bennett?
17   A    No.
18             MS. RYKKEN:  Nothing further.
19             THE COURT:  Cross-examination?
20             MR. MCDERMOTT:  May I, sir?
21             THE COURT:  Yes, please.
22
23                   CROSS-EXAMINATION
24   BY MR. MCDERMOTT:
25   Q    Dr. Richmond, we had another doctor here by the name of
```

App. 0725

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 315 of 786   Page ID #:757
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 53 of 235   Page ID #:699

53

```
 1   Dr. Joy.
 2         Are you with the same group?
 3   A    We are.
 4   Q    At the time were you in the same group with him?
 5   A    Yes.
 6   Q    And I think prospectively, there may be another doctor by
 7   a name of Globus coming into testify.
 8         Are you all in the same group?
 9   A    Yes, we were.
10   Q    How often would you say during this time frame -- it looks
11   like 2012 late -- how often did you use the Holter device?
12   A    I think I would order, like, two a year.
13   Q    And tell me this:  Do they train doctors on the usage of
14   Holter devices in medical school?
15   A    Yes.
16   Q    So you are familiar with how it works and what it's
17   capable of doing?
18   A    Yes.
19   Q    And when you had the opportunity to request the report to
20   be done, you had to fill out a request form from Holter Labs,
21   did you not?
22   A    Yes.
23   Q    I believe that was -- let me grab my notes here real
24   quick.
25         If you would open up the book to Exhibit No. 28, sir.
```

```
 1   A      Uh-huh.

 2   Q      Do you remember looking at that?

 3          That particular document, it lists something called Holter

 4   Monitoring about halfway down?

 5   A      Correct.

 6   Q      Date of service, apparently your office didn't fill out

 7   the form?

 8   A      Correct.

 9   Q      So we don't know for sure what date, at least from this

10   form, when it was utilized?

11   A      Well, you have the signature from the 3rd -- December 3rd

12   on the signature stamp.

13   Q      That would be where on that page?

14   A      On the lower right-hand side above my signature, it has my

15   initials, and it says December 3rd, 2012, 11:00 a.m.

16   Q      And that would be an electronic signature that was applied

17   to this?

18   A      Yes.

19   Q      All right.  And you indicated that at some point in time,

20   you received a report back and that would have been Exhibit

21   No. 29 for Martha Bennett?

22   A      Correct.

23   Q      Just so the jury and I both understand, when you have a

24   patient in your office, and you are discussing with him or her

25   the use of a Holter device --
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 317 of 786   Page ID #:759
Case 2:18-cv-00215-PA   Document 87   Filed 07/20/17   Page 35 of 235   Page ID #:4701

55

```
 1   A     Uh-huh.

 2   Q     -- you explain how the device works and the functions that

 3   it can perform?

 4   A     Yes.

 5   Q     And do you recall, and I don't know if the device in front

 6   of you, No. 1, that we have been seeing here today, is that the

 7   same or similar device that you used back then?

 8   A     It's similar.  I couldn't tell you if it looked exactly

 9   the same.

10   Q     Do you recall if the device that you had back then, had a

11   button on it and a vent button?

12   A     You know, I don't remember.

13   Q     Okay.  Do you know if those devices had event buttons?

14   A     I believe they do.

15   Q     Can you tell the jury what the event button is and what

16   it's used for?

17   A     It's so that when the patient is feeling the symptom, they

18   hit that, and then that can be used to compare to the actual

19   tracing to see if there is an arrythmia or heart issue going on

20   at the same time they are feeling their symptom.

21   Q     All right.  Now as you have looked through Exhibit No. 28,

22   were you able to identify any events that might have occurred

23   with the button on that machine might have been punched?

24   A     I don't -- I mean, the report says the patient pressed the

25   event monitor one time.
```

App. 0728

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 318 of 786   Page ID #:760
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 56 of 235   Page ID #:702

56

```
1   Q    All right.  What does tachycardia mean?

2   A    It means your heart rate is faster than normal.

3   Q    Okay.  Does the report indicate that that might have been

4   one of the concerns or conditions that she had while she was

5   wearing this device?

6   A    She did have some tachycardiac episodes, yes.

7   Q    And I would actually reflect back on the first page,

8   again, and this would be three-quarters of the way down, and

9   there is an item that is called V-tach?

10  A    Uh-huh.

11  Q    Do you see that?

12  A    Yeah.

13  Q    Do you see what it indicates as far as 003225?

14  A    Yes.

15  Q    Does that not indicate that she might have been having

16  something similar or akin to a heart attack?

17  A    No.

18  Q    No?

19  A    I mean, people have little arrhythmias and arrythmia

20  problems all of the time, so there is nothing consistent going

21  on.

22  Q    This didn't cause you any particular concern?

23  A    Not that, no.

24  Q    All right.  Anything in report cause you any concern as

25  far as her heart palpitations she was experiencing?
```

App. 0729

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 319 of 786   Page ID #:761
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 308 of 235   Page ID #:703

57

1   A     No.  I mean, she had -- no.

2   Q     Okay.  Now, obviously when you got the report, you sat

3   down with her and/or somebody did in your office and discussed

4   it with her?

5   A     I don't remember.  You know, normally I would look at the

6   report, and if there is anything significant, we might call her

7   in, but this was --

8   Q     Wasn't considered significant?

9   A     Reassuring.

10   Q     All right.  And at what point or what event in this

11   process, do you get to submit a bill to the insurance company?

12   A     When you apply it, you know, when you apply it, I mean

13   there is a charge for putting the Holter on.

14   Q     Okay.  How about for interpreting.

15         Are you allowed to bill for that?

16   A     You know, I don't even remember.  I don't know.

17   Q     As you sit here today, are you still using some kind of

18   devices, Holter devices at all?

19   A     No.

20   Q     Have you gone to something else?

21   A     Well, they have developed a lot of different kind of heart

22   monitoring devices, so we found that the cardiologists do

23   different things, so.

24   Q     Now, the government showed you what was marked as Exhibit

25   No. 28 -- excuse me, No. 27.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 320 of 786   Page ID #:704
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 58 of 235   Page ID #:762

58

 1          This was the report that was done or at least the entries

 2     that you made regarding her physical that she had on the 30th

 3     of November?

 4     A     Correct.

 5     Q     Okay.  In this particular document, it has been redacted

 6     in order to cover personal information about the examination?

 7     A     Uh-huh.

 8     Q     All right.  Is that yes, for the record?

 9     A     Yes.

10     Q     Have you had a chance to review the unredacted version?

11     A     I think I looked at it three weeks ago when I was told

12     about this.

13     Q     Did you determine or discover any discrepancies or errors

14     in your notes by chance?

15     A     I don't remember any.

16               MR. MCDERMOTT:  All right.  May I -- I have an

17     unredacted -- I don't want to show it to the jury.  I just want

18     to offer it to the witness to have him review it and refresh

19     his memory.

20          I have it marked as Defense Exhibit Alpha.

21          It would be Exhibit 27 without the redactions.  It's not

22     something I'm showing to the jury.

23               THE COURT:  Let's go to sidebar.

24                         (Sidebar begins.)

25               THE COURT:  Can I see it?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA  Document 1-5  Filed 06/05/23  Page 321 of 786  Page ID #:763
Case 2:16-cv-00215-PA  Document 87  Filed 07/20/17  Page 59 of 235  Page ID #:708

59

```
 1              MR. MCDERMOTT:  Yes, sir.  There is an item there I
 2     highlighted on yellow that I thought was peculiar for this
 3     particular exam.  I wanted to know how thorough he was in
 4     reviewing his records before testifying.
 5         It's a document provided to me from the discovery from the
 6     government.
 7         All I want him to do is look at it.
 8              THE COURT:  Okay.  Have you seen this?
 9              MR. FREEDMAN:  I have seen it.
10              MS. RYKKEN:  Yeah.
11              MR. FREEDMAN:  It also said he wasn't present.
12              MR. MCDERMOTT:  I know.  Want to know how thorough
13     he was.
14              THE COURT:  I'm sorry, okay.  Do you have any issue
15     with this?
16              MR. FREEDMAN:  Are you -- what are you going to ask
17     him?
18              MR. MCDERMOTT:  I'm just going to ask him to take a
19     look at the report, the yellow highlight.  Is it possible that
20     your reports you prepared and testified here, might not in fact
21     be totally accurate.
22         I'm not going to ask about penile or anything.
23                        (Sidebar ends.)
24              MR. MCDERMOTT:  Sir, may I approach or do I give it
25     to the clerk?
```

Case 2:23-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 322 of 786  Page ID #:700
Case 2:16-cv-00213-PA  Document 87-5  Filed 07/20/17  Page 60 of 235  Page ID #:764

60

```
 1              THE COURT:  Give it to the clerk, please.

 2              MR. MCDERMOTT:  Yes, sir.

 3  BY MR. MCDERMOTT:

 4  Q    Sir, would that be appear to be the same document that

 5  Exhibit No. 27 is?

 6  A    Yes.

 7  Q    Would you look at page 2, please, that I have got in

 8  yellow highlights?

 9  A    Yes.

10  Q    Would that appear to be a mistake?

11  A    Yes, it is.

12  Q    It is.

13       In preparation of your testimony here today, you reviewed

14  your records and your reports and your testimony; is that

15  correct?

16  A    I had a chance to look at the physical and the Holter

17  report.

18  Q    Okay.  And that would appear to be an incorrect entry on

19  that statement, obviously?

20  A    Correct, yes.

21              MR. MCDERMOTT:  Sir, I have nothing further.

22              THE COURT:  Redirect?

23       All right.

24              MS. RYKKEN:  One.

25
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 323 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87-5   Filed 07/20/17   Page 60 of 235   Page ID #:707
#:765

61

```
 1                    REDIRECT EXAMINATION
 2   BY MS. RYKKEN:
 3   Q    The mistake in your report, does that have anything to do
 4   with monitoring heart?
 5   A    No.
 6           MS. RYKKEN:  Nothing further.
 7           THE COURT:  Anything else?
 8
 9                    RECROSS-EXAMINATION
10   BY MR. MCDERMOTT:
11   Q    The mistake in the report, did it have anything to do with
12   the female?
13   A    No.
14           MR. MCDERMOTT:  Thank you.  Nothing further.
15           MS. RYKKEN:  Nothing further.
16           THE COURT:  Sir, you can step down.
17        All right.  Ladies and gentlemen, we're going to take our
18   first break of the morning.
19        Again, I want to remind you until this trial is over, you
20   are not to discuss this case with anyone, including your fellow
21   jurors, members of your family, people involved in the trial,
22   or anyone else, and do not allow others to discuss the case
23   with you.
24        This includes discussing the case on the Internet, through
25   blogs, bulletin boards, by e-mails or text message.
```

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 324 of 786   Page ID #:766
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 62 of 235   Page ID #:708

62

 1       If anyone tries to communicate with you about this case,

 2   please let me know about it immediately.

 3       Do not read, watch, or listen to any news reports or other

 4   accounts about the trial or anyone associated with it.

 5       Do not do any research such as consulting dictionaries,

 6   searching the Internet, or using other reference materials.

 7       And do not make any investigation about the case on your

 8   own.

 9       Finally, you are reminded to keep an open mind until all

10   of the evidence has been received, you have heard the arguments

11   of counsel, the instructions of the Court, and the views of

12   your fellow jurors.

13       If you need to speak with me, simply give a note to the

14   clerk.

15       We will come back at 25 until the hour.

16           THE COURTROOM DEPUTY:  All rise.

17            (JURY EXITS THE COURTROOM AT 9:24 A.M.)

18           THE COURT:  Okay.  Anything we need to take up?

19           MR. FREEDMAN:  No, Your Honor.

20           MR. MCDERMOTT:  No, Your Honor.

21           THE COURTROOM DEPUTY:  We will be in recess.

22               (Morning recess.)

23           THE COURTROOM DEPUTY:  All rise.  This United States

24   Court is in session.

25           THE COURT:  Maybe we have stopped the construction

App. 0735

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 325 of 786 Page ID
Case 2:16-cv-00215-PA Document 87 Filed 07/20/17 Page 63 of 235 Page ID #:709
#:767

63

 1   noise, at least, temporarily.

 2       Let's bring the jury in.

 3       Do you want to retrieve your next witness?

 4           MS. RYKKEN:  Yes.

 5           THE COURTROOM DEPUTY:  All rise.

 6            (JURY ENTERS THE COURTROOM AT 9:45 A.M.)

 7           THE COURTROOM DEPUTY:  You may be seated.

 8           THE COURT:  Call your next witness.

 9           MS. RYKKEN:  Government calls Suzanne Darsow.

10           THE COURTROOM DEPUTY:  Please raise your right hand.

11                (Oath was administered.)

12           THE WITNESS:  I do.

13           THE COURTROOM DEPUTY:  Please be seated.  Please

14   state your full name and spell your last name for the record.

15           THE WITNESS:  Susan Darsow.  D-a-r-s-o-w.

16

17                   SUSAN DARSOW,

18        having been duly sworn, testified as follows:

19

20           MS. RYKKEN:  May I proceed?

21           THE COURT:  Yes, please.

22

23                   DIRECT EXAMINATION

24   BY MS. RYKKEN:

25   Q    Where do you work?

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 326 of 786   Page ID
#:768
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 64 of 235   Page ID #:710
64

```
 1   A     I work for Optum.

 2   Q     What is Optum?

 3   A     Optum is the payment integrity portion of United Health

 4   Group.

 5   Q     What is United Health Group?

 6   A     United Health Group is the company that owns United

 7   Healthcare and Optum.

 8   Q     Is it a health insurance company?

 9   A     United Healthcare is the insurance company.

10   Q     And you said you work for the payment integrity group?

11   A     Correct.

12   Q     What does that group do?

13   A     So the payment integrity group reviews claims for

14   accuracy.

15         We review them for appropriate coding, things like

16   subrogation, coordination of benefits, so making sure that

17   payments are appropriate for claims that are processed by

18   United Healthcare Group.

19   Q     What is your title?

20   A     I am a team lead in the special investigations unit.

21   Q     So what does that mean?  What are your responsibilities as

22   the team lead?

23   A     So I oversee the day-to-day process of a team of

24   investigators.

25         Some of them are clinical investigators, some of them are
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 327 of 786   Page ID #:769
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 69 of 235   Page ID #:4711

65

```
 1    non-clinical investigators.  And we review claims to make sure

 2    that the coding is appropriate and that it is supported by the

 3    medical records.

 4        I help the investigators on my team develop a plan for

 5    what we are going to do when we review those particular claims

 6    for either a physician or a physician group.

 7    Q    You mentioned non-clinical and clinical investigators.

 8    What is the difference?

 9    A    So our non-clinical investigators have backgrounds in

10    either claims processing criminal justice, insurance

11    backgrounds, and our clinical investigators are either

12    registered nurses or certified coders or both.

13    Q    Do you know approximately how many claims United receives

14    everyday?

15    A    They receive approximately a million claims a day.

16    Q    And how are those claims processed?

17    A    Most of those claims go through, what we call, auto

18    adjudication.

19        So if there is nothing that would be questionable, or if

20    the coding is appropriate, it would just go through the claim

21    systems without any human intervention, and it would be

22    processed according to a member's benefits.

23    Q    Okay.  How does claims get into this auto adjudication in

24    the first place?

25    A    They could be submitted one of two different ways.
```

App. 0738                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 328 of 786   Page ID #:770
Case 2:16-cv-00223-PA   Document 87-5   Filed 07/20/17   Page 68 of 235   Page ID #:712

66

1    They could be submitted either electronically through a

2    portal with United Healthcare or physicians or physician's

3    groups can submit paper claims, which would go to -- it's

4    called a regional mail office.

5        And those claims actually get scanned, and then data

6    entered into the claim system, and then they move on from that

7    point.

8    Q    So let's talk a little bit more about auto adjudication.

9    A    Uh-huh.

10   Q    Do you know what it is that the auto adjudication system

11   would consider a red flag?

12   A    Sometimes it would be coding pairs that would -- may not

13   be appropriate.

14       For example, if we would get a pregnancy claim on a male,

15   that claim would fail auto adjudication, and it would drop to a

16   review for a person to look at it.

17   Q    And does this system have a way to tell what a particular

18   provider is authorized to bill for or not?

19   A    No.

20   Q    And what about multiple dates of service.

21       Can the system tell when multiple dates of service have

22   occurred?

23   A    Yes.

24   Q    What does multiple dates of service mean?

25   A    That means we have got services that have been billed by a

App. 0739                    UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 329 of 786   Page ID #:771
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 67 of 235   Page ID #:713

67

```
 1   provider or physician's group for multiple dates of service, so

 2   it could be one day a week; it could be two days a week.

 3       It could be however many days that they have said they

 4   provided services.

 5   Q   So is that typically -- if it happens twice on the same

 6   day, for example, with the system, say okay, that is too many

 7   for that date?

 8   A   If there were two claims for the same date of service, the

 9   system would actually compare the CPT codes or the coding of

10   the claim to see if they were duplicate claims.

11       And if the codes were the same, chances are the system

12   would actually deny one of those claims as duplicate.

13   Q   So how do the claims eventually make their way into your

14   unit?

15   A   Claims that would be looked at by the special

16   investigations unit would be stopped by a system edit.

17       Either it could be on an individual claim basis, or it

18   could be that we have placed a particular provider on review

19   due to allegations of misrepresentations, billing patterns, or

20   whatever.

21       Those claims would get stopped by the system first.

22       A request for medical records would go out, and nothing

23   would happen with that particular claim until those medical

24   records came in, and then it would get forwarded to our team to

25   review.
```

App. 0740

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 330 of 786    Page ID #:714
Case 2:16-cv-00215-PA    Document 87    Filed 07/20/17    Page 68 of 235    Page ID #:772

68

 1   Q     Is Martha Bennett insured by United?

 2   A     Yes.

 3   Q     Is John Hattrup insured by United?

 4   A     Yes.

 5   Q     So we're going to go through each of those people, and

 6   talk about their claims with Martha Bennett first.

 7         If you could look at Exhibit 31 in that binder, please.

 8         Do you see that?

 9   A     Yes, I do.

10   Q     What is that?

11   A     This is a cover sheet that is placed on claims that are

12   submitted to one of our regional mail offices for United

13   Healthcare.

14         And this indicates to me that this claim was submitted via

15   paper, and not electronically.

16   Q     Who made this claim?

17   A     The claim was submitted -- if I go to the third page -- by

18   Holter Labs.

19             MS. RYKKEN:  Excuse me.  Government moves to admit

20   Exhibit 31.

21             MR. MCDERMOTT:  No, objection, sir.

22             THE COURT:  It may be received.

23        (Exhibit 31 received into evidence.)

24   BY MS. RYKKEN:

25   Q     So this is page 1 that you were talking about?

App. 0741                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 331 of 786   Page ID
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 69 of 235   Page ID #:773
#:773

69

```
 1   A      Yes.

 2   Q      And now this is page 3.  What is this form?

 3   A      This is what is known as a HIPPA 1500.

 4          It is a standard billing form used by providers to submit

 5   claims to either commercial carriers or to Medicare or

 6   Medicaid.

 7          This form is actually developed by CMS, so for Centers for

 8   Medicare/Medicaid Services.  They use this form for all of

 9   their claims.

10   Q      Who is the patient?

11   A      The patient on this one is Martha Bennett.

12   Q      And who is -- the screen in front of you we're

13   highlighting something -- so Martha Bennett is on the left.

14          Who is the provider?

15   A      The provider is indicated down at the very bottom.

16          There is a signature of M. Mirando.  And the next box is

17   Holter Labs, LLC.

18          That is the actual physical location of where the services

19   were rendered.

20          And then the third box on the right-hand side of Holter

21   Labs with the P.O. Box is the actual billing entity of this

22   claim.

23   Q      Okay.  Let's take a look at the middle.

24   A      Sure.

25   Q      Can you highlight from Ronald Richmond down, please?
```

App. 0742

**UNITED STATES DISTRICT COURT**

```
 1            So you see Ronald Richmond in the middle of the document?
 2    A    Yes.
 3    Q    Why is his name there?
 4    A    Ronald Richmond would be the referring physician for the
 5    services.
 6    Q    So for an entity like Holter Labs, do they need a
 7    referring physician in order to submit claims?
 8    A    Yes.
 9    Q    Why is that?
10    A    It's my understanding that individual testing facilities
11    need to have physician orders in order to provide those
12    services.
13    Q    Can you tell what the date of service is on here?
14    A    The date of service is December 3rd, 2012.
15    Q    That is the far left of the document?
16    A    Yes.
17    Q    Then what is -- what are the numbers there that begin with
18    93226, 95827, and 93799?
19    A    Those would be the specific CPT codes that correlate to
20    the actual services that are rendered instead of providers or
21    clinics submitting verbiage as far as what was actually
22    provided.  There are what is known as CPT codes to indicate
23    that is the service that was provided.
24    Q    And then the dollar amount next to it, the 195, 325, and
25    195; is that the dollar amount?
```

App. 0743

**UNITED STATES DISTRICT COURT**

```
1   A    That would be the amount the particular -- yeah, the
2   physician is charging for that service.
3   Q    The physician or Holter Labs?
4   A    Holter Labs.
5   Q    And is this form something that United put together?
6   A    No.
7   Q    Who put this together?
8   A    This is usually created by CMS.
9        So this is a CMS 1500.
10  Q    The data in the form itself?
11  A    The data in the form is provided by the billing entity.
12  Q    Okay.  Could you look at page 2 of that document?
13       We will put that up on the screen.
14       It says "description of services rendered."
15  A    Uh-huh.
16  Q    Is this something that United put together?
17  A    No.  This is not.  This would have been submitted by the
18  provider of the services.
19  Q    Okay.  So I want to go a little bit back and forth between
20  pages 3 and 2 and compare.
21       So on page 3, one of the billing codes is 93226?
22  A    Uh-huh.
23  Q    Do you see that on the description of services rendered?
24  A    Yes.
25  Q    Okay.  And what does that say?
```

App. 0744

```
1    A     It's a microprocessor-based hard analysis with

2    corresponding report.  "Patient wore a Holter device for over a

3    24- to 48-hour period."

4    Q     So let's look at this second one.  It's 95827.

5          Do you see that?

6          And then do you see that on "description of services

7    rendered"?

8    A     I see it on the HIPPA, but I do not see it on the

9    description of services rendered.

10   Q     So there is a claim code right down here that looks like

11   it's 295806-27.

12   A     There we go.

13   Q     Can you read that?

14   A     So it's sleep study simultaneous recording of ventilation

15   respiratory effect, ECG or heart rate and oxygen saturation

16   unattended by a technologist.

17   Q     And then the last claim submitted is 93799.

18         Do you see that on page 3?

19   A     Yes.

20   Q     And then on page 2, do you see 93799?

21   A     Yes.

22   Q     What does that say?

23   A     It says "ST analysis for treatment of the cardiovascular

24   system which involves the heart and blood vessels by which

25   blood is pumped and circulated through the body."
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 335 of 786   Page ID
Case 2:16-cr-00213-PA   Document 87   Filed 07/20/17   Page 336 of 235   Page ID #:719
#:777

73

```
 1   Q    Okay.  Thank you.
 2        And page 2, here is a description of services, that was
 3   submitted with the claim by Holter Labs?
 4   A    Yes.
 5   Q    Can you look at Exhibit 33.  I'm sorry, 32 please.
 6        What is that document?
 7   A    Again, this is the cover page that is submitted by a
 8   particular provider to one of our regional mail offices.
 9        And this is the document separator, so this indicates to
10   me that this was another paper claim that was submitted to
11   United Healthcare.
12   Q    Who was the patient?
13   A    The patient on page 2 is Martha Bennett.
14        MS. RYKKEN:  Government moves to admit Exhibit 32
15   into evidence.
16        MR. MCDERMOTT:  No objection, sir.
17        THE COURT:  It will be received.
18        (Exhibit 32 received into evidence.)
19   BY MS. RYKKEN:
20   Q    Page 2, the 1500 form, is it similar to what we just
21   looked at in Exhibit 31, correct?
22   A    Correct.
23   Q    What is the date?
24   A    The date of service on this is 12/4/2012.
25   Q    Okay.  You said the patient is Martha Bennett.
```

App. 0746          **UNITED STATES DISTRICT COURT**

```
 1        Who is the referring physician?

 2   A    The referring physician, again, is Ronald Richmond.

 3   Q    Okay.  Who submitted this claim?

 4   A    Again, this was submitted by M. Mirando as the servicing

 5   provider.

 6        It was provided at Holter Labs, LLC, as indicated by the

 7   second box.

 8        And the third box is the billing entity, so Holter Labs is

 9   billing for these services.

10   Q    So let's go through these billing codes.

11   A    Uh-huh.

12   Q    There are two claims submitted here.

13        Do you see those?

14   A    Yes.

15   Q    And what are the two claim numbers?

16   A    The two CPT codes --

17   Q    Yes.

18   A    -- would be 93271 and 93025.

19   Q    If you look at page 3, description of services rendered.

20        Do you see that first CPT code in there, which is 93271?

21   A    Yes.

22   Q    What does that say?

23   A    That is the heart monitoring receipt of transmissions and

24   analysis with corresponding report.

25   Q    And 93025?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 337 of 786   Page ID
#:779
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 79 of 255   Page ID #:721

75

```
 1   A      93025, Microvolt T-wave all transfer assessment of
 2   ventricular arrhythmias.
 3         Excuse me, I read the wrong one.
 4   Q      It was the right one.
 5         And again, description of services rendered was submitted
 6   by the provider, Holter Labs?
 7   A      Correct.
 8   Q      Can you turn to Exhibit 33?
 9   A      Okay.
10   Q      What is that?
11   A      Again, this is the cover page that is placed on a paper
12   claim that was received at the regional mail office for United
13   Healthcare Group.
14   Q      Who is the patient for this claim?
15   A      The patient on page 2, is Martha Bennett.
16         MS. RYKKEN:  Government moves to admit Exhibit 33
17   into evidence.
18         MR. MCDERMOTT:  Sir, unless I jump up and object to
19   the admission, just assume we agree to the admission.
20         THE COURT:  It will be received.
21       (Exhibit 33 received into evidence.)
22   BY MS. RYKKEN:
23   Q   Let's take a look at page 2, and this is a similar claim
24   for the ones we just looked at, right?
25   A      Correct.
```

```
 1   Q     You said the patient is Martha Bennett.  Who is the
 2   provider?
 3   A     The provider of services, again, is the M. Mirando.
 4   Services were rendered at Holter Labs, LLC, and billing entity
 5   is Holter Labs, LLC.
 6   Q     I'm sorry, the referring physician?
 7   A     The referring physician is Ronald Richmond.
 8   Q     Let's take a look at the individual claims, again.
 9         There are three claims here, right?
10   A     Correct.
11   Q     What's the date of service?
12   A     The date of service is 12/6/2012.
13   Q     Take a look at those three billing codes.
14         The description of services rendered is on page 3, again?
15   A     Correct.
16   Q     What is 93226?
17   A     The 93226 is the microprocessor-based heart analysis with
18   corresponding report.  "Patient wore Holter monitoring device
19   over a 24-to 48-hour period."
20   Q     The next code 95827.  Do you see that?
21   A     95827 is, again, a sleep study simultaneous recording of a
22   ventilation respiratory effect ECG or heart rate and oxygen
23   saturation unattended by a technologist.
24   Q     And then the last one, 93025.
25         What does that claim refer to?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 339 of 786   Page ID #:73
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 77 of 235   Page ID #:781

77

```
 1   A     The 9025 is the Microvolt T-wave Alternans for assessment

 2   of ventricular arrythmia.

 3   Q     And this last page description of services rendered, that

 4   submitted by Holter Labs?

 5   A     Correct.

 6   Q     Can you look at Exhibit 34?

 7         Did you look at that?

 8   A     Yes.

 9   Q     What is it?

10   A     Again, this is the cover page that is received in our

11   regional mail office that separates claims being submitted --

12   yeah, being submitted by a provider.

13         MS. RYKKEN:  I move to admit Exhibit 34 into

14   evidence.

15         THE COURT:  It will be received.

16         (Exhibit 34 received into evidence.)

17   BY MS. RYKKEN:

18   Q     Okay.  So here is page 1.  And 2 is this 1500 form again?

19   A     Correct.

20   Q     And page 3 is description of services rendered?

21   A     Correct.

22   Q     Who is the patient?

23   A     The patient is Martha Bennett.

24   Q     Who is the provider?

25   A     The provider of services is M. Mirando.  Services were
```

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 340 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 78 of 295   Page ID #:782
#:782

78

1    rendered at Holter Labs, and it was billed by Holter Labs.

2    Q     Who is the referring physician?

3    A     The referring physician is Ronald Richmond.

4    Q     What is the date of service?

5    A     The date of service is 12/10/2012.

6    Q     And there are three billing codes there; is that right?

7    A     Correct.

8    Q     So we're going to do the same thing here.

9          The first code is 93226.

10         Can you see and read that on the description of services

11   rendered?

12   A     Yes.  So the 93226 is the microprocessor-based heart

13   analysis with corresponding report.

14         Patient wore a Holter monitoring device for over a 24-to

15   48-hour period.

16   Q     Okay.  And 95827?

17   A     95827 is the sleep study simultaneous recording of

18   ventilation respiratory effect, ECG, or heart rate and oxygen

19   saturation unattended by a technologist.

20   Q     95806, is that the same thing you just read?

21   A     Correct.

22   Q     And description of services rendered was submitted by

23   Holter Labs?

24   A     Yes, correct.

25   Q     Can you turn to Exhibit 35.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 341 of 786   Page ID
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 79 of 235   Page ID #:783
#:783

```
 1        Do you see that?

 2   A    Yes, I do.

 3   Q    What is it?

 4   A    This is an actual check that would have been made out to

 5   Holter Labs for payment of claims that have been processed by

 6   United Healthcare.

 7             MS. RYKKEN:  I will move to admit Exhibit 35.

 8             THE COURT:  It will be received.

 9             (Exhibit 35 received into evidence.)

10   BY MS. RYKKEN:

11   Q    How many pages are there?

12   A    There are three pages.

13   Q    Is each page a different check?

14   A    Yes.

15   Q    Let's take a look at page 1.

16        To whom is this check written?

17   A    This check is made out to Holter Labs, LLC.

18   Q    For what amount?

19   A    $353.94.

20   Q    And you said this was for services provided?

21   A    Yes.

22   Q    Page 2, please.  To whom was this check written?

23   A    This check was made out to Holter Labs, LLC.

24   Q    In what amount?

25   A    $534.60.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 342 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 80 of 235   Page ID #:720
#:784

80

```
 1   Q    This was for services rendered by Holter Labs?

 2   A    Correct.

 3   Q    Okay.  And then page 3, who is the payee?

 4   A    Again, this is made out to Holter Labs, LLC.

 5   Q    Okay.  And what amount?

 6   A    $723.53.

 7   Q    And this was for services rendered?

 8   A    Correct.

 9   Q    Can you turn to Exhibit 37?

10        Do you see that?

11   A    Yes, I do.

12   Q    What is this?

13   A    This is a listing of claims for Holter Labs for patient,

14   Martha Bennett.

15        It includes dates of service, a claim number, a diagnosis

16   description, CPT codes, and then the amounts paid, and the pay

17   date.

18   Q    Okay.  So is this a document from United?

19   A    Yes.

20        MS. RYKKEN:  Okay.  Move to admit Exhibit 37 into

21   evidence.

22        THE COURT:  It will be received.

23        (Exhibit 37 was received into evidence.)

24   BY MS. RYKKEN:

25   Q    So you will notice the version -- the binder is very
```

Case 2:23-cv-04496-PA   Document 1-5   Filed 06/05/23   Page 343 of 786   Page ID #:785
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 81 of 235   Page ID #:712

81

```
 1   different from the one on the screen because the column size

 2   had shrunk just a skosh.

 3        So what are the various dates of service on here?

 4   A    The various dates of service are 12/3/2012, 12/04/2012,

 5   12/06/2012, 12/10/2012.

 6   Q    And what is the provider's name for all of those different

 7   dates of service?

 8   A    Holter Labs, LLC.

 9   Q    What's the patient name?

10   A    Patient name is Martha Bennett.

11   Q    And where is that?  Is that on the far right?

12   A    Yes, it's on the far right.

13   Q    Okay.  Then there is a column entitled "CPT."

14        What is that?

15   A    That would be the CPT code that goes with the description

16   of the services rendered.

17   Q    And then the next column over?

18   A    That is the actual description --

19   Q    Okay.

20   A    -- of the services.

21   Q    So I'm not going to ask you to read every single one of

22   these.

23        But on 12/3, it appears there are 1, 2, 3, 4, 5, 6, 7, 8,

24   9, 10 claims made; is that correct?

25   A    There is ten items listed; however, with this particular
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 344 of 786   Page ID #:786
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 82 of 235   Page ID #:728

82

 1   claim, it was processed and then it was backed out of the

 2   system and then processed again.

 3        You can tell by the parentheses on the amount charged.

 4   Q    So how many claims were made on 12/3?

 5   A    There was one claim for three CPT codes.

 6   Q    Okay.  And the amount paid, then, it shows three amounts

 7   paid on 12/3?

 8   A    Correct.

 9   Q    And when were those paid?

10   A    Those were paid on 12/28/2012.

11   Q    And it was paid to Holter Labs?

12   A    Yes.

13   Q    Okay.  And then let's look at the next date for 12/4.

14   A    Uh-huh.

15   Q    How many claims are on 12/4?

16   A    Again, we have got one -- one claim with three CPT codes

17   -- excuse me, two CPT codes.

18   Q    Was it the same thing something was backed out, and then

19   re-done again?

20   A    Yes.

21   Q    So the amount paid on 12/4, which of the amounts -- is it

22   the ones in the parentheses or the one without the parentheses?

23   A    Without the parentheses.  So there was 213.30 and 321.30.

24   Q    Then on 12/6.  Do you see that?

25        How many claims were submitted?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 345 of 786   Page ID #:729
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 83 of 255   Page ID #:787

83

1    A    We have got one claim.

2    Q    There are two more lines below that, that says 12/6.

3         Do you see those?

4    A    Yes.

5    Q    So three for 12/6?

6    A    Correct.

7    Q    And were any of those paid?

8    A    It's not indicating a paid amount.  So, I don't know if

9    those were actually paid or not.

10   Q    Do you know why they weren't paid?

11   A    Not without seeing it in the actual claim system, no.

12   Q    Okay.  And then finally on 12/10 of 2012.

13        How many claims were there on that date?

14   A    Again, there was one claim with three CPT codes.

15   Q    Then the amounts paid again are the ones without the

16   parentheses?

17   A    Correct.

18   Q    And the amounts paid for 12/10 were 141.02, 195.53, and

19   198; is that correct?

20   A    It would be the 195.53 and the 198.  The 141.02 was backed

21   out.

22   Q    Okay.  So two claims paid -- for two codes?

23   A    Two codes paid, correct.

24   Q    We're going to move to John Hattrup next.

25        If you can look at Exhibit 44.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 346 of 786   Page ID
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 84 of 295   Page ID #:790
#:788

84

1       Do you see that?

2   A    Yes.

3   Q    What is it?

4   A    Again, this is the cover sheet that is placed when it is

5   received at the regional mail office.

6           THE COURT:  Slow down.

7   BY MS. RYKKEN:

8   Q    Who is the patient?

9   A    The patient is John Hattrup.

10  Q    Okay.  And who is the provider of services?

11  A    The provider of services is M. Mirando.

12       Services were rendered at Holter Labs, LLC, and it was

13  billed by Holter Labs, LLC.

14          MS. RYKKEN:  Government moves to admit Exhibit 44

15  into evidence.

16          THE COURT:  It will be received.

17       (Exhibit 44 received into evidence.)

18  BY MS. RYKKEN:

19  Q    So Exhibit 44 is on the screen.

20       This is the 1500 form that you were referring to.

21       Please highlight the patient.  The patient is John

22  Hattrup?

23  A    Yes.

24  Q    Can you highlight the provider that she mentioned?

25       Who submitted the claim?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 347 of 786   Page ID #:789
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 85 of 295   Page ID #:731

85

```
 1   A     The services were rendered by M. Mirando.  The services
 2   were rendered at Holter Labs and billed by Holter Labs, LLC.
 3   Q     Who is the referring physician?
 4   A     The referring physician on this one is Gregory Joy.
 5   Q     So I see three CPT codes in there; is that correct?
 6   A     Correct.
 7   Q     What is the date of service?
 8   A     Date of service is 4/11/2011.
 9   Q     Okay.  And this one is a little bit longer.
10         We have a cover page from a report, and then the order
11   form on the next page.
12         Do you see that?
13   A     Yes.
14   Q     And then finally on the last page is a description of
15   services rendered?
16   A     Yes.
17   Q     Okay.  So we -- our first code was 93226, which does not
18   appear on this list; is that right?
19   A     No, it does not.
20   Q     Okay.  The second one is 95827, and that is the sleep
21   study code; is that right?
22   A     That's correct.
23   Q     And then the third code submitted was 93799?
24   A     Correct.
25   Q     And that is for the ST analysis for treatment of
```

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 348 of 786   Page 12
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 86 of 235   Page ID #:732
#:790

86

```
 1   cardiovascular system; is that correct?

 2   A     Correct.

 3   Q     The description of services was submitted by Holter Labs?

 4   A     Correct.

 5   Q     So there were two other pages in here, the cover sheet, it

 6   looks like.

 7   A     Uh-huh.

 8   Q     And then the order form.

 9         Do you know why these were included?

10   A     Frequently when an unlisted code is billed by a provider,

11   such as in this case, the 93799, indicates it is an unlisted

12   code.

13         Frequently providers will include the medical records in

14   order to support the code.

15   Q     Okay.  And do you know if the system looked at this or did

16   anything with it?

17   A     Not without looking in the claim system.

18   Q     Can you turn to Exhibit 45, please.

19         What is that?

20   A     Again, this is the cover sheet that is placed on claims

21   when they are submitted to the regional mail office.

22   Q     For whom is this claim made?

23         What is the patient's name?

24   A     On page 3, it is John Hattrup.

25   Q     What is the date of service?
```

App. 0759

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 349 of 786    Page ID #:793
Case 2:16-cv-00215-PA    Document 87    Filed 07/20/17    Page 87 of 235    Page ID #:791

87

```
 1   A      Date of service is April 12th, 2011.

 2             MS. RYKKEN:  The government moves to admit

 3   Exhibit 45 in evidence.

 4             THE COURT:  It will be received.

 5        (Exhibit 45 received into evidence.)

 6   BY MS. RYKKEN:

 7   Q      So page 3, who is the provider?

 8   A      The provider is M. Mirando.  Services were rendered at

 9   Holter Labs, LLC, and billed by Holter Labs, LLC.

10   Q      Is the date of the claim April 12th, 2011?

11   A      Yes.

12   Q      How many CPT codes are on this claim?

13   A      There is one.

14   Q      What is that code?

15   A      That is 93271.

16   Q      And then we have description of services rendered?

17   A      Yes.

18   Q      Do you see that on there?

19   A      Yes.  It's the heart monitoring receipt of transmission

20   and analysis with corresponding report.

21   Q      Again, this was provided by Holter Labs?

22   A      Yes.

23   Q      Exhibit 46, please.

24        Do you recognize that?

25   A      Yes.  It's the cover sheet that is placed on claims when
```

App. 0760

UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 350 of 786   Page #2
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 88 of 295   Page ID #:794
#:792

88

```
 1    they are submitted to the regional mail office.

 2    Q     All right.  What is the patient's name?

 3    A     Patient name is John Hattrup.

 4    Q     And the provider?

 5    A     The provider is M. Mirando.  Services were rendered at

 6    Holter Labs and billed by Holter Labs.

 7              MS. RYKKEN:  Move to admit Exhibit 46 into evidence.

 8              THE COURT:  It will be received.

 9         (Exhibit 46 received into evidence.)

10    BY MS. RYKKEN:

11    Q     Okay.  This is the form 1500 on the screen that you were

12    just referring to?

13    A     Correct.

14    Q     And the provider is Holter Labs?

15    A     Correct.

16    Q     And M. Mirando is the signature?

17    A     Yes, correct.

18    Q     What's the date of service?

19    A     The date of service is April 15th, 2011.

20    Q     And do you see three different CPT codes?

21    A     Yes, I do.

22    Q     What are those?

23    A     Those are 93226, 85827, and 95921.

24    Q     I think you just said 8.  85827, did you mean 95827?

25    A     95827.
```

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 351 of 786   Page ID #:793
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 89 of 235   Page ID #:793

89

 1  Q    I'm going to check those again, the description of
 2  services rendered one more time.
 3       93226, is that the code for the 24-hour heart rate
 4  monitoring?
 5  A    Yes.
 6  Q    95827, is that the code for a sleep study?
 7  A    Yes.
 8  Q    95921, is that the HRV testing of an autonomic nervous
 9  system function?
10  A    Yes.
11  Q    And description of services rendered was submitted by
12  Holter Labs?
13  A    Yes.
14  Q    Exhibit 47.  Do you recognize that document?
15  A    Yes.  It's the cover page that is submitted to the -- it's
16  used by the regional mail office for claims by providers.
17  Q    Who is the patient?
18  A    The patient is John Hattrup.
19  Q    And who is the provider?
20  A    The provider is M. Mirando.  Holter Labs, LLC is where the
21  services were rendered, and it was billed by Holter Labs, LLC.
22            MS. RYKKEN:  Move to admit Exhibit 47 into evidence.
23            THE COURT:  It will be received.
24       (Exhibit 47 received into evidence.)
25  BY MS. RYKKEN:

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 352 of 786   Page ID #:794
Case 2:16-cv-00215-PA   Document 87   Filed 07/20/17   Page 90 of 235   Page ID #:730

90

 1   Q    Is this the form 1500 we were just referring to?

 2   A    Yes.

 3   Q    The patient is John Hattrup?

 4   A    Correct.

 5   Q    And the provider, down at the bottom, you mentioned is

 6   M. Mirando, Holter Labs?

 7   A    Correct.

 8   Q    And then let's look at the codes and the dates of service

 9   here.

10        So what is the date of service?

11   A    The date of service is April 18, 2011.

12   Q    How many codes are here?

13   A    There are three.

14   Q    What are those?

15   A    Those are 93226, 95827, 93025.

16   Q    Okay.  And let's check those one more time against

17   description of services rendered on the next page.

18        We have -- the first one was 93226.

19        Is that the 24- to 48-hour study?

20   A    Yes.

21   Q    Okay.  And 95827, that is the sleep study?

22   A    Yes.

23   Q    And 93025, is the Microvolt T-wave assessment; is that

24   correct?

25   A    Correct.

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 353 of 786   Page ID #:795
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 91 of 235   Page ID #:737

91

 1    Q      And the description of services rendered was submitted by

 2    Holter Labs?

 3    A      Yes.

 4    Q      Exhibit 48.  I believe this is the last one for John

 5    Hattrup.

 6    A      Okay.

 7    Q      What is that document?

 8    A      This is the cover page that is placed on claims when

 9    received by the regional mail office at United Healthcare.

10    Q      And the patient name?

11    A      Patient name is John Hattrup.

12            MS. RYKKEN:  Move to admit Exhibit 48 into evidence.

13            THE COURT:  It will be received.

14        (Exhibit 48 received into evidence.)

15    BY MS. RYKKEN:

16    Q      So form 1500 --

17    A      Correct.

18    Q      -- so the patient's name is John Hattrup.

19            Who is the provider?

20    A      The provider of service, again, is M. Mirando.  Services

21    were rendered at Holter Labs, LLC and billed by Holter Labs,

22    LLC.

23    Q      And then let's look the date of service and codes.

24            What is the date of service?

25    A      Date of service is April 21st, 2011, three CPT codes,

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 354 of 786   Page ID #:798
Case 2:16-cr-00213-PA   Document 87   Filed 07/20/17   Page 92 of 235   Page ID #:796

92

```
 1    93226, 95827, and 93025.

 2    Q    Okay.  Then on description of services rendered, which is

 3    the next page, code 93226 is the 24- to 48-hour Holter device

 4    test?

 5    A    Correct.

 6    Q    And 95827 is the sleep study test?

 7    A    Correct.

 8    Q    And 93025, is the Microvolt T-wave assessment?

 9    A    Correct.

10    Q    Can you look at Exhibit 49.

11         Do you recognize that?

12    A    This would be a check that would be issued to a provider

13    in payment of services rendered to patients.

14    Q    To whom is the check written?

15    A    Holter Labs, LLC.

16              MS. RYKKEN:  The government moves to admit

17    Exhibit 49.

18              THE COURT:  It will be received.

19         (Exhibit 49 received into evidence.)

20    BY MS. RYKKEN:

21    Q    So on page 1, this is a check to Holter Labs?

22    A    Correct.

23    Q    And what is the -- are we on page 1?

24         Okay.  What is the amount paid?

25    A    It's $3,231.50.
```

UNITED STATES DISTRICT COURT

93

```
 1    Q     And then on the second page?

 2    A     This is another check issued to Holter Labs, LLC.

 3    Q     In what amount?

 4    A     $1,626.75.

 5    Q     The third check, to whom was this paid?

 6    A     Holter Labs, LLC.

 7    Q     In what amount?

 8    A     $1,993.03.

 9    Q     And then the last page?

10    A     A check to Holter Labs for $4,416.

11    Q     Okay.  All of these checks were written by United?

12    A     Yes.

13    Q     Can you turn to Exhibit 50 -- I'm sorry, 51.

14          Do you see Exhibit 51?

15    A     Yes.

16    Q     What is that?

17    A     This is a listing of claims for John Hattrup that were

18    submitted by Holter Labs.

19    Q     Is this a United document?

20    A     Yes.

21          MS. RYKKEN:  The government moves to admit

22    Exhibit 51 into evidence.

23          THE COURT:  It will be received.

24    (Exhibit 51 received into evidence.)

25    BY MS. RYKKEN:
```

App. 0766                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 356 of 786   Page ID
Case 2:16-cv-00213-PA    Document 87    Filed 07/20/17   Page 94 of 235   Page ID #:740
#:798

94

1    Q    Why don't you tell me when you can read that.

2         Can you read that?

3    A    Yes.

4    Q    Okay.  So what is in the left-hand column?

5    A    The left-hand column would be the provider of services.

6    Q    Okay.  And who is the provider in this case?

7    A    Holter Labs, LLC.

8    Q    And what are the dates of service on this?

9    A    April 11th, 2011, April 12th, 2011, April 15th, 2011,

10   April 18th, 2011, and April 21st, 2011.

11   Q    That is five dates of service?

12   A    Correct.

13   Q    So for the first one for 4/11/2011, how many different

14   codes were reimbursed there?

15   A    Three codes.

16   Q    And so is that 325, three different times?

17   A    Yes.

18   Q    That was the amount paid to Holter Labs for April 11th,

19   2011?

20   A    Correct.

21   Q    Okay.  For April 12th, how many claims were paid on

22   April 12th?

23   A    There was one.

24   Q    One claim and one code?

25   A    Yes.  There was one code that was reimbursed.

App. 0767          **UNITED STATES DISTRICT COURT**

```
 1   Q    Okay.  What was that amount?

 2   A    $695.

 3   Q    And then let's look at April 15th, 2011.

 4   A    Yes.

 5   Q    Do you see that?

 6   A    Yes.

 7   Q    How many claims were submitted on that date?

 8   A    Three codes that were reimbursed.

 9   Q    What are those amounts?

10   A    $295, $400, and $225.

11   Q    On the 18th of -- April 18th, of 2011, how many claims

12   were submitted and how many codes?

13   A    There were three codes that were reimbursed.

14   Q    In what amounts?

15   A    $325, $300, and $325.

16   Q    And then the last date is April 21st, 2011?

17   A    Correct.

18   Q    How many claims and codes on that day?

19   A    There are three codes that were reimbursed.

20   Q    And in what amounts?

21   A    $325, $300, and $325.

22   Q    And all of these amounts were paid to Holter Labs?

23   A    Correct.

24   Q    For John Hattrup?

25   A    Correct.
```

App. 0768

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 358 of 786   Page ID #:742
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 96 of 285   Page ID #:800

96

```
 1              MS. RYKKEN:  Okay.  Can I just have a moment with my

 2   co-counsel?

 3              THE COURT:  Yes.

 4   BY MS. RYKKEN:

 5   Q    So we talked a lot about the CPT codes?

 6   A    Correct.

 7   Q    Does United rely on the CPT codes in its processing?

 8   A    Yes.

 9   Q    How come?

10   A    That gives a description of the services that are rendered

11   to patients.

12   Q    Is that a standard set of codes?

13   A    Yes.

14   Q    And do you rely on providers to submit accurate codes to

15   you?

16   A    Yes.

17   Q    Would you have paid if you had known that these were codes

18   for services that had not been provided?

19   A    No, we would not.

20   Q    Thank you.

21              MS. RYKKEN:  Nothing further at this point, Your

22   Honor.

23              MR. MCDERMOTT:  May I, sir?

24              THE COURT:  Yes.

25
```

App. 0769

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 359 of 786   Page ID #:43
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 97 of 285   Page ID #:9743
#:801

97

```
 1                        CROSS-EXAMINATION

 2   BY MR. MCDERMOTT:

 3   Q    Ma'am, how long have you been with the company?

 4   A    I have been United or Optum for little over 16 years.

 5   Q    16 years?

 6   A    Yes.

 7   Q    In your current position, how long have you been there?

 8   A    16 years.

 9   Q    You have been in the same job for 16 years?

10   A    Yes, sir.

11   Q    And you are here today to explain how United pays bills

12   and what was submitted to it, correct?

13   A    Correct.

14   Q    Does United offer an opportunity, for example, you just

15   talked about CPT codes.

16        How did you learn about CPT codes?

17   A    Through my experience with -- in the SIU and then actually

18   processing claims for a number of years, I became familiar with

19   them.

20   Q    Do you know whether or not your company actually offers

21   classes, online forms, anything like that to teach CPT codes?

22   A    No, not that I'm aware of.

23   Q    Okay.  If I wanted to start -- what is called an IDTF --

24   what does that stand for again?

25   A    I'm sorry, I'm not --
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 360 of 786   Page ID
Case 2:16-cv-00213-PA   Document 87   Filed 07/20/17   Page 98 of 235   Page ID #:744
#:802

98

```
 1   Q     Are you familiar with that term?

 2   A     IDTF, no.

 3   Q     Independent Diagnostic Technical Facility.

 4         Are you familiar with that at all?

 5   A     It sounds like it's an independent testing lab.

 6   Q     All right.  If I want to start a lab, and I want to start

 7   submitting bills to United --

 8   A     Yes.

 9   Q     -- do I have to go through an application process?

10   A     Not to my knowledge.

11   Q     So, I can just send out of the blue to you, apparently by

12   e-mail or fax, my billing for something that was done on a

13   patient authorized by a doctor; is that right?

14   A     I don't believe you can e-mail claims.

15   Q     Okay.

16   A     There is an electronic submission process, or a paper

17   process.

18   Q     Okay.  So is there anything that I have to go through with

19   your company to confirm that I'm a legitimate operator

20   providing services?

21   A     They do go through a process called provider

22   verification --

23   Q     Okay.

24   A     -- where there are staff members that verify such things

25   as tax identification numbers that a provider actually exists.
```

App. 0771                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 361 of 786   Page ID #:803
Case 2:18-cv-00213-PA   Document 87   Filed 07/20/19   Page 99 of 235   Page ID #:748

99

1   Q    All right.  And do they make any effort to confirm that

2   the services being provided actually fit a particular CPT code?

3   A    Yes, they could.

4   Q    All right.  So is that one way to weed out fraud, for

5   example?  I send in a report saying that I used a hammer on

6   somebody's knee, and I send you a code that has to do with

7   measuring heart.

8        Is there something in your system that prevents that kind

9   of fraud?

10  A    Usually not.  Usually most claims go right through the

11  system without being touched by human intervention.

12  Q    So, in essence, if I have someone teach me how to do CPT

13  codes, and I submit those to your insurance company, as long as

14  it looks normal -- looks like it's appropriate, it goes

15  through, true?

16  A    Generally, yes.

17  Q    Now, are you familiar at all with Holter devices?

18  A    A little bit.

19  Q    Now, in your position, are you required to learn something

20  a little bit about what a device or a procedure can do for a

21  patient?

22  A    In my position, no.

23       That is usually handled by our clinical investigators, and

24  so they are the experts on CPT coding and/or medical

25  terminology, anatomy, and physiology.

**UNITED STATES DISTRICT COURT**

1    I do have a background in that, so I am familiar with it,

2    so it does help my every-day job.

3    Q    So, that other group that does background work, they would

4    put you on notice if there was an issue about a provider?

5    A    Actually, providers may be identified by a number of

6    different means for possible billing practices.

7         It could be just a strict data analysis by the claims data

8    that he submits, and we would compare that data to other

9    providers, doing the same sorts of services.

10        They may be identified as being an outlier, so that may

11   cause somebody to be placed on review, or we could receive a

12   tip from a patient provider, the government -- a number of

13   different entities -- that would say, hey, this provider

14   appears to be doing X, and that may cause that provider to be

15   placed on review.

16   Q    All right.  Now, as to a provider wanting to start billing

17   through your system, I noticed on your claim forms that there

18   is entries for signatures on file.

19        That would be for the doctor, I would believe, true?

20   A    There is a couple of different places on a HIPPA 1500 that

21   could indicate signature on file.

22   Q    Okay.

23   A    Some of them could be for the patient, saying they are

24   authorizing the payment to go to the provider.

25   Q    Okay.

Case 2:23-cv-04493-PA Document 71 Filed 06/05/23 Page 363 of 786 Page ID #:805
Case 2:16-cr-00219-PA Document 87 Filed 07/20/17 Page 101 of 235 Page ID #:747

101

1    A    That is very frequently one of the instances when you

2    would have a signature on file.

3         And then as for the actual provider of services, down in

4    the lower left-hand corner of the HIPPA 1500 --

5    Q    Yes.

6    A    -- there can be either a typed electronic signature or a

7    signature on file indicating that this was the provider of

8    services.

9    Q    All right.  Now on the 1500 that you showed to the jury

10   here today --

11   A    Yes.

12   Q    -- you indicated in the bottom left-hand corner there was

13   a signature?

14   A    Correct.

15   Q    Apparently belonging to M. Mirando?

16   A    Correct.

17   Q    Now before you came into testify, is there a signature on

18   file with United that you compared those signatures to?

19   A    Not to my knowledge.

20   Q    So, when you say it's signed by M. Mirando --

21   A    Correct.

22   Q    -- you are assuming that that is the case because there is

23   nothing to compare at United?

24   A    Correct.  Plus a written signature is not required on a

25   HIPPA 1500.

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 364 of 786   Page ID
Case 2:16-cv-02138-PA   Document 87   Filed 07/20/17   Page 102 of 235   Page ID
#:806

102

```
 1   Q      It's not required?

 2   A      It's not required.

 3   Q      So the fact there is any marking there at all is an added

 4   bonus -- a plus, right?

 5   A      It could be.

 6   Q      Now, on those same forms, when it indicates CPT codes that

 7   Holter describes --

 8   A      Uh-huh.

 9   Q      -- does anyone in your facility actually take the time to

10   confirm whether those codes are appropriate for the particular

11   item?

12   A      There could be system edits in place for those particular

13   codes.

14   Q      Yes.

15   A      Again, as I said earlier, there are edits such as if we

16   would get a maternity claim from a male, that would hit a

17   system edit.

18          There are multiple system edits that are placed by United

19   Healthcare --

20   Q      Right.

21   A      -- in their system, to ensure some of that appropriate

22   coding.

23   Q      All right.  At any point in time, did any of the CPT codes

24   on the submissions made by Holter Labs, raise a red flag?

25   A      Not that I'm aware of.
```

App. 0775          **UNITED STATES DISTRICT COURT**

1    Q    Okay.  Now the government has put on display here charts

2    of payments, and it had CPT codes that you had a chance to take

3    a look at and compare with the billings.

4         I'm going to ask you to take a look at Exhibit No. 48, in

5    the book, would you please.

6         This is for Mr. Hattrup.

7    A    Yes.

8    Q    The last page is the descriptions of services rendered and

9    it's got the CPT code you went through, correct?

10   A    Correct.

11   Q    Now, it actually -- we have been asking the doctors here

12   -- and apparently there is something called 93025, Microvolt

13   T-wave Alternans for assessment of ventricular arrhythmias.

14        Do you see that entry?

15   A    Yes.

16   Q    To your knowledge, has anyone at United Healthcare gone

17   through that CPT code to decipher whether or not that entry

18   exists?

19   A    I don't know.

20   Q    To your knowledge, does that particular procedure exist?

21   A    I don't know, I would have to look it up.

22   Q    You were paying on that number -- on that code?

23   A    I believe it -- they were paid.

24   Q    Okay.  Because turn to the previous page, please.

25        Do you see at the bottom on 93025?

App. 0776

Case 2:23-cv-04198-PA   Document 1-5   Filed 06/05/23   Page 366 of 786   Page ID
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 104 of 235   Page ID #:750
#:808

104

1   A      Correct.

2   Q      That is a Microvolt T-wave Alternans for assessment of

3   ventricular arrhythmias, correct?

4   A      Correct.

5   Q      So your company paid on something that two doctors

6   previously sat in here and told us --

7           THE COURT:  Excuse me, counsel.  Let's go to

8   sidebar.

9                    (Sidebar begins.)

10          THE COURT:  What is this question?

11          MR. MCDERMOTT:  The one I was going to ask, sir?

12          THE COURT:  Uh-huh, before I interrupted you.

13          MR. MCDERMOTT:  I had two doctors come in and

14  testify they didn't know what that was.

15          THE COURT:  So your company paid something that two

16  doctors came in here and said they didn't know what it was.

17          MR. MCDERMOTT:  Exactly.  My next question is -- or

18  at least a followup to confirm that she is not aware of what

19  that is.

20          THE COURT:  I think she already said that.

21          MR. MCDERMOTT:  True.  I'm just trying to confirm

22  that point.

23          THE COURT:  Okay.  Do you have any objection to this

24  question?

25          MS. RYKKEN:  She doesn't know what the other doctors

**UNITED STATES DISTRICT COURT**

```
 1   testified to.
 2              THE COURT:  It sounds a little argumentative for me.
 3              MR. MCDERMOTT:  I will keep it down -- promise.
 4              THE COURT:  All right.
 5                     (Sidebar ends.)
 6   BY MR. MCDERMOTT:
 7   Q    On that same page, ma'am?
 8   A    Yes.
 9   Q    All right.  The government has also put up and highlighted
10   a payment or some kind of submission on their forms that has a
11   JS number in front of it.
12        Do you remember seeing that?
13   A    Not exactly on which check it was.
14   Q    All right.  I will ask you to go ahead and turn to Exhibit
15   No. 50 that you looked at with the government?
16   A    Uh-huh.
17   Q    That would be the compilation of Mr. Hattrup's billings, I
18   guess?
19   A    I don't think I looked at this page.
20              THE COURT:  I don't think so.
21              MR. MCDERMOTT:  All right.  Any objection?
22              MS. RYKKEN:  It's already been admitted into
23   evidence.
24              MR. MCDERMOTT:  That's what I thought, sir.
25              THE COURT:  Just one second.
```

App. 0778

**UNITED STATES DISTRICT COURT**

```
 1            MR. MCDERMOTT:  Sir, let me go and withdraw 50.  I
 2   will have her take a look at 51, please.
 3            THE COURT:  All right.
 4   BY MR. MCDERMOTT:
 5   Q    There are entries in here, for example, that begin with a
 6   J8.
 7        Do you see those entries, and they are billing for one
 8   cent?
 9   A    Yes, I do.
10   Q    Do you know what that pertains to?
11   A    I do not.
12   Q    Because I know they are putting it on their overhead sheet
13   as to the submissions, but I ask you to take a look at the form
14   1500 that you find on Exhibit 48 that you testified to, and
15   there is three codes that are being paid, correct?
16   A    Correct.
17   Q    Is there a code -- is there a JS being submitted or
18   offered in any way, shape, or form?
19   A    Not on that HIPPA 1500.
20   Q    All right.  At any point in time did you review any
21   document that identifies a J submission?
22   A    No, I did not.
23   Q    So do we even know that Holter actually offered that as
24   some kind of billing?
25   A    I would say they did not.
```

App. 0779            **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04408-PA Document 71-5 Filed 06/05/23 Page 369 of 786 Page ID
#:811
Case 2:16-cr-00218-PA Document 87 Filed 07/20/17 Page 107 of 235 Page ID #:753

107

```
 1   Q    Okay.  Because, I guess, my question is CPT codes -- do
 2   they always start with a 9?
 3   A    No, they do not.
 4   Q    Okay.  When it deals with heart, does it always start with
 5   a 9?
 6   A    Most of what I would consider the professional services,
 7   so things like EKGs monitoring would usually start with a 9.
 8        There are, like, cardiac -- other cardiac surgery codes
 9   that would start with a different number.
10   Q    All right.  Okay.  But I take it you -- because of your
11   background -- could you actually look at a code and figure out
12   what kind of area of medicine it falls into?
13   A    I would have an educated guess.
14   Q    All right.  And I would have you take a look again at
15   Exhibit No. 49, that the government had you take a look at.
16   These would be 1, 2, 3, 4 checks?
17   A    Correct.
18   Q    Payable to Holter, correct?
19   A    Correct.
20   Q    Was it your testimony that these checks pertained to
21   Mr. Hattrup?
22   A    These are checks that were issued.
23        Usually when checks get issued to providers, there is an
24   additional page, which would be known as a PRA or provider
25   remittance advice or EOB.
```

App. 0780              **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-FA Document 71-5 Filed 06/05/23 Page 370 of 786 Page ID
Case 2:16-cr-00219-FA Document 87-1 Filed 07/20/17 Page 108 of 295 Page ID #:754
#:812

108

 1      But I also believe that there is coding on this check that

 2   is listed right above the payment amount on the left-hand side

 3   that has a code that would correlate to that particular

 4   patient.

 5      It's not included in this.

 6   Q    So, for example, on No. 49 and this is USA No. 1448.

 7      Do you see that page?

 8   A    Yes.

 9   Q    And would that number you are talking about start with

10   19-2?

11   A    Correct.

12   Q    Turn the page.  What number starts on the next page, 18-1?

13   A    Yes.

14   Q    Would that tell me it's a different patient or different

15   claim?

16   A    It would tell you that it's a different claim.

17   Q    How about the third page?

18   A    Same thing.  It would tell you that it would be related to

19   a different claim.

20   Q    All right.  And the fourth page?

21   A    Again, related to a different claim.

22   Q    All right.  Now you see the amounts here we're talking --

23   it looks like 3,200, 1,600, almost 2,000 -- almost 4,400?

24   A    Correct.

25   Q    Now, I ask you to go ahead and take a look at No. 50.

**UNITED STATES DISTRICT COURT**

```
 1    This was not previously admitted.

 2         Have you seen this document before?

 3    A    No, I have not.

 4    Q    All right.  So this wasn't something that you were asked

 5    to prepare or review?

 6    A    No.

 7    Q    It indicates that it's claims filed with UHG?

 8              THE COURT:  Excuse me.  Is this document in

 9    evidence?

10              MR. MCDERMOTT:  I will try to lay the foundation, if

11    I may, sir, before we offer it.

12              THE COURT:  I don't think you can lay a foundation

13    with this witness.

14              MR. MCDERMOTT:  All right.  I will have you look

15    again at 51.

16         Do you see the amounts that were paid in 51?

17              THE WITNESS:  Yes, I do.

18    BY MR. MCDERMOTT:

19    Q    Do they add up to the amounts contained in the checks in

20    49?

21    A    They do not.

22    Q    Is it possible that these checks pertained to other

23    patients?

24    A    It's possible that it could include other patients.

25    Q    All right.  And in order to be completely accurate as to
```

App. 0782

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 372 of 786   Page ID #:814
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 110 of 235   Page ID #:756

110

 1    whether or not these checks apply to Mr. Hattrup, you would

 2    need to see additional documentation?

 3    A    Correct.

 4    Q    And those would have come with the checks because they

 5    would identify which patients were being paid for which

 6    services, true?

 7    A    Correct.

 8    Q    Today you haven't seen those?

 9    A    No, I have not.

10            MR. MCDERMOTT:  One moment, Your Honor, please.

11            THE COURT:  Uh-huh.

12            MR. MCDERMOTT:  Excuse me, sir.  One real quick

13    question, ma'am.

14    BY MR. MCDERMOTT:

15    Q    I believe if you could take a look at Exhibit 44.

16    A    Yes.

17    Q    Do you recognize that document as one you looked at today?

18    A    Yes, I do.

19    Q    And the cover sheet is something that is applied by United

20    Healthcare?

21    A    Correct.

22    Q    All right.  Then you talked about the 1500 -- this here

23    actually contains a report, or at least a partial page of

24    report, for Holter Labs, correct?

25    A    Correct.

App. 0783           **UNITED STATES DISTRICT COURT**

1   Q    Now at the bottom of this page it says one of -- what, 36?

2   A    Yes, it does.

3   Q    Okay.  When a submission takes place does the IDTF submit

4   the reports that it generates when it uses or makes an

5   application like this?

6   A    Not to my knowledge.

7              MS. RYKKEN:  Objection.  Foundation.

8              THE COURT:  Sustained.  Answer is stricken.  The

9   jury should disregard it.

10  BY MR. MCDERMOTT:

11  Q    All right.  As to the next page where it says the order

12  form, does that normally go in with a submission?

13             MS. RYKKEN:  Objection.  Foundation.

14             THE COURT:  Do you have additional questions?

15             MR. MCDERMOTT:  Just the foundation as to whether or

16  not this is a normal form that goes in with an application for

17  payment.

18             THE COURT:  Do you have any other questions?

19             MR. MCDERMOTT:  No.  That is the end of the story,

20  pretty much.

21             THE COURT:  Okay.  Let's go to sidebar.

22                    (Sidebar begins.)

23             THE COURT:  What's the objection?

24             MS. RYKKEN:  I withdraw the objection.  The last

25  question -- I shouldn't have said that.

App. 0784

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 374 of 786   Page ID #:816
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 112 of 235   Page ID #:758

112

```
 1              MR. MCDERMOTT:  It was your document.

 2              THE COURT:  All right.

 3                        (Sidebar ends.)

 4              THE COURT:  All right.  Would you like to have the

 5    question read back?

 6              MR. MCDERMOTT:  No, no.  I will just -- would you

 7    ma'am, this would be, again, we're in Exhibit No. 44.

 8              THE WITNESS:  Uh-huh.

 9    BY MR. MCDERMOTT:

10    Q    We're going to go three pages in.

11         This would appear to be some sort of report from Holter

12    Labs?

13    A    Yes.

14    Q    All right, ma'am.  In your experience, are reports

15    normally submitted with a request for payment?

16    A    If a provider bills with what is known as an unlisted

17    code, frequently they will attach that report because those

18    types of CPT codes would usually hit an edit in the claims

19    system to drop to a manual review.

20         On this form there is a 93799, which to me indicates it

21    would be an unlisted code.

22         Therefore, the report would usually be attached.

23    Q    All right.  And when this document says 1 of 36, would we

24    be missing 35 pages, then?

25    A    I can't answer that.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 71-5   Filed 06/05/23   Page 375 of 786   Page ID
Case 2:16-cv-02139-PA   Document 87   Filed 07/20/17   Page 113 of 255   Page ID #:759
#:817

113

```
 1  Q     All right.  But normally the entire report would be
 2  submitted?
 3  A     I believe so.
 4  Q     All right.  And again, that is to help your company
 5  understand kind of an unusual code being submitted?
 6  A     Correct.
 7  Q     All right.  And the following page, the order form, again,
 8  this comes from Holter Labs itself?
 9  A     Correct.
10  Q     Do you commonly see these types of order forms in request
11  for payment?
12  A     Only if there is usually an unlisted code bill.
13  Q     All right.  So it looks like, at least in this particular
14  situation, there was an application made for payment on a code
15  that might have struck your company as unusual or unique?
16  A     It might have dropped for review, yes.
17  Q     All right.  So at least it looks like there was an attempt
18  on this application, at least, to give your company a heads up
19  about the billing?
20  A     Yes.
21        MR. MCDERMOTT:  Thank you.
22  BY MR. MCDERMOTT:
23  Q     You have already explained for us, what kind of --
24        THE COURT:  Is there a question?
25        MR. MCDERMOTT:  Yes, sir.
```

App. 0786

Case 2:23-cv-04498-PA Document 71-5 Filed 06/05/23 Page 376 of 786 Page ID
Case 2:16-cv-02139-PA Document 87 Filed 07/20/17 Page 114 of 295 Page ID #:760
#:818

114

```
 1            THE COURT:  Let's get to the question.
 2   BY MR. MCDERMOTT:
 3   Q    You have already explained how your company looks for
 4   billings that are unusual or odd?
 5   A    Yes.
 6   Q    And you call them audits or edits?
 7   A    There could be an edit placed in the system for either
 8   providers that are identified as having possible fair billing
 9   practices, or there are also system edits that are in place
10   that will drop a claim to either a manual review or denial
11   because the codes don't match.
12   Q    As you sit here today, do you have an understanding as to
13   what the normal billing amount -- dollar amount is for a Holter
14   device usage?
15   A    The amount billed for a Holter device would vary from
16   location to location, because it's usually based on what they
17   call like fair health standards.
18        So, it could, you know, what people charge in California
19   would be different than what they charge in, for example,
20   Alabama.
21   Q    All right.  Okay.  Any of the edits or audits involved in
22   your company, is there an attempt to compare a submission by a
23   physician with the submission by an ITDF authorized by the
24   physician?
25   A    Not that I'm aware of.
```

App. 0787                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 71-5 Filed 06/05/23 Page 377 of 786 Page ID
#:819
Case 2:16-cv-02188-PA Document 87 Filed 07/20/17 Page 115 of 235 Page ID #:761

115

```
 1              MR. MCDERMOTT:  Thank you.  I have nothing further.

 2              THE COURT:  Any redirect?

 3

 4                      REDIRECT EXAMINATION

 5              MS. RYKKEN:  Very briefly.

 6    BY MS. RYKKEN:

 7    Q     You mentioned on direct, that United gets approximately 1

 8    million claims per day?

 9    A     Correct.

10    Q     And how many of those get flagged for review?

11    A     It would vary day by day.

12          There would be -- for my particular team in the SIU --

13    there might be 200 to 300 that get stopped for review and

14    medical records request go out.

15    Q     And that is approximately per day?

16    A     Approximately.  It would vary day by day depending what is

17    submitted by different providers.

18    Q     So how many claims a day does your team go through and

19    look at?

20    A     Approximately 200 to 300 a day.

21    Q     And how many people work there?

22    A     In our department there are approximately 60 people, but

23    that includes both what we call pre-pay reviews, which would be

24    reviews that go out -- or that are completed on claims that

25    have not been processed yet.
```

App. 0788

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-PA   Document 71-5   Filed 06/05/23   Page 378 of 786   Page ID
Case 2:16-cv-00219-PA   Document 87   Filed 07/20/17   Page 116 of 235   Page ID #:762
#:820

116

```
 1        And then we also have what we call a post-pay team.

 2        So if claims have already been processed, we also have

 3   teams that looked at claims that have already been processed.

 4             MS. RYKKEN:  Nothing else.  Thank you.

 5             MR. MCDERMOTT:  One, sir?

 6             THE COURT:  All right.

 7                         RECROSS-EXAMINATION

 8   BY MR. MCDERMOTT:

 9   Q    On how many occasions did your team highlight or edit

10   Holter Labs?

11   A    I don't know.

12             THE COURT:  All right.  You may step down.  Call

13   your next witness.

14             MR. FREEDMAN:  Your Honor, the government calls

15   Stacey Foster-Sixtos.

16             THE COURTROOM DEPUTY:  Please raise your right hand.

17                  (Oath was administered.)

18             THE WITNESS:  I do.

19             THE COURTROOM DEPUTY:  Please be seated.  Please

20   state your full name and spell your last name for the record.

21             THE WITNESS:  Stacey Ruth Sixtos, spelled

22   S-i-x-t-o-s.

23

24             ///

25             ///
```

App. 0789

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 379 of 786   Page ID
#:821
Case 2:16-cv-00218-PA   Document 87   Filed 07/20/17   Page 117 of 235   Page ID #:763

117

```
 1                    STACEY RUTH SIXTOS,

 2          having been duly sworn, testified as follows:

 3

 4          MR. FREEDMAN:  May I inquire, Your Honor?

 5          THE COURT:  Yes.

 6

 7                    DIRECT EXAMINATION

 8   BY MR. FREEDMAN:

 9   Q    Thank you.  Where do you live, Ms. Sixtos?

10   A    I live in Murrietta, California.

11   Q    What county is that?

12   A    Riverside.

13   Q    How long -- did you have a previous last name before

14   Sixtos?

15   A    Yes.  My maiden name is Foster.

16   Q    When did you change your name?

17   A    In late of 2012.

18   Q    Okay.  Do you have a general physician?

19   A    Yes.

20   Q    Who is your general physician?

21   A    Dr. Globus.

22   Q    How long have you gone to Dr. Globus?

23   A    I would say -- I would say ten -- nine, ten years, as long

24   as he's been in practice.

25   Q    Was he your doctor in 2011?
```

Case 2:23-cv-04188-PA Document 1-Filed 06/05/23 Page 380 of 786 Page ID #:822
Case 2:16-cv-00218-PA Document 87-1 Filed 07/20/17 Page 118 of 295 Page ID #:764

118

1   A      Yes.

2   Q      Do you recall seeing Dr. Globus in August of 2011?

3   A      Exact dates, no, but, yes.

4   Q      What was the purpose of the visit?

5   A      I was having a rapid heart beat.

6   Q      Did you mention those issues to Dr. Globus?

7   A      Yes.

8   Q      What did Dr. Globus do in response?

9   A      He ordered for me to wear a monitor to measure the heart

10  beats.

11  Q      Do you recall what that monitor was called?

12  A      No, I don't.

13  Q      Did Dr. Globus explain to you what the monitor did?

14  A      Yes.

15  Q      What did he tell you?

16  A      He explained to me that when I felt the issue or the item

17  that we were talking about, I would press a button, and it

18  would record my heart beat.  And then he would receive a

19  report, and we would discuss the results.

20  Q      Did he tell you if it was called a Holter device?

21  A      If he did, I don't remember.

22  Q      Did he tell you how long to wear the recorder?

23  A      I'm sure he did.  I don't remember exactly what that was.

24  I think it was one or two days.

25  Q      Do you remember how long you wore the recorder for?

App. 0791

Case 2:23-cv-04488-PA Document 71-5 Filed 06/05/23 Page 381 of 786 Page ID
Case 2:16-cv-02218-PA Document 87-1 Filed 07/20/17 Page 119 of 235 Page ID #:765
#:823

119

```
 1    A      I think it was one or two days.
 2    Q      Did Dr. Globus tell you anything about wearing the
 3    recorder for 30 days?
 4    A      No, no, no.
 5    Q      Do you recall anything about wearing the device for
 6    30 days?
 7    A      No.
 8    Q      Did Dr. Globus tell you anything about recording Microvolt
 9    T-waves?
10    A      I don't know what that is.
11    Q      Did he tell you anything about a night
12    electroencephalogram?
13    A      No, I don't know what that is.
14    Q      Did he tell you anything about brain scans?
15    A      No.
16    Q      Besides wearing the device, what part of the body was it
17    connected to?
18    A      It was -- there were pads attached to the heart, then I
19    wore it on my waist.  That was it.
20    Q      Did you wear --
21    A      It was just on my chest.
22    Q      Did you wear anything on your face?
23    A      No.
24    Q      Anything on your head?
25    A      No.
```

App. 0792

Case 2:23-cv-04489-PA  Document 1-5  Filed 06/05/23  Page 382 of 786  Page ID #:824
Case 2:16-cv-00219-PA  Document 87  Filed 07/20/17  Page 120 of 235  Page ID #:766

120

```
 1   Q     You didn't measure your breathing in any way?

 2   A     No.

 3   Q     Did you wear the device again -- do you recall, was the

 4   visit on August 10th?

 5   A     I don't know exactly the date.

 6   Q     Okay.  Did you wear it again after the first time you wore

 7   it?

 8   A     With Dr. Globus, no.

 9   Q     Was there another time when you wore a device?

10   A     Yes.  When I was pregnant with my twins, I wore a device.

11   Q     When was that?

12   A     In 2009.

13   Q     Was that prescribed by Dr. Globus?

14   A     No.  It was a completely different doctor.

15   Q     What kind of doctor prescribed it then?

16   A     The specialist for -- I was considered a high-risk

17   pregnancy for twins in my age.

18         I went to a specialist and they prescribed it.

19         She referred me to the cardiologist who initiated the

20   testing.

21   Q     How long did you wear it on that occasion?

22   A     Two weeks, I believe.

23   Q     Do you recall wearing a Holter devise prescribed by

24   Dr. Globus on August 18th, 2011?

25   A     Exactly, I don't know.
```

App. 0793                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 71-5 Filed 06/05/23 Page 383 of 786 Page ID #:825
Case 2:16-cv-02113-PA Document 87-1 Filed 07/20/17 Page 120 of 235 Page ID #:767

121

1    Q     What about August 24th, 2011?

2    A     No.

3    Q     I would like you to look at the larger binder that is in

4    front of you.

5    A     Uh-huh.

6    Q     Turn to tab exhibit, what is marked as Exhibit 77.

7    A     77.

8              MR. FREEDMAN:  Your Honor, this is one of the

9    pre-admitted summary charts.

10        May we publish it?

11             THE COURT:  Yes.

12             (Trial Exhibit 77 received into evidence.)

13             MR. FREEDMAN:  Thank you.

14   BY MR. FREEDMAN:

15   Q     Ms. Sixtos, this is a summary chart of claims.

16        Let me ask you, first, did you have health insurance at

17   the time that Dr. Globus had you wear the device?

18   A     Yes.

19   Q     Who was your health insurance provider?

20   A     It's either Aetna or Cigna, that is all I have ever had.

21   Q     This is the summary chart of claims that were submitted to

22   your insurer, and I would like to direct your attention to the

23   first section.

24   A     Okay.

25   Q     Do you see the date listed there?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 7-5 Filed 06/05/23 Page 384 of 786 Page ID #:826
Case 2:16-cv-02113-PA Document 87-1 Filed 07/20/17 Page 122 of 235 Page ID #:768

122

1    A    Yes.

2    Q    What is that date?

3    A    August 10th, of 2011.

4    Q    And it shows -- excuse me -- the variety of services here.

5    Do you see the first one?

6    A    Yes.

7    Q    What does that read?

8    A    ECG monitor/report 24 hours.

9    Q    Do you recall wearing an ECG monitor for 24 hours?

10   A    Yes.

11   Q    The second code, what does that read?

12   A    Cardiovascular provider.

13   Q    Do you recall having a cardiovascular procedure on

14   August 10th?

15   A    No.

16   Q    Do you recall having a cardiovascular procedure at any

17   time during August of 2011?

18   A    No.

19   Q    Did you ever have a cardiovascular procedure with

20   Dr. Globus at all?

21   A    No.

22   Q    The last code here, if you can read that, if you can

23   pronounce.

24   A    Night electroencephalogram.

25   Q    Did you have a night electroencephalogram on August 10?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA   Document 1-5   Filed 06/05/23   Page 385 of 786   Page ID #:827
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 123 of 255   Page ID #:769

123

```
 1    A      No.

 2    Q      Did Dr. Globus ever prescribe you a night

 3    electroencephalogram?

 4    A      I have never had one.

 5    Q      Let's look at the next day.

 6           MR. MCDERMOTT:  Judge, real quick, if we could have

 7    sidebar -- if we could?

 8           THE COURT:  All right.

 9           MR. MCDERMOTT:  It's okay, sir.

10      Thank you, I just needed to clarify what document we were

11    looking at.

12    BY MR. FREEDMAN:

13    Q      So let's look now at the next date, if you could read that

14    date.

15    A      August 11th of 2011.

16    Q      And besides the first date you saw Dr. Globus, did you see

17    him again in August of 2011?

18    A      Just to return the device.

19    Q      Did he order any other heart recording services?

20    A      No.

21    Q      Did he order an ECG monitoring and analysis?

22    A      I don't know.

23    Q      Did you have an ECG monitoring on August 11th, as far as

24    you recall?

25    A      I turned it back into him, so it would not have been.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 386 of 786   Page ID #:828
Case 2:16-cv-00219-PA   Document 87-1   Filed 07/20/17   Page 124 of 255   Page ID#:470

124

```
 1   Q    Let's look at the next date, please.

 2        Did you see Dr. Globus on August 18th?

 3   A    Not to my recollection.

 4   Q    Did you have -- can you read that first item there?

 5   A    ECG monitor report, 24 hours.

 6   Q    Did you wear the device again for 24 hours on August 18th?

 7   A    I did not.

 8   Q    Okay.  Did you have a night electroencephalogram?

 9   A    No, never.

10   Q    What about an autonomic nerve function test?

11   A    No.

12   Q    Did Dr. Globus ever prescribe that for you?

13   A    No.

14   Q    Do you want to look at the final date here?

15   A    August 24th, 2011.

16   Q    Did you see Dr. Globus on that date?

17   A    No.

18   Q    Did you wear a device on that date?

19   A    No.

20   Q    Did you have a Microvolt T-wave assessment on that date?

21   A    No.

22   Q    What about wearing it for 24 hours again?

23   A    No.

24   Q    What about a night electroencephalogram?

25   A    Again, never.
```

App. 0797

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 387 of 786 Page ID #:829
Case 2:16-cv-00219-PA Document 87 Filed 07/20/17 Page 129 of 235 Page ID #:471

125

1   Q    Did you ever receive a bill from a company called Holter

2   Labs?

3   A    Not to my knowledge.

4   Q    As far as you know, beyond the first item you testified

5   to, did you receive any of the services listed in this chart?

6   A    Not after the initial visit.

7            MR. FREEDMAN:  No further questions at this time,

8   Your Honor.

9            MR. MCDERMOTT:  Just couple, sir, if I may.

10

11                    CROSS-EXAMINATION

12            MR. MCDERMOTT:  Good morning.

13            THE WITNESS:  Good morning.

14  BY MR. MCDERMOTT:

15  Q    Ma'am, the questions you were asked regarding when service

16  was offered and received by you, have you had a chance to take

17  a look at your medical records or charts from that time frame?

18  A    No, because I changed companies, went back to that

19  company, so there are no records.

20  Q    Okay.  So when you are testifying here today, you are

21  testifying by memory?

22  A    And my calendar.

23  Q    Your calendar.

24  A    Right.

25  Q    Did you actually ever see a report that came back from

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA  Document 71-1  Filed 06/05/23  Page 388 of 786  Page ID #:830
Case 2:16-cv-02198-PA  Document 87  Filed 07/20/17  Page 126 of 235  Page ID #:772

126

```
 1   that Holter devise you wore?

 2   A    I believe Dr. Globus provided me with copy of everything,

 3   but I don't have it in hand or anything to that effect.

 4   Q    All right.  And in preparation of your testimony here

 5   today, were you given an opportunity to take a look at that

 6   report to see what functions were performed with that device?

 7            MS. RYKKEN:  Objection.  Foundation.

 8            THE COURT:  Sustained.

 9   BY MR. MCDERMOTT:

10   Q    Were you ever given an opportunity to see a report from

11   Holter Labs?

12   A    I don't know if I did, to be honest.

13   Q    Okay.  And a question that we have been asking, did you

14   receive any billing directly from Holter Labs?

15   A    Not to my knowledge.

16   Q    Did any agency bill collector or anything like that try to

17   collect on something that Holter Labs had done?

18   A    Not to my recollection.

19   Q    And does your company that you have at the time, do they

20   routinely send you things called "explanation of benefits"?

21   A    Yes, but they are online now.

22   Q    Okay.  All right.  Back then, it came in paper?

23   A    No.  I would have volunteered for online.

24   Q    Back in '11?

25   A    As soon as it would have been offered, I would have
```

App. 0799

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 71-5   Filed 06/05/23   Page 389 of 786   Page ID
#:831
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 127 of 235   Page ID #:713

127

 1   volunteered that.

 2        I mean, human resources, I don't need the paper, to be

 3   honest, and as soon as it was available, I denied it.

 4   Q    All right.  Did you ever see an explanation of benefits

 5   online relating to any other date than the date that you

 6   remember?

 7   A    I don't recollect.

 8             MR. MCDERMOTT:  Thank you.

 9             THE WITNESS:  You are welcome.

10             THE COURT:  Any redirect?

11             MR. FREEDMAN:  No, Your Honor.  Thank you.

12             THE COURT:  Thank you.  You may step down.

13             THE WITNESS:  Thank you, sir.  Do you want me to

14   close the book?

15             THE COURT:  That's fine, we will take care of it.

16        Call your next witness.

17             MR. FREEDMAN:  Your Honor, the government calls

18   Dr. Jeffrey Globus.

19             THE COURTROOM DEPUTY:  Please raise your right hand.

20                  (Oath was administered.)

21             THE WITNESS:  I do.

22

23                  JEFFREY JOHN GLOBUS, M.D,

24        having been duly sworn, testified as follows:

25

**UNITED STATES DISTRICT COURT**

```
 1                THE COURTROOM DEPUTY:  Please be seated.  Please
 2   state your full name and spell your last name for the record.
 3                THE WITNESS:  Jeffrey John Globus.  Last name,
 4   G-l-o-b-u-s.
 5                MR. FREEDMAN:  May I inquire, Your Honor?
 6                THE COURT:  Yes.
 7
 8                        DIRECT EXAMINATION
 9                BY MR. FREEDMAN:
10   Q    What is your profession?
11   A    A family practice physician.
12   Q    What does a family practice entail?
13   A    Visit with patients, generally, patients of all ages, and
14   potentially the idea is to mostly sort of see the whole family
15   so you can kind of care for the youngest children and the
16   oldest adults, and try to take care of their healthcare needs.
17   Q    Where do you work?
18   A    Mission Family Practice.
19   Q    What city is that in?
20   A    Mission Viejo, California.
21   Q    In what county?
22   A    Orange County.
23   Q    Is that your own practice?
24   A    Yes, sir.
25   Q    How long have you had your own practice?
```

App. 0801

Case 2:23-cv-04489-PA    Document 71-5    Filed 06/05/23    Page 391 of 786   Page ID
Case 2:16-cv-00219-PA    Document 87    Filed 07/20/17    Page 129 of 235    Page ID
#:833

129

```
 1    A      Two and a half years.

 2    Q      Did you work at a different practice before that?

 3    A      I used to work at OSO Family Medical Group.

 4    Q      From what time period to when?

 5    A      2009 until 2014.

 6    Q      And where is OSO?  Where is the OSO Group located?

 7    A      We're all in a single complex, so when I changed and

 8    started my own practice, we were about two doors away from OSO,

 9    just in the same medical complex there.

10    Q      When you worked at OSO, did you work with other doctors?

11    A      Yes, sir.

12    Q      Who were those other doctors?

13    A      Dr. Richmond, Ronald Richmond, and Dr. Greg Joy,

14    Dr. Stephanie Fightlin.

15    Q      Did you have a patient named Stacey Foster-Sixtos?

16    A      I still do, yes, sir.

17    Q      Do you -- did you have an appointment with Ms. Foster as

18    she was known in 2011?

19    A      Yes, sir.

20    Q      Do you recall anything about that appointment?

21    A      I believe she came in for palpitations, funny heart beats,

22    and we worked her up for that.

23           I think we ordered a Holter monitor.

24           I don't recall what other details we may have done without

25    notes.
```

App. 0802

Case 2:23-cv-04498-PA Document 71-1 Filed 06/05/23 Page 393 of 786 Page ID
Case 2:16-cv-02113-PA Document 87 Filed 07/20/17 Page 180 of 235 Page ID #:834

130

```
 1   Q    What is your understanding of a Holter monitor, as you are
 2   referring to it?
 3   A    We're looking at the electricity of the heart.  So, if
 4   people have palpitations, funny heart beats, you say, hey,
 5   could there be some problem with the electricity of the heart.
 6        Could people's hearts be going into funny rhythms, could
 7   they be at risk of clots, clots could form, if for example,
 8   they were in atrial fibrillation or problems like that.
 9   Q    What use of a Holter heart monitor do you make in your
10   practice as a family doctor?
11   A    I will generally use it as a screening tool.
12        I will usually order potentially like a 24-hour Holter
13   monitoring or I will get people into, like, a cardiologist.
14   Q    Did you ever order a Holter monitor longer than 24 hours?
15   A    No.
16   Q    Ever order it for 30 days?
17   A    Holter monitors can be done for 24 hours or as a 30-day
18   event recorder.
19        Generally, the time where I would have ever done the thing
20   myself, is usually just if I wanted it done as a 24-hour kind
21   of a quicker assessment.
22        The longer assessments, usually if people are having more
23   subtle difficulties, I would usually get them in with a
24   cardiologist.
25   Q    Did you ever prescribe a 30-day use for a patient?
```

App. 0803

Case 2:23-cv-04188-FA Document 1-Filed 06/05/23 Page 393 of 786 Page ID
Case 2:16-cv-00218-FA Document 87 Filed 07/20/17 Page 131 of 235 Page ID #:835

131

1    A     I don't believe so.

2    Q     Did you ever prescribe a 30-day use for Ms. Foster?

3    A     No, I don't believe so.

4    Q     How frequently would you say you prescribed Holter devises

5    for patients in the period of 2011?

6    A     In general, just as you use the word "prescribed,"

7    frequently what I will do is I will have a patient, I will say

8    okay, I want to get a 24-hour Holter monitor.

9          What I'm used to doing is sort of saying, okay, set up for

10   24-hour Holter monitor, but frequently people would go through

11   the cardiologist, but I would do that, I don't know, three or

12   four times a year.

13   Q     Okay.  Where did you get the Holter monitors that you had

14   patients wear?

15   A     In general, I think -- frequently -- what would happen

16   would be I would try and go through the cardiologist.

17         I think there was a company that the clinic had gotten

18   involved with, and so the clinic was using that company.

19         So I think during the period that Stacey had her Holter

20   monitor placed, I think the company that was being used told

21   the techs how to hook it up, so I think it was hooked up

22   through the clinic.

23   Q     When you say the techs, who do you mean?

24   A     Within the clinic there are physicians, and then we will

25   have medical assistants.  So the medical assistants are called

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA   Document 1-5   Filed 06/05/23   Page 394 of 786   Page ID
Case 2:16-cv-00219-PA   Document 87   Filed 07/20/17   Page 132 of 235   Page ID
#:836

132

```
 1    techs, also.
 2         But they are the people who help out with the jobs that
 3    need to get done.
 4    Q    When you prescribe Holter devices for patients -- well,
 5    let me ask you first.
 6         Do you recall the name of the company that provided you --
 7    your practice with the Holter devises?
 8    A    No, sir.
 9    Q    Did you ever prescribe a Holter device for a night
10    electroencephalogram?
11    A    No, sir.
12    Q    Do you know what a night electroencephalogram is?
13    A    An EEG is looking at brain waves, rather than at heart
14    issues.  I have never ordered an EEG.
15    Q    Did you ever order an EEG for Ms. Foster?
16    A    No, sir.
17    Q    Did you ever order a Holter devise to conduct a Microvolt
18    T-wave Alternans assessment?
19    A    No, sir.
20    Q    Do you know what a Microvolt T-wave Alternans assessment
21    is?
22    A    I'm sort of guessing, based on the description you have.
23              THE COURT:  Sir, don't guess.  If you know what that
24    is, fine.  If you don't, just say so.
25         We don't want you to guess.
```

App. 0805                  **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-FA Document 71-5 Filed 06/05/23 Page 395 of 786 Page ID
Case 2:16-cv-00219-FA Document 87-1 Filed 07/20/17 Page 133 of 255 Page ID #:779
#:837

133

```
 1              THE WITNESS:  No, sir.
 2   BY MR. FREEDMAN:
 3   Q    Did you ever order one of those for Ms. Foster?
 4   A    No, sir.
 5   Q    Did you pay for the Holter devices you had in your office?
 6   A    No, sir.
 7   Q    When you wanted to prescribe a Holter devise, did you fill
 8   out any paperwork to do so?
 9   A    I know that I did not.  I'm not sure if the medical
10   assistants, the techs, had to do something.
11   Q    And when you say techs, you mean people working in your
12   office?
13   A    Yes, sir.  I may have had to sign an order or something.
14   Q    Okay.  There is a binder to your left there.
15        Could you take a look at what has been tabbed as
16   Exhibit 72, please?
17        Do you see that document?
18   A    I think you are talking about the page --
19   Q    Following the yellow tab.
20   A    Yes, sir.
21   Q    What does that document appear to be?
22   A    It looks like it would be an order form for the -- just a
23   straight Holter.
24        It looks like there is a -- my name is typed into the
25   thing, but I don't see a signature.  It's circled with my name
```

App. 0806

Case 2:23-cv-04489-FA Document 1-5 Filed 06/05/23 Page 396 of 786 Page ID
Case 2:16-cr-00219-FA Document 87 Filed 07/20/17 Page 134 of 295 Page ID #:790
#:838

134

1   on there.

2          MR. FREEDMAN:  Your Honor, the government moves to

3   admit Exhibit 72.

4          THE COURT:  It will be received.

5      (Exhibit 72 received into evidence.)

6   BY MR. FREEDMAN:

7   Q    I would like to take a few parts of this chart.

8        If we can look at the top part first.

9        What information is filled out on this form?

10  A    Patient's name, Stacey Foster.  There is the city,

11  Foothill Ranch, insurance, Cigna, patient's ID.

12  Q    At the very top of the form?

13  A    Holter Lab.

14  Q    Does that have any significance to you?

15  A    It may have been the company that we ordered the Holter

16  through, but I wouldn't have paid much attention at the time.

17       Like, I would just, you know, I mostly wanted to get the

18  study done, so I wasn't too concerned about who was doing it.

19  Q    As far as you know, did anyone in your practice create

20  this order form?

21  A    I don't know.

22  Q    Let's look now in the middle section.

23       So in the section marked "diagnosis," is anything

24  indicated there?

25  A    Palpitations and tachycardia.

Case 2:23-cv-04498-PA  Document 71-1  Filed 06/05/23  Page 397 of 786  Page ID #:839
Case 2:16-cv-00219-PA  Document 87-1  Filed 07/20/17  Page 189 of 235  Page ID #:791

135

```
 1   Q    Is that consistent with the diagnosis you made of
 2   Ms. Foster when you saw her?
 3   A    Yes, sir.
 4   Q    And then in the next section, where it says Holter
 5   monitoring, is one of these boxes checked?
 6   A    24-hour study.
 7   Q    And there is -- what was the date of service?
 8   A    8/10/2011.
 9   Q    Then in the bottom section, is that your name circled
10   there?
11   A    Yes, sir.
12   Q    Did you circle your name?
13   A    I don't have a specific recollection, but I'm estimating
14   it would have been a tech that would do that.
15   Q    You didn't sign it?
16   A    No, sir.
17   Q    Was it common you might not sign these forms?
18   A    Yes, sir.
19   Q    Do you recall filling out any other Holter order forms for
20   Ms. Foster?
21   A    No, sir.
22   Q    Do you have any other records that you are aware of, of
23   order forms for Ms. Foster?
24   A    No, sir.
25   Q    Did you fill out an order form for August 18th?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    I don't recall.

 2   Q    Did you fill out an order form for August 24th?

 3   A    None that I recall.

 4   Q    And do you recall filling out -- ever filling out an order

 5   form where you checked a box for a night electroencephalogram?

 6   A    No.

 7   Q    How about for a Microvolt T-wave assessment?

 8   A    No, sir.

 9   Q    What about for a 30-day use of the device?

10   A    No, sir.

11   Q    Did you receive information back after the patient

12   Ms. Foster wore the device?

13   A    I don't recall.

14   Q    Do you recall making any analysis from what dealings were

15   made from her wearing the device?

16   A    I have an overall recollection that -- and some of it is

17   based on prior notes, that essentially the evaluation was a

18   negative one, and there was no significant need for further

19   assessment at that time, based on my notes.

20   Q    What information would you have gotten that would allow

21   you to make that evaluation?

22   A    Essentially, if I have a 24-hour Holter monitor, and we

23   don't see any evidence for more significant problems such as

24   atrial fibrillation or other heart beats that would be of

25   concern, then presumably my interest in the study goes away,
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04480-PA   Document 1-5   Filed 06/05/23   Page 399 of 786   Page ID
Case 2:16-cv-02113-PA   Document 87   Filed 07/20/17   Page 137 of 235   Page ID
#:841

137

1    and then she moves on.

2    Q    When you say -- when you look at the evidence, I'm asking

3    you what form is the evidence in?

4        Let me rephrase that.

5        After the patient wears the device, what does the patient

6    do with the device?

7    A    I believe she returns it to the clinic, and the clinic

8    keeps the device.

9    Q    Is the evidence contained in the device readable to you at

10   that moment in time?

11   A    No, sir.

12   Q    When is it readable to you?

13   A    I'm estimating what happens when they bring it back, but

14   the information on there, I believe, has to be downloaded in

15   some form, and then that gets turned into printouts that look

16   like an EKG, where you can say, okay, this is what happened and

17   so you can pick up events.

18   Q    Do you know who does that download process?

19   A    No, sir.

20   Q    I would like to turn your attention to what is marked as

21   Exhibit 70 in that binder in front of you.

22       If you could turn to that and take a quick look.

23            MR. MCDERMOTT:  I'm sorry, that was what?

24            MR. FREEDMAN:  70.

25   BY MR. FREEDMAN:

1   Q    Do you have an idea of what this document is?

2   A    It looks like it would be that next step.

3        So presumably, the patient returns the device, and then

4   that gets turned into something that I can look at and

5   interpret, and I think this is the document that would be

6   something I could look at and interpret.

7            MR. FREEDMAN:  Your Honor, the government moves to

8   admit Government 70.

9            THE COURT:  It will be received.

10       (Exhibit 70 received into evidence.)

11  BY MR. FREEDMAN:

12  Q    So looking at the top part of this document, does this

13  appear to be the report for Ms. Foster?

14  A    Yes, sir.

15  Q    And what is the date indicated there?

16  A    August 10th, 2011.

17  Q    Okay.  If we can look a little higher up.

18       Does this indicate to you who provided you the report?

19  A    Holter Labs, LLC.

20  Q    Okay.  Is there anything in this report, as you have

21  looked through it, that indicates to you evidence of a 30-day

22  use?

23       You have the full report in the binder.

24  A    No, sir.

25  Q    Anything in there that indicates to you that brain

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA Document 71-5 Filed 06/05/23 Page 401 of 786 Page ID #:843
Case 2:16-cv-02123-PA Document 87 Filed 07/20/17 Page 139 of 235 Page ID #:785

139

```
 1    information was obtained?
 2    A    No, sir.
 3    Q    Did you -- do you recall seeing any additional reports for
 4    Ms. Foster from other dates?
 5    A    No, sir.
 6    Q    From August 18th?
 7    A    No, sir.
 8    Q    From August 24th?
 9    A    No, sir.
10          MR. FREEDMAN:  No further questions, Your Honor.
11          THE COURT:  All right.
12          MR. MCDERMOTT:  Thank you.
13
14                    CROSS-EXAMINATION
15    BY MR. MCDERMOTT:
16    Q    Doctor, I'm going to have you leave that particular page
17    open.  That is Exhibit No. 70.
18          Can you describe for us and tell us what tachycardia is?
19    A    It's a rapid heart beat, generally over 100.
20    Q    And this was one of the diagnosis you uncovered or
21    experienced with Ms. Foster?
22    A    It's marked on the form.  I'm estimating that we would
23    have set it, but I would -- I don't have a lot of access to
24    records, so I don't have an independent recollection.
25    Q    That's right.  You are no longer with OSO, are you?
```

```
 1   A     No, sir.

 2   Q     You set up your own shop?

 3   A     Yes, sir.

 4   Q     Was there an issue as to billing at that location?

 5   A     None that I'm aware of.  I didn't work with the billing.

 6   Q     Okay.  All right.

 7         The -- in preparation of your testimony here today, were

 8   you able to take a look at your own physician notes as to your

 9   treatment of Ms. Foster?

10   A     The -- I don't believe I was able to look at the notes at

11   the time.

12         I do have notes, because I continue to see her, so I can

13   look at my more recent notes and estimate what happened at the

14   time.

15   Q     All right.  What I'm saying, I guess, then you don't have

16   your notes from 2011?

17   A     No, sir.

18   Q     And so, largely as to what you testified here today, you

19   are testifying largely from your memory?

20   A     Largely, but more from the notes that I have now going

21   back.

22   Q     Okay.

23   A     Essentially, as I changed practices, as best I could, I

24   took the notes that I had -- that I had at the time and turned

25   them into something I can use now.
```

App. 0813                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 71-5   Filed 06/05/23   Page 403 of 786   Page ID #:845
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 141 of 235   Page ID #:797

141

1   Q    Okay.  So when you set up your new practice in 2014 --

2   A    Yes, sir.

3   Q    -- you went back and thought about what happened in 2011

4   for Ms. Foster, and put it down on paper?

5   A    I had prior notes I was able to look at.  So I more or

6   less copied what I had.

7   Q    All right.  Did the government ask you for a copy of those

8   notes?

9   A    No, sir.

10  Q    As to Exhibit No. 72.  The report that was received back

11  from Holter Labs, it looks to being about 44 pages; is that

12  correct?

13  A    Yes, sir.

14  Q    All right.  And in this particular document, do you

15  recognize in that first page -- it's called comments, the

16  patient pressed the event button on the recorder two times.

17       Do you see that in the comment section?

18  A    Yes, sir.

19  Q    All right.  Now when you have a patient wear a Holter

20  devise, can you explain how it works and what it's supposed to

21  do?

22  A    It's generally not me.  It would be generally the medical

23  assistant, that tech would do that.

24  Q    So you don't have any specific recollection of talking to

25  Ms. Foster of using the Holter devise, correct?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 404 of 786   Page ID
#:846
Case 2:16-cv-00213-PA   Document 87-1   Filed 07/20/17   Page 142 of 235   Page ID #:798

142

1   A     I do recollect she came in, and she has having these

2   palpitations, and I said that we will get you a Holter monitor.

3   Q     Would you have taught her how to press the button on the

4   device in order to record an event?

5   A     No.  The medical tech would do that.

6   Q     So when you read this bottom line, what does that tell

7   you?

8   A     That the general idea is that we're looking for

9   palpitations, these funny heart beats.

10        So if she has palpitations, she has an episode, she pushes

11  the button, and it gives us the ability to look and say at the

12  time that she is feeling these funny heart beats, what is

13  happening on the EKG, and does this correspond to some

14  electrical irregularities that we can do something with.

15  Q     All right.  And did you have a chance to discuss that with

16  her afterwards?

17  A     I'm not quite sure what you are asking.

18        I would ask her to come back and tell her the results of

19  the Holter monitor.

20        In her case, it looked good.  We don't see any evidence

21  for higher level problems that I would be more concerned about.

22  Q     All right.  And would you turn to page 7 of 44 there?

23  A     Yes, sir.

24  Q     What does that page address?

25  A     I'm sorry?

App. 0815
**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-PA   Document 71-5   Filed 06/05/23   Page 405 of 786   Page ID
Case 2:16-cv-00219-PA   Document 87   Filed 07/20/17   Page 143 of 235   Page ID
#:847

143

```
 1   Q     The title at the top of the page, what is it recording?
 2   A     Sleep apnea.
 3   Q     Do you know -- obviously, you indicated for us that there
 4   was no request to have that done; is that true?
 5   A     Yes, sir.
 6   Q     Does this document of this page actually reflect that it
 7   might have been done?
 8   A     Yes, sir.
 9   Q     At any point in time, and I would take -- turn to page 12.
10         Do you recognize what this document is?
11   A     More EKG tracings.
12   Q     Yes.  Also on page 13 at the very top, indicating
13   tachycardia?
14   A     Yes, sir.
15   Q     Right.  The entire page -- how about the following page,
16   there is something called supraventricular ectopic?
17         Do you know what that is?
18   A     Yes, sir.
19   Q     What is that?
20   A     Generally, as we're looking for funny heart beats,
21   normally what happens is the atria give the electrical signals
22   that get the heart beating, and that gets transmitted to the
23   ventricles, so the atrias contract and ventricles contract.
24         So what can happen, is that sometimes you will get an
25   abnormality of signals, so that rather than the initial signal
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA Document 1-5 Filed 06/05/23 Page 406 of 786 Page ID #:848
Case 2:16-cv-00219-PA Document 87 Filed 07/20/17 Page 144 of 235 Page ID #:790

144

1    coming from the atria, sometimes you will be able to say, well,

2    it didn't really come from the atria, but it just came

3    somewhere supraventricular, somewhere above the ventricle.

4         So presumably the conduction got started somewhere other

5    than its usual spot.

6         But generally, we will see some of these kind of things

7    associated with episodes of palpitations.  But in and of

8    themselves, I don't usually worry about a supraventricular

9    beat.

10   Q    All right.  So the recordings you see in this particular

11   page, would have been something you would have been interested

12   in having done?

13   A    Overall, what should happen --

14        THE COURT:  Excuse me.  When you say these pages,

15   you are talking which page?

16        MR. MCDERMOTT:  You are right.  As to the one we

17   just talked about, the supraventricular ectopic.

18        Would that have been information you, as a physician,

19   would want to have regarding your analysis of Ms. Foster?

20        THE WITNESS:  The overall thought is if I order a

21   24-hour Holter monitor, we're looking for how many episodes are

22   there, of maybe a supraventricular ectopy, or there are other

23   types of ectopy, like what I call a ventricular tachycardia

24   atrial fibrillation.

25        So if you are on a 24-hour Holter monitor, if we had

1   12 beats of supraventricular ectopy, it would be included as

2   part of the report.

3   BY MR. MCDERMOTT:

4   Q    All right.  Do you recall whether any insurance company

5   contacted you regarding this report?

6   A    I believe the answer would be no.

7        I mean, I don't remember an insurance company contacting

8   me regarding a report.

9   Q    At any point in time, were you asked by an insurance

10  company to explain events that might have occurred later on, on

11  the 18th or the 21st, other than that date?

12       Did you ever have a contact that was reported in the

13  report, Number 70, the date on this would, again, be apparently

14  August 10th, 2011.

15       Did an insurance company ever come to you and ask you

16  whether or not you had a report prepared on the 18th to the

17  20th of August?

18  A    I don't believe -- as I have been practicing -- I don't

19  believe I have ever responded to, like -- I don't believe an

20  insurance company has ever come to me with any question.

21  Q    All right.

22  A    They may contact the office, and someone in the office may

23  talk to an insurance company, but I'm not usually in direct

24  contact with insurance companies.

25  Q    All right.  And when you have a patient use a Holter

App. 0818

```
1    device, how do you and your practice bill that event?

2         Is it when the report is returned and you sit down and

3    talk to the patient?

4         Is it when the patient comes in and puts it on?

5         How do you bill?

6    A    So, a couple things.

7         As I was with the practice with Drs. Richmond and Joy,

8    they had sort of set this up and the billing was handled by

9    them.

10        As I'm in practice myself, I usually get people in with a

11   cardiologist, and I more or less order -- I have good

12   relationships with the cardiologists, and so I can say, hey,

13   can you set this person up and do a 24-hour Holter.

14        So I don't get involved -- in both cases -- I have never

15   gotten involved with the billing, per se.

16   Q    All right.  So as to Ms. Foster back in 2011, when using

17   the Holter device, have you ever reviewed a bill that your

18   office submitted for the work that your office may have done on

19   that report?

20   A    No, sir.

21        MR. MCDERMOTT:  All right.  Thank you, sir.

22   I have nothing further.

23        MR. FREEDMAN:  No further questions, Your Honor.

24        THE COURT:  All right.  You may step down.  Thank

25   you.
```

App. 0819

Case 2:23-cv-04496-PA Document 1-5 Filed 06/05/23 Page 409 of 786 Page ID
Case 2:16-cv-02189-PA Document 87 Filed 07/20/17 Page 147 of 235 Page ID #:793
#:851

147

 1     All right.  Ladies and gentlemen, we're going to take our

 2  final break of the day.

 3     Again, I want to remind you until this trial is over, you

 4  are not to discuss this case with anyone, including your fellow

 5  jurors, members of your family, people involved in the trial or

 6  anyone else.

 7     And do not allow others to discuss the case with you.

 8  This includes discussing the case on the Internet, from e-mails

 9  or text messages.

10     If anyone tries to approach you and communicate with you

11  about this case, please let me know about it immediately.

12     Do not read, watch, or listen to any news reports or other

13  accounts about the trial or anyone associated with it.

14     Do not do any research such as consulting dictionaries,

15  searching the Internet or using other reference materials.

16     And do not make any investigation about the case on your

17  own.

18     If you need to speak with me, simply give a note to the

19  clerk.

20     We will come back at 11:50.

21          THE COURTROOM DEPUTY:  All rise.

22          (JURY EXITS THE COURTROOM AT 11:36 A.M.)

23          MR. FREEDMAN:  I think we're going to call

24  Ms. Solmor next, followed by her doctor.

25          THE COURT:  Okay, who is after the doctor?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 71-5    Filed 06/05/23    Page 410 of 786    Page ID #:852
Case 2:16-cr-00213-PA    Document 87    Filed 07/20/17    Page 148 of 295    Page ID #:794

148

```
1              MR. FREEDMAN:  Then we will do Ms. Russell and
2     Ms. Consiglio.
3              THE COURT:  How long do you expect to be with those
4     witnesses?
5              MR. FREEDMAN:  I think we're going to try to get
6     through them today.
7         I think we're going to be faster with each of them than we
8     have been with their counterparts.
9         So I would say with Ms. Solmor, 10 or 15 minutes, same
10    with Dr. Simpkins, and then maybe 15, 20 minutes with each of
11    the insurance representatives.
12             THE COURT:  Uh-huh.
13             MR. FREEDMAN:  If that does not work out roughly, I
14    can try to speed it up.
15             THE COURT:  No.  I'm trying to plan here.
16        Who is going to follow those people?
17             MR. FREEDMAN:  Then the government is going to call
18    Stanton Crowley.
19             THE COURT:  How long do you expect to be with him?
20             MR. FREEDMAN:  I would estimate one, one and a half
21    hours, maybe one to two hours.
22             THE COURT:  And then you are going to call who?
23             MR. FREEDMAN:  The case agent.
24             THE COURT:  How long do you expect with the agent?
25             MS. RYKKEN:  It would probably be an hour and a half
```

App. 0821

```
 1   to two hours.
 2            THE COURT:  So, when do you estimate that the
 3   government will finish its case?
 4            MR. FREEDMAN:  We're hoping to finish tomorrow.
 5            THE COURT:  Okay.  And do you plan to put on a case?
 6            MR. MCDERMOTT:  Not yet, sir.
 7            THE COURT:  Not yet?
 8            MR. MCDERMOTT:  It doesn't appear to be.
 9            THE COURT:  When will you know that?
10            MR. MCDERMOTT:  Well, I'm almost 100 percent certain
11   probably not.
12        It's just that I don't see any issue right now.
13            THE COURT:  So --
14            MR. MCDERMOTT:  We should very likely be finished
15   with evidence tomorrow.
16            THE COURT:  Okay.  Thank you.
17            MR. FREEDMAN:  Thank you, Your Honor.
18            THE COURTROOM DEPUTY:  This Court now stands in
19   recess.
20                        (Recess.)
21            THE COURTROOM DEPUTY:  All rise.  This United States
22   Court is now in session.
23        Please be seated.
24            THE COURT:  All right.  Let's bring the jury in.
25            MR. FREEDMAN:  Your Honor, would you like us to
```

App. 0822

Case 2:23-cv-04489-PA Document 71-5 Filed 06/05/23 Page 412 of 786 Page ID
Case 2:16-cr-00219-PA Document 87 Filed 07/20/17 Page 150 of 235 Page ID #:796
#:854

150

```
 1    bring in the next witness?

 2              THE COURT:  Please.

 3              THE COURTROOM DEPUTY:  All rise.

 4              (JURY ENTERS THE COURTROOM AT 12:00 P.M.)

 5              THE COURTROOM DEPUTY:  You may be seated.

 6              THE COURT:  Call your next witness.

 7              MR. FREEDMAN:  Your Honor, the government calls Lisa

 8    Solmor.

 9              THE COURTROOM DEPUTY:  Please raise your right hand.

10                   (Oath was administered.)

11              THE WITNESS:  Yes, I do.

12

13                        LISA MARY SOLMOR,

14         having been duly sworn, testified as follows:

15

16              THE COURTROOM DEPUTY:  Please be seated.

17         Please state your full name and spell your last name for

18    the record.

19              THE WITNESS:  Lisa Mary Solmor.  S-o-l-m-o-r.

20              MR. FREEDMAN:  May I inquire, Your Honor?

21              THE COURT:  Yes, please.

22

23                        DIRECT EXAMINATION

24    BY MR. FREEDMAN:

25    Q    Where do you live, Ms. Solmor?
```

```
 1   A     Thousand Oaks, California.

 2   Q     What county is that in?

 3   A     Ventura.

 4   Q     Do you have a general physician?

 5   A     Yes, I do.

 6   Q     Who is your general physician?

 7   A     Dr. Ruby Simpkins.

 8   Q     How long has Ruby Simpkins been your general physician?

 9   A     Between seven and eight years.

10   Q     Was she your physician in 2013?

11   A     Yes.

12   Q     Do you recall seeing her in May of 2013?

13   A     Yes.

14   Q     Do you recall when, in May, you saw her?

15   A     Not the exact date.

16   Q     What was the purpose of your visit?

17   A     Routine physical.

18   Q     Did you mention any issues related to your heart?

19   A     No.

20   Q     Did Dr. Simpkins mention any symptoms related to your

21   heart?

22   A     Yes.

23   Q     What did she mention?

24   A     Some irregular heart beats.

25   Q     Did she propose anything in response to that?
```

App. 0824                    **UNITED STATES DISTRICT COURT**

```
 1   A     Yes.

 2   Q     What did she propose?

 3   A     Asked me to wear a Holter monitor, a heart monitor.

 4   Q     Did she explain to you what a Holter monitor is?

 5   A     Yes.

 6   Q     What did she tell you about it?

 7   A     It just regulates -- regulates the measurements of my

 8   heart.

 9   Q     Did you wear the Holter monitor?

10   A     Yes.

11   Q     How long did you wear it for?

12   A     24 hours.

13   Q     Was that on the doctor's instructions?

14   A     Yes.

15   Q     Did she tell you to wear it for 24 hours?

16   A     Yes.

17   Q     Did the Holter device you wore, connect any other parts of

18   your body besides your chest?

19   A     No.

20   Q     Did it connect to your face?

21   A     No.

22   Q     Or to your head?

23   A     No.

24   Q     Did Dr. Simpkins tell you anything about wearing the

25   device for 30 days?
```

App. 0825

Case 2:23-cv-04498-PA   Document 71-5   Filed 06/05/23   Page 415 of 786   Page ID
Case 2:16-cv-00218-PA   Document 87   Filed 07/20/17   Page 153 of 255   Page ID
#:857

153

```
 1    A     No.

 2    Q     Did you wear it for 30 days?

 3    A     No, I did not.

 4    Q     Did she tell you anything about Microvolt T-waves?

 5    A     No.

 6    Q     Did she tell you anything about a night

 7   electroencephalogram?

 8    A     No.

 9    Q     Did she tell you anything about brain scans?

10    A     No.

11    Q     How do you remember how long you wore the device for?

12    A     How do I remember -- I'm sorry?

13    Q     Do you remember wearing it for 24 hours?

14    A     I remember wearing it for 24 hours, and it was the worse

15   24 hours of my life.

16    Q     What was so bad about the 24 hours?

17    A     It just freaked me out that I was wearing this device that

18   was going to tell me something was wrong with my heart.

19    Q     Do you remember wearing the device, again, after that

20   24 hours?

21    A     No.

22    Q     Did you wear it again?

23    A     No.

24    Q     Did you ever wear a Holter device again with anything

25   connected to your head?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 7-1 Filed 06/05/23 Page 416 of 786 Page ID #:858
Case 2:16-cv-00218-PA Document 87-1 Filed 07/20/17 Page 154 of 295 Page ID #:800

154

 1   A      No.

 2   Q      And anything connected to your face for breathing?

 3   A      No.

 4          MR. FREEDMAN:  If you could, Your Honor, I would

 5   like to show the witness what has been pre-admitted as

 6   Exhibit 62.

 7          THE COURT:  That's fine.

 8              (Exhibit 62 received into evidence.)

 9   BY MR. FREEDMAN:

10   Q      Did you have health insurance at the time you saw

11   Dr. Simpkins?

12   A      Yes.

13   Q      Who were you insured by?

14   A      Aetna.

15   Q      So what you have in your binder is Exhibit 62.  It's not

16   showing up.

17          So, I'm just going to ask you some questions about this.

18   Exhibit 62 is a summary chart?

19   A      In here?

20   Q      Yes, in the binder.

21          Do you have that in front of you?

22   A      Yes.

23   Q      There is a summary chart of claims that were submitted to

24   Aetna on your behalf.

25          So I would like to direct your attention to the first

Case 2:23-cv-04488-PA Document 71-1 Filed 06/05/23 Page 417 of 786 Page ID #:859
Case 2:16-cv-02188-PA Document 87-1 Filed 07/20/17 Page 188 of 235 Page ID #:801

155

```
 1   date.
 2         Could you read that date?
 3   A    5/29/13.
 4   Q    Is that when you saw Dr. Simpkins?
 5   A    It could be the initial date.  I don't recall for sure,
 6   but it was in May.
 7   Q    Then the first service that is listed there in the
 8   procedure code, could you read that?
 9   A    ECG monitor report up to 48 hours.
10   Q    Is that consistent with what you had an ECG monitor for
11   24 hours?
12   A    For 24 hours.
13   Q    The next item, if you could read that?
14   A    Cardiovascular procedure.
15   Q    Did you have a cardiovascular procedure?
16   A    No.
17   Q    Did you ever have a cardiovascular procedure with
18   Dr. Simpkins?
19   A    No.
20   Q    Did you have any other ones in May?
21   A    No.  I don't -- I don't even know what a cardiovascular
22   procedure is.
23   Q    The next item there, what is that, if you could read that
24   -- if you could pronounce that?
25   A    Night electroencephalogram.
```

App. 0828                  **UNITED STATES DISTRICT COURT**

```
 1   Q     Did you have a night electroencephalogram in May?
 2   A     No.
 3   Q     Did Dr. Simpkins ever prescribe a night
 4   electroencephalogram?
 5   A     No.
 6   Q     Did she ever prescribe anything to you having to do with
 7   brain waves?
 8   A     No.
 9   Q     Then if you look, there is another date listed, if you
10   could read that date?
11   A     Microvolt T-wave assessment.
12   Q     First, read the service date listed.
13   A     I'm sorry, 5/30/13.
14   Q     Now, did you have services on more than one date in May
15   of 2013?
16   A     Follow-up for when I wore the monitor.
17   Q     But you didn't wear the monitor on more than one occasion?
18   A     No.
19   Q     So then that first item next to 5/30/2013, what does that
20   read?
21   A     Microvolt T-wave assessment.
22   Q     Did you have a Microvolt T-wave assessment?
23   A     No.
24   Q     Then the next item there.
25   A     ECG monitoring and analysis.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04448-PA Document 71-5 Filed 06/05/23 Page 419 of 786 Page ID
Case 2:16-cv-02113-PA Document 87 Filed 07/20/17 Page 157 of 235 Page ID #:803
#:861

157

```
 1    Q    Did you have any more ECG monitoring after the first

 2    occasion?

 3    A    No.

 4    Q    Did you ever get a bill from a company called Holter Labs?

 5    A    Not to my recollection.

 6    Q    So besides this first item on this chart, did you receive

 7    any of these other services?

 8    A    No.

 9              MR. FREEDMAN:  No further questions.

10              THE COURT:  Mr. McDermott?

11              MR. MCDERMOTT:  Briefly, sir.

12

13                   CROSS-EXAMINATION

14    BY MR. MCDERMOTT:

15    Q    Ms. Solmor, did you happen to wear the device just during

16    the day or was it overnight?

17    A    It was for 24 hours overnight.

18    Q    So put it on the 29th, and took it off on the 30th?

19    A    If that is it, yes.

20    Q    Does that sound about right?

21    A    Yes.

22    Q    So the device was actually working both on the 29th and

23    the 30th?

24    A    Yes.

25    Q    Did your doctor, I believe, it's Ruby Simpkins -- is that
```

App. 0830                    **UNITED STATES DISTRICT COURT**

```
 1   her name?

 2   A     Yes.

 3   Q     Did she ever sit down and show you a lab report from

 4   Holter Labs regarding what the device recorded?

 5   A     I don't recall.

 6   Q     All right.  And I recognize, as you sit here today, it's

 7   been four years since you wore that device?

 8   A     Yes.

 9   Q     It's a very unusual device, so you certainly remember

10   having it on your body?

11   A     Yes.

12   Q     Can you tell the jury where you had it attached on your

13   body?

14   A     The suction cups were on my upper chest, and then had a

15   strap, and I just swore it over my shoulder.

16   Q     Okay.  So it was like a shoulder strap?

17   A     It was a black shoulder strap, yes.

18   Q     Where was the device itself sitting on -- on the shoulder

19   on the strap someplace?

20   A     On my hip.

21   Q     On your hip?

22   A     Attached to the strap.

23   Q     You were instructed that once the cycle was done, you had

24   to bring your machine back to the doctor's office?

25   A     I didn't take the machine off.  I returned it so they can
```

App. 0831

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 421 of 786 Page ID #:863
Case 2:16-cv-00218-PA Document 87 Filed 07/20/17 Page 159 of 235 Page ID #:863

159

```
 1    take it off in the office.

 2    Q    Okay.  Then maybe was it the doctor or the nurse that took

 3    care of that?

 4    A    The nurse probably removed it.  She didn't do that.

 5    Q    Maybe I might need to be a little more specific about my

 6    question for you.

 7         Did Dr. Simpkins' assistant or nurse explain any of the

 8    reports to you?

 9    A    No.  The nurse would have not explained any reports to me.

10    Q    All right.

11              MR. MCDERMOTT:  Thank you.

12              THE COURT:  Anything else?

13              MR. FREEDMAN:  No, Your Honor.

14              THE COURT:  All right.  You may step down.

15         Thank you.  Call your next witness.

16              MR. FREEDMAN:  Your Honor, the government calls

17    Dr. Ruby Simpkins.

18              THE COURTROOM DEPUTY:  Please stand before me raise

19    your right hand.

20                   (Oath was administered.)

21              THE WITNESS:  I do.

22

23                   RUBY SIMPKINS, M.D.,

24         having been duly sworn, testified as follows:

25
```

App. 0832

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 422 of 786   Page ID #864
Case 2:16-cv-00219-PA   Document 87   Filed 07/20/17   Page 160 of 235   Page ID #:806

160

```
 1                    THE COURTROOM DEPUTY:  Please be seated.  Please
 2    state your full name, and spell your last name for the record.
 3                    THE WITNESS:  Ruby Simpkins.  S-i-m-p-k-i-n-s.
 4                    MR. FREEDMAN:  May I inquire, Your Honor?
 5                    THE COURT:  Yes.
 6
 7                         DIRECT EXAMINATION
 8    BY MR. FREEDMAN:
 9    Q    What is your profession?
10    A    I'm a physician.
11    Q    What kind of physician are you?
12    A    Internist.
13    Q    What does that mean?
14    A    Adult medical doctor.
15    Q    How long have you been an internist?
16    A    I graduated medical school in 1973, finished my training
17    in New York in '76.
18    Q    Where do you work?
19    A    I have a private office in Agoura Hills, California.
20    Q    What county is that in?
21    A    Los Angeles.
22    Q    Did you have a patient named Lisa Solmor?
23    A    Yes.
24    Q    Do you still have Lisa Solmor as a patient?
25    A    Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    How long has Lisa Solmor been your patient?

 2   A    I don't know.  At least three years, but I'm not sure.

 3   Q    So was she your patient in 2013?

 4   A    Yes.

 5   Q    Do you recall having an appointment with her in May

 6   of 2013?

 7   A    My records indicate that.

 8   Q    And you reviewed those records in connection with this

 9   case?

10   A    Yes.

11   Q    Do you recall anything about that appointment in May

12   of 2013?

13   A    In general, it was a general physical examination at the

14   time, and I did a physical and lab tests.

15        Electrocardiogram is a part of that evaluation.  It showed

16   multiple irregularities in the heart rhythm, which were quite

17   disturbing.

18        I ordered a 24-hour Holter monitor to further evaluate.

19   Q    Could you look at the binder in front of you, the bigger

20   one that has been tabbed Exhibit 55.

21        Do you recognize this document?

22        What is it?  I'm sorry, take your time.

23   A    I'm sorry, I didn't hear.

24   Q    Do you recognize this document that has been marked

25   Exhibit 55?
```

App. 0834

Case 2:23-cv-04496-PA   Document 71-5   Filed 06/05/23   Page 424 of 786   Page ID
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 162 of 235   Page ID #:808
#:866

162

```
 1    A     Yes.

 2    Q     What does it appear to be?

 3    A     It's a copy of the history and physical examination done

 4    May 28th, 2013, on Lisa Solmor.

 5          MR. FREEDMAN:  Your Honor, the government moves to

 6    admit Exhibit 55.

 7          THE COURT:  It will be received.

 8          (Exhibit 55 received into evidence.)

 9          MR. FREEDMAN:  Thank you, Your Honor.

10    BY MR. FREEDMAN:

11    Q     Looking at this record, does this record have any

12    information about the heart issue you were just mentioning?

13    A     There is a lot blacked out.

14    Q     The parts of it have been blacked out for personal

15    information.

16    A     The ECG is here.

17    Q     Okay.  Is there anything in the -- anything in here about

18    ordering a Holter device?

19    A     No.

20    Q     Okay.  But you recall ordering a Holter device?

21    A     Yes.  I did because the rhythm was quite disturbing.

22    Q     What do you typically use a Holter device for?

23    A     I use it to monitor the cardiac rhythm for a 24-hour

24    period in patients who are either symptomatic with syncope, or

25    dizzy episodes or those that I detect an irregularity on the
```

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 425 of 786   Page ID
Case 2:16-cv-00219-PA   Document 87-1   Filed 07/20/17   Page 163 of 235   Page ID
#:867

163

```
 1   EKG, and I need further clarification.
 2   Q    How frequently would you say you prescribe Holter devices
 3   for your patients?
 4   A    Not very often.
 5   Q    Approximately how many times?
 6   A    I don't know if I had done any in the past year.  I can't
 7   recall.
 8   Q    And in 2013?
 9   A    It was probably doing more, but I can't recall.
10   Q    Around ten maybe a year?
11   A    It's possible.
12   Q    Did you ever prescribe a Holter device for a 30-day period
13   of time?
14   A    I don't recall ever doing that.
15   Q    Did you ever prescribe a Holter device to Ms. Solmor more
16   for 30 days?
17   A    No.
18   Q    Did you ever prescribe for Ms. Solmor to wear the Holter
19   device on more than one occasion?
20   A    No.
21   Q    Did you ever prescribe a patient to wear the Holter device
22   for a night electroencephalogram?
23   A    No.
24   Q    Do you know what a night electroencephalogram is?
25   A    Yes.
```

App. 0836                 **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04408-PA Document 1-5 Filed 06/05/23 Page 426 of 786 Page ID
Case 2:16-cr-00218-PA Document 87 Filed 07/20/17 Page 164 of 295 Page ID #:810
#:868

164

```
1    Q    What is it?

2    A    It's basically a test that is done in patients -- I order

3    for sleep studies.

4              THE COURT:  Just one moment, please.

5         We're having small technical problems.  We will be taking

6    care of them in a couple of minutes.

7              All right.  I think the mics are back on now.

8              MR. FREEDMAN:  Thank you, Your Honor.

9    BY MR. FREEDMAN:

10   Q    I believe you were telling me what a night

11   electroencephalogram is?

12   A    Yes.  An EEG records the brain wave activity in patients.

13   Q    Did you ever prescribe a Holter device to do a night EEG?

14   A    No.

15   Q    Why not?

16   A    When I order an EEG, I order it through the neurologist.

17   I don't order it with a Holter monitor.

18   Q    Do you know how a neurologist does an EEG?

19   A    Well, he places various leads over the head and records

20   the various parameters as the patients are sleeping.

21   Q    Is that through a Holter monitor or different kind of

22   device?

23   A    I always thought it was through a different kind of

24   device.

25   Q    Did you ever prescribe the use of a Holter device for a
```

**UNITED STATES DISTRICT COURT**

```
 1   Microvolt T-wave Alternans?

 2   A     No.

 3   Q     Do you know what a Microvolt T-wave Alternans is?

 4   A     No.  I know what a T-wave is.

 5   Q     What is a T-wave?

 6   A     Well, a T-wave is a wave that is on the electrocardiogram

 7   that represents repolarization of heart.

 8   Q     Where did you get the Holter devices that you had patients

 9   wear?

10   A     I obtained them from a Holter monitor company.  Holter

11   Labs, I think, it was called.

12   Q     Did you pay for the devices?

13   A     No.

14   Q     How did you come to have the devices done?

15   A     I think the doctor who was there before me had used the

16   device, so they were available for 24-hour Holter monitoring.

17   Q     When you wanted to prescribe a Holter device, did you fill

18   out any paperwork?

19   A     Yes.

20   Q     What kind of paperwork did you fill out?

21   A     Well the nurses filled it out.

22         I had the patient's demographic information, the

23   indication for the test basically, and the codes.

24   Q     Could you take a look at what has been marked as

25   Exhibit 58.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04188-PA   Document 71-5   Filed 06/05/23   Page 428 of 786   Page ID
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 166 of 295   Page ID
#:870

166

```
 1          Do you recognize this document?

 2     A    Yes.

 3     Q    What is in?

 4     A    It's a Holter device order form.

 5     Q    Is this the form you filled out for Ms. Solmor?

 6     A    Yes.

 7               MR. FREEDMAN:  Your Honor, the government moves to

 8     admit Exhibit 58.

 9               THE COURT:  It will be received.

10          (Exhibit 58 received into evidence.)

11     BY MR. FREEDMAN:

12     Q    Okay.  Let's take a look at this document.  If we could

13     look at the first third of the document, please?

14          So, this is your patient, Lisa Solmor.

15     A    Yes.  She's my patient.

16     Q    Did you fill out this form?

17     A    No.

18     Q    Okay.  Who filled out the form?

19     A    My medical assistant.

20     Q    Okay.  And let's look at the very top of the document, if

21     we could.

22          Who provided this form -- well, did your office create

23     this form?

24     A    I think the form is provided by the Holter Labs.

25     Q    And here Holter Labs is the company that you got the
```

```
 1    devices from?

 2    A    Yes.

 3    Q    Okay.  Did you send this form back to Holter Labs after it

 4    was filled out?

 5    A    Yes.  It's sent with a tape -- a recording of the

 6    monitoring over the 24-hour period.

 7    Q    Okay.  Let's look at the mid-part here.

 8         So, in the diagnosis section, what indications did you

 9    make there?

10    A    Cardiac dysrhythmia and abnormal EKG.

11    Q    What are those diagnoses roughly?

12    A    The abnormal EKG simply means that there was something

13    other than the normal pattern on the EKG.

14         Cardiac dysrhythmia means there was irregularity of the

15    heart rhythm at the time.

16    Q    So this is an indication of why you were prescribing the

17    device?

18    A    Yes.

19    Q    And then in the Holter monitoring section, what

20    information was provided there?

21    A    The date of service.  The hook-up time, the 24-hour study

22    was requested.

23    Q    And then if we could look at the bottom physician

24    information.

25         Is that your signature?
```

App. 0840

```
 1   A     Yes, it is.

 2   Q     Okay.  Do you recall filling out one of these order forms

 3   for Ms. Solmor on more than one occasion?

 4   A     No.

 5   Q     Do you recall filling one out for May 30th of 2013?

 6   A     No.

 7   Q     How did you receive the information from the device after

 8   your patient wore it?

 9   A     I think this was faxed back to me.

10         It may have been mailed, but I think it may have been

11   faxed back, I'm not quite sure.

12   Q     Do you know who sent it back?

13   A     Who sent it back?

14   Q     Who gave you the report?

15   A     Well, the report is placed on my desk by the medical

16   assistant.

17   Q     Is the report generated within your office?

18   A     No.

19   Q     Do you know where the report is generated?

20   A     No.  Through Holter Labs.

21   Q     Could you take a look at what has been marked in that

22   binder as Exhibit 56, please?

23         Do you recognize this document?

24   A     Yes.

25   Q     What is it?
```

App. 0841

Case 2:23-cv-04489-PA   Document 71-5   Filed 06/05/23   Page 431 of 786   Page ID
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 169 of 235   Page ID #:815
#:873

169

```
 1   A    It's a Holter Lab monitor report.

 2            MR. FREEDMAN:  Your Honor, the government moves to

 3   admit Government 56.

 4            THE COURT:  It may be received.

 5        (Exhibit 56 received into evidence.)

 6   BY MR. FREEDMAN:

 7   Q    So looking at the top half of this document, is this the

 8   report you received for Ms. Solmor?

 9   A    Yes.

10   Q    Does it indicate on here the date of the service that was

11   provided?

12   A    May 28th.

13   Q    Okay.  Did you receive any additional reports from Holter

14   Labs from Ms. Solmor?

15   A    I don't recall receiving any additional reports.

16   Q    Do you recall receiving a report from May 30th?

17   A    No.

18            MR. FREEDMAN:  No further questions, Your Honor.

19            THE COURT:  Thank you.

20        Cross-examination?

21            MR. MCDERMOTT:  Thank you, sir.

22

23                      CROSS-EXAMINATION

24   BY MR. MCDERMOTT:

25   Q    Ma'am, would you stay on the report there, Exhibit 56,
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 71-1    Filed 06/05/23    Page 432 of 786    Page ID
#:874
Case 2:16-cv-00219-PA    Document 87    Filed 07/20/17    Page 170 of 235    Page ID #:816

170

```
 1   please.

 2        Do you recall receiving this report?

 3   A    No.  I don't recall receiving it.

 4   Q    Do you recall discussing it with your patient?

 5   A    Yes.

 6   Q    And is there -- there would appear to be 21 pages

 7   altogether in this report?

 8   A    It's 21 pages, but what I discussed with the patient was

 9   initially on the first page.

10   Q    Okay.  Under the heart rate, do you notice any issues with

11   what was revealed under the heart rate?

12   A    The ventricular ectopy was what caught my eye.  There was

13   a lot of abnormality.

14        There were several runs of ventricular tachycardia, three

15   in a row.

16        That is an urgent matter that needs follow-up.  So I

17   advised the patient to see the cardiologist for further

18   work-up.

19   Q    How about under heart rate, that particular paragraph,

20   that segment of the report?  Highest rate, lowest, longest, did

21   that cause you any concern?

22   A    Well, this is -- no, this is obviously an error.

23   Q    Right.

24   A    The maximum heart rate is there, the minimum heart rate is

25   there.
```

App. 0843

Case 2:23-cv-04408-FA   Document 71-5   Filed 06/05/23   Page 433 of 786   PageID
Case 2:16-cr-00218-FA   Document 87   Filed 07/20/17   Page 171 of 235   Page ID #:817
#:875

171

1   Q    Right.  But we're missing something in this report, aren't

2   we?

3   A    You are missing something, but the reason I ordered the

4   report, I see the results, and that's what I acted on,

5   basically.

6   Q    Okay.  And also, did you review the rest of the report for

7   its contents as to what the report was offering to you?

8   A    I looked at some of the complexes.  I confirmed that there

9   were multiple complexes, there were three in a row.

10        As I said, this was a matter that concerned me.  It was

11  urgent, so I wanted further evaluation and follow-up with a

12  cardiologist.

13  Q    Okay.  Why don't you turn to page 12 of that report.

14        What does the report reflect?

15  A    It says sleep apnea.

16  Q    Does it appear to be a report that identifies testing that

17  took place with your patient?

18  A    It does, but I don't recall seeing this.

19  Q    Okay.  Any doubt or question in your mind this was the

20  report that you received as to Ms. Solmor?

21  A    Well, I didn't order a sleep apnea report.

22  Q    Okay.  All right.  Let me ask you this:  You don't often

23  have patients wear monitors like this?

24  A    Not a lot.

25  Q    And in Ms. Solmor's case, did you have medical records to

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-FA Document 71-5 Filed 06/05/23 Page 434 of 786 PageID
Case 2:16-cv-00218-FA Document 87-1 Filed 07/20/17 Page 172 of 235 Page ID #:876
#:876

172

 1   review as far as her entire medical history to determine how

 2   many times she may have worn something like this?

 3   A    I had no medical records to review --

 4   Q    Okay.

 5   A    -- in that regard.

 6   Q    All right.  Is everything kept on a computer or you just

 7   don't have records that far back?

 8   A    I have records from May of 2013.

 9   Q    Okay.  Anything subsequent that you reviewed?

10   A    Between 2013 and now?

11   Q    Yes, ma'am.

12   A    I looked at the cardiology report, and my notes basically

13   on follow-up requesting that she sees a cardiologist.

14        And I think I saw her recently for another physical.

15   Q    All right.  And it was your understanding that the device

16   would be worn overnight, correct?

17   A    Yes.

18   Q    So it would actually be two different days in which this

19   device was being utilized?

20   A    Well, she starts before she goes to sleep, and she wears

21   it for 24 hours.

22   Q    Okay.  There you go.

23        So this particular device was ordered on the 28th, the

24   date of service was on the 28th, so that would include the day

25   it started, and it would have carried over into the 29th?

```
 1   A      I assume so.

 2   Q      All right.  Now, at any point in time were you ever

 3   contacted by her insurance company as to the validity of this

 4   report or claim made by Holter Labs?

 5   A      I don't recall.

 6   Q      At any point in time, were you contacted by any insurance

 7   investigator regarding your billing in relation to this

 8   particular examination?

 9   A      I don't recall.

10   Q      All right.

11          MR. MCDERMOTT:  Thank you, ma'am.  I have nothing

12   further, sir.

13          MR. FREEDMAN:  Just a few questions, Your Honor.

14          THE COURT:  All right.

15

16                    REDIRECT EXAMINATION

17   BY MR. FREEDMAN:

18   Q      You mentioned sleep apnea in your report.  Do you know

19   what sleep apnea is?

20   A      Yes.

21   Q      What kind of condition is it?

22   A      It's a cessation of breathing while one is sleeping.

23   Q      Would information about a heart beat or rate give you any

24   information about sleep apnea?

25   A      Not really.  Not that I can recall.
```

App. 0846                 **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-PA  Document 71-5  Filed 06/05/23  Page 436 of 786  Page ID
#:878
Case 2:16-cv-02218-PA  Document 87  Filed 07/20/17  Page 174 of 295  Page ID #820

174

 1     I know the heart rate decreases while sleeping.  There is

 2  bradycardia or decrease in heart beat.

 3     But for sleep apnea, I would request an overnight test

 4  with a pulmonologist, that I use in the area.

 5  Q    Would that require a Holter device -- go ahead.

 6  A    No.  It involves an EEG, oximeter, test oxygen.

 7     There are leads across the chest.  They are looking for

 8  restless legs.  There may be other parameters.

 9     But I order those through a sleep study lab, usually a

10  pulmonary doctor, sometimes a neurologist.

11  Q    You mentioned two terms in there that I didn't quite catch

12  that.  I was going to ask you to explain.

13     Do you recall what those were?  You mentioned a

14  pulmonologist, and you would look at two factors?

15  A    Well, the pulmonologist is a respiratory specialist.

16  Q    So if a sleep apnea study was done through a pulmonologist

17  would you only be measuring heart rate?

18  A    No.

19  Q    What else would be measured?

20  A    You measure oxygen level, you measure time of offset to

21  sleep, sleep latency period.

22     You measure activity in terms of restless legs, motion.

23  You measure EEG, brain wave patterns.

24  Q    So, if you were doing an overnight EEG, how would you

25  measure oxygen?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-PA   Document 71-5   Filed 06/05/23   Page 437 of 786   Page ID
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 175 of 235   Page ID
#:879
175

```
 1   A     Well, it can be measured with an oximeter on the finger.

 2   Q     Any other ways?

 3   A     Well, you can directly measure the oxygen level of the

 4   blood by getting an t-o2 level.

 5   Q     How do you get a t-o2 level?

 6   A     T-o2 level -- that is a blood test, but usually it is an

 7   oximeter.

 8   Q     If you wanted to measure brain, as you mentioned, how

 9   would you measure?

10   A     By using the electroencephalogram.

11   Q     What would that consist of?

12   A     It places leads over the skull and records the activity of

13   the brain.

14   Q     And did you ever order this for Ms. Solmor?

15   A     No.

16         MR. FREEDMAN:  No further questions, Your Honor.

17   Thank you.

18         THE COURT:  Anything else?

19         MR. MCDERMOTT:  No, sir.

20         THE COURT:  All right.  You may step down.  Thank

21   you very much.

22      Call your next witness.

23         MR. FREEDMAN:  Your Honor, the government calls

24   Emily Russell.

25         THE COURTROOM DEPUTY:  Please raise your right hand.
```

App. 0848

Case 2:23-cv-04498-PA Document 71-5 Filed 06/05/23 Page 438 of 786 Page ID #:880
Case 2:16-cv-02218-PA Document 87 Filed 07/20/17 Page 176 of 235 Page ID #:882

176

```
 1                    (Oath was administered.)

 2               THE WITNESS:  I do.

 3

 4                    EMILY DAWN RUSSELL,

 5          having been duly sworn, testified as follows:

 6

 7               THE COURTROOM DEPUTY:  Please be seated.

 8          Please state your full name and spell your last name for

 9    the record.

10               THE WITNESS:  Emily Dawn Russell.  R-u-s-s-e-l-l.

11               MR. FREEDMAN:  May I inquire?

12               THE COURT:  Yes.

13

14                    DIRECT EXAMINATION

15    BY MR. FREEDMAN:

16    Q    Where do you work?

17    A    I work at Cigna Healthcare.

18    Q    What does Cigna Healthcare do?

19    A    Cigna Healthcare is an insurance company that does

20    healthcare claims.

21    Q    What kind of services does it provide?

22    A    A variety of different services, but primarily they offer

23    services where they administrate claim payments for medical

24    claims that are submitted by providers.

25    Q    And who does Cigna insure?
```

App. 0849                    **UNITED STATES DISTRICT COURT**

```
 1   A      Lots of different people.

 2          It's a private insurer, so it can do companies,

 3   corporations, or they do individuals as well.

 4   Q      And are those people known as beneficiaries?

 5   A      Yes.

 6   Q      Do you have an idea of how many beneficiaries Cigna

 7   insures?

 8   A      I don't.  A lot.

 9   Q      Over a million?

10   A      Over a million.

11   Q      Over 10 million?

12   A      I'm not sure about that.

13   Q      How many providers does Cigna deal with?

14   A      Probably over 100- 150,000 providers, if not more.

15   Q      Where is Cigna headquartered?

16   A      They are headquartered in Linfield, Connecticut.

17   Q      They deal with beneficiaries all over the country?

18   A      That's correct.

19   Q      They deal with providers all over the country?

20   A      That's correct.

21   Q      What is your job at Cigna?

22   A      I'm a compliance senior specialist.

23          And that means I work with a group of people where we have

24   intake projects where there has been a question from a provider

25   or member about how their claims are processed and paid.
```

App. 0850

```
 1        We look at those and determine whether the benefits were
 2   applied correctly.
 3   Q    How do providers submit claims to Cigna?
 4   A    They can submit claims either electronically or by snail
 5   mail, post office.
 6   Q    And then what does the process entail for them to get
 7   paid?
 8   A    In order for them to get paid or for claims to be
 9   processed, a claim goes through submission for eligibility.
10        And what that means is we make sure that a client actually
11   has insurance through Cigna.
12        And then it goes to processing, where a lot of our claims
13   are done through auto adjudication, meaning they are
14   automatically processed via the system.
15        If it goes through the automated process, then benefits
16   are determined that way.
17        Then it goes back out, and if the claims are processed and
18   paid, then payment is issued out either via electronic or
19   paper.
20        Or if it goes to a person's deductible, then we send out
21   something showing that that is where it went.
22   Q    You used the term "auto adjudication."
23        What does that mean exactly?
24   A    It means where it's processed and either paid or denied or
25   put to a person's deductible, via the system, meaning there is
```

App. 0851                       **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 441 of 786 Page ID #:883
Case 2:16-cv-02218-PA Document 87 Filed 07/20/17 Page 179 of 235 Page ID #:883

179

1  no human intervention.

2  Q    So is it routine for claims to be handled from start to

3  finish, just by the computer?

4  A    Yes.

5  Q    How many claims does Cigna receive in a month?

6  A    In a month, I would say between 25- to 30,000.

7  Q    And how many of those are reviewed by a human being?

8  A    I'm not sure monthly, but overall our auto adjudication

9  process is about 90 percent of our business.

10 Q    What kind of factors does the auto adjudication system

11 look at to determine whether a human needs to look at it -- the

12 claim?

13 A    If a claim form has most of the information needed, then

14 it can go through -- what I mean by that is if the boxes on a

15 claim form -- if they are filled out completely, then typically

16 it can go through the automated process.

17     However, in the event that a claim has some kind of

18 clinical claim review that requires medical personnel to look

19 at it, then it can require human intervention.

20     If there are missing components, let's say, an address is

21 missing, then it will go out to a person because we don't want

22 to deny a claim.  We want to have somebody try to find and

23 match up that information, so that's another way that it can

24 get kicked out to an actual person to review.

25 Q    How does the system know what service is being billed for

App. 0852

**UNITED STATES DISTRICT COURT**

```
 1   in a claim?
 2   A    The system is loaded with CPT codes and diagnosis, and it
 3   goes off of that.
 4   Q    What is a CPT code?
 5   A    The code for services rendered.
 6   Q    When the providers send a claim with the CPT code, do they
 7   have to make any sort of representation to Cigna that those
 8   services were actually provided?
 9   A    Well, we go under the assumption that, you know, a
10   provider, when they are submitting a claim for a member, that
11   they actually provided those services.
12   Q    Is the provider required to sign any documentation to
13   corroborate that assumption?
14   A    Yes.
15   Q    Where do they sign?
16   A    They can sign on the claim form.  But typically, if they
17   have a contract with us, then they sign that way.
18   Q    So, does Aetna deal with some providers with contracts?
19   A    Aetna?
20   Q    Sorry, I'm sorry, Cigna.
21   A    Okay.  Yes, they do.
22   Q    And Cigna also deals with providers without contract?
23   A    That's correct.
24   Q    So if you have a contract, you just sign once?
25   A    To the best of my knowledge, yes.
```

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 443 of 786 Page ID
Case 2:16-cv-02153-PA Document 87 Filed 07/20/17 Page 181 of 235 Page ID #:827
#:885

181

1    Q    And if you don't have a contract, you have to sign each of

2    the claims?

3    A    To the best of my knowledge, yes.

4    Q    Would Cigna pay for claims, if Cigna knew that the

5    services had not been performed?

6    A    No, we would not.

7    Q    Okay.  I would like you to look at the binder in front of

8    you, and turn to what has been marked as Exhibit 73.

9    A    Okay.

10   Q    Do you recognize this document?

11   A    I do.

12   Q    What is it?

13   A    It's a CPS claim form.

14            MR. FREEDMAN:  Your Honor, we move to admit 73.

15            THE COURT:  It will be received.

16       (Exhibit 73 received into evidence.)

17   BY MR. MCDERMOTT:

18   Q    So let's look at the first half of this document up here

19   on the screen.

20       What is the patient's name indicated?

21   A    Stacey R. Foster.

22   Q    So is that the beneficiary?

23   A    In this case, it is, yes.

24   Q    Okay.  And then if we can go back to the full document.

25   And we will look down on the bottom half, okay.

App. 0854          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 444 of 786  Page ID
Case 2:16-cv-00219-PA  Document 87  Filed 07/20/17  Page 182 of 235  Page ID
#:886
182

1          So let's start at the bottom.

2          What is that information?

3     A     In Box 31, it's the signature of the physician that

4     rendered the service.

5          In Box 32, it lists the facility location.

6          And then in Box 33, it lists the billing provider

7     information.

8     Q     Now you mentioned in the 31, you said physician.  Is this

9     the physician or the provider?

10    A     The provider of the services.

11    Q     Okay.  And above the signature line, if you wouldn't mind,

12    could you read that text?

13    A     The tax ID number?

14    Q     No.  The text -- the words on 31?

15    A     "Signature of physician or supplier including degrees or

16    credentials."

17         And then it says, "I certify that the statements on the

18    reverse apply to this bill and are made apart thereof."

19    Q     And then does this appear to be signed by a provider?

20    A     It does.

21    Q     Who signed it, who does it appear to be?

22    A     M. Mirando.

23    Q     Okay.  And then the facility and the provider, if you

24    could just read that name for us?

25    A     Holter Labs, LLC.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA Document 71-5 Filed 06/05/23 Page 445 of 786 Page ID
#:887
Case 2:16-cv-02113-PA Document 87 Filed 07/20/17 Page 183 of 255 Page ID #:829

183

1    Q    As far as you know, did Holter Labs have a contract with

2    Cigna?

3    A    To the best of my knowledge, no.

4    Q    Now, looking up above, there are some dates here.

5         So what are we looking at here?

6    A    We're looking at the date of service that the services

7    were rendered, where the services were rendered, what types of

8    services were provided, which diagnosis are related to those

9    services, and then how much was charged for each service.

10   Q    Okay.  The CPT code is just a number, right?

11   A    That's correct.

12   Q    So how does Cigna know what those codes correspond to?

13   A    We actually have a system that we utilize that tells us

14   what the CPT codes are, and we can look at that if we need

15   clarification on that.

16   Q    If could you turn to page 3 here.

17        Does the provider ever provide a description of services?

18   A    Yes, they do.

19   Q    Is that what we're looking at here?

20   A    Yes, it is.

21   Q    Who provided this description of services?

22   A    The submitter of this claim.

23   Q    Can you see down at the bottom who the submitter is?

24   A    Holter Labs.

25   Q    And then I'm not going to go through each of these codes

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 446 of 786   Page ID #:888
Case 2:16-cv-00218-PA   Document 87   Filed 07/20/17   Page 184 of 295   Page ID #:890

184

```
 1   here, but do the CPT codes listed here with descriptions

 2   following them, do those codes correspond to the ones we were

 3   looking at on the claim form?

 4   A     Yes.

 5   Q     Now, let's look at the second page here.

 6         Is this also a document that the provider would have

 7   submitted?

 8   A     Yes, it is.

 9   Q     And what does that document appear to be?

10   A     It's an order form.  It is showing, you know, who

11   recommended that this service be provided.

12   Q     And does it show the date of service?

13         Can you zoom in on the middle, Holter monitor?

14   A     8/10/2011.

15   Q     That is consistent with the first page where the CPT codes

16   are claimed?

17   A     That's correct.

18   Q     Same date of service?

19   A     Yes.

20   Q     Is it typical for the providers to provide documentation

21   like this?

22   A     They can.  It's up to them.

23   Q     Does Cigna require it?

24   A     Not necessarily.

25   Q     Let's turn to Exhibit 74 in your binder.
```

App. 0857

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 447 of 786   Page ID
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 185 of 235   Page ID #:891
#:889

185

```
 1          Do you recognize this document?

 2   A      Yes.

 3   Q      What is this?

 4   A      It's a claim form as well.

 5   Q      Okay.

 6              MR. FREEDMAN:  Your Honor, the government moves to

 7   admit Exhibit 74.

 8              THE COURT:  It will be received.

 9       (Exhibit 74 received into evidence.)

10   BY MR. MCDERMOTT:

11   Q      Now, if we can look at the bottom again here.

12          Is this the same provider?

13   A      Yes, it is.

14   Q      What provider is that?

15   A      M. Mirando, Holter Labs.

16   Q      It's signed again?

17   A      Yes.

18   Q      With the same certification?

19   A      Yes.

20   Q      Okay.  Let's look at the CPT codes now.

21          So what is the date of service here?

22   A      8/11/2037.

23   Q      Then there is one CPT code.

24          So we'll look at that and compare it to page 2, 93271.  We

25   can look at the second page.
```

Case 2:23-cv-04488-PA Document 1-5 Filed 06/05/23 Page 448 of 786 PageID
Case 2:16-cr-00218-PA Document 87 Filed 07/20/17 Page 188 of 235 Page ID #:892
#:890

186

```
 1        Do you see what that is?

 2   A    I do.

 3   Q    What is it?

 4   A    It says heart monitoring receipt of transmission, and

 5   analysis with corresponding report.

 6   Q    Okay.  Now, this document, besides the yellow exhibit tab,

 7   how many pages does it have?

 8   A    Two.

 9   Q    Is there an order form contained with this claim?

10   A    Repeat the question, I'm sorry.

11   Q    Is there an order form contained with this claim?

12   A    Not that I see.

13   Q    Okay.  Let's look at Exhibit 75.

14        Do you recognize this document?

15   A    Yes.

16   Q    What is it?

17   A    It's a claim form as well.

18             MR. FREEDMAN:  Your Honor, the government moves to

19   admit Exhibit 75.

20             THE COURT:  It will be received.

21        (Exhibit 75 received into evidence.)

22   BY MR. MCDERMOTT:

23   Q    So same question again at the bottom, is this the provider

24   information?

25   A    It is.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-PA   Document 1-5   Filed 06/05/23   Page 449 of 786   Page ID
Case 2:16-cv-00219-PA   Document 87   Filed 07/20/17   Page 187 of 235   Page ID #:893
#:891

187

1   Q    And the certification is signed again?

2   A    That's correct.

3   Q    Okay.  Let's look at the CPT codes billed here.

4        What date was this claimed for?

5   A    8/18/2011.

6   Q    How many CPT codes were claimed this time?

7   A    There are three.

8   Q    Okay.  Does the -- is there a dollar amount associated

9   with each of these CPT codes?

10  A    Yes, there is.

11  Q    Who sets that dollar amount for the claim?

12  A    The provider.

13  Q    Okay.  Now, let's look at just one of these, for example.

14       If you look at 95827, and then is there a glossary with

15  this document again?

16  A    Yes, there is.

17  Q    And does the glossary explain what 95827 is?

18  A    It does.

19  Q    What does it claim?

20  A    It says "sleep study simultaneously recording of

21  ventilation, respiratory effort, ECG, or heart rate, and oxygen

22  saturation, unattended by a technologist."

23  Q    Is there an order form for this claim?

24  A    No, there is not.

25  Q    Okay.  Let's now look at Exhibit 76.

App. 0860

Case 2:23-cv-04488-BA Document 71-5 Filed 06/05/23 Page 450 of 786 PageID
Case 2:16-cr-00213-PA Document 87 Filed 07/20/17 Page 188 of 235 Page ID #:894
#:892

188

1      Do you recognize this document?

2    A    Yes.  This is a claim form.

3          MR. FREEDMAN:  Your Honor, the government moves to

4    admit Exhibit 76.

5          THE COURT:  It will be received.

6      (Exhibit 76 received into evidence.)

7    BY MR. FREEDMAN:

8    Q    Let's look at the bottom again.

9      Is this the same provider?

10   A    Yes, it is.

11   Q    Is the certification signed again?

12   A    Yes.

13   Q    Let's look again at the CPT code.

14      What is the date of service?

15   A    8/24/2011.

16   Q    How many CPT codes claimed?

17   A    There are three.

18   Q    Again, the dollar amount provided by the provider?

19   A    That's correct.

20   Q    So let's look here at 923025, and we will look at two

21   pages ahead.

22      Does the glossary provided by the provider, Holter Labs,

23   define 93025?

24   A    It does.

25   Q    What does it define it as?

**UNITED STATES DISTRICT COURT**

```
 1   A     Microvolt T-wave Alternans for assessment of ventricular

 2   arrhthymias.

 3   Q     Let's go back one page.  First, let me ask, is there an

 4   order form contained with this document?

 5   A     No, there is not.

 6   Q     Is there some other correspondence?

 7   A     Yes, there is.

 8   Q     Who is this correspondence from?

 9   A     Holter Labs.

10   Q     That is the provider?

11   A     Yes.

12   Q     And what does this correspondence appear to relate to?

13   A     It looks like a letter letting us know that they have

14   changed their billing mailing address.

15   Q     Okay.  What is the new billing address?

16   A     Holter Labs, LLC, P.O. Box 25408, Portland, Oregon, 97298.

17   Q     Who signed this letter?

18   A     Michael Mirando.

19   Q     Is there a title listed under that?

20   A     Senior Partner, Holter Labs, LLC.

21   Q     Okay.  Assuming that there is no human review, does Cigna

22   typically pay these claims in a timely fashion?

23   A     They would, yes.

24   Q     Does it pay the full amount that the provider claims?

25   A     It pays, based on whatever the member's benefits are.
```

Case 2:23-cv-04498-PA   Document 71-5   Filed 06/05/23   Page 452 of 786   Page ID #:894
Case 2:16-cv-00219-PA   Document 87   Filed 07/20/17   Page 190 of 235   Page ID #:896

190

1    Q    Okay.  What kind of records does Cigna keep regarding

2    claims and payments?

3    A    We keep all information in our system for ten years.

4         So it would maintain the record of correspondence received

5    via paper or electronic.

6    Q    And is it just the actual claim or is there a database?

7    A    There is a database.

8    Q    What kind of information does that database contain?

9    A    The claim forms correspondence, or any kind of history and

10   physical information that has been requested and received.

11        So anything we have received.

12   Q    Does it also include the amount claimed?

13   A    Yes, on the claims.

14   Q    And the amount paid?

15   A    In a separate system, yes.

16   Q    Okay.  Let's look at Exhibit 78 in your binder.

17        Do you recognize this document?

18   A    I do.

19   Q    What is it?

20   A    It is a document that shows our system and gives a

21   printout of the claim, according to how it shows in our system.

22   Q    So, is this a printout from your system?

23   A    It is.

24   Q    Okay.  And which beneficiary does it relate to?

25   A    Stacey Foster.

**UNITED STATES DISTRICT COURT**

1    MR. FREEDMAN:  Your Honor, the government moves to

2  admit Exhibit 78.

3    THE COURT:  It will be received.

4    (Exhibit 78 received into evidence.)

5  BY MR. FREEDMAN:

6  Q    If I can show it to you.  I will just ask you about it.

7    So looking at this document, what dates does it list for

8  services claimed?

9  A    8/10/2011, 8/11/2011, 8/18/2011, and 8/24/2011.

10  Q    Does it list the CPT code that was claimed that we were

11  looking at the other claim?

12  A    It does.

13  Q    Does it also list the description of the service provided?

14  A    It does.

15  Q    Okay.  Could you read down that list of those

16  descriptions?

17  A    Microvolt T-wave assessment, ECG monitor/report, 24 hours,

18  night electroencephalogram, ECG monitor/report, 24 hours, night

19  electroencephalogram, automatic nervous function test, ECG

20  monitoring and analysis, ECG monitor report 24 hours,

21  cardiovascular procedure, and night electroencephalogram.

22  Q    Then we looked at that amount.  Is the charge amount the

23  same as the amount claimed on those claim forms we were looking

24  at?

25  A    Yes.

App. 0864

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 454 of 786   Page ID
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 192 of 235   Page ID #:896
#:896

192

 1   Q     And now there is a paid amount.

 2         What does that column reflect?

 3   A     It's the amount that we paid on the particular services.

 4   Q     Okay.  And then where the check number is indicated, what

 5   does that indicate?

 6   A     It indicates the check number that the payments were made

 7   on.

 8   Q     Okay.  So this database record reflects that Cigna made

 9   these payments?

10   A     That's correct.

11   Q     Okay.  Would Cigna have made these payments if it had

12   known that the services listed here were not performed?

13   A     No, they would not have.

14         MR. FREEDMAN:  No further questions, Your Honor.

15         THE COURT:  Thank you.

16         All right.  Mr. McDermott?

17         I'm sorry, on that last document.  That we were

18   looking at.

19

20                       CROSS-EXAMINATION

21   BY MR. MCDERMOTT:

22   Q     I'm sorry, on that last document that we were looking at.

23   Ma'am, I noticed you testified that a computer handles all of

24   the billing?

25   A     I'm not sure of the question.

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 455 of 786   Page ID #:897
Case 2:16-cv-00219-PA   Document 87   Filed 07/20/17   Page 193 of 255   Page ID #:897

193

1    Q    All right.  Well, let's go to Number 78, the last one you

2    looked at, please.

3    A    Okay.

4    Q    So if somebody wore an Holter device on the 10th of August

5    2011, and it generated a report and was worn for 24 hours, why

6    wouldn't Cigna pay on that?

7    A    They would.

8    Q    Well, according to Exhibit 77, it was billed for $100, but

9    there was no payment made.

10        Why is that?

11   A    Are you looking at date of service 8/10/2011?

12   Q    Yes, ma'am.

13   A    For this particular service date, all of those charges

14   went towards the patient's deductible.

15   Q    So in this particular situation, the patient didn't

16   received a bill from Holter Labs?

17   A    I can't speak to that.

18   Q    Okay.  So this is reflecting billing on the 11th of August

19   and the 18th of August, then the deductible had been paid?

20   A    I'm saying that for that particular date of service,

21   8/10/2011, those particular charges were subjected to the

22   individual's deductible.

23   Q    How would we know that for sure?

24   A    It would show on an EOP that the provider would receive

25   and that's an explanation of payment.

App. 0866

Case 2:23-cv-04498-PA    Document 71-1    Filed 06/05/23    Page 456 of 786    Page ID
#:898
Case 2:16-cv-02139-PA    Document 87    Filed 07/20/17    Page 194 of 295    Page ID #:840

194

```
 1   Q    Okay.  Have you had a chance to look at that document?
 2   A    The EOP?
 3   Q    For this particular claim?
 4   A    I have not.
 5   Q    All right.  So do you know that that document exists?  Is
 6   it somewhere in the system?
 7   A    I don't know that it exists, but it should.
 8   Q    It should.
 9        In preparation of your testimony here today, did you have
10   a chance to take a look at that?
11   A    I did not look at the EOPs.
12   Q    Now I'm just kind of curious, are you familiar with how
13   someone actually gets into the Cigna system as a provider?
14   A    Yes.
15   Q    Can you tell the jury, at least as to how Cigna does it,
16   how a provider gets into the system so they can get paid?
17   A    Okay.  If they are a contracted provider then they meet
18   with different people within Cigna, usually our sales team, and
19   they sign a contract agreeing to certain rates for charges and
20   then they are input into the system with whatever tax ID number
21   or multiple tax ID numbers that are agreed upon.
22        And then it's set up that way.
23        If they are out-of-network providers, then typically they
24   get input into the system when we receive our first claim from
25   them.
```

**UNITED STATES DISTRICT COURT**

1   Q     All right.  Now does Cigna make any effort to determine

2   for -- in this particular case -- Holter Labs, they were not a

3   contracted provider, correct?

4   A     Correct.

5   Q     Does Cigna take any steps to confirm prior to payment what

6   that provider is able to do and what they are not able to do?

7   A     Just based on their credential, no.

8   Q     How do you ensure when somebody submits a request to be

9   paid on a procedure or a device, that in fact they are capable

10  of doing that?

11  A     What we do is, based on who they are and the services that

12  they are rendering, we go on the fact that they are not going

13  to submit claims in which services weren't rendered.

14  Q     All right.  Do you in fact, on an individual basis, or

15  does your company actually investigate individual

16  non-contracted providers?

17  A     Not on a normal basis, no.

18  Q     So, what your company kind of relies upon then is a

19  computer system to highlight or pinpoint problem billing taking

20  place?

21  A     What the computer system looks at is whether the person

22  has eligibility, if those services are something that are

23  covered under that individual's plan, and does it meet -- if

24  the claim form is completed to allow it to go through the

25  system automatically, then it will.

Case 2:23-cv-04498-PA Document 71-5 Filed 06/05/23 Page 458 of 786 Page ID #:900
Case 2:16-cv-02218-PA Document 87-1 Filed 07/20/17 Page 198 of 285 Page ID #:842

196

 1   Q    Just out of curiosity then, is there any effort by your

 2   company to match up a physician's request for payment with a

 3   provider's request for payment?

 4   A    I'm not sure I follow the question.

 5   Q    Let me back it down this way.

 6        A doctor orders a device to be worn.

 7   A    Uh-huh.

 8   Q    And in that process, they apparently spend some time with

 9   the patient, and they would bill Cigna, true?

10   A    True.

11   Q    Okay.  Then that device is then provided and worn by the

12   patient and that person then bills -- that company then bills

13   the insurance company, true?

14   A    True.

15   Q    Is there any effort with this computer system that you got

16   to marry the two together?

17   A    If they are done on the same date of service, yes, it

18   would look at both of them.

19   Q    Okay.  Is there anything in the system that tells -- would

20   tell you or tell a human that if that doesn't match that there

21   should be something looked at?

22   A    Yes.

23   Q    And what process is that called?

24   A    It's just a review process.

25   Q    To your understanding, ma'am, at any point in time, has

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 459 of 786 Page ID #:901
Case 2:16-cv-02218-PA Document 87 Filed 07/20/17 Page 197 of 235 Page ID #:843

197

```
 1    your company done a review process on Holter Labs?

 2    A    Not to my knowledge.

 3    Q    Okay.  I know the government had you read some documents

 4    and it had on the claim form 1500 Holter Labs.

 5         Is there anything in your system that allows you to

 6    compare signatures with the provider that is being asked to be

 7    paid?

 8    A    No.

 9    Q    All right.  So I take it, then, when you get an

10    application for payment, has a name on there, and it has some

11    sort of writing on it, you are assuming that that particular

12    individual signed that document, correct?

13    A    That's correct.

14    Q    And when you receive payment requests from doctors, the

15    same process is supposed to take place.

16         The doctors are supposed to sign those documents in order

17    to get paid from Cigna, correct?

18    A    That's correct.

19    Q    Do you ever accept automatic or automated signatures?

20    A    We accept electronic claim forms, yes.

21    Q    All right.  So if in fact someone was making claims on

22    dates that didn't correspond with what the doctor said the

23    service was conducted, that would trigger some kind of review

24    by a human?

25    A    I don't follow your question.
```

App. 0870

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 460 of 786   Page ID #:902
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 198 of 235   Page ID #:844

198

1    Q     I will break it down again.

2    A     Okay.

3    Q     The doctor sees the patient and makes a request for a

4    Holter device to be used.  A Holter device is used.

5          If the dates don't match, does that draw in a human to

6    take a look at what is going on?

7    A     I'm still not sure of your question.

8                  THE COURT:  Vague.

9    BY MR. MCDERMOTT:

10   Q     All right.  Let me do this way.

11   A     Okay.

12   Q     Obviously, you receive billings from doctors, correct?

13   A     Yes.

14   Q     You receive billing from device providers, correct?

15   A     Correct.

16   Q     Is there an attempt to match the two together?

17                 THE COURT:  That's been asked and answered, counsel.

18                 MR. MCDERMOTT:  All right.  Thank you.  I have

19   nothing further.

20                 MR. FREEDMAN:  No further questions, Your Honor.

21                 THE COURT:  All right.  You may step down.

22        Call your next witness.

23                 MR. FREEDMAN:  Your Honor, the government calls

24   Robyn Consiglio.

25                 THE COURTROOM DEPUTY:  Raise your right hand.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA Document 1-5 Filed 06/05/23 Page 461 of 786 Page ID
Case 2:16-cv-00218-PA Document 87 Filed 07/20/17 Page 199 of 235 Page ID#:845
#:903

199

```
 1                    (Oath was administered.)

 2               THE WITNESS:  I do.

 3

 4                    ROBYN MICHELLE CONSIGLIO,

 5          having been duly sworn, testified as follows:

 6

 7               THE COURTROOM DEPUTY:  Please be seated.  Please

 8    state your full name and spell your last name for the record.

 9               THE WITNESS:  Robyn Michelle Consiglio.  C-o-n-s-i-.

10               MR. FREEDMAN:  Your Honor, may I inquire?

11               THE COURT:  Yes.

12

13                    DIRECT EXAMINATION

14    BY MR. FREEDMAN:

15    Q    Where do you work?

16    A    I work for Aetna Insurance.

17    Q    Where is Aetna based?

18    A    I work out the Jacksonville, Florida office.  It's based

19    out of Connecticut.

20    Q    Does it have insured beneficiaries all over the country?

21    A    Yes, it does.

22    Q    Approximately how many?

23    A    In the millions.

24    Q    How many providers, roughly, does Aetna deal with?

25    A    That would also probably be in the millions.
```

Case 2:23-cv-04498-PA  Document 71-5  Filed 06/05/23  Page 462 of 786  Page ID
Case 2:16-cv-02113-PA  Document 87  Filed 07/20/17  Page 200 of 235  Page ID #:846
#:904

200

```
 1   Q     Does Aetna have contracts with all of its providers?
 2   A     No.
 3   Q     Does it accept claims from some providers it doesn't have
 4   contracts with?
 5   A     Yes, it does.
 6   Q     What's your job title?
 7   A     It's a project lead.  It is a claim reporting of special
 8   services consultant.
 9   Q     What does that entail?
10   A     I work in the claims rework unit, and we review claims
11   that have already been handled once previously or as many times
12   as necessary to look at them for any reasons that they were not
13   handled correctly, we will rework those claims and pay them so
14   they are done right.
15   Q     Are they handled first by an auto-adjudicated system?
16   A     They can be auto-adjudicated or they can be previously
17   handled by a processor.
18   Q     How do providers submit claims to Aetna?
19   A     They can either submit them electronically or if they do
20   submit paper claims on the 1500 forms, those will go to
21   centralized mailbox where they are then filmed and then loaded
22   into the electronic database so the processor receives
23   everything on the system.
24   Q     How many claims, roughly, does Aetna receive in a month?
25   A     That would also be in the millions, probably at least 5
```

App. 0873

1   million.

2   Q    And approximately what percentage or what number of those

3   are subject to further review?

4   A    Well, very few.  80 percent of our claims are

5   auto-adjudicated so no one has even looked at them.

6        Then the remaining claims that come through don't

7   necessarily need to be reviewed by anywhere else, the processor

8   can just handle it.

9        There is probably very few instances where it has to go on

10  to further review.

11  Q    Does Aetna rely on the CPT codes that providers provide?

12  A    Yes, it does.

13  Q    Does Aetna require the providers to provide a signature,

14  attesting that the services have actually been provided?

15  A    The form should have the signature on there.  If it is not

16  there, the provider's name is on the bill, then it can go

17  through and get processed.  But they are looking for it to be

18  there.

19  Q    Would Aetna pay for claims that were submitted if Aetna

20  knew that those services hadn't been performed?

21  A    No.

22  Q    Could you look at the binder in front of you what has been

23  marked as Exhibit 59?

24  A    The large one?

25  Q    Yes.

1    A    Okay.

2    Q    Then look at the document behind that tab.

3    A    The first one?

4    Q    Yeah, Tab 59.

5    A    59, okay.

6    Q    Do you recognize this document?

7    A    Yes.

8    Q    What is it?

9    A    It's a HIPPA 1500 form that the provider would fill out.

10        MR. FREEDMAN:  Your Honor, the government moves to

11   admit Exhibit 59.

12        THE COURT:  It will be received.

13        (Exhibit 59 received into evidence.)

14   BY MR. FREEDMAN:

15   Q    Who is the beneficiary on this form?

16   A    The member is Lisa Solmor.

17   Q    Who is the provider?

18   A    Holter Labs, Incorporated.

19   Q    Has someone signed on behalf of Holter Labs?

20   A    Yes, Dr. Mirando.

21   Q    What is the purpose of the signature?

22   A    To show that this doctor performed the procedures.

23   Q    Okay.  Let's look at the dates and the CPT codes.

24        I'm sorry, let's look above at the MD name in the middle.

25        Is this a doctor?

App. 0875

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 465 of 786   Page ID
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 203 of 235   Page ID #:849
#:907

203

```
 1   A     Ruby Simpkins.

 2   Q     Yes.

 3   A     That would be the referring doctor.

 4   Q     Okay.  So the bottom part, is that -- is the provider

 5   always a doctor or could it be a non-doctor company?

 6   A     That signed it?

 7   Q     Right.

 8   A     It could be a non-doctor.

 9   Q     Okay.  Let's look at the CPT codes.

10         So what is the date of service here?

11   A     5/29/2013.

12   Q     Are these -- the numbers here, the CPT codes?

13   A     Yep, the five-digit number.

14   Q     If we look at page 2, did the provider provide a glossary

15   of what those CPT codes are in reference to?

16   A     Yes, it did.

17   Q     Let's now look at what has been marked as Exhibit 60.

18         Do you recognize that document?

19   A     Yes.

20   Q     What is it?

21   A     It's a 1500 form as well.

22             MR. FREEDMAN:  Your Honor, the government moves to

23   admit Exhibit 60.

24             THE COURT:  It will be received.

25         (Exhibit 60 received into evidence.)
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA Document 71-5 Filed 06/05/23 Page 466 of 786 PageID #:908
Case 2:16-cv-02198-PA Document 87 Filed 07/20/17 Page 204 of 295 Page ID #:850

204

```
 1   BY MR. FREEDMAN:

 2   Q    So information on this form?

 3   A    Yes.

 4   Q    Same beneficiary?

 5   A    Yes.

 6   Q    Same provider?

 7   A    Yes.

 8   Q    Signed again?

 9   A    Yes.

10   Q    Okay.  And then let's zoom in on the date.

11        Is this for a different date of service?

12   A    Yes.  It says May 30th.

13   Q    Different CPT codes?

14   A    Yes.

15   Q    And then is there a glossary again with this one that

16   indicates what those codes are?

17   A    Yes, there is.

18   Q    The glossary is provided by the provider?

19   A    Yes.

20   Q    Okay.  Assuming that no further review is conducted after

21   the auto-adjudication, does Aetna pay out on the claims?

22   A    Yes.  Assuming everything was fine and everything was fine

23   with the member, it would pay out.

24        It just depends on the plan of benefits, whether

25   everything could have gone to the deductible.
```

App. 0877

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA Document 71-5 Filed 06/05/23 Page 467 of 786 Page ID
#:909
Case 2:16-cr-00218-PA Document 87-1 Filed 07/20/17 Page 209 of 235 Page ID #:851

205

1      So it's all individually based.

2  Q    Does Aetna pay the full amount that the provider claims?

3  A    Not necessarily.  It depends on what they bill and whether

4  -- how the plan administers.  It's going to apply the plan's

5  benefits, do they follow reasonable and customary; do they

6  allow certain percentages of Medicare rates.

7  Q    You mentioned before that these claims make their way into

8  a database.

9      Could you take a look at what has been marked as

10 Exhibit 63?

11     Do you recognize this document?

12 A    This looks like a report pulled.

13 Q    Pulled from the database?

14 A    Yes.

15          MR. FREEDMAN:  Your Honor, the government moves to

16 admit Exhibit 63.

17          THE COURT:  It will be received.

18     (Exhibit 63 received into evidence.)

19 BY MR. FREEDMAN:

20 Q    Let's put it up on the screen.  Yeah, 63.

21     Can you read for the jury -- since the document is not

22 coming up -- can you read the dates of service here that are

23 claimed?

24 A    The dates of service are 5/29/2013, and 5/30/2013.

25 Q    Is that consistent with the claim forms we were just

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA Document 71-5 Filed 06/05/23 Page 468 of 786 PageID #:910
Case 2:16-cv-02218-PA Document 87 Filed 07/20/17 Page 206 of 235 Page ID #:852

206

 1  looking at?

 2  A     Yes.

 3  Q     Now, does this form have an addition -- does it have the

 4  CPT codes from those claim forms?

 5  A     Yes, it does.

 6  Q     Does it also have the text of the codes that were claimed?

 7  A     Yes.

 8  Q     Does Aetna rely only on the glossary provided or does it

 9  also have a way of checking what those codes mean?

10  A     We have a database that we can go if they want to check to

11  see what the CPT codes means, they can go to a database and

12  look it up.

13  Q     So the codes we're looking at here, I won't make you read

14  through all of them, but those are the services that were

15  claimed by this provider?

16  A     Yes.

17  Q     Okay.  And then the billed amount, is that the same number

18  we saw on the claim of what the provider was claiming?

19  A     Yes.

20  Q     Okay.  And now this shows a paid amount.

21        Is that the amount that Aetna paid on these claims?

22  A     Yes.

23  Q     And then the provider name, is that the same name that we

24  saw on the other forms of the provider?

25  A     Yes.

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 469 of 786   Page ID
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 207 of 235   Page ID #:913
#:911

207

1    Q     Can you read that name?

2    A     Michael J. Mirando.

3    Q     And then the check number, does that correspond to a check

4    that Aetna paid?

5    A     Yes.

6    Q     Would Aetna have paid those checks if it had known that

7    these services described here had not been performed?

8    A     No, it wouldn't.

9    Q     Okay.

10              MR. FREEDMAN:  No further questions.

11              MR. MCDERMOTT:  May I, sir?

12              THE COURT:  Yes.

13

14                    CROSS-EXAMINATION

15   BY MR. MCDERMOTT:

16   Q     Ma'am, are you familiar with the process in which a

17   non-contracted provider can actually get paid by your system?

18   A     Yes.

19   Q     And is there some kind of application process that they

20   have to go through in order to get recognized by your system

21   and paid?

22   A     Well, they are in our provider database.  All providers

23   are listed in there.

24         If it's a provider we don't have on file on, the processor

25   would send it over to have them added.

UNITED STATES DISTRICT COURT

1  Q    Okay.  And does the processor require the provider to fill

2  out some background information, anything of that nature?

3  A    No.  The processor doesn't request that.

4  Q    All right.  Does anybody in your company require that?

5  A    That would -- provider data service, that would be their

6  area.

7       If there was anything they needed from the provider, they

8  would handle that information.

9  Q    Does your company make the effort to make sure a provider

10 who is claiming to do something in particular actually has the

11 ability to do that?

12 A    It's not my area, but provider data services is going to

13 make sure the provider is accredited.

14 Q    All right.  At some point in time, when a provider such as

15 in this case, submits a bill, does the automated system

16 actually check to see that when somebody says we're offering a

17 bill on Holter devices, that it can do the codes that it's

18 trying to get paid on?

19 A    No, it wouldn't.

20 Q    Okay.  Where does that come in the process?

21      Is there anybody inside of Aetna that actually compares

22 CPT codes with what a device can actually do?

23 A    I'm not sure I follow that question.

24 Q    Okay.  You receive a bill from a provider, and it has a

25 CPT code on it.

App. 0881          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 471 of 786   Page ID
Case 2:16-cv-02213-PA   Document 87   Filed 07/20/17   Page 209 of 235   Page ID #:35
#:913

209

1    Is there any effort made to confirm that that CPT code is

2  something that that provider can do?

3  A    Depending on who is billing.

4    If it's a medical doctor billing that service, then --

5  Q    Right.

6  A    -- no, it wouldn't.

7    If a durable medical supply company was billing for an

8  office visit, then yes.

9  Q    Okay.  For a device provider like a Holter Labs, is there

10  some process that the first claim submitted to Aetna has to go

11  through in order to confirm that Holter Labs can bill for what

12  the CPT codes are in the paperwork?

13        MR. FREEDMAN:  Objection.  Vague.

14        MR. MCDERMOTT:  I will break it down.  I will back

15  out.

16        THE COURT:  Okay.

17  BY MR. MCDERMOTT:

18  Q    The first time an independent provider -- non-contracted

19  provider submits a bill, is there any effort to determine that

20  provider and their CPT codes are something that they can do?

21  A    No.

22  Q    Okay.  So when something like Holter Labs submits a bill

23  for the very first time, it's just accepted as to what is on

24  the paperwork that they can actually do that CPT code?

25  A    That is correct.

App. 0882

**UNITED STATES DISTRICT COURT**

1    We assume the provider is billing for the proper

2  procedures.

3  Q    Is there any effort at any point in time to confirm that,

4  to make sure you are not paying on something you shouldn't be

5  paying on?

6  A    If there is any situation in something like that, if there

7  are bills submitted in, a processor may come across a bill or

8  look in the history and something triggers them that they think

9  maybe this should be investigated more, they would send it

10  over.

11    They may even still pay the claim, but then send it over

12  to the special investigations unit area for further review,

13  just to make sure everything is good.

14    But they are going to pay the bill originally.

15  Q    All right.  In anticipation of your testimony here today,

16  were you asked to investigate Holter Labs' billings with Aetna?

17  A    Me personally?

18  Q    Yes, ma'am?

19  A    No.

20  Q    So you were only asked to take a look at this particular

21  report and this particular payment?

22  A    Yes.

23  Q    All right.  Are you familiar with whether or not this

24  particular payment file had a request for reconsideration of

25  services?

App. 0883                **UNITED STATES DISTRICT COURT**

```
 1   A     I am not aware of that, no.

 2   Q     Okay.  Are you at all familiar with the reconsideration of

 3   services at Aetna?

 4   A     Yeah, I'm familiar with it.

 5   Q     All right.  So if a provider doesn't get paid and there is

 6   an issue or question about why they didn't get paid, there is a

 7   process that they can go through?

 8   A     Yes.

 9   Q     And this process -- do you know as you sit here today --

10   whether or not this process was attempted on the Solmor file?

11   A     No, I don't know.

12              MR. MCDERMOTT:  Just a second here, please.

13         May I, Your Honor, just have a second.

14         Excuse me, Your Honor.

15         Thank you, sir.  I have nothing further.

16              THE COURT:  Anything else?

17              MR. FREEDMAN:  Nothing further, Your Honor.  Thank

18   you.

19              THE COURT:  All right.  You may step down.

20         Call your next witness.

21              MR. FREEDMAN:  Your Honor, the government calls

22   Stanton Crowley.

23              THE COURTROOM DEPUTY:  Please stand before me.

24   Raise your right hand.

25                     (Oath was administered.)
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-FLA Document 71-5 Filed 06/05/23 Page 474 of 786 Page ID #:916
Case 2:16-cv-02138-FLA Document 87 Filed 07/20/17 Page 212 of 235 Page ID #:858

212

```
 1                THE WITNESS:  Yes.  Yes.

 2

 3                      STANTON ROSS CROWLEY,

 4           having been duly sworn, testified as follows:

 5

 6                THE COURTROOM DEPUTY:  Please be seated.  Please

 7   state your full name and spell your last name for the record.

 8                THE WITNESS:  Stanton Ross Crowley.  C-r-o-w-l-e-y.

 9

10                      DIRECT EXAMINATION

11   BY MR. FREEDMAN:

12   Q    Where do you live?

13   A    I live in Santa Ana.

14   Q    Where do you work?

15   A    Dana Point.

16   Q    What company do you work at?

17   A    Specialized Medical.

18   Q    What kind of company is that?

19   A    It's a Holter telemetry monitoring company.

20   Q    Did you used to work at Holter Labs?

21   A    Yes.

22   Q    When did you work at Holter Labs?

23   A    2005 to 2012.

24   Q    How long have you worked within the Holter device

25   industry?
```

App. 0885

```
 1   A     Probably since 1998.

 2   Q     What kind of work do you do with respect to Holter

 3   devices?

 4   A     I read the Holter monitor, the device, the information on

 5   that.

 6         I read the reports and produce the report for the doctor.

 7   Q     How do you produce that report?

 8   A     The doctor would hook it up to a patient.  He would upload

 9   it -- the information after 24 to 48 hours.

10         I would download it, put it into the program, and go

11   through the information and produce the report.

12   Q     Is that report process different from the billing process?

13   A     Yes.

14   Q     Do you -- in your time working in the Holter industry,

15   have you handled billing?

16   A     No.

17   Q     Have you handled -- so at all of the companies you have

18   worked at, you have handled coding?

19   A     I have handled --

20   Q     I'm sorry, you have handled the reports?

21   A     Yes.

22   Q     Who handled the coding at Holter Labs?

23   A     Michael Mirando.

24   Q     How -- was Michael Mirando an employee of Holter Labs?

25   A     He was the owner.
```

App. 0886

```
 1    Q     Were there any other owners?
 2    A     No.  There was Jim Cast was a temporary owner, but he
 3    never was put on the papers.
 4    Q     Were you an owner of Holter Labs?
 5    A     Yes.
 6    Q     Okay.  Did Holter Labs already exist when you began
 7    working for it in 2005?
 8    A     No.
 9    Q     Did you form Holter Labs?
10    A     Yes, with Mike.
11    Q     And when you say Mike, who do you mean?
12    A     Mike Mirando.
13    Q     How did you and Mike Mirando come to form Holter Labs?
14    A     We came to form Holter Labs by a previous company that I
15    had, and basically he became a partner.
16    Q     Who became a partner?
17    A     Mike became a partner.
18          We changed it.  It was Nationwide Holter Labs, so we
19    changed it to Holter Labs and made it that company.
20    Q     Did you already know Michael Mirando?
21    A     Yes.
22    Q     How did you know him?
23    A     He was a neighbor.
24    Q     So you know what he looks like?
25    A     Yes.
```

App. 0887

Case 2:23-cv-04488-PA    Document 1-5    Filed 06/05/23    Page 477 of 786    Page ID
Case 2:16-cr-00219-PA    Document 87    Filed 07/20/17    Page 219 of 235    Page ID #:881
#:919

215

```
 1   Q      Would you recognize him again if you saw him today?

 2   A      Yes.

 3   Q      Do you see him in the courtroom today?

 4   A      Yes.

 5   Q      Could you identify him based on where he is sitting and an

 6   item of clothing he is wearing, please?

 7   A      He is the young man in the blue shirt to the left.

 8   Q      Sitting where?

 9   A      Sitting to the left of you.

10          MR. FREEDMAN:  Your Honor, may the record reflect

11   the witness has identified the defendant?

12          THE COURT:  The record will so reflect.

13          MR. FREEDMAN:  Thank you.

14   BY MR. FREEDMAN:

15   Q   When you formed Holter Labs with Michael Mirando, did the

16   two of you have an agreement as to who was going to handle what

17   part of the company's operations?

18   A      Yes.

19   Q      What was that agreement?

20   A      The agreement was that I would handle interpreting the

21   information for the reports for the doctors, and he would do

22   the marketing/billing.

23   Q      Why did you arrive at that agreement?

24   A      My experience is only with doing the scanning or the

25   reports.
```

App. 0888          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-PA Document 1-5 Filed 06/05/23 Page 478 of 786 Page ID
Case 2:16-cv-02113-PA Document 87-1 Filed 07/20/17 Page 216 of 235 Page ID #:862
#:920

216

```
 1    Q    Did the defendant have any experience with billing?

 2    A    No.

 3    Q    Why was he going to handle the billing and the marketing?

 4    A    Because at the time Jim Cast was there, he came in to help

 5    him do that.

 6    Q    Okay.  Now, did Jim Cast remain in the business?

 7    A    No, he did not.

 8    Q    When did he leave the business?

 9    A    Around 2006, early.

10    Q    Sorry, go ahead.

11    A    Around 2006.

12    Q    So the business started in 2005?

13    A    Yes.

14    Q    And Jim Cast left in 2006?

15    A    Something like that, yes.

16    Q    And you worked there until 2012?

17    A    Yes.

18    Q    So from the period of 2006 to 2012, who handled the

19    billing?

20    A    Mike Mirando.

21    Q    Did you handle the billing?

22    A    No.

23    Q    Okay.  You mentioned marketing as well.

24         What did the marketing process entail?

25    A    The marketing process was getting mailing lists and
```

App. 0889                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04448-PA   Document 1-5   Filed 06/05/23   Page 479 of 786   Page ID
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 217 of 235   Page ID #:863
#:921

217

```
 1   sending out fliers to physicians.

 2   Q     When you say "he," who do you mean?

 3   A     Mike Mirando.

 4   Q     Okay.  Could you take a look at what has been marked as

 5   Exhibit 14 in the binder in front of you?

 6   A     Okay.

 7   Q     Do you recognize that document?

 8   A     Yes.

 9   Q     What is it?

10   A     It looks like a screen shot of the website.

11   Q     Which website?

12   A     Holter Labs.

13         MR. FREEDMAN:  Your Honor, the government moves to

14   admit Exhibit 14.

15         THE COURT:  It may be received.

16     (Exhibit 14 received into evidence.)

17   BY MR. FREEDMAN:

18   Q     So, who created this?

19   A     Mirando created this.

20   Q     And is this one of the ads that was sent to doctors?

21   A     Yes.

22   Q     Okay.  What kind of services does this advertise to

23   doctors?

24   A     This service is Holter monitoring and sleep apnea

25   screening.
```

App. 0890                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 71-1 Filed 06/05/23 Page 480 of 786 Page ID #:922
Case 2:16-cr-00219-PA Document 87 Filed 07/20/17 Page 218 of 235 Page ID #:864

218

```
 1    Q    Okay.  Does it mention anything with respect to time?

 2    A    24 to 48 hours.

 3    Q    Okay.  What services did Holter Labs provide?

 4    A    Holter monitoring.

 5    Q    What is Holter monitoring?

 6    A    It's a 24- to 48-hour recorder that collects data from the

 7    patient for 24 hours and the reports produced from that.

 8         If he has any symptoms of arrhythmias it will show in the

 9    report.

10    Q    What part of the body does the Holter device reflect?

11    A    The heart.

12    Q    Okay.  Does the Holter device reflect any brain waves?

13    A    No.

14    Q    Does it reflect any oxygen?

15    A    No.

16    Q    Does it reflect any respiration?

17    A    No.

18    Q    Did the advertising that Holter Labs and the defendants

19    send out to doctors offer any services for brain studies?

20    A    No.

21    Q    What about for respiratory studies?

22    A    No.

23    Q    What about for oxygen studies?

24    A    No, they didn't.

25    Q    Now, sleep apnea is mentioned here.
```

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 71-5   Filed 06/05/23   Page 481 of 786   Page ID
Case 2:16-cv-02138-PA   Document 87   Filed 07/20/17   Page 219 of 235   Page ID
#:923

219

1        What services did the Holter device provide with respect

2   to sleep apnea?

3   A      There was a sleep apnea report that went along with the

4   Holter report.

5   Q      What information from the body was that based upon?

6   A      It was based upon the heart rate.

7   Q      Okay.  Did the Holter device that Holter Labs marketed and

8   provided to doctors, have any ability to attach to a different

9   part of a person's body besides the heart?

10  A      No, it did not.

11  Q      Could it attach to the brain?

12  A      No.

13  Q      What about the face?

14  A      No.

15  Q      What about a finger?

16  A      No.

17  Q      Could it draw blood?

18  A      No.

19  Q      Okay.  As far as you knew during the time period that you

20  were initially working at the company, was Holter Labs ever

21  providing services related to the brain?

22  A      No.

23  Q      What about related to Microvolt T-wave assessment?

24  A      No.  It was not.

25  Q      Was -- as far as you knew -- was Holter Labs billing for

App. 0892

Case 2:23-cv-04408-PA   Document 1   Filed 06/05/23   Page 482 of 786   Page ID #:924
Case 2:16-cv-02113-PA   Document 87   Filed 07/20/17   Page 220 of 235   Page ID #:924

220

1   these services?

2   A    I have never seen the billing from that, except once I

3   retrieved it in 2012 with Blue Shield.

4   Q    What happened then?

5   A    I had Jim Cast try to find out if he could get a hold of

6   the Blue Shield -- get to the Blue Shield providers and he did,

7   because he got the Blue Shield number, and he got in and looked

8   at the claims.

9   Q    What did you learn?

10  A    I just learned that there was many things in there like

11  brain and the wrong sleep apnea, things like that that were in

12  there, and billed multiple times.

13  Q    When you say "wrong," what do you mean by that?

14  A    It was the sleep apnea you have to -- you need respiration

15  the breathing and SPO2.

16  Q    So why is that wrong?

17  A    Because the Holter monitor doesn't -- cannot do that.

18       It doesn't have any respiration and breathing.

19  Q    So your company was not providing those services?

20  A    No.

21  Q    But you discovered that your company was billing for those

22  services?

23  A    Yes.

24  Q    And who was doing the billing?

25  A    Mirando.

App. 0893

Case 2:23-cv-04488-PA Document 71-5 Filed 06/05/23 Page 483 of 786 Page ID
Case 2:16-cr-00219-PA Document 87 Filed 07/20/17 Page 221 of 235 Page ID
#:925

221

```
 1   Q     The defendant?

 2   A     Yes.

 3   Q     Okay.  What were you doing -- let's talk a little bit

 4   about your role at Holter Labs.

 5         You mentioned that you handled the technical side of

 6   things.

 7         What did that involve?

 8   A     That involved basically daily going and downloading all of

 9   the information from each patient that the doctor had uploaded

10   the Holter.

11         We downloaded the information, put that into the computer,

12   each one, and going through the report, checking for bad

13   arrhythmias and provide a report for the doctor.

14   Q     Where were you -- where was Holter Labs based?

15   A     Holter Labs was based in Santa Ana, Laguna Hills.

16   Q     In an office?

17   A     In an office.  One of them.

18         There were a few locations.

19   Q     What were the other locations?

20   A     Aliso Viejo, Laguna Hills, Santa Ana.

21   Q     Always in an office?

22   A     It was in a home at the beginning.

23   Q     Okay.  And who worked out of that home?

24   A     Mike Mirando and Jim Cast and I.

25   Q     Okay.  So you handled the recording?
```

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 484 of 786   Page ID
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 222 of 235   Page ID
#:926

222

```
 1   A      Yes.

 2   Q      Where were you working physically?

 3   A      In an office with them on to the right, about six feet.

 4   Q      The same room?

 5   A      Yes.

 6   Q      How did the information get conveyed to the defendant to

 7   know how to submit bills?

 8   A      He learned it through Jim Cast.

 9   Q      Once you had generated a report for services that had been

10   generated, how did the defendant know whether it was time to

11   send a bill?

12   A      There was an order form filled out by the physician.

13          That would go along with the front copy of the Holter

14   report.

15   Q      How did Holter Labs get that order form?

16   A      They would get it by -- I would e-mail that -- forward it

17   to Mirando.

18   Q      Well, how did you get it in the first place?

19   A      It came in an e-mail or a fax.

20   Q      Who made the order forms that Holter Labs used?

21   A      Mike Mirando.

22   Q      Can you look at what has been marked as Exhibit 18 in the

23   binder in front of you?

24             THE COURT:  Is this a convenient time to take our

25   break for the day?
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. FREEDMAN:  Can I ask a few questions on the

 2    order form, then I will be done, Your Honor?

 3              THE COURT:  That's fine.

 4              MR. FREEDMAN:  Thank you.

 5    BY MR. FREEDMAN:

 6    Q    Do you recognize this document?

 7    A    Yes.

 8    Q    What is it?

 9    A    A Holter order form.

10              MR. FREEDMAN:  Your Honor, the government moves to

11    admit Exhibit 18.

12              THE COURT:  It will be received.

13         (Exhibit 18 received into evidence.)

14              MR. FREEDMAN:  Can you pull it up?

15    BY MR. FREEDMAN:

16    Q    Who made this document?

17    A    Mike Mirando.

18    Q    Does this document order form indicate what services

19    Holter Labs provided?

20    A    Yes.

21    Q    Okay.  Where does it indicate that?

22    A    It's indicated under where it says "Holter monitoring."

23    Q    Did Holter -- were there other order forms that offered

24    other services?

25    A    No.
```

App. 0896

Case 2:23-cv-04498-PA    Document 71-1    Filed 06/05/23    Page 486 of 786    Page ID
Case 2:16-cr-00213-PA    Document 87    Filed 07/20/17    Page 224 of 295    Page ID
#:928

224

```
 1  Q     Were there order forms that offered brain scans?

 2  A     No.

 3  Q     Were there order forms that offered Microvolt T-wave

 4  assessments?

 5  A     No, there wasn't.

 6  Q     Did you ever generate reports for those kind of services?

 7  A     No, I didn't.

 8  Q     But you eventually learned that the defendant had been

 9  billing for those kind of services?

10  A     Yes.

11        MR. FREEDMAN:  Your Honor, I think that is probably

12  a good stopping point for today.

13        THE COURT:  Ladies and gentlemen, we're going to

14  break for the day.

15        Again, I want to remind you until this trial is over, you

16  are not to discuss this case with anyone, including your fellow

17  jurors, members of your family, people involved in the trial or

18  anyone else.

19        And do not allow others to discuss the case with you.

20        This includes discussing the case on the Internet, blogs,

21  bulletin boards, by e-mails, text messages.

22        If anyone tries to communicate with you about this case,

23  please let me know about it immediately.

24        Do not read or listen to any news reports or other

25  accounts about the trial or anyone associated with it.
```

App. 0897

 1          Do not do any research, such as consulting dictionaries,

 2     searching the Internet, or using other reference materials.

 3          And do not make any investigation about the case on your

 4     own.

 5          Finally, you are reminded to keep an open mind until all

 6     of the evidence has been received, you have heard the arguments

 7     of counsel, the instructions of the Court, and the views of

 8     your fellow jurors.

 9          If you need to speak with me, simply give a note to the

10     clerk.

11          Now, I believe I expect that the government will conclude

12     its presentation of its case tomorrow.

13          And we may very well have closing arguments by the lawyers

14     tomorrow, and then the case would be submitted to you for

15     deliberations.

16          If we don't finish tomorrow, we will certainly finish

17     on -- what I'm thinking about doing now is having Monday as a

18     dark day and then having you come back on Tuesday.

19          Does that inconvenience anybody?

20          (No response.)

21          Then that will be our plan.

22          So you will either -- I will either have arguments

23     tomorrow or Tuesday at the latest.

24          Okay.  Thank you very much.

25          Leave your notebooks on your chairs.  We will see

App. 0898

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA   Document 71-5   Filed 06/05/23   Page 488 of 786   Page ID
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 226 of 235   Page ID #:930
#:930

226

```
 1    everybody tomorrow morning at 8 o'clock.

 2              THE COURTROOM DEPUTY:  All rise.

 3              (JURY EXITS THE COURTROOM AT 1:37 P.M.)

 4              THE COURT:  As I understand it, the parties have

 5    agreed upon all of the instructions?

 6              MR. FREEDMAN:  We have, Your Honor.

 7         In light of the cross-examination of the insurance company

 8    witnesses, the government may wish to propose something along

 9    the lines of a gullible victim instruction.

10              THE COURT:  Okay.  Let me ask you another question.

11         As I -- well, let me ask this:  Are there any counts in

12    which the government -- well, are there any counts in which the

13    insurance company did not pay?

14              MR. FREEDMAN:  I believe they were all paid.

15              MR. MCDERMOTT:  I will look -- I think the last one,

16    sir, it was not.

17              THE COURT:  I seem to have recalled some testimony

18    today where there is at least one count that it looks like it

19    was billed, at least what I thought the witness indicated and

20    the document indicated, that it wasn't paid.

21         Now, but you can --

22              MR. FREEDMAN:  We will look to confirm.

23              THE COURT:  Okay.  I think I can -- maybe I will be

24    able to tell you which count that is.  The one I had a question

25    about was Count 6.
```

App. 0899              **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA Document 71-5 Filed 06/05/23 Page 489 of 786 Page ID
Case 2:16-cv-02128-PA Document 87 Filed 07/20/17 Page 227 of 235 Page ID #:873
#:931

227

1                    MR. MCDERMOTT:  It was 9, I believe.

2                    MR. FREEDMAN:  We will check on that, Your Honor.

3                    THE COURT:  Now for the moment, let's assume that

4    there was no actual payment by the insurance company.

5        Is that fatal?

6                    MR. FREEDMAN:  I don't believe so, Your Honor.  I

7    don't think that the loss needs to be actual.  It can be an

8    intended loss.  It's still a fraudulent claim whether it was

9    paid or not.

10                   MR. MCDERMOTT:  I'm not entirely sure about that.

11                   THE COURT:  I think he may be right, but I haven't

12   looked at it recently, but I think he may be right.

13                   MR. MCDERMOTT:  I know.

14                   THE COURT:  So maybe somebody can look at that.

15                   MR. FREEDMAN:  We will look at that, Your Honor.

16                   THE COURT:  You can just check the documents and

17   testimony.

18        Based on my rough estimates, you are going to be with him

19   another hour, hour and a half?

20                   MR. FREEDMAN:  I think another hour, possibly less,

21   but I would say about an hour.

22                   THE COURT:  Okay.  Do you have an estimate as to how

23   long you are going to be with him?

24                   MR. MCDERMOTT:  45 minutes.  I have got some

25   documents, that sort of thing.

App. 0900                  **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04489-PA Document 71-5 Filed 06/05/23 Page 490 of 786 Page ID
Case 2:16-cr-00219-PA Document 87 Filed 07/20/17 Page 228 of 235 Page ID #:934
#:932

228

```
 1              THE COURT:  So that gets us roughly to 10, and then
 2      the agent is going to be on for another --
 3              MS. RYKKEN:  Probably an hour and a half.  Maybe
 4      two.  There are financial documents, so it may take a little
 5      longer.
 6              THE COURT:  That would get us to roughly noon.
 7          Do you have an idea of how long it's going to be?
 8              MR. MCDERMOTT:  It depends on the nature of it, it
 9      won't be anywhere near as long.
10          But just as an offer to the Court, would you consider that
11      we prepare for closing and instructions Tuesday morning?
12              THE COURT:  That depends on how far we get.
13              MR. MCDERMOTT:  I know.
14              THE COURT:  It sounds like -- well, it sounds like
15      that is going to happen anyway.  It would be my guess.
16              MR. MCDERMOTT:  The concern I have is the two of us
17      doing closings on Friday, and then the government being able to
18      come back and do the rebuttal on Tuesday morning.
19          I would love to have -- if the Court would indulge us --
20      just to make sure we get that all done at the same time.
21              THE COURT:  I will give that some thought.
22              MR. MCDERMOTT:  All right.
23              THE COURT:  I will get that figured out.
24          And who is going to do the closing?
25              MR. FREEDMAN:  I am, Your Honor.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04486-PA    Document 1-5    Filed 06/05/23    Page 491 of 786    Page ID
Case 2:16-cr-00219-PA    Document 87    Filed 07/20/17    Page 229 of 235    Page ID #:975
#:933

229

```
 1              THE COURT:  And have you determined how long your

 2    closing is going to be?

 3              MR. FREEDMAN:  I haven't.  I'm planning to run

 4    through it this afternoon for the first time.  I would guess

 5    maybe about half an hour.

 6              THE COURT:  Do you know how long you are going to

 7    be?

 8              MR. MCDERMOTT:  No longer than that.

 9              THE COURT:  Okay.  And then the closing part of your

10    rebuttal?

11              MR. FREEDMAN:  Probably 10 to 15 minutes.

12              THE COURT:  Okay.

13              MR. FREEDMAN:  I agree with defense counsel, if it's

14    going to be broken up over two days, we would prefer to do it

15    all on one day.

16              THE COURT:  Okay.  You are a lot nicer guys than I

17    was when I was practicing law -- I'm kidding.

18              MR. FREEDMAN:  I know.  I know.

19              THE COURT:  I'm just kidding.  My normal practice is

20    not to split them up.

21              MR. MCDERMOTT:  Yes, sir.

22              THE COURT:  So, but if we're -- by some miraculous

23    reason, we're done at 10 o'clock or something, I'm not going to

24    waste the whole day.  But I doubt it's really going to be a

25    problem.
```

Case 2:23-cv-04488-PA   Document 1-1   Filed 06/05/23   Page 492 of 786   Page ID #:934
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 230 of 235   Page ID #:876

230

 1          I doubt it's going to be an issue.

 2               MR. FREEDMAN:  Can I ask a question?

 3          Assuming that we were done earlier than expected, and we

 4     did closings tomorrow would the Court then have the jury stay

 5     past 1:30 to begin deliberations?

 6               THE COURT:  It would be up to the jury, pretty much.

 7          But then we're going to instruct -- it's really kind of up

 8     to them.

 9          I'm going to leave it up to them.  I suspect they are not

10     going to get too much done.

11          If we're pushing at 1:30 or a little after 1:30, even if

12     they stayed until 3:30, they are not going to -- my experience

13     is they usually get a foreperson selected, then they are ready

14     to go home.

15          Anyway.  I normally send back a copy of the indictment.

16          I think if we're going to do that, we probably need a

17     redacted or cleaned-up indictment.  I think there is a

18     forfeiture.

19               MR. FREEDMAN:  That is correct, Your Honor.

20          So we can redact that page.

21          The other thing I should mention, there is a forfeiture

22     allegation in the indictment.

23          The government has filed a bill of particulars earlier

24     this week in order to record a *lis pendens*.

25          Depending on what happens with this case, the government

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 493 of 786   Page ID
Case 2:16-cr-00219-PA   Document 87   Filed 07/20/17   Page 231 of 235   Page ID
#:935

231

1    would intend to move forward and trace the assets.

2         The defendant has a right to have that tried before the

3    same jury.

4         If he waives that right, then the Court can conduct that

5    hearing in whatever schedule you arrive at.  I just say that

6    because --

7              THE COURT:  That's fine.  Were you aware of this?

8              MR. MCDERMOTT:  Yes, I was.

9              THE COURT:  Okay.  Do you know now -- in the event

10   that we get that far -- do you know now whether or not you want

11   to have this jury do that?

12             MR. MCDERMOTT:  I haven't made up my mind on that,

13   sir.

14             THE COURT:  When would you know that?

15             MR. MCDERMOTT:  Well, it is something I can revisit

16   this evening.  I'm sorry, sir, I was hoping to be able to do

17   that over the weekend.

18             THE COURT:  You are both certain the jury -- the

19   defendant has a right to have the jury --

20             MR. FREEDMAN:  I believe so.  That's what I have

21   been told by prosecutors in the asset forfeiture section.  It's

22   not commonly requested, but I believe it is the first option.

23             THE COURT:  That is your recollection?

24             MR. MCDERMOTT:  Actually, my research points that is

25   one of the potentials here, yes, particularly the way it was

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA   Document 71-5   Filed 06/05/23   Page 494 of 786   Page ID
Case 2:16-cr-00218-PA   Document 87   Filed 07/20/17   Page 282 of 235   Page ID #:878
#:936

232

 1    originally filed.

 2            THE COURT:  Okay.  Well, we will look at that.

 3        If you can -- I just want to -- I'm telling the jury what

 4    they are in for.

 5        Why don't you see if you can figure that out, and we may

 6    need to let them know that tomorrow before the end of the day.

 7        Anything else?

 8            MR. MCDERMOTT:  Just a quick request, sir.  I want

 9    to ask whether or not the Court is at all inclined to modify

10    the terms of the bond -- the terms of the conditions of

11    compliance right now.

12            THE COURT:  Right now?

13            MR. MCDERMOTT:  Yes, sir.

14            THE COURT:  What is the government's position?

15            MR. FREEDMAN:  Can we have a moment to confer?

16            THE COURT:  That's fine.

17            MR. FREEDMAN:  Your Honor, we don't have a strong

18    view, but I don't think that anything has changed from the

19    Court's consideration yesterday.

20        And the additional factor, I would note, that now that the

21    cooperating witness has taken the stand, that is a concern in

22    the government's mind.

23            THE COURT:  Unless there is something that calls to

24    address this issue today, why don't we address that issue

25    tomorrow?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA Document 1-5 Filed 06/05/23 Page 495 of 786 Page ID #:937
Case 2:16-cv-00219-PA Document 87 Filed 07/20/17 Page 239 of 255 Page ID #:879

233

1          MR. MCDERMOTT:  All right, sir.

2          THE COURT:  If there is some reason that it has to

3    be today, you can tell me what that is.

4          MR. MCDERMOTT:  Sir, I would just say that the only

5    thing that has changed is his concern about his young son being

6    here in the area, the inability to have the opportunity of

7    being able to say good-bye.

8       Beyond that, there isn't any particular change.

9          THE COURT:  So he has a child?

10          MR. MCDERMOTT:  20-month old son, sir.

11          THE COURT:  That is where?

12          MR. MCDERMOTT:  Actually here, locally.

13       Just to edify the Court, I didn't appreciate what the

14    father had to say yesterday either or the way he reacted.  That

15    is why he's not here today.  I made sure of that.

16       I wanted to convey, though, that he did write an apology.

17    I just want to offer that to the Court.

18       I just wanted to have the client have the opportunity to

19    -- if in fact we get an adverse verdict -- the opportunity to

20    be able to talk to his child before he leaves in an environment

21    that doesn't contain a set of bars.

22          THE COURT:  Well, I will consider it tomorrow.

23          MR. MCDERMOTT:  All right.

24          THE COURTROOM DEPUTY:  All rise.  This Court now

25    stands adjourned.

Case 2:23-cv-04498-FA Document 1-5 Filed 06/05/23 Page 496 of 786 PageID
Case 2:16-cv-00218-FA Document 87 Filed 07/20/17 Page 234 of 235 Page ID #:890
#:938

234

1          (The proceedings were concluded at 1:51 p.m.)

2                          *  *  *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
1              CERTIFICATE OF OFFICIAL REPORTER

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6          I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  July 4, 2017

17

18

19                    /s/ TERRI A. HOURIGAN

20   _____
                 TERRI A. HOURIGAN, CSR NO. 3838, CCRR
21                   Federal Official Court Reporter

22

23

24

25
```

App. 0908

Case 2:23-cv-04498-PA   Document 69-5   Filed 06/05/23   Page 498 of 786   Page ID
Case 2:16-cv-00215-PA   Document 69   Filed 07/20/17   Page 1 of 193   Page ID #:832
#:940

1

```
 1                UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3            HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,

 6                 Plaintiff,

 7         vs.                            Case No. CR-16-215-PA

 8   MICHAEL MIRANDO,

 9                 Defendant.
                                      /
10   _____

11

12          REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                            TRIAL DAY 3
13                      FRIDAY, APRIL 28, 2017
                             8:00 A.M.
14                     LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23          TERRI A. HOURIGAN, CSR NO. 3838, CCRR
                 FEDERAL OFFICIAL COURT REPORTER
24              350 WEST FIRST STREET, ROOM 4311
                LOS ANGELES, CALIFORNIA  90012
25                      (213) 894-2849
```

Case 2:23-cv-04498-PA   Document 9-5   Filed 06/05/23   Page 499 of 786   Page ID #:941
Case 2:16-cv-00218-PA   Document 69   Filed 07/20/17   Page 2 of 199   Page ID #:2832

2

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         EILEEN DECKER
          United States Attorney
5         BY:  MICHAEL FREEDMAN
               KATHERINE RYKKEN
6               Assistant United States Attorney
          United States Courthouse
7         312 North Spring Street
          Los Angeles, California  90012
8

9

     **FOR THE DEFENDANT MICHAEL MIRANDO:**
10

          LAW OFFICES OF KEVIN BARRY MCDERMOTT
11        BY:  KEVIN B. MCDERMOTT
               Attorney at Law
12        300 Spectrum Center Drive, Suite 1420
          Irvine, California 92618
13

14

     ALSO PRESENT:  Special Agent Kathleen Kennedy
15

16

17

18

19

20

21

22

23

24

25

Case 2:23-cv-04498-PA Document 69-5 Filed 06/05/23 Page 500 of 786 Page ID
Case 2:16-cv-00218-PA Document 69 Filed 07/20/17 Page 801 108 of Page ID #9684
#:942

3

**I N D E X**

--------------------------------------------------------

CHRONOLOGICAL INDEX OF WITNESSES

WITNESSES:                                              PAGE

    STANTON CROWLEY (RESUMED THE STAND)

        Direct Examination by Mr. Freedman          17

        Cross-Examination by Mr. McDermott          53

        Redirect Examination by Mr. Freedman        120

        Recross-Examination by Mr. McDermott        122


    KATHLEEN IRENE KENNEDY

        Direct Examination by Ms. Rykken            124

        Cross-Examination by Mr. McDermott          165

Case 2:23-cv-04498-PA   Document 9-5  Filed 06/05/23   Page 501 of 786  Page ID #:943
Case 2:18-cv-00218-PA   Document 69  Filed 10/20/17   Page 401 of 493   Page ID #:9685

4

```
 1                        INDEX OF EXHIBITS

 2    EXHIBIT NO.              Page

 3    26                      20

 4    11                      27

 5    15                      28

 6    16                      29

 7    17                      30

 8    20                      34

 9    21                      46

10    23                      51

11    89                     134

12    90                     139

13    91                     144

14    8                      147

15    36                     148

16    50                     149

17    62                     150

18    77                     150

19    84                     151

20    92                     159

21    95                     162

22    94                     163

23

24

25
```

App. 0912                  UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA    Document 9-5  Filed 06/05/23   Page 502 of 786   Page ID
Case 2:16-cr-00215-PA    Document 69   Filed 07/20/17   Page 501 of 192   Page ID #:936
#:944

5

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | **LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 28, 2017**          |
| 2   | * * *                                                        |
| 3   |                                                              |
| 4   | THE COURTROOM DEPUTY:  Calling Item 1, *CR-16-215,*          |
| 5   | *United States of America versus Michael Mirando.*          |
| 6   | Counsel, may I have your appearance please.                  |
| 7   | MR. FREEDMAN:  Good morning, Your Honor.  Michael           |
| 8   | Freedman and Katherine Ryyken.  And Kathleen Kennedy is with us |
| 9   | again at counsel table.                                      |
| 10  | THE COURT:  Good morning.                                    |
| 11  | MR. MCDERMOTT:  Good morning, Your Honor.  Kevin            |
| 12  | McDermott on behalf of Mr. Mirando, who is present.          |
| 13  | THE COURT:  Good morning.  Let's talk a little bit           |
| 14  | about the status of the case, so we can hopefully update the |
| 15  | jury with more accurate information as to where we are.      |
| 16  | You have two witnesses, one of whom is outstanding.          |
| 17  | MR. FREEDMAN:  That's correct, Your Honor.                   |
| 18  | THE COURT:  And does defense intend to put on a              |
| 19  | case?                                                        |
| 20  | MR. MCDERMOTT:  No, sir.                                     |
| 21  | THE COURT:  And that includes the defendant is not          |
| 22  | going to testify?                                            |
| 23  | MR. MCDERMOTT:  Yes, sir.                                     |
| 24  | THE COURT:  Now, I take it the status of the                 |
| 25  | forfeiture is as it was yesterday?                           |

App. 0913

6

1              MR. FREEDMAN:  I want to note the issue we left

2      hanging yesterday, the Federal Rules of Criminal Procedure --

3              THE COURT:  Sir, you can update me on what you

4      believe the law is in a minute.

5          Okay.  What is your estimate as to how long it's going to

6      take to put on this forfeiture?

7              MR. FREEDMAN:  I would think approximately an hour

8      or two.

9              THE COURT:  An hour or two.

10         Okay.  Now, what we should have done, is updated the jury

11     at the start of this case, that there was a possibility they

12     were going to have to be retained after they concluded their

13     deliberations.

14         And as I understand the law, we need to tell them before

15     they deliberate now that there is a possibility that they may

16     have to come back in to decide a remaining issue in this case.

17         And I suspect they are not going to greet that news with

18     open arms, because they should have been told earlier.

19         Now, do you have jury instructions?

20             MR. FREEDMAN:  Yes, Your Honor.

21             MS. RYKKEN:  Yes.

22             THE COURT:  Jury instructions on the forfeiture?

23             MS. RYKKEN:  On the forfeiture, we do not.

24             THE COURT:  Do you have a verdict form?

25             MR. FREEDMAN:  No, we don't, Your Honor.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 69-5   Filed 06/05/23   Page 504 of 786   Page ID
Case 2:16-cv-00216-PA   Document 69-5   Filed 07/20/17   Page 7 of 193   Page ID #9889
#:946
7

1          THE COURT:  All right.  I want that by Monday.

2          MR. FREEDMAN:  Yes, Your Honor.

3          THE COURT:  Now, I told the jury yesterday that we

4    weren't going to be in session on Monday.  I'm going to go back

5    now, and leave that up to them when I update them on the status

6    of this case.

7          Now, Monday apparently I guess there is going to be some

8    protests in the area.  But I'm going to leave it up to them.

9          Those protests, I think, are going to hit full and are

10   going to impact this area probably around 10:30.

11         So, if we start at 8 o'clock, we probably ought to be able

12   to get in the courthouse.  As I understand it they are

13   estimating there may be -- may be 100,000 people participating.

14         So probably if we're in session on Monday, you are

15   probably not going to be able to -- the jury and anybody else

16   is going to have a hard time getting in and out of downtown

17   starting at around 10:30, 11 o'clock.

18         That protest is supposed to take place in Grand Park.  And

19   the path of the protest is going to come straight up Broadway,

20   and I will tell them all of that.

21         And what I proposed -- well, the other thing is I want the

22   parties to meet and confer at the end of today to determine

23   whether or not there is indeed going to be need for a jury

24   trial on this forfeiture.

25         If there is, there is, that is fine.

App. 0915          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 69-5   Filed 06/05/23   Page 505 of 786   Page ID
Case 2:16-cv-00213-PA   Document 69-5   Filed 07/20/17   Page 805 of 195   Page ID #:8689
#:947

8

1          But the government ought to disclose -- if they haven't,

2    what they have.

3          What is the standard?

4               MR. FREEDMAN:  Your Honor, I'm not exactly sure.

5               THE COURT:  If you don't know, just say you don't

6    know.

7               MR. FREEDMAN:  I don't know.  I have to consult with

8    the forfeiture department.

9               MR. MCDERMOTT:  May I take the fall on this, more so

10   than the government, because of the lock-up at night, it's been

11   difficult for me to get in to see him based on when he gets

12   back.

13         And I would ask the Court just for the time and

14   opportunity, to be able to do that over the weekend, go through

15   the process and explain it.

16         Now, if he's still in confinement, I will come back here.

17   I will be glad, obviously, to do that.

18         But in light of the conversation going on, as far as the

19   right to jury as opposed to a judgment forfeiture, I would like

20   to have the opportunity to discuss that with the client, get

21   his full cooperation with it, and it may involve the situation

22   where we decide not to.

23         I haven't had the opportunity to fully go through that

24   process with him, sir.

25               THE COURT:  Okay.  Well, I believe there would be an

Case 2:23-cv-04498-PA   Document 69-5   Filed 06/05/23   Page 506 of 786   Page ID
Case 2:16-cv-00215-PA   Document 69   Filed 07/20/17   Page 9 of 199   Page ID #:890
#:948

9

 1    opportunity to do that today, and if we need to, once we

 2    conclude at 1:30, you can take some time, take as much time as

 3    you like to talk with him.

 4         I think he can be held in this building, and they can

 5    provide you with access to him, or we will provide you with

 6    access here in the courtroom.

 7         You can discuss it.  We can come back here at 3:30,

 8    4 o'clock, whatever time it takes, and you can talk with the

 9    government, see what they have or don't have, and you guys can

10    make an informed decision.

11         If you -- look, he's got a right to have a jury trial on

12    that issue.  And I'm not going to put any pressure on it to

13    make a decision.

14         If he wants a jury trial on that issue, that is fine, we

15    will deal with it.

16         So, I think the sooner we know that, just so the Court can

17    plan, and the jury can plan.

18         What I intend to tell the jury is something to the effect

19    that I have had an opportunity to confer with the parties to

20    give us an update on the status of this case.

21         We anticipate that there are going to be two witnesses,

22    one of whom is on the stand now before the government concludes

23    its case.

24         Once the government rests, that will conclude the

25    presentation of the evidence.

App. 0917                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA    Document 4-5    Filed 06/05/23    Page 507 of 786    Page ID
#:949
Case 2:16-cv-00213-PA    Document 89    Filed 07/20/17    Page 106 of 193    Page ID #:891

10

 1          The lawyers have estimated that it's going to take them at

 2     least -- based on what I think I was told yesterday -- an hour

 3     and a half to complete their closing arguments.

 4          I think you wanted, what, about 30 minutes?

 5               MR. MCDERMOTT:  Yes.

 6               THE COURT:  I think he wants 30 minutes --

 7               MR. FREEDMAN:  Yes.

 8               THE COURT:  -- for his opening, and another 15 or

 9     20 minutes.

10          So I think that is roughly about an hour and a half.

11          Now, I'm also going to tell the jury -- I know you guys

12     wanted to argue, I guess, next week, but given -- I mean, if

13     we're going to have to have another proceeding, I want to try

14     to get this jury done as close as possible to that Tuesday

15     estimate that we gave them.

16          So it seems to me -- I will even ask the jury today, if

17     they want to stay a little later today, and once these

18     witnesses are done, we could argue and we could complete the

19     arguments today.

20          And then I'm going to tell them the Court will then

21     instruct you after the parties' argument -- that is going to

22     take roughly 20 minutes or so -- and then you will retire to

23     deliberate.

24          And after you conclude your deliberations, there may be

25     one additional factual issue that you have to decide and that

App. 0918               **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 14-5   Filed 06/05/23   Page 508 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 108 of 193   Page ID #:892
#:950
11

1   will require you return to the Court for an additional

2   proceeding that is estimated to last an hour to maybe two hours

3   tops, and then you will be given another verdict form, and you

4   will deliberate to resolve that issue.

5        Now, so under our present thinking when we weren't going

6   to be in trial on Monday, we would estimate you would get the

7   case Tuesday.

8        We told you at the start of the trial the case would be

9   over either Tuesday or Wednesday -- I think that is what we

10  told them.

11       So if you don't want to be here on Monday, that is fine,

12  and I think if worst comes to worst -- well, that is a little

13  tricky, too.  I can't tell you how long it's going to take you

14  to deliberate on this case, but you would have this case by

15  Tuesday worst case.

16       If you want -- knowing everything I know now -- if you

17  want to be here on Monday, you can decide among yourselves and

18  we can -- we will be here on Monday, if that's what you want to

19  do, and we will just leave it to them.

20       Okay.  Now, I think the defense has raised this issue

21  about the defendant's bond yesterday.

22       And I will hear from counsel at some point perhaps at the

23  end of the day, but here is my thinking:

24       Based on what I know right now, the defendant's bond was

25  revoked because the Court -- one of the obligations of the

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 509 of 786   Page ID #:951
Case 2:18-cr-00213-PA   Document 89-5   Filed 07/20/17   Page 120 of 193   Page ID #:893

12

1    Court is to ensure the integrity of these proceedings.

2         And the Court had found that the defendant had approached

3    two of the jurors here in an effort to gain sympathy.

4         Now, once the jury concludes, and I think with the defense

5    -- I think the issue for the defense was, at least as I recall

6    from yesterday, was that in the event that the defendant was

7    convicted, he wanted to have some time with his family and get

8    his affairs in order.

9         Now, unless -- given what I know right now and assuming

10   nothing new comes out, I don't know what the -- in the event of

11   a conviction, I don't know what the government's position is

12   with respect to the defendant remaining on bond, but if there

13   is nothing new, then what I intend -- he will have that

14   opportunity no matter what the jury does -- because if he's

15   acquitted, he will be ordered released forthwith.

16        If there is a conviction, and I know there is nothing new,

17   I'm probably going to put him back on his bond because the jury

18   will have -- they will have concluded their responsibilities,

19   and the concern I had then won't be present.

20        So that's sort of my thinking right now on that issue.

21        And he will be released, and if he's convicted, I may take

22   a look at the conditions.  He may have to put on a bracelet or

23   something, but he would certainly have an opportunity to go

24   home and get his affairs together, based on what I know right

25   now.

App. 0920                  **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 510 of 786   Page ID #:952
Case 2:16-cr-00215-PA   Document 89   Filed 07/20/17   Page 196 of 193   Page ID #:894

13

 1      So that's sort of where we are.

 2      All right.  All the members of the jury are here.

 3      Is there anything else that we need to take up?

 4           MR. FREEDMAN:  No, Your Honor.

 5           MR. MCDERMOTT:  No, sir.

 6           THE COURT:  Okay.  Let's bring the jury in.

 7           THE COURTROOM DEPUTY:  All rise.

 8           (JURY ENTERS THE COURTROOM AT 8:18 A.M.)

 9           THE COURTROOM DEPUTY:  Item 1, *CR-16-215 United*

10 *States of America versus Michael Mirando.*

11      Counsel, may I have your appearances, please?

12           MR. FREEDMAN:  Good morning, Your Honor.  Michael

13 Freedman and Katherine Rykken, and with us at counsel table is

14 Special Agent Kathleen Kennedy, as well.

15           THE COURT:  Good morning.

16           MR. MCDERMOTT:  Good morning, Kevin McDermott on

17 behalf of Mr. Mirando, who is present.

18           THE COURT:  Good morning.

19      Ladies and gentlemen, after conferring with the parties, I

20 wanted to give you our latest views as to the status of this

21 case, and our estimates of how long it's going to take to

22 conclude these proceedings.

23      Now, yesterday, in addressing you, I mentioned that we

24 would not be in session on Monday.

25      I really want to give you an opportunity to address that,

App. 0921            **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04198-PA Document 1-5 Filed 06/05/23 Page 511 of 786 Page ID #:953
Case 2:18-cr-00213-PA Document 89-5 Filed 07/20/17 Page 146 of 193 Page ID #:898

14

1   and it's really going to be up to you whether or not we're in

2   session on Monday.

3          And maybe after I give you an idea of our estimates, if

4   you want to be here on Monday, that is fine.

5          Now, one of the other things I would let you know, is that

6   on Monday, there is going to be a May Day demonstration in the

7   downtown area.  And it's estimated that there are going to be

8   100,000 people in the downtown area and this demonstration is

9   going to take place -- there is going to be a march and

10  demonstration and is going to take place in Grand Park, which

11  is about two blocks from the courthouse, maybe a block.

12         Now, if we started at eight, we are probably going to miss

13  a lot of that congestion.

14         And at 1:30, there are going to be what they call rolling

15  street closures.

16         Probably by 1:30 or 2 o'clock, you would be able to --

17  First Street and Broadway and Hill Street would probably may no

18  longer be closed.

19         They are going to close around 10 o'clock to let the

20  marchers get to Grand Park, so you would be able to get out of

21  here in the afternoon.

22         Now, the government has two witnesses left.  One of whom

23  is on the stand now.

24         And the government -- the parties estimate that it's

25  probably going to take us somewhere between four to five hours

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 512 of 786   Page ID #:954
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 190 of 193   Page ID #:890

15

1    to conclude the examination of those witnesses.

2         So that would take us to something like noon, maybe 12:30.

3    If we're really slow, maybe 1 o'clock.

4         Counsel have estimated that that will conclude the

5    presentation of the evidence in the case.

6         Then counsel will have their closing arguments.

7         That's going to take, I believe, roughly an hour and a

8    half.

9         Then the case will be submitted to you for your

10   deliberations.  And I can't -- I have no way of knowing how

11   long it's going to take you to deliberate to reach a verdict if

12   you can.

13        Now, after you conclude your deliberations, there may

14   be -- there may be or may not be an additional factual issue

15   that you have to resolve.

16        That will require that you return to the courtroom, and

17   there will be an additional presentation of evidence that is

18   going to take somewhere between an hour, maybe two hours tops.

19        And then you would retire to deliberate on that issue.

20        Now, we still -- we told you when the case started, that

21   we expected the case would conclude either Tuesday or

22   Wednesday.

23        Even if you aren't here on Monday, we still would expect

24   that the case will conclude with everything by Wednesday,

25   depending on -- and that includes -- well, it depends on how

Case 2:23-cv-04493-PA  Document 1-5  Filed 06/05/23  Page 513 of 786  Page ID #:955
Case 2:16-cv-00213-PA  Document 89  Filed 07/20/17  Page 16 of 193  Page ID #:897

16

```
 1    long you take to deliberate.

 2         We can finish the presentation of the evidence.  We will

 3    finish that today.

 4         If you wanted to have the lawyers argue today, depending

 5    on how long it's going to take to conclude these witnesses,

 6    that may last past a little past 1:30.

 7         We might need to be here until 2, or 2:30.

 8         If you still want to leave at 1:30, and you want to be

 9    here Monday, then Monday we would have the arguments, and you

10    would start deliberating.

11         If you still don't want to come in on Monday, and they

12    don't argue today, they would argue.  That would take about an

13    hour.

14         It's going to take -- I have to instruct you -- it's going

15    to take about 20 minutes.  You will still get the case on

16    Tuesday morning.

17         Okay.  So that's sort of where we are.

18         So, it's a lot to process, but I won't ask you to do that

19    now while you are sitting here, but maybe at the break, and if

20    you guys want to meet among yourselves, let us know what you

21    want to do.

22         Monday is going to be an interesting day, but you decide

23    and we will accommodate you.

24         But even if we weren't in session on Monday, you will --

25    you would probably -- my guess is you would still get this case
```

UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 514 of 786   Page ID #:956
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 106 of 195   Page ID #:898

17

```
 1    on Tuesday -- sometime Tuesday morning.

 2         Even if we -- if you want to stop early today after the

 3    presentation of the witnesses, that is fine, too.

 4         And then we would resume on Tuesday or Monday with

 5    counsel's arguments and you will still get the case Tuesday

 6    morning.

 7         Okay.  Does counsel have anything you want to take up at

 8    sidebar to discuss anything?

 9              MR. FREEDMAN:  No, Your Honor.

10              MR. MCDERMOTT:  No, sir.

11              THE COURT:  All right.  Let's bring the witness in,

12    please.

13              THE COURTROOM DEPUTY:  Please be seated.

14         Mr. Crowley, you are reminded that you are still under

15    oath.

16         Do you understand that?

17              THE WITNESS:  Yes.

18              MR. FREEDMAN:  May I inquire?

19              THE COURT:  Yes.

20

21                   DIRECT EXAMINATION (RESUMED)

22    BY MR. FREEDMAN:

23    Q    Mr. Crowley, what year was it that you testified to

24    yesterday that you discovered the billing irregularities?

25    A    2012.
```

App. 0925            **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA   Document 4-5   Filed 06/05/23   Page 515 of 786   Page ID #:957
Case 2:16-cv-00215-PA   Document 89-5   Filed 07/20/17   Page 180 of 193   Page ID #:899

18

```
 1   Q     Did you do anything when you discovered these billing
 2   irregularities?
 3   A     Yes.  I came to the government.
 4   Q     What do you mean by that?
 5         What did that entail?
 6   A     I got an attorney and brought the evidence to the
 7   government.
 8   Q     Why did you decide to get an attorney?
 9   A     Because I didn't really know the process how to do that.
10   Q     When you say "how to do that," what does that mean?
11   A     How to bring it to the government.
12   Q     What led you to think you should bring this to the
13   government?
14   A     Because of the certain codes that I Googled and checked,
15   and they were not codes that we were supposed to be doing, that
16   the Holter recorder could do.
17   Q     Why did you think the government needed to know this?
18   A     It just seemed excessive, and it wasn't the right thing to
19   do.
20   Q     Did you get an attorney?
21   A     Yes.
22   Q     Did that attorney arrange for you to go to the government?
23   A     Yes.
24   Q     And when you say that you went to the government, who
25   exactly -- what part of the government did you speak with?
```

App. 0926          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04198-PA   Document 1-5   Filed 26/05/23   Page 516 of 786   Page ID
Case 2:16-cv-00215-PA   Document 89   Filed 07/20/17   Page 196 of 193   Page ID #:900
#:958

19

```
 1   A      The FBI.

 2   Q      Did you speak with any attorneys for the government?

 3   A      Yes.

 4   Q      Were those from the United States Attorney's Office?

 5   A      Yes.

 6   Q      And when did you speak with the -- did you speak with the

 7   FBI and the United States Attorneys at the same time?

 8   A      Yes.

 9   Q      When was that?

10   A      2013.

11   Q      When you met with the government in 2013, did the

12   government have you sign any documents?

13   A      Yes.  They had me sign one.

14   Q      What kind of document was that, if you recall?

15   A      It was, like, something for a day -- a talk -- not get in

16   trouble or something like that.

17   Q      Did you have any obligations under that document?

18   A      No.

19   Q      Can you take a look at the binder in front of you, the

20   larger one, the tab that is marked Exhibit 26?

21          Do you recognize this document?

22   A      Yes.

23   Q      What is it?

24   A      I'm lost.

25   Q      26?
```

App. 0927                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA    Document 4-5    Filed 06/05/23    Page 517 of 786    Page ID
Case 2:16-cv-00223-PA    Document 89    Filed 07/20/17    Page 20 of 193    Page ID #:901
#:959

20

```
 1   A    Yes, I recognize it.

 2   Q    What is it?

 3   A    It's a document I signed when I came to the government.

 4              MR. FREEDMAN:  Your Honor, the government moves to

 5   admit 26.

 6              MR. MCDERMOTT:  No objection.

 7              THE COURT:  All right.  It will be received.

 8        (Exhibit 26 received into evidence.)

 9   BY MR. FREEDMAN:

10   Q    Is this the letter you signed with the government?

11   A    Yes.

12   Q    Okay.  Let's look at Section 1(c) here.

13        Is this the date that you met with the government,

14   September 17, 2013?

15   A    Yes.

16   Q    Okay.  And then let's look at the page 2, and let's look

17   at Section 2 through 6.

18        Can you look at Item 2 and tell us what that says?

19   A    Yes.  Your client will respond truthfully, and completely

20   to any and all questions put to your client at the meeting.

21   Q    And I should have clarified earlier, was this letter

22   addressed to your attorney?

23   A    No, it's to me.

24   Q    "Can we go back to the first page.

25        Where it says "dear," is that your attorney, Mr. Zanides?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 518 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 208 of 193   Page ID #:902
#:960

21

```
 1   A      Yes.

 2   Q      It's regarding you?

 3   A      Yes.

 4   Q      Okay.  So, when it says "your client," does that refer to

 5   you?

 6   A      Yes.

 7   Q      So did you have an obligation letter agreement with the

 8   government to respond truthfully and completely to all

 9   questions?

10   A      Yes.

11   Q      Did you honor that obligation?

12   A      Yes.

13   Q      Okay.  Let's look at Section 5.

14          What does this section say?

15   A      "The office reserves the right to use any statements or

16   information provided by your client in any prosecution for

17   false statements, obstruction of justice, or perjury."

18   Q      So does this -- did you have any understanding of what the

19   -- were there potential consequences to you if you didn't tell

20   the truth to the government?

21   A      Yes.

22   Q      Were these the consequences?

23   A      Yes.

24   Q      And you reviewed this letter with your lawyer and with the

25   government before speaking with them, right?
```

```
 1   A     Yes.

 2   Q     And did you sign this letter?

 3   A     Yes.

 4   Q     Let's pull up the last page.

 5         Is that your signature there?

 6   A     Yes.

 7   Q     And your attorney signed it as well?

 8   A     Yes.

 9   Q     Okay.  And then let's look at Section 6 on page 2.

10         Does this section provide additional detail on your

11   obligations to tell the truth to the government?

12   A     Yes.

13   Q     And does it reiterate that there are consequences if you

14   didn't tell the truth to the government?

15   A     Yes.

16   Q     Okay.  So again, did you honor the terms of this

17   obligation in your September 17, 2013 meeting with the

18   government?

19   A     Yes, I did.

20   Q     After that meeting, did you continue cooperating with the

21   government?

22   A     Yes.

23   Q     What form did that cooperation take?

24   A     I met with them -- met with the FBI.

25   Q     How many times did you meet with the FBI?
```

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 520 of 786   Page ID
#:962
Case 2:16-cv-00215-PA   Document 89   Filed 07/20/17   Page 23 of 193   Page ID #:904

23

```
 1   A     At least five times.

 2   Q     What was the purpose of those meetings?

 3   A     Any information or evidence.

 4   Q     Did you sign any other documents with the government?

 5   A     No.

 6   Q     Did the government make you any other promises besides

 7   what was contained in this letter?

 8   A     No.

 9   Q     Did the government ever tell you that it would agree not

10   to charge you?

11   A     No.

12   Q     Did the government ever tell you that it would pay you any

13   money?

14   A     No.

15   Q     Did the government ever pay you any money?

16   A     No.

17   Q     Did you have any expectation of making money when you went

18   to the government?

19   A     No, I didn't.

20   Q     Did you have an understanding that what you were telling

21   the government could lead you to being charged?

22   A     Possibly.

23   Q     And in your subsequent meetings with the FBI and

24   government since this first one, did you understand that you

25   were under a continuing obligation to tell the truth?
```

App. 0931                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 521 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 240 of 293   Page ID #:903
#:963

24

```
 1   A     Yes.

 2   Q     Did you understand that there were continuing consequences

 3   for not telling the truth?

 4   A     Yes.

 5   Q     Okay.  Did you tell the truth at all times you worked with

 6   the government in this case?

 7   A     Yes.

 8             MR. FREEDMAN:  Okay.  Let's go back.  We were

 9   looking yesterday when we concluded -- I think it was

10   Exhibit 18, the order form.

11         Your Honor, may we publish?

12             THE COURT:  Yes.

13   BY MR. FREEDMAN:

14   Q     I think I asked you this yesterday, but I want to confirm.

15   Did Holter Labs produce this order form?

16   A     Yes.

17   Q     And did Holter Labs send this order form to doctors?

18   A     Yes.

19   Q     And who specifically at Holter Labs created this order

20   form?

21   A     Mike Mirando.

22   Q     How did Holter Labs get in contact with doctors in the

23   first instance to provide Holter devices?

24   A     The mailer was sent out, an advertising mailer.

25   Q     Who made that mailer?
```

App. 0932          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 522 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 25 of 193   Page ID #:900
#:964

25

```
 1   A     Mirando.

 2   Q     Okay.  Could you take a look at what is marked in the

 3   binder in front of you as Exhibit 14?

 4              MR. FREEDMAN:  Your Honor, I believe this has

 5   previously been admitted.  May we publish?

 6              THE COURT:  Yes.

 7   BY MR. FREEDMAN:

 8   Q     Is this one of those mailers?

 9   A     Yes.

10   Q     Did Holter devices also have a website?

11   A     Yes.

12   Q     Who designed the website?

13   A     Mike Mirando.

14   Q     Could you take a look at what has been marked as

15   Exhibit 11, please?

16         Do you recognize this screen shot?

17   A     Yes.  It's a little newer than what I used to see.

18   Q     What is it?

19   A     It's a screen shot of the website.

20              MR. FREEDMAN:  Okay.  Your Honor, we move to admit

21   Exhibit 10?

22              MR. MCDERMOTT:  With one reservation foundationally

23   as to date or time of this particular document, if this witness

24   knows.

25              THE COURT:  Okay.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 523 of 786   Page ID
#:965
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 208 of 293   Page ID #:907
26

```
 1   BY MR. FREEDMAN:
 2   Q    Do you know when this screen shot of the website was
 3   taken?
 4   A    No.
 5   Q    Did you take this screen shot of the website?
 6   A    No.
 7   Q    Okay.  Does it -- when did you last see the website of
 8   Holter Labs?
 9   A    A year ago.
10   Q    Okay.  And when did you last see it when you worked at
11   Holter Labs?
12   A    Probably 2013.
13   Q    And does this exhibit in front of you appear consistent
14   with the website when you worked there?
15   A    It's similar, slightly different.
16           MR. MCDERMOTT:  I'm sorry, without more definition
17   as to what is different, we still object.
18   BY MR. FREEDMAN:
19   Q    What is different about it, Mr. Crowley?
20   A    He has telemetry on here.  It wasn't on there when I saw
21   it.
22   Q    Okay.
23   A    It's one of the things.
24           MR. FREEDMAN:  Your Honor, we would move to
25   Exhibit 10 -- Exhibit 11.
```

App. 0934                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 524 of 786   Page ID #:966
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 296 of 295   Page ID #:908

27

```
 1                THE COURT:  Any objection?

 2                MR. MCDERMOTT:  Not at this point as long as it's

 3     clear it wasn't something that he saw back in 2013.

 4                THE COURT:  All right.  It will be received.

 5           (Exhibit 11 received into evidence.)

 6     BY MR. FREEDMAN:

 7     Q     Let's look at the first section where it explains -- does

 8     this explain services that Holter Labs offered?

 9     A     Yes.

10     Q     And how does it explain Holter monitoring?

11     A     It explains Holter monitoring, 24/48-hour ECG recording.

12     Q     Is that explanation consistent with what was on the

13     website when you saw it -- when you worked at Holter Labs?

14     A     Yes.

15     Q     Did Holter Labs' website ever promote brain studies?

16     A     No.

17     Q     Did it ever promote services for a night

18     electroencephalogram?

19     A     No, not when I was there.

20     Q     What about for Microvolt T-wave assessments?

21     A     No.

22     Q     Could you take a look at Exhibit 15.

23           Do you recognize this document?

24     A     Yes.

25     Q     What is it?
```

App. 0935

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 525 of 786   Page ID #:967
Case 2:16-cv-00215-PA   Document 89-5   Filed 07/20/17   Page 280 of 293   Page ID #:909

28

```
 1   A    The advertising mailer.

 2            MR. FREEDMAN:  Okay.  Your Honor, we move to admit

 3   Exhibit 15.

 4            MR. MCDERMOTT:  Again, same question as to time

 5   frame, please.

 6   BY MR. FREEDMAN:

 7   Q    Do you recognize this as an advertisement from when you

 8   worked at Holter Labs?

 9   A    Yes.  It looks similar, very similar.

10            MR. FREEDMAN:  Your Honor, we move to admit the

11   exhibit.

12            MR. MCDERMOTT:  No objection at this time.

13            THE COURT:  It will be received.

14       (Exhibit 15 received into evidence.)

15   BY MR. FREEDMAN:

16   Q    Could you take a look at Exhibit 16?

17       Do you recognize this document?

18   A    Yes.

19   Q    What is it?

20   A    It looks like another mailer.

21   Q    Is it a mailer from the time you worked at Holter Labs?

22   A    Yes.

23            MR. FREEDMAN:  Your Honor, we would move to admit

24   Exhibit 16.

25            MR. MCDERMOTT:  No objection.
```

App. 0936

Case 2:23-cv-04496-PA   Document 4-5   Filed 06/05/23   Page 526 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 290 of 293   Page ID #:910
#:968

29

```
 1              THE COURT:  It may be received.

 2         (Exhibit 16 received into evidence.)

 3    BY MR. FREEDMAN:

 4    Q    So when -- were you involved at all in designing these

 5    advertisements?

 6    A    No.

 7    Q    Were you involved in promoting a Holter device to doctors?

 8    A    No.  This one went to a mailing list to the doctors.

 9    Q    Who was responsible for sending out the advertisements?

10    A    Mike Mirando.

11    Q    About how many doctors would you say, if you know, the

12    defendant sent these advertisements to?

13    A    Thousands.

14    Q    1,000 or thousands?

15    A    Thousands.

16    Q    Thousands.  And roughly, how many -- what percentage of

17    those doctors responded they wanted a Holter device?

18    A    It was under five percent.

19    Q    When doctors responded that they wanted to engage the

20    services of Holter Labs, what did Holter Labs do?

21    A    They would contact them if they were interested.  They

22    would sign a form and then they would get a recorder sent to

23    them.

24    Q    Who was responsible for sending the recorder?

25    A    Mike Mirando.
```

App. 0937                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04408-PA Document 1-5 Filed 06/05/23 Page 527 of 786 Page ID #:969
Case 2:16-cv-00213-PA Document 89-5 Filed 07/20/17 Page 300 of 293 Page ID #:969

30

```
1   Q    When the defendant sent the Holter device to the doctors,

2   did he send the order form at the same time?

3   A    Yes.

4   Q    Did -- how about -- so you mentioned about five percent.

5        Did you keep any inventory of who Holter Labs had sent

6   these reports to -- sorry, who it had sent the devices to?

7   A    Yes.

8   Q    Could you take a look at what has been marked as

9   Exhibit 17.

10       Do you recognize this document?

11  A    Yes.

12  Q    What is it?

13  A    It's a spreadsheet of the doctors and recorders.

14  Q    Is this a document from the time that you worked at Holter

15  Labs?

16  A    Yes.

17           MR. FREEDMAN:  Your Honor, we move to admit

18  Exhibit 17.

19           MR. MCDERMOTT:  No objection.

20           THE COURT:  It will be received.

21       (Exhibit 17 received into evidence.)

22  BY MR. FREEDMAN:

23  Q    So just looking at the top here, it appears to reflect the

24  total number of devices that had been sent out?

25  A    Yes.
```

App. 0938          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 528 of 786   Page ID #:970
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 30 of 293   Page ID #:912

31

```
 1   Q    What is that number?

 2   A    229.

 3   Q    Okay.  And then is it correct that this document then

 4   lists the various doctors that the devices had been sent out

 5   to?

 6   A    Yes.

 7   Q    And what other information does it provide?

 8   A    The type of recorder.

 9   Q    Okay.  As far as you know, did any of the recorders that

10   Holter Labs sent out to these doctors have brain wave

11   measurement capabilities?

12   A    No.

13   Q    Did they have oxygen measurement capabilities?

14   A    No.

15   Q    Blood test capabilities?

16   A    No.

17   Q    Did any of them last long enough to run for 30 days?

18   A    No.

19   Q    So, once the devices were sent to the doctors, then walk

20   me through, if you would, what happened next.

21        How did you get business?

22   A    The doctor would have a patient that came in that had a

23   possible heart issue.

24        They would hook up that patient with the recorder, send

25   them home for 24 to 48 hours.
```

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 529 of 786    Page ID
#:971
Case 2:16-cv-00213-PA    Document 89    Filed 07/20/17    Page 32 of 293   Page ID #:913

32

1          Then they would come back to the office.

2          The nurse would take the recorder, the memory card out,

3    upload the data to the site, and then we would retrieve the

4    data.

5          I would retrieve the data into the computer.

6          It would go into the Holter software.  I would produce a

7    report for the doctor and upload -- upload to the doctor the

8    report.

9    Q    Were you the only person at Holter Labs who reviewed those

10   reports?

11   A    Yes.

12   Q    Do you ever recall reviewing reports for the same patient

13   named more than once in a month?

14   A    No.

15   Q    Do you ever recall reviewing reports that had 30 days

16   worth of data?

17   A    No.

18   Q    Do you ever recall reviewing reports that had data

19   pertaining to the brain?

20   A    No.

21   Q    What about data pertaining to Microvolt T-wave assessment?

22   A    No.

23   Q    What about data pertaining to oxygen and respiratory

24   measurements?

25   A    No.

              **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 530 of 786   Page ID #:972
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 39 of 193   Page ID #:914

33

```
1   Q     Did anyone else at Holter Labs handle these reports?
2   A     No.
3   Q     So after you sent the reports to the -- back to the
4   doctors, what was the next step in the business of Holter Labs?
5   A     When the report was done, I would get an e-mail or fax of
6   the patient order form and put that together with the cover
7   sheet of the Holter report and e-mail it to Mike Mirando.
8   Q     Why did you e-mail it to the defendant?
9   A     For him to take it and do the billing.
10  Q     When you e-mailed it to the defendant, did you tell him
11  what codes to bill?
12  A     No.
13  Q     Did you tell him what services to bill for?
14  A     No.
15  Q     So was it your -- did you have an understanding with him
16  that the information he needed was contained in the documents
17  you sent him?
18  A     Yes.
19  Q     Okay.  Could you take a look at what has been marked in
20  the binder in front of you as Exhibit 20.
21        Do you recognize this document?
22  A     Yes.
23  Q     What is it?
24  A     It's an e-mail forwarded with the order form that the
25  Holter was done with insurance information.
```

App. 0941

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 531 of 786   Page ID #:973
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 34 of 193   Page ID #:973

34

1    Q    Did you write this e-mail?

2    A    No.

3    Q    Who is the e-mail from?

4    A    The e-mail is from me to Mike, because the Holter was done

5    so I had to send him the information.

6    Q    So you sent this e-mail?

7    A    Yes.

8    Q    When you worked at Holter Labs?

9    A    Yes.

10          MR. FREEDMAN:  Your Honor, the government moves to

11   admit Exhibit 20.

12          MR. MCDERMOTT:  No objection.

13          THE COURT:  It will be received.

14      (Exhibit 20 received into evidence.)

15   BY MR. FREEDMAN:

16   Q    Is this one of the documents you provided to the FBI?

17   A    Yes.

18   Q    Okay.  So, is this an example of one of the e-mails you

19   were just describing?

20   A    Yes, it's an example.

21   Q    What kind of information is provided in this e-mail?

22   A    The physician's name, patient, date of birth, insurance

23   policy, address.

24   Q    Does it include the date of service?

25   A    Yes.

App. 0942          **UNITED STATES DISTRICT COURT**

35

```
 1   Q    Okay.  And then let's look back at the top.  It looks like
 2   -- were there attachments sent with this e-mail?
 3   A    Yes.
 4   Q    What would those attachments have been?
 5   A    They would be the order form and the first page of the
 6   Holter report.
 7   Q    And you saved the Holter report by its date of service?
 8   A    Yes.
 9   Q    Do you recall ever sending e-mails to the defendant for
10   the same patient for multiple dates of service?
11   A    No.
12   Q    Once you sent this information to the defendant, did you
13   have any further role in the process of billing and payment?
14   A    No.
15   Q    Were you working in the same room as defendant when he was
16   handling the billing?
17   A    The Santa Ana location, no.
18   Q    Did you ever chat with the defendant about the billing?
19   A    Not really, just forwarded the information.
20   Q    When you started the company together, did you have any
21   initial discussions about who was going to handle the billing?
22   A    Yes.
23   Q    Did you have any discussions about how the billing should
24   be handled?
25   A    No.
```

App. 0943

Case 2:23-cv-04493-PA Document 14-5 Filed 06/05/23 Page 533 of 786 Page ID #:975
Case 2:16-cv-00223-PA Document 89 Filed 07/20/17 Page 36 of 193 Page ID #:917

36

1    Q     Did you have any understanding with the defendant that the

2    billing should be aggressive for services that weren't done?

3    A     No.

4    Q     Now, once the defendant sent out the bills, how did Holter

5    Labs get paid on its claims?

6    A     The insurance companies would pay.

7    Q     And did Holter Labs have a bank account?

8    A     Yes.

9    Q     Where was that bank account?

10   A     Chase.

11   Q     Okay.  Was it Chase at the time?

12   A     At the beginning, it was Washington Mutual.

13   Q     And then was it the same account and the bank changed?

14   A     Yes.

15   Q     As far as you were aware before 2012, did Holter Labs have

16   any other business bank accounts?

17   A     No.

18   Q     Were you a signatory on the Chase account?

19   A     Yes.

20   Q     Were you a signatory on any other Holter Labs accounts?

21   A     No.

22   Q     Was the defendant a signatory on the Chase account?

23            MR. MCDERMOTT:  At this point, I'm going to object

24   as to foundation.

25            THE COURT:  All right.  Objection sustained.

App. 0944            **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA Document 4-5 Filed 06/05/23 Page 534 of 786 Page ID
Case 2:18-cv-00213-PA Document 89-5 Filed 07/20/15 Page 306 of 195 Page ID #:918
#:976

37

```
 1        The answer is stricken.  The jury is to disregard it.
 2   BY MR. FREEDMAN:
 3   Q    How did the money -- were you a partner in Holter Labs?
 4   A    Yes.
 5   Q    Did you get paid a salary?
 6   A    Yes.
 7   Q    What was your salary?
 8   A    It varied.
 9   Q    What was the range it varied?
10   A    It probably averaged throughout all of the years, probably
11   80,000 throughout all of the years.
12        If you broke it up, some years were more than others.
13   Q    About 80,000 a year?
14   A    Yeah, some were more than others, though.
15   Q    Were you getting a bi-weekly paycheck?
16   A    Yes.
17   Q    Who was -- what account was the paycheck drawn from?
18   A    Chase.
19   Q    Did you write that check to yourself from the Chase
20   account?
21   A    No.
22   Q    How did the check get written to you?
23   A    Mike wrote out the check.
24   Q    Okay.  What about business expenses.  Were you involved in
25   handling business expenses?
```

App. 0945        **UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Who was involved in handling business expenses? |
| 3 | A | Mike was.  He took care of that. |
| 4 | Q | You mentioned that you made about roughly $80,000 a year. |
| 5 | | Were some years you made more that than? |
| 6 | A | Yes. |
| 7 | Q | Some years less? |
| 8 | A | Yes. |
| 9 | Q | In the years when you made more money, did it seem to you |
| 10 | | that you were busier with more reports? |
| 11 | A | Yes. |
| 12 | Q | In the years that it was slower, did it seem there were |
| 13 | | fewer reports? |
| 14 | A | Yes. |
| 15 | Q | Did you and the defendant have an agreement as to the |
| 16 | | split of the profits from the business? |
| 17 | A | There was 40/60. |
| 18 | Q | Who made 40? |
| 19 | A | I was 40, he was 60. |
| 20 | Q | And how did you reach that agreement? |
| 21 | A | That was just an agreement Mike made. |
| 22 | Q | With you? |
| 23 | A | Yes. |
| 24 | Q | Why was he making more? |
| 25 | A | I don't know. |

UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 536 of 786   Page ID #:978
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 39 of 193   Page ID #:920

39

```
 1   Q    Did it seem to you -- did you have any sense of how much

 2   money defendant was making on a yearly basis?

 3   A    No.

 4   Q    How come you didn't know that?

 5   A    I never saw his salary.

 6   Q    At any point in time, did you suspect that the agreement

 7   was not being honored as to the 60/40 split?

 8   A    It seems that -- I mean, it came across my mind, yes.

 9   Q    When did it come across your mind?

10   A    Well, when he was getting ready to move to Oregon.

11   Q    When was that?

12   A    2011.

13   Q    And what made that thought come across your mind?

14   A    Just the big down payment on the house, and things like

15   that.

16   Q    How did you know about the down payment on the house?

17   A    He said.

18   Q    What did he say?

19   A    He said he's putting 450,000 down.

20   Q    Do you know -- did he tell you how much the house cost?

21   A    Somewhere around 950.

22   Q    So did the defendant move to Portland?

23   A    Yes.

24   Q    And when was that?

25   A    Somewhere around 2011.
```

App. 0947

Case 2:23-cv-04493-PA   Document 14-5   Filed 06/05/23   Page 537 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 40 of 193   Page ID #:921
#:979

40

1    Q     When the defendant moved to Portland, did the business

2    continue operating?

3    A     Yes.

4    Q     Did you ever incorporate the business in Oregon?

5    A     No.

6    Q     Did you -- how did you continue working with the defendant

7    if he was in another state?

8    A     I would do the same thing.  I would get the information on

9    the Internet for the Holters.

10         I would produce the Holter, and when it was done, I would

11   forward the e-mail with the Holter report, and the order form

12   to Mike, the same way.

13   Q     Did the defendant return to California over the course of

14   the -- after he moved to Portland?

15   A     Here and there, yes.

16   Q     Did you meet with him when he returned?

17   A     Yes, a couple of times.

18   Q     Did you ever raise with him concerns about these money

19   issues that you were just discussing?

20   A     I raised a concern, yeah.

21         One time I asked him if he had any secret bank accounts.

22   Q     What did he tell you?

23   A     No.

24   Q     Did you ever raise concerns with him about how much money

25   you were making from Holter Labs compared to how much he was

App. 0948              UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA    Document 4-5    Filed 06/05/23    Page 538 of 786    Page ID
Case 2:16-cv-00213-PA    Document 89-5    Filed 07/20/17    Page 40 of 193    Page ID #:922
#:980

41

1    making?

2    A    No.

3    Q    Did you ever express to him that you felt you were making

4    less money at Holter Labs than you previously had been?

5    A    Yes.

6    Q    What did you say?

7    A    I basically said, I'm -- we're making a lot less money

8    than we used to make.

9    Q    Did the defendant respond to you?

10   A    Yes.

11   Q    What did he say?

12   A    He said Holter pays a lot less.

13   Q    Okay.  Did he say anything else?

14   A    I will start the billing event again.

15   Q    Did you understand what he meant by that?

16   A    Well, it was the same time that I asked him about secret

17   bank accounts.

18        Not really -- it didn't seem legitimate.  He seemed kind

19   of lying.

20   Q    Why did it seem that way?

21   A    Just the way his expression was and the way he said it.

22   Q    Did you understand what "event" meant?

23   A    Yes.

24   Q    What does it mean?

25   A    It's a 30-day monitor.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 539 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 42 of 193   Page ID #:923
#:981

42

1   Q    And why did that -- how did that factor into your

2   interpretation of what the defendant told you?

3   A    It just seemed the whole thing he was making up.  I didn't

4   know exactly what to think of it.

5   Q    Why did it seem he was making up event?

6   A    The expression on his face and the way he said it.

7   Q    Did you have any understanding as to whether it was

8   possible to bill for event?

9   A    Well, we had event through a service, an outside service.

10   Q    What does that mean?

11   A    They have the -- they would do the monitoring of event.

12   Q    What is event.  I think you may have already explained it.

13   A    It's a similar recorder that does 30 days instead of 24 to

14   48 hours.

15   Q    Why did you do it through a different service?

16   A    It was just how it was done.  It was set up that way.

17   Q    As far as you knew, as far as you were concerned, was

18   Holter Labs ever billing for a 30-day event?

19   A    No.

20   Q    Did you know any claims were being made to insurance

21   companies for 30-day event?

22   A    No.

23   Q    Did -- what occurred next in your relationship with

24   defendant after he moved to Portland and you developed the

25   suspicions?

App. 0950        **UNITED STATES DISTRICT COURT**

```
 1   A    Basically, I got ahold of Jim Cast to check on what was
 2   being billed because I never knew.
 3        So he accessed the Blue Shield account, and went in and
 4   found out what was being billed through that company.
 5   Q    Can you just remind the jury who Jim Cast was?
 6   A    He was there from 2005 to 2006, like, the third partner,
 7   possible partner.
 8   Q    Did he remain a partner after 2006?
 9   A    No.
10   Q    Why not?
11   A    He had another job, and he didn't have time for it.
12   Q    When was it you contacted him again?
13   A    2012.
14   Q    So between 2006 and 2012, were there any other partners
15   besides you and defendant?
16   A    No.
17   Q    Anyone else working at Holter Labs?
18   A    No.
19   Q    Why did you contact Jim Cast?
20   A    Because he got the provider.
21        You have to get it in the beginning of 2005, or 06, he's
22   the one that got it, so he's the one that could access or call
23   and get in.  He was the contact.
24   Q    When you say "access," what do you mean by that?
25   A    You could log-in to the Blue Shield account.
```

UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 541 of 786   Page ID #:983
Case 2:18-cv-00215-PA   Document 89-5   Filed 07/20/17   Page 440 of 193   Page ID #:923

44

```
 1   Q      How many insurance companies did Holter Labs do business

 2   with?

 3   A      At least 20.

 4   Q      For those insurance companies, did Holter Labs have

 5   contracts with the insurance companies?

 6   A      Some of them, yes.

 7   Q      And some of them not?

 8   A      Yes.

 9   Q      Did Holter Labs submit -- how did Holter Labs submit

10   claims to those insurance companies, if you know?

11   A      They were submitted -- paid electronically, I don't know

12   exactly where they were sent -- like how.

13   Q      When they were submitted electronically, did you have

14   log-in and password access for any of the electronic systems?

15   A      No.

16   Q      Who had that access?

17   A      Any access was Mike on the providerships.

18   Q      Did he tell you what the information was?

19   A      No.

20   Q      So was it only the Blue Cross Blue Shield that Jim Cast

21   had access to?

22   A      Yes.

23   Q      And why was that?

24   A      Because he's the one that got the providership at the

25   beginning.
```

App. 0952                  **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA    Document 4-5    Filed 06/05/23    Page 542 of 786    Page ID #:984
Case 2:18-cv-00213-PA    Document 89    Filed 07/20/17    Page 49 of 193    Page ID #:920

45

```
 1   Q    Okay.  Why did you contact Jim Cast to try to gain this

 2   access?

 3   A    I needed to see what was going on with the billing and the

 4   company.

 5   Q    Why did you need to see that?

 6   A    It just -- I have never seen it.  I needed to see what was

 7   going on as far as what was going on as far as the money.

 8   Q    If you had never seen it before, why did you decide you

 9   needed to see it now?

10   A    Because I thought something was going on when he moved to

11   Oregon, and he bought the big house and stuff.

12   Q    Did you and Jim Cast access the records?

13   A    Yes.

14   Q    How did you do that?

15   A    He contacted Blue Shield, and he was the contact -- his

16   name matched, so he got in.

17   Q    Could you take a look at what has been marked as

18   Exhibit 21?

19        Do you recognize this document.

20   A    Yes.

21   Q    What is it?

22   A    It's a Blue Shield -- where it shows the patient.

23   Q    Is it printed out from a website?

24   A    Yes.

25   Q    On what -- does it appear -- does it indicate on what date
```

App. 0953

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 543 of 786   Page ID
Case 2:16-cr-00213-PA   Document 89-5   Filed 07/20/17   Page 480 of 198   Page ID #:927
#:985

46

1    it was printed out?

2    A    I don't see the date, offhand, 2012, 10/13/2012.

3    Q    Are these the records you obtained from Blue Cross?

4    A    Yes.

5          MR. FREEDMAN:  Your Honor, the government moves to

6    admit Exhibit 21.

7          MR. MCDERMOTT:  No objection.

8          THE COURT:  It will be received.

9    (Exhibit 21 received into evidence.)

10   BY MR. FREEDMAN:

11   Q    Did you ultimately provide a copy of those documents to

12   the government?

13   A    Yes.

14   Q    Are these the documents you found when you and Jim Cast

15   were able to gain access?

16   A    Yes.

17   Q    Did obtaining these documents lead you to any conclusions?

18   A    I Googled some of the codes and they weren't the codes

19   that we were doing.

20   Q    What were some of the codes you found, if you remember?

21   A    The one on here 95827.

22   Q    What was that?

23        Do you remember what you found when you Googled that?

24   A    Offhand, I can't match the code with what it was, but I

25   don't know what that code is.

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 544 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 400 of 193   Page ID #:928
#:986

47

1    Q    Aside from the numbers of codes, do you have any

2    recollection of what sort of terminology you found when you did

3    these Google searchs?

4    A    Yes.

5    Q    What were some of those services?

6    A    One was some type of brain test.  The other was T-wave

7    Alternans, and the other one was sleep apnea.

8    Q    And what was your conclusion after doing the Google

9    search?

10   A    That we were not doing those tests.

11   Q    Had you ever known before this point that bills had been

12   made -- claims had been made for those tests?

13   A    No.

14   Q    Had you ever known before whether those kind of tests were

15   actually performed?

16   A    No.

17   Q    Had you ever seen a glossary of terms of tests that Holter

18   Labs provided with its claims?

19   A    Glossary?

20   Q    Had you ever seen written expressions of these services

21   before?

22   A    Not those, no.

23   Q    Okay.  Did you learn anything else from this investigation

24   into the insurance records?

25   A    There were different dates of service billed many times

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 545 of 786   Page ID #:987
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 48 of 153   Page ID #:929

48

 1    for the same patient.

 2    Q    Did you learn anything about whether the insurance

 3    companies made payments on these claims?

 4    A    Some of them made payments, yes.

 5    Q    How did you determine that?

 6    A    It says in the red column.

 7    Q    Did you take any further investigation to see where those

 8    claims were paid?

 9         What account they were made into?

10    A    Basically Jim got a returned check, yes.

11    Q    And what account was that returned check for?

12    A    Bank of the West.

13    Q    Was it a Holter Labs Bank of the West account?

14    A    Yes.

15    Q    Did you know before this date that Holter Labs had a Bank

16    of the West account?

17    A    No.

18    Q    Were you a signatory on any Bank of the West account for

19    Holter Labs?

20    A    No.

21    Q    Okay.  When you learned this information, did you take any

22    action with respect to the defendant?

23    A    No.

24    Q    Did you ask him about what you had found?

25    A    No.

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 546 of 786   Page ID #:988
Case 2:16-cv-00215-PA   Document 89   Filed 07/20/17   Page 49 of 193   Page ID #:930

49

```
 1   Q    Did you have a feeling that you should have earned some of
 2   this money?
 3   A    No.
 4   Q    Did you try to obtain any relief or money from the
 5   defendant?
 6   A    I was on a civil lawsuit.
 7   Q    You filed a civil lawsuit?
 8   A    Yes.
 9   Q    When did you file the civil lawsuit?
10   A    It was March or April, 2013.
11   Q    How did you -- did you have a lawyer?
12   A    Yes.
13   Q    How did you pay for the lawyer?
14   A    I got money out of the Holter Labs account.
15   Q    How much money?
16   A    24,000.
17   Q    And when you say the Holter Labs account, which account?
18   A    The Chase Bank account.
19   Q    Did the defendant have any response when you took that
20   money out of the account?
21   A    He sent an e-mail, "what is this"?
22   Q    Did he take any further action?
23   A    He cut me out of the business.
24   Q    How did he do that?
25   A    He basically stopped access to the Holter -- any Holter
```

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 547 of 786   Page ID #:989
Case 2:16-cv-00215-PA   Document 89   Filed 07/20/17   Page 50 of 193   Page ID #:931

50

 1   Labs stuff, like the log-ins and everything.

 2   Q     So after this point, was it in 2013, you said?

 3   A     The end of 2012.

 4   Q     So did you stop reviewing reports for Holter Labs at some

 5   point in time?

 6   A     Yes, right then.

 7   Q     End of 2012.  And in the lawsuit, did it proceed -- were

 8   filings made in Court?

 9   A     Yes.

10   Q     Did you receive copies of those filings?

11   A     Yes.

12   Q     In those filings, was there an issue as to who owned the

13   business, Holter Labs?

14   A     Yes.

15   Q     And what was the -- did the defendant take a position in

16   that lawsuit on who owned Holter Labs?

17   A     Yes.

18   Q     What was his position?

19   A     He was claiming I was just an agent of Holter Labs.

20   Q     Who did he claim owned Holter Labs?

21   A     He claimed that he owned Holter Labs, Mike.

22   Q     Could you take a look at what has been marked as

23   Exhibit 23?

24         Do you recognize in document?

25   A     Yes.

App. 0958

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 548 of 786   Page ID #:990
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 51 of 193   Page ID #:932

51

```
1   Q     What is it?

2   A     It's a lawsuit.

3   Q     And is this the lawsuit you were just describing?

4   A     Yes.

5   Q     You were involved in?

6   A     Yes.

7              MR. FREEDMAN:  Your Honor, we move to admit

8   Exhibit 23.

9              MR. MCDERMOTT:  No objection.

10             THE COURT:  It will be received.

11         (Exhibit 23 received into evidence.)

12  BY MR. FREEDMAN:

13  Q     So, let's take a look at page 2 here, Section 5.  What

14  does that read?

15  A     "Defendant admits that Mirando, created an entity in

16  Oregon known as Holter Labs, LLC, where he was the sole member.

17  Defendant denies the other material allegation."

18  Q     Then let's look at page 4.

19        Can you read the first line here?

20  A     "I am a member of Holter Labs, LLC, a party to this

21  action."

22  Q     I think -- can you read it again more carefully at the

23  beginning?

24  A     "I am the member of Holter Labs, LLC, a party to this

25  action.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 549 of 786   Page ID #:993
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 52 of 193   Page ID #:991

52

```
 1   Q     Who signed this?

 2   A     Michael Mirando.

 3   Q     Okay.  Do you recognize that signature?

 4   A     Yes.

 5   Q     Had you seen his signature before in doing business with

 6   him?

 7   A     Yes.

 8   Q     Is that defendant's signature?

 9   A     Yes.

10   Q     What happened with the lawsuit?

11   A     Just went on and I gave up on it.  I didn't have any

12   money, so I couldn't keep it going.

13   Q     Okay.  Did you ever make any threats against the

14   defendant?

15   A     No.

16   Q     Did he ever make any threats against you?

17   A     At one time he did.

18   Q     What did he say?

19   A     He said he had a lot of guns, and he's a better aim than

20   me.

21   Q     Was that in the course of this lawsuit?

22   A     It was right before -- right around when Jim filed the

23   lawsuit first.

24   Q     Okay.  Was it after the lawsuit -- was the lawsuit still

25   pending when you contacted the government?
```

App. 0960

**UNITED STATES DISTRICT COURT**

53

```
 1   A     Yes.

 2   Q     Were you trying to involve the government for some benefit

 3   in the civil lawsuit?

 4   A     No.

 5   Q     Did you ever threaten the defendant that you were going to

 6   go to the government to report him?

 7   A     No.

 8   Q     Why -- what was your motivation then for reporting this to

 9   the government?

10   A     It seemed like the right thing to do.

11   Q     And why was that?

12   A     Because I saw all of the billing that was all wrong, and

13   it was out of control.

14   Q     And it was billing that had occurred when it was still

15   your company?

16   A     Yes.

17   Q     Okay.

18         MR. FREEDMAN:  No further questions at this time,

19   Your Honor.

20         THE COURT:  Cross-examination?

21         MR. MCDERMOTT:  Yes, sir.

22

23                      CROSS-EXAMINATION

24   BY MR. MCDERMOTT:

25   Q     Mr. Crowley, I want you to tell the jury what you think of
```

App. 0961

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 551 of 786    Page ID
Case 2:16-cv-00213-PA    Document 89-5    Filed 07/20/17    Page 540 of 593    Page ID #:993
#:993

54

```
 1   Mr. Mirando?

 2   A    What I think of him?

 3   Q    Yeah, what do you think of him?

 4   A    I don't really have anything to say.

 5   Q    Personal opinion, you despise the man, don't you?

 6   A    No.

 7   Q    You don't?

 8   A    No.

 9   Q    You absolutely have total disgust for him, don't you?

10   A    No.

11   Q    Not at all?

12   A    No.

13   Q    Not a bit?

14   A    No.

15   Q    Because in fact he stole your company from you.

16        That is your testimony, correct?

17   A    Yes.

18   Q    He stole your company that you started with him and walked

19   away from it, correct?

20   A    Yes.

21   Q    And you are not angry at him?

22   A    Yeah, I'm angry, but I'm not in total disgust.

23   Q    Okay.  And you are angry still to this day, are you not?

24   A    Slightly.

25   Q    Let's talk about your business.
```

App. 0962                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 552 of 786   Page ID #:994
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 390 of 193   Page ID #:936

55

1      Didn't you testify yesterday that you had already a

2   business in place when you met Mr. Mirando?

3   A     Yes.

4   Q     In fact the two of you lived in a condo complex in Aliso

5   Viejo, correct?

6   A     Yes.

7   Q     And it was 2002, when you first met my client, right?

8   A     Yes.

9   Q     And in fact, my client -- he's about, what, 10 or 15 years

10  younger than you?

11  A     He's 12.

12  Q     12 years younger?

13  A     Yeah, 12.

14  Q     And at some point in time the two of you became friends,

15  right?

16  A     Yes.

17  Q     And before you got into a business together you were

18  friends; is that true?

19  A     Yes.

20  Q     And at some point in time, you asked him to get involved

21  with your business, true?

22  A     Actually, he asked me.

23  Q     He asked you?

24  A     Yes.

25  Q     Well, what kind of business did you have in 2002?

App. 0963           **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 553 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 380 of 193   Page ID #:937
#:995
56

```
 1   A     It was a Holter business.

 2   Q     It was a Holter business?

 3   A     Yes.

 4   Q     Well, you had been involved with Holter for quite

 5   sometime, had you not?

 6   A     Yes.

 7   Q     What was your previous employer?

 8   A     It was Nationwide Cardio.

 9   Q     Nationwide Cardio.

10         Now, how long had you been working for Nationwide Cardio?

11   A     A few years.

12   Q     What is a few?

13   A     Maybe three.

14   Q     Three years?

15         By that time -- I mean, when did you start working there

16   and when did you leave?

17   A     I left there in 2005.

18   Q     And when did you start?

19   A     2002.

20   Q     2002.  Had you worked in the Holter industry before that?

21   A     Yes.

22   Q     And what company was that?

23   A     National Cardio.

24   Q     National Cardio.

25         What was the name of your company?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 554 of 786   Page ID #:996
Case 2:16-cv-00215-PA   Document 89-5   Filed 07/20/17   Page 309 of 195   Page ID #:996

57

```
 1    A      Nationwide Cardio.

 2           It wasn't my company really, though, it was another

 3    person's.

 4    Q      That would be Mr. Burns?

 5    A      No.

 6    Q      Who was it?

 7    A      Darren Slack.

 8    Q      Slack.

 9           Now, when you were working for the first company, that was

10    owned by a family named Parsons?

11    A      Yes.

12    Q      When did you start working for them?

13    A      In 1998.

14    Q      1998.  And you worked for them for how long?

15    A      Until 2002.

16    Q      2002.

17           At which point in time you were fired from that company,

18    correct?

19    A      Yes.

20    Q      And you started your own company, and that company,

21    Parsons Company, sued your company, did it not?

22    A      Yes.

23    Q      In fact, they claimed that you had stole client lists and

24    trade secrets from the original company, true?

25    A      It wasn't my company.  It was Darren Slack's company.
```

App. 0965

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 555 of 786   Page ID #:997
Case 2:18-cv-00213-PA   Document 89   Filed 07/20/17   Page 58 of 193   Page ID #:939

58

```
 1   Q     All right.  But that company got sued, correct?
 2   A     Yes.
 3   Q     And Darren Slack got sued.
 4         Were you named as a defendant in that case?
 5   A     Yes.
 6   Q     So, a former company sued you and Mr. Slack because of
 7   trade secrets and other violations?
 8   A     Yes.
 9   Q     And at some point in time, did you do the right thing and
10   go to the FBI?
11   A     Yes.
12   Q     Now, when you were at the company with Mr. Slack, were you
13   in fact making money off of Holter devices?
14   A     Yes.
15   Q     And how was the Holter device company with Mr. Slack
16   performing?
17         Were you making money?
18   A     Yes.
19   Q     How much money were you making?
20   A     Probably about 50 grand a year.
21   Q     50 grand a year.
22         And during that time frame with Mr. Slack, were you filing
23   tax returns?
24   A     Yes.
25   Q     During that time frame, you were filing tax returns?
```

App. 0966                   UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 556 of 786   Page ID #:998
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 59 of 193   Page ID #:940

59

```
1    A     I think so, yes.

2    Q     You think so.

3          All right.  From that point in time, when you were sued,

4    did you in fact then leave that company and start something new

5    with Mr. Mirando?

6    A     Yes.

7    Q     Because it was the completely new company that wouldn't be

8    involved with Darren Slack or anybody else, true?

9    A     It was a new company, yes.

10   Q     Clean break?

11   A     He was in Riverside.  It was too far away.

12   Q     When you say Riverside, who was in Riverside?

13   A     Darren Slack was in Riverside.

14   Q     So, were you having to travel to Riverside to Aliso Veijo,

15   to do the work?

16   A     Yes.

17   Q     So you two weren't actually transmitting back and forth

18   e-mails and whatnot to keep your business going, correct?

19         Let me withdraw that.  I will give you an easier question.

20         You had to drive every day to Riverside to do your

21   business with Slack?

22   A     Yes.

23   Q     Now, when you set up Holter Labs, there was actually a

24   contract, an agreement done between the two of you -- you and

25   Mr. Mirando, correct?
```

App. 0967          **UNITED STATES DISTRICT COURT**

```
 1   A      Yes.

 2   Q      And that contract was something you signed, correct?

 3   A      Yes.

 4   Q      And in that contract it indicated who got what, who was

 5   responsible for how much, correct?

 6   A      Yes.

 7   Q      All right.  Now let me ask you this:  What was your

 8   portion of the contribution to this company with Michael

 9   Mirando?

10   A      Person with the recorders from the previous company.

11   Q      All right.  And you took those recorders from the previous

12   company, correct?

13   A      I did -- yes, they were half mine.

14   Q      Half yours?  Now when you say "half yours," you mean Slack

15   owned half of it?

16   A      Yes.

17   Q      And did you pay Slack for his portion of it?

18   A      No.  He gave me half.

19   Q      He gave you half.

20   A      Yes.

21   Q      How many of those properly functioned by the time you set

22   up Holter Labs?

23   A      Probably around 30.

24   Q      30 of them?

25          Now, did you see that list that you looked at as far as
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 14-5   Filed 06/05/23   Page 558 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 61 of 193   Page ID #:942
#:1000

61

```
 1   the devices at Holter Labs?

 2   A    This one?

 3   Q    Yes.

 4   A    Yes.  I looked at it a little bit.  It is a far newer

 5   list, though.

 6   Q    It is, far newer.

 7        Now are you saying that this was a list that wasn't

 8   created while you were with Holter Labs?

 9   A    I don't know if that is the exact list, but it's very

10   similar.

11   Q    Very similar.  But on that list can you identify which

12   devices were yours that you brought to the --

13   A    I could if I probably -- if I saw the numbers.

14   Q    Well, take a look at the document.

15        Do you have it in front of you?

16   A    What number is it?

17   Q    Number 17, please.

18        Do you have Number 17 in front of you?

19   A    Yes.

20   Q    Look through the list and tell us which one of those

21   devices you brought to Holter Labs?

22   A    The ones that do not say "VXE."

23   Q    I'm sorry?

24   A    VXK.

25   Q    The ones that do or don't say VXE?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 559 of 786   Page ID
Case 2:18-cv-00215-PA   Document 89   Filed 07/20/17   Page 620 of 193   Page ID #:943
#:1001

62

```
 1   A     The ones that don't.

 2   Q     All right.  So how many of them are there?

 3   A     I will have to count them.  There is a lot of pages.

 4   Q     I'm sorry?

 5   A     It says 13 on here, but there was more.

 6   Q     There was more?

 7   A     Yes.

 8   Q     But they are not listed there, is it, so that may not be a

 9   correct list of all of the devices that were at Holter Labs,

10   true?

11   A     I don't know.

12   Q     You don't know.

13         So there may have been other devices that Holter Labs had

14   that you are not aware of, correct?

15   A     Correct.

16   Q     Now, let's talk about the formation.

17         The two you were living in the same complex in Aliso

18   Viejo, in 2002.

19         And by 2005, the two of you decided to form a business

20   together, correct?

21   A     Yes.

22   Q     In that business, one of the things that Mr. Mirando

23   brought to the table was $40,000, correct?

24   A     Yes.

25   Q     And the other thing he brought to the table was the
```

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 560 of 786   Page ID #:1002
Case 2:16-cv-00215-PA   Document 89   Filed 07/20/17   Page 63 of 193   Page ID #:944

63

1    ability to apply for credit, true?

2    A    Yes.

3    Q    Well, for example, wasn't there an American Express

4    account set up with the business?

5    A    Yes.

6    Q    In fact, you had a card from that account that you used

7    for your expenses?

8    A    Yes.

9    Q    So in addition to the salary that you received over the

10   course of time, your expenses were paid by the company,

11   correct?

12   A    Yes.

13   Q    Is that yes?

14   A    Some, yes.

15   Q    In fact, during the entire time you were with Holter Labs,

16   did you ever use your credit history to secure an item or

17   document or a device for Holter Labs?

18   A    No.

19   Q    That is because your credit wouldn't sustain being able to

20   buy something for Holter Labs; isn't that true?

21   A    At the beginning.

22   Q    Well, at the beginning because you had no tax record

23   history; isn't that true?

24   A    No.

25   Q    No.  All right.  So in 2004, 2005, 2006, you had filed tax

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 561 of 786   Page ID #:1003
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 64 of 193   Page ID #:948

64

```
 1   returns, correct?

 2   A     I don't know.

 3   Q     You don't know.

 4   A     I think all of my taxes -- yes, I think they are all filed

 5   now.

 6   Q     Well, they are filed now.

 7   A     Yes.

 8              THE COURT:  Counsel.

 9              MR. MCDERMOTT:  I'm sorry, sir.

10   BY MR. MCDERMOTT:

11   Q     So in 2005 time frame, you form this business, and it's

12   yours and Mr. Mirando's, correct?

13   A     Yes.

14   Q     And in this agreement, there is no mention originally of

15   James Cast, is there?

16   A     Not originally, no.

17   Q     In fact Mr. Cast was brought in -- he was somebody you

18   knew, correct?

19   A     Yes.

20   Q     And that person was somebody you worked with at the

21   Parsons Company, correct?

22   A     Yes.

23   Q     That is where -- well, the two of you met long before

24   that.

25         You actually went to high school together, right?
```

App. 0972

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 14-5   Filed 06/05/23   Page 562 of 786   Page ID #:1004
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 63 of 193   Page ID #:940

65

```
 1   A     I didn't hang around Mr. Cast in high school.

 2   Q     But you went to the same high school?

 3   A     Yes.

 4   Q     And maybe I'm thinking this thing wrong, you and Mr. Slack

 5   went to high school together, right?

 6   A     Yes, but he was a lot younger.

 7   Q     Okay.  But all three of you from the same high school were

 8   involved in the same business which was Holter devices,

 9   correct?

10   A     Yes.

11   Q     Explain to the jury when you were working at Parsons -- we

12   will call it Parsons -- did you in fact have any medical

13   training?

14   A     No.

15   Q     Any background?

16   A     I was trained through National Cardio.

17   Q     Okay.  And they trained you how to do the interpretation

18   aspect of it?

19   A     Yes.

20   Q     What else did they train you to do?

21   A     That's it.

22   Q     Well, did you prepare a declaration in this lawsuit that

23   the government has been talking about when you tried to get

24   your interest or take control of the Holter Labs Company -- did

25   you file a declaration under penalty of perjury in that case?
```

App. 0973

Case 2:23-cv-04493-PA  Document 1-5  Filed 06/05/23  Page 563 of 786  Page ID
Case 2:18-cv-00215-PA  Document 89  Filed 07/20/15  Page 66 of 193  Page ID #:947
#:1005

66

1    A     Yes.

2    Q     You did.  Do you recall some of the contents of that

3    declaration under penalty of perjury?

4    A     Not offhand, no.

5    Q     Sir, I have an original for the witness and a copy for the

6    Court.

7         I think the next in order would have been C as in Charlie?

8              THE COURT:  Ladies and gentlemen, we're going to

9    take our first break this morning.

10        Again, I want to remind you until this trial is over, you

11   are not to discuss this case with anyone including your fellow

12   jurors, your family members, people involved in the trial or

13   anyone else.  And do not allow them to discuss the case.

14        This includes discussing the case on the Internet, by

15   bulletin boards, e-mail, text messages, and if anyone tries to

16   talk to you about this case, please let me know immediately.

17        Do not read, watch or listen to any news reports or other

18   accounts about the trial or anyone associated with it.

19        Do not do any research such as consulting dictionaries,

20   searching the Internet, and do not make any investigation about

21   the case on your own.

22        Finally, you are reminded to keep an open mind until all

23   of the evidence has been received, you have heard the arguments

24   of counsel, and the instructions of the Court and the views of

25   your fellow jurors.

Case 2:23-cv-04493-PA    Document 1-5    Filed 06/05/23    Page 564 of 786   Page ID
Case 2:16-cv-00213-PA    Document 89    Filed 07/20/17    Page 68 of 195   Page ID #:948
#:1006
67

 1          If you need to speak with me, simply leave a note with the

 2     clerk.

 3          We're going to come back at 9:35.

 4               (JURY EXITS THE COURTROOM AT 9:24 A.M.)

 5          THE COURT:  You maybe seated.  This declaration is

 6     filed in the underlying suit between your client and him.

 7               MR. MCDERMOTT:  Yes, sir.  The lawsuit identified by

 8     the government on direct.

 9               THE COURT:  Is there a particular paragraph?

10               MR. MCDERMOTT:  Actually, sir, it isn't going to be

11     a document that I'm going to offer to the jury as an

12     evidentiary document, but I do intend to confront him

13     specifically about the first couple of paragraphs relating to

14     his training and experience to include the fact that he had

15     extensive training in billing, which is something that he

16     denied knowing much about on direct.

17               THE COURT:  Okay.

18               MR. MCDERMOTT:  All right, sir.

19               THE COURTROOM DEPUTY:  All rise.

20                    (Recess.)

21               THE COURTROOM DEPUTY:  All rise.  This United States

22     Court is in session.  Please be seated.

23               THE COURT:  All right.  Mr. McDermott, I take it you

24     want to use this to impeach him about something he testified

25     to?

App. 0975                UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 14-5   Filed 06/05/23   Page 565 of 786   Page ID #:1007
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 68 of 193   Page ID #:940

68

```
1              MR. MCDERMOTT:  Yes, sir.

2              THE COURT:  On his direct?

3              MR. MCDERMOTT:  Yes, sir.

4              THE COURT:  And what is the page and the line on

5    this?

6              MR. MCDERMOTT:  I'm sorry, sir.  We are going to

7    start -- obviously, I will have him identify Paragraph 1, and

8    obviously the signature page and the attestation in the back.

9         Precisely it would be Paragraph 2, Lines 8 through 11.

10        In particular, the billing of insurance companies for

11   services related to Holter monitors.

12             THE COURT:  Okay.  Well, we already know you have

13   already elicited -- you gave a declaration.

14             MR. MCDERMOTT:  Yes.

15             THE COURT:  He prepared a declaration in this civil

16   lawsuit and then he was cited under penalty of perjury,

17   correct?

18             MR. MCDERMOTT:  Yes, sir.

19             THE COURT:  So, I take it it's your position that

20   Lines 8 through 11 are inconsistent with testimony that he gave

21   on direct?

22             MR. MCDERMOTT:  Yes, sir.

23             THE COURT:  Okay.  So it seems to me, and I will --

24   if we could make up an instruction to tell the jury what a

25   declaration is, they know it is under penalty of perjury, and I
```

App. 0976

```
 1    think you read the paragraph.

 2         Start out on page 1, Paragraph 1, 8 through 11 and read it

 3    and move on.

 4              MR. MCDERMOTT:  Yes, sir.

 5              THE COURT:  Okay.

 6              MR. MCDERMOTT:  I indicated to the Court it's not

 7    something I was going to offer to admit into evidence.  It was

 8    basically just to impeach.

 9              THE COURT:  Does the government have any objection

10    to Line 8 through 11?

11              MR. FREEDMAN:  No.  Your Honor, we prefer 2 and 3 be

12    read for completeness.  It's the same issue being addressed.

13              MR. MCDERMOTT:  Well, the entire Paragraph 2?

14              MR. FREEDMAN:  And 3.

15              MR. MCDERMOTT:  And 3.

16              THE COURT:  What is your view?

17              MR. MCDERMOTT:  I'm not necessarily contesting that

18    Michael Mirando may have done billing for Holter Labs.  I don't

19    know if this is, you know, bolstering, you know, prior

20    testimony that has not necessarily been challenged at this

21    point.

22              THE COURT:  Well, if you have an objection to

23    reading paragraph -- isn't the government really interested in

24    line -- I guess it's Line 18, starting with the word

25    "additionally."  I guess down to Line 23 or 24?
```

Case 2:23-cv-04493-PA Document 4-5 Filed 06/05/23 Page 567 of 786 Page ID
Case 2:16-cv-00213-PA Document 89-5 Filed 07/20/17 Page 790 of 193 Page ID #:951
#:1009

70

```
 1              MR. FREEDMAN:  Yes.

 2              THE COURT:  Okay.

 3              MR. MCDERMOTT:  That's fine.

 4              THE COURT:  Okay.  Anything else you want to impeach

 5    him with?

 6              MR. MCDERMOTT:  No, sir.

 7              THE COURT:  All right.  Anything else we need to

 8    take up?

 9              MR. FREEDMAN:  No.

10              MR. MCDERMOTT:  No, sir.

11              THE COURT:  Okay.  Let's bring the jury in.

12         You may be seated.

13              (JURY ENTERS THE COURTROOM AT 9:46 A.M.)

14              THE COURT:  While we're waiting for this witness,

15    did the jury have occasion to decide whether or not you want to

16    be here on Monday?

17              JUROR:  We decided we would rather come in Tuesday.

18              THE COURT:  Okay.

19              JUROR:  If closing arguments are only going to take

20    an hour, probably we would rather do them Tuesday morning, so

21    it's fresh.

22              THE COURT:  Okay.  You don't want to be down here on

23    Monday?

24              JUROR:  No thanks.  It's not you, it's the 1,000.

25              THE COURT:  My closest personal friends.
```

App. 0978                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 14-5   Filed 06/05/23   Page 568 of 786   Page ID #:952
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 71 of 193   Page ID #:1010

71

```
 1        Let's bring the witness in.
 2             MR. MCDERMOTT:  May I, sir?
 3        Madam Clerk is the original document up there?
 4             THE COURT:  All right.  Everybody keep your voice up
 5   and we will see if we can get a technician in here.
 6   BY MR. MCDERMOTT:
 7   Q    All right.  Mr. Crowley, I asked the clerk to put in front
 8   of you what we have marked for the record as Defense Exhibit C.
 9        Do you have that document in front of you?
10   A    Yes.
11   Q    And have you seen that document before?
12   A    Yes.
13   Q    And in fact, isn't that a document that you had prepared
14   in the civil case?
15   A    Yes.
16   Q    Could I have you take a look at the first paragraph, and
17   indicate to the jury what that paragraph contains?
18             THE COURT:  Let's go to sidebar.
19                  (Sidebar begins.)
20             THE COURT:  If you are going to impeach him with
21   this, and you are not offering it, I don't think he can read
22   from the document.
23        You can look at some language that is a declaration that
24   is filed in that action under penalty of perjury.
25             MR. MCDERMOTT:  All right.  That is fine.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 569 of 786   Page ID #:953
Case 2:16-cv-00215-PA   Document 89   Filed 07/20/17   Page 72 of 193   Page ID #:1011

72

```
 1                 THE COURT:  All right.

 2                      (Sidebar ends.)

 3   BY MR. MCDERMOTT:

 4   Q    Mr. Crowley, I would also have you take a look at the last

 5   page.

 6        Do you see a signature on that last page?

 7   A    Yes.

 8   Q    And is this a document, when you signed it, was it your

 9   understanding this was a declaration made under penalty of

10   perjury?

11   A    Yes.

12   Q    And in this particular document, did you in fact identify

13   what kind of experience you had in the healthcare industry?

14   A    Yes.

15   Q    And in fact, did you not indicate --

16                 THE COURT:  Page and line.  Just read it.

17                 MR. MCDERMOTT:  I will read it.  [As read:]

18        Paragraph 2:  "I have worked in the patient monitoring

19   aspect of healthcare for more than 15 years.  I have extensive

20   experience with Holter monitors, including the set-up of the

21   monitoring program with the doctor's office, the receipt of

22   data from the monitors, the creation of reports for doctors,

23   and the billing of insurance companies for services related to

24   Holter monitors.

25        Prior to forming Holter Labs, LLC, in 2005, I had been
```

App. 0980

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 570 of 786   Page ID #:954
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 73 of 193   Page ID #:1012

73

```
 1    employed by similar companies providing monitoring services for

 2    filling the same role."

 3         Did you in fact --

 4              THE COURT:  Excuse me, sir.  Let's read Paragraph 3.

 5              MR. MCDERMOTT:  Starting with "additionally"?

 6              THE COURT:  Yes.

 7              MR. MCDERMOTT:  Yes, sir.

 8         "Additionally, the cardiac Holter report and patient

 9    insurance information was sent to Mr. Mirando for billing of

10    the insurance companies based upon the type of monitoring

11    requested by the doctor and provided by Holter Labs.

12         The insurance company then remits the payments to Holter

13    Labs.

14         At all times I was associated with Holter Labs.

15         Michael Mirando was solely responsible for the billing by

16    Holter Labs of the patient healthcare insurers in the

17    collection of payments from the insurance company."

18              THE COURT:  Yes.  If I could just see both counsel

19    at sidebar?

20                        (Sidebar begins.)

21              THE COURT:  Okay.  Now, you were about to ask him

22    what?

23              MR. MCDERMOTT:  Was it true, as to his experience

24    with billing --

25              THE COURT:  No.  He's already -- this is nothing --
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 571 of 786   Page ID #:1013
Case 2:16-cv-00215-PA   Document 89-5   Filed 07/20/17   Page 400 of 193   Page ID #:953

74

```
 1   this is just like a deposition transcript or grand jury
 2   transcript.
 3       They say one thing on direct.  You have got something --
 4   but they have impeached -- it's already before the jury.
 5           MR. MCDERMOTT:  Right.
 6           THE COURT:  That's it.
 7           MR. MCDERMOTT:  Okay.
 8           THE COURT:  We don't do any more.
 9           MR. MCDERMOTT:  All right.  So I can't even ask him
10   about whether or not that statement regarding his understanding
11   of billing services is incorrect?
12           THE COURT:  I assumed that when you -- that you had
13   already set this up.
14           MR. MCDERMOTT:  Right.
15           THE COURT:  And you have got him at one point
16   saying, "I guess, I don't know much about billing."
17           MR. MCDERMOTT:  Right.
18           THE COURT:  Now he's under penalty of perjury,
19   saying, "I have extensive experience in billing."  That's it.
20           MR. MCDERMOTT:  All right.
21           THE COURT:  Okay.
22                   (Sidebar ends.)
23   BY MR. MCDERMOTT:
24   Q   Now, Mr. Crowley, during the course of the time you were
25   working with Holter Labs -- it originally started in a spare
```

App. 0982

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 572 of 786   Page ID #:1014
Case 2:18-cv-00215-PA   Document 89   Filed 07/20/15   Page 73 of 193   Page ID #:950

75

```
 1   room in your condominium?
 2   A     A house, yes.
 3   Q     A house.
 4         Where was that house located?
 5   A     Aliso Viejo.
 6   Q     You had a spare room that actually was where the two of
 7   you would work together?
 8   A     Three.
 9   Q     Three.  Well, at some point Cast came along; is that
10   correct?
11   A     Yes.
12   Q     How long had you and Mr. Mirando worked together before
13   Mr. Cast came into the picture?
14   A     I don't recall exactly.
15   Q     Couple of months?  Half a year?  Any estimate, whatsoever?
16   A     Less than half a year.
17   Q     Now, during that time, was Holter Labs actually billing
18   for services?
19   A     The Holter Labs was only billing after Mirando and Cast
20   started.
21   Q     All right.  So during the time that it was just you and
22   Mr. Mirando, there was no business going on with Holter Labs?
23   A     There was no billing getting done.
24   Q     No billing was being done.
25         Were you doing reports?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 14-5   Filed 06/05/23   Page 573 of 786   Page ID
Case 2:16-cv-06223-PA   Document 89   Filed 07/20/17   Page 78 of 193   Page ID #:957
#:1015

76

```
 1   A    It all started together, reports and billing.  That's why
 2   Jim was brought on.
 3   Q    All right.  That's because Mr. Mirando didn't know
 4   billing, correct?
 5   A    He did not know billing.
 6   Q    He did not know.  And Mr. Cast was brought in because he
 7   was somebody that had extensive experience in billing, correct?
 8   A    Yes.
 9   Q    And it was Mr. Cast that taught Mr. Mirando how to do
10   billing, true?
11   A    He went through it, yes.
12   Q    And while this -- did they have training sessions -- what
13   exactly did they do?
14   A    They just sat in the corner and worked together.
15   Q    And to your understanding, had you ever been through a
16   class, a seminar, anything during your 15 years of experience,
17   that taught you about CPT codes?
18   A    No.
19   Q    Is there anything like that during the time frame you have
20   been working with Holter device available to somebody?
21        MR. FREEDMAN:  Objection.  Lacks personal knowledge
22   and foundation.
23        THE COURT:  Sustained.
24   BY MR. MCDERMOTT:
25   Q    To your knowledge, you have never had an opportunity to
```

App. 0984          **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 574 of 786   Page ID #:958
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 700 of 193   Page ID #:1016

77

```
  1   engage in a training seminar or any kind of classes relating to

  2   CPT codes, correct?

  3   A     Correct.

  4   Q     Are you aware of whether or not these training seminars or

  5   classes actually exist?

  6              MR. FREEDMAN:  Same objection.

  7              MR. MCDERMOTT:  Foundation question, sir.

  8              THE COURT:  You can answer yes or no.

  9              THE WITNESS:  No.

 10   BY MR. MCDERMOTT:

 11   Q     So, when you brought -- did you personally approach Mr.

 12   Cast to have him come in?

 13   A     I mentioned it to Mike.  Mike thought it would be a good

 14   idea to bring him in.

 15   Q     Okay.  So, you had worked with Cast in the past.  You knew

 16   he had the experience and obviously Mr. Mirando did not,

 17   correct?

 18   A     Correct.

 19   Q     And so, sometime in 2005, ballpark time frame?

 20   A     Yes.

 21   Q     And he was part of the company, until 2006?

 22   A     Somewhere around there, yes.

 23   Q     And at some point in time, did you and Mr. Mirando execute

 24   an agreement regarding your company -- your partnership?

 25   A     Yes.
```

App. 0985                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 575 of 786   Page ID #:959
Case 2:18-cv-00215-PA   Document 89-5   Filed 07/20/17   Page 730 of 793   Page ID #:1017

78

```
1   Q    Was that agreement modified when Mr. Cast came onboard?

2   A    Yes.

3   Q    And how -- excuse me.

4        So, for a period of time Mr. Cast was considered also a

5   member of the partnership?

6   A    On the operating agreement, yes.

7   Q    And at some point in time, he left; is that true?

8   A    Yes.

9   Q    And can you tell us the circumstances as to why he left?

10  A    He had another job, and didn't have enough time.

11  Q    So, he was asked to leave or he just voluntarily left on

12  his own?

13  A    It was kind of a mutual thing.

14  Q    So you were just as anxious to see him go as he was

15  anxious to leave?

16  A    I don't recall.

17  Q    Well, let me ask you this:  After he left, did the two of

18  you remain in contact?

19  A    Not -- briefly, yeah.

20  Q    Because you were social friends, were you not, in addition

21  to business partners?

22  A    Yes.

23  Q    Now, while the company was being formed -- while you were

24  creating Holter Labs, were you at all engaged in the

25  advertising brochures, the order forms -- did you ever have an
```

App. 0986

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 576 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 79 of 193   Page ID #:960
#:1018

79

1    opportunity to review them and look at them?

2    A     I looked at them.

3    Q     At any point in time, did you raise an objection as to

4    anything contained in the advertising fliers that we have been

5    looking at in this Court?

6    A     No.

7    Q     Because certainly, if you thought there was something on

8    an advertising flier that was false or incorrect, you would

9    have done something about changing it, correct?

10   A     If I saw it, yes.

11   Q     All right.  And the government had you take a look at some

12   documents.

13         We will go back to the large folder, if you would.

14         Let's take a look at Number 14 for starters, please.

15         Can you find Number 14?

16   A     Yes.

17   Q     Now you have identified that document as something that

18   was related to Holter Labs, true?

19   A     Yes.

20   Q     And Number 14, it is a flier that contains various amounts

21   of information on it, correct?

22   A     Correct.

23   Q     Would this have been a flier that was being circulated

24   during the time that you were working at Holter Labs?

25   A     Possibly, yes.

App. 0987                     **UNITED STATES DISTRICT COURT**

1    Q    Okay.  Now is there anything on that particular document

2    that you find to be untrue?

3    A    Right now, I don't see anything.

4    Q    All right.  So that document isn't making any

5    misrepresentations as far as you are concerned, correct?

6    A    As far as I know.

7    Q    And this was -- was this a flier that was going to the

8    doctors that you testified about?

9    A    Yes.

10   Q    Now, I believe you testified on direct that you had an

11   understanding as to the number of doctors who were contacted.

12        And you said it was in the thousands?

13   A    Yes.

14   Q    And you estimated that about 5 percent of them responded

15   positively; is that correct?

16   A    I said possibly under 5 percent.

17   Q    And you looked at a list of the devices that might have

18   been with various doctors, and that was Exhibit No. 17,

19   correct?

20   A    I don't remember, 17.

21   Q    That is the one I had you look at to see if you could

22   identify your devices that you brought to Holter Labs?

23   A    Okay.

24   Q    Okay.  Now, these are the doctors that responded

25   positively to this inquiry.

App. 0988

1    And I believe you testified that when a doctor wanted to

2  be involved with Holter Labs, they had to fill out some

3  paperwork to sign on with Holter Labs?

4  A    Yes.

5  Q    And what was the purpose of having a doctor fill out that

6  paperwork?

7  A    You just signed for the recorder.

8  Q    Okay.  But also didn't Holter Labs need a physician to

9  confirm or verify that Holter Labs was doing work for them?

10 A    Not that I know of, no.

11 Q    All right.  So how about when you talked to us about the

12 Blue Shield that was accessed by Mr. Cast, when that

13 application was made to that insurance companies, were you

14 involved with that application?

15 A    No.

16 Q    So you have no idea what was submitted to the insurance

17 company; is that correct?

18 A    Correct.

19 Q    That was done by Mr. Cast, correct?

20 A    What was done?

21 Q    I'm sorry?

22 A    I don't understand the question.

23 Q    Well, when you are trying to get a contract with an

24 insurance company, do you have to submit paperwork?

25 A    I assume, yes.

Case 2:23-cv-04493-PA   Document 14-5   Filed 06/05/23   Page 579 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 82 of 193   Page ID #:963
#:1021

82

```
 1    Q     You assumed.

 2          Okay.  But you didn't actually participate?

 3    A     No.

 4    Q     But Mr. Cast had, at least as to -- was that Blue Cross

 5    Blue Shield?

 6    A     Blue Shield.

 7    Q     Blue Shield.  And he was the one that originally set up

 8    that account?

 9    A     Yes.

10    Q     That wasn't Mr. Mirando, correct?

11    A     Correct.

12    Q     Because again, Mr. Mirando didn't know how to do that,

13    correct?

14    A     Possibly.

15    Q     All right.  Now, you weren't around when Mr. Cast made the

16    application, filled out the paperwork and sent it in to Blue

17    Cross Blue Shield?

18    A     No.

19    Q     Are you aware of whether or not the insurance companies

20    require any paperwork at all from Holter Labs in order to bill?

21    A     I'm not aware.

22    Q     So, your role, according to your testimony, is that all

23    you would do is receive data from the doctors and prepare

24    reports?

25    A     Yes.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-01498-PA    Document 4-5    Filed 06/05/23    Page 580 of 786   Page ID
Case 2:16-cv-00213-PA    Document 89    Filed 07/20/17    Page 88 of 193   Page ID #:964
#:1022
83

1  Q    And how would the doctors send you the data?

2  A    They would upload them.

3  Q    And how would -- how, I'm sorry, it's working.

4       How would the doctor be able to upload?  Was there

5  programming given to the doctor?

6  A    They had to upload a link.

7  Q    Okay.  And so, was there ever an occasion which Holter

8  Labs submitted a bill that didn't go through a doctor?

9  A    I don't understand the question.

10 Q    Was there ever an occasion in which a Holter device was

11 used while you were there that was not authorized by a doctor?

12 A    Not that I know of.

13 Q    Now during the entire time that you were working at Holter

14 Labs, before you left in 2012, had you been aware of any

15 contact, any inquiry made by an insurance company as to the

16 billing being done by Holter Labs?

17 A    No.

18 Q    Now, just from a perspective when you testified about how

19 much you were earning, what was your peak year, would it be

20 2008, 2009, what year was your peak year?

21 A    2010.

22 Q    And in '10 how much were you making?

23 A    I think it was around 200 something.

24 Q    200.  Okay.  Where were you living at that time?

25 A    At that time I was living in Tustin.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 581 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 840 of 193 of Page ID #:963
#:1023

84

1  Q    Okay.  And you were living there with your family,

2  correct?

3  A    Yes.

4  Q    All right.  Now I'm going to have you take a look at

5  Exhibit Number 15, which is another document the government had

6  you take a look at.

7       Again, you indicated you were familiar with that document,

8  correct?

9  A    Okay.

10  Q    All right.  Now, was that a document that was in existence

11  while you were working at Holter Labs?

12  A    It looks like it, yes.

13  Q    Did you have an opportunity at all to take a look at it

14  while you were working at Holter Labs?

15  A    Yes, I saw it over there.

16  Q    Okay.  In essence, a lot of the promotional materials and

17  whatnot were put together and formulated when Holter Labs got

18  started in 2005, 2006, true?

19  A    Some, yes.

20  Q    So something like this document that we're looking at,

21  Number 15, is in fact a document that was created early on?

22  A    I don't understand the question.

23  Q    Well, the document that you are looking at that the

24  government had you take a look at, this one in particular has

25  to do with devices of what Holter Labs can do, and the

App. 0992                UNITED STATES DISTRICT COURT

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 582 of 786   Page ID #:1024
Case 2:18-cv-00213-PA   Document 89-5   Filed 07/20/15   Page 89 of 193   Page ID #:960

85

```
 1   benefits, correct?
 2   A     Yes.
 3   Q     Is there anything on this document that you deemed to
 4   believe is a false representation?
 5   A     I don't see anything.
 6   Q     All right.  So, even when it talks about at the very top,
 7   sleep apnea screening, did you take issue with that at all?
 8   A     Did I take issue?  What do you mean?
 9   Q     Well, the fact that the device was doing sleep apnea
10   screening, was that a false statement?
11   A     It had a sleep apnea report through the ECG, yes.
12   Q     Okay.  So from your understanding and your experience in
13   dealing with the Holter device, sleep apnea screening would be
14   an appropriate function of the device, correct?
15   A     On the program, yes.
16   Q     Okay.  Now, tell us again -- explain to us again exactly
17   what the event button on one of those devices does?
18   A     The patient has a symptom, they push a button.  They can
19   push a button.
20   Q     Right.  And this is something that can be recorded over a
21   -- how long of a period of time?
22   A     24 to 48 hours.
23   Q     So is it your testimony the device can never be used for
24   something lasting 30 days?
25   A     Yes.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-PA   Document 4-5   Filed 06/05/23   Page 583 of 786   Page ID #:1025
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 886 of 193   Page ID #:967

86

```
 1   Q    So, if there was any representation about a device being

 2   used for 30 days, that would be incorrect?

 3   A    That device, yes.

 4   Q    Okay.  But otherwise, if Holter was using some device that

 5   was going for longer than 24 to 48, it would need another type

 6   of device to be used?

 7   A    Yes.

 8   Q    Now, when you -- in your time of working with Holter Labs,

 9   did you and Mr. Mirando frequently communicate by e-mail?

10   A    Yes.

11   Q    Because for a period of time after you apparently expanded

12   or began to become profitable, the operation moved out of your

13   house, true?

14   A    Yes.

15   Q    And it went to various locations around Orange County that

16   would be considered business offices?

17   A    Yes.

18   Q    And including one in Tustin?

19   A    Santa Ana.

20   Q    Santa Ana, on 17th Street?

21   A    Yes.

22   Q    And was there other locations?

23   A    Yes.

24   Q    And where were they?

25   A    Laguna Hills, there was a couple.
```

App. 0994                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 584 of 786   Page ID #:1026
Case 2:16-cv-00215-PA   Document 89   Filed 07/20/17   Page 8 of 195   Page ID #:968

87

```
 1    Q    All right.  Now would these locations be locations where
 2    you and Mr. Mirando worked together?
 3    A    Only one.
 4    Q    Only one.  Which one was that?
 5    A    Santa Ana.
 6    Q    Santa Ana, and the two of you shared an office space,
 7    correct?
 8    A    Yes.
 9    Q    And you shared office space for the third person, did you
10    not?
11    A    Yes.
12    Q    And so, there was three people working in a smaller
13    office?
14    A    There is three people in the office, yes.
15    Q    Okay.  And at some point in time, did you and Mr. Mirando
16    have a discussion about your work performance while at that
17    particular location?
18    A    I don't recall.
19    Q    You don't recall.
20         Do you recall whether or not the two of you got into a
21    heated argument, and you actually followed him in your truck
22    and tracked him down, chased him for a period of several miles
23    until the two of you stopped and pulled over?
24    A    No, I don't recall.
25    Q    Now, at some point in time, the decision was made that
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 585 of 786   Page ID #:1027
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 88 of 153   Page ID #:969

88

```
 1   Mr. Mirando was going to move his family to Oregon, correct?

 2   A     Yes.

 3   Q     That was in 2011, right?

 4   A     Yes.

 5   Q     Now, the Tustin location, or the Santa Ana location on

 6   17th Street, approximately what time frame are we talking

 7   about?

 8   A     2006, 2007, 2010, 2011, something like that.

 9   Q     So at the end of '10 or '11, where did they move to --

10   where did you move your offices to?

11   A     The offices were moved to Laguna Hills.

12   Q     Was that a business location?

13   A     Yes.

14   Q     Now, while you were at the Santa Ana location, did you and

15   Mr. Mirando, on a daily basis -- well, during the work week

16   actually work together in the same room?

17   A     I worked in the middle room and he worked in the front

18   office.

19   Q     In the front office.

20         And while you were at the Laguna Hills location, did you

21   in fact work in the same office?

22   A     No.

23   Q     Was it different rooms?

24   A     I didn't work in that office.

25   Q     Where did you work?
```

App. 0996

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 586 of 786   Page ID #:1028
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 89 of 193   Page ID #:910

89

```
 1   A     At home.
 2   Q     So, Mr. Mirando set up an office and you worked out of
 3   your home?
 4   A     Yes.
 5   Q     So the entire time you were at the Santa Ana location, you
 6   never once saw a billing; is that your testimony?
 7   A     What?
 8   Q     Did you ever see a billing done by Mr. Mirando while the
 9   two of you were in the same office?
10   A     I saw it, but I didn't pay attention.  Really, I didn't go
11   over it.
12   Q     You saw it -- you saw actual bills being submitted, right?
13   A     From a distance.  I didn't pay attention to it.
14   Q     Well, this is your company, correct?
15   A     Yes.
16   Q     You are supposed to be making 50 percent of the income,
17   correct?
18   A     Correct.
19   Q     And by 2010 you are making $200,000 a year, correct?
20   A     Correct.
21   Q     And again, during that particular calendar year, you
22   didn't file a tax return, correct?
23   A     At the time?
24   Q     That's right.  You filed your tax returns after you talked
25   to the FBI; isn't that true?
```

App. 0997                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 4-5 Filed 06/05/23 Page 587 of 786 Page ID #:1029
Case 2:16-cv-00213-PA Document 89-5 Filed 07/20/17 Page 306 of 193 Page ID #:911

90

```
 1   A      Before.

 2   Q      Before.  Now, you have almost three years -- 2006, 2007,

 3   to 2010 working at the same location.

 4          How, many occasions do you actually think you had a chance

 5   to see a billing?

 6   A      How many times?  I don't know.

 7   Q      But you saw them being performed -- you saw them being put

 8   together, did you not?

 9   A      He was at his desk working.  I was at my desk working.

10   Q      And the computers were absolutely open to you, were they

11   not?

12   A      His computer was not open to me.

13   Q      So he had a password on his computer that you couldn't

14   access?

15   A      Yes.

16   Q      So you never inquired to find out exactly how the billing

17   was going and how much was being billed?

18   A      No.

19   Q      And you were content with that from 2009 and 2010?

20   A      Yes.

21   Q      But at some point in time you began to become suspicious;

22   is that your testimony?

23   A      Yes.

24   Q      Now, didn't that suspicion start when Mr. Cast wanted back

25   into the company?
```

App. 0998

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA    Document 14-5    Filed 06/05/23    Page 588 of 786    Page ID #:1030
Case 2:16-cv-02153-PA    Document 89    Filed 07/20/17    Page 91 of 193    Page ID #:912

91

```
 1   A     I don't recall that.

 2   Q     Well, did you have conversations with Mr. Cast going as

 3   far back as 2008, where he claimed he wanted to be part of the

 4   company again?

 5   A     He had mentioned it.

 6   Q     He mentioned it.

 7         Did you in fact discuss with him whether or not he had a

 8   right to?

 9   A     I didn't really discuss it, no.

10   Q     You didn't.  Did you in fact tell him that he didn't have

11   a right to it?

12   A     I don't remember.

13   Q     You don't remember.

14   A     No.

15   Q     So at some point in time, though, he began communicating

16   with you that he thought he had the right?

17             MR. FREEDMAN:  Objection.  Hearsay.

18             THE COURT:  Sustained.

19   BY MR. MCDERMOTT:

20   Q     But you learned he filed a lawsuit, right?

21   A     When?

22   Q     Well, the one that you were involved with?

23   A     Oh.

24   Q     He filed it first, right?

25   A     He filed it first.
```

Case 2:23-cv-04493-PA   Document 4-5   Filed 06/05/23   Page 589 of 786   Page ID #:1031
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 92 of 193   Page ID #:913

92

```
 1   Q    Yes.  And he told you about it, did he not?

 2   A    Yes.

 3   Q    He gave you a copy of it, correct?

 4   A    He told me about it.

 5   Q    Okay.  Now, when he filed that lawsuit, why weren't you a

 6   party to the lawsuit?

 7   A    I don't know.

 8   Q    I mean, you were being ripped off, money was being stolen

 9   from you, and Mr. Cast comes in and files a lawsuit.

10        You didn't originally join that lawsuit, true?

11   A    True.

12   Q    In fact, that lawsuit was going on almost a year before

13   you joined, true?

14   A    I don't know the time frame.  I don't think it was a year.

15   Q    Six months, at least -- it was a while, correct?

16   A    Correct.

17   Q    All of this time you are still working at Holter Labs,

18   correct?

19   A    No.

20   Q    No?  Didn't he file a lawsuit before you left Holter Labs?

21   A    Right before.

22   Q    He filed it right before.

23        All right.  Then you decided you wanted to join the

24   lawsuit later, correct?

25   A    Correct.
```

App. 1000

Case 2:23-cv-04198-PA   Document 4-5   Filed 06/05/23   Page 590 of 786   Page #2
Case 2:16-cv-00213-PA   Document 85-5   Filed 07/20/17   Page 590 of 193   Page ID #:1032
#:1032

93

```
 1    Q    And what you did, is you drained the bank account for
 2    Holter Labs of everything that was in it, true?
 3    A    In 2012.
 4    Q    That's right, 2012, correct?
 5    A    Correct.
 6    Q    Now during the entire time --
 7    A    The only bank account I knew of.
 8    Q    And that bank account was one you were signatory on,
 9    correct?
10    A    Correct.
11    Q    And before you drained the bank account, you didn't
12    mention anything to Mr. Mirando, you just took the money,
13    correct?
14    A    Correct.
15    Q    And during the entire time the two of you worked together,
16    did you exchange e-mails between yourselves?
17    A    Yes.
18    Q    Was there ever an e-mail you authored that you sent to
19    Mr. Mirando, that said, "how much money are we making"?
20    A    I asked him how much we were making -- he gave me an
21    e-mail back.
22    Q    Have you seen that e-mail recently?
23    A    No.
24    Q    At any point in time did you write him an e-mail and
25    demand an accounting of what the company was earning?
```

App. 1001                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA Document 4-5 Filed 06/05/23 Page 591 of 786 Page ID #:1033
Case 2:16-cv-00213-PA Document 89 Filed 07/20/17 Page 94 of 193 Page ID #:9173

94

 1   A     I asked him.  I don't know if it was an e-mail or what.

 2   Q     Have you seen an e-mail recently that expressed that

 3   intent, "I want to know what we're making."

 4         Have you seen one lately?

 5   A     I haven't seen one lately, but I know I asked him.

 6   Q     And when you talk about guns -- remember your testimony

 7   about Mr. Mirando having guns, do you remember that testimony?

 8   A     Yes.

 9   Q     And the context of that was, why you should be afraid or

10   Mr. Cast should be afraid.

11         What was the purpose of the discussion about guns?

12   A     It wasn't a discussion about guns.

13   Q     What was it, then?

14   A     What are you referring to?

15   Q     Well, your testimony on direct, you said you had a

16   discussion with my client regarding weapons?

17   A     It wasn't about weapons.  It was about the lawsuit.

18   Q     The lawsuit.

19   A     He learned of the lawsuit.

20   Q     Okay.  Was this when you were still at Holter Labs?

21   A     Yes.

22   Q     And he is discussing with you weapons?

23   A     He just brought it up.

24   Q     He brought it up.

25         And this was at the Laguna Hills location.

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 592 of 786    Page ID #:1034
Case 2:16-cv-00213-PA    Document 89-5    Filed 07/20/17    Page 590 of 593    Page ID #:9170

95

1    Were you still were working out of your home?

2    A    Yes.

3    Q    Okay.  Was this a phone call you had -- the two of you had

4    or was it a face-to-face meeting where you were discussing

5    guns?

6    A    It was a phone call.

7    Q    Phone call.

8    Okay.  And in that he expressed that he was going to --

9    somehow he had guns, and he was going to deal with the lawsuit

10   that way.

11   Was that your testimony?

12   A    That wasn't my testimony.

13   Q    All right.  What do you remember exactly it to be?

14   What was that conversation about?

15   A    He just said he had more guns and he was a better aim than

16   me.

17   Q    Was he making a specific threat to you?

18   A    I don't know.

19   Q    You don't know.

20   Was he making a specific threat to Mr. Cast?

21   A    No.

22   Q    No.  He just mentioned it.  Is that your testimony?

23   A    Yes.

24   Q    Now, when you went to the FBI in September --

25   September 17th, 2013, the agent that was involved with

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 593 of 786    Page ID
#:1035
Case 2:16-cv-00283-PA    Document 89    Filed 07/20/17    Page 96 of 193    Page ID #:917

96

```
 1   interviewing you was Agent Kennedy, correct?

 2   A     Correct.

 3   Q     The agent sitting here at the table, correct?

 4   A     Correct.

 5   Q     And you had at least, what, five meetings with her

 6   face-to-face?

 7   A     Something like that.

 8   Q     And there was a number of conversations by e-mail, true?

 9   A     True.

10   Q     And phone calls, correct?

11   A     Correct.

12   Q     And in fact you sent information regarding Mr. Mirando's

13   fiance, correct?

14   A     I don't recall that.

15   Q     But you were doing searches online to assist the

16   investigation, were you not?

17   A     Possibly, yes.

18   Q     Okay.  Now, the conversations that you had with Agent

19   Kennedy, while they were ongoing, do you happen to recall

20   whether or not she was writing anything on a piece of paper

21   while you were talking to her?

22   A     Yes.

23   Q     And are you certain that you told Agent Kennedy about

24   guns?

25   A     Yes, I told her about it.
```

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 4-5   Filed 06/05/23   Page 594 of 786   Page ID
Case 2:16-cv-00213-PA   Document 89   Filed 07/20/17   Page 94 of 195   Page ID #:918
#:1036
97

```
 1    Q     You told her about it.

 2          Okay.  And you saw her write that down?

 3    A     No, I didn't.

 4    Q     In that same book, I'm going to ask you to take a look at

 5    Exhibit No. 16.

 6          This wasn't a particular document identified by the

 7    government, necessarily, but is this a document you recognize?

 8    A     Yes.

 9    Q     And what do you recognize that to be?

10    A     It looks like a mailer.

11    Q     Is that something that was created during the time you

12    were with Holter Labs?

13    A     It could have been, yes.

14    Q     Is there anything in this particular flier you find to be

15    deceitful or untruthful?

16          THE COURT:  Just one second.  Let me see counsel at

17    sidebar.

18                     (Sidebar begins.)

19          THE COURT:  I think these guys are here.

20          MR. MCDERMOTT:  They are the tech guys.  I trust you

21    can hear me back there?

22          THE COURT:  I think yours is off.

23       Give me one second.

24          MR. MCDERMOTT:  Uh-huh.

25       Are you going to have any objection to Exhibit 16?
```

App. 1005                **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA    Document 1-5    Filed 06/05/23    Page 595 of 786    Page ID
Case 2:16-cv-00213-PA    Document 89-5    Filed 07/20/17    Page 98 of 153    Page ID #:919
#:1037

98

```
 1                    MR. FREEDMAN:  I think we admitted it.

 2                    MR. MCDERMOTT:  Oh, you did.

 3                    MR. FREEDMAN:  We just didn't show it.

 4                    MR. MCDERMOTT:  Okay.

 5                    MR. FREEDMAN:  I just wanted to use it in closing.

 6                    MR. MCDERMOTT:  Okay.

 7                    THE COURT:  All right.  Is this document in?

 8                    MR. MCDERMOTT:  It is.  It turns out I misspoke.

 9                    THE COURT:  All right.

10                          (Sidebar ends.)

11   BY MR. MCDERMOTT:

12   Q    Mr. Crowley, Exhibit 16 -- I misspoke -- was actually

13   already admitted.

14        You have seen it before, have you not?

15   A    No, it's familiar.

16   Q    The government actually had you take a look at it, true?

17   A    Yes.

18   Q    Now that you had a chance to look at that document, can

19   you tell us if there is anything you can identify as being

20   false or incorrect?

21   A    No.

22   Q    Now, you also said that Mr. Mirando put together the order

23   forms?

24   A    Yes.

25   Q    And this would have been what -- excuse me, Your Honor
```

App. 1006                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-PA   Document 1-5   Filed 06/05/23   Page 596 of 786   Page ID #:980
Case 2:16-cv-00213-PA   Document 89-5   Filed 07/20/17   Page 99 of 193   Page ID #:1038

99

1    just a second.

2          That would be Exhibit No. 18.

3          Do you want to pull that open?

4          Do you recognize that document?

5    A    Yes.

6    Q    You have identified on the record as an order form that

7    Mr. Mirando put together?

8    A    Yes.

9    Q    Now, is there anything on that form that you deemed to be

10   incorrect or false?

11   A    Not that I can see.

12   Q    So, when we talk about what the doctor can check the box

13   and ask to have done, there isn't anything incorrect about that

14   form; is that right?

15   A    As I can see, yes.

16   Q    Okay.  But it doesn't contain any CPT codes, does it?

17   A    No.

18   Q    And again, would this document had been formulated early

19   in Holter Labs' existence with Mr. Cast involved?

20   A    I don't know when this document was formed.

21   Q    You don't know when it was informed, but you do know it

22   existed while you were there, correct?

23   A    Correct.

24   Q    At no point in time did you ever object to that form being

25   used by your company, correct?

App. 1007          UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 597 of 786   Page ID
Case 2:16-cr-00219-PA   Document 80   Filed 07/20/17   Page 100 of 193   Page ID
#:1039
100

 1    A     I never objected.

 2    Q     And at no time did you ever object to a billing that you

 3    might have overlooked or saw at any time while you were at

 4    Holter Labs, correct?

 5    A     Correct.

 6    Q     Let's talk about you joined the lawsuit in early 2013,

 7    true?

 8    A     Yes.

 9    Q     And you had a chance -- that declaration was part of that

10    lawsuit, was it not?

11    A     Yes.

12    Q     And during that lawsuit, you were asked to appear at a

13    deposition to testify about what you knew about the contract

14    and what you knew about the company?

15    A     Yes.

16    Q     And did you ever have or receive notification you were

17    supposed to appear at a certain location to testify under a

18    deposition?

19    A     Yes.

20    Q     And do you recall how many occasions in which you were

21    served with such notice?

22    A     Once.

23    Q     Once.  And do you recall whether or not you showed up?

24    A     I didn't do a deposition, no.

25    Q     At some point in time, the lawsuit resulted in what we

Case 2:23-cv-04489-PA Document 1-5 Filed 06/05/23 Page 598 of 786 Page ID
Case 2:16-cv-02115-PA Document 85 Filed 07/20/17 Page 101 of 193 Page ID #:1040

101

```
 1    call a cross-complaint or a claim against you and Mr. Cast
 2    personally; isn't that true?
 3    A    I don't know if he was on it or not.
 4    Q    But at least you were, correct?
 5    A    Yes.
 6    Q    And in fact, isn't it true, you failed to respond to that,
 7    correct?
 8    A    The lawyer failed, yes.
 9    Q    The lawyer failed.  And you ended up having a default
10    judgment against you, correct?
11    A    Correct.
12    Q    And that default judgment was in an amount of about 26 or
13    $27,000; isn't that true?
14    A    Yes.
15    Q    And you were required to undergo an examination as to
16    whether or not you could pay that, true?
17    A    True.
18    Q    And you actually submitted to questions under oath
19    regarding your role and involvement in Holter Labs, true?
20    A    Yes, I met with them.
21    Q    I'm sorry?
22    A    Yes, I went there.
23    Q    You went there.
24         And weren't you in fact supposed to return for a second
25    day to be interviewed by the --
```

App. 1009

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 599 of 786   Page ID #:1041
Case 2:16-cr-00219-PA   Document 86   Filed 07/20/17   Page 102 of 193   Page ID #:1041

102

```
 1              THE COURT:  Let's go to sidebar.

 2                     (Sidebar begins.)

 3              THE COURT:  This was a judgment debtor?

 4              MR. MCDERMOTT:  Yes.

 5              THE COURT:  Why is that relevant if he didn't show

 6   up?

 7              MR. MCDERMOTT:  No, no, no.  Maybe I didn't make it

 8   clear.  He was actually, or at least his lawyers were, served

 9   with four different deposition notices.

10              THE COURT:  So what.

11              MR. MCDERMOTT:  Point of the matter is he never

12   showed.

13              THE COURT:  So what.  People don't show up for

14   depositions for a lot of different reasons.

15              MR. MCDERMOTT:  For a lot of different reasons, I

16   know.  The debtor exam was something that was conducted under

17   oath.

18              THE COURT:  Okay.

19              MR. MCDERMOTT:  Okay.  And the government has a copy

20   of that.

21              THE COURT:  Where are we going with this?

22              MR. MCDERMOTT:  The point of it is, is that he

23   was --

24              THE COURT:  You keep your voice down.

25              MR. MCDERMOTT:  He was supposed to show up for a
```

App. 1010

**UNITED STATES DISTRICT COURT**

```
 1    second day, and did not.  What he did was then file for

 2    bankruptcy protection at that point.

 3             THE COURT:  Okay.

 4             MR. MCDERMOTT:  In that he made a declaration as to

 5    the value of his share of the company.

 6             THE COURT:  Okay.

 7             MR. MCDERMOTT:  I think that is relevant.

 8             THE COURT:  Okay.

 9             MR. MCDERMOTT:  It's relevant from the standpoint of

10    here is a man who claims to have learned that his company was

11    fraudulent, yet he is still advocating an ownership interest in

12    it and advocating it has a value, and his portion he claims was

13    1.6 million.  That's what he put in his bankruptcy paperwork.

14        The point of the matter is if this man truly believed this

15    was a fraudulent company, why try to wrestle it back and take

16    on all of the headaches that would occur if you ended up owning

17    the company.

18             THE COURT:  Well, what is the government's opinion?

19             MR. FREEDMAN:  I think you can impeach him with the

20    testimony -- I think that is permissible.

21             THE COURT:  Impeach him with the testimony about

22    what?

23             MR. FREEDMAN:  If he said something in a debtor's

24    exam, and they are impeaching him about that, that is fine.

25             THE COURT:  Yeah, I think that is fine.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA   Document 1-5   Filed 06/05/23   Page 601 of 786   Page ID
#:1043
Case 2:16-cv-00218-PA   Document 85   Filed 07/20/17   Page 104 of 193   Page ID #:985

104

1    This whole thing about the deposition not showing up, I

2    don't think that gets us -- I don't think that is going very

3    far.

4        But the idea that he wanted his company back.  He filed

5    bankruptcy, and he said it was valued at 1., or whatever it is,

6    I don't know where that gets us.

7        If he wanted the company back because your client was

8    involved in some fraud, but he wanted the company back, I don't

9    see how that goes to his veracity or credibility.

10            MR. MCDERMOTT:  The fact as late as 2013, he

11    believed his interest was worth 1.6 million.

12            THE COURT:  Okay.

13            MR. MCDERMOTT:  It ended up -- the bankruptcy

14    trustee zeroed out his interest in it and my client ended up

15    having to buy that interest out of bankruptcy.

16        He paid $60,000 for it.

17        The point of the matter is, the man was making $200,000 a

18    year.

19        Now he's in bankruptcy court and there is tons of tax

20    judgments because of not filing on time.

21        Anyway, the point of the matter is he ended up having to

22    move back in with his wife's family.

23        The house on the hill at Tustin was gone.  He was made

24    destitute with what occurred with this civil suit.

25        The whole notion he's not angry or not really despicably

Case 2:23-cv-04488-PA Document 1-5 Filed 06/05/23 Page 602 of 786 PageID
Case 2:16-cv-00218-PA Document 80-1 Filed 07/20/17 Page 109 of 233 Page ID #:996
#:1044

105

1    despising my client is something I think I have a right to

2    address.

3                THE COURT:  I think you do, but I think all of this

4    stuff, not showing up for a depo or not showing up, I don't see

5    where that goes.

6          But you ought to ask him --

7                MR. MCDERMOTT:  I will make it quick, I promise.  I

8    won't drag it out.

9          Thank you.

10               THE COURT:  Okay.

11                        (Sidebar ends.)

12               MR. MCDERMOTT:  May I, sir?

13               THE COURT:  Yes.

14   BY MR. MCDERMOTT:

15   Q    Mr. Crowley, as we were discussing at some point in time

16   you filed for bankruptcy, true?

17   A    Yes.

18   Q    In that bankruptcy petition, it was occurring while the

19   lawsuit was going on against Mr. Mirando, correct?

20   A    Correct.

21   Q    And you had just received a judgment against you for about

22   $27,000, right?

23   A    At the exact time -- I don't remember the exact time

24   frame.

25   Q    But one of the motivations for you to file for bankruptcy

App. 1013        **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-FA Document 1-5 Filed 06/05/23 Page 603 of 786 Page ID
Case 2:16-cv-02218-FA Document 80 Filed 07/20/17 Page 106 of 193 Page ID #:987
#:1045

106

1  is you had a judgment against you, true?

2  A     No.

3  Q     No.  You filed bankruptcy because you were broke, right?

4  A     Yes.

5  Q     You had gone from living in a home in -- was it Tustin

6  Heights or Santa Ana Heights where you were living at the time?

7  A     Yes.

8  Q     And it was a big house, wasn't it?

9  A     Decent size.

10  Q     Sure.  And were you -- you owned it or did you rent at the

11  time?

12  A     Rent.

13  Q     And were you paying a lot of money for rent?

14  A     Yes.

15  Q     How much?

16  A     3,800.

17  Q     3,800.  Now when you filed for bankruptcy, where were you

18  living?

19  A     With my in-laws.

20  Q     And that was where?

21  A     Santa Ana.

22  Q     And a much smaller house, true?

23  A     Yes.

24  Q     Everything had basically come apart.  You were no longer

25  making big money from Holter Labs, right?

App. 1014

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 604 of 786 Page ID #:1046
Case 2:16-cv-02213-PA Document 80-1 Filed 07/20/17 Page 107 of 193 Page ID #:988

107

1   A    Yes.  I wasn't making any money from Holter Labs.

2   Q    In fact, at that particular time, were you working for

3   another Holter company?

4   A    Yes.

5   Q    Specialized Medical, correct?

6   A    Correct.

7   Q    That was a company run by who?

8   A    Steve Burns.

9   Q    Burns.

10       Now, at any point in time during the course of the

11  lawsuit, did you become aware of whether or not either Burns or

12  Cast were sending e-mails to Mr. Mirando?

13            MR. FREEDMAN:  Objection.  Hearsay.

14            MR. MCDERMOTT:  I'm not asking content, just if he

15  was aware of it being sent.

16            THE COURT:  Overruled on that ground.

17            MR. MCDERMOTT:  Thank you.

18  BY MR. MCDERMOTT:

19  Q    Sir, were you aware of whether or not Cast or Burns were

20  sending e-mails to Mr. Mirando?

21  A    No, I wasn't.

22  Q    So at no time you had no understanding whatsoever as to

23  any communication, correct?

24  A    Correct.

25  Q    But did you file for bankruptcy before or after you met

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 605 of 786 Page ID
Case 2:16-cr-00219-PA Document 85 Filed 07/20/17 Page 108 of 253 Page ID #:989
#:1047

108

```
 1   with the FBI?

 2   A     After.

 3   Q     After.  In fact, were you involved with making a demand on

 4   Mr. Mirando during the first or second week of September, 2013

 5   demanding $250,000 for your share of the company?

 6   A     I'm not aware of that, no.

 7   Q     So you never had any communications with anyone regarding

 8   a demand you get paid 250 or you are going to report Mirando to

 9   the feds?

10   A     No, I wasn't.

11   Q     You weren't part of that?

12   A     No.

13   Q     You had no knowledge of that?

14   A     No.

15   Q     Did you ever have a communication with anybody who made

16   you aware of that demand?

17   A     Later it was brought up.

18   Q     Later.  Who brought it up?

19   A     The civil.

20   Q     Who did?

21   A     The attorneys.

22   Q     And you were shown e-mails?

23   A     There was some e-mails that briefly talked about it.

24   Q     Sure.  Okay.  So, but it was never your intent to get paid

25   in exchange for going to the feds; is that your testimony?
```

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 606 of 786 Page ID #:1048
Case 2:16-cr-00218-PA Document 80-1 Filed 07/20/17 Page 109 of 193 Page ID #:990

109

```
 1   A     No.
 2   Q     So, were you willing to take a payment as opposed to
 3   meeting with the FBI?
 4   A     No.
 5   Q     All right.  So, you walked into the FBI and you did that
 6   because it was the right thing to do; is that correct?
 7   A     Correct.
 8   Q     That was your testimony on direct?
 9   A     Correct.
10   Q     And you had no knowledge of the billings until Cast showed
11   you the screen for Blue Cross, right?
12   A     Correct.
13   Q     But before you showed up at the FBI, you hired a criminal
14   defense lawyer, right?
15   A     Correct.
16   Q     And that criminal defense lawyer was the one that made
17   contact with you with the FBI, right?
18   A     Yes.
19   Q     And this would have occurred within a few days before you
20   actually sat down with the FBI the first time?
21   A     Yes.
22   Q     And you -- two days before, three days before -- how long?
23   A     I don't recall.
24   Q     Now, the government showed you what is called -- I think
25   you were getting ready to call it a queen for day letter?  Does
```

App. 1017

**UNITED STATES DISTRICT COURT**

 1  that sound familiar?

 2  A     The one-day letter.

 3  Q     One-day letter, yeah.

 4        That would be Exhibit No. 26 in your book, right?

 5  Correct?

 6  A     Yes.

 7  Q     Now at the time you signed this document, had you filed

 8  for bankruptcy?

 9  A     No.

10  Q     That came later, correct?

11  A     Correct.

12  Q     In fact, you told Agent Kennedy in conversations that you

13  had filed for bankruptcy, correct?

14  A     Correct.

15  Q     And in fact you asked her on several occasions whether or

16  not you should go to the IRS or whether or not she was going to

17  go to the IRS, correct?

18  A     Correct.

19  Q     Now, this particular document requires you -- Number 26 --

20  requires you to be completely honest in your cooperation and

21  testimony, correct?

22  A     Correct.

23  Q     But that document protected you from any criminal

24  responsibility for anything you said during that first meeting,

25  true?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 608 of 786   Page ID
Case 2:16-cv-00218-PA   Document 80   Filed 07/20/17   Page 111 of 193   Page ID #:992
#:1050

111

1    A      That's what I understood.

2    Q      Okay.  Did it also provide you protection from anything

3    you said subsequent to that first meeting?

4    A      No.

5    Q      Was it your understanding that that document covered you?

6    A      No.

7    Q      For all of your communications, correct?

8    A      For that day?

9    Q      Well, let me backtrack, it will be easier for both of us.

10          You understood that document to be good only for the 17th

11   of September, correct?

12   A      Correct.

13   Q      Now, at that particular point in time when you walked into

14   the FBI offices with that agreement in hand, you had an

15   understanding there might be some criminal responsibility for

16   you, true?

17   A      Possibly.

18   Q      Possibly.  And what was the -- in your mind, what criminal

19   responsibility did you think you might have?

20   A      I didn't think for specifics.

21   Q      You didn't think for specifics.  Nothing having to do with

22   knowing what billings went out?

23   A      I didn't think of any specifics, no.

24   Q      Well, by the time you walked into the FBI office, you had

25   the paperwork from Blue Cross for almost a year, true?

App. 1019

Case 2:23-cv-04488-PA Document 1-5 Filed 06/05/23 Page 609 of 786 PageID
Case 2:16-cv-02218-PA Document 80 Filed 07/20/17 Page 112 of 193 Page ID #:1051

112

```
 1   A      Less than a year, yeah.

 2   Q      Well, the documents that were shown today from that

 3   extraction were October 15th of 2012.

 4          Doesn't that sound about right?

 5   A      Yes.

 6   Q      And you didn't show up at the FBI office until

 7   September 17th, 2013, correct?

 8   A      Correct.

 9   Q      Now, you had an entire -- almost an entire year to do the

10   right thing.

11          At no point in time, between October 15th, 2012, and

12   September 2013, did you go to the FBI offices or IRS and do the

13   right thing; isn't that true?

14              THE COURT:  Argumentative, counsel.  Next question.

15   BY MR. MCDERMOTT:

16   Q      You didn't have any communication with any law enforcement

17   prior to September 17th, 2013, correct?

18   A      Correct.

19   Q      Now, did someone tell you or were you led to believe that

20   you didn't need another document; that this document would

21   cover your communications entirely with the FBI?

22   A      No.

23   Q      So when you had your subsequent communications with the

24   FBI and talked to them, did you believe that you were immune

25   from prosecution?
```

App. 1020

**UNITED STATES DISTRICT COURT**

```
 1   A      No, I did not.

 2   Q      Did you in fact believe you could be prosecuted?

 3   A      There was a possibility.

 4   Q      So did anybody make you a promise that that wouldn't

 5   happen?

 6   A      No.

 7   Q      To this day has anybody made you a promise that that

 8   prosecution wouldn't happen?

 9   A      No.

10   Q      In your bankruptcy petition that you filed after meeting

11   with the FBI, did you have a value that you placed on your

12   interest in Holter Labs?

13   A      I put Holter Labs on there.

14   Q      Yes.  And do you recall how much you valued it at?

15   A      No, I don't recall.

16          MR. MCDERMOTT:  Excuse me, sir.  My apologies, sir.

17   I just wanted to make sure the government had seen this

18   document.

19       I just want to use something to refresh his memory.

20          THE COURT:  All right.

21          MR. MCDERMOTT:  All right.

22       Would the Court like to see the document?

23          THE COURT:  You need to give it to the clerk,

24   please.  Is there a particular page?

25          MR. MCDERMOTT:  Page 13, I'm going to direct him to,
```

App. 1021

Case 2:23-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 611 of 786  Page ID #:1053
Case 2:16-cv-02218-PA  Document 80  Filed 07/20/17  Page 114 of 193  Page ID #:995

114

```
 1  sir.
 2              THE COURT:  Okay.  Place this in front of the
 3  witness, please.
 4         This has been marked for identification.
 5              MR. MCDERMOTT:  D, Delta, sir, for identification.
 6              THE COURT:  Next in order.  I might already have a
 7  D, but that is fine.
 8  BY MR. MCDERMOTT:
 9  Q    Sir, do you recognize that document?
10              THE COURT:  Sir, this is to refresh his
11  recollection, correct?
12              MR. MCDERMOTT:  Yes.
13              THE COURT:  Okay.  What image would you like him to
14  look at?
15              MR. MCDERMOTT:  Page 13.
16              THE COURT:  If you could turn to page 13, please.
17  And just read that to yourself and let us know when you are
18  finished looking at it.
19              THE WITNESS:  Okay.
20              THE COURT:  If you just turn it over.
21              MR. MCDERMOTT:  You can close it.
22  BY MR. MCDERMOTT:
23  Q    Does that refresh your memory as to how much the value you
24  claimed your interest in Holter Labs was?
25  A    Yes.  It was a business educated guess.  I didn't know how
```

App. 1022

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA Document 1-53 Filed 06/05/23 Page 612 of 786 Page ID
Case 2:16-cv-02128-PA Document 80-1 Filed 07/20/17 Page 119 of 133 Page ID #:996
#:1054

115

```
 1   much.  I just put a number down.

 2   Q     What was that number?

 3   A     2.6 million.

 4   Q     That interest in that company was eventually sold, was it

 5   not?

 6   A     I don't know what that means.

 7   Q     Well, at some point in time, the bankruptcy case was over.

 8   Did you get 2.6 million for your interest?

 9   A     No.

10   Q     How much did you get?

11   A     I didn't get any.

12   Q     Not a dime?

13   A     I think I got like 26 grand.

14   Q     Okay.  Do you have a recollection here today how much your

15   interest sold for through bankruptcy?

16   A     No.

17   Q     But what you received was 25,000?

18   A     Yes.

19   Q     More or less?

20   A     Yes.

21   Q     Now eight years of work basically from 2005 to 2011, we're

22   talking 6 or 7 years, from '07, '08, '09 and '10, did you file

23   tax returns in the same year they were due?

24   A     No.

25         MR. FREEDMAN:  Objection.  Relevance.
```

App. 1023

Case 2:23-cv-04488-PA Document 1-5 Filed 06/05/23 Page 613 of 786 Page ID
Case 2:16-cr-00219-PA Document 85 Filed 07/20/17 Page 116 of 193 Page ID #:997
#:1055

116

```
 1              THE COURT:  Sustained.

 2   BY MR. MCDERMOTT:

 3   Q    At any point in time in your communications with the FBI

 4   after you began working with them, did you expect to get paid?

 5   A    No, I did not.

 6   Q    Had you ever had that experience?

 7   A    Explain.

 8              THE COURT:  Sidebar.

 9                   (Sidebar begins.)

10              THE COURT:  I could have swore we talked about this.

11              MR. MCDERMOTT:  All right.  That will be the end of

12   it.

13        All right.

14              THE COURT:  Okay.

15                   (End of sidebar.)

16   BY MR. MCDERMOTT:

17   Q    There were actually other individuals that were utilized

18   to put Holter Labs together.

19        For example, was there a web designer?

20   A    I don't know who did the website exactly.  Yeah, there

21   was.

22   Q    Okay.  And also at any point of time you looked at the

23   website to make sure it was accurate?

24   A    I looked at it.

25   Q    Okay.  Now, as to the equipment that you specifically
```

App. 1024

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04488-PA Document 1-5 Filed 06/05/23 Page 614 of 786 PageID #:1056
Case 2:16-cv-00218-PA Document 85 Filed 07/20/17 Page 117 of 193 Page ID #:998

117

```
 1   used, the software program, that isn't something you created,

 2   correct?

 3   A     Correct.

 4   Q     When you did reports, you were doing reports based on

 5   software that somebody else had developed, correct?

 6   A     Correct.

 7   Q     Did you know that individual?

 8   A     Which software -- what are you referring to?

 9   Q     The software to interpret the Holter data?

10   A     Yes.

11   Q     Are you familiar with Care?

12   A     Yes.

13   Q     Okay.  Was that an individual involved with the company as

14   far as the software programming?

15   A     No.

16   Q     Who was that?

17   A     Jim Brown.

18   Q     Jim Brown.  Do you know whether or not Jim Brown is Care

19   Technology?

20   A     I think he is, yes.

21   Q     Now, did you have communications with Mr. Brown?

22   A     A few times.

23   Q     Sure.  He was responsible for, what, teaching you how to

24   interpret the data?

25   A     I don't recall exactly what we talked about.
```

App. 1025

Case 2:23-cv-04486-PA Document 1-5 Filed 06/05/23 Page 615 of 786 Page ID
Case 2:16-cv-00218-PA Document 80-1 Filed 07/20/17 Page 118 of 153 Page ID #:999
#:1057
118

 1   Q     Well, who taught you how to interpret data?

 2   A     On that program?

 3   Q     Yes.

 4   A     I went over it a few items with him.

 5   Q     Okay.  Did you have any classes, any seminars you attended

 6   on how to properly interpret the data coming from a Holter

 7   device?

 8   A     No.

 9   Q     So you simply relied upon your training and experience at

10   Parsons maybe to learn how to interpret data coming from the

11   Holter device?

12   A     Yes.

13   Q     Physically, what do you have to do?  You just punch a

14   button on the computer and it automatically does it for you?

15         What exactly did you have to do?

16   A     You go through and make sure the program gets any

17   irregularities right or wrong.

18   Q     And then are you responsible for some way interpreting the

19   data to make sure the doctor gets the information correct?

20   A     No, I'm not responsible for interpreting it.

21   Q     The computer does that?  The software does that?

22   A     It runs through the software, yes.

23   Q     Okay.  And at any point in time, are you responsible in

24   any way, shape, or form of interpreting what comes out of the

25   computer to determine whether or not there is a serious

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 616 of 786 Page ID #:1000
Case 2:16-cr-00219-PA Document 89 Filed 09/20/17 Page 119 of 193 Page ID #:1058

119

```
 1   condition?

 2   A     I wasn't responsible to interpret, no.

 3   Q     So all you were responsible for was taking the data,

 4   converting it to something you could read, and send it back to

 5   the doctor, correct?

 6   A     Correct.

 7   Q     And that work you did peaked in 2010, with almost $200,000

 8   a year?

 9   A     Yes.

10   Q     At no point in time did you ever think there was something

11   going on with the billing that would be incorrect to make that

12   kind of money just pushing a button on a computer?

13   A     I didn't think about it.

14   Q     Did you in fact have another employer while you were still

15   working with Holter Labs?

16   A     No.

17   Q     You didn't work for Specialized Medical and Steve Burns

18   during 2011?

19              MR. FREEDMAN:  Objection.  Relevance.

20              THE COURT:  Sustained.

21   BY MR. MCDERMOTT:

22   Q     At this time point in time, are you working and earning

23   the same amount of money that you were in 2010?

24              MR. FREEDMAN:  Same objection.

25              THE COURT:  Sustained.
```

App. 1027

Case 2:23-cv-04496-RA   Document 1-5   Filed 06/05/23   Page 617 of 786   Page ID #:1059
Case 2:16-cr-00215-PA   Document 89   Filed 07/20/17   Page 120 of 193   Page ID #:1001

120

```
 1    BY MR. MCDERMOTT:

 2    Q    At any point in time, are you still working in the Holter

 3    field?

 4    A    Yes.

 5    Q    And in that particular company, is that Specialized

 6    Medical; is that correct?

 7    A    Yes.

 8    Q    Have you reached a point yet where you are earning

 9    anywhere near what you were earning at Holter Labs?

10              MR. FREEDMAN:  Same objection.

11              THE COURT:  Sustained.

12              MR. MCDERMOTT:  I have nothing further, Judge.

13              MR. FREEDMAN:  Couple of questions, Your Honor.

14    Thank you.

15

16                        REDIRECT EXAMINATION

17    BY MR. FREEDMAN:

18    Q    You proffered a letter that you signed with the government

19    that we went over and it required you to tell the complete

20    truth, right?

21    A    Yes.

22    Q    You understood if you did not tell the truth to the FBI

23    that you could be prosecuted for a separate federal offense?

24    A    Yes.

25    Q    You understood you could face that same liability even
```

App. 1028

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 618 of 786 Page ID #:1060
Case 2:16-cr-00219-PA Document 89 Filed 07/20/17 Page 121 of 193 Page ID #:1002

121

```
 1   after that one day the letter covered?
 2   A     Yes.
 3   Q     Did you provide any false information to the FBI in the
 4   course of this case?
 5   A     No.
 6   Q     What about to the U.S. Attorney's Office?
 7   A     No.
 8   Q     When you went to the FBI, did you expect them to help you
 9   with any tax issues?
10   A     No, I did not.
11   Q     Did you ask them to help you with any tax issues?
12   A     No, I did not.
13   Q     What about the U. S. Attorney's Office?
14   A     No.
15   Q     Did the FBI help you with any tax issues?
16   A     No, they did not.
17   Q     Did the U. S. Attorney's Office help you with any tax
18   issues?
19   A     No.
20   Q     What about your bankruptcy proceedings, did anyone -- did
21   you seek help from the FBI with that proceeding?
22   A     No.
23   Q     From the U. S. Attorney's Office?
24   A     No, I didn't.
25   Q     Did anyone from the federal government provide you with
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-RA   Document 1-5   Filed 06/05/23   Page 619 of 786   Page ID #:1061
Case 2:16-cr-00215-PA   Document 89   Filed 07/20/17   Page 122 of 193   Page ID #:1003
122

 1    bankruptcy proceedings?

 2    A    No.

 3    Q    You understood as well that the information that you were

 4    giving to the FBI in the course of this case, could potentially

 5    expose you to liability for criminal charges?

 6    A    Yes.

 7             MR. FREEDMAN:  Nothing further, Your Honor.

 8             MR. MCDERMOTT:  Two questions based on this.  Thank

 9    you.

10                      RECROSS-EXAMINATION

11    BY MR. MCDERMOTT:

12    Q    They didn't promise you to help you on your tax issue, but

13    you haven't been charged with anything relating to your taxes,

14    have you?

15    A    No.

16    Q    In fact, on how many occasions did you receive a 1099 from

17    Holter Labs?

18             THE COURT:  Beyond the scope, counsel.

19        Next question.

20    BY MR. MCDERMOTT:

21    Q    So, as you sit here today, nobody has indicated that you

22    have any issues with your taxes, correct?

23             MR. FREEDMAN:  Objection.  Vague.

24             THE COURT:  Sustained.

25    BY MR. MCDERMOTT:

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 620 of 786 Page ID #:1062
Case 2:16-cr-00219-PA Document 89 Filed 07/20/17 Page 123 of 193 Page ID #:1004

123

 1    Q     Any law enforcement or prosecutor ever tell you that you

 2    don't have any issues with your taxes?

 3              MR. FREEDMAN:  Objection.  Vague.

 4              MR. MCDERMOTT:  I will leave it at that, Judge.  I

 5    will withdraw.

 6              THE COURT:  All right.

 7              MR. FREEDMAN:  Nothing further, Your Honor.

 8              THE COURT:  Sir, you may step down.

 9        Call your next witness.

10              MS. RYKKEN:  Government calls Special Agent Kathleen

11    Kennedy.

12        We need to put some binders on the stand.

13        Is binder 2 up there?

14              THE COURTROOM DEPUTY:  Please raise your right hand.

15                    (Oath was administered.)

16              THE WITNESS:  Yes.

17              THE COURTROOM DEPUTY:  You may be seated.

18

19      KATHLEEN IRENE KENNEDY, PLAINTIFF WITNESS, DULY SWORN

20

21              MS. RYKKEN:  If we could have a brief sidebar before

22    we start?

23              THE COURT:  Okay.

24                    (Sidebar begins.)

25              MS. RYKKEN:  I discussed this before, and I think

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 621 of 786   Page ID #:1063
Case 2:18-cr-00215-RA   Document 89   Filed 07/20/21   Page 1240 of 293 of 786   Page ID #:1005

124

```
 1   there is no objection, but we were going to bring in some

 2   information about the billing after his arrest to show

 3   knowledge on his part.

 4              MR. MCDERMOTT:  I haven't seen the chart.

 5              MS. RYKKEN:  We sent it to you.  It's one of the

 6   exhibits.  So I just wanted to raise it here.

 7              THE COURT:  Well, ask him and if he has an

 8   objection, he will make it.  We will deal with it then.

 9              MS. RYKKEN:  Okay.

10                        (Sidebar ends.)

11              THE COURTROOM DEPUTY:  Please state your full name,

12   spell your last name for the record.

13              THE WITNESS:  My name is Kathleen Irene Kennedy.  My

14   last name is K-e-n-n-e-d-y.

15              MS. RYKKEN:  May I inquire?

16              THE COURT:  Yes.

17

18                        DIRECT EXAMINATION

19   BY MS. RYKKEN:

20   Q    Where are you employed?

21   A    I'm a special agent with the Federal Bureau of

22   Investigations.

23   Q    Where is your office located?

24   A    It's located in Los Angeles, California.

25   Q    What is your position with the FBI?
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 622 of 786   Page ID #:1064
Case 2:16-cr-00215-PA   Document 89   Filed 07/20/17   Page 129 of 193   Page ID #:1006

125

```
1    A      I'm a special agent.

2    Q      And what sort of duties do you have as a special agent?

3    A      To investigate violations of federal law.

4    Q      Are you assigned to a particular squad in your office?

5    A      Yes, I am.

6    Q      What is that squad?

7    A      It's WCC 3, which is the healthcare fraud squad.

8    Q      So what kinds of crimes do you investigate?

9    A      We investigate fraud against healthcare benefit programs.

10          Also, violations of the anti-kickback statute relating to

11   healthcare, and HIPPA violations related to healthcare as well.

12   Q      So you mentioned the term, "healthcare benefit program."

13   What does that mean?

14   A      It's basically an insurance company, either a public

15   healthcare benefit program -- an example would be Medicare.

16          A private would be a private health insurance company,

17   like Aetna, Cigna, or United Health Group.

18   Q      Have you had any training with respect to healthcare fraud

19   schemes?

20   A      Yes.

21   Q      What is that training?

22   A      I have attended courses offered by the FBI.

23          I have also attended courses offered by the NHCAA, which

24   stands for National Healthcare -- National Healthcare

25   Anti-Fraud Association which is an organization that is a
```

App. 1033                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 15   Filed 06/05/23   Page 623 of 786   Page ID
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 126 of 193   Page ID #:1007
#:1065

126

```
 1    public, private partnership related to healthcare fraud

 2    investigations.

 3    Q     What was your role with respect to this case?

 4    A     I was the case agent.

 5    Q     What does that mean?

 6    A     It means I was responsible for the investigation.

 7    Q     So are you familiar with the defendant, Michael Mirando?

 8    A     I never met him, but yes, I am.

 9    Q     How did this investigation start?

10    A     I was asked to come to the United States Attorney's Office

11    to meet with an individual who had information he wished to

12    provide to the Department of Justice.

13          And that individual was Stanton Crowley.

14    Q     Do you recall when that was?

15    A     It was in September of 2013.

16    Q     And what did you learn from Mr. Crowley?

17    A     Mr. Crowley and Mr. Mirando owned a company called Holter

18    Labs that was based in Orange County, California.

19          They started the company in 2005.

20          This company offered cardiac monitoring equipment, and

21    wrote the test report from the equipment.

22          The equipment would be provided to doctors who would use

23    it on their patient, and then the data gathered by the device

24    would then be transmitted back to Holter Labs, and Holter Labs

25    would create a report summarizing that data or providing that
```

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 624 of 786 Page ID #:1066
Case 2:18-cr-00219-PA Document 89 Filed 07/20/19 Page 127 of 195 Page ID #:1008

127

1  data.

2      That report would be sent back to the physician, and then

3  Holter Labs would submit billings to help bill that patient's

4  health insurance company for the work that they performed.

5  Q   Okay.  What investigative steps did you take after meeting

6  with Mr. Crowley?

7  A   Well, the first thing I did was I requested the claims

8  data from insurance companies.

9      So for private insurance through the NHCAA, they offer a

10 service where you can, through a portal that they have or a

11 request e-mailed to them, they will take that request for

12 claims data, and send it out to their members, and then the

13 members individually decide if they are going to respond to

14 that request, and if so, they will respond directly to the

15 investigating agent and provide claims data that they have as

16 requested.

17 Q   Did you obtain any other documents or evidence other than

18 insurance claims?

19 A   Yes.  I also requested bank records from several bank

20 accounts.

21 Q   What bank accounts?

22 A   There was the Holter Labs account at Chase.

23     There was Michael Mirando's personal account at Chase.

24     There was Holter Labs account at Bank of the West.

25     There were some other additional personal accounts that

1    Michael Mirando had at Allied Bank, or ING, E-trade.

2         There was another related business called Murrieta Medical

3    Supply that had a bank account at Bank of America.  I requested

4    those records.

5    Q    What about any patient records?

6    A    So when I got the claims data, and I looked at the claims

7    data, I decided to go out and interview -- select some patients

8    and interview them to find out specifically what they recalled.

9         I did that, and then after interviewing them, I requested

10   more specific claims data from their insurance providers,

11   essentially the claim form.

12        And from the claim form, I was able to identify the

13   referring physician.

14        Then I subpoenaed from the referring physician, medical

15   records relating to the claims that Holter Labs had submitted

16   to the patient's insurance company.

17   Q    So when you subpoenaed the medical records from the

18   patient's files, what did you request?

19   A    I requested the prescriptions that would support the

20   claims, each of the services that was listed on the claims that

21   Holter Labs submitted to the insurance carrier for the patient.

22   Q    And what did you receive back?

23   A    I received back, generally speaking, one -- one visit

24   date, notes from one visit, and for some of them, they also

25   included a copy of the Holter Lab report that Holter Labs had

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 626 of 786   Page ID
Case 2:18-cr-00219-PA   Document 89   Filed 07/20/21   Page 129 of 193   Page ID #:1010
#:1068

129

1    provided to the doctor.

2    Q    And do you recall roughly how many patients' data you

3    received back when you got the claims data?

4    A    I'm sorry, could you say that again?

5    Q    The claims data that you received back initially, how many

6    patients were included?

7    A    Thousands.

8    Q    And how did you select the eventual patients that you met

9    with?

10   A    Well, the Los Angeles Office of the FBI has a certain area

11   of responsibility.  It's several counties in California.

12        So I wanted to select patients that were within our area

13   of responsibility.

14        So I reviewed the claims data to determine if there were

15   any patients that were in the area for the Los Angeles field

16   office, and I identified seven or eight, and I contacted them.

17   Q    Okay.  And the patients were from all around the country?

18   A    Yes.  The patients in all of the claims data were from all

19   over the country.

20   Q    All right.  So in your review of the records that you

21   subpoenaed, did you learn who had worked at Holter Labs?

22   A    I -- from the bank records, the signature cards, there

23   were two names, Michael Mirando and Stanton Crowley, on the

24   signature card for Holter Labs account at Chase.

25   Q    Do you know what Mr. Mirando's role in the company was?

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 627 of 786   Page ID #:1069
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 130 of 193   Page ID #:1021

130

1    A    My investigation revealed that Mr. Mirando was essentially

2    responsible for the business end of Holter Labs while

3    Mr. Crowley did the reports.

4    Q    And do you know approximately how many documents you

5    collected during the investigation?

6    A    I don't know, a few thousand.

7    Q    Did you review all of those records and documents that you

8    received back?

9    A    Yes.

10   Q    How many people did you interview during your

11   investigation?

12   A    Maybe 15 to 20.

13   Q    What exactly did Mr. Crowley report to you when you met

14   with him for the first time?

15   A    So he reported how the business ran.

16        And then he reported that the business was operating for

17   several years, and that he then became suspicious that the

18   amount of -- how the money was being split between himself and

19   Mr. Mirando didn't seem fair, because Mr. Mirando seemed to

20   have a lot more money than he did.

21        So, he began to question Mr. Mirando about where is -- how

22   come I'm not getting as much money or something along those

23   lines about the finances of the business.

24        And he wasn't satisfied with Mr. Mirando's response, so he

25   contacted another individual by the name of Jim Cast who had

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 628 of 786   Page ID #:1070
Case 2:16-cr-00215-PA   Document 89   Filed 07/20/17   Page 130 of 193   Page ID #:1032

131

1    been involved with the business early on in 2005, 2006, to

2    request assistance to get a copy of some of the claims, the

3    billing records that Holter Labs had submitted, so he could try

4    to determine how much money is Holter Labs getting and where is

5    this money going.

6    Q    So in your review of the thousands of documents that you

7    received back, were you able to corroborate Mr. Crowley's

8    story?

9    A    Yes.

10   Q    Did you investigate Mr. Crowley's involvement at Holter

11   Labs?

12   A    Yes, I investigated Holter Labs in its entirety, both

13   Mr. Crowley and Mr. Mirando.

14   Q    What about Mr. Cast?

15   A    And Mr. Cast as well.

16        As you are doing your investigation, you are constantly

17   looking to see who is signing, who is getting the money, whose

18   signature is on the bank records, on the withdrawals, just

19   trying to verify who is involved and how involved were they.

20   Q    Did you find any evidence that Mr. Crowley was involved in

21   the medical fraud?

22   A    I found no evidence that Mr. Crowley was involved in

23   completing any of the claims or submitting any of the claims to

24   the health insurance company.

25   Q    What about Mr. Cast?

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 629 of 786   Page ID #:1071
Case 2:16-cr-00219-PA   Document 99   Filed 07/2017   Page 132 of 193   Page ID #:1023

132

1  A     I found no evidence that Mr. Cast was involved in the

2  business at all, to be frank.

3  Q     And in the course of your investigation, did you learn

4  about CPT codes?

5  A     Yes, I did.

6  Q     What did you learn?

7  A     So CPT codes, the abbreviation that stands for is current

8  procedural terminology, and it is a set of medical codes

9  established by the American Medical Association for the use in

10 healthcare industry.

11       And they standardize procedures so that everybody knows

12 what is being billed when they see a particular code, and can

13 look at the definition of that code.

14 Q     Did you know about CPT codes before this case?

15 A     I did, but not as much.

16 Q     And what did you do to learn about the specific CPT codes

17 in this case?

18 A     So I looked at the claims data, and Mr. Crowley had

19 provided some information about CPT codes.

20       And then I researched it on Google, and I queried at

21 Google, then I would look at the results, and I would look to

22 see what I felt were reliable websites such as Medicare, Aetna,

23 Anthem, Blue Cross Blue Shield, Humana, and then I would then

24 go to those websites and review the information that is on

25 those websites about CPT codes, what the description is for

App. 1040

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 630 of 786 Page ID #:1072
Case 2:16-cr-00219-RA Document 89 Filed 07/20/17 Page 133 of 193 Page ID #:1074

133

 1  particular CPT codes, et cetera.

 2  Q    And once you reviewed those CPT codes, what did that lead

 3  you to conclude about Holter Labs billing?

 4  A    That they were submitting claims to health insurance

 5  companies for procedures that they did not have the equipment

 6  that could perform those.

 7       Essentially, they were submitting for services that were

 8  never rendered.

 9  Q    So you mentioned earlier that part of your investigation

10  included a review of financial records?

11  A    Yes.

12  Q    Can you take a look at Exhibit 89 in your binder.

13  A    Is this the government exhibit binder or the witness

14  statement binder?

15  Q    It would be the government exhibits.

16       And if we don't have the second set up there, we will

17  bring it up.

18  A    Mine only goes up to 81.

19       I'm sorry, what was the number again?

20  Q    Exhibit 89.

21  A    Okay.

22  Q    What is that?

23  A    This is a document that I created that summarizes the

24  assets of Michael Mirando that I discovered during my

25  investigation.

Case 2:23-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 631 of 786  Page ID #:1073
Case 2:16-cr-00215-PA  Document 89  Filed 07/20/17  Page 134 of 193  Page ID #:1025

134

 1   Q    And this list is based on all of the records that you

 2   reviewed?

 3   A    Yes.

 4            MS. RYKKEN:  The government moves to admit

 5   Exhibit 89 into evidence.

 6            THE COURT:  Any objection.

 7            MR. MCDERMOTT:  Your Honor, can we have a quick

 8   sidebar?

 9            MS. RYKKEN:  That is not the exhibit.

10            MR. MCDERMOTT:  There we go.  No objection.

11            THE COURT:  It may be received.

12       (Exhibit 89 received into evidence.)

13            MS. RYKKEN:  Thank you.

14   BY MS. RYKKEN:

15   Q    Okay.  So this is what you were just looking at?

16   A    Yes.

17   Q    And tell me how you organized this?

18   A    So I tried to group like things together.

19       So during the review of bank records, escrow records, loan

20   documents that I obtained, I identified some real estate that

21   Mr. Mirando owned.

22       I also identified vehicles and bank accounts, both for

23   Holter Labs as well as his personal bank accounts.

24       I also discovered in the bank records and the documents

25   that I received during the investigation, that he had some

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 632 of 786   Page ID #:1074
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 139 of 193   Page ID #:1026

135

```
 1   investment accounts, some stock accounts, some retirement, life

 2   insurance policy that has a surrender value.

 3        And then I also discovered that there was money going to

 4   perhaps back from other possible investments listed under

 5   "other" at the bottom of the page there.

 6   Q    So let's look at the header, Bank Accounts for Holter

 7   Labs.

 8        Do you see that?

 9   A    Yes, I do.

10   Q    The Holter Labs Chase account; is that the one you were

11   referring to earlier?

12   A    Yes.

13   Q    And who were the signatories on that?

14   A    Michael Mirando and Stanton Crowley.

15   Q    How do you know that?

16   A    Because I saw the signature card.

17   Q    And the second account Mirando Murrieta Medical Supply.

18   What is that account?

19   A    Mr. Mirando filed a fictitious business name in Orange

20   County, California, and opened up a bank account and it was

21   Michael Mirando doing business as Murrieta Medical Supply.

22        I obtained records, not only the fictitious business

23   statements, but also bank records from Bank of America.

24   Q    What did the bank records tell you about Murrieta Medical?

25   A    Mr. Mirando opened that account and he was the sole
```

App. 1043

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA    Document 1-5    Filed 06/05/23    Page 633 of 786    Page ID #:1075
Case 2:16-cr-00219-RA    Document 89    Filed 07/20/17    Page 136 of 193    Page ID #:1027

136

1  signatory on the account.

2       The money going into the account -- essentially the only

3  money going into that account were large dollar checks for

4  several thousands of dollars drawn on the Holter Labs Chase

5  account being deposited into the Murrieta Medical Supply

6  account.

7       And the monies going out of that Murrieta Medical Supply

8  account were predominantly for personal funds going to either

9  Michael Mirando or Stanton Crowley.

10      I didn't see a lot of business expenses.  I saw a lot of

11 mortgage payments, like monthly mortgage payments being made,

12 different HOAs, homeowner association dues being paid.

13      Then the occasional gas bill, water bill, garbage bill,

14 that kind of thing.

15 Q   Did you see any business expenses?

16 A   No.  Like I said, I saw the occasional gas bill or trash

17 bill, and I did not determine, during the investigation, if

18 that was for a personal, you know, residence, or if that was a

19 business expense at an office building.

20      But I saw no office rent payments being made or anything

21 of that nature.

22 Q   What about the third account, the Bank of the West account

23 for Holter Labs?

24 A   That was an account that Michael Mirando was the sole

25 signatory on.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 634 of 786   Page ID #:1076
Case 2:16-cr-00215-RA   Document 89   Filed 07/20/17   Page 138 of 195   Page ID #:1018

137

1   Q    And did you look at the bank records for the Bank of the

2   West account?

3   A    Yes, I did.

4   Q    Did you learn about what was going in and what was going

5   out of that account?

6   A    Yes.  So being deposited into that account were checks

7   from various insurance companies, made payable to Holter Labs,

8   LLC.

9        And the money going out of that account solely benefited

10  Mr. Mirando.

11  Q    Did you see any checks being written to Mr. Crowley from

12  that account?

13  A    No, I did not.

14  Q    And then this fourth one, Michael Mirando doing business

15  as Holter Labs, LLC, U.S. Bank account.

16       What is that account?

17  A    That is an account that Mr. Mirando opened in Portland,

18  Oregon, I believe, for Holter Labs, LLC.  But he did it as a

19  "doing business as" initially, so it was Michael Mirando doing

20  business as Holter Labs, LLC.

21       And then a few months later, he had incorporated Holter

22  Labs in the state of Oregon, so he opened up a new account also

23  at U.S. Bank of Holter Labs, Inc.

24       And he then essentially abandoned it, and it eventually

25  closed the doing business as account.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 635 of 786   Page ID
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 138 of 153   Page ID #:1019
#:1077

138

1    Q    And the last one, Holter Labs, Inc. U.S. Bank?

2    A    That is the account I spoke of.

3    Q    Okay.  What about that, the doing business as Holter Labs,

4    for those in the next account that was created later?

5    A    I'm sorry.

6    Q    Was the doing business as account created first, and the

7    other one was created second?

8    A    That's correct.

9    Q    And then of these five accounts, was Mr. Crowley a

10   signatory only on the Chase account?

11   A    That's correct.

12   Q    Was Mr. Mirando a signatory on all of the remaining

13   accounts, all five of them?

14   A    Yes, he was.

15   Q    And here is page 2 of that.

16        What is this?

17   A    This is a listing of all of the accounts that I identified

18   and obtained some records from.

19        I didn't necessarily obtain a full set of all of the

20   records for all of these accounts, but I obtained some records.

21   Q    So this includes the accounts listed on the previous page,

22   but also a few additional ones?

23   A    That's correct.

24   Q    Can you turn to Exhibit 90 in your binder.

25        Do you see that?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 636 of 786   Page ID
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 139 of 193   Page ID #:1020
#:1078

1    A      Yes, I do.

2    Q      What is that?

3    A      This is a document that I created that summarizes the flow

4    of money into various bank accounts.

5    Q      And when did you create this?

6    A      I created this document -- well, I created it throughout

7    the investigation, but this actual one that is being presented

8    here, I would have created in the past several months, maybe up

9    to a year ago.

10   Q      And is the information reflected in this chart based on

11   the documents that you reviewed in your investigation?

12   A      Yes, it is.

13            MS. RYKKEN:  The government moves to admit

14   Exhibit 90 into evidence.

15            MR. MCDERMOTT:  No objection.

16            THE COURT:  It will be received.

17        (Exhibit 90 received into evidence.)

18   BY MS. RYKKEN:

19   Q      So what is this first page?

20   A      So the first page is the money going into the account.

21        So, on the left-hand side at the top you say "payor" money

22   came from, that is who was writing the checks or the amount

23   being deposited.

24        And then the columns that follow is the account that the

25   money went into.

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 637 of 786   Page ID #:1079
Case 2:18-cr-00219-PA   Document 89   Filed 07/20/17   Page 140 of 193   Page ID #:1021

140

1   Q     So the first line item, Holter Labs payments from

2   insurance companies.

3         Can you explain how that worked?

4   A     Yes.  So that's a summary of checks from insurance

5   companies that were being deposited into the accounts.

6   Q     It looks like it's been deposited into two accounts?

7   A     That's correct.  So HL stands for Holter Labs, so the

8   second column, excuse me, is Holter Labs Chase, that is the

9   amount of money that was deposited into the Holter Labs Chase

10  account from insurance companies.

11        The third column HL Bank of the West, that is Holter Labs

12  bank account at Bank of the West, and the amount there

13  indicates the summary of the insurance checks being deposited

14  into that account.

15  Q     And the first account, the Holter Labs Chase account, that

16  is the account that both Michael Mirando and Stanton Crowley

17  was signatories on?

18  A     That's correct.

19  Q     The Bank of the West account, is that the account that

20  only the defendant was the signatory on?

21  A     That's correct.

22  Q     So then the total amount at the end, what is that amount?

23  A     It's $5,683,408.

24  Q     And that amount is the amount you could determine came in

25  from insurance companies to pay claims from Holter Labs?

App. 1048

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 638 of 786   Page ID #:1080
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 141 of 193   Page ID #:1022

141

1    A      Yes.

2    Q      Let's look at page 2.  What is page 2?

3    A      Page 2 is a document that I created that summarizes the

4    flow of money out of these accounts that are listed there.

5           So the first column is "payee," and that's where the money

6    went to.

7           And then the other columns are the accounts that the money

8    was coming out of.

9    Q      So let's look at the second one, American Express.

10   A      Yes.

11   Q      It looks like -- did you subpoena any records for that

12   American Express account?

13   A      I did not.

14   Q      Okay.  But the first account, the $457,000, that was the

15   account that both Mr. Crowley and Mr. Mirando were signatories

16   on?

17   A      That's correct.  That is the Holter Labs Chase account.

18   Q      Then the America Express for the Bank of the West account,

19   that is the account that only Mr. Mirando was a signatory on?

20   A      That's correct.

21   Q      At the bottom, do you know what the Plegiac Properties

22   are?

23   A      Yes.  My investigation revealed that Mr. Mirando owned

24   several rental properties.  He had created separate companies

25   always using the word Plegiac [phonetic] Properties to indicate

Case 2:23-cv-04498-RA   Document 15   Filed 06/05/23   Page 639 of 786   Page ID #:1081
Case 2:16-cr-00215-PA   Document 89   Filed 07/20/17   Page 142 of 193   Page ID #:1023

142

1   whatever the state the rental property was located in.

2          So Plegiac Properties of MS, is Plegiac Properties of

3   Mississippi, because he owned a rental property there.

4          And then you have, you know, North Carolina and South

5   Carolina.

6   Q    And then the dollar amounts reflected in the columns

7   thereafter, those are payments from Holter Labs account to the

8   Plegiac Property?

9   A    To the Plegiac Properties bank account.

10  Q    Can you turn to page 3.  So at the top, is that just the

11  end of the previous chart?

12  A    Yes, that's correct.

13  Q    What is the middle?

14  A    The middle is from the chart that we were just describing.

15  I was trying to determine how much of this money went to

16  benefit Stanton Crowley, and how much went to benefit Michael

17  Mirando.

18  Q    What did you learn?

19  A    So -- well, Michael Mirando got significantly more of the

20  money than Stanton Crowley.

21  Q    Could you do the middle box?

22         So this is the summary to Mr. Crowley?

23  A    That is correct.

24  Q    What was the total amount that he received?

25  A    $1,076,327.76.

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-RA    Document 1-5    Filed 06/05/23    Page 640 of 786    Page ID #:1082
Case 2:16-cr-00219-RA    Document 89    Filed 07/20/17    Page 143 of 193   Page ID #:1024

143

```
 1    Q      What was the source of those funds?

 2    A      Those funds came from Holter Labs Chase account or from

 3    the Murrieta Medical Supply Bank of America account.

 4    Q      Did you see any other evidence that Mr. Crowley was

 5    receiving other payments than what is summarized here?

 6    A      No.

 7    Q      Can you go to the third box, please.

 8           Okay.  So this is -- this ends on the next page, and it

 9    appears to be the summary of funds to Mirando -- to Michael

10    Mirando; is that correct?

11    A      That's correct.

12    Q      And what is the total amount of funds that went to the

13    defendant?

14    A      So some of these columns, if you included it in the total

15    summary, might be duplicative.

16           So at the very bottom I just pulled out those that I know

17    would not be duplicative.

18           So the total amount that Mr. Mirando received was

19    $3,365,444.

20    Q      Okay.  Can you turn to Exhibit 91?

21           Do you see that?

22    A      Yes, I do.

23    Q      What is it?

24    A      This is a chart that visually describes the flow of money

25    in and out of the Holter Labs Chase account.
```

App. 1051

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 641 of 786   Page ID
Case 2:16-cr-00215-RA   Document 89   Filed 07/20/17   Page 144 of 193   Page ID #:1025
#:1083

144

1   Q      And when did you create this?

2   A      I requested the assistance of a financial analyst at the

3   FBI in analyzing the bank records, and as part of her analyzing

4   and helping me analyze the bank records, she created this

5   chart.

6              MS. RYKKEN:  The government moves to admit

7   Exhibit 91 into evidence.

8              MR. MCDERMOTT:  No objection.

9              THE COURT:  It will be received.

10             (Exhibit 91 received into evidence.)

11  BY MS. RYKKEN:

12  Q      So this chart is just for the Chase account, correct?

13  A      That's correct.

14  Q      Why did you create this?

15  A      Well, it helps if you -- usually when you are doing your

16  analysis, we use a program called Excel, which is just lines

17  and lines on a worksheet.

18        So it's kind of hard to see or understand fully the flow

19  of money.  So, the analyst can create a visual representation,

20  so it makes it a little simpler and easier to understand what

21  is going on with the flow of money in and out of the bank

22  account.

23  Q      So it appears on the top half there are arrows going down

24  into the middle, and then on the bottom half arrows coming out?

25  A      That's correct.

**UNITED STATES DISTRICT COURT**

Case 2:83-cv-04499-RA Document 1-5 Filed 06/05/23 Page 642 of 786 Page ID #:1084
Case 2:16-cr-00219-RA Document 89 Filed 07/20/17 Page 145 of 193 Page ID #:1026

145

```
1    Q    What does that mean?

2    A    So the arrows on the top, that is money that is inflows,

3    so the arrows are pointing into the representation of a bank

4    account.

5         And then on the bottom, there are arrows going out and

6    down, that is money going out of that account.

7    Q    So, for example, on the right-hand side for the American

8    Express card, that is one you didn't subpoena records for but

9    it went out of the Chase account, correct?

10   A    That's correct.

11   Q    And then the other outflows, can we go through them from

12   the top left "unknowns" and describe what those are?

13   A    Yeah, unknown deposits are unable to read, so that meant

14   -- essentially what the financial analyst was doing for the

15   bank records is I got the signature card, the monthly

16   statement, and copies of all of the checks that were deposited

17   and all of the debits that came out of that account.

18        And then she went through and essentially by hand, with

19   some assistance of a computer program, line by line identified

20   each of those checks, who they came from, what the amount was,

21   and other data.

22        But sometimes she couldn't always read the copy, and on

23   some of them we didn't necessarily get 100 percent of the

24   checks.

25        So that's what that total represents.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 643 of 786 Page ID
Case 2:16-cr-00219-PA Document 89 Filed 07/01/21 Page 146 of 193 Page ID #:1027
#:1085

146

1    Q    Okay.  So, is it fair to say then that the total amount

2    you knew went to Mr. Mirando may not include everything --

3    A    That's correct.

4    Q    -- that went to Mr. Mirando.

5         Now, let's turn to the claims and the insurance records.

6         We can talk about the specific beneficiaries.

7         Can you look at Exhibit 8?

8              MR. MCDERMOTT:  Which number?

9              MS. RYKKEN:  Eight.

10        We are going to back up.  This is actually going to be

11   about the Holter device themselves.

12             THE WITNESS:  But it's still Exhibit 8?

13   BY MS. RYKKEN:

14   Q    Exhibit 8.

15   A    Okay.  I have Exhibit 8.

16   Q    Okay.  Now, do you recognize that?

17   A    Yes, I do.

18   Q    What is it?

19   A    This is a document that I created that summarized

20   information I obtained from invoices I obtained during the

21   investigation.

22   Q    Who were those invoices from?

23   A    The invoices from Datrix to Lin Medical or from Datrix to

24   Caird Technology.

25             MS. RYKKEN:  This is a document that was previously

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04496-RA   Document 1-5   Filed 06/05/23   Page 644 of 786   Page ID
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 147 of 195   Page ID #:1028
#:1086
147

```
 1    pre-admitted, so I would like to move to admit into evidence

 2    now.

 3               MR. MCDERMOTT:  No objection.

 4               THE COURT:  It may be received.

 5         (Exhibit 8 received into evidence.)

 6    BY MS. RYKKEN:

 7    Q    And then similarly, did you create charts of the benefits

 8    paid out for specific beneficiaries?

 9    A    Yes, I did.

10    Q    Can you look at Exhibit 31, please.

11         What is that?

12    A    31 is a copy of the documents that I received from one of

13    the subpoenas served on one of the insurance companies

14    requesting the specific --

15               MS. RYKKEN:  It might be 27, not 31.

16               THE WITNESS:  Oh.

17               MS. RYKKEN:  Sorry, 36.

18               THE WITNESS:  Okay.  Here we go.

19    BY MS. RYKKEN:

20    Q    Do you recognize that?

21    A    Yes, I do.

22         This is a document that I created that summarizes some of

23    the information from the claims data that I obtained that

24    relates to Martha Bennett.

25    Q    Does this contain the information that we showed to
```

App. 1055

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 645 of 786 Page ID
Case 2:16-cr-00219-PA Document 89 Filed 07/20/17 Page 148 of 153 Page ID #:1029
#:1087

```
 1    Ms. Bennett yesterday?

 2    A     Yes, it does.

 3              MS. RYKKEN:  The government would move to admit

 4    Exhibit 36 into evidence.

 5              MR. MCDERMOTT:  No objection.

 6              THE COURT:  It will be received.

 7         (Exhibit 36 received into evidence.)

 8    BY MS. RYKKEN:

 9    Q     So this is the document as it appeared to you yesterday.

10          The document in the binder is slightly different, so I

11    just want to confirm it's exactly the same.

12    A     The data is the same, it's just presented differently.

13    Q     Okay.  I'm going to switch to this, so that the jury can

14    see.

15              THE COURT:  Val, turn on the ELMO.

16              MS. RYKKEN:  Okay.

17    BY MS. RYKKEN:

18    Q     So is this the document you are looking at in the binder?

19    A     Yes, it is.

20    Q     That is similar to the one that was shown yesterday?

21    A     Yes.

22    Q     Okay.  Now, we're going to do the same thing for the other

23    patients.

24          Okay.  Can you look at Exhibit 50?

25    A     I have it.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 15   Filed 06/05/23   Page 646 of 786   Page ID #:1088
Case 2:16-cr-00215-RA   Document 89   Filed 07/2017   Page 149 of 193   Page ID #:1030
149

```
 1   Q    Okay.  What is that?

 2   A    This is a document that I created that summarizes the

 3   claims submitted by Holter Labs to an insurance company on

 4   behalf of John Hattrup.

 5          MS. RYKKEN:  Now, the government moves to admit

 6   Exhibit 50 into evidence.

 7          MR. MCDERMOTT:  No objection.

 8          THE COURT:  It will be received.

 9     (Exhibit 50 received into evidence.)

10   BY MS. RYKKEN:

11   Q    Similarly, I would just like to show the jury what it

12   looks like.  It's in a slightly different format.  There we go.

13          So that data is the same as the data that was shown on

14   Mr. Hattrup yesterday?

15   A    Yes.  It's identical.  It is the same information, just in

16   a slightly different format.  The chart looks a little

17   different.

18   Q    Okay.  Can you look at Exhibit 63?  Oh, no, 62.

19   A    I have it.

20   Q    Okay.  What is that?

21   A    This is a document that I created that summarizes the

22   claims information of what Holter Labs submitted to the

23   insurance company on behalf of Lisa Solmor.

24          MS. RYKKEN:  The government moves to admit

25   Exhibit 62 into evidence.
```

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 647 of 786 Page ID #:1089
Case 2:16-cr-00215-PA Document 80 Filed 07/20/17 Page 150 of 193 Page ID #:1031

150

1          THE COURT:  It will be received.

2          (Exhibit 62 received into evidence.)

3    BY MS. RYKKEN:

4    Q    And similarly, this document looks a little different than

5    the one you saw yesterday; is that right?

6    A    Yes.

7    Q    But this information is correct?

8    A    Yes.  It's the same data, it's just a different

9    presentation.

10   Q    Okay.  And then the last patient.  Can you look at

11   Exhibit 77?

12   A    I have it.

13   Q    Okay.  What is that?

14   A    This is a document that I created that summarizes the

15   claims data submitted to -- submitted by Holter Labs to the

16   insurance company on behalf of Stacey Foster.

17          MS. RYKKEN:  The government moves to admit Exhibit

18   77 into evidence.

19          THE COURT:  It will be received.

20          (Exhibit 77 received into evidence.)

21   BY MS. RYKKEN:

22   Q    Then the last one I want to make sure the jury sees this.

23   This is similar to the information that was shown yesterday,

24   correct?

25   A    Yes.

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 648 of 786 Page ID
Case 2:16-cr-00219-RA Document 89 Filed 07/20/17 Page 1390 of 195 Page ID #:1090
#:1090
151

1    Q    All right.  So I want to talk a little bit more about the

2    overall investigation of claims.

3         You mentioned that you received documents from various

4    insurance companies?

5    A    That's correct.

6    Q    Thousands of claims?

7    A    Yes.

8    Q    Can you look at Exhibit 84?

9    A    I have it.

10   Q    Okay.  What is that document?

11   A    This is a document that I created.

12        So I got insurance claims data from about 25 insurance

13   companies.  Each one has a different worksheet, if you will.

14        So I wanted to be able to analyze the information

15   globally.

16        So, I copied some of the information from the columns on

17   to another worksheet so that I could then do some analysis of

18   that.

19        And this is a summary of that document I created.

20             MS. RYKKEN:  The government moves to admit

21   Exhibit 84 into evidence.

22             MR. MCDERMOTT:  No objection.

23             THE COURT:  It will be received.

24        (Exhibit 84 received into evidence.)

25   BY MS. RYKKEN:

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 649 of 786 Page ID #:1091
Case 2:18-cr-00213-RA Document 89 Filed 07/20/17 Page 152 of 193 Page ID #:1033

152

```
 1    Q    So this is the first page of the exhibit?

 2    A    Yes.

 3    Q    What is that?

 4    A    This is a listing of the insurance companies that provided

 5    me claims data, and then the date range of those claims; the

 6    date range being the date of service.  So the earliest date of

 7    service and the last date of service.

 8    Q    Are all of these healthcare insurance companies the HBCPs

 9    that we were talking about earlier?

10    A    Yes, they are.

11    Q    Does this include Aetna?

12    A    Yes, it does.

13    Q    And United?

14    A    Yes, it does.

15    Q    And Cigna?

16    A    Yes, it does.

17    Q    Can you turn to the next page?

18    A    I have it.

19    Q    What is that?

20    A    So when I was analyzing the data, I went through each line

21    and I identified, based upon my investigation, whether that CPT

22    code on that line was something that Holter Labs could have

23    performed, so I would have marked it "as appears to be valid."

24         My investigation revealed that they did not have the

25    equipment to perform that procedure, so I listed as "unable to
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04493-RA   Document 1-5   Filed 06/05/23   Page 650 of 786   Page ID #:1092
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 153 of 193   Page ID #:1034

153

1  perform."

2       Whether it was a duplicate date of service within a short

3  period of time from the first date of service in the claims

4  data, so if it was a duplicate date of service, and it's

5  possible that it could have been performed or I didn't know, I

6  listed as "duplicate date of service."

7       Then if it was none of the three that I just described, I

8  marked it "unknown."

9  Q     And this listing is organized by code?

10  A     This listing is summarized by insurance company and then

11  the CPT codes on the claims that were submitted to that

12  insurance company by Holter Labs.

13  Q     And this summary goes on for a number of pages; is that

14  right?

15  A     Yes, it does.

16  Q     If you can make your way toward the end, where the next

17  chart begins.  This is page 19, for the record.

18  A     I'm there.

19  Q     What is this?

20  A     This is -- I took the same analysis, the global claims,

21  and I sorted it different ways to create the summary charts.

22       This one is summarized by how I analyzed each claim line

23  and they are grouped together by how I -- by the category.  It

24  appears to be valid, duplicate date of service, unknown, or

25  unable to perform.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 651 of 786 Page ID #:1093
Case 2:18-cr-00219-PA Document 89 Filed 07/20/21 Page 1340 of 193 Page ID #:1035

154

1          So this includes for all insurance companies.

2     Q    Okay.  So, this appears to be the valid section?

3     A    Yes.

4     Q    These are all of the things that you thought might have

5     been okay?

6     A    Yes.  I was conservative in making those determinations.

7          I tried to be as conservative as I could be.

8          And based upon my investigation, it appears that Holter

9     Labs did have the equipment that could have performed these,

10    and it was not a duplicate date of service.

11    Q    Okay.  So the first dollar amount, that column, what is

12    it?

13    A    That is the summary of what you see below you.

14         So it appears to be valid.  You go straight over and the

15    second column is the summary of the amount billed that I

16    determined to be -- appears to be valid, and the amount paid

17    under "appears to be valid."

18    Q    So the amount billed is the amount of claims submitted?

19    A    Yes.  That I analyzed as appears to be valid.

20    Q    Okay.  Then the amount paid is the insurance money that

21    was actually paid to Holter Labs?

22    A    That's correct.

23    Q    And duplicate date of service, let's look at that.

24    A    Yeah.  Duplicate date of service, again, in analyzing each

25    claim line, I looked at when the first date of service was, and

App. 1062                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 652 of 786   Page ID
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 159 of 193   Page ID #:1036
#:1094

155

 1  then if there was a duplicate date of service within six months

 2  of the first day of the service, I marked it as a "duplicate

 3  date of service."

 4  Q    What is the total amount billed for duplicate dates of

 5  service?

 6  A    $1,079,433.86.

 7  Q    What is the amount paid to Holter Labs?

 8  A    $369,883.36.

 9  Q    Let's take a look at the third category, "unable to

10  perform."

11       What is the total amount that was billed there?

12  A    $7,369,392.69.

13  Q    What was the amount received back?

14  A    $2,655 -- I'm sorry, let me start again, $2,655,446.11.

15  Q    And there are particular categories that were larger

16  amounts of money.

17       Can you look below on the third one, the Microvolt T-wave

18  assessment?

19  A    Yes.  So the total billings under that CPT code was

20  $1,106,777.76 that was billed under that CPT code.

21  Q    What about the next one, the remote 30 days EG?

22  A    That was $507,566.34 billed.

23  Q    Okay.  And then on the next page, there is "unknown"?

24  A    Yes.

25  Q    What is the total amount billed there?

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 653 of 786   Page ID #:1095
Case 2:18-cr-00219-PA   Document 89   Filed 07/20/21   Page 156 of 193   Page ID #:1037

156

1    A    $289,313.10.

2    Q    And the amount that Holter Labs received?

3    A    $80,095.37.

4    Q    And approximately how many different claims are

5    encapsulated by this summary?

6    A    The global?  Thousands.

7    Q    Is it tens of thousands?

8    A    That would be reasonable, yes.

9    Q    And then on the last page, we have a total amount.

10        So it reads:  $10,316,506.93 of attempted.

11   A    Yes.  From all insurance companies that I received claims

12   data from.

13   Q    You didn't receive that from every insurance company?

14   A    No, I did not.

15   Q    And the total amount that was paid to Holter Labs?

16   A    $3,504,675.17.

17   Q    Can you look at Exhibit 92?

18        THE COURT:  Is this a convenient time for us to take

19   our break?

20        MS. RYKKEN:  Yes.

21        THE COURT:  All right.  Ladies and gentlemen, we're

22   going to take our final break of the day.  Again, I want to

23   remind you until this trial is over, you are not to discuss

24   this case with anyone, including your fellow jurors, members of

25   your family, people involved in the trial or anyone else.

App. 1064

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 654 of 786 Page ID #:1096
Case 2:16-cr-00219-RA Document 89 Filed 07/20/17 Page 159 of 193 Page ID #:1038

157

1      Do not allow others to discuss the case with you.

2      This includes discussing the case on Internet, bulletin

3  boards, by e-mails or text messages.

4      If anyone tries to communicate with you about this case,

5  please let me know about it immediately.

6      Do not read, watch or listen to any news reports or other

7  accounts about the trial or anyone associated with it.

8      Do not do any research such as consulting dictionaries,

9  searching the Internet, or using other reference materials.  Do

10  not make any investigation about the case on your own.

11      Finally, I remind to you to keep an open mind until all of

12  the evidence has been received, you have heard the arguments of

13  counsel, the instructions of the Court, and the views of your

14  fellow jurors.

15      If you need to speak with me, simply give a signed note to

16  the clerk.

17      We will come back at five until the hour.

18          THE COURTROOM DEPUTY:  All rise.

19           (JURY EXITS THE COURTROOM AT 11:44 A.M.)

20          THE COURT:  How much longer will you be with this

21  witness?

22          MS. RYKKEN:  My guess is no more than 15 minutes,

23  probably, like, ten.

24          THE COURT:  Okay.

25          MR. MCDERMOTT:  20 minutes.

App. 1065

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 655 of 786   Page ID
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 138 of 193   Page ID #:1039
#:1097
158

```
 1                THE COURT:  Okay.  All right.  We will see everybody
 2      in 10 or 15 minutes.
 3                THE COURTROOM DEPUTY:  This Court will stand in
 4      recess.
 5                          (Recess.)
 6                THE COURTROOM DEPUTY:  All rise.
 7        This Court is once again in session.
 8        You may be seated.
 9                THE COURT:  Are we ready to resume?
10                MS. RYKKEN:  Yes, Your Honor.
11                THE COURT:  Bring the jury in.
12        Mr. McDermott, do you need any tissues?
13                MR. MCDERMOTT:  I have got a box.
14                THE COURT:  I thought you were running low.
15                MR. MCDERMOTT:  I am going to the doctor after we
16      leave.
17                THE COURTROOM DEPUTY:  All rise.
18                 (JURY ENTERS THE COURTROOM AT 12:00 P.M.)
19                THE COURTROOM DEPUTY:  You may be seated.
20                THE COURT:  Why don't we have the witness resume the
21      stand?
22                MS. RYKKEN:  May I begin?
23                THE COURT:  Yes, please.
24      BY MS. RYKKEN:
25      Q    Okay.  So we were just about to look at Exhibit 92.
```

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 656 of 786   Page ID
Case 2:18-cr-00215-PA   Document 89   Filed 07/20/17   Page 159 of 193   Page ID #:1040
#:1098

159

1    Do you see that in your binder?

2  A    Yes, I do.

3  Q    What is that?

4  A    This is a document that I created that I -- during this

5  investigation, recently I requested new claims data from a few

6  insurance companies and I -- for, I think, the fall of 2016,

7  through the current date, as current as they could give it to

8  me.

9       This is a summary of claims data that I received from

10  Anthem for claims that were submitted after the defendant's

11  arrest to the most current date that they had available.

12  Q    And when was the date of defendant's arrest?

13  A    The defendant was arrested on October 7, 2016.

14       MS. RYKKEN:  The government moves to admit

15  Exhibit 92 into evidence.

16       MR. MCDERMOTT:  No objection.

17       THE COURT:  It will be received.

18       (Exhibit 92 received into evidence.)

19  BY MS. RYKKEN:

20  Q    So was this what you were referring to just on the screen?

21  A    Yes.

22  Q    Okay.  And the top half, what is all of the information on

23  the top half?

24  A    This is all of the CPT codes that were in the claims data

25  set I received from Anthem that were submitted after the

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 657 of 786   Page ID
Case 2:16-cr-00215-RA   Document 89   Filed 07/20/17   Page 160 of 193   Page ID #:1041
#:1099

160

```
 1    defendant's arrest to the most current date that Anthem had

 2    available and could provide me.

 3    Q    That is the sum total?

 4    A    Yes.

 5    Q    What's the dollar amount that was attempted to be billed?

 6    A    The dollar amount on that is $109,240.

 7    Q    What was the amount paid?

 8    A    $24,231.29.

 9    Q    I see you have highlighted some things in yellow.

10         What does that mean?

11    A    Those are four of the codes that I had -- in previous

12    analysis -- had determined that Holter Labs did not have the

13    devices to perform those procedures, so I highlighted them in

14    here.

15         And then I did a summary of those four just below this

16    chart.

17    Q    That summary of the four inappropriate codes, is that what

18    you see on the screen?

19    A    Yes, it is.

20    Q    What are the codes for?

21    A    One code is for a device that has wireless capability.

22         Another code -- the second code is 30-day event.

23         The fourth code is for a sleep study in which cardiac rate

24    and oxygen saturation and respiratory effort are also measured.

25         And then the fourth one is EEG, the brain scan.
```

App. 1068

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 658 of 786   Page ID
Case 2:16-cr-00215-PA   Document 89   Filed 07/20/17   Page 160 of 193   Page ID #:1042
#:1100

161

1    Q    So the total amount that was paid out, what is that for

2    the ones that were fraudulent?

3    A    For those four codes, it was $19,149.54.

4    Q    And about what percentage of the total amount paid?

5    A    That represents 79 percent of the total amount paid to

6    Holter Labs by Anthem on claims submitted after the defendant's

7    arrest to the most current date.

8    Q    How does that percentage compare to the claims from before

9    his arrest?

10   A    It's about standard.

11   Q    And what percentage of the claims submitted before his

12   arrest were what you considered fraudulent?

13   A    80 percent.

14   Q    All right.  So you mentioned earlier you met with various

15   doctors and patients during your investigation.

16        Do you recall which patients you met with?

17   A    Yes, I met with Martha Bennett, John Hattrup, Lisa Solmor,

18   Stacey Foster, and then there were a couple of more that I also

19   interviewed that did not testify at trial.

20   Q    Why did you meet with those four?

21   A    Those were four that Holter Labs had submitted claims to

22   insurance companies for providing services, and those patients

23   were located within the Los Angeles office of the FBI area of

24   responsibility.

25   Q    Can you look at Exhibit 95?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA    Document 1-5    Filed 06/05/23    Page 659 of 786    Page ID #:1101
Case 2:16-cr-00219-RA    Document 89    Filed 07/20/17    Page 162 of 193    Page ID #:1043

162

1    A    I have it.

2    Q    What is that?

3    A    This is a summary chart that I created that lists the

4    claims data that was submitted by Holter Labs to insurance

5    companies for the four patients that I interviewed and

6    testified during trial.

7              MS. RYKKEN:  And the government moves to admit

8    Exhibit 95 into evidence.

9              MR. MCDERMOTT:  No objection.

10             THE COURT:  It will be received.

11        (Exhibit 95 received into evidence.)

12   BY MS. RYKKEN:

13   Q    So is this similar to the information we looked at before

14   in Exhibits 36, 85, and the summaries for each of the patients

15   earlier?

16   A    Yes.  So this is identical to the summaries of each of the

17   patients.  This one has all four on one sheet.

18   Q    So can you just go down to the bottom for the total?

19   A    The grand total?

20   Q    The grand total.  What is the total amount billed?

21   A    $12,455.

22   Q    And what was the amount paid?

23   A    $6,815.67.

24   Q    Are you familiar with the indictment in this case?

25   A    Yes.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 660 of 786   Page ID #:1102
Case 2:18-cr-00219-RA   Document 89   Filed 07/30/21   Page 163 of 193   Page ID #:1044

163

1    Q      How are you familiar with that?

2    A      I recall seeing it when it was drafted and presented to

3    the grand jury.

4           I also received a copy after the grand jury had issued the

5    indictment.

6           I'm not sure what the legal term is.

7    Q      So did you have a chance to look at all of the 15 counts

8    in the indictment?

9    A      Yes.

10   Q      Can you look at Exhibit 94?

11   A      94?

12   Q      Yes.

13   A      I have it.

14   Q      What is that?

15   A      This is the summary of each count for which Michael

16   Mirando was charged in the indictment, and it lists each

17   beneficiary the code, the procedure, the date of service, and

18   the amount claimed.

19          MS. RYKKEN:  The government moves to admit 94 into

20   evidence.

21          MR. MCDERMOTT:  No objection.

22          THE COURT:  It will be received.

23       (Exhibit 94 received into evidence.)

24   BY MS. RYKKEN:

25   Q      Do you know if the indictment refers to the patients by

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 661 of 786   Page ID
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 164 of 193   Page ID #:1045
#:1103

```
 1   name?

 2   A     No.  The indictment uses initials.

 3   Q     Okay.  Do you remember the initials in the indictment?

 4   A     Yes.

 5   Q     Okay.  What were they?

 6   A     So John Hattrup was JH, Martha Bennett was MB, Lisa Solmor

 7   was LS, and Stacey Foster-Sixtos was abbreviated, I believe, as

 8   SF for Stacey Foster.

 9   Q     And this chart is similar to the counts in the indictment,

10   correct?

11   A     Yes.

12   Q     And what is in the CPT code column?

13   A     The CPT code is the code that was used in the claim by

14   Holter Labs on the submission to the insurance company.

15   Q     These were the charged fraudulent codes?

16   A     Yes.

17   Q     And the procedure?

18   A     The procedure is the description that I received from the

19   claims data I received from the insurance company.

20   Q     Okay.  And then in the date column?

21   A     That is the date of service, so that's the date of service

22   that was listed on the claims that were submitted by Holter

23   Labs to the insurance company.

24   Q     And the final amount claimed?

25   A     The amount claimed was the amount that Holter Labs billed
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 662 of 786    Page ID #:1104
Case 2:18-cr-00215-PA    Document 89    Filed 07/2017    Page 165 of 193    Page ID #:1046

165

1    for each procedure on the 1500 forms, the claim forms, that

2    Holter Labs submitted to the insurance company.

3    Q    So it's not the amount that was paid on those claims?

4    A    That is correct.  That is the amount billed.

5              MS. RYKKEN:  Can I have a minute with co-counsel?

6              THE COURT:  Yes.

7              MS. RYKKEN:  Okay.  Nothing further.

8              THE COURT:  All right.  Cross-examination?

9              MR. MCDERMOTT:  Thank you, sir.  May I?

10             THE COURT:  Yes.

11

12                       CROSS-EXAMINATION

13   BY MR. MCDERMOTT:

14   Q    Agent Kennedy, I might have missed it.  How long have you

15   been an agent?

16   A    It will be 20 years this August.

17   Q    How long have you been in the health investigation field?

18   A    Since 2013.

19   Q    So, this would have been one of your first cases?

20   A    This is my second case.

21   Q    Second case?

22   A    Uh-huh.

23   Q    Okay.  Now in your office there with the FBI, do you have

24   a guide book, a training book that tells you how to investigate

25   a case such as this?

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 663 of 786   Page ID #:1105
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 166 of 193   Page ID #:1047

166

1    A    There are resources available that agents can access, plus

2    I happen to sit next to one of the most experienced FBI agents

3    in healthcare fraud in the Los Angeles County.  He's a resource

4    as well.

5         Plus my supervisor is a resource.

6         There is FBI headquarters that is a resource, so there is

7    a lot of resources.

8    Q    What did you do before healthcare fraud?

9    A    Within the FBI?

10   Q    Yes.

11   A    I was the applicant coordinator for Los Angeles office

12   helping to select and process applicants for the special agent

13   position for the FBI.

14   Q    So, an administrative position?

15   A    Yes.

16   Q    Not necessarily an investigative position?

17   A    For the time period, I was the applicant coordinator, yes.

18   Q    Right.  How long was that?

19   A    Six years.

20   Q    Six.  Were you in the field at any point in time as an

21   investigator?

22   A    Oh, yes.

23   Q    All right.  So you are familiar with the use of search

24   warrants?

25   A    Yes.

Case 2:23-cv-04493-RA   Document 1-5   Filed 06/05/23   Page 664 of 786   Page ID
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 168 of 195   Page ID #:1048
#:1106

167

1    Q    Obviously, you are familiar with the use of subpoenas,

2    correct?

3    A    Yes.

4    Q    Now, in this particular case, did you use search warrants?

5    A    No.  We did not get a search warrant.

6    Q    All right.  At any point in time, did you use any device,

7    search warrant of any nature, directly on Holter Labs or

8    directly on Michael Mirando?

9    A    No, we did not.

10   Q    So, when we put together a list of available devices,

11   supposedly being used with certain patients --

12   A    Uh-huh.

13   Q    -- you don't have a list coming directly from Holter Labs

14   as to what devices they possessed, true?

15   A    No, I do have a list.

16   Q    Well you relied on Datrix and Lin Medical, correct?

17   A    Stanton Crowley, when I first met with him in September

18   of 2013, he had brought -- or he had some documents that he

19   obtained from Holter Labs that were available to him because he

20   was part of Holter Labs.

21        So I think I met with him shortly thereafter, and obtained

22   copies of that, and one of those documents was an Excel

23   spreadsheet.

24        And one of the sheets on that listed the inventory that

25   was assigned to specific doctors, and it had the serial number

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 665 of 786 Page ID
Case 2:16-cr-00215-PA Document 89 Filed 07/20/17 Page 168 of 193 Page ID #:1049
#:1107

168

```
 1    and some other information that had been maintained.
 2         So that was an internal Holter Labs document.
 3    Q    So did you go about confirming those serial numbers with
 4    the specific doctors?
 5    A    No.  I got one from Ruby Simpkins, the actual device.
 6    Q    Yes.
 7    A    And I did confirm that it was the serial number that was
 8    listed on the sheet that I received from Michael Mirando that
 9    was the internal Holter Labs document.
10    Q    No, no.  Not Michael Mirando, but from Stanley Crowley?
11    A    Holter Labs, I'm sorry, Stan Crowley, I misspoke.
12    Q    So this was a document that he turned over to you in
13    September of 2013, correct?
14    A    Correct.
15    Q    That would have been the first time in which you had a
16    chance to interview him, correct?
17    A    Stanton Crowley, yes.
18    Q    This would have been -- like you said -- the second case
19    that you had that involved healthcare fraud, right?
20    A    Yes.
21    Q    This particular individual that showed up in your office,
22    was there because he had a proffer agreement, right?
23    A    It was a proffer agreement, yes.
24    Q    You understood what a proffer agreement was, did you not?
25    A    Yes.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 666 of 786   Page ID #:1108
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 169 of 193   Page ID #:1080

169

1   Q     So this was an individual that had some issues regarding

2   exposure to charges?

3   A     Yeah, that is probably accurate.

4   Q     All right.  I mean, before this was handed out to him, did

5   you have any discussions with the Assistant U.S. Attorney that

6   gave him the proffer agreement?

7   A     I think that would have been administrative.

8   Q     All right.  So there was no discussion ahead of time that

9   you were going to sit down with a witness that had a protection

10  agreement?

11  A     As I recall I was asked to go over to the U. S. Attorney's

12  Office.  They had an individual who was coming in to provide

13  information.

14        And I think the U. S. Attorney had very briefly given me

15  some information that there was going to be a proffer, and then

16  I was going to speak to the witness.

17  Q     Okay.  Now --

18  A     I apologize.

19  Q     -- at that particular time in 2013, had you become aware

20  that Crowley had not been part of the Holter Lab operation

21  since October of 2012?

22  A     I discovered that during the interview of Mr. Crowley.

23  Q     All right.  So the information he had -- do you need any

24  cough drops?

25  A     I actually have water.  I think this is good, I apologize.

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 667 of 786 Page ID #:1109
Case 2:16-cr-00219-RA Document 89 Filed 07/20/17 Page 170 of 193 Page ID #:1081

170

1    Q    So what you had was a list of items that had been

2    generated in 2012, at the latest, right?

3    A    Correct.

4    Q    Now, at any point in time, did you try to independently

5    verify where that list came from?

6    A    I considered it, but I didn't see any method of being able

7    to do so.

8    Q    All right.  Because my question is when that document came

9    to you, was it in an Excel spreadsheet?

10   A    Yes.

11   Q    Okay.  Now, the Excel spreadsheet, that is necessary --

12   not necessarily a "read only" kind of creation, is it?

13   A    That's correct.

14   Q    So, he acquired this a year before seeing you, and that

15   document could have been amended, altered, changed, a lot of

16   different things during that year time frame, correct?

17   A    That's correct.

18   Q    And as you sit here today, do you have any independent

19   investigation that confirmed what devices Holter Labs had other

20   than from Lin Medical and Datrix?

21   A    Other than Mr. Crowley's information about some of the

22   devices that were on there, no.

23   Q    Okay.  That is the point.

24        Mr. Crowley gave you some information, but independently

25   verifying what was on there other than Lin Medical or Datrix,

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA  Document 1-5  Filed 06/05/23  Page 668 of 786  Page ID #:1110
Case 2:16-cr-00219-PA  Document 89  Filed 07/20/17  Page 172 of 193  Page ID #:1082

171

```
 1   that did not occur, true?

 2   A    True.

 3   Q    Now, when you -- when you put this list together of all of

 4   the devices and all of the billing codes and adding them up,

 5   were you able to confirm with the physicians on those codes,

 6   this list -- the complete list -- which devices they were using

 7   and what was available?

 8   A    I attempted to get the device from the doctors that I

 9   interviewed -- that I obtained records from for those patients.

10   Q    We're talking about the four?

11   A    Correct.

12   Q    All right.  But this lengthy list of billings that you put

13   together --

14   A    Uh-huh.

15   Q    -- that had this phenomenal amount of money involved, did

16   you contact the physicians in that particular situation that

17   determined whether or not the devices could do with the codes

18   say they could do?

19   A    Other than the four, no.

20   Q    Now, when Mr. Crowley came to your office, and he had the

21   proffer agreement --

22   A    Uh-huh.

23   Q    -- can you tell me whether or not any promises were

24   extended to him beyond that proffer agreement?

25   A    Not that I'm aware of.
```

UNITED STATES DISTRICT COURT

1   Q    And it was obviously an ongoing conversation and

2   communication that you had with Mr. Crowley during that time?

3   A    Yes.

4   Q    And was there in fact an instance in which he wanted to

5   know whether or not the IRS had been contacted?

6   A    I do recall a conversation that I had with Mr. Crowley

7   about him asking me if I had contacted the IRS.

8        I told him I had not.

9        I wasn't aware the IRS was involved, and he said something

10  about he was wondering if he should contact them, and I said,

11  that's up to him.

12  Q    And to your knowledge, does the FBI and the IRS coordinate

13  investigations?

14  A    We have.  We do at times.

15  Q    So has that occurred in this case?

16  A    No.

17  Q    The dollar amounts that we have that you put together, how

18  much Stan Crowley received, how much Michael Mirando received,

19  from your understanding there is no ongoing or current IRS

20  investigation as to those numbers?

21  A    I'm not aware of any IRS investigation.

22  Q    During the course of your investigation, did you ever

23  receive an e-mail, text message copy, voice message of any sort

24  involving Mr. Mirando talking about his role in Holter Labs?

25  A    I received as part of the discovery from your office to

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 670 of 786   Page ID #:1112
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 173 of 193   Page ID #:1084

173

 1    the United States Attorney's Office, who in turn, sent it to

 2    me.

 3    Q    Okay.  But independently on your own, my office delivered

 4    the documents that you ended up with.

 5         But independently, did you have e-mails, text messages,

 6    voice messages, interviews with Michael Mirando?

 7    A    No.

 8    Q    Now, to your knowledge and understanding, at least in your

 9    conversations with Mr. Crowley, did you become aware of whether

10    or not either Mr. Cast or Mr. Crowley trained Mr. Mirando on

11    billing?

12    A    I received some information from Mr. Crowley and Mr. Cast

13    regarding that.

14    Q    And the sum total or extent of the total of that was that

15    they in fact trained him on how to bill, correct?

16    A    Mr. Crowley said that Mr. Cast had shown Mr. Mirando how

17    to do the coding, the billing.

18         And Mr. Mirando [sic] stated that he didn't know how to do

19    it, so he didn't show him.

20         When I interviewed Mr. Cast, he said that he knew how to

21    do it, and he did some of it, but he did not train Mr. Mirando.

22    Q    Okay.  So, either Cast isn't telling the truth or Crowley,

23    right?

24    A    Yeah, I don't know.

25    Q    But it's pretty certain that Mr. Mirando did not know how?

App. 1081                    UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 671 of 786   Page ID
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 174 of 193   Page ID #:1085
#:1113

174

1   A      I do not know.

2   Q      All right.  But at least in the course of your

3   investigation, you didn't find any independent source of

4   information that confirmed to you that Michael Mirando knew how

5   to do coding before meeting Cast and Crowley?

6   A      That would be correct.

7   Q      And subsequent to meeting Cast and Mr. Crowley, any

8   evidence whatsoever, that Michael Mirando went to some kind of

9   seminar, teaching class of any sort to learn coding?

10  A      I found no record of that.

11  Q      Now, you had to do your own homework to figure out what

12  coding was by going online?

13  A      Yes.

14  Q      That would include going on websites for insurance

15  companies, I believe, you testified?

16  A      Yes.

17  Q      And the insurance companies are the ones that created that

18  system?

19  A      No.  The American Medical Association created the CPT

20  codes.

21  Q      And during the course of your investigation and searching

22  online, did you find courses offered to teach people how to do

23  coding?

24  A      I didn't search for that online, but I'm aware there are

25  courses.

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 672 of 786    Page ID
Case 2:16-cr-00219-PA    Document 89    Filed 07/20/17    Page 179 of 193    Page ID #:1086
#:1114

175

1    Q     There are?

2    A     Yes.

3    Q     To your knowledge, did you ever uncover as to whether or

4    not Mr. Cast or Mr. Crowley ever attended one of those classes?

5    A     I did not find any evidence that.

6    Q     When Mr. Crowley arrived at your office in September 2013,

7    you began to contact the insurance companies regarding what he

8    had to say about?

9    A     I requested claims data, yes.

10   Q     All right.  Did any one of the insurance companies inform

11   you that they had already opened up an investigative file on

12   Holter Labs?

13   A     No.

14   Q     Did any one of the insurance companies come to you or even

15   after you contacted them, and say, "You know, we have actually

16   got an open file here on Holter Labs.  We have been keeping

17   tabs on some really unusual coding going on with this device

18   that you wear on your chest."

19         Any one of the insurance companies do that?

20   A     No.

21   Q     So relative to how to code and how to bill, none of the

22   insurance companies went to directly to Mirando or Holter and

23   said, "You are doing this wrong"?

24              MS. RYKKEN:  Objection.  Foundation.

25              THE COURT:  Sustained.

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 673 of 786 Page ID #:1115
Case 2:16-cr-00215-RA Document 89 Filed 07/20/17 Page 178 of 193 Page ID #:1087

176

```
 1   BY MR. MCDERMOTT:
 2   Q    Are you aware of whether or not any insurance company went
 3   directly to Mirando and informed him he was billing
 4   incorrectly?
 5   A    I'm not aware of any insurance company offering any
 6   education or instruction to Mr. Mirando.
 7   Q    And no insurance company at all had an open investigation
 8   before you opened yours, right?
 9            MS. RYKKEN:  Objection.  Foundation.
10            THE COURT:  Sustained.
11   BY MR. MCDERMOTT:
12   Q    Are you aware?
13            THE COURT:  That doesn't cure that problem.
14            MR. MCDERMOTT:  Okay.  I will fix it.
15   BY MR. MCDERMOTT:
16   Q    Are you aware of any insurance company having an open
17   investigation before you contacted them regarding Michael
18   Mirando?
19   A    I am not.
20   Q    Did you have -- you brought it up in your direct that
21   Mr. Crowley, over the course of time that he was working with
22   Holter Labs, collected close to $1,076,000, right?
23   A    It was on the summary chart.
24   Q    Does that sound about right?
25   A    That is accurate, yeah.
```

App. 1084

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 674 of 786 Page ID #:1116
Case 2:18-cr-00213-RA Document 89 Filed 07/20/21 Page 177 of 195 Page ID #:1088

177

1   Q    And there was -- he had the benefit of American Express
2   cards, right?
3   A    There was an American Express card for Holter Labs.
4        I did not receive the statements, so I do not know who
5   charged and who received the benefit.
6   Q    Okay.  But you are aware that he actually had a card?
7   A    I believe that's accurate.
8   Q    All right.  So, American Express didn't return your calls
9   or respond to your subpoena?
10  A    I didn't subpoena it.  I was drowned in records, as it
11  was, sir.
12  Q    Okay.  So we don't know how much he might have collected
13  from American Express to pay his bills, right?
14  A    That's correct.
15  Q    Any other account that you listed on that document that
16  you didn't get the records for to determine how much Stan
17  Crowley might have benefited?
18  A    Stan Crowley had an ING account.
19  Q    Right.
20  A    I did not request the records for Stan Crowley's ING
21  account.
22  Q    Okay.  Do you know whether or not Holter Labs was paying
23  for his vehicle?
24  A    I believe it was.
25  Q    Did you include that in the $1 million figure?

UNITED STATES DISTRICT COURT

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 675 of 786   Page ID #:1117
Case 2:16-cr-00215-RA   Document 89   Filed 07/20/17   Page 178 of 193   Page ID #:1089

178

1   A     Yes.

2   Q     So we haven't -- we didn't include the ING, we didn't

3   include American Express.

4         Anything else we didn't include for Mr. Crowley?

5   A     Not that I'm aware of.

6   Q     And did you in fact have discussions with him regarding

7   his tax situation?

8   A     No.

9   Q     All right.  So, in sum, when you went through the summary

10  of indictment charges and the patients, and that sort of thing,

11  did you testify that at least as to Ruby Simpkins you actually

12  saw the device that was used on that particular patient?

13  A     Yes.  It's been admitted into evidence.

14  Q     Well, that particular device we're talking No. 1, Exhibit

15  No. 1 --

16  A     Yes.

17  Q     -- that was the one from Ruby Simpkins?

18  A     Yes.

19  Q     All right.  As to the other three patients, did you track

20  those down?

21  A     I attempted.  They no longer had the devices in their

22  possession.

23  Q     So is it safe to say, other than what we might have in

24  documents, you have never looked at the device that was used on

25  those particular patients, correct?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA    Document 1-5    Filed 06/05/23    Page 676 of 786    Page ID
Case 2:16-cr-00219-RA    Document 89    Filed 07/20/17    Page 179 of 198    Page ID #:1000
#:1118

179

1   A     Yes.

2   Q     So the only one you have that conversation with, as far as

3   the type of device, was Ms. Solmor?

4   A     Ms. Solmor, yes, sir.

5         MR. MCDERMOTT:  Just a second, Your Honor, if I

6   could.

7         THE COURT:  All right.

8   BY MR. MCDERMOTT:

9   Q     You had some numbers and figures regarding billings that

10  occurred after my client's arrest back in October of 2016?

11  A     That were submitted afterwards, yes.

12  Q     All right.  And they, in your opinion, reflect some kind

13  of pattern of inappropriate billing for what the device would

14  allow somebody to do?

15  A     Yes.

16  Q     Now, as to any of those particular billings, did you in

17  fact contact the physicians and figure out exactly what devices

18  they had?

19  A     No.

20  Q     You are basically relying upon it being device No. 1,

21  Exhibit No. 1?

22  A     The same model -- that Holter Labs had the same model.

23  Q     And you haven't been able to update or confirm what Holter

24  Labs and Michael Mirando might have had as far as devices since

25  October 2016?

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 677 of 786   Page ID
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 180 of 193   Page ID #:1001
#:1119

180

```
 1   A     I have not.
 2   Q     Now, in addition to the insurance companies that are
 3   involved with this case, have you made any contact with MediCal
 4   or Medicare?
 5   A     Medicare, yes.
 6   Q     Okay.  Was there billings through Medicare?
 7   A     Yes.
 8   Q     To your knowledge, from 2005, through 2011, or '12, was
 9   Holter Labs able to bill Medicare?
10   A     No.
11         MS. RYKKEN:  Objection.  Relevance.
12   BY MR. MCDERMOTT:
13   Q     Just a few more questions.
14         And -- during your investigation, did you become familiar
15   with the process to become eligible to do that?
16         MS. RYKKEN:  Objection.  Relevance.
17         THE COURT:  Sustained.
18   BY MR. MCDERMOTT:
19   Q     Do you know now whether or not Holter Labs is qualified to
20   bill Medicare?
21         MS. RYKKEN:  Same objection.
22         THE COURT:  Sustained.
23         MR. MCDERMOTT:  I have nothing further.
24         MS. RYKKEN:  No redirect.
25         THE COURT:  You may step down.  Thank you.
```

App. 1088

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 678 of 786   Page ID #:1120
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 180 of 193   Page ID #:1062

181

```
 1          Let me see counsel at sidebar.

 2                        (Sidebar begins.)

 3                  THE COURT:  Okay.  Do you have any additional

 4    witnesses?

 5                  MR. FREEDMAN:  No.

 6                  THE COURT:  Subject to confirming that all of the

 7    documents are in, you are prepared to rest?

 8                  MR. FREEDMAN:  Yes.

 9                  MS. RYKKEN:  Yes.

10                  MR. MCDERMOTT:  I will stand up and say, we rest.

11                  THE COURT:  I'm thinking maybe we could do that.

12          Do you want to do it today or --

13                  MR. MCDERMOTT:  Tuesday morning.

14                  THE COURT:  -- Tuesday morning.

15                  MR. MCDERMOTT:  Certainly.  Just for planning

16    purposes, I have asked the government also that they are

17    putting together instructions on the forfeiture aspect.  And I

18    would like to get those instructions so I can sit down with the

19    client, so I don't have those yet.

20          And I apologize, maybe I should have taken more time to

21    look that through.

22                  MR. FREEDMAN:  Someone is writing that down.

23                  THE COURT:  Okay.  I will tell you what, why don't

24    we, for each side, I will ask if you are resting and that will

25    be subject to confirming that whatever documents --
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. MCDERMOTT:  Right.

 2              MR. FREEDMAN:  Do you want us to say that part of it

 3    or just say we rest?

 4              MR. MCDERMOTT:  I like the idea of me coming in on

 5    Tuesday and saying, I rest.

 6              THE COURT:  I know.  You can always seek to reopen

 7    if you want, if you have a good reason.

 8              MR. MCDERMOTT:  I know.  Give me all weekend long to

 9    think about it.

10              THE COURT:  Well, anyway.  All right.

11                        (Sidebar ends.)

12              THE COURT:  All right.  Does the government have any

13    additional witnesses?

14              MR. FREEDMAN:  No, Your Honor.

15              THE COURT:  Okay.  And subject to confirming that

16    all of the appropriate exhibits have been received, does the

17    government rest?

18              MR. FREEDMAN:  Yes, Your Honor.

19              THE COURT:  Okay.  Does the defense intend to call

20    any witnesses?

21              MR. MCDERMOTT:  Your Honor, right now, our position

22    on it is that the defense would also indicate we're going to

23    rest.

24              THE COURT:  All right.  Ladies and gentlemen, I

25    think we have done about all we can do today.
```

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 680 of 786   Page ID #:1004
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 183 of 193   Page ID #:1122

183

```
1        So we're going to resume on Tuesday.

2        Are you sure you don't want to come down here Monday?

3        All right.  We will resume on Tuesday at 8:00 a.m.

4        On Tuesday, we will have the closing arguments of counsel,

5   which as I indicated before, I think will last about an hour

6   and a half, and then the Court will have some instructions to

7   take about 20 to 25 minutes, and then the case will be

8   submitted to you for your deliberations.

9        All right.  So until Tuesday, remember that the trial --

10  that until this trial is over, you are not to discuss this case

11  with anyone, including your fellow jurors, members of your

12  family, people involved in the trial or anyone else.  And do

13  not allow others to discuss the case with you.

14       This includes discussing the case on the Internet,

15  bulletin boards, e-mails, or text messages.

16       If anyone tries to communicate with you about this case,

17  please let me know about it immediately.

18       Do not read, watch, or listen to any news reports or other

19  accounts about the trial or anyone associated with it.

20       Do not do any research such as consulting dictionaries,

21  searching the Internet, or using other reference materials.

22  And do not make any investigation about the case on your own.

23       Finally, you are reminded to keep an open mind until all

24  of the evidence has been received, you have heard the arguments

25  of counsel, the instructions of Court, and the views of your
```

App. 1091

Case 2:23-cv-04498-RA    Document 1-5    Filed 06/05/23    Page 681 of 786    Page ID
Case 2:16-cr-00215-RA    Document 89    Filed 07/20/17    Page 184 of 193    Page ID #:1005
#:1123

184

1    fellow jurors.

2        If you need to speak with me, simply give a note to the

3    clerk.

4        Have a nice weekend.  We will see everybody Tuesday

5    morning at 8:00.

6                THE COURTROOM DEPUTY:  All rise.

7                THE COURT:  If you could, leave your notebooks on

8    the chairs.

9                (JURY EXITS THE COURTROOM AT 12:35 P.M.)

10                THE COURT:  Have you seen the latest version of the

11    jury instructions?

12                MR. MCDERMOTT:  I have a copy of it.  I haven't read

13    through it.

14                THE COURT:  I think there are two -- there is a

15    change in one of the instructions, and there is one new

16    instruction.

17                MR. MCDERMOTT:  The gullible victim.  Right, I have

18    got to take a look at that one.

19                THE COURT:  Okay.  When do you want to go over the

20    jury instructions?

21                MS. RYKKEN:  After he's had a chance to review them,

22    we can do that.  I mean, the first thing on Tuesday morning.

23                MR. MCDERMOTT:  Can I let the clerk know?

24        I will be working on it this weekend.

25        If I have an issue with it, I will indicate to the Court

Case 2:23-cv-04496-RA   Document 1-5   Filed 06/05/23   Page 682 of 786   Page ID
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 185 of 193   Page ID #:1006
#:1124

185

1    that I do.

2         I can't -- I have got no issues as to the balance, it's

3    just those two.

4         I can leave the clerk a message that we're copacetic with

5    the two additional.

6              THE COURT:  That is fine.

7              MS. RYKKEN:  Would you like -- would the Court like

8    us to provide copies of the jury instructions to the jurors?

9              THE COURT:  I'm sorry?  I didn't hear you.  The

10   microphone is off again.

11             MS. RYKKEN:  Would the Court like us to provide

12   copies of the jury instructions to the jurors or are you going

13   to send back multiple copies?

14             THE COURT:  No.  We will take care of that.

15        I think I may have made some stylistic changes to the

16   verdict form, but you will have that Tuesday and have an

17   opportunity to review it.

18        I don't think there is really anything of substance, but

19   you will get a chance to look at that before it goes back and

20   to be heard.

21        Anything else?

22             MR. MCDERMOTT:  Can I address one thing that is near

23   and dear to my heart?

24             THE COURT:  Yes.

25             MR. MCDERMOTT:  The government is in the process of

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA   Document 1-5   Filed 06/05/23   Page 683 of 786   Page ID #:1125
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 186 of 193   Page ID #:1007

186

1    preparing instructions on the forfeiture aspect, and they are

2    going to get those to me.

3        It would make it a lot easier for me if I didn't have to

4    come up to MDC this weekend to sit down and go through it.

5        My client's family have actually rented a home through

6    Wednesday in Silver Lake, less than five miles away from here,

7    I think.  And if at all possible, either if we could release

8    him to the Central District, he doesn't go back to Oregon, here

9    locally, I really need to sit down and talk with him at some

10   point in time, and it would be a great convenience for him to

11   come to my office as opposed to me trying to get to MDC and

12   talk about it.

13       I'm asking the Court, again, if there are any terms and

14   conditions that would allow him to be out with his family in

15   the home here locally, and able to visit with me during the

16   weekend, I would really appreciate it.

17            THE COURT:  What is the government's position?

18            MR. FREEDMAN:  Your Honor, as long as the jury is

19   still empaneled and out, I don't think anything has changed

20   with the Court's concerns.

21       Yesterday, we had the additional concern of the

22   cooperating witness.  That concern is now gone, so I think

23   status quo where things were on Wednesday.

24            THE COURT:  Let me see counsel at sidebar.

25                     (Sidebar begins.)

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 684 of 786   Page ID #:1126
Case 2:16-cr-00219-PA   Document 89   Filed 07/20/17   Page 189 of 193   Page ID #:1008

187

 1          THE COURT:  Well, you know, I understand what you

 2    are saying.

 3          The problem that I have is that that was pretty over the

 4    top, making contact with these -- initiating contacts with

 5    these jurors.

 6          And, you know, once the case is over and there is nothing

 7    new, I don't have a problem releasing him, but --

 8                MR. MCDERMOTT:  There is a location down in Orange

 9    County that he stays there away from LA County.  I'm sure I'm

10    not going to be bumping into any of the jurors down there in my

11    office.  None of them are from Orange County.

12          I mean, I would gladly indicate to the Court I would have

13    him text me every hour on the hour, and I could provide you a

14    copy of that to make sure he's where he is supposed to be.

15                I understand the Court's concern.

16          In fact Mr. Freedman and I were talking about this in the

17    bathroom today, just kind of the way the set-up is, I can

18    understand why the Court would have the concern that it does.

19          I'm just asking the Court for some consideration on making

20    my job just a tad easier.  I know it's not your job.

21                THE COURT:  I understand that.  You know, I have

22    been doing this longer than I care to even think about, but I

23    can tell you I have never had something like that come up, even

24    as a lawyer.

25          So, I'm inclined to just kind of leave it where it is for

Case 2:23-cv-04498-RA   Document 15   Filed 06/05/23   Page 685 of 786   Page ID
Case 2:16-cr-00219-RA   Document 89   Filed 07/20/17   Page 188 of 193   Page ID #:1009
#:1127

188

 1   now.

 2          MR. MCDERMOTT:  You have to admit there is a lot of

 3   firsts.  I was telling Mr. Freedman the idea of actually having

 4   a juror telling us that he was in a witness protection program

 5   is a first for me.

 6          Maybe I didn't address it properly.  Like I said, Judge,

 7   it's as much my responsibility for not being a little bit more

 8   adamant with the client in understanding the rules and

 9   instructions that you were giving.

10          So, I just want the Court to consider that, too.

11          THE COURT:  I have.  I don't think -- well, I have.

12   I am going to leave it the way it is, and then we will --

13          MR. MCDERMOTT:  Okay.

14                       (Sidebar ends.)

15          THE COURT:  Okay.  Counsel has asked to have the

16   Court reconsider -- or to consider releasing the defendant back

17   on bond.

18          And I'm inclined to -- out of an over abundance of caution

19   just to leave things the way they are.

20          As I said before, unless I learn something new, once the

21   jury has completed its tasks, the defendant will be released

22   one way or the other.

23          If he's acquitted, the Court will order him released

24   forthwith.

25          And if it's an adverse result, provided I don't learn of

App. 1096                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 686 of 786 Page ID #:1128
Case 2:16-cr-00219-PA Document 89 Filed 07/20/17 Page 189 of 193 Page ID #:1070

189

```
  1   anything new, the defendant will be released forthwith once the
  2   jury has concluded.
  3            MR. MCDERMOTT:  Let me add one more item for the
  4   record.
  5        He's being housed on Five South right now.
  6            THE COURT:  Okay.
  7            MR. MCDERMOTT:  Hopefully, it will get corrected, if
  8   I'm wrong, but that is what I understand.
  9        Does MDC actually have a floor in which there are
 10   adjudicated -- just prisoners being held there?  It was my
 11   understanding it was all people awaiting trial.
 12            THE COURT:  I think the vast majority of people
 13   there are waiting for trial.
 14        If what you are saying is if there are people there who
 15   have had their cases adjudicated?
 16            MR. MCDERMOTT:  Right.
 17            THE COURT:  There may be.  I know that, for example,
 18   there may be people there who are waiting a designation or who
 19   are waiting for transportation.
 20            MR. MCDERMOTT:  Right.
 21            THE COURT:  But certainly the Marshals can speak to
 22   that better than I can.
 23            MR. MCDERMOTT:  My concern is in light of the type
 24   of classification he would normally fall in with Bureau of
 25   Prisons, where he is lumped in right now in Five South, it is
```

Case 2:23-cv-04496-PA Document 1-5 Filed 06/05/23 Page 687 of 786 Page ID #:1129
Case 2:16-cr-00215-PA Document 89 Filed 07/20/17 Page 190 of 193 Page ID #:1071

190

1    from a category of much more, for lack of a better word,

2    "violent" than what he would be normally placed in.

3        I don't know if the marshals have the ability to place him

4    on a floor with less problems like that.  That is part of my

5    concern.

6            THE COURT:  Well, I don't think -- I don't know -- I

7    don't believe it's the marshal's -- I don't think that falls in

8    their bailiwick.  He's on Five South?

9            MR. MCDERMOTT:  Yes, sir.

10           THE COURT:  If you want to wait a minute, I can make

11   a call and see if the Bureau of Prisons -- in fact, do you know

12   if they have different designations?

13           THE MARSHAL:  This is Deputy Kiff.  Once he entered

14   the MDC, there is a counselor who interviewed him, and they

15   will place him in custody depending on his level and security,

16   but it's that way throughout the whole institution.  The only

17   floor is fifth floor, and those people are pretty much waiting

18   for designation to serve their time.

19           THE COURT:  The fifth floor is?

20           THE MARSHAL:  It is the Cadre units.  They are

21   sentenced inmates.  They are the ones who pretty much can be

22   housed.

23           THE COURT:  They are on the fifth floor?

24           THE MARSHAL:  Five North.

25           THE COURT:  But the marshal service cannot ask --

App. 1098                    **UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 688 of 786 Page ID #:1130
Case 2:16-cr-00219-PA Document 89 Filed 07/20/17 Page 191 of 193 Page ID #:1072

191

1     I understand that part, but on the other floors, there are

2  people who are awaiting trial?

3         THE MARSHAL:  That's correct.

4         THE COURT:  We can take -- I can -- why don't you

5  hold on for a minute, I will make a couple of calls.

6         MR. MCDERMOTT:  Thank you.

7         THE COURT:  All right.  Why don't you guys sit tight

8  for a minute, and I will go make a call.

9         THE COURTROOM DEPUTY:  All rise.  This Court now

10  stands in recess.

11               (Recess.)

12             (Sidebar begins.)

13         THE COURT:  Okay.  I talked to somebody over at the

14  MDC.

15     They tell me he is on the fifth floor.  He's in a wing

16  where most of those people, they are pre-trial detainees.

17     A lot of people there are either older, need some sort of

18  disability assistance, so he's probably on the best floor he

19  can be.

20     In fact, the marshals were telling me that they think he's

21  going to be okay.  I appreciate the effort.

22     Next week he will be out.

23         MR. MCDERMOTT:  All right.

24            (Sidebar ends.)

25         THE COURT:  I have talked to the people over there.

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 689 of 786 Page ID #:1131
Case 2:16-cr-00219-PA Document 89 Filed 07/2017 Page 192 of 193 Page ID #:1073

192

```
1    I think he's on a floor or in a wing where they are pretrial
2    detainees.
3         And it's probably one of the best floors that he could be
4    under the circumstances.
5         If there is a specific problem or a specific threat or
6    something, let us know, and we can address that.
7              MR. MCDERMOTT:  I will.
8              THE COURT:  As I said before, we will -- if nothing
9    new happens -- I'm going to put him back out.
10             MR. MCDERMOTT:  I know.
11             THE COURT:  And the instructions you changed?
12             MS. RYKKEN:  They were 32, the additional of the
13   attempt, and I added attempt 2 instructions 33, and global
14   victim instruction, 34.
15             THE COURT:  Okay.
16             MR. MCDERMOTT:  I have a copy, like I said, I will
17   go through it, and I will leave the clerk a note.
18             THE COURT:  Okay.  Have a nice weekend.
19             MR. MCDERMOTT:  Thank you, sir.
20             THE COURTROOM DEPUTY:  All rise.
21        This Court now stands adjourned.
22             (Proceedings were concluded at 1:19 p.m.)
23                             * * *
24
25
```

App. 1100

**UNITED STATES DISTRICT COURT**

Case 2:23-cv-04498-RA Document 1-5 Filed 06/05/23 Page 690 of 786 Page ID #:1132
Case 2:16-cf-00219-PA Document 89 Filed 07/20/17 Page 193 of 193 Page ID #:1074

193

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES   )
                             )
 4   STATE OF CALIFORNIA     )

 5

 6           I, TERRI A. HOURIGAN, Federal Official Realtime

 7   Court Reporter, in and for the United States District Court for

 8   the Central District of California, do hereby certify that

 9   pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  July 4, 2017

17

18

19                         /s/ TERRI A. HOURIGAN

20                     _____
                       TERRI A. HOURIGAN, CSR NO. 3838, CRR
21                        Federal Official Court Reporter

22

23

24

25
```

Case 2:23-cv-04490-PA   Document 15   Filed 06/05/23   Page 691 of 786   Page ID
Case 2:16-cr-00215-PA   Document 315   Filed 07/06/17   Page 1 of 96   Page ID #:894
#:1133

```
1                 UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

4                            - - -

5

6

7                                    )
     UNITED STATES OF AMERICA,        )
8                                    )
                        PLAINTIFF,    )
9                                    )
              vs.                    ) No. CR16-215-PA
10                                    )
     MICHAEL MIRANDO,                 )
11                                    )
                        DEFENDANT.    )
12    _____)

13

14            REPORTER'S TRANSCRIPT OF JURY TRIAL

15                          DAY 4

16                 LOS ANGELES, CALIFORNIA

17       LOS ANGELES, CALIFORNIA; TUESDAY, MAY 2, 2017

18                        7:57 A.M.

19

20

21

22        _____

23            CINDY L. NIRENBERG, CSR 5059, FCRR
               U.S. Official Court Reporter
24              350 W. 1st Street, #4455
                 Los Angeles, CA 90012
25                www.msfedreporter.com
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1102

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:
                         OFFICE OF THE UNITED STATES ATTORNEY
 4                       BY: MICHAEL FREEDMAN,
                             ASSISTANT U.S. ATTORNEY
 5                           KATHERINE A. RYKKEN,
                             ASSISTANT U.S. ATTORNEY
 6                       312 NORTH SPRING STREET
                         13TH FLOOR
 7                       LOS ANGELES, CA 90012
                         213-894-2434
 8

 9

10

11

12

13   FOR THE DEFENDANT:
                         LAW OFFICES OF KEVIN BARRY MCDERMOTT
14                       BY: KEVIN B. MCDERMOTT, ATTORNEY AT LAW
                         300 SPECTRUM CENTER DRIVE
15                       SUITE 1420
                         IRVINE, CA 92618
16

17

18

19   ALSO PRESENT:
                         KATHLEEN KENNEDY, SPECIAL AGENT
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1103

```
 1                       I N D E X

 2   FORFEITURE HEARING WITNESSES:           PAGE

 3   KATHLEEN KENNEDY

 4      DIRECT BY MR. FREEDMAN                65

 5

 6

 7   CLOSING ARGUMENTS

 8   CLOSING ARGUMENT BY MR. FREEDMAN          9

 9   CLOSING ARGUMENT BY MR. MCDERMOTT        20

10   CLOSING REBUTTAL ARGUMENT BY MR. FREEDMAN  30

11

12   FURTHER PROCEEDINGS

13   DISCUSSION HELD OUTSIDE PRESENCE OF JURY   4

14   DISCUSSION HELD AT SIDEBAR                 8

15   DISCUSSION HELD OUTSIDE PRESENCE OF JURY  34

16   DISCUSSION HELD OUTSIDE PRESENCE OF JURY  40

17   DISCUSSION HELD AT SIDEBAR                52

18   DISCUSSION HELD OUTSIDE PRESENCE OF JURY  55

19   DISCUSSION HELD OUTSIDE PRESENCE OF JURY  57

20   DISCUSSION HELD AT SIDEBAR                61

21   DISCUSSION HELD AT SIDEBAR                63

22   DISCUSSION HELD OUTSIDE PRESENCE OF JURY  66

23   DISCUSSION HELD AT SIDEBAR                67

24   DISCUSSION HELD AT SIDEBAR                71

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1104

Case 2:23-cv-04498-PA   Document 15   Filed 06/05/23   Page 694 of 786   Page ID
Case 2:16-cr-00215-PA   Document 315   Filed 07/06/17   Page 4 of 96   Page ID #:891
#:1136

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, MAY 2, 2017

 2                            7:57 A.M.

 3                          -  -  -  -  -

 4        (The following was heard outside the presence of the

 5        jury.)

 6              THE CLERK:  Item 1, CR16-215, United States of

 7   America versus Michael Mirando.

 8              Counsel, please state your appearances.

 9              MR. FREEDMAN:  Good morning, Your Honor.  Michael

10   Freedman and Katherine Rykken on behalf of the United States

11   with Kathleen Kennedy at counsel table.

12              THE COURT:  Good morning.

13              MR. MCDERMOTT:  Good morning, sir.  Kevin McDermott

14   appearing on behalf of Mr. Mirando, who is present.

15              THE COURT:  Good morning.

16              All right.  As I understand where we are, the

17   presentation of the evidence has concluded?

18              MR. MCDERMOTT:  Sir, that's correct.

19              MR. FREEDMAN:  Yes, Your Honor.

20              THE COURT:  All right.  I want to just talk briefly

21   about a couple of jury instructions.

22              You have an instruction here "Statements by the

23   Defendant."  That's Ninth Circuit Instruction 4.1.  I think

24   that instruction is given normally where a custodial defendant

25   has made a statement and the jury has to determine whether that
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

App. 1105

```
 1   statement was voluntary.

 2            MS. RYKKEN:  Yes, I think that's correct, Your Honor.

 3            MR. MCDERMOTT:  Yes.  It was just part of the format

 4   package that was originally introduced.

 5            THE COURT:  Okay.  So I don't think we need that

 6   instruction.

 7            There's a "Dual Role Testimony."

 8            MS. RYKKEN:  That was out of an abundance of caution

 9   in case counsel thought that one of the doctors had testified

10   as an expert, but I don't believe we need that.

11            THE COURT:  "Summaries Not Received in Evidence"?

12            MS. RYKKEN:  We don't have any that we are using,

13   Your Honor, so we don't need that anymore.

14            MR. MCDERMOTT:  There may be some in closing that I

15   want to make sure the jury understands it's just demonstrative.

16            MR. FREEDMAN:  There's two graphs in the closing

17   based on one of the summary charts.

18            THE COURT:  I don't think that instruction is

19   intended for that.  I think the instruction is intended for

20   where you have some summary chart that wasn't moved into

21   evidence.  If you've got a demonstrative exhibit you want to

22   use in your closing, I don't think that's what this instruction

23   is intended for.  I think there were charts and summaries that

24   were offered in evidence.

25            MS. RYKKEN:  That's correct.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1106

Case 2:16-cr-00215-PA   Document 815   Filed 07/06/17   Page 9 of 96   Page ID #:3993

1        MR. MCDERMOTT:  Correct.

2        THE COURT:  You've also submitted an instruction on

3    an attempt.  I believe those -- I believe that instruction was

4    submitted in response to claims that were submitted but the

5    insurance company didn't pay because perhaps the insured hadn't

6    paid off on the deductible.

7        I don't know why you're -- I don't know why that's an

8    attempt because a loss -- there's no element for a loss in this

9    case, so I don't know why you want to interject that here, but

10   if you can -- have a reason, let me know.

11       MS. RYKKEN:  I don't think that we need it,

12   Your Honor.  We offered it after the discussion that we had

13   with you, I think, on Thursday afternoon after we had finished

14   closing evidence to see if it was necessary.

15       THE COURT:  Well, I don't know that that's -- well, I

16   think there -- I think there is an instruction in -- that's

17   given in mail fraud cases where there's no -- they didn't pay

18   or there was no loss, and I think it's -- so you might want to

19   look -- it may be something where you want to -- you might want

20   an instruction that says the loss -- it's not necessary to

21   complete the offense by having a loss.  A loss is not an

22   element of the offense.

23       I think there's probably some instructions out there

24   on that issue, so you might want to look at that, but I'm not

25   sure the attempt is where you want to go.  It seems to me an

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:23-cv-04496-PA   Document 315   Filed 06/05/23   Page 697 of 786   Page ID
#:1139
Case 2:16-cr-00215-PA   Document 315   Filed 07/06/17   Page 66 of 96   Page ID #:900

```
 1    attempt is something like he tried to mail it, it got lost in

 2    the mail, the mailman didn't mail it, or there wasn't any

 3    postage on it when he mailed it, but the crime was complete.

 4    Once there's the scheme, it's submitted to the insurance

 5    company.  But -- I'll leave that up to you, but you might want

 6    to look at that before the Court instructs the jury.

 7              Okay.  And as I understand it, your opening and

 8    closing is going to be --

 9              MR. FREEDMAN:  It's going to be about 20 minutes.

10              THE COURT:  Okay.

11              MR. MCDERMOTT:  No longer than 30.

12              THE COURT:  Okay.  I'll let you know when you've got

13    maybe five minutes or so.

14              And then your rebuttal argument is going to be how

15    long?

16              MR. FREEDMAN:  It will somewhat depend on what points

17    are made in the defendant's closing, but I think it will be

18    shorter than the opening close.  10, 15 minutes I hope.

19              THE COURT:  Okay.  Fifteen?

20              MR. FREEDMAN:  Sure.

21              MR. MCDERMOTT:  Sir, just a reminder mechanically, do

22    you read the instructions first -- before argument or after?

23              THE COURT:  After.

24              MR. MCDERMOTT:  And today is an 8:00 to 3:30 day?

25              THE COURT:  Correct.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1108

Case 2:23-cv-04498-PA   Document 31-5   Filed 06/05/23   Page 698 of 786   Page ID
Case 2:16-cr-00212-PA   Document 315   Filed 07/06/17   Page 3 of 96   Page ID #:4013
#:1140

```
 1              MR. FREEDMAN:  Is the Court going to give the

 2    gullible victim instruction?

 3              THE COURT:  I -- yes.  I understood there was no

 4    objection to it.

 5              MR. MCDERMOTT:  Not at all, sir.

 6              THE COURT:  And I had understood at some point that

 7    there was some discussion about Exhibit 6.

 8              MR. FREEDMAN:  It appears not to have been admitted,

 9    so we'll withdraw it from what goes to the jury.

10              THE COURT:  One of the reasons that you rest subject

11    to making sure all your exhibits are in for either side is if

12    there's something that you inadvertently didn't do but it's

13    necessary, you can ask for permission to put a witness up to

14    put that exhibit in, but --

15              MR. FREEDMAN:  We're not going to call the witness

16    back to put that exhibit in.  If it wasn't admitted, that's

17    fine, we can live with that.

18              THE COURT:  Okay.  All right.  Let's bring the jury

19    in.

20              I guess we sort of provisionally rested, so I'm going

21    to ask each side if you have rested.

22        (Jury in at 8:06 A.M.)

23              THE COURT:  Good morning, ladies and gentlemen.  Let

24    me see counsel at sidebar.

25        (The following proceedings were held at sidebar.)
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1109

```
 1              THE COURT:  The reporter just whispered to me that

 2    she thought Exhibit 6 was in.

 3              MS. RYKKEN:  We thought that it was, too.  It just

 4    didn't show up in the transcript.

 5              THE COURT:  All right.  Let me see.

 6              Do you want to join us over here.

 7         (Discussion held off the record with the reporter.)

 8              THE COURT:  So I guess that's back in play.

 9         (The following proceedings were held in open court.)

10              THE COURT:  Does the government rest?

11              MR. FREEDMAN:  Yes, Your Honor, the government rests.

12              THE COURT:  And does the defense rest?

13              MR. MCDERMOTT:  Yes.

14              THE COURT:  Ladies and gentlemen, we're now going to

15    have the closing arguments in the case.

16              Does the government wish to make a closing argument

17    at this time?

18              MR. FREEDMAN:  Yes, Your Honor.

19              May I proceed, Your Honor?

20              THE COURT:  Yes, please.

21              MR. FREEDMAN:  The defendant billed for things that

22    never happened.  It was a fraud.  He knew it.  He didn't just

23    do it once or a couple of times.  No.  He billed for fake

24    services over and over for years and years.  He knew what he

25    was doing, and he knew it was a fraud.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              And you, ladies and gentlemen, you know that what he

 2    was doing was a fraud.  Last week you saw the evidence of

 3    defendant's fraud.  You saw the bills he submitted, the bills

 4    he signed, the bills for things that never happened:  30-day

 5    tests, oxygen measurements, microvolt T-waves, brain scans.

 6              And you heard from the patients.  They never had

 7    these services.  You heard from their doctors.  They never

 8    prescribed these services.  You heard from the device

 9    manufacturer.  The device can't perform these services.  You

10    heard from defendant's former partner.  The company never

11    provided these services, never had any record of these

12    services.

13              And Agent Kennedy showed you all the times the

14    defendant submitted fraudulent bills and all the money he made

15    from his fraud.  Ladies and gentlemen, it was a fraud, and he

16    knew it.

17              It was a fraud and you know it.  It was a fraud and

18    he is guilty.

19              Now, this morning I want to go over the evidence of

20    defendant's fraud that you saw and heard last week, the

21    evidence that proves defendant guilty of fraud beyond any

22    reasonable doubt.

23              Last week you saw 15 specific examples of defendant's

24    fraudulent bills.  We'll look at those again in a few minutes,

25    but before we go over the specific examples, I want to take a
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1111

1    few minutes to talk with you about the legal elements of health

2    care fraud and why the evidence you've heard leads you to

3    conclude that all those elements have been met, why the

4    evidence leads you to conclude the defendant is guilty.

5            The judge will instruct you that health care fraud

6    has the following elements:  Defendant had a scheme to defraud,

7    a scheme to defraud health care benefit programs for health

8    insurance companies, a scheme that he knowingly and willfully

9    participated in.

10           The next element is materiality.  That means he made

11   false claims that were material, false claims about the codes

12   relied upon by the insurance companies, and he had the intent

13   to deceive and cheat.

14           Finally, payment.  Defendant submitted his fraudulent

15   bills to get paid.

16           So let's talk first about the scheme.

17           You've seen the evidence that defendant knew his

18   devices could not do what he billed for.  The website

19   advertised 24- to 48-hour testing.  Look at Exhibits 9 and 11,

20   look at the ads he sent to the doctors, Exhibits 14 and 15,

21   advertising 24 or 48 hours.

22           You also saw the order forms that he provided

23   doctors.  You have them in evidence:  Exhibits 28, 42, 58, 72.

24   They provided two options:  24 hours or 48 hours.  That's it.

25   Nothing about brain scans.  Nothing about 30 days, nothing

App. 1112

1    about oxygen or microvolt T-waves.

2            And you know it was defendant who made these ads,

3    designed the order forms.  Stan Crowley told you defendant was

4    in charge of the business side, the marketing, the banking, the

5    billing, the fraud.

6            You've seen the defendant's bills.  You have Exhibit

7    84 with the data that Agent Kennedy provided you.  This is a

8    graph based on that data.  It shows the bills for things that

9    never happened, bills for all the things he never advertised,

10   never included on the order form.

11           You've seen the lists he provided to the insurance

12   companies listing all these things that never happened.  Look

13   at this exhibit.  Look at the bills for things that never

14   happened:  $2.7 million in night EEGs, the brain scans, the

15   brain scans that no one ever had.  $2.4 million for the 30-day

16   tests that no one ever had.

17           Look at the information another way, another graph

18   based on Exhibit 84.  Of the $10 million he billed over the

19   course of this scheme, over $7 million was for these services

20   that never happened, and another 1 million was for duplicate

21   dates of service, more services that never happened.

22           It was a fraud.  Defendant submitted these bills to

23   insurance companies.  You've heard from them about the services

24   they provide, and you've heard from Agent Kennedy that

25   insurance companies are what the law calls health care benefit

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1113

```
 1    programs.  That is not in dispute.

 2              And it's no defense if the insurance companies never

 3    caught on to defendant's fraud.  The insurance companies relied

 4    upon what defendant claimed.  They relied upon his lies.

 5              They told you if they had known these services were

 6    never performed, they wouldn't have paid.  And you know that

 7    with those lies, he intended to deceive and to cheat.  He is

 8    the one who made most of the money from the fraud, money he hid

 9    in secret accounts and moved through a fictitious company.

10              Agent Kennedy walked you through Exhibits 90 and 91,

11    walked you through the millions that he made, the cars, the

12    houses, the accounts.

13              When you look at the evidence you've seen and heard,

14    you see that all of the elements have been met.  He ran a

15    fraudulent scheme and he knew what he was doing, he lied about

16    material facts, he intended to deceive and to cheat, and he did

17    it to get paid.  When you look at the evidence, you see that

18    the only conclusion it leads you to is that the defendant is

19    guilty of health care fraud.

20              Now, as I mentioned, you've also seen over the course

21    of this trial the detailed evidence of the 15 specific examples

22    of defendant's fraud that are charged in the Indictment.

23              You'll have the Indictment, and you'll have Exhibit

24    94, which summarizes these accounts.

25              For these 15 examples, you heard from the patients
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1114

 1    about exactly what they had done and what they did not have

 2    done.  You heard from the doctors about exactly what they

 3    prescribed and did not prescribe.

 4            You've seen the medical records, the order forms, the

 5    Holter reports.  They show you what happened.  But you've also

 6    seen defendant's bills for all the things that never happened.

 7            And you've heard from the insurance companies and

 8    seen their records of what defendant tried to get paid for and

 9    what he did get paid for.  It was the same fraud over and over

10    again.

11            I want to walk you through the details of the first

12    patient you heard from, John Hattrup, and then we'll look at

13    just the summaries of the fraudulent bills for the remaining

14    three patients.

15            For each of these patients, in addition to the

16    summary chart that we'll look at this morning, you have the

17    records, the orders, the bills, the claims data.  I'm going to

18    note the exhibit numbers as we go, if you want to note them

19    down to refer to them when you deliberate.

20            You saw these exhibits and you heard these patients

21    and their doctors testify about the services that were never

22    performed.

23            You, ladies and gentlemen, have the evidence of

24    defendant's fraud.  John Hattrup is Counts One through Five,

25    and his summary chart is Exhibit 50.  You saw his medical

```
 1    records at Exhibit 41.  You heard why his doctor had him wear a

 2    Holter device:  To measure his heart rhythm.  Nothing about

 3    sleep apnea.  Nothing about brain scans.  He wore it for 24

 4    hours.  He told you that.

 5            You saw the report for the 24-hour test, Exhibit 42.

 6    He never wore it again.  He didn't wear it for 30 days.  He

 7    didn't have any brain scans.

 8            But you also saw the bills for these services,

 9    Exhibits 44 to 48, the fraudulent bills that defendant signed.

10            Count One, defendant billed for the actual 24-hour

11    use that Mr. Hattrup actually had but also $325 for a night

12    electroencephalogram on April 11th.  That's the night EEG or

13    the brain scan.

14            Count Two, defendant billed for a 30-day event

15    monitoring on April 12th, but Hattrup never wore the device

16    again and he never wore it for 30 days.  Dr. Joy told you he

17    never prescribed the device again, and he never prescribed it

18    for 30 days.

19            Then, Count Three, defendant billed for another

20    48-hour test on April 15th plus another brain scan.

21            Now, ask yourself, if Mr. Hattrup starts wearing a

22    device for 30 days on April 11th, how is he wearing another

23    device for 48 hours during the exact same time.  He wasn't.

24    This never happened.

25            But then, again, Count Four, April 18th.  Now he's
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1116

1    wearing another 48-hour device, having another brain scan, plus

2    a microvolt T-wave test.

3            And then Count Five, April 21st, a fourth 48-hour

4    test, still while that 30 days is supposedly running plus more

5    brain scans and more microvolt T-waves, more tests that never

6    happened.

7            Remember what Dr. Joy told you about these tests?

8    Over and over he told you, "I don't know what that is.  I have

9    no idea what that is."  He reviewed the April 11th report that

10   you've also seen.  It's Exhibit 42 and his records for

11   Mr. Hattrup and he told you there is no record for any of these

12   studies that were billed for.

13           There's no record, ladies and gentlemen, because it

14   never happened.  But you have the checks paid by United to

15   defendant and the insurance companies' claims data at Exhibits

16   49 and 51, payments for things that never happened.

17           For all these patients, the insurance companies

18   relied on defendant's claims.

19           Remember what Ms. Darsow from United told you?  They

20   get a million claims per day.  The computer reviews for

21   accuracy, for information about the patient, for obvious red

22   flags, like the exact same service in the exact same day or if

23   a man had pregnancy services.

24           Ms. Russell from CIGNA, she told you they only review

25   about 10 percent of all the claims they receive.  And

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1117

Case 2:23-cv-04498-PA   Document 1-5  Filed 06/05/23   Page 707 of 786   Page ID
#:1149
Case 2:16-cr-00218-PA   Document 61-5  Filed 07/06/17   Page 17 of 96   Page ID #:410

```
 1    Ms. Consiglio from Aetna explained to you they don't have time
 2    to compare the service billed to the device being used.  No.
 3    She told you, "We assume that the provider is billing for the
 4    proper procedure."  And that makes sense, ladies and gentlemen,
 5    because even if the insurance company gets tricked or even if
 6    it's negligent, even if it should have reviewed it, it's still
 7    no defense for defendant's fraud.
 8            Now let's look at the fraudulent bills for Lisa
 9    Foster.  She's Counts Six through Nine.  Her summary chart is
10    Exhibit 77.  If you want to look at her records, they're
11    Exhibit 70 and 72.  The bills defendant submitted are at
12    Exhibits 73 to 76, and the claims and payment records by CIGNA
13    are at Exhibit 78.
14            Same story as Mr. Hattrup.  On the first bill, August
15    10th, defendant added a night EEG that Ms. Bennett never had,
16    that Dr. Globus never prescribed, never filled out on the order
17    form in Exhibit 72, that Crowley never processed on the report
18    at Exhibit 70.
19            Then three more dates, three more counts:  A 30-day
20    test on August 11th, two more 48-hour tests on August 18th and
21    24th.  Again, like Mr. Hattrup, she's apparently wearing two
22    more devices while wearing the 30-day device, plus two more
23    night brain scans and a microvolt T-wave assessment.
24            The doctors don't even know what a microvolt T-wave
25    assessment is.  And Ms. Foster told you she didn't have these
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1118

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 708 of 786    Page ID
Case 2:16-cr-00218-PA    Document 81-5    Filed 07/06/17    Page 18 of 96    Page ID #:411
#:1150

1    tests.  Dr. Globus told you he didn't prescribe these tests.

2    They never happened.

3    Now let's look at Martha Bennett, Counts Ten through

4    Thirteen.  Her summary chart is Exhibit 36.  If you want to

5    look at her bills, her order form, her records, they're

6    Exhibits 27 through 29 and 31 through 34, and the claims and

7    payment records by United are Exhibit 35 and 37.

8    Ms. Bennett remembers seeing Dr. Richmond for her

9    heart.  Like the others, she told you she wore the device once

10   for 24 hours.  She didn't wear it for 30 days, she didn't wear

11   anything on her head or her face, she didn't have any

12   complaints regarding sleep apnea, and she didn't have her

13   breathing measured.

14   But look at what defendant billed for:

15   A 30-day test on December 4th and then two more

16   48-hour tests during the same time:  Two Microvolt T-waves, one

17   sleep study with oxygen.  Her doctor, Dr. Richmond, told you a

18   sleep study that measures oxygen requires a special device.  It

19   goes on your face and your head.  He never ordered one for

20   Ms. Bennett;

21   Plus three more night EEGs on December 3rd, 4th,

22   December 10th.  Her doctor told you, "I never ordered an EEG in

23   my life."

24   Finally, Lisa Solmar for Counts Fourteen and Fifteen.

25   Her summary chart is Exhibit 32.  Her medical records are

```
 1   Exhibit 55.  Her Holter report, Exhibit 56.  Dr. Simkins' order
 2   form, Exhibit 58.  The claims are at Exhibits 59 and 60.  I'm
 3   sorry, that should be Exhibit 62 is the summary chart.  And the
 4   claims and the payment records from Aetna are at Exhibit 63.
 5         According to the defendant's bills, she had a night
 6   EEG, a 30-day test and a microvolt T-wave.  But look at the
 7   order form.  The only thing that her doctor, Dr. Simpkins, ever
 8   ordered was one 24-hour test, just like the other doctors.  And
 9   just like the other patients that you heard from, that's all
10   she remembers having.
11         Ladies and gentlemen, these four patients never had
12   these tests.  The doctors prescribed the device once.  The
13   patients wore the device once.  That's what the evidence shows.
14         The evidence also shows you they did not wear the
15   device multiple times, they didn't wear it for 30 days, they
16   didn't have brain scans or oxygen studies or microvolt T-wave
17   assessments.
18         These things never happened.  Defendant billed for
19   things that never happened.  He knew they never happened, and
20   so do you.
21         It was a fraud.  The documents prove it, the
22   testimony proves it, the evidence proves it.  Ladies and
23   gentlemen, defendant is guilty of health care fraud.
24         THE COURT:  Does the defense wish to give a closing
25   argument at this time?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

App. 1120

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 710 of 786   Page ID
#:1152
Case 2:16-cr-00218-PA    Document 81-5 Filed 07/06/17   Page 20 of 96   Page ID #:419

```
 1            MR. MCDERMOTT:  Yes, please, if I may.

 2            Thank you, sir.

 3            I always tell young counsel that one of the first

 4    things you should do in closing statements to a jury is to

 5    thank them, recognizing that it takes time out of your life,

 6    out of your work, away from your family to make a decision that

 7    impacts one individual for the rest of his life.  And on behalf

 8    of Mr. Mirando and myself, I want to say thank you to each and

 9    every one of you for taking the time.  It's an often-made

10    mistake by young counsel, and some of the things and some of

11    the times when you put a case together, you overlook things

12    that should be very obvious to you.

13            And one of the obvious things I'd like to express to

14    you today is recall throughout the testimony of this trial was

15    there anyone who testified as a code expert.  Even the

16    manufacturer, Mr. Barron, couldn't tell us what codes belong to

17    what procedures.  None of the doctors were experts.

18            And the gist of what the government had to offer in

19    relation to any type of code identification would be Stan

20    Crowley.  And as to his testimony, ask yourself whether or not

21    you'd buy a used car from him.  If you don't think you won't,

22    then don't, because that's what the government is trying to

23    sell you here.

24            Now, I'm always amazed when -- and I don't mean this

25    particular government counsel, but any government counsel --
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1121

1    argues to the jury that, you know, don't blame the victim.  And

2    we're not necessarily blaming the victim, but when's the last

3    time you failed to pay your medical bill to your insurance

4    company and you didn't have issues getting it turned back on?

5            You think they have got the capability to keep tabs

6    on the expenses and costs in order to keep that profit line

7    going?  We're talking about multi-billion dollar companies, and

8    you mean to tell me something like this can go on for seven

9    years and not one insurance company come forward and say,

10   "Mirando, what are you doing here?  What is going on here?"

11           How many times have you traveled across the country,

12   used your credit card for one time, and then they -- you try to

13   use it a second time and it's stopped.  You're wondering, "What

14   happened?"  Well, your credit card company tells you, "We don't

15   recognize you billing in New York City so we're just making

16   sure we can prevent a fraud from taking place."

17           You mean to tell me CIGNA and Aetna don't have that

18   capability?  Now, why wouldn't they?  Aren't they really

19   concerned about health care costs and what it costs you and I

20   to have insurance that they can't take the extra step or did

21   they not have that step?  Because no one here testified as to

22   what the appropriate codes were.

23           The other thing we're very certain about is this.  It

24   would appear from the testimony, even from Agent Kennedy, that

25   there may not be the kind of formalistic class that you can go

App. 1122

```
 1    to to learn coding.

 2              I mean, Good Lord, you can't get a driver's license

 3    in this state without going through classes, but we're going to

 4    be able to bill hundreds of thousands, millions of dollars and

 5    not have to attend, certify, some class so you know exactly

 6    what it is you're doing.

 7              So what do we have in this particular situation?  The

 8    car salesman, Mr. Crowley, and some nefarious buddy of his by

 9    the name of Cast taught my client how to bill.  Taught him how

10    to bill.  No one from the insurance company, no one from any

11    other portion of the industry ever taught him how to bill.

12              So who are you supposed to rely upon?  The uncle that

13    gets you behind the wheel of his pickup truck and teaches you

14    how to drive that that's the appropriate way to drive?  Well,

15    if that's all you're exposed to and you're making all kinds of

16    illegal turns without a signal, maybe you're not doing what's

17    right, but you're not intentionally doing what's wrong.  You're

18    doing what you're taught.  And that's one of the elements in

19    this case.  It's one of the absolute elements in this case.

20              So you have to convince yourself at some point in

21    time, two things should have occurred:  Either an insurance

22    company came along and said, "Why don't we do some audit on

23    your billing.  We've got some issues.  We got some issues," or

24    early in the process, Mr. Crowley going, "How is it that we are

25    making a lot more money than I did previously?  Do we have an
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    issue as to -- we must be really popular.  We must be getting a

2    lot more doctors in.  Because over the course of time, I'm

3    making almost a million dollars, and I'm not complaining about

4    it," until this nefarious individual by the name of Cast comes

5    back into the picture, who clearly doesn't have a right to the

6    company but apparently he thought so and so let's get a lawsuit

7    started.  And how does that lawsuit resolve?  Mr. Crowley ends

8    up having a judgment against him.

9           Now, at some point in time, somebody should have said

10   during that lawsuit, "Is this right?  Is this correct billing?

11   Are we doing the right thing?"

12          So the point of the matter, ladies and gentlemen, is

13   this.  We have a circumstance here that in all common sense and

14   manner should tell you that if the insurance company doesn't

15   have the wherewithal and the understanding to work and make the

16   codes appropriate, and all my client has as a reference is

17   Crowley and Cast -- and not one physician walked in this door,

18   not one physician walked in this door with his own billing to

19   the insurance company, with his own set of codes that he

20   submitted to the insurance company.

21          Bear in mind, this product, this device, is a

22   money-maker for the doctors because the doctors, as they told

23   us, get to bill every time they use it, explaining to the

24   patient why it's being done, explaining the results of the

25   patient after it's finished.  You don't think that's for free?

1    It's what they get to bill.

2              So I ask you this.  When we talk about records in

3    this case and what you can rely upon on the screen for the

4    government, think of it this way.  The only evidence that the

5    government offered to you, as far as the type of devices that

6    were employed by Holter Labs, was an Excel spreadsheet provided

7    by Mr. Crowley a year after he took it when he came to the FBI

8    in February -- excuse me, September of 2013; a sheet of paper,

9    an object on a thumb drive that could be manipulated over the

10   course of time.  It wasn't a read-only document.  As

11   Ms. Kennedy was kind enough to admit to us, it was something

12   that could have been altered and changed over time.

13             So when the government asks you to look at the

14   records, ask yourself this.  What specifically did the

15   government offer you as to the specific device that was used,

16   the specific codes as to who can honestly and expertly tell you

17   what those codes are and when and how billing should occur?

18             Now, I've thought a lot about this argument that the

19   government has been putting forward from the very beginning:

20   Look at all the money he was hiding.  Look at all the money he

21   didn't tell his partner, Crowley.

22             Well, there's a couple of things.  You recall the

23   testimony of either Mr. Crowley or Ms. Kennedy when there was

24   an inquiry about whether or not the IRS had been notified?  I

25   thought I heard that.  Why is that important?  Well, you would

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1125

1    hope agencies would talk to each other, cooperate.  You're only

2    asked here to take a look at a health care fraud allegation.

3    You're not here to look at whether or not taxes were properly

4    paid.

5            So the point of that is making money is not illegal

6    and certainly isn't bald-faced evidence that some sort of

7    conspiracy, some sort of fraud was taking place.  If there were

8    from a standpoint of how that money was spent and earned, it'd

9    be a different story.

10           Now, how does this all culminate with what we have

11   presented before you now?  The government has the opportunity

12   to stand up after I'm done, and the reason they have that

13   opportunity is because they have the burden.  And the law

14   considers that burden to be so significant that they get the

15   last opportunity to talk to you.

16           Mr. Freedman has the right to get up and specifically

17   address comments that I've made here during my closing

18   argument, has every right to minimize, belittle and absolutely

19   crush me for comments I made.  That's his prerogative.  That's

20   his authority, and that's what the law has given him the right

21   to do.

22           So when I'm done, he'll get the chance to speak, and

23   then the judge will read you the instructions that you will

24   have to follow in this case, and one of the instructions that

25   he will provide you that Mr. Freedman alluded to was what we

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1126

1    call the gullible victim instruction.

2              And what the government is going to ask you to

3    believe in your heart of hearts -- that beyond a reasonable

4    doubt, that Aetna, CIGNA, Anthem, and all the rest of them are

5    gullible victims; absolutely blind, deaf and mute victim, who

6    for seven years couldn't figure out what a CPT code was that

7    the doctors got up there and told you that they didn't know

8    what it was.

9              I might remind you that the one doctor didn't know

10   exactly whether or not his patient was male or female, so I'm

11   not sure I'd rely on him telling me whether or not the codes

12   are accurate.  But none of them told you that they had the

13   opportunity to actually attend a code class.  Now, how does

14   that all boil down?  What does it really all mean?  I don't

15   know that I'm breaking the law unless somebody tells me.

16             Now, you may think it's obvious because I made all

17   this money or it's obvious because there was multiple billings

18   for the same event with the same patient, but it's not obvious

19   if you've got someone like Cast and Crowley teaching you that

20   this is the appropriate way to do it and this is the way

21   companies expect you to bill because, hey, maybe they won't pay

22   you the first time, so try it the second time and maybe they'll

23   pay.

24             And then you go through year 2005.  You go through

25   year 2006.  Then we go through '7, '8, '9, '10, '11, '12, '13,

1    not one complaint.

2         And the other issue that should be cemented here that

3    Ms. Kennedy offered to us is this.  The only documents that

4    they ever got from my client were provided to them by

5    Mr. Crowley.  You never heard a single witness come up and

6    testify that, "We hit his servers.  We hit any kind of device,

7    other individuals, if they were involved, to get records

8    directly from Holter Labs."

9         Not only that, not once did anyone ask the doctors to

10   bring in their own records to confirm the billings for a

11   particular day.  That would have been the clearest evidence, as

12   to what not was done or was done, would be the doctors going,

13   "And, by the way, for this particular patient in this

14   particular period of time, here's my two bills that I sent in,

15   device, interpretation."

16        Now, when we have a circumstance such as you're

17   presented with here, there's a lot of different definitions.

18   The judge will give you one specifically about what constitutes

19   reasonable doubt.  I gave you one early on in this as to

20   whether or not you'd buy a used car from Mr. Crowley, and

21   that's really what this really is.

22        The feeling when you're done with your deliberation

23   process, when you sit down in that jury room and discuss with

24   each other the evidence that you heard, the jury instructions

25   that you believe apply to the case, you have to ask yourself,

1    "Would I buy this used car?  Would I make this long-time,

2    lifetime decision for Mr. Mirando?"

3         We think there's incredible amount of error, doubt

4    and mistake in this particular case, not the least of which

5    there's no codes, there's no experts, and there's absolutely no

6    evidence from the insurance companies that they were gullible,

7    that they were naive, that they were somehow foolish.  Would

8    you buy a used car now from CIGNA or Aetna, knowing what you

9    know about their tracking of billings that go through their

10   company?

11        If you can't trust what they have to offer, if you

12   can't trust those particular insurance companies, then my

13   suggestion to you is take the evidence that they have presented

14   in this case with a large grain of salt.

15        Yes, you've seen medical records, yes, you've seen

16   billing records, but then you have to ask yourself, long and

17   short, if the insurance company didn't think the codes were

18   inappropriate, why should anybody else, certainly, in a

19   particular situation such as this where we're not talking about

20   whether or not some insurance company gets paid but we're

21   talking about whether or not somebody has a conviction.

22        I implore each and every one of you to think about

23   that process and the instruction that the judge will give you

24   on gullible victim.

25        In order to be guilty, the government has to prove

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 719 of 786   Page ID
Case 2:16-cr-00213-PA   Document 81-5   Filed 07/06/17   Page 29 of 96   Page ID #:422
#:1161

```
 1   beyond a reasonable doubt that my client had no means,

 2   opportunity, motive or method to understand fully that what he

 3   was doing was wrong.

 4           The contrary is true.  With the likes of Cast and

 5   Crowley and the gullible victims that the government wants you

 6   to believe, my client had no opportunity other than to follow

 7   what he'd learned.

 8           And there's even some evidence that bolsters that.

 9   Do you remember Agent Kelly getting on the stand and testifying

10   about how, even after he'd been arrested, the billing was still

11   problematic?  Everybody remember that?

12           Now, you can decide that to be incredible hubris,

13   depraved hubris, or it's evidence of a young man who believes

14   that the billing he was taught and what the insurance companies

15   reflected back to him was appropriate.  So in that manner, he

16   spoke to you as to what he thought appropriate billing should

17   be.

18           He's only guilty if in fact he knew he was defrauding

19   and he participated in it willingly.  He certainly made money

20   off of it, and he certainly relied upon the insurance companies

21   to tell him whether or not he was doing the right thing.

22           The idea that you have to accept in order to prove

23   him guilty -- the government -- is that three or four

24   multi-billion-dollar corporations can't figure out a logarithm

25   program to catch inappropriate CPT codes and billings.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1130

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 720 of 786   Page ID
Case 2:16-cr-00213-PA   Document 81   Filed 09/17/... Page 80 of 90   Page ID #425
#:1162

| | |
|---|---|
| 1 | Ladies and gentlemen, simple process.  Try not paying |
| 2 | your bills some day.  See how quickly you get a note.  Because |
| 3 | he never got a note, he should not be found guilty. |
| 4 | Thank you for the opportunity. |
| 5 | THE COURT:  All right.  Does the government wish to |
| 6 | give its closing rebuttal argument at this time? |
| 7 | MR. FREEDMAN:  Yes, please, Your Honor. |
| 8 | May I proceed, Your Honor? |
| 9 | THE COURT:  Yes, please. |
| 10 | MR. FREEDMAN:  Ladies and gentlemen, you have to |
| 11 | decide this case based on the evidence, the evidence that |
| 12 | you've seen of defendant's fraud. |
| 13 | Last week you heard the evidence.  You heard from |
| 14 | four patients.  You heard from their doctors about the tests |
| 15 | that were billed in their name, the tests that never happened. |
| 16 | That's what this case comes down to.  The evidence |
| 17 | shows you that tests were ordered, tests were billed for that |
| 18 | were never performed. |
| 19 | And you've heard from the insurance companies about |
| 20 | why they relied on defendant's statements.  You saw how much he |
| 21 | billed for.  You have the evidence of the claims he submitted |
| 22 | over the years, the lies he told and the money he made. |
| 23 | It's about these 15 counts.  It's about these four |
| 24 | patients.  It's about the evidence that you have, the testimony |
| 25 | that you heard. |

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1131

Case 2:16-cr-00213-PA    Document 61    Filed 07/17/17    Page 81 of 96    Page ID #:424

1      It's the evidence that tells you what happened and

2   what didn't.  It's the evidence that tells you it was a fraud.

3   It's the evidence that tells you defendant is guilty.

4      You have to decide this case based on the evidence,

5   not on the defendant's distractions, not on attempts to divert

6   your attention.

7      You have to live in a fantasy land to be distracted

8   from what the live witnesses in this courtroom told you, that

9   the tests that were billed for never happened, to distract you

10  from the records you've seen, to distract you from the

11  evidence.

12     The defense's arguments don't explain away a

13  decade-worth of millions in phony bills.  They don't explain

14  how a device somehow performed 30-day tests, brain scans,

15  microvolt T-wave assessments that nobody you heard from has any

16  recollection of or any record of.  The distractions don't

17  explain away the evidence.  The evidence explains the fraud,

18  the evidence explains the defendant's guilty.

19     Let me address a few of the points that the defense

20  brought up.  Let's talk about the insurance companies.  As the

21  judge is going to instruct you, it doesn't matter if they were

22  gullible or negligent.  It doesn't matter if they fell for

23  defendant's fraud.

24     First of all, they explain to you what they do and

25  why they rely on bills.  When people submit bills and they sign

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 722 of 786   Page ID
#:1164
Case 2:16-cr-00213-PA   Document 61   Filed 07/06/17   Page 82 of 86   Page ID #:425

```
 1    the bills, the insurance company relies upon them.  That's how

 2    the system works.  They assume providers are telling the truth.

 3            Remember what Ms. Consiglio from Aetna told you.  We

 4    assume that the provider is billing for the proper procedure,

 5    and that's what they pay based upon.  They get millions of

 6    claims and they review them to make sure, address information,

 7    that their beneficiary is correct, that there's no obvious red

 8    flags.  They don't go check with every beneficiary, with every

 9    doctor on these millions of claims.

10            Dr. Globus told you, "In the time I've practiced,

11    I've never had an insurance company come to me with any

12    question."

13            It doesn't matter what the insurance companies did or

14    didn't do.  It matters what the defendant did.  He submitted

15    false bills, he lied, he committed fraud.

16            Let's talk about coding.  The defense suggested that

17    maybe an expert was required to understand how all this works.

18    Ladies and gentlemen, it doesn't take an expert to know that

19    you cannot bill for things that never happened.  It doesn't

20    take an expert to consider what the witnesses told you, that

21    they never had these services.  It doesn't take an expert when

22    the defendant provides a glossary with the list of terms that

23    he is billing for.  It's not a one-off error.  It's not that he

24    enters the number wrong one time.

25            70 percent of the time that he billed, it was for
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1133

 1    services that the device couldn't do.

 2             2.5 million alone in brain scans.

 3             And when he submitted the bills, he is the one who

 4    provided the list, telling the insurance companies what he was

 5    billing for.  The list that says 30-day tests, brain scans,

 6    microvolt T-wave assessments, he's the one who gave this

 7    information.  That's not a mistake, that's fraud.

 8             What about the fact that when he started the

 9    business, he worked with some other people who taught him how

10    to bill for a month or a couple months, six months?

11             He billed for ten years.  The evidence that you've

12    seen in this case is his billing, his fraud over ten years.

13             If your uncle teaches you to drive a pickup truck

14    without making a left turn and you get pulled over ten years

15    later, is that the excuse?  "Ten years ago, I was taught how to

16    do it."  No, ladies and gentlemen.  He's been doing it on his

17    own, signing the bills, making the fraudulent claims for ten

18    years.  It doesn't matter who he learned it from.  It matters

19    what he did.

20             Your job is to consider the evidence, not these

21    distractions.  It's the evidence that proves to you beyond a

22    reasonable doubt that he is guilty of health care fraud.

23             Reasonable doubt is the same standard of proof that's

24    been used in criminal trials in this country for over 200

25    years.  It's not proof beyond all doubt or beyond a shadow of a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1134

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 724 of 786    Page ID
Case 2:16-cr-00218-PA    Document 61    Filed 07/00/17    Page 84 of 96    Page ID #:427
#:1166

```
 1   doubt.  The key word is reasonable.  The key word is one that

 2   the defense mentioned to you:  Common sense.

 3            Use your common sense, ladies and gentlemen.  See the

 4   evidence.  Use your common sense and ignore these distractions.

 5   Apply your reason and apply that common sense to the evidence

 6   that you have in front of you, to the evidence you saw at this

 7   trial.  That evidence leads you to only one result.  The

 8   evidence shows you the defendant billed for things that never

 9   happened.  You know those things never happened and you know

10   he's the one who billed for them.  You know that he committed

11   fraud.

12            The evidence, ladies and gentlemen, proves to you

13   beyond a reasonable doubt that the defendant is guilty.

14            THE COURT:  All right.  Ladies and gentlemen, we're

15   going to take our first break of the morning.

16            Again, I want to remind you until this trial is over,

17   you're not to discuss this case with anyone, including your

18   fellow jurors, members of your family, people involved in the

19   trial.  Do not read or listen to any news reports or other

20   accounts about the trial.

21            We're going to come back in about 15 minutes.  I'll

22   have some instructions for you, and then the case will be

23   submitted to you for your deliberations.

24       (Jury out at 8:54 A.M.)

25       (The following was heard outside the presence of the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

App. 1135

```
 1        jury.)

 2             THE COURT:  The parties have submitted Instruction

 3    4.3.

 4             MR. MCDERMOTT:  I'm sorry, sir.  What are we looking

 5    for?

 6             THE COURT:  We're looking at Instruction 4.3.

 7             MS. RYKKEN:  This is Instruction Number 27,

 8    Your Honor?

 9             MR. MCDERMOTT:  What page are we talking?

10             MS. RYKKEN:  Page 29.

11             THE COURT:  Twenty-nine.

12             I think given the evidence of other claims that were

13    submitted that weren't charged, I think this instruction is

14    probably okay.

15             MR. MCDERMOTT:  Well, I guess my question is -- this

16    one I'm usually familiar with when we get a 404(b) notice, and

17    I'm not sure that we did in this case.

18             MS. RYKKEN:  Yeah, we did.  Oh, no I'm sorry.  We

19    didn't.

20        (Counsel confer off the record.)

21             MR. FREEDMAN:  Your Honor, it was provided based on

22    the evidence possibly coming in and billing after the arrest,

23    not based on any 404(b).

24             THE COURT:  I'm sorry?

25             MR. FREEDMAN:  Not offered for 404(b) purposes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1136

```
1              THE COURT:  Wasn't there evidence submitted to the
2    jury about either -- billings that were made after the arrest?
3              MR. FREEDMAN:  Yes.
4              THE COURT:  And so I think this instruction is -- I
5    think it's probably appropriate in this case.
6              MR. MCDERMOTT:  As to that circumstance, post-'13 --
7    or post-'16 arrest are we talking, sir?
8              THE COURT:  I seem to recall there was some evidence
9    about the defendant billing even after his arrest in this case.
10             MR. MCDERMOTT:  I brought that up in closing.  That I
11   don't have an issue with, if this is tailored to that.  I've
12   always seen this, sir, as a 404(b) type, "Hey, we gave you
13   notice and this is some of the other evidence that you can take
14   a look at."  I don't have an argument with the Court or the
15   government, if they just limit it to evidence occurring post
16   October of 2016.
17             THE COURT:  I think it's a Ninth Circuit instruction.
18   I think the jury may have heard evidence that the defendant may
19   have committed other crimes or wrongs that are not charged here
20   and this instruction merely tells them how they are to consider
21   that evidence and what it can be used for.
22             MR. MCDERMOTT:  All right.  Just so it's noted for
23   the record.
24             THE COURT:  That's fine.
25             MR. MCDERMOTT:  I think the government would concur
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1137

1    as far as anything pre-October '16 that wasn't a 404(b) notice.

2              MR. FREEDMAN:  That's correct.  It was provided in

3    case the issue came up after the arrest and in an abundance of

4    caution for the defendant.

5              THE COURT:  Okay.  Let's look at Instruction 32.

6              MR. MCDERMOTT:  I'm sorry, sir.  Again, the number?

7              THE COURT:  Instruction 32.

8              MS. RYKKEN:  It's on page 34.

9              THE COURT:  I don't think there was any arguments

10   that somehow those counts were invalid or -- so I'm not sure

11   you need these three paragraphs on page 35.

12             MS. RYKKEN:  I think that's correct, Your Honor.  I

13   would also note on page 34, it does say "health care fraud or

14   attempted health care fraud," so maybe we would take out the

15   "attempted health care fraud" in the first paragraph on page

16   34.

17             THE COURT:  And I think there's case law that loss to

18   an insurance company is not an element of health care fraud or

19   loss is not an element of health care fraud.  So if you wanted

20   to add that, we could add that sentence, that loss is not an

21   element of health care fraud.  I don't think it is.

22             MS. RYKKEN:  I think that's fine, Your Honor.

23             MR. MCDERMOTT:  At this time I don't have any

24   objection.

25             THE COURT:  Okay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1138

```
 1            MR. MCDERMOTT:  And that's based upon my

 2   understanding.  The Indictment specifically says "billing" as

 3   opposed to "payment."

 4            THE COURT:  Correct.

 5            Okay.  We will try to get these instructions in some

 6   order.

 7            Let me go through these real -- let me give you the

 8   numbers that we're going to give, so if there's something I'm

 9   missing, you can let me know.

10            I'm going to give 3.1, 3.2, 3.3, 3.5, 3.6, 3.7, 3.8,

11   3.9, 3.10 --

12            MR. MCDERMOTT:  I'm sorry.  3.12?

13            THE COURT:  3.10.

14            MR. MCDERMOTT:  Ten.  Okay.  Yes, sir.

15            THE COURT:  3.11.

16            4.1 I'm not going to give.

17            4.3, 4.16, I am going to give the O'Malley

18   instruction on on or about.

19            Instruction 32, health care fraud; Instruction 33,

20   which I think is the gullible victim; Instruction 34;

21   Instruction 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45.

22            All right.  Are there any instructions that I've left

23   out?

24            MS. RYKKEN:  The only one is 46, which is your

25   instruction on re-reading of testimony.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1139

```
 1              THE COURT:  Well, that won't be given unless they

 2    make a request.

 3              MR. MCDERMOTT:  Sir, I know you read looks like 1

 4    through 8 previously.  Do you go over those again in closing?

 5              THE COURT:  I normally don't.  Is there one you have

 6    in mind?

 7              MR. MCDERMOTT:  Well, just based on some of -- the

 8    comment that was made in closing, with both sides, as to what

 9    is evidence and what is not.

10              THE COURT:  That -- I'm sorry.  I believe that's

11    going to be given.

12              MR. MCDERMOTT:  It is?  All right.

13              THE COURT:  Yeah.

14              MR. MCDERMOTT:  Then also Number 2, Presumption of

15    Innocence.

16              THE COURT:  I believe that's -- we're going to define

17    reasonable doubt --

18              MR. MCDERMOTT:  1.2.

19              THE COURT:  Excuse me.

20              -- what is evidence and what is not evidence.

21              MS. RYKKEN:  These are repeated as instructions in

22    the three-level --

23              MR. MCDERMOTT:  Oh, they are?

24              MS. RYKKEN:  -- so if you look at presumption and

25    then 16.
```

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 730 of 786    Page ID
Case 2:16-cr-00218-PA    Document 61    Filed 07/06/17    Page 40 of 90    Page ID #:439
#:1172

```
 1            MR. MCDERMOTT:  Okay.  Got it.

 2            THE COURT:  Okay.  We'll be back out in about five

 3   minutes.

 4        (Recess taken 9:05 to 9:15 A.M.)

 5        (The following was heard outside the presence of the

 6        jury.)

 7            THE COURT:  On Instruction 32, Health Care Fraud,

 8   we've added "Loss is not an element of health care fraud, nor

 9   is it an intent to cause loss."

10            MS. RYKKEN:  No objection from the government.

11            THE COURT:  Is there anything else we need to go

12   over?

13            MR. MCDERMOTT:  No, sir.

14            THE COURT:  Let's bring the jury in.

15        (Jury in at 9:19 A.M.)

16            THE COURT:  Members of the jury, now that you've

17   heard all of the evidence, it is my duty to instruct you on the

18   law that applies to this case.  A copy of these instructions

19   will be available in the jury room for you to consult.

20            It is your duty to weigh and to evaluate all the

21   evidence received in the case and in that process to decide the

22   facts.  It is also your duty to apply the law as I give it to

23   you to the facts as you find them, whether you agree with the

24   law or not.

25            You must decide the case solely on the evidence and
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1141

1    the law and must not be influenced by any personal likes or

2    dislikes, opinions, prejudices, or sympathy.  You will recall

3    that you took an oath promising to do so at the beginning of

4    the case.

5            You must follow all these instructions and not single

6    out some and ignore others.  They are all important.

7            Please do not read into these instructions or into

8    anything I may have said or done any suggestion as to what

9    verdict you should return.  That is a matter entirely up to

10   you.

11           The Indictment is not evidence.  The defendant has

12   pleaded not guilty to the charges.  The defendant is presumed

13   to be innocent unless and until the government proves the

14   defendant guilty beyond a reasonable doubt.

15           In addition, the defendant does not have to testify

16   or present any evidence to prove innocence.  The government has

17   the burden of proving every element of the charges beyond a

18   reasonable doubt.

19           A defendant in a criminal case has a constitutional

20   right not to testify.  You may not draw any inference of any

21   kind from the fact that the defendant did not testify.

22           Proof beyond a reasonable doubt is proof that leaves

23   you firmly convinced that the defendant is guilty.  It is not

24   required that the government prove guilt beyond all possible

25   doubt.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1142

1      A reasonable doubt is a doubt based upon reason and

2  common sense and is not based purely on speculation.  It may

3  arise from a careful and impartial consideration of all the

4  evidence or from lack of evidence.

5      If after a careful and impartial consideration of all

6  the evidence you are not convinced beyond a reasonable doubt

7  that the defendant is guilty, it is your duty to find the

8  defendant not guilty.

9      On the other hand, if after a careful and impartial

10  consideration of all the evidence, you are convinced beyond a

11  reasonable doubt that the defendant is guilty, it is your duty

12  to find the defendant guilty.

13      The evidence you are to consider in deciding what the

14  facts are consists of the sworn testimony of any witness, the

15  exhibits received in evidence, and any facts to which the

16  parties have agreed.

17      In reaching your verdict, you may consider only the

18  testimony and exhibits received in evidence.  The following

19  things are not evidence and you may not consider them in

20  deciding what the facts are:  Questions, statements,

21  objections, and arguments by the lawyers are not evidence.  The

22  lawyers are not witnesses.  Although you must consider a

23  lawyers' questions to understand the answers of a witness, the

24  lawyers' questions are not evidence.

25      Similarly, what the lawyers have said in their

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1143

1    opening statements, in their closing arguments, and at other

2    times is intended to help you interpret the evidence, but it is

3    not evidence.  If the facts as you remember them differ from

4    the way the lawyers state them, your memory of them controls.

5            Any testimony that I've excluded, stricken, or

6    instructed you to disregard is not evidence.  In addition, some

7    evidence was received only for a limited purpose.  What I have

8    instructed you to consider certain evidence in a limited way,

9    you must do so.

10            Anything you may have seen or heard when court was

11   not in session is not evidence.  You are to decide the case

12   solely on the evidence received at the trial.

13            Evidence may be direct or circumstantial.  Direct

14   evidence is direct proof of a fact, such as testimony by a

15   witness about what that witness personally saw or heard or did.

16            Circumstantial evidence is indirect evidence, that

17   is, it is proof of one or more facts from which you can find

18   another fact.  You are to consider both direct and

19   circumstantial evidence.  Either can be used to prove any fact.

20   The law makes no distinction between the weight to be given to

21   either direct or circumstantial evidence.  It is for you to

22   decide how much weight to give any evidence.

23            In deciding the facts of this case, you may have to

24   decide which testimony to believe and which testimony not to

25   believe.  You may believe everything a witness says or part of

1  it or none of it.

2         In considering the testimony of any witness, you may

3  take into account the witness's opportunity and ability to see

4  or hear or know the things testified to; the witness's memory;

5  the witness's manner while testifying; the witness's interest

6  in the outcome of the case, if any; the witness's bias or

7  prejudice, if any; whether other evidence contradicted the

8  witness's testimony; the reasonableness of the witness's

9  testimony in light of all the evidence and any other factors

10 that bear on believability.

11        The weight of the evidence as to a fact does not

12 necessarily depend on the number of witnesses who testify.

13 What is important is how believable the witnesses were and how

14 much weight you think their testimony deserves.

15        You are here only to determine whether the defendant

16 is guilty or not guilty of the charges in the Indictment.  The

17 defendant is not on trial for any conduct or offense not

18 charged in the Indictment.

19        A separate crime is charged against the defendant in

20 each count.  You must decide each count separately.  Your

21 verdict on one count should not control your verdict on any

22 other count.

23        You've heard evidence that the defendant committed

24 other crimes, wrongs or acts not charged here.  You may

25 consider this evidence only for its bearing, if any, on the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1145

1    question of the defendant's intent, motive, opportunity,

2    preparation, plan, knowledge, or absence of mistake and for no

3    other purpose.  You may not consider this evidence as evidence

4    of guilt of the crime for which the defendant is now on trial.

5             Certain charts and summaries have been admitted in

6    evidence.  Charts and summaries are only as good as the

7    underlying supporting material.  You should, therefore, give

8    them only such weight as you think the underlying material

9    deserves.

10            The Indictment charges that the offenses alleged were

11   committed on or about or in or around certain dates.  Although

12   it is necessary for the government to prove beyond a reasonable

13   doubt that the offenses were committed on a date reasonably

14   near the dates alleged in the Indictment, it is not necessary

15   for the government to prove that the offenses were committed

16   precisely on the dates charged.

17            The Indictment also alleges that an approximate

18   amount of money was involved in the crimes charged.  It is not

19   necessary for the government to prove the exact or precise

20   amount of money alleged in the Indictment.

21            The Indictment also charges the defendant with

22   committing the charged offenses in several ways using the

23   conjunctive word "and," however, it is sufficient if the

24   government proves that the defendant committed the offense in

25   only one of the several ways.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1146

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 736 of 786   Page ID
Case 2:16-cr-00218-PA    Document 61    Filed 07/06/17    Page 48 of 96   Page ID #:439
#:1178

```
 1           Defendant is charged in Counts One through Fifteen of

 2   the Indictment with health care fraud, in violation of Section

 3   1347 of Title 18 of the United States Code.  In order for a

 4   defendant to be found guilty of that charge, the government

 5   must prove each of the following elements beyond a reasonable

 6   doubt;

 7           First, the defendant knowingly and willfully

 8   participated in a scheme or plan to defraud a health care

 9   benefit program or a scheme or plan for obtaining money or

10   property from a health care benefit program by means of false

11   or fraudulent pretenses, representations, or promises;

12           Second, the statements made or facts omitted as part

13   of the scheme were material, that is, they had a tendency to

14   influence or are capable of influencing a person to part with

15   money or property of a health care benefit program;

16           Third, the defendant acted with the intent to

17   defraud, that is, the intent to deceive or cheat;

18           And fourth, the scheme was in connection with the

19   delivery of or payment for health care benefits, items, or

20   services.

21           In determining whether a scheme to defraud exists,

22   you may consider not only the defendant's words and statements

23   but also the circumstances in which they are used as a whole.

24           Loss is not an element of health care fraud, nor is

25   an intent to cause loss.  It is not a defense in the crimes
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1147

1  charged in Counts One through Fifteen that the victim of the

2  fraud was negligent, gullible, or incompetent.

3       The term "health care benefit program" means any

4  public or private plan or contract affecting commerce under

5  which any medical benefit, item, or service is provided to any

6  individual and includes any individual or entity who is

7  providing a medical benefit item or service for which payment

8  may be made under the plan or contract.

9       A scheme to defraud and a scheme for obtaining money

10  or property means any deliberate plan of action or course of

11  conduct by which someone intends to deceive or to cheat another

12  or by which someone intends to deprive another of something of

13  value.

14       If you decide that defendant was a member of a scheme

15  to defraud and that he had the intent to defraud, defendant may

16  be responsible for other co-schemer's actions during the course

17  of and in furtherance of the scheme, even if he did not know

18  what they said or did.

19       For defendant to be guilty of an offense committed by

20  a co-schemer in furtherance of the scheme, the offense must be

21  one that he could reasonably foresee as a necessary and natural

22  consequence of the scheme to defraud.

23       Defendant may be found guilty of health care fraud

24  even if he personally did not commit the act or acts

25  constituting the crime but instead willfully caused an act to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1148

 1   be done, which directly -- which if directly performed by him

 2   or another would constitute health care fraud.

 3          To prove defendant guilty under this theory, the

 4   government must prove beyond a reasonable doubt:

 5          First, health care fraud was committed by someone;

 6          Second, defendant willfully ordered, directed, or

 7   otherwise brought about the commission of health care fraud.

 8          An act is done knowingly if the defendant is aware of

 9   the act and does not act or does not fail to act through

10   ignorance, mistake, or accident.  You may consider evidence of

11   the defendant's words, acts or omissions along with all the

12   other evidence in deciding whether the defendant acted

13   knowingly.

14          The word "willfully" means that the defendant

15   committed the act voluntarily and purposely and with knowledge

16   that his conduct was in a general sense unlawful, that is,

17   defendant must have acted with a bad purpose to disobey or

18   disregard the law.

19          The government need not prove that he was aware of

20   the specific provision of the law that he is charged with

21   violating or any other specific provision.

22          When you begin your deliberations, elect one member

23   of the jury as your foreperson who will preside over the

24   deliberations and speak for you here in court.  You will then

25   discuss the case with your fellow jurors to reach agreement, if

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1149

1    you can do so.  Your verdict, whether guilty or not guilty,

2    must be unanimous.

3              Each of you must decide the case for yourself, but

4    you should do so only after you've considered all of the

5    evidence, discussed it fully with the other jurors and listened

6    to the views of your fellow jurors.  Do not be afraid to change

7    your opinion if the discussion persuades you that you should,

8    but do not come to a decision simply because other jurors think

9    it is right.

10             It is important that you attempt to reach a unanimous

11   verdict, but of course, only if each of you can do so after

12   having made your own conscientious decision.  Do not change an

13   honest belief about the weight and effect of the evidence

14   simply to reach a verdict.

15             Because you must base your verdict only on the

16   evidence received in the case and on these instructions, I

17   remind you that you must not be exposed to any other

18   information about the case or to the issues it involves.

19             Except for discussing the case with your fellow

20   jurors during your deliberations, do not communicate with

21   anyone in any way and do not let anyone else communicate with

22   you in any way about the merits of the case or anything to do

23   with it.

24             This includes discussing the case in person, in

25   writing, by phone, or electronic means via e-mail, text

1  messaging, or any internet chat room, blog, website, or other

2  feature.  This applies to communicating with your family

3  members, your employer, the media or press and the people

4  involved in the trial.

5        If you're asked or approached in any way about your

6  jury service or anything about this case, you must respond that

7  you've been ordered not to discuss the matter and to report the

8  contact to the Court.

9        Do not read, watch or listen to any news or media

10  accounts or commentary about the case or anything to do with

11  it.  Do not do any research, such as consulting dictionaries,

12  searching the internet, or using other reference materials, and

13  do not make any investigation or in any other way try to learn

14  about the case on your own.

15        The law requires these restrictions to ensure the

16  parties have a fair trial based on the same evidence that each

17  party has had an opportunity to address.

18        A juror who violates these restrictions jeopardizes

19  the fairness of these proceeding.  If any juror is exposed to

20  any outside information, please notify the Court immediately.

21        Some of you have taken notes during the trial.

22  Whether or not you took notes, you should rely on your own

23  memory of what was said.

24        Notes are only to assist your memory.  You should not

25  be overly influenced by your notes or those of your fellow

App. 1151

1  jurors.

2          The punishment provided by law for these crimes is

3  for the Court to decide.  You may not consider punishment in

4  deciding whether the government has proved its case against the

5  defendant beyond a reasonable doubt.

6          A verdict form has been prepared for you.  After

7  you've reached a unanimous agreement on a verdict, your

8  foreperson should complete the verdict form according to your

9  deliberations, sign and date it, and advise the court security

10  officer that you're ready to return to the courtroom.

11          If it becomes necessary during your deliberations to

12  communicate with me, you may send a note through the court

13  security officer signed by any one or more of you.  No member

14  of the jury should ever attempt to communicate with me except

15  by a signed writing and I will respond to the jury concerning

16  the case only in writing or here in open court.

17          If you send out a question, I will consult with the

18  lawyers before answering it, which may take some time.  You may

19  continue your deliberations while waiting for the answer to any

20  question.

21          Remember, you are not to tell anyone, including me,

22  how the jury stands numerically or otherwise on any question

23  submitted to you, including the question of the guilt of the

24  defendant, until after you've reached a unanimous verdict or

25  have been discharged.

App. 1152

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 742 of 786    Page ID
#:1184
Case 2:16-cr-00213-PA    Document 61    Filed 07/06/17    Page 92 of 96    Page ID #:4445

```
 1              All right.  May I see counsel at sidebar, please.
 2          (The following proceedings were held at sidebar.)
 3              THE COURT:  Any objection to the instructions as
 4      read?
 5              MR. MCDERMOTT:  No, sir.
 6              MS. RYKKEN:  None.
 7              THE COURT:  All right.  Thank you.
 8          (The following proceedings were held in open court.)
 9              THE COURT:  All right.  Will the court security
10      officer please come forward.
11              Could I ask the clerk to what swear the court
12      security officer.
13              THE CLERK:  Please raise your right hand.
14              Do you solemnly swear to keep this jury together in
15      some private and convenient place, that you will not permit any
16      person to speak or communicate with them, nor do so yourself
17      unless by order of the Court, or to ask them whether they have
18      agreed upon a verdict and that you will return them into court
19      when they have so agreed or when ordered by the Court, so help
20      you God?
21              THE BAILIFF:  I do.
22              THE COURT:  All right.  Ladies and gentlemen,
23      deliberating jurors, you're going to deliberate from 8:00 a.m.
24      to 3:30.  Lunch is going to be brought in to you each day.
25              You may take breaks as you see fit, but do not
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1153

```
 1    discuss the case with anyone, including each other, until all

 2    of you are back in the jury room.

 3            If you leave the jury room, you must be accompanied

 4    by the court security officer.  Again, please do not start your

 5    deliberations until all of you are present in the morning or

 6    when you return from a break.  You must all be present before

 7    you start your deliberations.

 8            Now, I'm going to ask the alternate jurors, do either

 9    of the alternate jurors have any belongings in the jury room?

10            ALTERNATE JUROR:  Yes.

11            THE COURT:  Okay.  I'm going to ask if you would step

12    out, go into the jury room and retrieve those belongings,

13    please, and come back here into the courtroom.  And you can

14    leave your notebook on your chair.

15        (Brief pause in the proceedings.)

16            THE COURT:  All right.  I'm going to ask the

17    alternate jurors to return to the jury assembly room on the

18    first floor.

19            Until the jury reaches a verdict or until the jury is

20    discharged, you are to go to the jury assembly room every day

21    while the jury is deliberating.

22            Lunch will also be brought in for you each day.

23            You will be notified when the jury reaches a verdict

24    or when the jury has been discharged.

25            While you're waiting in the jury room, you are not to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1154

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 744 of 786   Page ID
#:1186
Case 2:16-cr-00218-PA   Document 81   Filed 07/06/17   Page 54 of 96   Page ID #:447

```
 1   discuss this case with anyone, including your fellow alternate,

 2   people involved in the trial, your family members or anyone

 3   else, nor are you permitted to allow others to approach you and

 4   try to talk to you about this case.  This includes discussing

 5   the case on the internet, in chat rooms, through blogs,

 6   bulletin boards, by e-mails, or text messages.

 7        If anyone approaches you and tries to talk with you

 8   about this case, please notify one of the officials in the jury

 9   assembly room.

10        Do not read, watch or listen to any news reports or

11   other accounts about the trial or anyone associated with it.

12   Do not do any research, such as consulting dictionaries,

13   searching internet, or other reference materials, and do not

14   make any investigation about the case on your own.

15        If you simply -- if you need to speak to me, simply

16   give a note to one of the officials in the jury assembly room

17   and they will see to it that it's given to the clerk.

18        As alternate jurors, you're bound by the same rules

19   that govern the conduct of jurors who are sitting on the panel.

20   You should not form or express any opinion about the case until

21   after you've been substituted in for one of the deliberating

22   jurors on the panel or until the jury has been discharged so

23   I'm going to ask the alternate jurors to leave their notebooks

24   on your chairs, and if you both now would return to the jury

25   assembly room on the first floor.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1155

1          All right.  Ladies and gentlemen, you may now retire

2     to the jury room to begin your deliberations.  We'll bring in a

3     copy of the jury instructions, the exhibits, a copy of the

4     Indictment.  They'll be brought in.  We'll also give you a

5     exhibit list.  And you may take your notebooks with you into

6     the jury room to begin your deliberations.

7          All right.  Thank you.

8          THE CLERK:  All rise.

9     *(Jury out at 9:46 A.M.)*

10    *(The following was heard outside the presence of the*

11    *jury.)*

12         THE COURT:  All right.  Have the lawyers met with the

13    clerk to ensure that all the exhibits are in and satisfied

14    themselves that those exhibits should go back to the jury?

15         MR. FREEDMAN:  We have, Your Honor, not since the

16    discussion about Exhibit 6.

17         THE COURT:  Okay.  I'm advised by the court reporter

18    that Exhibit 6 was admitted into evidence, so that will go back

19    into the jury room as well.

20         Where are you going to be if there are any notes?

21         MR. FREEDMAN:  We're happy to stay in this building.

22    If the Court would like otherwise, we may go back to Spring

23    Street.

24         THE COURT:  I think you guys have an office of some

25    sort in this building.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1156

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 746 of 786    Page ID
#:1188
Case 2:16-cr-00218-PA    Document 61    Filed 07/06/17    Page 58 of 96    Page ID #:449

```
 1              MR. FREEDMAN:  We do.

 2              THE COURT:  Just stay in the building, please.

 3              And where are you going to be?

 4              MR. MCDERMOTT:  Probably the cafeteria.

 5              THE COURT:  Okay.  Make sure the clerk has a cell

 6   phone where you can be reached.

 7              Now, if the jury doesn't come back today, does either

 8   party want to be present when they resume their deliberations

 9   tomorrow morning?  My practice is normally just to send them

10   back into the jury room.

11              MR. MCDERMOTT:  Send them back there, yeah.  I don't

12   particularly care.

13              MR. FREEDMAN:  Yeah, that's fine.  We don't need to

14   be here.

15              THE COURT:  Okay.  We'll have a clean set of jury

16   instructions, if you want to review those before they go back

17   in probably in, probably in about ten minutes.  The verdict

18   form should be available in roughly ten minutes.

19              And I understand that the government filed a redacted

20   or cleaned up Indictment.  I think there were two versions, and

21   I'm not sure what -- I know one had a blank page on it.

22              MR. FREEDMAN:  Right.  And so Item 2 deleted that

23   blank page just because once the page was blank, it sort of

24   begged the initial question.

25              MR. MCDERMOTT:  Judge, I don't know if I'm late in
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1157

```
 1    getting my Pacer stuff, but I'd like to take a look at it.

 2             THE COURT:  That's fine.

 3             And I think the jury also should get an exhibit list.

 4    So why don't you -- I think we've got an electronic version of

 5    the exhibit list.  We'll go ahead and delete the exhibits that

 6    weren't used and then both of you can take a look at that as

 7    well.

 8             MR. MCDERMOTT:  That's fine.

 9             THE COURT:  Okay.  Anything else?

10             MR. MCDERMOTT:  Now that they're in deliberation I,

11    recall the Court start time is 8:30 to 3:30?

12             THE COURT:  8:00 a.m. to 3:30.

13             MR. MCDERMOTT:  Oh, all right.

14             MR. FREEDMAN:  Nothing else, Your Honor.  Thank you.

15             THE COURT:  Okay.  Thank you.

16             THE CLERK:  All rise.

17        (Recess taken 9:50 to 10:33 A.M.)

18        (The following was heard outside the presence of the

19        jury.)

20             THE COURT:  All right.  Let's call the case, please.

21             THE CLERK:  Item 1, CR16-215, United States of

22    America versus Michael Mirando.

23             Counsel, please state your appearances.

24             MR. FREEDMAN:  Good morning, Your Honor.  Michael

25    Freedman and Katherine Rykken on behalf of the United States.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1158

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 748 of 786 Page ID
Case 2:16-cr-00218-PA Document 61 Filed 09/06/17 Page 58 of 96 Page ID #:4451
#:1190

```
 1              MR. MCDERMOTT:  Sir, Kevin McDermott on behalf of

 2    Mr. Mirando, who is present.

 3              THE COURT:  Good morning.  We've received a note from

 4    the jury, and the note reads that the jury has reached a

 5    unanimous verdict.

 6              What I'm going to do is I'm going to -- we're going

 7    to bring the jury in.  I'm going to get the alternates.  We

 8    will bring the alternates in.  We will then learn what the

 9    verdict is.

10              Then I'm going to -- well, depending on what the

11    verdict is -- if the verdict is not guilty, then we'll dismiss

12    the jury and they will go on their way.  If the verdict is

13    guilty, then we're going to go immediately into this forfeiture

14    action, and I'm going to reseat the alternates to hear the

15    forfeiture.

16              What's your estimate?

17              MR. FREEDMAN:  Your Honor, I think we can probably do

18    it in about half an hour.

19              THE COURT:  Okay.  Do you intend to put on a case?

20              MR. MCDERMOTT:  No, sir.

21              THE COURT:  Okay.  Let's bring the jury in.

22         (Jury in at 10:37 A.M.)

23              THE COURT:  All right.  Let's bring the alternates

24    in, please.

25              Please be seated.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1        (Alternate jurors in at 10:38 a.m..)

 2             THE COURT:  Members of the jury, I understand you've

 3   reached a unanimous verdict.

 4             Who is your foreperson?

 5             FOREPERSON:  Me.

 6             THE COURT:  And, sir, would you please hand the

 7   verdict to the court security officer.

 8             All right.  I'm going to ask the clerk to publish the

 9   verdict.

10             THE CLERK:  United States District court, Central

11   District of California, number CR16-215-PA, United States of

12   America, plaintiff, versus Michael Mirando, defendant.

13             Verdict Form.

14             Count One.  We, the jury, unanimously find defendant

15   Michael Mirando guilty of health care fraud as charged in Count

16   One of the Indictment.

17             Count Two.  We, the jury, unanimously find defendant

18   Michael Mirando guilty of health care fraud as charged in Count

19   Two of the Indictment.

20             Count Three.  We, the jury, unanimously find

21   defendant Michael Mirando guilty of health care fraud as

22   charged in Count Three of the Indictment.

23             Count Four.  We, the jury, unanimously find defendant

24   Michael Mirando guilty of health care fraud as charged in Count

25   Four of the Indictment.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1160

```
 1              Count Five.  We, the jury, unanimously find defendant
 2    Michael Mirando guilty of health care fraud as charged in Count
 3    Five of the Indictment.
 4              Count Six.  We, the jury, unanimously find defendant
 5    Michael Mirando guilty of health care fraud as charged in Count
 6    Six of the Indictment.
 7              Count Seven.  We, the jury, unanimously find
 8    defendant Michael Mirando guilty of health care fraud as
 9    charged in Count Seven of the Indictment.
10              Count Eight.  We, the jury, unanimously find
11    defendant Michael Mirando guilty of health care fraud as
12    charged in Count Eight of the Indictment.
13              Count Nine.  We, the jury, unanimously find defendant
14    Michael Mirando -- excuse me, we, the jury, unanimously find
15    defendant Michael Mirando guilty of health care fraud as
16    charged in Count Nine of the Indictment.
17              Count Ten.  We, the jury, unanimously find defendant
18    Michael Mirando guilty of health care fraud as charged in Count
19    Ten of the Indictment.
20              Count Eleven.  We, the jury, unanimously find
21    defendant Michael Mirando guilty of health care fraud as
22    charged in Count Eleven of the Indictment.
23              Count Twelve.  We, the jury, unanimously find
24    defendant Michael Mirando guilty of health care fraud as
25    charged in Count Twelve of the Indictment.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1161

```
 1              Count Thirteen.  We, the jury, unanimously find
 2    defendant Michael Mirando guilty of health care fraud as
 3    charged in Count Thirteen of the Indictment.
 4              Count Fourteen.  We, the jury, unanimously find the
 5    defendant Michael Mirando guilty of health care fraud as
 6    charged in Count Fourteen of the Indictment.
 7              Count Fifteen.  We, the jury, unanimously find the
 8    defendant Michael Mirando guilty of health care fraud as
 9    charged in Count Fifteen of the Indictment.
10              Dated the 2nd day of May, 2017, at Los Angeles,
11    California.  Signed by the foreperson.
12              THE COURT:  Members of the jury, is that the verdict
13    of each of you, so say you all?
14              THE JURY:  Yes.
15              THE COURT:  All right.  May I see counsel at sidebar.
16         (The following proceedings were held at sidebar.)
17              THE COURT:  What they did -- rather than check, they
18    put a "yes" after each of the counts.
19              Okay.  So we're going to now start with this
20    forfeiture.
21              MR. MCDERMOTT:  Right.
22              MR. FREEDMAN:  I have a few additional exhibits that
23    I'll hand up to the Court, if that's okay.
24              THE COURT:  That's fine, but we got a couple more
25    steps to take care of this, and then we'll start.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1162

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 752 of 786    Page ID
#:1194
Case 2:16-cr-00218-PA    Document 61    Filed 06/06/17    Page 62 of 96    Page ID #:455

```
 1              MR. FREEDMAN:  Okay.

 2         (The following proceedings were held in open court.)

 3              THE COURT:  Does defense wish to have the jury

 4    polled?

 5              MR. MCDERMOTT:  No, sir.

 6              THE COURT:  Any reason why the verdict should not now

 7    be recorded?

 8              MR. MCDERMOTT:  No, sir.

 9              MR. FREEDMAN:  No, Your Honor.

10              THE COURT:  All right.  The clerk is directed to file

11    and record the verdict.

12              Ladies and gentlemen, we have one additional factual

13    issue that you're going to need to decide, so we're going to

14    put the alternates back in place and we're going to commence

15    with that proceeding now.

16              Either counsel wish to make an opening statement?

17              MR. FREEDMAN:  No, Your Honor.

18              MR. MCDERMOTT:  No, sir.

19              THE COURT:  Ladies and gentlemen, I think it's -- I

20    think the presentation of the evidence for this determination

21    is going to take roughly 30, maybe 40 minutes, and then there

22    may be some argument, and then that factual question will be

23    submitted to you for your deliberations.

24              All right.  Does the government wish to call a

25    witness?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1163

```
 1              MR. FREEDMAN:  Yes, Your Honor.  The government calls

 2    Special Agent Kathleen Kennedy.

 3              THE COURT:  All right.

 4              THE CLERK:  Please raise your right hand.

 5              Do you solemnly swear that the testimony you shall

 6    give in the cause now before this Court shall be the truth, the

 7    whole truth, and nothing but the truth, so help you God?

 8              THE WITNESS:  I do.

 9              THE CLERK:  Please be seated.

10              Please state your full name and spell your last name

11    for the record.

12              THE WITNESS:  My name is Kathleen Irene Kennedy.  My

13    last name is spelled K-e-n-n-e-d-y.

14              MR. FREEDMAN:  Your Honor, before I begin, may I

15    approach the clerk with the exhibit list?

16              THE COURT:  Yes, that's fine.

17              Counsel, if you could hold on just one second,

18    please.

19              MR. FREEDMAN:  Sure.

20              THE COURT:  I'm sorry.  Let me see counsel at sidebar

21    for a moment.

22         (The following proceedings were held at sidebar.)

23              THE COURT:  Okay.  I think we probably should tell

24    them what we're --

25              MR. MCDERMOTT:  Going to do, sure.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1164

```
1              THE COURT:  I'm going to -- I think there's a pretty
2    reasonable statement in the proposed jury instructions.
3              Do you have those?
4              MR. FREEDMAN:  I do.  Do you want me to get a copy?
5              THE COURT:  Yeah, get a copy, and let's see if we
6    can --
7              Okay.  Does anybody have any objection to giving this
8    now?
9              MR. FREEDMAN:  No.
10             MR. MCDERMOTT:  No.
11         (The following proceedings were held in open court.)
12             THE COURT:  Ladies and gentlemen, in view of your
13   verdict that Defendant Mirando is guilty of health care fraud,
14   as set forth in Counts One through Fifteen of the Indictment,
15   you have one more task to perform before you're discharged.
16             Under federal law, any person who is convicted of
17   health care fraud shall forfeit to the United States any
18   property, real or personal, that constitutes or is derived
19   directly or indirectly from the gross proceeds of the
20   commission of the offense.
21             It is now your task to determine whether the
22   following assets constitute or are traceable to such proceeds,
23   namely, the real property known as 92334 NW Finzer Court,
24   Portland, Oregon, 97229-0835.
25             I instruct you, however, that your previous finding
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1165

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 755 of 786   Page ID
Case 2:16-cr-00215-PA   Document 61-5   Filed 07/06/17   Page 69 of 96   Page ID #:458
#:1197

```
1    that the defendant is guilty of health care fraud is final,

2    conclusive and binding.

3          Because you are bound by your previous finding that

4    the defendant is guilty, I direct you not to discuss in your

5    forfeiture deliberations whether the defendant is guilty or not

6    guilty of these charges.

7          All of my previous instructions regarding direct and

8    circumstantial evidence, credibility of witnesses, and duty to

9    deliberate apply with respect to your verdict regarding

10   forfeiture.

11         All right.

12         MR. FREEDMAN:  Thank you, Your Honor.

13         Your Honor, may I proceed?

14         THE COURT:  Yes.

15         MR. FREEDMAN:  Thank you.

16                    KATHLEEN KENNEDY,

17              having been first duly sworn,

18                 testified as follows:

19                 DIRECT EXAMINATION

20   BY MR. FREEDMAN:

21   Q.   Special Agent Kennedy, you testified during the trial in

22   this matter that you obtained financial records for the

23   defendant's bank account; is that correct?

24   A.   Yes.

25   Q.   And could you just briefly for the jury refresh us as to
```

```
 1    what that consisted of?

 2    A.   So there was the whole --

 3              THE COURT:  I'm sorry.  Excuse me one moment.

 4              Did you leave your notebooks?

 5              THE JURY:  Yes.

 6              THE COURT:  Okay.  Why don't we retrieve the

 7    notebooks.  I'll ask the clerk to retrieve them.

 8              They're marked with your seat numbers?

 9              THE JURY:  No.

10              THE COURT:  All right.  Why don't we allow you to go

11    back and get your notebooks.

12              THE CLERK:  All rise.

13         (Jury out at 10:53 A.M.)

14         (The following was heard outside the presence of the

15         jury.)

16              MS. RYKKEN:  Your Honor.  May I put this up at the

17    witness stand?

18              THE COURT:  That's fine.

19              MR. MCDERMOTT:  Your Honor, there's something else

20    I'd like to address if we could.

21              THE COURT:  Let's wait until the jury returns and

22    then --

23              MR. MCDERMOTT:  It doesn't have anything to do with

24    the jury.  It has to do with the nature of the forfeiture

25    request that I think the Court needs to consider.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1167

```
 1                THE COURT:  All right.  Well let's do that at

 2    sidebar.

 3          (The following proceedings were held at sidebar.)

 4                MR. MCDERMOTT:  Because the government is asking for

 5    the forfeiture and that the forfeiture would then be to the

 6    government -- it's not going to the private companies, so --

 7    there was some recent 2016 decisions on forfeiture and who the

 8    appropriate victim is and who the appropriate restitutionee

 9    should be -- I mean, because what's going to happen,

10    theoretically, is that the insurance companies can now use this

11    conviction for civil actions against the client.

12                THE COURT:  They can or cannot?

13                MR. MCDERMOTT:  Can.

14                THE COURT:  Um-hmm.

15                MR. MCDERMOTT:  So my concern -- question is this.

16    If they were doing restitution for the insurance companies, I

17    wouldn't have an objection, but based on the instructions that

18    we've got, they're doing restitution for the government.  And

19    so my question is whether or not that's the appropriate victim

20    to claim restitution.

21                MR. FREEDMAN:  It's not -- may I?

22                THE COURT:  Um-hmm.

23                MR. FREEDMAN:  It's not restitution.  It's forfeiture

24    provided for by the statute that the defendant's proceeds shall

25    be forfeited.  If the defense -- the defense can take this up
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    at the appropriate time if there's a civil action for

2    forfeiture.  The purpose of today's proceedings --

3         (Jury in 10:55 a.m.)

4              THE COURT:  Go ahead.

5              MR. FREEDMAN:  The purpose of the proceedings today

6    is to prove to the jury, as the defendant has requested

7    certain, specific property falls within those gross proceeds.

8              MR. MCDERMOTT:  Right.

9              MR. FREEDMAN:  There would then still be a forfeiture

10   proceeding.

11             MR. MCDERMOTT:  Right.

12             MR. FREEDMAN:  All of this can be litigated at that

13   time.  And, in fact, if the defendant doesn't want this proven

14   to the jury, he can take all of that up --

15             MR. MCDERMOTT:  Well --

16             THE COURT:  I think his point is is that if you're

17   forfeiting the property, that's an asset that he has.  There

18   may be restitution that may be ordered --

19             MR. MCDERMOTT:  Um-hmm.

20             THE COURT:  -- in this case.

21             Now, I think to a certain extent he's right.  I think

22   there is a statute that provides for forfeiture.  Now, whether

23   the government wants to get together with the insurance

24   companies and decide, "We lost X, Y, Z amount of money.  We're

25   going to be able to sell this property for who knows.  We'll
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1169

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 759 of 786   Page ID
#:1201
Case 2:16-cr-00216-PA   Document 61   Filed 07/06/17   Page 89 of 98   Page ID #:9462

1    give you a certain amount of that to compensate you for your

2    restitution," which would --

3            MR. MCDERMOTT:  So then -- but based on your

4    representation, then, are you confirming then that Crowley is

5    not a relater?

6            MR. FREEDMAN:  We have no information that he's a

7    relater.  I know we talked about this before.

8            MR. MCDERMOTT:  No, I know, but once seeing the

9    instructions --

10           MR. FREEDMAN:  Also, the loss amount would be

11   determined by the Court at sentencing --

12           MR. MCDERMOTT:  Right.

13           MR. FREEDMAN:  -- and the restitution and the

14   forfeiture flows from that.  What we're doing today is just

15   getting that house in there so that once the loss amount is

16   calculated, the house is one of the things that can be used.

17           THE COURT:  It can be.

18           MR. MCDERMOTT:  As an offset, but my mind -- like I

19   said, my concern is that, if the insurance companies decide

20   that they are entitled to direct restitution, whether or not

21   anything that the government has collected is something that

22   they're entitled to have.

23           THE COURT:  I think that's something for the victims

24   and the government to work out.

25           MR. MCDERMOTT:  Okay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1170

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 760 of 786    Page ID
#:1202
Case 2:16-cr-00213-PA    Document 61    Filed 09/17/--    Page 70 of 90    Page ID #:9469

```
1            THE COURT:  And the government may well decide to use
2    that asset to pay restitution.  They may or they may not.
3            MR. MCDERMOTT:  Because then I don't want to hear the
4    counter-argument that it doesn't count toward the restitution
5    that the Court may order.  Right?
6            THE COURT:  I think that's my -- my understanding is
7    that that is something for the victims and the government to
8    work out.
9            MR. MCDERMOTT:  Okay.
10           MR. FREEDMAN:  This is just -- the total amount will
11   be determined at sentencing.
12           MR. MCDERMOTT:  Right.
13           MR. FREEDMAN:  The purpose of today is just to lock
14   in the house as one of the things that can be gone after,
15   whatever the amount is.
16           MR. MCDERMOTT:  Okay.  Go ahead.
17        (The following proceedings were held in open court.)
18           THE COURT: All right.  Let's --
19           MR. FREEDMAN:  Your Honor, may my colleague also
20   deliver a set of exhibits to the Court at this point?
21           THE COURT:  Yes, that's fine.
22           MR. FREEDMAN:  May I resume?
23           THE COURT:  Yes, please.
24   BY MR. FREEDMAN:
25   Q.   So, Special Agent Kennedy, describe the process of tracing
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the accounts.

2    A.    So I obtained bank records for Holter Labs Chase account

3    and Holter Labs Bank of the West account.  I also obtained bank

4    records for Michael Mirando's Chase account.

5          In reviewing those records, we discovered -- I

6    discovered other accounts that Mr. Mirando had.

7          I discovered the Murrieta Medical Supply account at

8    Bank of America.  I discovered Michael Mirando's account at

9    ING, or I-N-G, at Allied Bank, as well as there were some other

10   accounts that he had for companies, Collegiate Properties of

11   Mississippi, North Carolina, South Carolina.  And it was a

12   process of looking at the flow of money from one -- into one

13   account and then out to another account.

14         MR. MCDERMOTT:  Sir, can we have a quick sidebar?

15         THE COURT:  Yes.

16      (The following proceedings were held at sidebar.)

17         MR. MCDERMOTT:  In light of the miraculously fast

18   verdict in this case, we would be willing to go ahead and sign

19   off on the stip.  All right?

20         THE COURT:  Okay.

21         MR. MCDERMOTT:  We got it right here and we'll sign

22   off on it.

23         MR. FREEDMAN:  And then I'll sign it.

24         THE COURT:  All right.  So -- okay.  So then I'm

25   going to excuse the jury.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1172

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 762 of 786    Page ID
#:1204
Case 2:16-cr-00218-PA    Document 61-5    Filed 06/06/17    Page 720 of 96    Page ID #:9469

```
 1              MR. MCDERMOTT:  Okay.  Right.

 2              THE COURT:  And I'll go out -- I'm going to excuse

 3     the jury, tell them we've resolved this issue without their --

 4     we've resolved the issue, and I'm going to excuse them.

 5              I'm going to go back in and thank them for their

 6     service, and then we'll come back here, get a sentencing date

 7     and deal with any other issues.

 8              MR. MCDERMOTT:  All right.  Thank you.

 9              THE COURT:  All right.  The witness may step down.

10        (The following proceedings were held in open court.)

11              THE COURT:  Ladies and gentlemen, we've resolved this

12     issue, and so you won't need to deliberate further.

13              Again, I want to thank you for your service in this

14     case.  Our constitution's framers recognized that trial by jury

15     is the essence of a free government.

16              Jury service is a right that our forefathers fought

17     for and men and women are fighting for today to secure because

18     of its importance in the governing of a democratic society.

19     For the jury to perform an historic and beneficial role in our

20     democracy, it must be constituted with people like yourselves

21     who are willing to serve.

22              As a society, we've given to the people the power to

23     make the ultimate determination of whether or not to deprive a

24     fellow citizen of life, liberty, or property in criminal cases.

25              I'm proud of the fact that citizens like you are
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1173

1    willing to serve on juries.

2              I'm going to dismiss you with the thanks of the

3    Court.

4              The court security officer will escort you to the

5    jury assembly room on the 1st Floor.

6              And now that the case has been concluded, some of you

7    may have questions about the confidentiality of the

8    proceedings.

9              Many times jurors are asked that if they are now at

10   liberty to discuss the case with anyone, and now that the case

11   is over, you are, of course, free to discuss the case with any

12   person you choose.

13             By the same token, however, I would advise you that

14   you are under no obligation whatsoever to discuss this case

15   with any person.

16             If you do decide to discuss the case with anyone, I

17   would suggest that you treat it with the same degree of

18   seriousness, and that whatever you do decide to say, you would

19   be willing to say in the presence of the other jurors or under

20   oath here in open court in the presence of all of the parties.

21             Also, always bear in mind that if you do decide to

22   discuss the case that the other jurors fully and freely stated

23   their opinions with the understanding that they were being

24   expressed in confidence.  Please respect the privacy of the

25   views of your fellow jurors.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1174

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 764 of 786    Page ID
Case 2:16-cr-00218-PA    Document 81    Filed 07/06/17    Page 74 of 96    Page ID #:467
#:1206

```
 1              I'm going to ask if you would return to the jury
 2    assembly room for two minutes.  I'm just going to come in there
 3    and personally thank you for your services, and then we will
 4    let you go back to the jury assembly room.
 5              So if you will return to the jury room for just a
 6    couple of minutes, I just want to come in and thank you.
 7              THE CLERK:  All rise.
 8              THE COURT:  And if you could just take your notebooks
 9    with you.
10        (Jury out at 11:04 A.M.)
11              THE COURT:  Okay.  I assume the stipulation has been
12    signed?
13              MR. FREEDMAN:  Yes, Your Honor.
14              THE COURT:  All right.  I'm going to go -- we're
15    going to take a recess for about five minutes.  I'm just going
16    to thank the jury, and then we'll come in and set a date for
17    sentencing and deal with any other matters we have to.
18        (Recess taken 11:04 to 11:14 A.M.)
19              THE COURT:  All right.  I'm going to ask the clerk to
20    give us a date for sentencing.
21              THE CLERK:  July 31st, 2017, at 8:30 a.m.
22              THE COURT:  Is that date and time convenient to both
23    counsel and the defendant?
24              MR. MCDERMOTT:  July -- no, it's not for me.  We
25    discussed, if it was at all possible, sir, our memorandum is
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1175

```
 1   due on the 7th of August and a hearing date on the 21st.

 2             THE COURT:  Of August?

 3             MR. MCDERMOTT:  Yes, sir.

 4             MR. FREEDMAN:  That's fine with the government.

 5             THE COURT:  All right.  We'll continue -- well, we'll

 6   have sentencing in this case on August -- I'm sorry, August

 7   21st?

 8             MR. MCDERMOTT:  It's a Monday.

 9             THE COURT:  It is.

10             August 21st, 2017, at 8:30 a.m.

11             The defendant is ordered to appear for sentencing on

12   August 21, 2017, at 8:30 a.m. without further notice or order

13   from the Court.

14             In the interim, this case is going to be referred to

15   the probation department for the preparation of a Pre-sentence

16   Report.  The defendant will be asked to give information for

17   the report.  You'll have an opportunity to read the report and

18   to speak at the sentencing hearing.  I want to urge the

19   defendant to consult with his lawyer throughout this process so

20   he can answer any questions he may have.

21             All right.  Are there any other matters we need to

22   take up at this time?

23             MR. FREEDMAN:  No, Your Honor.

24             MR. MCDERMOTT:  No, sir, not at this time, other than

25   asking the Court to consider the bond situation, sir.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1176

```
 1              THE COURT:  What's the current bond?

 2              MR. MCDERMOTT:  It was literally sign a promise to

 3    appear, sir.  There was no monetary, no bracelet, and just

 4    contact the probation officer.

 5              In fact, the Pretrial Services up there contacted me.

 6    They didn't even have him doing fill out the forms or regular

 7    contact.  So we'd ask that it be just a mere signature

 8    situation, if we could.

 9              THE COURT:  Was there a Pre-trial Services report

10    prepared in this case?

11              MR. MCDERMOTT:  This was unusual from the standpoint

12    it was Oregon, Portland, originally.  I'm not sure we had one

13    assigned out here, to tell you the truth, sir.  I think he has

14    always been assigned to Oregon.

15              MR. FREEDMAN:  There was a Pretrial Services officer

16    down here but not in Portland.

17              MR. MCDERMOTT:  Maybe originally.  They might have

18    interviewed him, but that might have been it, sir.

19              THE COURT:  Does he have a passport?

20              MR. MCDERMOTT:  It's already turned in, sir.

21    Weapons, passports, everything has been rid of or turned in.

22              THE COURT:  Okay.  Here's what I'm going to do.  I'm

23    going to have a Pretrial Services officer interview him and

24    then -- hopefully, they can get that done by 1:30 or 2 o'clock

25    this afternoon.  I'll bring you back here and then we'll decide
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1177

1   the bond, but I'd like to get some information from Pretrial

2   Services.

3          And I anticipate -- well, let me ask this.  I know

4   that the Oregon property, I guess, was subject to this

5   forfeiture.

6          Did I understand the evidence that there's other

7   property that the defendant owns?

8          MR. FREEDMAN:  Correct.

9          THE COURT:  Real property?

10         MR. FREEDMAN:  Yes.

11         THE COURT:  There's going to be some sort of bond in

12   this case, and probably the defendant -- well, I'll take a look

13   at the report, but there may be -- he may be restricted to his

14   home, and he may end up having to wear a bracelet, because the

15   standard changes once there's been a conviction, but I'll wait

16   to see the report.

17         But unless there's something new, I suspect we'll be

18   able to arrive at some conditions of bond.

19         So the defendant will be interviewed by Pretrial

20   Services.

21         Were you able -- does the government know -- I take

22   it the government knows where these other pieces of property

23   are?

24         MR. FREEDMAN:  Most of them.

25         THE COURT:  Okay.  And do we know -- do we have any

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1178

1    sense of whether there's any equity in those pieces of

2    property?

3              AGENT KENNEDY:  I believe there is -- there's going

4    to be equity in all of them, but some of them may have

5    mortgages on them still.

6              THE COURT:  Okay.  I think that's what he needs to

7    share to Pretrial Services so then we can fix a bond.

8              Are you going to keep him here -- or can you keep him

9    here?

10             THE OFFICER:  Normally, we would take him back to

11   Roybal, Your Honor, but if we need to -- because pretrial is in

12   Roybal anyways.

13             THE COURT:  That's fine.

14             THE OFFICER:  So we can take him back and have him

15   interviewed and bring him back as soon as he is done.

16             THE COURT:  Okay.  If you want to be with him, that's

17   fine.

18             MR. MCDERMOTT:  You want us back here at 2:00.

19             THE COURT:  1:30, 2 o'clock, whatever works.

20             MR. MCDERMOTT:  Well, I need to -- if the Court is

21   going to do a bond, I need to figure out how to get that done.

22             THE COURT:  Okay.  So do you want to do it this

23   afternoon?

24             MR. MCDERMOTT:  I'm going to work on it as soon as I

25   can certainly.  I will start making calls now.

App. 1179

```
 1              THE COURT:  Okay.  Why don't we -- I'll see if we can

 2    get Pretrial Services geared up.  He lives, though, in

 3    Portland?

 4              MR. MCDERMOTT:  Yes, sir.

 5              THE COURT:  Okay.  And we'll tentatively set this for

 6    2 o'clock.

 7              MR. MCDERMOTT:  That's fine, sir.

 8              MR. FREEDMAN:  That's fine.

 9              THE COURT:  Okay.  Thank you.

10              THE CLERK:  All rise.

11         (Recess taken 11:22 to 2:30 P.M.)

12              THE CLERK:  Item 1, CR16-215, United States of

13    America versus Michael Mirando.

14              Counsel, please state your appearances.

15              MR. FREEDMAN:  Good afternoon, Your Honor.  Michael

16    Freedman and Katherine Rykken on behalf of the United States,

17    and Kathleen Kennedy at counsel table as well.

18              THE COURT:  Good afternoon.

19              MR. MCDERMOTT:  Sir, Kevin McDermott on behalf of

20    Mr. Mirando, who is present and out of custody.

21              THE COURT:  Good afternoon.

22              MR. MCDERMOTT:  I should say he's in custody.

23              THE COURT:  I have a Pre-trial Services report.  If

24    the parties desire to take a look at it, it's fine.

25              MR. MCDERMOTT:  Sir, I was there during the
```

Case 2:23-cv-04498-PA Document 1-5 Filed 06/05/23 Page 770 of 786 Page ID
#:1212
Case 2:16-cr-00215-PA Document 61 Filed 09/06/17 Page 80 of 90 Page ID #:479

1    interview.

2              THE COURT:  Okay.

3              MR. FREEDMAN:  No issue with needing to look at it,

4    Your Honor.

5              THE COURT:  Okay.  Do you wish to see it?

6              MR. FREEDMAN:  We'll take a quick look, if that's

7    okay.

8              THE COURT:  And I believe I have a Pretrial Services

9    report from Oregon.

10             MR. MCDERMOTT:  Yes, sir.

11             Is there a date on that one, sir?

12             THE COURT:  Looks like October 7th, 2016.

13             MR. MCDERMOTT:  It's the original one, sir.  I've

14   read that one, yes.

15             THE COURT:  You want to see the original?

16             MS. RYKKEN:  Yeah.

17             THE COURT:  Let me just ask a couple of questions.

18   Other than the income that he's receiving from Holter labs,

19   does he have any other sources of income?

20             MR. MCDERMOTT:  Sir, at this particular point, no.

21             I can indicate to the Court that the sale of a

22   condominium that occurred in Orange County before moving to

23   Oregon had netted about $400,000 in equity.  It was a home that

24   they had purchased -- or a condo he purchased back in 2002 or

25   '3.  But beyond that, there isn't any other sources of income.

App. 1181

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 771 of 786    Page ID
#:1213
Case 2:16-cr-00215-PA    Document 81    Filed 07/06/17    Page 81 of 96    Page ID #:474

```
 1              THE COURT:  Okay.  And this report indicates that he

 2    has properties in Oregon, North Carolina, and South Carolina

 3    with a combined approximate value of $980,000.

 4              MR. MCDERMOTT:  There would be some rental income

 5    from those properties, but as far as any other type -- I think

 6    of nonpassive income -- I don't believe there's anything else

 7    to report.

 8              THE COURT:  Okay.  Does he own any other properties?

 9              MR. MCDERMOTT:  The list that you have in front of

10    you, sir, is the government's list from the exhibits.

11              THE COURT:  My question -- my question is a little

12    different.  Does he own any other properties?

13              MR. MCDERMOTT:  Sir, not that I'm aware of.

14              MR. FREEDMAN:  Your Honor, there's also the condo in

15    Honduras.

16              THE COURT:  All right.  Pretrial Services is on the

17    phone.  I'm going to recess for about five minutes.  I had a

18    couple of questions I wanted to ask them.

19              MR. MCDERMOTT:  And just for the Court's

20    consideration, too.  The parents have equity in their home in

21    Portland and would be willing to use that as collateral if the

22    Court requires it.  It's my understanding that that home is

23    independent of any kind of conduct in this case.  It would have

24    nearly about 500,000 in equity, maybe more.

25              THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1182

```
 1            MR. MCDERMOTT:  All right.

 2        (Recess taken 2:35 to 2:43 P.M.)

 3            THE CLERK:  Item 1, CR16-215, United States of

 4    America versus Michael Mirando.

 5            Counsel, please state your appearances.

 6            MR. FREEDMAN:  Michael Freedman, Katherine Rykken on

 7    behalf of the United States, and Kathleen Kennedy at counsel

 8    table.

 9            MR. MCDERMOTT:  Kevin McDermott on behalf of

10    Mr. Mirando, who is present.

11            THE COURT:  Okay.  The values of the property that --

12    in Oregon, North Carolina and South Carolina, this value of the

13    $980,000, is that the properties' value?  Is that equity in

14    those properties?

15            MR. MCDERMOTT:  From the -- from, I believe -- the

16    list, I think that may be gross.

17            THE COURT:  Okay.  Do you have a --

18            MR. MCDERMOTT:  Frankly, I haven't done a background

19    on it.  I was relying upon their list.  It's my understanding

20    it's --

21            THE COURT:  Well, it's not so much what they think it

22    is.

23            MR. MCDERMOTT:  No, I know.  I'm just reflecting to

24    the Court I haven't done my own personal evaluation of the

25    properties.  I didn't really thought I'd have a need to until
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1183

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 773 of 786    Page ID
#:1215
Case 2:16-cr-00218-PA    Document 61    Filed 07/06/17    Page 89 of 90    Page ID #:476

```
 1    today.  But in discussions with my client, I think the 900- is

 2    a gross figure and less mortgages.  And the rest of it, I think

 3    we're at -- on those about 55 percent, so somewhere in the

 4    neighborhood of about 400-.

 5             THE COURT:  Okay.  And then he's got another 270,000

 6    in bank accounts and another $500,000 in investment accounts.

 7             MR. MCDERMOTT:  That was the list as of about maybe

 8    six months ago.  I know that the current figures that my client

 9    gave today would be more accurate, if that's the amount that

10    was given.

11             THE COURT:  Right.  I'm just reading from the report.

12             MR. MCDERMOTT:  The one that was put together today?

13    Yes, sir, that's correct, then.

14             THE COURT:  Okay.  Now, I think you had indicated at

15    some point that the defendant had rented a house here in

16    Southern California.

17             MR. MCDERMOTT:  Yes, sir.

18             THE COURT:  Okay.  Is that house still available?

19             MR. MCDERMOTT:  It's an Airbnb, sir.  It's due to be

20    finished this week.

21             THE COURT:  How long is he going to be -- how long

22    has he made arrangements to be here in Southern California?

23             MR. MCDERMOTT:  I think they have actually requested

24    a check-out of Friday.

25             THE COURT:  And today is Tuesday.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1184

```
 1              MR. MCDERMOTT:  Yes, sir.

 2              THE COURT:  All right.  Does the government have a

 3    position?

 4              MR. FREEDMAN:  Your Honor, the government agrees with

 5    the $500,000 bond amount in the Pretrial Services report.

 6              The government is concerned about a bond being posted

 7    with any of the defendant's properties or accounts because

 8    based on the testimony at trial, it sounds like most of those

 9    proceeds are proceeds from the fraud.

10              If the defense wishes to proceed with trying to put

11    those properties up, we would reserve the right to seek a Nebia

12    hearing at that time.  It may be cleaner for everybody if the

13    parents' property is used in the first instance.

14              THE COURT:  Okay.  Do you know what the -- I think

15    you may have mentioned it.  The parents have equity in their

16    home of what?

17              MR. MCDERMOTT:  Yes, sir.  It's my understanding at

18    least $500,000.  And I don't necessarily disagree with the

19    government's position.  If the Court's concerned about that, if

20    it's a reasonable amount we can work with, I would rather

21    perhaps have the parents involved than the other properties.  I

22    don't want it to be an issue later on for the Court to have to

23    be concerned with.

24              THE COURT:  All right.  Well, here's what I'm -- what

25    I'm considering.  What I'm considering doing is setting a bond
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1185

 1    that's going to have to be fully secured with some property,

 2    and I will give the parties some period of time to see if they

 3    can work that out.

 4            And in the meantime, what I would do is require him

 5    to wear an ankle bracelet, in other words, location monitoring

 6    with GPS.  He'd reside in this -- in the Central District in

 7    this Airbnb, and I would assume by Friday we could have this

 8    property worked out.  And then I think the way this would work

 9    is that he -- is he going to fly back to Oregon?

10            MR. MCDERMOTT:  Yes, sir.

11            THE COURT:  Okay.  I think he can work out with

12    Pretrial Services to take that bracelet off when getting on the

13    plane.  I think the airlines don't want you to fly with it, but

14    you can take it off.

15            He gets to Oregon, puts it back on, reports

16    immediately to Pretrial Services in Portland where they will

17    give a new bracelet or use that one.

18            And I'm trying to confirm -- they're trying to

19    confirm now that Portland can do GPS monitoring.

20            So that's sort of my suggestion.

21            So he -- and I'd give him some time.  He's got -- he

22    can sign an appearance bond, but at some point before he goes

23    back to Oregon -- and, hopefully, you'll be able to -- in the

24    next 48, 72 hours be able to work out what the property is and

25    to meet this bond.

App. 1186

Case 2:23-cv-04498-PA    Document 1-5 Filed 06/05/23    Page 776 of 786   Page ID #:479
Case 2:16-cr-00213-PA    Document 61 Filed 07/06/17    Page 80 of 96   Page ID #479
#:1218

```
1              MR. MCDERMOTT:  Right.

2              The government and I had some discussions, and let me

3    see if I can pose this to the Court.

4              It wouldn't take us long -- and I've already been

5    talking to a bondsman who is checking on the equities of the

6    parents' home as we speak.  I'd like to get that cleared.

7              And it was in an agreement that I hope we can

8    convince the Court would be appropriate -- is to give us --

9    release the man today, conditions that he's not working in the

10   business, and give us until two weeks from yesterday to fully

11   have everything to the government, all the paperwork done and

12   whatever other terms and conditions that the Court wants,

13   including, if I can't convince the Court not to do the

14   bracelet, to at least, rather than going through the headache

15   of taking it off and putting it back on when you get up there,

16   get the confirmation from Portland that they can do it, send

17   him back as soon as possible.

18             We'll finish up the paperwork, as long as the

19   government is satisfied and the Court's satisfied, and we'll

20   submit long before that Monday the fully encumbered, or

21   whatever the Court may need, on that parents' property, sign

22   off on any documents and paperwork the Court wants, any

23   promises, whatever, and let the government and I work out --

24   and if it turns out it doesn't, then the two of us will be back

25   here on that Monday and face the consequences.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1187

```
 1              THE COURT:  Okay.  I guess the only rub that I --

 2    generally, I don't have a problem with that.  The only rub I

 3    have is that -- when is he ready to return to Portland?

 4              MR. MCDERMOTT:  Sir, I can put him on a plane

 5    tomorrow.

 6              THE COURT:  Okay.

 7              MR. MCDERMOTT:  All right?  Right away, and the first

 8    thing he'll do getting off the plane is to march right into

 9    Pretrial Services.

10              THE COURT:  Okay.  I guess my view -- my view is if

11    he wants -- if he wants to leave tomorrow, that's fine, but

12    he's going to need that bracelet.  And once he arrives in

13    Portland, it's going to be home confinement, subject to --

14              MR. MCDERMOTT:  Church.

15              THE COURT:  -- church, medical reasons.

16              MR. MCDERMOTT:  Can I put him on that -- can we agree

17    that he gets on that plane tomorrow and the first thing he does

18    is check into Portland and gets that bracelet situation

19    hammered out?  Or are you going to require us to get one here

20    and then take it off tomorrow?

21              I'll do my best to offer to the Court I'll make sure

22    it gets it done tomorrow when he gets back to Portland.

23              THE COURT:  The only -- well, if he wanted to -- I

24    assume you wanted to try to get him out today?

25              MR. MCDERMOTT:  Yes, sir.
```

App. 1188

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 778 of 786    Page ID
#:1220
Case 2:16-cr-00215-PA    Document 61    Filed 07/06/17    Page 88 of 98    Page ID #:481

```
 1                THE COURT:  Then he needs that bracelet.

 2                MR. MCDERMOTT:  Okay.  Would that be through Pretrial

 3    Services here, then?

 4                THE COURT:  Yeah, they can put one on this afternoon.

 5                MR. MCDERMOTT:  Okay.

 6                THE COURT:  I don't --

 7                MR. MCDERMOTT:  I just want to make sure I can get an

 8    order from the Court to have them do that.

 9                THE COURT:  I'm going to call them.  They will meet

10    you over there and they'll put it on.

11                MR. MCDERMOTT:  All right.

12                THE COURT:  Okay?  And the only thing, I guess, that

13    we need to do is to figure out what this bond amount is going

14    to be.  And what you're saying is you won't know the equity in

15    the parents' home until --

16                MR. MCDERMOTT:  I've got somebody working on it right

17    now.  I'd like to be able to tell the Court I can do it -- if I

18    can reach the person -- 20 minutes, 30 minutes, if I can reach

19    him.  He's already given me the estimates for the most part on

20    the properties on the list, at least the primary home and some

21    other properties.  So I know he's got the capability.  I just

22    don't know how busy he is right now.

23                THE COURT:  Okay.  And your best guess is that the

24    parents' -- the equity in the parents' home is somewhere

25    between 4- and $500,000?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1189

```
 1              MR. MCDERMOTT:  Yes, sir.

 2              THE COURT:  Okay.  And he's got another -- and he's

 3    got another $700,000 either in banks or in investments?

 4              MR. MCDERMOTT:  That appears to be correct.

 5              THE COURT:  I'm sorry?

 6              MR. MCDERMOTT:  That appears to be correct.

 7              THE COURT:  Okay.  And I guess I haven't done this in

 8    a while.  So if I had $500,000 in the bank, I guess we could

 9    make this bond that it's cash or secured by property, correct?

10              MR. MCDERMOTT:  Cash or secured by property?

11              THE COURT:  Any combination of cash, real property.

12              MR. MCDERMOTT:  Okay.  Yes, sir.

13              THE COURT:  Right?

14              MR. MCDERMOTT:  Right.

15              THE COURT:  And he can either -- I guess somehow

16    either put up those funds that he's got in those accounts or go

17    out and get a bail bondsman and pay for it, right --

18              MR. MCDERMOTT:  Yes, sir.

19              THE COURT:  -- and/or the real property.

20              MR. MCDERMOTT:  Or encumber the parents' property

21    sure.  Yes, sir.

22              THE COURT:  Okay.  And we'll give him some amount of

23    time to do that.

24              MR. MCDERMOTT:  Yes, sir.

25              THE COURT:  And in the meantime, he will wear the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1190

```
 1   bracelet, sign an appearance bond for whatever amount we come

 2   up with and that subsequently he's going to secure this amount?

 3          MR. MCDERMOTT:  Yes, sir.

 4          THE COURT:  And you want a week or something?

 5          MR. MCDERMOTT:  Hopefully, sir.  The government and I

 6   discussed it would be two weeks from yesterday, so it would be

 7   a Monday.  That way if there was an issue, we know it's an open

 8   date for the Court, we'd come in and at least show good faith

 9   that we couldn't for whatever reason.

10          THE COURT:  That's fine.

11          MR. MCDERMOTT:  All right.

12          THE COURT:  Okay.

13          MR. MCDERMOTT:  Can I check real quick, too?  Because

14   when the order goes in, I want to make sure exactly the time of

15   the flight out that we can get done, and I believe the wife may

16   have that information.  So I want to just make sure when the

17   order goes in, that when they put the bracelet on, that there

18   is a time tomorrow that they can take it off so he can make

19   that flight.

20          THE COURT:  He can -- that's fine, but he can work

21   all that out with Pretrial.

22          MR. MCDERMOTT:  All right.  As long as they accept

23   his word and the wife's word, I'm fine with that.

24          THE COURT:  He can work all that out with Pretrial

25   Services.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1191

```
 1            MR. MCDERMOTT:  All right.

 2            THE COURT:  And if there's an issue --

 3            MR. MCDERMOTT:  I'll have him call.

 4            THE COURT:  -- they can call.

 5            Okay.  So I'm going to -- based on what I have here,

 6    I'm going to -- and let me make sure I understand that his

 7    income now is made up from Holter Labs.

 8            MR. MCDERMOTT:  That's correct, sir.  Direct, as

 9    opposed to passive where there's some income coming in on

10    rental properties.

11            THE COURT:  Okay.  And he's got income coming in from

12    rental properties?

13            MR. MCDERMOTT:  Yes, sir.

14            THE COURT:  Okay.  They used to give us, I thought,

15    what his expenditures are.

16            MR. MCDERMOTT:  They asked that.  It was in the range

17    of 4- to $5,000 a month.  I heard him say that to the Pretrial

18    Services individual today.

19            THE COURT:  Okay.  All right.  What I'm going to do

20    is I'm going to set a bond of a million dollars made up of

21    cash, security.  He'll sign a promise today to -- for a

22    million.

23            If after -- within this next two weeks, if your

24    position is that's too much or it's based on whatever, you can

25    come in and ask me to modify that.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1192

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 782 of 786    Page ID
#:1224
Case 2:16-cr-00219-PA    Document 61-5    Filed 09/08/17    Page 92 of 96    Page ID #:485

```
 1              And that million dollars is made up of -- secured by

 2   real property and/or cash.

 3              MR. MCDERMOTT:  All right.  And just so I'm clear on

 4   the Court's requirements, if the parents' property, let's say

 5   hypothetically, comes in with an appraisal of 1.1 million,

 6   would that suffice to cover the million for the Court?

 7              THE COURT:  Yep.

 8              MR. MCDERMOTT:  All right.  All right.

 9              THE COURT:  Do you have any disagreement with that?

10              MR. FREEDMAN:  No, Your Honor.

11              THE COURT:  Okay.

12              MR. MCDERMOTT:  And the cash deposit would be with

13   the clerk of court here?  With the government?  How would the

14   Court like to have that done?

15              THE COURT:  We'll work that out in the next couple of

16   weeks.

17              MR. MCDERMOTT:  Okay.  I just want to make sure

18   we're -- I'd like to have this completed and presented to the

19   Court long before that Monday so we don't have to take the

20   Court's time.

21              THE COURT:  Okay.

22              MR. MCDERMOTT:  All right?

23              THE COURT:  Okay.  And so I guess we'll prepare -- so

24   his travel is going to be restricted to the Central District of

25   California and Oregon.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1193

Case 2:23-cv-04498-PA    Document 1-5    Filed 06/05/23    Page 783 of 786    Page ID
#:1225
Case 2:16-cr-00218-PA    Document 61    Filed 09/06/17    Page 93 of 96    Page ID #:486

```
 1              MR. MCDERMOTT:  I'm not sure -- is there more than

 2   one district up there?  Yeah, so the District of Oregon.

 3              THE COURT:  Okay.  And he's already surrendered his

 4   passport?

 5              MR. MCDERMOTT:  Yes, sir.

 6              THE COURT:  And he's going to agree not to relocate

 7   without PSA.  He's going to be basically staying at home --

 8              MR. MCDERMOTT:  Yes, sir.

 9              THE COURT:  -- with a GPS monitor.

10              And he's going to avoid any contact with any

11   witnesses who testified in this case, not possess any firearms.

12              Is there any other property that's outside -- other

13   than this property in Honduras?

14              MR. FREEDMAN:  Not that we're aware of.

15              MR. MCDERMOTT:  No, sir, not that I am aware of.

16              THE COURT:  And what's the value of the property

17   that's in Honduras?  Do you know?

18              MR. FREEDMAN:  Approximately $650,000.

19              THE COURT:  And do we know how much equity is in that

20   property?

21              MR. MCDERMOTT:  We don't know.  The Honduran property

22   may have about a hundred in equity.

23              THE COURT:  Okay.  Okay.  So we'll sign -- you need a

24   release for him?

25              THE OFFICER:  Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1194

Case 2:23-cv-04498-PA    Document 1-5  Filed 06/05/23    Page 784 of 786   Page ID
Case 2:16-cr-00215-PA    Document 61  Filed 07/06/17   Page 94 of 96   Page ID #:487
#:1226

```
 1              THE COURT:  If he's got to put on an ankle bracelet,

 2    do we release him to Pretrial Services?

 3              THE OFFICER:  That's correct, Your Honor.

 4              MR. MCDERMOTT:  And that would be back at Roybal?

 5              THE OFFICER:  Yes.

 6              THE COURT:  So if you like, I'll contact pretrial and

 7    confirm they're going to be able to meet you over there to give

 8    him his bracelet.

 9              MR. MCDERMOTT:  Yes, sir.

10              THE COURT:  Anything else?

11              MR. MCDERMOTT:  Just for the Court's edification,

12    plane tickets are available 11 o'clock tomorrow.  The flight

13    leaves tomorrow.

14              THE COURT:  At 11:00?

15              MR. MCDERMOTT:  Yes, sir.

16              THE COURT:  Okay.

17              MR. MCDERMOTT:  LAX.

18              THE COURT:  To Portland?

19              MR. MCDERMOTT:  Oh, Long Beach to Portland.

20              THE COURT:  Okay.  Just make sure that you notify

21    Pretrial of what the itinerary is and when you expect -- and

22    then when they get to Portland, they should report to Pretrial

23    Services in Portland.

24              Okay.  Anything else?

25              MR. FREEDMAN:  No, Your Honor.  Thank you.
```

App. 1195

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 785 of 786   Page ID
Case 2:16-cr-00218-PA   Document 61   Filed 07/00/17   Page 99 of 96   Page ID #9488
#:1227

```
 1              MR. MCDERMOTT:  No, sir.

 2              THE COURT:  If you want to wait, I'll have the

 3      clerk -- I'm pretty sure pretrial -- if there's a problem,

 4      we'll notify.  Maybe it's best they get him back over there,

 5      and then if there's going to be a problem with pretrial, she

 6      has your cell phone.

 7              MR. MCDERMOTT:  She does.

 8              THE COURT:  Okay.  And we'll notify you, but I don't

 9      anticipate there's going to be a problem.

10              Okay.  Thank you very much.

11          (Proceedings concluded 3:07 P.M.)

12                          --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:23-cv-04498-PA   Document 1-5   Filed 06/05/23   Page 786 of 786   Page ID
Case 2:16-cr-00218-PA   Document 81-5   Filed 07/06/17   Page 96 of 96   Page ID #:489
#:1228

```
 1

 2

 3                          CERTIFICATE

 4

 5       I hereby certify that pursuant to Section 753,

 6   Title 28, United States Code, the foregoing is a true and

 7   correct transcript of the stenographically reported

 8   proceedings held in the above-entitled matter and that the

 9   transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date: JULY 6, 2017

13

14

15

16

17            /s/  Cindy L. Nirenberg, CSR No. 5059

18                      Official Court Reporter

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

App. 1197